1  Harvey L. Leiderman (SBN 55838)
   Email: HLeiderman@reedsmith.com
2  Tita K. Bell (SBN 206735)
   Email: TKBell@reedsmith.com
3  REED SMITH LLP
   Two Embarcadero Center, Suite 2000
4  San Francisco, CA 94111-3922

5  **Mailing Address:**
   P.O. Box 7936
6  San Francisco, CA 94120-7936

7  Telephone:    415.543.8700
   Facsimile:    415.391.8269
8
   Attorneys for Plaintiff Amisil Holdings Ltd.
9

**ORIGINAL FILED**

AUG 28 2006

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-Filing

*(left margin vertical text:)* REED SMITH LLP — A limited liability partnership formed in the State of Delaware

10          UNITED STATES DISTRICT COURT

11          NORTHERN DISTRICT OF CALIFORNIA

MJJ

12

13  AMISIL HOLDINGS LTD., a Cyprus
    Corporation,
14
              Plaintiff,
15
       v.
16
    CLARIUM CAPITAL MANAGEMENT, LLC
17  f/k/a/ THIEL CAPITAL MANAGEMENT, LLC,
    a Delaware Limited Liability Company, PETER
18  ANDREAS THIEL, a California resident, JASON
    PORTNOY, a California resident, MARK
19  WOOLWAY, a California resident,
20
              Defendants.
21

Civil Case No.: C 06 52551

**COMPLAINT FOR:**

**1. VIOLATION OF SECURITIES
EXCHANGE ACT OF 1934 SEC. 10(b),
15 U.S.C. § 78j(b), AND RULE 10b-5,
17 C.F.R. § 240.10b-5
2. VIOLATION OF INVESTMENT
ADVISERS ACT OF 1940, 15 U.S.C. § 80b-1
ET SEQ.
3. FRAUD (DECEIT)
4. CONVERSION
5. BREACH OF FIDUCIARY DUTY
6. CONSPIRACY
7. BREACH OF CONTRACT
8. BREACH OF IMPLIED COVENANT OF
GOOD FAITH AND FAIR DEALING
9. UNFAIR BUSINESS PRACTICES, CAL.
BUS. & PROF. CODE § 17200 ET SEQ.
10. ACCOUNTING AND CONSTRUCTIVE
TRUST
11. PRELIMINARY AND PERMANENT
INJUNCTION**

**AND DEMAND FOR JURY TRIAL**

22

23

24

25

26

27

28

Plaintiff Amisil Holdings Ltd. states as follows:

### NATURE OF THE ACTION AND RELIEF SOUGHT

1.     Through an elaborate shell game, Defendants Clarium Capital Management, LLC and Peter A. Thiel have confiscated Amisil's investment in Clarium and appropriated Amisil's share of the company's profits for themselves.

2.     Amisil Holdings Ltd. ("Amisil") is a long-time investor in Defendant Clarium Capital Management, LLC, f/k/a Thiel Capital Management, LLC ("Clarium"). Clarium, a registered investment adviser, reportedly manages $2 billion in investors' funds. Defendant Peter Thiel ("Thiel") dominates Clarium and its investment portfolio. Thiel and the other individual codefendants, acting individually and on behalf of Clarium, have oppressed and continue to oppress Amisil's rights as holder of a minority membership interest in Clarium. Defendants have also repeatedly breached the company's Subscription Agreement and Operating Agreement to Amisil's continuing damage. Through a pattern and practice of unlawful activity, Defendants have deprived Amisil of the true value of its investment.

3.     This is an action for securities fraud in violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder and the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6. This is also an action for common law fraud, conversion, breach of fiduciary duty, conspiracy, breach of contract, breach of implied covenant of good faith and fair dealing, violation of California Business and Professions Code section 17200 set seq., accounting and constructive trust, and preliminary and permanent injunction.

### JURISDICTION

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, for alleged violation of the Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 and for alleged violation of the Investment Advisers Act of 1940. This Court also has jurisdiction in this matter pursuant to 28 U.S.C. § 1332 (a) in that this is a civil action arising between citizens of different states and countries, and the matter in controversy exceeds the

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

sum of $75,000 exclusive of interest and costs. This Court also has supplemental jurisdiction over the remaining causes of actions alleged herein pursuant to 28 U.S.C. § 1387.

## VENUE

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) as Clarium resides and conducts business in this district, the individual Defendants reside in the County of San Francisco, and a substantial part of the events or omissions giving rise to this action arose in the Counties of San Mateo and San Francisco.

## INTRADISTRICT ASSIGNMENT

6.      This action must be assigned to the San Francisco or Oakland Divisions of this District pursuant to Civil L.R. 3-2(d) because a substantial part of the events or omissions giving rise to this action arose in the County of San Mateo.

## PARTIES

7.      Plaintiff Amisil is a corporation organized and existing under the laws of Cyprus with its principal place of business in Bermuda.

8.      Defendant Clarium is a limited liability company organized and existing under the laws of the state of Delaware with its principal place of business in San Francisco, California.

9.      Defendant Thiel was at all relevant times the majority member and Managing Member of Clarium and is an individual who resides in the State of California. Amisil is informed and believes and thereon alleges that Thiel resides in San Francisco, California.

10.     Defendant Jason Portnoy ("Portnoy") was at all relevant times Chief Financial Officer of Clarium. Amisil is informed and belies and thereon alleges that Portnoy resides in San Francisco, California.

11.     Defendant Mark Woolway ("Woolway") was at all relevant times Managing Director of Clarium. Amisil is informed and belies and thereon alleges that Woolway resides in San Francisco, California.

COMPLAINT

**SUMMARY OF CLAIM**

12.    Defendant Thiel is a Silicon Valley financier and entrepreneur.  He is a co-founder and the former Chief Executive Officer of PayPal, the publicly traded on-line payment service acquired by eBay for $1.5 billion in 2002.  The sale made Thiel an instant multimillionaire.

13.    Defendant Clarium is a global macro hedge fund manager reportedly managing over $2 billion in investor capital.  Since October 2002, new investors in Clarium reportedly have more than tripled their investment.  In 2003, and again in 2005, Clarium reportedly had net returns of over 50%.  At all times relevant to this Complaint, Clarium has received a management fee and/or a substantial portion of the annual profits earned for its investor clients.

14.    Amisil has been a minority member of Clarium since 1998.  Pursuant to Clarium's Operating Agreement and applicable law, Amisil is entitled to certain benefits for its ownership interest.  In the early years, Thiel expressly led Amisil to believe that its minority interest was nearly worthless.  Indeed, shortly after PayPal's initial public offering in 2002, Thiel proposed to buy Amisil out of Clarium for $372, which Thiel deceitfully represented was the fair market value for Amisil's interest at that time.  In reality, however, and unbeknownst to Amisil, the fair market value of Amisil's interest was many multiples of the amount being offered.  Moreover, in light of events that occurred just two months after Thiel's $372 offer, the true value of Amisil's interest in Clarium escalated to more than a thousand times that amount, again unbeknownst to Amisil.  Amisil rejected the buy-out offer in 2002 and instead remained a minority member of Clarium, waiting for its investment to continue to mature.

15.    For the next three years, Clarium and Thiel gave Amisil no information about its investment in Clarium.  It was not until early this year that Amisil learned for the first time that Clarium had begun managing hedge funds with assets in excess of $1.5 billion.  Shortly thereafter, Amisil also learned that Clarium, at the direction of Thiel, had quietly bought out all the other investors in Clarium so that Thiel and Amisil were the only remaining members.  Further, Amisil learned for the first time that Clarium had made a $31 million (or more) distribution to Thiel personally out of its calendar year 2005 profits.  No distribution was made to Amisil for that year -- or for any other period.  Upon learning of Thiel's sizeable distribution, Amisil sought to exercise

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   its contractual rights as a member of Clarium, requesting past due financial statements and other

2   related documents from Clarium in an effort to ascertain the extent and value of its interest in the

3   company.  In response, Clarium, at the direction of Thiel, unilaterally and unlawfully issued a notice

4   claiming to expel Amisil as a member of Clarium and confiscating Amisil's share of the company, at

5   a fraction of its value.

6       16.    In short, Defendants have fraudulently seized control over Amisil's property,

7   deprived Amisil of its rightful distributions and oppressed Amisil as a minority member of Clarium.

8   These are the facts that warrant the filing of this lawsuit.

9

10  **BACKGROUND AND GENERAL ALLEGATIONS**

11  **Chronology of Events**

12      17.    On or about September 5, 1996, Clarium became a registered investment advisor with

13  the federal Securities Exchange Commission.

14      18.    On December 19, 1997, Thiel solicited Amisil to invest in Thiel Capital International,

15  LLC (the "Fund") and Clarium.  Both entities had principal offices located in Menlo Park,

16  California.  Clarium was the investment adviser to the Fund.  As part of Thiel's inducement of

17  Amisil to enter into the transaction, Thiel provided Amisil with operating agreements for the Fund

18  and Clarium.  Attached hereto as Exhibits A and B are true and correct copies of the Operating

19  Agreement of Thiel Capital International, LLC (the "Fund's Operating Agreement"), and the

20  Operating Agreement of Thiel Capital Management, LLC ("Clarium's Operating Agreement"), both

21  of which are dated September 9, 1996.

22      19.    On February 27, 1998, based upon the materials presented and Thiel's

23  representations, Amisil entered into a subscription agreement with the Fund and Clarium.  Attached

24  hereto as Exhibit C is a true and correct copy of the Subscription and Investment Representation

25  Agreement entered into between Amisil, Thiel Capital International, LLC, and Thiel Capital

26  Management, LLC (n/k/a Clarium Capital Management, LLC), dated February 27, 1998

27  ("Subscription Agreement").  According to the Subscription Agreement, upon Amisil's investment

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    of $300,000, Amisil would receive a 1% membership interest in Clarium. On February, 1998,

2    Amisil paid $300,000 to the Fund and Clarium.

3        20.     According to the Fund's Operating Agreement, Clarium, as the Manager of the Fund,

4    earned a 20% performance bonus annually for its services to the Fund, which is referred to in the

5    operating agreement for the Fund as an "incentive allocation." See Exhibit A, the Fund's Operating

6    Agreement, section 4.1.

7        21.     Additionally, Clarium, as the Manager of the Fund, earned a management fee equal to

8    1% per annum of each Capital Contribution made by a Member through the end of the Fiscal

9    Quarter in which such Capital Contribution is made. On the first day of each Fiscal Quarter

10   thereafter, Clarium earned a fee in an amount equal to 0.25% of the value of such Member's

11   Opening Capital Account balance as defined in the Fund's Operating Agreement. See Exhibit A,

12   section 6.6 (c).

13       22.     On or about March 31, 1999, after a year of poor performance by the Fund, Amisil

14   withdrew the remaining balance of its investment in the Fund, which was less than its initial capital

15   contribution. However, Amisil retained its full membership interest in Clarium.

16       23.     In December 1998, the Fund made a private equity investment and was the sole seed

17   investor into a new company called Field Link, which was renamed Confinity shortly thereafter, then

18   ultimately renamed PayPal, Inc. ("PayPal"). The Fund obtained a substantial ownership interest in

19   PayPal in return for its investment therein. Thiel also obtained a substantial interest in PayPal,

20   personally. PayPal was in the business of providing payment services for on-line business

21   transactions.

22       24.     By January 1999, as a part of and/or in addition to this seed investment, Thiel became

23   CEO of FieldLink, later PayPal.

24       25.     During the relevant time period, Portnoy served as Vice President of Financial

25   Planning and Analysis at PayPal. As a senior member of PayPal's financial team, Portnoy was

26   responsible for the corporate financial model, M&A due diligence, and communications with the

27   investment community.

28

26.    During the relevant time period, Woolway served as Vice President of Corporate Development at PayPal.  Woolway was responsible for PayPal's private financing and oversaw its buy-side M&A activity.  Woolway led the execution of PayPal's $80 million initial public offering.

27.    According to year-end financial statements for 1998 and 1999 provided by the Fund and Clarium's accountants, Ernst & Young, LLP, Clarium reinvested its annual management earnings (including that portion distributable to Amisil's interest) back into the Fund.  At the end of fiscal year 1999, Clarium owned at least 15% of the Fund.

28.    On February 14, 2002, PayPal conducted an initial public offering ("IPO") of its shares in the public markets.  By its second day of trading, Thiel's personal stake in PayPal was in excess of $100 million while the Fund's estimated stake was, at a minimum, of $24 million.  As manager of the Fund and an investor in the Fund, Clarium's stake in PayPal was worth approximately $4.9 million.

29.    On or about May 2, 2002, at the behest of Thiel, Clarium attempted to buy out Amisil's membership interest in Clarium for $372.  Attached hereto as Exhibit D is a true and correct copy of correspondence, dated May 2, 2002, sent by Peter Thiel of Thiel Capital Management, LLC (n/k/a Clarium Capital Management, LLC), to Amisil.

30.    Shortly thereafter, in June and July 2002, PayPal, via the efforts of Thiel, Portnoy and Woolway, completed a $131.1 million secondary public offering of 6.9 million shares.

31.    On July 8, 2002, PayPal announced that it would be sold to eBay, Inc. ("eBay") for approximately $1.54 billion.

32.    On October 3, 2002, eBay completed the purchase of PayPal for $1.5 billion in stock.  On the same date, Thiel announced his resignation from PayPal effective immediately.

33.    On January 23, 2003, according to the state of California Department of Corporations, Clarium changed its name to Clarium Capital Management, LLC.

34.    On February 19, 2003, Thiel, on behalf of Clarium, wrote to Amisil regarding certain proposed changes to Clarium's Operating Agreement.  Among the changes would be a new provision purporting to authorize the Managing Member of Clarium to remove a member without the member's consent.  Shortly thereafter, pursuant to section 10.4 of Clarium's Operating

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    Agreement, Amisil objected in writing to some of the proposed changes to Clarium's Operating

2    Agreement, including specifically the provision concerning removal of a member without consent.

3        35.    During 2002, 2003, 2004 and 2005, Clarium failed to make any distributions to

4    Amisil, issue any tax returns or disclose any of its operations to Amisil.

5        36.    On February 9, 2006, Portnoy and Woolway, officers of Clarium, left a voicemail

6    message for Amisil about "clearing up some old records" that were discovered as part of their work

7    effort for their registration with the Securities Exchange Commission.

8        37.    On March 1, 2006, Amisil learned that Clarium was managing a hedge fund with

9    more than $1.5 billion in assets.

10        38.    On March 14, 2006, Portnoy and Woolway met with Amisil in San Francisco to

11    discuss Amisil's interests in Clarium. At that meeting, Portnoy and Woolway informed Amisil that

12    Clarium now had only two members: Thiel and Amisil, with Thiel holding 98.66%. Reportedly all

13    other members in Clarium had been bought out in 2002. At the meeting, Portnoy also stated that for

14    calendar year 2005, (1) Clarium's revenues were $72 million; (2) its operating costs were

15    $11 million; (3) it paid $30 million in bonuses to employees; and (4) it distributed $31 million to

16    Peter Thiel.

17        39.    Since the inception of its membership interest in Clarium, Amisil has received no

18    annual or quarterly financial documents relating to Clarium and/or its interests. Consequently, in

19    light of the information that Clarium actually had revenue in 2005 and that multi-million dollar

20    distributions were made to the other member (Thiel), on March 20, 2006, Amisil made a written

21    request to inspect certain books and records of Clarium (the "requested documents") as provided by

22    the Operating Agreement.

23        40.    On March 21, 2006, Portnoy informed Amisil that the requested documents would be

24    forthcoming. It later became apparent that this was merely a delay tactic and Defendants had no

25    intention of producing the requested documents to Amisil.

26        41.    On May 2, 2006, Thiel proposed to buy out Amisil's membership interest.

27

28

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

42.     On June 14, 2006, Thiel made a verbal offer of $300,000 for Amisil's interest in Clarium, which Thiel claimed had been reduced to a fraction of Amisil's vested interest. Amisil informed him that any offer would be difficult to assess without first reviewing Clarium's books.

43.     On June 22, 2006, Clarium proposed that a third-party appraiser value Amisil's purportedly reduced membership interest, but again refused to allow Amisil access to Clarium's books and records.

44.     On July 17, 2006, Amisil made another request to inspect Clarium's books and records, this time by means of a formal written notice to Clarium to inspect its books and records pursuant to Amisil's rights as a member of Clarium.

45.     In response to Amisil's exercise of its right to inspect Clarium's books and records, on July 20, 2006, Thiel, in his capacity as Managing Member of Clarium, purported to expel Amisil as a member of Clarium and acquire its interest, effective July 26, 2006. Attached hereto as Exhibit E is a true and correct copy of correspondence, dated July 20, 2006, sent by Clarium's General Counsel to Amisil's counsel. In connection with this forced sale, not only did Clarium wrongfully assert that it had the unilateral authority to make such a forced sale, but, in its previous correspondence regarding a buy-out, Clarium wrongfully asserted that Amisil had only a 0.3% interest in Clarium. Thus, by virtue of Clarium's July 20, 2006 to Amisil, it was apparent that that the purported purchase by Clarium of Amisil's membership interest would be far less than its actual value.

46.     Clarium's Operating Agreement, section 4.1, provides in relevant part:

**Allocations of Clarium Profits and Losses.**

(a)     General. Except as otherwise provided in this Section 4.1, the items of Profit and Loss of Clarium for each fiscal quarter (or shorter period selected by the Managing Member) shall be allocated as follows:

(i)     Items of Profit and Loss attributable to Incentive Fees and to Management Fees shall be allocated among the Members in proportion to their respective Membership Interests.

(ii)     All other items of Profit and Loss shall be allocated among the Members in proportion to their respective Capital Contributions.

(iii)     Items of loss, expense or deduction attributable to Clarium's indemnification obligation under Section 9.2 shall be allocated among the Members in proportion to their respective Membership Interests.

47.    Section 5.1 of Clarium's Operating Agreement provides in relevant part:

**Discretionary Distributions.**

The Managing Member in his sole discretion shall determine the amount and timing of all distributions by Clarium and whether such distributions will be in cash or in kind or partly in cash and partly in kind. Except as otherwise provided herein, all distributions shall be made in proportion to the Members' closing Capital Account balances determined as of the close of the allocation period for which such distribution occurs. Distributions in kind shall be made at valuations determined as provided in Section 6.10.

48.    For fiscal year 2005, Thiel, the Managing Member of Clarium, received a $31 million distribution. For that same fiscal year, and since becoming a member of Clarium in 1998, Amisil has received no distributions whatsoever.

49.    Section 6.9 of Clarium's operating agreement provides in relevant part:

**Records and Financial Statements.**

(a)    Clarium shall maintain true and proper books, records, reports, and accounts in which shall be entered all transactions of Clarium. Such books, records, reports and accounts shall be located at the Principal Office and shall be available to any Member for inspection and copying during reasonable business hours.

(b)    Clarium shall maintain all Schedules to this Agreement and shall update such Schedules promptly upon receipt of new information relating thereto. Schedules to this Agreement shall be treated as records of Clarium for purposes of Section 6.9(a).

(c)    Within 90 days after the end of each Fiscal Year, Clarium shall furnish to each Member a statement of (i) the assets and liabilities of Clarium, (ii) the net Profit or Loss of Clarium, and (iii) the Capital Account balance of such Member. In addition, within 90 days after the end of each Fiscal Year, Clarium shall supply all information reasonably necessary to enable the Members to prepare their Federal income tax returns and (upon request therefor) to comply with other reporting requirements imposed by law.

(d)    Within 30 days after the value of any asset is determined pursuant to Section 6.10, Clarium shall furnish to each Member a statement identifying the asset valued and the value determined therefor.

(e)    Clarium shall promptly deliver to the Members copies of all financial reports delivered by the Fund to its constituent members.

50.    Despite multiple requests for such information, Amisil has received no yearly and/or quarterly statements for Clarium or the Fund since becoming a member of Clarium.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**FIRST CLAIM FOR RELIEF**

**Violation of § 10(b) of the Securities Exchange Act of 1934,
15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5
Against All Defendants**

51.     Plaintiff re-alleges paragraphs 1 through 50 of this Complaint as if fully set forth herein.

52.     Amisil's minority interest in Clarium was acquired pursuant to an investment contract, and is therefore a "security" as defined in the Securities Act of 1933, 15 U.S.C. § 77b(a)(1), and the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(1).  Amisil invested its money in a common enterprise and was led to expect profits solely from the efforts of Clarium.  As an investor, Amisil had no meaningful control over its investment.  Amisil was a passive investor relying on the efforts of Clarium and its Managing Member, Thiel.

53.     Defendants' attempt to expel Amisil as a member of Clarium was null and void because Clarium's Operating Agreement specifically prohibits the removal of a member without its consent (see Exhibit B, section 7.3).  Further, the attempted purchase and sale of Amisil's interest was aborted due to Defendants' fraud.  Alternatively, if such expulsion is deemed to be effective, the forced confiscation of Amisil's minority interest in Clarium without a proper accounting and far less than its value amounted to a purchase and sale of that security.

54.     In connection with the purchase and sale of Amisil's security, Defendants disseminated false statements and/or concealments described above, which they knew or recklessly disregarded were materially false and misleading, in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made not misleading.  Defendants engaged in a scheme to defraud Amisil and/or acts and practices that operated a fraud on Amisil by forcing the sale of Amisil's membership interest in Clarium at a fraction of its value, while failing to furnish any information that would have allowed Amisil to determine the value of its membership interest and refusing to allow Amisil access to Clarium's books and records to which it is legally and contractually entitled.

55.     Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

misrepresent and conceal material information about Clarium from Amisil, employ a scheme to defraud Amisil and operate a fraud on Amisil in the following manner, among others:

    (a)    Defendants have maintained in connection with the aborted July 26, 2006 sale of Amisil's interest that Amisil had a 0.3% membership interest (rather than at least a 1% interest), yet Defendants have not disclosed the basis on which that reduced membership interest was calculated, or the basis on which the value of such an interest would be calculated; and

    (b)    Defendants have also failed to furnish any financial information to Amisil or provide Amisil access to Clarium's books and records so that Amisil could independently ascertain the fair market value of its interest in Clarium's securities.

56.    Culminating with the purported confiscation of its membership interest in Clarium, Amisil relied on Defendants' manipulative and deceptive conduct, to its detriment. During the course of the said misrepresentations and concealments, Amisil was ignorant of their falsity or concealment and believed the false statements to be true. Had Amisil known of the truth, which was never disclosed to it by Defendants, Amisil would have demanded an immediate accounting and, absent voluntary acquiescence by Clarium, would have immediately filed legal action to block further wrongful acts and to secure damages.

57.    As a result of Defendants' manipulative and deceptive conduct, Amisil has been deprived of a proper accounting, of any unpaid distributions due in connection with its eight-year membership interest in Clarium, and the current fair market value of its interest in Clarium.

58.    Defendants' manipulative and deceptive conduct was the proximate cause of Amisil's loss. This loss was clearly foreseeable to Defendants when they engaged in the fraudulent conduct described herein.

59.    As a result of the acts and omissions alleged herein, Amisil has been damaged in an amount subject to proof at the time of trial, which amount exceeds $75,000.00, excluding attorneys' fees and costs of suit.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## SECOND CLAIM FOR RELIEF

### Violation of the Investment Advisers Act of 1940 15 U.S.C. § 80b-1 et seq.
### Against All Defendants

60.    Plaintiff re-alleges paragraphs 1 through 59 of this Complaint as if fully set forth herein.

61.    The acts and omissions of Defendant Clarium, aided and abetted by Defendants Thiel, Portnoy and Woolway, set forth above and incorporated herein, have resulted in Clarium's acquisition of control over securities owned by Amisil.  As such, Clarium, a registered Investment Adviser, has assumed a fiduciary relationship with Amisil as its client.

62.    Defendant Clarium, aided and abetted by its principals Defendants Thiel, Portnoy and Woolway, has, by use of the mails or other means or instrumentality of interstate commerce, engaged in acts and practices that were fraudulent, deceptive, and manipulative.  Among other things, Defendants knowingly made misrepresentations to Amisil as to the value of Amisil's membership interest while attempting on several occasions to involuntarily acquire Amisil's stake in Clarium for less than the amount to which Amisil is entitled.  Defendants knowingly concealed material information from Amisil in many ways, including but not limited to failing to provide information about Clarium's business plans, failing to provide any meaningful financial information regarding Clarium in the course of Amisil's eight-year investment and re-investing Amisil's interest in distributions back into the Fund and elsewhere without Amisil's knowledge or consent. Defendants knowingly made the following material misrepresentations and omissions, among others, to Amisil:

(a)    From 2000 to the present, Defendants have failed to furnish the required yearly financial statements to Amisil such that Amisil was deprived of information which would have allowed it to determine the value of any profits made by Clarium or evaluate its entitlement to any distributions owed by Clarium, and determine whether to continue to invest in Clarium;

(b)    On May 2, 2002, in an unsolicited offer to purchase Amisil's stake in Clarium, Defendants represented that the fair market value of Amisil's membership

interest in Clarium was only $372 when in fact it was worth substantially

more than that;

(c)  Defendants failed to divulge information to Amisil that would have allowed

Amisil to obtain an accurate understanding of the proposed merger of PayPal

and eBay in October 2002 and accurately determine what the return on its

investment should be in connection with that transaction;

(d)  In 2005 and thereafter, Defendants concealed the fact that Clarium made a

distribution to Thiel in the amount of at least $31 million and failed to furnish

any explanation or accounting for such distribution;

(e)  In 2006, when Amisil learned of the 2005 distribution to Thiel and requested

access to Clarium's books and records, Defendants refused to comply despite

Amisil's clear entitlement to inspect and copy those records under Clarium's

Operating Agreement; and

(f)  In July 2006, upon declaring that Amisil had been expelled from membership

in Clarium and stating that it would be paid a sum of money for a fraction of

its true membership interest, Defendants failed to disclose the basis on which

that membership interest was calculated, the fair value of Amisil's interests, or

the basis on which the sum of money to be paid to Amisil would be

calculated; furthermore, Defendants have not provided Amisil access to

Clarium's books and records upon which the value of Amisil's interests could

be ascertained.

63.    Defendants' misrepresentations and concealments, as alleged above, were material in that they related to the value of Clarium and Amisil's interests in the securities of Clarium, and the value of any profits made in connection with the PayPal IPO, the sale of PayPal to eBay, and subsequent investments.

64.    As set forth above, Defendants willfully intended to deceive Amisil in order to prevent Amisil from receiving any income distributions and, ultimately, to force a sale of Amisil's interest in Clarium's securities for a mere fraction of its true value.

65.    Amisil relied on Defendants' misrepresentations and concealments to its detriment. Had Amisil been aware of the false statements and concealed information, it would have immediately demanded an accounting and payment of any unpaid distributions.  Instead, Amisil has been deprived of the use and control of the unpaid distributions, whether they were in cash or in kind.

66.    Amisil's reliance on the false and misleading statements made by Defendants was reasonable and justifiable in that Defendants possessed information that was not available to Amisil. For one, Defendants had a duty to divulge truthful information to Amisil so that it could obtain an accurate picture of the proposed merger of PayPal and eBay and accurately determine what the return on its investment should be in connection with that transaction.

67.    For the foregoing reasons, Defendants have violated the Investment Advisers Act of 1940, for which violation Amisil is entitled to damages and equitable relief according to proof at trial.

## THIRD CLAIM FOR RELIEF

### Fraud (Deceit)
### Against All Defendants

68.    Plaintiff re-alleges paragraphs 1 through 67 of this Complaint as if fully set forth herein.

69.    Defendants knowingly made the following material misrepresentations and omissions, among others, to Amisil:

    (a)    From 2000 to the present, Defendants have failed to furnish the required yearly financial statements to Amisil such that Amisil was deprived of information which would have allowed it to determine the value of any profits made by Clarium or evaluate its entitlement to any distributions owed by Clarium, to determine whether to continue to invest in Clarium; and to determine whether to exercise any of its rights as a member of Clarium;

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

(b)     On May 2, 2002, in an unsolicited offer to purchase Amisil's stake in the Clarium, Defendants represented that the fair market value of Amisil's membership interest in Clarium was only $372 when in fact it was worth substantially more than that;

(c)     Defendants failed to divulge information to Amisil that would have allowed Amisil to obtain an accurate understanding of the eBay acquisition of PayPal in October 2002 and accurately determine what the return on its investment should be in connection with that transaction;

(d)     In 2005 and thereafter, Defendants concealed the fact that Clarium made a distribution to Thiel in the amount of at least $31 million and failed to furnish any explanation or accounting for such distribution; and

(e)     In July 2006, upon declaring that Amisil had been expelled from membership in Clarium and stating that it would be paid a sum of money for only a fraction of its true membership interest, Defendants did not disclose the basis on which that membership interest was calculated, the fair value of Amisil's interests, or the basis on which the sum of money to be paid to Amisil would be calculated; furthermore, Defendants have not provided Amisil access to Clarium's books and records upon which the value of Amisil's interests could be ascertained.

70.     Defendants also knew, or were reckless in failing to know at the time of these material omissions and misrepresentations, that they caused a false and misleading picture of the Clarium's operations and profitability to Amisil. Because of their executive and managerial positions with Clarium, Defendants Thiel, Portnoy and Woolway (a) knew or had access to the material, non-public information about Clarium's operations and planned business strategy; and (b) drafted, reviewed, ratified, published, and/or approved the false or misleading statements about Clarium with the knowledge and expectation that they would be given to Amisil.

71.     Defendants Thiel, Portnoy and Woolway, as officers of Clarium, owed a duty to provide its minority member a full and fair disclosure of all facts affecting Amisil's rights and

interests. Defendants had a duty to divulge truthful information to Amisil so that it could obtain an accurate picture of the proposed PayPal IPO, the PayPal and eBay transaction and subsequent transactions, and accurately determine what the return on its investment should be in connection with those transactions. Thiel, Portnoy and Woolway had exclusive knowledge of the material facts described above, none of which were known to Amisil, and actively concealed the material facts.

72.     Defendants' misrepresentations and concealments, as alleged above, were material in that they related to the value of Clarium and Amisil's rights as a member of Clarium, particularly the value of any profits made in connection with the PayPal IPO, the sale of PayPal to eBay, and subsequent investments.

73.     As set forth above, Defendants willfully intended to deceive Amisil, and/or had no reasonable basis for believing that the representations set forth above, among others, were true. The misrepresentations and concealments were designed to prevent Amisil from understanding the conduct of Clarium's business or otherwise exercise its rights under the Clarium Operating Agreement or receiving any income distributions, and ultimately to force a sale of Amisil's interest in Clarium for a mere fraction of its true value, which would result in significant pecuniary benefits for Thiel, Portnoy and Woolway.

74.     Amisil was unaware of the concealments or the falsity of the misrepresentations set forth above, among others, and relied on them, to its detriment. Had Amisil been aware of the false statements and concealed information, it would have immediately demanded an accounting and payment of any unpaid distributions. Instead, Amisil has been deprived of the use and control of the unpaid distributions, whether they were in cash or in kind.

75.     Amisil's reliance on Defendants' misrepresentations and concealments was reasonable and justifiable in that Defendants were in a position of knowledge and authority and possessed information that was not available to Amisil.

76.     As a result of the acts and omissions alleged herein, Amisil has been damaged in an amount subject to proof at the time of trial, which amount exceeds $75,000.00, excluding attorneys' fees and costs of suit.

COMPLAINT

77.    In doing the acts alleged herein, Defendants acted in conscious and intentional disregard for Amisil's rights and acted with oppression, fraud, and/or malice so as to entitle Amisil to recover punitive and exemplary damages against Defendants in an amount deemed by the trier of fact to be sufficient to punish, deter, and make an example of Defendants.

## FOURTH CLAIM FOR RELIEF

### Conversion
### Against All Defendants

78.    Plaintiff re-alleges paragraphs 1 through 77 of this Complaint as if fully set forth herein.

79.    Amisil owned the money and/or shares of stock that should have been distributed to it as income pursuant to its membership interest in Clarium for the past eight years.  Instead, such money and/or shares of stock have been wrongfully retained or otherwise appropriated by the Defendants.

80.    Defendants intentionally interfered with Amisil's ownership of the money and/or shares of stock.  Amisil has demanded an inspection of certain books and records of Clarium in order to determine the value of such money and/or shares of stock that have been wrongfully retained by Defendants so that Amisil can make an appropriate demand.  However, Defendants have refused to comply fully with Amisil's request and have paid no money and given no shares of stock to Amisil to date.

81.    As a result of the acts and omissions alleged herein, Amisil has been damaged in an amount subject to proof at the time of trial, which amount exceeds $75,000.00, exclusive of interest, attorneys' fees and costs of suit.

82.    In doing the acts alleged herein, Defendants acted in conscious and intentional disregard for Amisil's rights and acted with oppression, fraud, and/or malice so as to entitle Amisil to recover punitive and exemplary damages against Defendants in an amount deemed by the trier of fact to be sufficient to punish, deter, and make an example of Defendants.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**FIFTH CLAIM FOR RELIEF**

**Breach of Fiduciary Duty**
**Against Thiel, Portnoy and Woolway**

83.    Plaintiff re-alleges paragraphs 1 through 82 of this Complaint as if fully set forth herein.

84.    Defendants Thiel, Portnoy and Woolway, in their capacity as officers and directors of and/or majority members in Clarium, were and are fiduciaries to all members in Clarium.  As fiduciaries, they owe Amisil a duty of loyalty, honesty and candor regarding the conduct of the affairs of Clarium and their handling of Amisil's interest in Clarium's securities.  These Defendants have a duty to exercise reasonable care with respect to their conduct as fiduciaries to Amisil and not to mislead or deceive Amisil.  They are required to use their ability to control the company in a fair, just, and equitable manner and to ensure that any use to which they put Clarium or their power to control Clarium must benefit all members of Clarium proportionately and must not conflict with the proper conduct of Clarium's business.

85.    Defendants Thiel, Portnoy and Woolway breached their fiduciary duties by intentionally and/or recklessly misstating to Amisil, as alleged above, facts that were material in that they related to Clarium's business plan and operations and the value of Amisil's interest in Clarium from time to time.  Defendants used their power to control company activities to benefit themselves alone or in a manner detrimental to Amisil, the minority member.  Accordingly, these are facts that were important to Amisil in evaluating and deciding to retain or dispose of its interest in Clarium, and the true facts, if known, would have altered the basis on which Amisil would have made its decisions.

86.    As a result of the acts and omissions alleged herein, Amisil has been damaged in an amount subject to proof at the time of trial, which amount exceeds $75,000.00, exclusive of interest, attorneys' fees and costs of suit.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

## SIXTH CLAIM FOR RELIEF

### Conspiracy to Defraud and to Breach Fiduciary Duties
### Against Thiel, Portnoy and Woolway

87.     Plaintiff re-alleges paragraphs 1 through 86 of this Complaint as if fully set forth herein.

88.     Defendants Thiel, Portnoy and Woolway had knowledge of and agreed to the objective and course of action to injure Amisil.  Defendants took steps in furtherance of the conspiracy by not allowing Amisil to be informed about the conduct of Clarium's business, failing to make any income distributions to Amisil despite its eight-year investment in Clarium, and ultimately attempting to expel Amisil from Clarium and force a sale of Amisil's interest in Clarium for a fraction of its true value.

89.     Defendants Thiel, Portnoy and Woolway made numerous misrepresentations to and concealments from Amisil and breached their fiduciary duties to Amisil, as alleged above.

90.     As a proximate result of the acts and omissions alleged herein, Amisil has been damaged in an amount subject to proof at the time of trial, which amount exceeds $75,000.00, exclusive of interest, attorneys' fees and costs of suit.

91.     In doing the acts alleged herein, Defendants acted in conscious and intentional disregard for Amisil's rights and acted with oppression, fraud, and/or malice so as to entitle Amisil to recover punitive and exemplary damages against Defendants in an amount deemed by the trier of fact to be sufficient to punish, deter, and make an example of Defendants.

## SEVENTH CLAIM FOR RELIEF

### Breach of Contract
### Against Clarium

92.     Plaintiff re-alleges paragraphs 1 through 91 of this Complaint as if fully set forth herein.

93.     Amisil and Clarium are parties to the Subscription Agreement and Clarium's Operating Agreement.

94.     Amisil has complied with all covenants and conditions imposed by the Subscription Agreement and Clarium's Operating Agreement, except those that have been excused or waived by Clarium.

95.     In breach of the Subscription Agreement and Clarium's Operating Agreement, Clarium has, among other things, failed to make Clarium's books, reports and accounts available for inspection and copying by Amisil despite repeated requests (Clarium's Operating Agreement, section 6.9); failed to furnish "a statement of (i) the assets and liabilities of Clarium, (ii) the net Profit or Loss of Clarium, and (iii) the Capital Account balance of such Member" within 90 days after each fiscal year (Clarium's Operating Agreement, section 6.9); failed to make any distributions to Amisil to date (Clarium's Operating Agreement, sections 4.1 and 5.1); seized control over Amisil's membership interest by wrongfully allocating or utilizing the funds and/or shares of stock that should properly have been distributed to Amisil; and oppressed Amisil's exercise of its rights under the Subscription Agreement and Clarium's Operating Agreement.

96.     As a result of Clarium's breach, Amisil has been damaged in an amount subject to proof at the time of trial, which amount exceeds $75,000.00, exclusive of interest, attorneys' fees and costs of suit.

## EIGHTH CLAIM FOR RELIEF

### Breach of Implied Covenant of Good Faith and Fair Dealing
### Against Clarium

97.     Amisil re-alleges paragraphs 1 through 96 of this Complaint as if fully set forth herein.

98.     The Subscription Agreement and Clarium's Operating Agreement each contain an implied covenant of good faith and fair dealing requiring that neither party do anything to deprive the other of the benefits of the contract. This covenant imposes on each party the duty to do everything the contract presupposes that party will do to accomplish the purpose of the contract.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

99.     Clarium has breached the implied covenant of good faith and fair dealing by interfering with or failing to cooperate with the Amisil in the performance of both agreements as set forth above and incorporated herein.

100.    As a result of Clarium's breach, Amisil has been damaged in an amount subject to proof at the time of trial, which amount exceeds $75,000.00, exclusive of interest, attorneys' fees and costs of suit.

101.    In doing the acts alleged herein, Defendants acted in conscious and intentional disregard for Amisil's rights and acted with oppression, fraud, and/or malice so as to entitle Amisil to recover punitive and exemplary damages against Defendants in an amount deemed by the trier of fact to be sufficient to punish, deter, and make an example of Defendants.


## NINTH CLAIM FOR RELIEF

### Unfair Business Practices
### Violation of Cal. Bus. & Prof. Code § 17200, et seq.
### Against All Defendants

102.    Plaintiff re-alleges paragraphs 1 through 101 of this Complaint as if fully set forth herein.

103.    California Business and Professions Code section 17200, et seq., prohibits "any unlawful, unfair or fraudulent business act or practice."

104.    The acts and practices described above and incorporated herein were unlawful, unfair and fraudulent. Defendants have oppressed and continue to oppress Amisil's rights as owner of a minority interest in Clarium. Pursuant to Clarium's operating agreement and applicable law, Amisil is entitled to certain benefits for its ownership status. However, Defendants, in breach of their respective duties to Amisil, have engaged in a pattern and practice of disguising the true value of Amisil's membership interest while purporting to offer Amisil the real value of its interest. In addition, Defendants have refused to allow Amisil access to financial statements and other related documentation from Clarium except on limited terms contrary to the applicable agreements between the parties. Finally, Defendants unilaterally and unlawfully issued a notice purporting to expel Amisil as a member of Clarium and pay it a mere fraction of the value of its interest.

– 22 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1

105.    As a result of the unlawful, unfair and fraudulent acts and practices described above,

2

Defendants have been and continue to be unjustly enriched by way of income distributions that were

3

never made to Amisil over the course of the past eight years but instead have been confiscated or

4

otherwise appropriated by Defendants.

5

106.    Amisil brings this action pursuant to Cal. Bus. & Prof. Code § 17203 for restitution

6

and injunctive relief to stop such continued unfair, unlawful and fraudulent business practices of

7

Defendants.

8

9

**TENTH CLAIM FOR RELIEF**

10

**Accounting and Constructive Trust**
**Against All Defendants**

11

12

107.    Plaintiff re-alleges paragraphs 1 through 106 of this Complaint as if fully set forth

13

herein.

14

108.    The amount of money and/or stock misappropriated and due from Defendants is

15

presently unknown to Amisil and cannot be ascertained without a complete forensic accounting of

16

the books and records of Clarium and from each of the Defendants.

17

109.    Amisil is informed and believes and thereon alleges that the requested accounting will

18

reveal the assets improperly misappropriated by Defendants.

19

110.    As a result of the acts and omissions set forth herein, as will be revealed in the

20

requested accounting, Defendants have been unjustly enriched.  Amisil has a financial interest in

21

such unjust enrichment.

22

111.    Defendants therefore hold such enrichment for the benefit of Amisil as constructive

23

trustees, and Amisil is entitled to an accounting and to trace such enrichment to obtain the benefits of

24

such constructive trusts.

25

112.    Once the amount of the enrichment is ascertained, the constructive trust should be

26

ordered to promptly deliver the proceeds of the trust to its rightful owner, Amisil.

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

COMPLAINT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

### ELEVENTH CLAIM FOR RELIEF

### Preliminary and Permanent Injunction
### Against All Defendants

113.    Plaintiff re-alleges paragraphs 1 through 112 of this Complaint as if fully set forth herein.

114.    Unless enjoined from transferring the assets of Clarium out of the jurisdiction of this Court during the pendency of this litigation and further using the converted funds, Amisil will be irreparably harmed.

115.    As set forth above, Defendants committed numerous unlawful and fraudulent acts that have resulted in seizing control of Amisil's property.  Defendants have deprived Amisil of its rightful distributions and have oppressed Amisil as a minority member of Clarium.

116.    Amisil has exhausted all reasonable efforts to obtain a fair resolution of this dispute. Clarium has threatened to consummate the involuntary expulsion and "conclude" Amisil's relationship with Clarium by transferring a sum that Clarium has unilaterally determined to be the value of Amisil's membership interest.  Should this occur without a proper accounting, there is a risk that Amisil will neither recover the unpaid distributions nor receive fair market value of its membership interest because Defendant Thiel, the Managing Member of Clarium, maintains Clarium's accounts in Bermuda and has the resources and motivation to transfer Clarium assets out of the jurisdiction of the Court.  The balance of the interim harm to Amisil if the requested injunction is not issued far outweighs any interim harm to Defendant in requiring Clarium's assets that are within the jurisdiction of this Court remain so while this litigation is pending, and prohibiting Defendants from wrongfully converting Amisil's interest in Clarium and its profits.

117.    This Complaint and exhibits filed herewith establish a reasonable probability that Amisil will prevail in its claims against Defendants at trial.

COMPLAINT

**PRAYER**

WHEREFORE, Plaintiff, Amisil, prays for judgment against Defendants, and each of them, as follows:

On the First Claim for Relief

1.    For general damages according to proof at trial in an amount in excess of $75,000.00;

On the Second Claim for Relief

2.    For equitable relief and general damages according to proof at trial in an amount in excess of $75,000.00;

On Each of the Third through Eighth Claims for Relief

3.    For a judicial determination that the Thiel Capital International, LLC, and Thiel Capital Management, LLC, Subscription and Investment Representation Agreement dated February 18, 1998, and the Operating Agreement of Thiel Capital Management, LLC, dated September 9, 1996, are valid and binding upon Amisil and Clarium;

4.    For a judicial determination that the action undertaken by Defendants on July 20, 2006, to remove Amisil as a member of Clarium is null and void;

5.    For specific performance of Defendants' duties under the "Operating Agreement of Thiel Capital International, LLC a Delaware Limited Liability Clarium," dated September 9, 1996, including but not limited to those pertaining to Amisil's right to receive periodic financial and ownership information regarding Clarium and right to receive distributions of Clarium's profits;

6.    For general damages according to proof at trial in an amount in excess of $75,000.00;

7.    For punitive and exemplary damages in an amount deemed by the trier of fact to be sufficient to punish, deter, and make an example of Defendants;

On the Ninth Claim for Relief

8.    For an order enjoining Defendants from engaging in the fraudulent, unfair and unlawful conduct described herein;

9.    For an order for restitution of money and/or shares of stock wrongfully withheld from Amisil by Defendants;

COMPLAINT

1

On the Tenth Claim for Relief

2      10.    For a complete accounting of the books and records of Clarium and the Defendants to

3   trace the distribution of assets from Clarium and Amisil's rights thereto;

4      11.    For an order that Defendants hold amounts found due from the accounting for the

5   benefit of the Amisil as constructive trustee and an Order that those sums be delivered to the rightful

6   owner, Amisil;

7

On the Eleventh Claim for Relief

8      12.    For a preliminary and permanent injunction prohibiting Defendants from transferring

9   the assets of Clarium out of the jurisdiction of this Court during the pendency of this litigation and

10  prohibiting Defendants from continuing their wrongful conversion of Amisil's interests;

11

On All Claims for Relief

12      13.    For prejudgment interest in an amount according to proof at trial;

13      14.    For attorneys' fees and costs of suit incurred herein; and

14      15.    For such other and further relief as the Court may deem just and proper.

15

16   DATED:  August 28, 2006

17                                              REED SMITH LLP

18                                       By   _Harvey L. Leiderman_____

19                                              Harvey L. Leiderman
                                                Attorneys for Plaintiff
20                                              Amisil Holdings Ltd.

21

22

23

24

25

26

27

28

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

## DEMAND FOR JURY TRIAL

### Rule 38 of the Federal Rules of Civil Procedure

Amisil demands a jury trial on all issues so triable.

DATED: August 28, 2006

REED SMITH LLP

By _____

Harvey L. Leiderman
Attorneys for Plaintiff
Amisil Holdings Ltd.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

Pursuant to Civil L.R. 3-16, the undersigned certifies that the following listed persons, firms, partnerships, corporations (including parent corporations) or other entities (i) have a financial interest in the subject matter of the litigation, or (ii) have a non-financial interest in that subject matter or in a party that could be substantially affected by the outcome of this proceeding:

1.    Clarium Capital, LLC, a feeder fund managed by Clarium Capital Management, LLC;

2.    Clarium Capital Fund, Ltd. an offshore feeder fund managed by Clarium Capital Management, LLC; and

3.    Clarium Capital, Ltd., an offshore master fund managed by Clarium Capital Management, LLC.

DATED: August 28, 2006.

REED SMITH LLP

By _____
    Harvey L. Leiderman
    Attorneys for Plaintiff
    Amisil Holdings Ltd.

DOCSSFO-12450529.3-TKBELL 8/26/06 6:56 PM

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 28 –

# **EXHIBIT A**

# OPERATING AGREEMENT

## OF

## THIEL CAPITAL INTERNATIONAL, LLC

## A DELAWARE LIMITED LIABILITY COMPANY

**September 9, 1996**

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE REGULATORY AUTHORITY HAS APPROVED OR DISAPPROVED THIS OPERATING AGREEMENT OR THE LIMITED LIABILITY COMPANY INTERESTS ("INTERESTS") PROVIDED FOR HEREIN. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THE INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE COMPANY HAS NO OBLIGATION TO REGISTER THE INTERESTS UNDER THE SECURITIES ACT IN THE FUTURE.

THE COMMODITY FUTURES TRADING COMMISSION HAS NOT PASSED UPON THE MERITS OF THE INTERESTS PROVIDED FOR HEREIN NOR HAS THE COMMISSION PASSED ON THE ADEQUACY OR ACCURACY OF THIS OPERATING AGREEMENT.

AN INTEREST MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION UNDER THE SECURITIES ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED. ADDITIONAL RESTRICTIONS ON THE TRANSFER OF INTERESTS ARE CONTAINED IN SECTION 7 OF THIS AGREEMENT. BASED UPON THE FOREGOING, EACH ACQUIROR OF AN INTEREST MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF INVESTMENT THEREIN FOR AN INDEFINITE PERIOD OF TIME.

# TABLE OF CONTENTS

**Page**

SECTION 1  DEFINITIONS ............................................................. 1

SECTION 2  FORMATION .............................................................. 5

2.1   Formation and Name ......................................................... 5
2.2   Term .................................................................................... 5
2.3   Purpose and Scope .............................................................. 5
2.4   Principal Office .................................................................... 5
2.5   Delaware Office and Agent for Service of Process ............... 5
2.6   Members, Additional Members and Assignees ...................... 5
2.7   Required Documents ............................................................ 6
2.8   Title to Property .................................................................. 6

SECTION 3  CAPITALIZATION ....................................................... 7

3.1   Capital Contributions ........................................................... 7
3.2   Minimum Issue Price ............................................................ 7
3.3   Additional Capital Contributions .......................................... 7
3.4   Permitted Withdrawal and Return of Capital ......................... 7
3.5   Required Withdrawal and Return of Capital ........................... 8
3.6   Procedure Upon Early Withdrawal ........................................ 9
3.7   Capital Withdrawals by the Manager ..................................... 9
3.8   Loans to the Fund ................................................................ 9
3.9   Limitation of Liability; Return of Certain Distributions ......... 9
3.10  Interest on Capital ............................................................... 10

SECTION 4  PROFITS AND LOSSES ................................................ 10

4.1   Allocations of Profits and Losses .......................................... 10
4.2   Reallocation of Organization and Syndication Expenses ....... 11
4.3   Withholding Taxes ............................................................... 12

SECTION 5  DISTRIBUTIONS .......................................................... 12

5.1   Discretionary Distributions .................................................. 12
5.2   Liquidating Distributions ...................................................... 12
5.3   Limitation on Distributions ................................................... 12

SECTION 6  ADMINISTRATIVE PROVISIONS ................................ 13

6.1   Management by the Manager. ............................................... 13
6.2   Special Limitations on the Authority of the Manager. ........... 14
6.3   Other Ventures and Activities. ............................................. 15
6.4   Policies With Respect to Investment Opportunities. .............. 15

# TABLE OF CONTENTS
(continued)

Page

6.5    Expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
6.6    Member Compensation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
6.7    Limitations on Payments to the Manager . . . . . . . . . . . . . . . . . 16
6.8    Reports, Records and Financial Statements . . . . . . . . . . . . . . . 17
6.9    Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
6.10   Disclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
6.11   Tax Matters Member . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
6.12   Valuation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

SECTION 7  TRANSFERS AND WITHDRAWALS . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

7.1    General Provisions Regarding Transfers . . . . . . . . . . . . . . . . . 18
7.2    Withdrawal by a Member . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
7.3    Expulsion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
7.4    Status of Assignees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

SECTION 8  DISSOLUTION AND LIQUIDATION . . . . . . . . . . . . . . . . . . . . . . . . . . 20

8.1    Dissolving Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
8.2    Special Meeting to Dissolve or Continue the Fund . . . . . . . . . 20
8.3    Winding Up of the Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
8.4    Designation of Liquidating Agent . . . . . . . . . . . . . . . . . . . . . . 21

SECTION 9  LIABILITY PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

9.1    Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
9.2    Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

SECTION 10  GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

10.1   Status Under the Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
10.2   Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
10.3   Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
10.4   Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
10.5   Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
10.6   Counterparts; Binding Upon Members and Assignees . . . . . . . 23
10.7   Survival of Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
10.8   No Third Party Beneficiaries . . . . . . . . . . . . . . . . . . . . . . . . . 24
10.9   Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
10.10  Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
10.11  Consents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
10.12  No Partition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
10.13  Representation by Members and Assignees . . . . . . . . . . . . . . . 24
10.14  No Usury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**TABLE OF CONTENTS**
**(continued)**

|  |  | Page |
|---|---|---|
| 10.15 | Partnership for Tax Purposes Only | 25 |
| 10.16 | Legal Counsel | 25 |
| 10.17 | Miscellaneous | 26 |

SCHEDULE A

THIS OPERATING AGREEMENT of Thiel Capital International, LLC, a Delaware limited liability company, is entered into as of September 9, 1996.

## SECTION 1

## DEFINITIONS

As used in this Agreement:

*Act* shall mean the Delaware Limited Liability Company Act, as amended.

*Affiliate* shall mean, with respect to any person, any other person with regard to which the person is controlling, controlled or commonly controlled. For purposes of the preceding sentence, "control" shall mean the power to direct the principal business management and activities of such person, whether through ownership of voting securities, by agreement, or otherwise.

*Agreement* shall mean this Operating Agreement of Thiel Capital International, LLC, a Delaware limited liability company.

*Allocation Period* shall mean a period beginning immediately following the determination of Members' Closing Capital Accounts and ending upon the next occurrence of a Closing Event, provided that the Fund's first Allocation Period shall begin on the Initial Closing Date.

*Anniversary* means, with respect to a Member, the first anniversary of such Member's admission to the Fund.

*Assignee* shall mean a person that has acquired an interest in the Fund (including, without limitation, a person that has acquired such interest by means of a Transfer permitted under Section 7), but that has not been admitted as a Member.

*Bank* shall mean Bank of America NT & SA.

*Bankruptcy* shall mean, with respect to a Member: (i) the commencement of any bankruptcy or insolvency case or proceeding against such Member which shall continue and remain unstayed and in effect for a period of 60 consecutive days; (ii) the filing by such Member of a petition, answer or consent seeking relief under any bankruptcy, insolvency or similar law; or (iii) the occurrence of any other event that is deemed to constitute bankruptcy for purposes of the Act.

*Capital Account* shall mean, for each Member, a separate account that is:

      (a)      Increased by: (i) the amount of such Member's Capital Contributions and (ii) allocations of Profits to such Member pursuant to Section 4.1;

      (b)      Decreased by: (i) the amount of cash distributed to such Member by the Fund (whether pursuant to Section 3.4, 3.5, 5, 8.3 or otherwise), (ii) the fair market value of any other property distributed to such Member by the Fund (whether pursuant to Section 3.4, 3.5, 5, 8.3 or otherwise) determined as of the date

of distribution in accordance with the provisions of Section 6.12 and net of liabilities secured by such property that such Member assumes or to which such Member's ownership of the property is subject, and (iii) allocations of Losses to such Member pursuant to Section 4.1;

(c)     Adjusted in accordance with Incentive Allocations and Management Fees pursuant to Sections 4.1(b) and 6.6(c); and

(d)     Otherwise adjusted in accordance with the provisions of this Agreement.

*Capital Contribution* shall mean, for any Member, the net amount of cash and the fair market value of any other property (determined as of the date of contribution in accordance with the provisions of Section 6.12 and net of liabilities secured by such property that the Fund assumes or to which the Fund's ownership of such property is subject) contributed by such Member to the capital of the Fund.

*Close of Business* shall mean 5:00 p.m., local time, in San Francisco, California.

*Closing Capital Account* shall mean, with respect to an Allocation Period and a Member, the Opening Capital Account of such Member for such Allocation Period adjusted as provided in this Agreement to reflect the Closing Event triggering the closing of such Allocation Period in the following order: (i) first, allocations pursuant to Section 4.1 and distributions pursuant to Section 5.1, (ii) next, the Closing Event, and (iii) finally, the close of the Allocation Period and the determination of such Member's Closing Capital Account balance.

*Closing Event* shall mean any of the following: (i) a Capital Contribution by a Member, (ii) a distribution by the Fund to a Member, (iii) an allocation made to a Member, (iv) the end of each Fiscal Quarter, (v) the date of dissolution of the Fund, and (vi) such other dates as the Manager may determine.

*Code* shall mean the Internal Revenue Code of 1986, as amended.

*Company Act* shall mean the Investment Company Act of 1940, as amended.

*Dissolution* of a Member that is not a natural person shall mean that such Member has terminated its existence (whether as a partnership, corporation, limited liability company or other legal entity) and dissolved; *provided, however,* that a change in the membership of a Member that is a partnership or limited liability company shall not constitute a "Dissolution" of such Member so long as the business of the Member is continued in partnership or limited liability company form, regardless of whether such Member is deemed technically dissolved for partnership, limited liability company or tax law purposes.

*ERISA* shall mean the Employee Retirement Income Security Act of 1974, as amended.

*Exempt Companies* shall have the meaning set forth in Section 3.5(a).

*FCM* shall mean a "futures commission merchant" as defined in 17 C.F.R. § 1.3(p).

*Financial Instruments* shall mean (a) commodity futures contracts, including commodity futures contracts on foreign currencies, and options on commodity futures contracts; (b) forward contracts, including foreign exchange contracts, and options on forward contracts; (c) instruments commonly referred to as "securities," such as stocks, warrants, bonds, convertible instruments of indebtedness, and options; and (d) any other instruments necessary to effect the trading of the above, such as margin account agreements.

*Fiscal Quarter* shall mean each of the four three-month periods commencing on January 1, April 1, July 1 and October 1 and ending on March 31, June 30, September 30 and December 31.

*Fiscal Year* shall mean the period from January 1 through December 31 of each year (unless otherwise required by law).

*Fund* shall mean Thiel Capital International, LLC, a Delaware limited liability company.

*Fund Expenses* shall have the meaning set forth in Section 6.5(b).

*GAAP* shall mean United States generally accepted accounting principles, consistently applied.

*Incentive Allocation* shall have the meaning set forth in Section 4.1(b)(i).

*Incentive Allocation Period* shall have the meaning set forth in Section 4.1(b)(i).

*Indemnified Person* shall mean the Manager and each: (i) business entity of which the Manager is an officer, director or member, or any officer, director, member, employee or agent thereof; and (ii) Affiliate of the Manager.

*Initial Closing Date* shall mean the date of the first closing at which membership interests are issued and persons are admitted as Members in accordance with the provisions of Section 2.6.

*Interests* shall have the meaning set forth on the cover page of this Agreement.

*Liquidating Agent* shall have the meaning set forth in Section 8.4.

*Loss Recovery Account* shall have the meaning set forth in Section 4.1(b)(iv).

*Majority-In-Interest of the Members* shall mean a group of Members whose aggregate Capital Account balances are in excess of 50% of the total Capital Account balances of all the Members.

*Management Fee* shall have the meaning set forth in Section 6.6(c).

*Manager* shall mean Thiel Capital Management, LLC, a Delaware limited liability company.

*Material Misconduct* shall mean, with respect to an Indemnified Person, gross negligence, a willful and material breach of this Agreement, fraud, breach of fiduciary duty, or a material violation of applicable law (except in the case of a violation of applicable law where the Indemnified Person reasonably believed that no such violation would occur in consequence of such Indemnified Person's action or inaction, as the case may be).

*Measuring Period* shall have the meaning set forth in Section 4.1(b)(iii).

*Member* shall mean any person (i) listed on Schedule A as a Member or (ii) admitted to the Fund pursuant to the terms of this Agreement as a Substitute Member or additional Member, but only if such person has not withdrawn from the Fund within the meaning of Section 7.2 or been expelled pursuant to Section 7.3 or Transferred its entire membership interest to one or more other Members and/or persons admitted to the Fund

as Substitute Members pursuant to Section 7. Without limiting the foregoing, a Member shall not cease to be a Member or lose its non-economic rights in respect of the Fund solely by virtue of having Transferred to one or more persons its entire economic interest in the Fund. Except where the context requires otherwise, a reference in this Agreement to "the Members" shall mean all of the Members (taken together or acting unanimously, as appropriate).

*Net Decrease* shall have the meaning set forth in Section 4.1(b)(iv).

*Net Increase* shall have the meaning set forth in Section 4.1(b)(i).

*Opening Capital Account* shall mean, with respect to an Allocation Period and a Member, such Member's Closing Capital Account, as determined at the close of the immediately preceding Allocation Period, reduced by any allocation made pursuant to Section 6.6; *provided, however,* that the Fund's initial Allocation Period will commence on the Initial Closing Date and each Member admitted to the Fund on the Initial Closing Date will have an Opening Capital Account balance at that time equal to such Member's initial Capital Contribution, reduced by any allocation made pursuant to Section 6.6.

*Permitted Withdrawal Date* shall have the meaning set forth in Section 3.4.

*Principal Office* shall have the meaning set forth in Section 2.4.

*Profits and Losses* shall mean, for any period, the Fund's items of income and gain as well as loss, expense and deduction as determined under GAAP; *provided, however,* that Profits and Losses as computed for each Allocation Period under Section 4 shall be determined by taking into account all unrealized gains and losses in respect of attributable to such allocation period (for purposes of determining such unrealized gains and losses, as well as any realized gains or losses that ultimately may arise, the basis of each Financial Instrument shall be deemed to be its fair market value determined in accordance with the provisions of Section 6.12 as of the start of such Allocation Period or, if the Financial Instrument was acquired by the Fund during such period, its cost).

*Risk-Free Rate* means, with respect to a date, the interest rate on such date of U.S. government debt having a maturity of one year, as determined by the Manager.

*Securities Act* shall have the meaning set forth on the cover page of this Agreement.

*Subscription Agreement* shall mean the subscription agreement between the Fund and each Member in the form prescribed by the Manager.

*Substitute Member* shall mean an Assignee of all or a portion of a Member's interest in the Fund that becomes a Member and succeeds, to the extent of the interest assigned, to the rights and powers and becomes subject to the restrictions and liabilities of the assignor Member.

*Tax Matters Member* shall have the meaning set forth in Section 6.11(a).

*Transfer* shall mean any sale, exchange, transfer, gift, encumbrance, assignment, pledge, mortgage, hypothecation or other disposition, whether voluntary or involuntary.

## SECTION 2

## FORMATION

2.1    *Formation and Name.*

    (a)    The Members are entering into and forming the Fund as a limited liability company governed by the Act for the limited purpose and scope set forth in this Agreement.

    (b)    The name of the Fund shall be "Thiel Capital International, LLC."

2.2    *Term.* The term of the Fund shall commence upon the later of: (i) the filing of the Fund's certificate of formation with the office of the Delaware Secretary of State, or (ii) the execution of this Agreement by two or more persons. Except as specifically provided in Section 8, the term of the Fund shall continue until the Close of Business on December 31, 2005, and shall not end prior to such date in consequence of the death, retirement, resignation, expulsion, Bankruptcy, or Dissolution of a Member or the occurrence of any other event which terminates the continued membership of a Member in the Fund.

2.3    *Purpose and Scope.* The purpose and scope of the Fund shall be to:

    (a)    Seek income and gain through the acquisition, holding and disposition of Financial Instruments, with the principal focus on acquiring and holding for gain equity index futures, debt futures and foreign exchange futures; *provided, however,* that the Fund will not acquire illiquid Financial Instruments to the extent that following any such acquisition greater than 10% of the Fund's assets as determined in accordance with Section 6.12 would be invested in illiquid Financial Instruments;

    (b)    Temporarily invest the assets of the Fund in cash and cash equivalents; and

    (c)    Engage in all other lawful activities (including, without limitation, those activities described in Section 6.1) determined by the Manager to be necessary, advisable or desirable in furtherance of the foregoing.

2.4    *Principal Office.* The Fund shall have a single "Principal Office" that initially shall be at 19 Coleman Place 37, Menlo Park, California 94025, and may thereafter be changed from time to time by the Manager upon notice to the other Members.

2.5    *Delaware Office and Agent for Service of Process.* The Fund shall maintain a Delaware registered office and agent for service of process as required by Section 18-104 of the Act. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Manager shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be.

2.6    *Members, Additional Members and Assignees.*

    (a)    Each person whose name is listed on <u>Schedule A</u> is hereby admitted as a Member.

(b)     Set forth below the name of each Member on <u>Schedule A</u> shall be appropriate contact information for such Member (including, without limitation, such Member's mailing address, telephone number, and facsimile number as well as, in the case of a Member that is an entity, the name or title of an individual to whom correspondence should be directed). Each Member shall promptly provide the Fund with the information required to be set forth for such Member on <u>Schedule A</u> and shall thereafter promptly notify the Fund of any change to such information.

(c)     With the approval of the Manager, additional persons may be admitted as Members upon their proper completion, due execution and delivery of a Subscription Agreement, and no consent of any other Member shall be required for such admissions.

(d)     The Fund shall not issue Assignee interests.

(e)     Notwithstanding Sections 2.6(c) and (d), the provisions of Section 7 shall apply with regard to the admission of Substitute Members and the Transfer of Assignee interests by Members and Assignees.

2.7     *Required Documents.*

(a)     *Fund Documents.*   The Manager shall cause to be executed, filed, recorded, or amended, as necessary, articles of organization and any other documents required or desirable to be executed, filed, recorded, or amended in connection with the formation, operation or dissolution of the Fund, including without limitation this Agreement, pursuant to the laws of the State of Delaware or any other jurisdiction in which the Fund's business is conducted. The terms and provisions of each document described in the preceding sentence shall be initially established and shall be amended as necessary to cause such terms and provisions to be consistent with the terms and provisions of this Agreement.

(b)     *Other Documents.*  The Members shall execute and acknowledge such other documents as may be necessary or desirable, as determined by the Manager in his reasonable discretion, to give effect to the terms of this Agreement.

(c)     *Special Power of Attorney.*  Each Member hereby grants to the Manager a special power of attorney (with full rights of assignment) irrevocably appointing the Manager as the granting Member's attorney-in-fact with power and authority to execute and acknowledge, in the granting Member's name and on its behalf, any document described in Section 2.7(a) or (b); *provided, however,* that no such power of attorney shall be used to execute or acknowledge a document on behalf of a Member if the action to be taken by such document has not received the level of consent of the Members required under the Act or this Agreement. Each special power of attorney granted under this Section 2.7(c) is coupled with an interest and shall not be revoked by the bankruptcy, death, disability or other event of legal incapacity of the granting Member.

2.8     *Title to Property.*  Title to all Fund property shall be held in the name of the Fund.

# SECTION 3

# CAPITALIZATION

3.1    *Capital Contributions.* Each Member, upon and as a condition to admission to the Fund, shall make the Capital Contribution set forth in such Member's Subscription Agreement. The Manager will maintain a Capital Account balance of at least 1% of the aggregate Capital Account balances of all of the Members and Assignees.

3.2    *Minimum Issue Price.* The Fund shall not admit any Member in exchange for a Capital Contribution of less than $5,000.

3.3    *Additional Capital Contributions.* A Member may make one or more additional Capital Contributions at any time, and in the amount of at least $5,000, with the consent of the Manager (which consent may be withheld in the Manager's sole discretion).

3.4    *Permitted Withdrawal and Return of Capital.*    Except as provided in this Section 3 or in Section 5 or 8, no Member shall be entitled to the return of such Member's Capital Contribution or to a distribution in respect of such Member's Capital Account balance. On or after a Member's Anniversary, such Member may, on at least 30 days' prior written notice to the Manager and as of the last day of the fiscal quarter specified in such notice, withdraw all or part of its Capital Account balance (each such date being a "Permitted Withdrawal Date"); *provided, however,* that:

(a)    On the applicable Permitted Withdrawal Date the Incentive Allocation shall be made with respect to the amount withdrawn as set forth in Section 4.1(b).

(b)    No partial withdrawal may be made in an amount less than $50,000 without the prior consent of the Manager.

(c)    Partial withdrawals of up to 95% of a Member's Capital Account balance shall be paid within 10 days after the applicable Permitted Withdrawal Date.

(d)    If a Member withdraws in excess of 95% of such Member's Capital Account balance, then 95% of such balance shall be paid within 10 days after the applicable Permitted Withdrawal Date and the remainder of the withdrawal (the "Withdrawal Balance") shall be paid within 10 days after the Fund receives audited financial statements for the Fiscal Year in which the withdrawal occurs. The Withdrawal Balance will bear interest from the applicable Permitted Withdrawal Date to the date paid at the Risk-Free Rate determined as of the applicable Permitted Withdrawal Date. A Member will receive no allocations or distributions with respect to the Withdrawal Balance. Notwithstanding the foregoing, the total withdrawal paid may not exceed the value of the Member's Capital Account as shown by such financial statements, and if the Fund's independent accountants determine that the amount paid by the Fund exceeds the balance of that Capital Account, the Member shall forthwith, on demand by the Manager, repay such excess to the Fund in cash.

(e)     In the sole discretion of the Manager, the amount withdrawn may be paid by assigning to the Member any of the Fund's non-cash assets, or a combination of cash and such assets, having an aggregate value at the applicable Permitted Withdrawal Date equal to the amount to be withdrawn determined in the manner set forth in Section 6.12.

(f)     The Manager may suspend the right of withdrawal or postpone the date of payment for any period during which (i) any futures or commodities exchange or market on which a substantial part of the Financial Instruments owned by the Fund are traded is closed (other than weekend and holiday closings) or trading on any such exchange or market is restricted or suspended, (ii) there exists a state of affairs that constitutes a state of emergency, as a result of which disposal of the Financial Instruments owned by the Fund is not reasonably practicable, (iii) a breakdown occurs in any of the means normally employed in ascertaining the value of a substantial part of the assets of the Fund or when for any other reason the value of such assets cannot reasonably be ascertained, (iv) the amount of requested withdrawals would result in a disorderly liquidation of Fund investments or a violation of the Fund's investment policies, or (v) there exist such other extraordinary circumstances, as determined in good faith by the Manager, that cause withdrawals or such payments to be impracticable under existing economic or market conditions or conditions relating to the Fund (including, without limitation, receipt from Members of notices of withdrawals of amounts aggregating more than 50% of the Capital Account balances of all Members). At the conclusion of such period, the Manager shall resume permitting withdrawals on the next available Permitted Withdrawal Date and shall resume any payments required pursuant to this Section 3.4 as soon as reasonably practicable.

(g)     No withdrawal or distribution shall be made (i) if such withdrawal or distribution would violate any contract or agreement to which the Fund is then a party or any law then applicable to the Fund, or (ii) to the extent that the Manager, in its sole discretion, determines that it is necessary or advisable for the Fund to retain any amount otherwise withdrawable or distributable to pay, or to establish a reserve for the payment of, any liability or obligation of the Fund, whether known or unknown, liquidated, fixed, contingent or otherwise.

(h)     The Manager in its sole discretion may waive the requirement that a Member making a withdrawal give 30 days' notice, make such withdrawal on or after such Member's Anniversary or on a Permitted Withdrawal Date, or otherwise comply with the terms of this Section 3.4.

(i)     Funds withdrawn by a Member shall be paid in the order in which credited to such Member's Capital Account as determined by the Manager in consultation with the Fund's independent accountants.

3.5     *Required Withdrawal and Return of Capital.*

(a)     Anything herein to the contrary notwithstanding, except as the Manager may in its sole discretion otherwise determine, a single Member that is a corporation, partnership, trust or other entity may not at any time hold Interests totaling 10% or more of all Interests then outstanding, unless such Member has less than 10% of its assets invested in one or more companies, including the Fund, that rely on the exclusion from the definition of "investment company" under Section 3(c)(1) of the Company Act ("Exempt Companies") and each such Member agrees to inform the Manager (i) immediately upon investing 10% or more of its assets in Exempt Companies, and (ii) from time to time at the request of the Manager, of the percentage of its assets invested in Exempt Companies. If at any time the Manager becomes aware that any Member holding Interests totaling 10% or more of all Interests then outstanding has invested 10% or more of its assets in Exempt Companies, such Member shall be deemed to have given notice of withdrawal pursuant to Section 3.4 of such portion or all of the Capital Account balance of such Member as the Manager may determine is necessary or advisable to cure such

violation, and such withdrawal shall be consummated as provided in Section 3.4 to the maximum extent feasible. In the event that a Member's partial or complete withdrawal pursuant to the preceding sentence or the Member's expulsion pursuant to Section 7.3 results from such Member's additional investment in Exempt Companies, including the Fund, such withdrawal shall be treated as having been made on a Permitted Withdrawal Date. By notice to such Member, the Fund may exercise its rights under this Section 3.5(a) at any time while such violation continues.

(b)     Anything herein to the contrary notwithstanding, except as the Manager may in its sole discretion otherwise determine, if at any time the Manager becomes aware that the participation in the Fund by one or more Members that are employee benefit plans subject to ERISA would cause the Fund's assets to be considered "plan assets" subject to regulation under ERISA, then the Manager may by notice to such Members cause the withdrawal of a portion or all of such Members' Capital Account balances as the Manager may determine is necessary or advisable to prevent the Fund from being subject to such regulation.

3.6     *Procedure Upon Early Withdrawal.*

(a)     If a withdrawal is made by a Member prior to such Member's Anniversary, (i) no Incentive Allocation shall be made with respect to the amount withdrawn, but an additional management fee equal to 2% of the amount withdrawn shall be deducted from the amount withdrawn and paid to the Manager, and (ii) payment of the withdrawn amount shall be made as described in Sections 3.4(c), (d) and (e) as if the date of withdrawal were a Permitted Withdrawal Date.

(b)     If a withdrawal is made by a Member on a date on or after such Member's Anniversary but on a date other than a Permitted Withdrawal Date at the end of a fiscal year, then (i) the Incentive Allocation shall be made on the date of withdrawal with respect to the amount withdrawn, and (ii) payment of the withdrawn amount shall be made as described in Sections 3.4(c), (d) and (e) as if the date of withdrawal were a Permitted Withdrawal Date.

3.7     *Capital Withdrawals by the Manager.*  The Manager may withdraw funds from its Capital Account in accordance with Sections 3.4 and 3.5 in the sole discretion of the Manager including, without limitation, withdrawals on dates other than Permitted Withdrawal Dates, but only to the extent that such withdrawals do not reduce the Manager's Capital Account balance below 1% of the aggregate Capital Account balances of all of the Members and Assignees.

3.8     *Loans to the Fund.*  No Member shall be required to lend any money to the Fund or to guaranty any Fund indebtedness.

3.9     *Limitation of Liability; Return of Certain Distributions.*

(a)     Except as otherwise set forth in this Agreement, a Member will be liable to the Fund only to the extent (i) that any Member receiving a distribution in violation of this Agreement shall return such distribution promptly following the Member's receipt of a request therefor from the Fund, and (ii) required by Delaware law.

(b)     No Member of the Fund shall be obligated personally for any debt, obligation or liability of the Fund solely by reason of being a Member of the Fund.

3.10    *Interest on Capital.*  No Member shall be entitled to interest on such Member's Capital Contribution or Capital Account balance.

---

## SECTION 4

## PROFITS AND LOSSES

---

4.1    *Allocations of Profits and Losses.*

(a)    *General.*  Except as otherwise provided in this Section 4.1, Profits and Losses of the Fund shall be allocated at the close of each Allocation Period among the Members as follows.

(i)    Profits shall be allocated to the Members' Capital Accounts in proportion to their respective positive Opening Capital Account balances.

(ii)    Losses shall be allocated to the Members' Capital Accounts in proportion to their respective positive Opening Capital Account balances, provided that items of loss that represent organization and syndication expenses of the Fund in excess of $50,000 shall be specially allocated to the Manager.

(b)    *Incentive Allocations.*  Notwithstanding the provisions of Section 4.1(a), the following special allocation rules shall apply:

(i)    If for an Incentive Allocation Period the amount of Net Increase that otherwise would be allocated to a Member for that Incentive Allocation Period pursuant to Section 4.1(a) exceeds the amount of any unrecovered balance in that Member's Loss Recovery Account, then 20% of such excess shall instead be allocated to the Manager (the "Incentive Allocation") and 80% of such excess shall be allocated to that Member.  "Incentive Allocation Period" shall mean, with respect to a Member, the following:  (i) the first Incentive Allocation Period shall be the period from the date of such Member's admission to the Fund to such Member's Anniversary, (ii) the second Incentive Allocation Period shall correspond to the period from the date of such Anniversary through the end of the Fiscal Year in which such Anniversary occurs, and (iii) succeeding Incentive Allocation Periods will correspond to subsequent Fiscal Years of the Fund.  "Net Increase" shall mean, with respect to an Incentive Allocation Period and a Member's Capital Account, the net Profit allocable to such Member for that Incentive Allocation Period reduced (but not below zero) by the amount that would have accrued on such Capital Account during such Incentive Allocation Period at the Risk-Free Rate, as determined on the first day of such Incentive Allocation Period.

(ii)    Except as otherwise set forth in this Section 4.1(b), the Incentive Allocation shall be debited as of the end of each Incentive Allocation Period from the Capital Account of each Member.  The total amount so debited shall be credited as of the end of that Incentive Allocation Period to the Capital Account of the Manager.

(iii)    If a Member has been a Member for at least four full fiscal quarters from the date of such Member's admission to the Fund and withdraws from the Fund as of a date other than the last day of a Fiscal Year, an Incentive Allocation determined in the following manner shall be allocated to the Manager:

An amount equal to 20% of such Member's Net Increase from the first day of the preceding Fiscal Year (or, if later, from the date of admission of the Member to the Fund) through the date of the Member's withdrawal (the "Measuring Period") shall be determined (disregarding any Incentive Allocation credited to the Manager during the Measuring Period). The excess, if any, of such amount over the Incentive Allocation credited to the Manager during the Measuring Period shall be reallocated to the Capital Account of the Manager as an Incentive Allocation. The Manager shall have no obligation to pay or otherwise compensate such Member in the event that the Incentive Allocation determined pursuant to this Section 4.1(b)(iii) is less than the Incentive Allocation credited during the Measuring Period.

(iv)    There shall be established on the books of the Fund for each Member a memorandum account (the "Loss Recovery Account"), the opening balance of which shall be zero. At the end of each Incentive Allocation Period or at such other date as the calculation of an Incentive Allocation is required to be made under this Section 4.1(b), the balance in each Member's Loss Recovery Account shall be adjusted as follows: (i) If there has been, in the aggregate, Net Decrease with respect to such Member since the immediately preceding date as of which a calculation of an Incentive Allocation with respect to such Member was made (or if no calculation has yet been made with respect to such Member, since such Member's admission to the Fund), an amount equal to such Net Decrease shall be charged to such Member's Loss Recovery Account, or (ii) if there has been Net Increase with respect to such Member since the immediately preceding date as of which a calculation of an Incentive Allocation was made, an amount equal to such Net Increase, before any Incentive Allocation to the Manager, shall be credited to and reduce any unrecovered balance in such Member's Loss Recovery Account, but not below zero. "Net Decrease" shall mean, with respect to an Incentive Allocation Period and a Member's Capital Account, the amount that would have accrued on such Capital Account during such Incentive Allocation Period at the Risk-Free Rate reduced (but not below zero) by the net Profit allocable to such Member for that Incentive Allocation Period and increased by the net Loss allocable to such Member for that Incentive Allocation Period.

In the event that a Member with an unrecovered balance in its Loss Recovery Account withdraws all or a portion of its capital in the Fund, the unrecovered balance in such Member's Loss Recovery Account shall be reduced as of the beginning of the next Incentive Allocation Period by an amount equal to the product obtained by multiplying the balance in such Member's Loss Recovery Account by a fraction, the numerator of which is the amount of the withdrawal made by such Member and the denominator of which is the balance in such Member's Capital Account, calculated without regard for such withdrawal, on the date of such withdrawal. Additional Capital Contributions shall not affect any Member's Loss Recovery Account.

(v)    The Manager, in its sole discretion, may waive all or any portion of any Incentive Allocation with respect to any Member.

(c)    *Adjustment to Capital Accounts for Distributions of Property.* If property distributed in kind is reflected in the Capital Accounts of the Members at a book value that differs from the fair market value of such property on the date of distribution, the difference shall be treated as Profit or Loss on the sale of the property and shall be allocated among the Members in accordance with the provisions of this Section 4.

(d)    *Tax Allocations.* Subject to applicable law, items of Fund income, gain, loss, expense, deduction and credit shall be allocated among the Members for income tax purposes in such manner as shall be determined by the Manager in its sole discretion.

4.2    *Reallocation of Organization and Syndication Expenses.* Upon each initial or additional Capital Contribution to the Fund made prior to the third anniversary of the Initial Closing Date, the Capital

Accounts of all Members will be adjusted by the Manager so that the organization and syndication costs of the Fund (as determined by the Manager in its sole discretion), are borne by the Members pro rata based upon their respective aggregate Capital Contributions to the date of such adjustment. In no event will the aggregate organization and syndication costs of the Fund borne by the Members pursuant to this Section 4.2 exceed $50,000.

4.3    *Withholding Taxes.*    The Fund shall withhold taxes from distributions to, and allocations among, the Members to the extent required by law. Except as otherwise provided in this Section 4.3, any amount so withheld by the Fund with regard to a Member shall be treated for purposes of this Agreement as an amount actually distributed to such Member pursuant to Section 5.1. An amount shall be considered withheld by the Fund if remitted to a governmental agency without regard to whether such remittance occurs at the same time as the distribution or allocation to which it relates; *provided, however,* that an amount actually withheld from a specific distribution or designated by the Manager as withheld from a specific allocation shall be treated as if distributed at the time such distribution or allocation occurs. To the extent operation of the foregoing provisions of this Section 4.3 would create a negative balance in a Member's Capital Account (or increase the amount by which such Capital Account balance is negative), the amount withheld shall be treated as a loan by the Fund to such Member, which loan shall be payable upon demand and shall bear interest at a floating rate equal to 200 basis points above the prime rate as announced from time to time by the Bank. Each Member hereby agrees to indemnify the Fund and the other Members for any liability they may incur for failure to properly withhold taxes in respect of such Member; moreover, each Member hereby agrees that neither the Fund nor any other Member shall be liable for any excess taxes withheld in respect of such Member's interest in the Fund and that, in the event of overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate governmental authority.

# SECTION 5

# DISTRIBUTIONS

5.1    *Discretionary Distributions.*    Subject to Section 3.4(g), the Manager in its sole discretion shall determine the amount and timing of all distributions by the Fund and whether such distributions will be in cash or in kind or partly in cash and partly in kind. Except as otherwise provided herein, all distributions shall be made in proportion to the Members' Closing Capital Account balances determined as of the close of the Allocation Period for which such distribution occurs. Distributions in kind shall be made at valuations determined as provided in Section 6.12.

5.2    *Liquidating Distributions.*    Notwithstanding the provisions of Section 5.1, cash and property of the Fund available for distribution upon the dissolution of the Fund shall be distributed in accordance with the provisions of Section 8.3.

5.3    *Limitation on Distributions.*    Notwithstanding any provision of this Agreement to the contrary, no distribution shall be made to a Member to the extent that such distribution would (i) be in violation of the Act, (ii) render the Fund insolvent, (iii) render the Member liable for a return of such distribution under the Act, or (iv) exceed the amount of the Member's positive Capital Account balance determined as if, immediately prior to such distribution, all of the Fund's assets had been sold for fair market value (as determined in accordance with

Section 6.12), and the Profits and Losses attributable thereto had been allocated among the Members in accordance with the provisions of Section 4.1.

## SECTION 6

## ADMINISTRATIVE PROVISIONS

6.1     *Management by the Manager.*  The Manager is the sole "manager" of the Fund within the meaning of Section 18-101(10) of the Act.  Subject to the provisions of this Agreement and applicable law, the Manager shall have the exclusive power and authority to perform acts (solely in furtherance of the Fund's purpose) associated with the management of the Fund and its business including, without limitation, the power and authority to:

(a)     Acquire, purchase, invest in, hold for investment, own, exchange, assign, sell or otherwise dispose of, trade in (on margin with FCMs, brokerage firms, banks or other financial institutions, or otherwise), sell short, or otherwise deal in Financial Instruments;

(b)     Exercise all powers, privileges and other incidents of ownership or possession with respect to Financial Instruments held or owned by the Fund;

(c)     Enter into custodian agreements with FCMs, brokerage firms, banks or other financial institutions, to open, maintain and close bank and other brokerage accounts and to draw checks or other orders for payments of money or the delivery of instruments;

(d)     Employ or retain any qualified person to perform services or provide advice on behalf of the Fund and pay reasonable compensation therefor;

(e)     Compromise, arbitrate or otherwise adjust claims in favor of or against the Fund and commence or defend litigation with respect to the Fund or any assets of the Fund, at the Fund's expense;

(f)     Cause the Fund to maintain, at the Fund's expense, insurance coverage reasonably satisfactory to the Manager with regard to any circumstance or condition that may affect the Fund, or the liability of the Manager in its capacity as such;

(g)     Cause the Fund to enter into, make and perform such contracts, agreements and other undertakings, and to do such other acts, as he may deem necessary or advisable for, or as may be incidental to, the conduct of the business of the Fund, including, without limitation, contracts, agreements, undertakings and transactions with any Member or with any other person related to any Member; *provided, however,* that transactions with such persons for the account of the Fund shall be on terms no less favorable to the Fund than are generally afforded to unrelated third parties in comparable transactions;

(h)     Open, conduct business regarding, draw checks or other payment orders upon, and close cash, checking, custodial or similar accounts with banks or brokers on behalf of the Fund and pay the customary fees and charges applicable to transactions in respect of all such accounts;

(i)     Cause the Fund to compensate FCMs, brokerage firms, banks or other financial institutions for record keeping, custodial, and related services through brokerage compensation and use such compensation to repay brokers for computer equipment, software, and services used for Fund accounting and reporting to Members, as well as for paying other Fund expenses, such as accounting and legal fees and expenses, telecommunications and postage chargers incurred in the Fund's business;

(j)     Use Fund commissions and other transaction compensation other than "soft dollars" to pay for such items as rent, office services, office supplies, telephone charges, and salaries of administrative personnel that would otherwise be borne by the Manager;

(k)     Determine the FCM or brokerage firm to be used for Fund transactions and the commission rates at which transactions will be effected.  The Manager may employ several FCMs or brokerage firms to undertake all activities incident to the receipt and delivery of Financial Instruments purchased, sold, sold short or covered, making and receiving payments, custody of Financial Instruments, compliance with margin and maintenance requirements, custody of all cash, dividends and other rights accruing to a client's account, and other services;

(l)     Cause the Fund to purchase Financial Instruments from a primary market maker acting as principal on a net basis with no brokerage commission;

(m)     Purchase from an FCM or brokerage firm or allow a broker to pay for certain research services and market information, portfolio strategy advice, industry and company comments, technical data, recommendations, general reports, consultations, news wire charges, and Quotron rent.  The Manager may pay a brokerage commission in excess of the commission another FCM or brokerage firm might charge for effecting the same transaction in recognition of the value of the brokerage and research provided.  In each case, however, the Manager will determine in good faith that such commission is reasonable in relation to the value of brokerage and research services provided by such FCM or brokerage firm, viewed in terms of either the specific transaction or the Manager's overall responsibilities to the portfolios over which the Manager exercises investment authority;

(n)     Implement a program of FCM or brokerage firm compensation that consists of directing a certain amount of business to an FCM or brokerage firm or in return for the FCM's or brokerage firm's referral of prospective clients; and

(o)     Assume and exercise all powers and responsibilities permitted to or imposed upon a limited liability company manager by the laws of the State of Delaware.

Without limiting the foregoing, (i) any contract, agreement, deed, lease, note or other document or instrument executed on behalf of the Fund by the Manager shall be deemed to have been duly executed, (ii) no other Member's signature shall be required in connection with the foregoing and third parties shall be entitled to rely upon the Manager's authority under the provisions of this sentence without otherwise ascertaining that the requirements of this Agreement have been satisfied, and (iii) no Member other than the Manager shall have any right, power or authority to participate in the management of the Fund, vote on any Fund matter or act on behalf of the Fund, except as specifically provided in this Agreement.

6.2     *Special Limitations on the Authority of the Manager.* Unless approved by the Manager and the vote or consent of a Majority-In-Interest of the Members, the Fund shall not: (i) merge or consolidate with any corporation or other entity, (ii) incur indebtedness other than in the ordinary course of business or as otherwise provided herein, or (iii) purchase from or sell to the Manager Financial Instruments of private companies.

6.3     *Other Ventures and Activities.*

(a)     Any Member (including the Manager) and such Member's Affiliates may engage in any activities, whether or not related to the business of the Fund. Each Member specifically recognizes that some or all of the Members and their Affiliates may be engaged in various aspects of the securities business, including, without limitation, engaging in securities portfolio management and the formation and management of investment funds, both for their own accounts and for others. Such Members may continue, or initiate further, such activities. Each Member agrees that any Member and any Affiliate of any Member (i) may engage in or possess an interest, direct or indirect, in any business venture of any nature or description for its own account, independently or with others, including, without limitation, any business, industry or activity in which the Fund may be interested in investing or may also have investments, and (ii) may do so without any obligation to report the same to the Fund or any Member or to afford the Fund or any Member any opportunity to participate therein. Neither the Fund nor any Member shall have any right in or to any such independent venture or investment or the revenues or profits derived therefrom. The Manager and other Fund personnel may trade in the same Financial Instruments traded for the Fund; however, it is the policy of Manager not to give preference to its orders or those of other Fund personnel regarding such trading.

(b)     The Members hereby acknowledge that the Manager may be prohibited from taking action for the benefit of the Fund: (i) due to confidential information acquired or obligations incurred in connection with an outside activity permitted to the Manager, its Affiliates, shareholders or other related persons under this Section 6.3, or (ii) in connection with activities undertaken by a shareholder, Affiliate or other related person of the Manager prior to the date first above written. No person shall be liable to the Fund or any Member for any failure to act for the benefit of the Fund in consequence of a prohibition described in the preceding sentence.

6.4     *Policies With Respect to Investment Opportunities.*

(a)     The Members recognize that decisions concerning investments and potential investments involve the exercise of judgment and the risk of loss.

(b)     While the Manager generally intends to offer to the Fund at least some portion of all investment opportunities that meet the Fund's investment criteria, the Manager will apply its reasonable business judgment in determining when an investment opportunity meets the Fund's investment criteria and whether it is in the best interests of the Fund to take advantage of an investment opportunity (even if the opportunity otherwise satisfies such criteria).

(c)     Notwithstanding any provision of this Agreement to the contrary, the Manager, in its sole discretion, may elect to make available investment opportunities which come to its attention, in whole or in part, to one or more of the Fund or any other person or persons.

6.5    *Expenses.*

(a)    Except as otherwise provided in Section 6.1 or 6.5(b), expenses of the Fund shall not include the normal operating expenses of the Manager and its Affiliates (including salaries paid to employees of the Manager or its Affiliates, rent, communications, travel and similar expenses, investment consultant fees, and other expenses incurred in investigating or evaluating investment opportunities).

(b)    Expenses to be borne by the Fund ("Fund Expenses") shall include the following costs and expenses associated with the organization, operation, dissolution, or liquidation of the Fund: (i) up to $50,000 in expenses associated with the organization of the Fund or the syndication of Interests therein, (ii) legal, accounting, audit, bookkeeping, custodial, consulting and other professional fees, (iii) banking and trading expenses (including, without limitation, expenses relating to short sales, brokerage commissions, clearing and settlement charges, option premiums, service fees and costs incurred in acquiring, holding, selling or otherwise disposing of Fund assets and liabilities), (iv) insurance premiums, indemnifications, costs of litigation and other extraordinary expenses, (v) costs of financial statements and other reports to Members, as well as costs of all governmental returns, reports and other filings, (vi) costs of meetings of the Members (including, without limitation, the reasonable travel and other out-of-pocket costs incurred by the Manager in attending such meetings), (vii) interest expenses (including margin expenses), (viii) expenses incurred after the first anniversary of the Initial Closing Date for equipment used in the business of the Fund, (ix) costs of dissolving and liquidating the Fund, (x) any other expenses not listed in the preceding clauses (i) through (ix) that are normal operating expenses of the Manager in conducting the business of the Fund and are incurred after the first anniversary of the Initial Closing Date. Any costs incurred in connection with special services requested by a Member will be required to be paid by that Member.

(c)    The Manager shall be promptly reimbursed by the Fund for Fund Expenses paid or incurred by the Manager on the Fund's behalf.

(d)    There will be no sales charges in connection with the offering of interests in the Fund. The Manager may from time to time engage persons to introduce prospective Members to the Fund and may pay them compensation for such services. All such payments will be made by the Manager and not borne by any of the other Members or reimbursed by the Fund.

6.6    *Member Compensation.*

(a)    *General.* Except as otherwise provided in this Section 6.6, no Member shall be entitled to compensation for services provided by such Member to, or for the benefit of, the Fund.

(b)    *Members.* A Member that, with the consent of the Manager, performs services for the Fund as an employee or independent contractor shall be entitled to receive fair market value compensation for such services (as determined by the Manager in its reasonable discretion).

(c)    *Management Fee.* There shall be deducted from each Capital Contribution made by a Member a fee to be paid and/or allocated to the Manager an amount equal to 1% per annum of such Member's Capital Contribution, calculated through the end of the Fiscal Quarter in which such Capital Contribution is made. Thereafter, there shall be deducted from the Capital Account of such Member and paid and/or accrued as a fee to the Manager on the first day of each Fiscal Quarter an amount equal to .25% of the value of such Member's Opening Capital Account balance on such day, including, without limitation, the value of any Capital Contribution made on such day. Each of the foregoing fees is referred to as a "Management Fee." The Manager,

16

in its sole discretion, may waive all or any portion of the Management Fee with respect to any Member in any Fiscal Quarter.

6.7    *Limitations on Payments to the Manager.*  Notwithstanding anything in this Agreement to the contrary, any payment to the Manager or any Affiliate of the Manager, including without limitation capital withdrawals, Incentive Allocations, Management Fees and reimbursed expenses, shall first have been reviewed by an independent representative who is an attorney or an independent public accountant other than the Manager or an Affiliate of the Manager (but which in the sole discretion of the Manager may be the Fund's independent accountant) and shall have been found by such independent representative to be in accordance with this Agreement.

6.8    *Reports, Records and Financial Statements.*

(a)    The Fund shall maintain true and proper books, records, reports, and accounts in which shall be entered all transactions of the Fund. Such books, records, reports and accounts shall be located at the Principal Office and shall be available for inspection by any Member at such times and intervals as are reasonable. Schedule A shall be treated as a record of the Fund and updated each time the Fund is notified of new or changed information to be shown thereon.

(b)    As soon as is reasonably practicable after the close of each Fiscal Year, and in any event within 90 days after the end of such Fiscal Year, the Manager shall make or cause to be made a full and accurate inventory and accounting of the affairs of the Fund as of the close of that Fiscal Year and shall deliver to the Members the following financial statements, audited by the Fund's independent accountants: a statement of financial condition as of the close of such Fiscal Year, a statement of operations for such Fiscal Year, and a statement of changes of net assets during such Fiscal Year. In addition, the Manager shall furnish to each Member information regarding the Fund necessary for such Member to complete such Member's federal and state income tax returns. The Manager shall also furnish a copy of the Fund's tax returns to any Member requesting the same.

(c)    The Manager shall make or cause to be made and shall timely deliver to the Members all such statements, reports and other information as may be required pursuant to the Commodity Exchange Act and the rules and regulations promulgated thereunder.

6.9    *Confidentiality.*  The Members acknowledge and agree that all information provided to them by or on behalf of the Fund concerning the business of the Fund or any Member shall be deemed strictly confidential and shall not, except as required by law, be disclosed to any person (other than a Member) without the prior consent of the Manager. The Members hereby consent to the disclosure by each Member of Fund information to such Member's accountants, attorneys and similar advisors bound by a duty of confidentiality; moreover, the foregoing requirements of this Section 6.9 shall not apply to a Member with regard to any information that is currently or becomes (i) publicly known or available in the absence of any improper or unlawful action on the part of such Member (including, without limitation, any action in violation of this Section 6.9), or (ii) known or available to such Member other than through or on behalf of the Fund.

6.10    *Disclosures.*  Each Member shall furnish any data with respect to itself reasonably required in connection with the formation, operation or dissolution of the Fund.

6.11    *Tax Matters Member.*

(a)    *General.*  The Manager is hereby designated the "Tax Matters Member" of the Fund within the meaning of Section 6231(a)(7) of the Code.  Except to the extent specifically provided in the Code and the regulations issued thereunder (or the laws of other relevant taxing jurisdictions), the Tax Matters Member shall have the exclusive power to act for or on behalf of the Fund in respect of tax matters.

(b)    *Notice of Inconsistent Treatment of Fund Item.*  No Member shall file a notice with the Internal Revenue Service under Section 6222(b) of the Code in connection with such Member's intention to treat an item on such Member's Federal income tax return in a manner that is inconsistent with the treatment of such item on the Fund's Federal income tax return unless such Member has, not less than 30 days prior to the filing of such notice, provided the Tax Matters Member with a copy of the notice and thereafter in a timely manner provides such other information related thereto as the Tax Matters Member shall reasonably request.

(c)    *Notice of Settlement Agreement.*  Any Member entering into a settlement agreement with the Department of the Treasury which concerns a Fund item shall notify the Tax Matters Member of such settlement agreement and its terms within 60 days from the date thereof.

6.12    *Valuation.*  The value or amount of the Fund's assets and liabilities shall be determined by the Manager in good faith in a commercially reasonable manner.  Subject to the preceding sentence, illiquid Financial Instruments normally will be valued at cost.  In all events, the value of the Fund's assets and liabilities determined by the Manager shall be conclusive and binding on all of the Members and all those claiming through or under them; *provided, however,* that if within 30 days of the distribution of illiquid Financial Instruments to a Member pursuant to Section 3.4, 3.5, 5 or 8.3, such Member notifies the Manager or the Liquidating Agent, as the case may be, of any objection to such valuation and the Manager or the Liquidating Agent, as the case may be, declines to adjust such valuation in a manner that eliminates such objection, the matter shall be resolved as provided in Section 10.9.

---

## SECTION 7

## TRANSFERS AND WITHDRAWALS

---

7.1    *General Provisions Regarding Transfers.*    No Member may sell, assign, pledge, grant a security interest in, or otherwise transfer or encumber all or any portion of such Member's Interest in the Fund without the prior written consent of the Manager, which consent may be (i) withheld in the Manager's sole discretion, and (ii) conditioned upon the review and approval by the Fund's outside legal counsel of the instruments effecting such transfer or encumbrance.  Subject to Section 7.2, any attempted transfer or encumbrance in violation of the provisions of this Section 7.1 shall be void and ineffective.

7.2    *Withdrawal by a Member.*  Except as provided in Section 3.4 and this Section 7.2, a Member may not withdraw from the Fund.  A Member shall be deemed to have withdrawn as a Member of the Fund (i) on its death, (ii) on the entry of any court order charging its entire Interest in the Fund with the unsatisfied amount of any judgment, (iii) on the vesting of its Interest in the Fund in any other person as the result of the Member's insolvency or incapacity, or for any other reason, or (iv) on notice given by the Manager to such Member pursuant to Section 7.3, which withdrawal shall be effective as of the end of the Fiscal Quarter in which any of the events described in the foregoing clauses (i)-(iii) occurs, or, in the case of an event described in the foregoing clause (iv), on the date specified in Section 7.3, as appropriate.

In the event of a deemed withdrawal, a Member or the successor of such Member's Interest shall be treated as an Assignee.

7.3     *Expulsion.*  The Manager may at any time, in its sole discretion, expel any Member from the Fund, with or without cause, on 5 days' notice to such Member specifying the effective date of such expulsion. In the event of such expulsion, the expelled Member shall be deemed to have withdrawn such Member's entire Capital Account balance from the Fund as provided in Section 3.4 effective as of the date fixed therefor by the Manager.  Except as provided in Section 3.5(a), the expelled Member's withdrawal date shall be treated as a Permitted Withdrawal Date for purposes of Section 3.4.  Notwithstanding anything to the contrary in this Agreement, the Manager may not be removed from its position as such without its consent.

7.4     *Status of Assignees.*

(a)     An Assignee that holds an Interest in the Fund shall be entitled to receive the allocations attributable to such Interest pursuant to Section 4, to receive the distributions attributable to such Interest pursuant to Sections 5 and 8, and to Transfer such Interest in accordance with the terms of this Section 7. Notwithstanding the foregoing, the Fund and the Members shall incur no liability for allocations and distributions made to a transferor, and an assignment need not otherwise be recognized by the Fund, until the Fund has received and had reasonable opportunity to record on its books an effective written instrument of assignment pursuant to which the Assignee agrees to be bound by the provisions of this Agreement.

(b)     An Assignee that holds an Interest in the Fund shall be responsible for any obligation to return distributions or make other payments to the Fund associated with such Interest pursuant to this Agreement; *provided, however,* that the transferor of such Interest, if a Member, also shall continue to be responsible for the satisfaction of such obligations until such time as a Substitute Member is admitted in respect of such Interest.  To the extent otherwise applicable to the Interest in the Fund that has been transferred to an Assignee, the Assignee shall be subject to, and bound by, all of the terms and provisions of this Agreement that inure to the benefit of the Fund and/or other Members (including, without limitation, the provisions of this Agreement concerning confidentiality of Fund information, Transfers of Fund Interests, and resolution of disputes). The foregoing provisions of this Section 7.4(b) shall apply to any Assignee that becomes bound by this Agreement pursuant to Section 10.6 without regard to whether such Assignee has executed a written instrument of assignment as described in Section 7.4(a).

(c)     Solely to the extent necessary to give effect to the Assignee rights and obligations set forth in Sections 7.4(a) and (b), an Assignee shall be treated as a Member for purposes of this Agreement.

(d)     An Assignee shall not, solely by virtue of its status as such, hold any non-economic rights in respect of the Fund.  Without limiting the preceding sentence, an Assignee's interest in the Fund shall not entitle such Assignee to participate in the management of the Fund, vote on any Fund matters or bind the Fund under agreements with third parties.  An Assignee shall not hold itself out as a Member in any forum or for any purpose; *provided, however,* that, to the extent necessary to maintain consistency with the Fund's income tax returns, reports, and other filings, an Assignee shall take the position that it is a Member solely for income tax purposes.

(e)     Subject to Section 7.4(a), the Manager may in its sole discretion elect to redeem any Assignee's Interest at any time by paying to such Assignee in cash or in kind the amount that such Assignee would have received if, on the effective date of redemption, such Assignee had withdrawn its entire Capital Account

balance from the Fund. Payments of the withdrawn amounts shall be made as described in Sections 3.4 (c), (d) and (e) as if the date of withdrawal were a Permitted Withdrawal Date.

---

## SECTION 8

## DISSOLUTION AND LIQUIDATION

---

8.1     *Dissolving Events.* The Fund shall be dissolved upon the occurrence of any of the following events:

   (a)     Expiration of the Fund's term;

   (b)     Issuance of an order by a court of competent jurisdiction requiring the dissolution of the Fund;

   (c)     Failure of the Fund to have at least two Members;

   (d)     Permanent cessation of the Fund's business;

   (e)     The withdrawal, retirement, death, incapacity, Dissolution or Bankruptcy of the Manager;

   (f)     When the Manager elects, by written notice to the Fund, to dissolve the Fund.

8.2     *Special Meeting to Dissolve or Continue the Fund.* Upon the withdrawal, retirement, death, incapacity, Dissolution or Bankruptcy of the Manager, the Liquidating Agent shall notify the remaining Members of a special meeting of the Members to be held not less than 10 days nor more than 60 days after the date of such event. At that meeting, the Members may by unanimous vote elect to continue the business of the Fund and agree to the appointment of a new Manager. If the Members do not elect to continue the business of the Fund and to appoint a new Manager, the Liquidating Agent or the Liquidating Agent's designee shall then cause the Fund to be liquidated in accordance with Section 8.3.

8.3     *Winding Up of the Fund.*

   (a)     Upon dissolution of the Fund, the Liquidating Agent shall promptly wind up the affairs of the Fund in accordance with the provisions of this Section 8.3. The Fund shall engage in no further business except as may be necessary, in the reasonable discretion of the Liquidating Agent, to preserve the value of the Fund's assets during the period of dissolution and liquidation.

   (b)     Distributions to the Members in liquidation may be made in cash or in kind, or partly in cash and partly in kind, as determined by the Liquidating Agent. Distributions in kind shall be valued in accordance with Section 6.12 and shall be subject to such conditions and restrictions as may be necessary or advisable in the reasonable discretion of the Liquidating Agent to preserve the value of the property so distributed.

(c)     The Profits and Losses of the Fund during the period of dissolution and liquidation shall be allocated among the Members in accordance with the provisions of Section 4.1. If any property is to be distributed in kind, the Capital Accounts of the Members shall be adjusted with regard to such property in accordance with the provisions of Section 4.1(c).

(d)     The assets of the Fund (including, without limitation, proceeds from the sale or other disposition of any assets during the period of dissolution and liquidation) shall be applied as follows:

(i)     First, to repay any indebtedness of the Fund, whether to third parties or any of the Members, in the order of priority required by law;

(ii)     Next, to any reserves which the Liquidating Agent reasonably deems necessary for contingent or unforeseen liabilities or obligations of the Fund (which reserves when they become unnecessary shall be distributed in accordance with the provisions of (iii), below); and

(iii)     Next, to the Members in proportion to their respective positive Closing Capital Account balances (after taking into account all adjustments to the Members' Capital Accounts required under Section 8.3(c)).

8.4     *Designation of Liquidating Agent.* The "Liquidating Agent" shall initially be the Manager and shall thereafter be the person or entity designated from time to time by the Manager. In the event the Manager has resigned as Liquidating Agent without designating a replacement Liquidating Agent or the Manager or its designee is unable to carry out its duties as Liquidating Agent, the Liquidating Agent shall be the Member having the largest Capital Account balance. The Liquidating Agent may be a non-Member, if in the opinion of counsel to the Fund this would not cause the Fund to be classified as an association taxable as a corporation for Federal income tax purposes.

## SECTION 9

## LIABILITY PROVISIONS

9.1     *Liability.* Except as otherwise specifically provided in this Agreement, no Indemnified Person shall be personally liable for the return of any contributions made to the capital of the Fund by the Members. In the absence of Material Misconduct (which misconduct shall have given rise to the matter at issue) on the part of an Indemnified Person, such Indemnified Person shall not be liable to the Fund or the Members for any act or omission concerning the Fund's business. An Indemnified Person may consult with legal counsel or accountants in respect of Fund affairs and, so long such advisors were selected with reasonable care, shall be deemed to have acted in good faith and without negligence with regard to any action or inaction that is taken in accordance with the advice or opinion of such advisors. An Indemnified Person shall not be liable to the Fund or the Members for losses due to the fraud, bad faith, willful misconduct or negligence, whether of omission or commission, of any independent contractor, employee or other agent of the Fund unless such Indemnified Person was or should have been directly involved with the selection, engagement or supervision of such person and failed to exercise reasonable care in connection therewith. Nothing in this Agreement to the contrary shall in any way constitute a waiver or limitation of any right that Members may have under Federal securities laws.

9.2    *Indemnification.* In the absence of Material Misconduct (which misconduct shall have given rise to the matter at issue) on the part of an Indemnified Person, the Fund shall indemnify and hold each Indemnified Person harmless from and against any loss, expense, damage or injury suffered or sustained by any of them by reason of any acts, omissions, or alleged acts or omissions arising out of any activity performed or required to have been performed by, for, on behalf of, or otherwise in furtherance of the interests of the Fund. This indemnification shall include, but not be limited to, (i) payment of reasonable attorneys fees and other expenses incurred in settling any claim or threatened action or in connection with any legal proceeding, and (ii) the removal of any liens affecting the property of an Indemnified Person. Neither any amendment or repeal of this Section 9.2, nor the adoption of any provision of this Agreement inconsistent with this Section 9.2, shall eliminate or reduce the effect of this Section 9.2 in respect of any matter occurring, or any action or proceeding accruing or arising or that, but for this Section 9.2, would accrue or arise, prior to such amendment, repeal or adoption.

## SECTION 10

## GENERAL PROVISIONS

10.1    *Status Under the Act.* This Agreement is the "limited liability company agreement" of the Fund within the meaning of Section 18-101(7) of the Act.

10.2    *Entire Agreement.* This Agreement contains the entire understanding among the Members and supersedes any prior written or oral agreement between them respecting the Fund. There are no representations, agreements, arrangements, or understandings, oral or written, among the Members relating to the Fund which are not fully expressed in this Agreement.

10.3    *Amendments.*

(a)    Except as provided in this Section 10.3, this Agreement is subject to amendment only with the consent of the Manager and a Majority-In-Interest of the Members.

(b)    Notwithstanding the foregoing, the Manager may, without the consent of the other Members, amend this Agreement: (i) to reflect changes validly made in the membership of the Fund, the Capital Contributions, and the Interests issued to the Members, (ii) to change the provisions relating to the Incentive Allocation so that such provisions conform to any applicable requirements of the Commodity Futures Trading Commission, the Securities and Exchange Commission and other regulatory authorities, so long as such amendment does not increase the Incentive Allocation with respect to any Member to more than 20% of the aggregate Net Increase for any Incentive Allocation Period, (iii) to reflect a change in the name of the Fund, (iv) to make a change that is necessary or, in the opinion of the Manager, advisable to qualify the Fund as a limited liability company in which the Members have limited liability under the laws of any state, or to ensure that the Fund will not be treated as an association taxable as a corporation for Federal income tax purposes, (v) to make a change that is necessary or desirable to cure any ambiguity, to correct or supplement any provision in this Agreement that would be inconsistent with any other provision in this Agreement, or to make any other provision with respect to matters or questions arising under this Agreement that will not be inconsistent with the provisions of this Agreement, in each case so long as such change does not adversely affect the Members, (vi) to make a change that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any

opinion, directive, order, ruling or regulation under or of any Federal or state statute, so long as such change is made in a manner which minimizes any adverse effect on the Members; or to make a change that is required or contemplated by this Agreement, (vii) to make a change in any provision of this Agreement that requires any action to be taken by or on behalf of the Manager or the Fund pursuant to the requirements of applicable Delaware law if the provisions of applicable Delaware law are amended, modified or revoked so that the taking of such action is no longer required, (viii) to prevent the Fund or the Manager from in any manner being deemed an "investment company" subject to the provisions of the Company Act, or (ix) to make any other amendments that will not affect the rights and duties of the Members in any material respect.

(c)     An amendment to any provision of this Agreement that calls for a higher level of approval of the Members or the approval of certain specified Members shall, in addition to the execution percentages set forth in Section 10.3(a), require the same form of approval as is set forth in such provision.

(d)     Except with regard to amendments otherwise specifically required under this Agreement, there shall be no amendment to this Agreement which would have a material adverse effect upon a Member unless the amendment: (i) is consented to by such Member or (ii) by its terms applies to all Members and could have a disproportionately adverse effect upon such Member only due to some attribute of the Member itself (other than the Member's status as such).

(e)     . Any amendment to this Section 10.3 shall require the unanimous consent of the Members.

10.4     *Governing Law.* All questions with respect to the interpretation of this Agreement and the rights and liabilities of the Members shall be governed by the laws of the State of Delaware as they are applied to contracts entered into and wholly performed upon in Delaware by residents of Delaware. To the extent permitted by the Act and other applicable law, the provisions of this Agreement governing the rights and obligations of the Members shall supersede any contrary provisions of the Act or other applicable law.

10.5     *Severability.* In the event that any provision of this Agreement is determined to be invalid or unenforceable, such provision shall be deemed severed from the remainder of this Agreement and replaced with a valid and enforceable provision as similar in intent as reasonably possible to the provision so severed, and shall not cause the invalidity or unenforceability of the remainder of this Agreement.

10.6     *Counterparts; Binding Upon Members and Assignees.* This Agreement may be executed in any number of counterparts and when so executed, all of such counterparts shall constitute a single instrument binding upon all parties notwithstanding the fact that all parties are not signatory to the original or to the same counterpart. In addition, to the maximum extent permitted by applicable law, a person shall become bound in accordance with the terms of this Agreement as an Assignee or Member if such person (or a representative authorized by such person orally, in writing or by other action such as payment for an Interest in the Fund) executes any other writing evidencing the intent of such person to become a Member or Assignee or if such person or representative complies with the conditions for becoming a Member or Assignee as set forth in this Agreement or any other writing and requests (orally, in writing or by other action such as payment for an interest in the Fund or acceptance of distributions from the Fund) that the records of the Fund reflect such admission or assignment.

10.7     *Survival of Rights.*  Subject to the restrictions against unauthorized Transfer set forth in this Agreement, the provisions of this Agreement shall inure to the benefit of and be binding upon each Member and Assignee and such Member's or Assignee's heirs, devises, legatees, personal representatives, successors, and assigns.

10.8     *No Third Party Beneficiaries.*  Except as otherwise provided in this Section 10.8, the provisions of this Agreement are not intended to be for the benefit of or enforceable by any third party.  Without limiting the foregoing, no third party shall have any right to enforce or demand enforcement of a Member's obligation to return distributions or obligation to make other payments to the Fund as set forth in this Agreement.

10.9     *Arbitration.*  Any controversy or claim arising out of or relating to this Agreement, the Fund or the Members' respective rights and duties shall be settled by arbitration in San Mateo County, California, or . the county in which the Principal Office is then located.  Such arbitration shall be in accordance with the rules of the American Arbitration Association and judgment upon the award may be entered in any court of competent jurisdiction.  The prevailing party or parties in such arbitration and any ensuing legal action shall be reimbursed by the party or parties who do not prevail for their reasonable attorneys', accountants' and experts' fees and the costs of such actions, and such non-prevailing parties shall be jointly and severally liable for such amounts.

10.10     *Notices.*  Any notice required or permitted to be given under this Agreement or the Act shall be in writing.

        (a)     *Notice to Members.*  Notice to a Member shall be deemed duly given: (i) when personally delivered to such Member; (ii) at the Close of Business on the third day after being deposited in the United States mail, registered or certified, postage prepaid and addressed to the address set forth on Schedule A for such Member, or to any other address of which the Fund is notified by such Member in writing; (iii) at the Close of Business on the first day after being deposited in the United States with a nationally recognized overnight delivery service, with delivery charges prepaid and addressed as provided in the preceding clause; or (iv) when actually received by such Member via public or private mail, telecopy, telex or telegram.

        (b)     *Notice to the Fund.*  Notice to the Fund shall be deemed duly given when duly given to a Member or when actually received at the Principal Office, in accordance with the same procedures set forth in Section 10.10(a).

10.11     *Consents.*  Subject to the provisions of Section 10.6, all consents, agreements, elections and approvals provided for or permitted by this Agreement or the Act shall be in writing and signed copies thereof shall be retained with the books of the Fund.

10.12     *No Partition.*  Except as otherwise permitted by this Agreement, no Member shall have the right, and each Member does hereby agree that it shall not seek, to cause a partition of the Fund's property whether by court action or otherwise.

10.13     *Representation by Members and Assignees.*

        (a)     Each Member and each Assignee hereby represents that, with respect to its Interest in the Fund: (i) it is acquiring or has acquired such Interest for purposes of investment only, for its own account (or a trust account if such Member or Assignee is a trustee), and not with a view to resell or distribute the same or any part thereof; and (ii) no other person has any interest in such Interest or in the rights of such Member or Assignee under this Agreement other than a spouse having a community property or similar interest under

applicable state law. Each Member or Assignee also warrants to the Fund and the other Members that it has the business and financial knowledge and experience necessary to acquire an Interest in the Fund on the terms contemplated herein and that it has the ability to bear the risks of such investment (including the risk of sustaining a complete loss of all its capital contributions) without the need for the investor protections provided by the registration requirements of the Securities Act.

(b)     The Members and Assignees hereby acknowledge that certain provisions of this Agreement (including, without limitation, Sections 6.3 and 6.4) have the effect of reducing the fiduciary duties of the Members to the Fund under applicable law. Each Member and Assignee hereby represents that it has carefully considered each such provision and has made an informed decision to consent thereto.

10.14   *No Usury.* Notwithstanding any provision of this Agreement to the contrary, the rate of interest charged by the Fund to any Member in connection with an obligation of the Member to the Fund shall not exceed the maximum rate permitted by applicable law. To the extent that any interest otherwise paid or payable by a Member to the Fund shall have been finally adjudicated to exceed the maximum amount permitted by applicable law, such interest shall be retroactively deemed to have been a required repayment of principal (and any such amount paid in excess of the outstanding principal amount shall be promptly returned to the payor Member).

10.15   *Partnership for Tax Purposes Only.* As set forth in Section 2.1, the Members hereby form the Fund as a limited liability company under the Act. The Members expressly do not intend hereby to form a partnership except insofar as the Fund may be treated as a partnership solely for tax purposes.

10.16   *Legal Counsel.* The Manager and the Fund have engaged Wilson, Sonsini, Goodrich & Rosati, Professional Corporation, and David Hodge, Esq., as legal counsel ("Legal Counsel") to the Manager and the Fund. No legal counsel has been engaged by the Fund to protect or otherwise represent the interests of any other Member. Moreover, Legal Counsel may represent the Fund, the Manager and/or certain parties related thereto in the future. Each Member: (i) approves Legal Counsel's representation of the Manager and the Fund in the preparation of this Agreement, (ii) acknowledges that no legal counsel has been engaged by the Manager and the Fund to protect or otherwise represent the interests of the Members other than the Manager, that Legal Counsel has not been engaged by any Member other than the Manager to protect or represent the interests of such Member vis-a-vis the Fund or the preparation of this Agreement, and that actual or potential conflicts of interest may exist among the Members in connection with the preparation of this Agreement (with the consequence that a Member's interests may not be vigorously represented unless such Member engages its own legal counsel), and (iii) acknowledges further that such Member has been afforded the opportunity to engage and seek the advice of its own legal counsel before entering into this Agreement. In addition, each Member: (x) acknowledges the possibility of a future conflict or dispute among Members or between any Member or Members and the Fund, (y) agrees that Legal Counsel may represent the Fund and/or any Member in connection with any such conflict or dispute and, to the extent permitted under the California Rules of Professional Conduct and any other applicable rules governing the professional conduct of attorneys (the "Professional Rules"), waives its right to object to such representation (including, without limitation, on the grounds of any actual or potential conflict of interests), and (z) acknowledges the possibility that, pursuant to operation of the Professional Rules, Legal Counsel may be precluded from representing the Fund and/or any Member in connection with any such conflict or dispute (even if Legal Counsel has represented such Member with regard to other matters). Nothing in this Section 10.16 shall preclude the Fund from selecting different legal counsel to represent it at any time in the future and no Member shall be deemed by virtue of this Section 10.16 to have waived its right to object to any conflict of interest relating to matters other than this Agreement or the transactions contemplated herein.

10.17 *Miscellaneous.* No failure or delay by any party in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof; any actual waiver shall be contained in a writing signed by the party against whom enforcement of such waiver is sought. The section headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. Unless the context clearly requires to the contrary, all references in this Agreement to designated "Sections" are to the designated Sections and other subdivisions of this Agreement. This Agreement shall not be construed for or against any party by reason of the authorship or alleged authorship of any provisions hereof or by reason of the status of the respective parties. Except where the context clearly requires to the contrary, instances of gender or entity-specific usage (*e.g.*, "his," "her," "its," "person," or "individual" ) shall not be interpreted to preclude the application of any provision of this Agreement to any individual or entity. References to laws, regulations and other governmental rules shall mean such laws, regulations and rules as in effect on the date of determination (taking into account any amendments thereto prior or subsequent to the date of this Agreement). All dates and times specified in this Agreement are of the essence and shall be strictly enforced. Except as otherwise specifically provided in this Agreement, the remedies set forth in this Agreement are cumulative and shall not exclude any other remedies to which a person may be lawfully entitled.

: A

IN WITNESS WHEREOF, the parties have ex

# **EXHIBIT B**

# OPERATING AGREEMENT

## OF

## THIEL CAPITAL MANAGEMENT, LLC

## A DELAWARE LIMITED LIABILITY COMPANY

**September 9, 1996**

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE REGULATORY AUTHORITY HAS APPROVED OR DISAPPROVED THIS OPERATING AGREEMENT OR THE LIMITED LIABILITY COMPANY MEMBERSHIP INTERESTS ("INTERESTS") PROVIDED FOR HEREIN. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THE INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"), AND THE COMPANY IS UNDER NO OBLIGATION TO REGISTER THE INTERESTS UNDER THE 1933 ACT IN THE FUTURE.

AN INTEREST MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION UNDER THE 1933 ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED. ADDITIONAL RESTRICTIONS ON THE TRANSFER OF INTERESTS ARE CONTAINED IN SECTION 7 OF THIS AGREEMENT. BASED UPON THE FOREGOING, EACH ACQUIROR OF AN INTEREST MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF INVESTMENT THEREIN FOR AN INDEFINITE PERIOD OF TIME.

# TABLE OF CONTENTS

**Page**

SECTION 1  DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SECTION 2  FORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    2.1     Formation and Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    2.2     Term of the Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    2.3     Purpose and Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    2.4     Principal Office . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    2.5     Delaware Office and Agent for Service of Process . . . . . . . . . . . . . . . . . . . 5
    2.6     Names and Contact Information of the Members . . . . . . . . . . . . . . . . . . . . 5
    2.7     Required Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    2.8     Title to Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    2.9     Additional Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SECTION 3  CAPITALIZATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    3.1     Capital Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    3.2     Limitation on Capital Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    3.3     Withdrawal and Return of Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    3.4     Loans to the Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    3.5     Limitation of Liability; Return of Certain Distributions . . . . . . . . . . . . . . . . 7
    3.6     Interest on Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SECTION 4  PROFITS AND LOSSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    4.1     Allocations of Company Profits and Losses . . . . . . . . . . . . . . . . . . . . . . . . 7
    4.2     Modifications to Preserve Underlying Economic Objectives . . . . . . . . . . . . 9
    4.3     Withholding Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

SECTION 5  DISTRIBUTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    5.1     Discretionary Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    5.2     Liquidating Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    5.3     Limitation on Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

SECTION 6  ADMINISTRATIVE PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    6.1     Management Rights of the Non-Managing Members . . . . . . . . . . . . . . . . 11
    6.2     Management Rights of the Managing Member . . . . . . . . . . . . . . . . . . . . 11
    6.3     The Managing Member . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    6.4     Other Ventures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    6.5     Duties to the Company and the Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    6.6     Reimbursement of Member Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    6.7     Member Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    6.8     Tax Matters Partner. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    6.9     Records and Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    6.10   Valuation of Company Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    6.11   Confidentiality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**TABLE OF CONTENTS**
(continued)

Page

6.12  Disclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
6.13  Related Party Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

SECTION 7   TRANSFERS OF COMPANY INTERESTS; WITHDRAWALS AND REMOVALS;
VESTING OF MEMBERSHIP INTERESTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
7.1  Transfers of Company Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
7.2  Withdrawal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
7.3  Removal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
7.4  Procedures Following Withdrawal or Removal . . . . . . . . . . . . . . . . . . . . 16
7.5  Vesting of Members' Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
7.6  Status of Assignees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

SECTION 8  DISSOLUTION AND LIQUIDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
8.1  Dissolving Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
8.2  Election to Continue the Company Following Certain Dissolution Events . . . . . . . . . 18
8.3  Winding Up of the Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

SECTION 9  LIABILITY PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
9.1  Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
9.2  Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
9.3  Contribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

SECTION 10  GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
10.1  Special Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
10.2  Status Under the Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
10.3  Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
10.4  Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
10.5  Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
10.6  Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
10.7  Counterparts; Binding upon Member and Assignees . . . . . . . . . . . . . . . . 22
10.8  Survival of Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
10.9  Survival of Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
10.10  No Third Party Beneficiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
10.11  Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
10.12  Consents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
10.13  No Partition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
10.14  Representations by Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
10.15  No Usury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
10.16  Partnership for Tax Purposes Only . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
10.17  Dispute Resolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
10.18  Legal Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
10.19  Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**TABLE OF CONTENTS**
**(continued)**

Page

SCHEDULE A

THIS OPERATING AGREEMENT of Thiel Capital Management, LLC, a Delaware limited liability company, is entered into as of September 9, 1996.

# SECTION 1

# DEFINITIONS

As used in this Agreement:

*Act* shall mean the Delaware Limited Liability Company Act, Title 6, Delaware Code Ann., Section 18-101, et seq., as amended.

*Additional Member* shall mean any Person, other than a Substitute Member, admitted to the Company as a Member after the date first above written.

*Affiliate* shall mean, with respect to any Person, any other Person with regard to which the Person is controlling, controlled, or commonly controlled. For purposes of the preceding sentence, "control" shall mean the power to direct the principal business management and activities of a Person, whether through ownership of voting Securities, by agreement, or otherwise.

*Agreement* shall mean this Operating Agreement of Thiel Capital Management, LLC, a Delaware limited liability company.

*Assignee* shall mean a Person that has acquired an interest in the Company (including, without limitation, a Person that has acquired such interest by means of a Transfer permitted under Section 7), but that has not been admitted as a Member.

*Bank* shall mean the Bank of America National Trust & Savings Assn., San Francisco main branch.

*Bankruptcy* shall mean, with respect to a Member: (i) an assignment of all or substantially all of the assets of such Member for the benefit of its creditors generally; (ii) the commencement of any bankruptcy or insolvency case or proceeding against such Member which shall continue and remain unstayed and in effect for a period of 60 consecutive days; (iii) the filing by such Member of a petition, answer or consent seeking relief under any bankruptcy, insolvency or similar law; or (iv) the occurrence of any other event that is deemed to constitute bankruptcy for purposes of the Act.

*Capital Account* shall mean, for each Member, a separate account that is:

    (a)    Increased by: (i) the amount of such Member's Capital Contribution and (ii) allocations of Profit to such Member pursuant to Section 4;

    (b)    Decreased by: (i) the amount of cash distributed to such Member by the Company, (ii) the fair market value of any other property distributed to such Member by the Company (determined as of the time of distribution and net of liabilities secured by such property that the Member assumes or to which the Member's ownership of the property is subject), and (iii) allocations of Loss to such Member pursuant to Section 4; and

      (c)      Otherwise adjusted in accordance with the provisions of this Agreement.

*Capital Contribution* shall mean, for any Member, the sum of the net amount of cash and the fair market value of any other property (determined as of the time of contribution and net of liabilities secured by such property that the Company assumes or to which the Company's ownership of the property is subject) contributed by such Member to the capital of the Company. The term "capital contribution" (where not capitalized) shall mean any contribution to the capital of the Company valued in accordance with the rules set forth in the preceding sentence.

*Close of Business* shall mean 5:00 p.m., local time, in San Francisco, California.

*Code* shall mean the Internal Revenue Code of 1986, as amended.

*Company* shall mean Thiel Capital Management, LLC, a Delaware limited liability company.

*Dissolution* shall mean, with respect to a Member that is not a natural person, that such Member has terminated its existence (whether as a partnership, corporation, limited liability company or other legal entity) and dissolved; provided, however, that a change in the membership of a Member that is a partnership or limited liability company shall not constitute a "Dissolution" of such Member, so long as the business of the Member is continued in partnership or limited liability company form, regardless of whether such Member is deemed technically dissolved for partnership, limited liability company or tax law purposes.

*Fiscal Year* shall mean the period from January 1 through December 31 of each year (unless otherwise required by law).

*Fund* shall mean Thiel Capital International, LLC, to be organized as a limited liability company under the laws of the State of Delaware.

*Fund Agreement* shall mean the Operating Agreement of the Fund, as amended.

*GAAP* shall mean United States generally accepted accounting principles, consistently applied.

*Incentive Fee* shall mean the "incentive allocation," as defined in the Fund Agreement.

*Indemnified Person* shall mean each Member as well as each officer, director or member of a Member. In addition, "Indemnified Person" shall also include any employee or agent of the Company to the extent determined by the Managing Member in its reasonable discretion.

*Liquidating Member* shall mean the Managing Member unless another Person is selected to serve as Liquidating Member pursuant to Section 8.2.

*Majority-In-Interest of the Members or the Non-Managing Members* shall mean a group of Members or Non-Managing Members whose aggregate Membership Interests at the time of determination exceed fifty percent of the total Membership Interests of all the Members or Non-Managing Members, as applicable, at such time.

*Management Fee* shall mean the quarterly management fee payable to the Company by the Fund pursuant to the Fund Agreement.

*Managing Member* shall mean the Member that, at the time of determination, is designated as such pursuant to Section 6.3.

*Material Misconduct* shall mean, with respect to an Indemnified Person, gross negligence, a willful and material breach of this Agreement, fraud, breach of a fiduciary duty arising under this Agreement, or a commission of a felony (except in the case of a felony where the Indemnified Person reasonably believed that no such felony would occur in consequence of such Indemnified Person's action or inaction, as the case may be). For purposes of the preceding sentence: (i) an Indemnified Person that consults with legal counsel or an accountant in respect of Company affairs shall be deemed to have acted in good faith and without negligence with regard to any action or inaction that is taken in accordance with the advice or opinion of such advisor so long as such advisor was selected with reasonable care; and (ii) an Indemnified Person's reliance upon the truth and accuracy of any written statement, representation or warranty of a Member shall be deemed to have been reasonable and in good faith absent such Indemnified Person's actual knowledge that such statement, representation or warranty was not, in fact, true and accurate.

*Member* shall mean any Person (i) listed on Schedule A as a Member or (ii) admitted to the Company pursuant to the terms of this Agreement as an Additional Member or a Substitute Member, but only if such Person has not withdrawn or been removed from the Company within the meaning of Section 7.2 or 7.3 or Transferred its entire membership interest to one or more Members and/or Persons admitted to the Company as Substitute Members pursuant to Section 7.1 or 7.6. Except where the context requires otherwise, a reference in this Agreement to "the Members" shall mean all of the Members (taken together or acting unanimously, as appropriate).

*Membership Interest* shall mean, with respect to each Member, such Member's interest in the Company; Membership Interests shall be apportioned among the Members as set forth on Schedule A.

*Non-Managing Member* shall mean any Member other than the Managing Member. Except where the context requires otherwise, a reference in this Agreement to "the Non-Managing Members" shall mean all of the Non-Managing Members (taken together or acting unanimously, as appropriate).

*Person* shall mean an individual, partnership, corporation, limited liability company, unincorporated organization, trust, joint venture, governmental agency, or other entity, whether domestic or foreign.

*Principal Office* shall have the meaning set forth in Section 2.4.

*Profits and Losses* shall mean, for any period, the Company's items of income and gain as well as loss, expense and deduction as determined under GAAP; provided, however, that Profits and Losses as computed for each allocation period under Section 4 shall in any event include (i) all items allocated to the Company by the Fund during such allocation period (whether or not realized at the time of such allocation), and (ii) all items of unrealized gain or loss in respect of Securities held by the Company attributable to such allocation period (except, in the case of the Company's interest in the Fund, to the extent that changes in the value thereof are accounted for under the preceding clause (i)). For purposes of determining unrealized gains and losses, as well as any realized gains or losses that ultimately may arise, the basis of each Security shall be deemed to be its fair market value as of the start of such allocation period or, if the Security was acquired by the Company during such period, its cost.

*Securities* shall mean debt, equity and synthetic securities of any type.

*Subscription Agreement* shall mean the subscription agreement between the Company, the Fund and each Member in the form prescribed by the Managing Member.

*Substitute Member* shall mean an Assignee of all or a portion of a Member's interest in the Company that becomes a Member and succeeds, to the extent of the interest assigned, to the rights and powers and becomes subject to the restrictions and liabilities of the assignor Member.

*Term* shall have the meaning set forth in Section 2.2. Where not capitalized, "term" shall mean the entire period of the Company's existence, including any period of winding-up and liquidation following the dissolution of the Company pursuant to Section 8.1.

*Transfer* shall mean any sale, exchange, transfer, gift, encumbrance, assignment, pledge, mortgage, hypothecation or other disposition, whether voluntary or involuntary.

*Treasury Regulation* shall mean a regulation issued by the United States Treasury Department and relating to a matter arising under the Code.

*Two-Thirds-Interest of the Members or the Non-Managing Members* shall mean a group of Members or Non-Managing Members whose aggregate Membership Interests at the time of determination equals or exceeds two-thirds of the total Membership Interests of all the Members or Non-Managing Members, as applicable, at such time.

*Valuation Member* shall have the meaning set forth in Section 6.10(a).

*Vested Percentage* shall have the meaning set forth in Section 7.5(b)(i).

*Vesting Interest* shall have the meaning set forth in Section 7.5(a).

*Withdrawn Member* shall have the meaning set forth in Section 7.4.

---

## SECTION 2

## FORMATION

---

2.1     *Formation and Name.*

(a)     The Members hereby enter into and form the Company as a limited liability company governed by the Act for the limited purpose and scope set forth in this Agreement.

(b)     The name of the Company shall be "Thiel Capital Management, LLC."

2.2     *Term of the Company.* The "Term" of the Company shall commence upon the later of: (i) the filing of the Company's certificate of formation with the office of the Delaware Secretary of State or (ii) the execution of this Agreement by two or more Members. Except as specifically provided in Section 8, the Company's term shall continue until the Close of Business on the date which is one year after the final dissolution and liquidation of the Fund and shall not end prior to such date in consequence of the death, retirement, resignation, expulsion, Bankruptcy, or Dissolution of a Member or the occurrence of any other event which terminates the continued membership of a Member in the Company.

2.3     *Purpose and Scope.*  The purpose and scope of the Company shall be to:

    (a)     Serve as the sole constituent managing member of the Fund;

    (b)     Provide management and management-related services to the Fund;

    (c)     Hold for investment, distribute and/or otherwise dispose of cash, Securities or other property (i) distributed to the Company by the Fund or (ii) otherwise received by the Company in connection with its business;

    (d)     Engage in such other activities as are customary for the sole constituent managing member of an investment fund such as the Fund; and

    (e)     Engage in any other lawful activities reasonably determined by the Managing Member to be necessary or advisable in furtherance of the foregoing.

2.4     *Principal Office.*  The Company shall have a single "Principal Office" which shall at all times be located within the United States.  The Principal Office initially shall be located at 19 Coleman Place 37, Menlo Park, California 94025, and may thereafter be changed from time to time by the Managing Member upon notice to the other Members.

2.5     *Delaware Office and Agent for Service of Process.*  The Company shall maintain a Delaware registered office and agent for the service of process as required by the Act.  In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Managing Member shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be.

2.6     *Names and Contact Information of the Members.*

    (a)     Each Person whose name is listed on <u>Schedule A</u> is hereby admitted as a Member of the Company.

    (b)     Set forth below the name of each Member on <u>Schedule A</u> shall be appropriate contact information for such Member (including, without limitation, such Member's mailing address, telephone number, and telecopy number as well as, in the case of a Member that is an entity, the name or title of an individual to whom correspondence should be directed).  Each Member shall promptly provide the Company with the information required to be set forth for such Member on <u>Schedule A</u> and shall thereafter promptly notify the Company of any change to such information.

2.7   .  *Required Documents.*

    (a)     *Company Documents.*  The Members shall cause to be executed, filed, recorded or amended, as necessary, a certificate of formation and any other documents required or desirable, as determined by the Managing Member in its reasonable discretion, to be executed, filed, recorded or amended in connection with the formation, operation or dissolution of the Company pursuant to the laws of the State of Delaware or any other jurisdiction in which the Company's business is conducted.  The terms and provisions of each document described in the preceding sentence shall be initially established and shall be amended as necessary to cause such terms and provisions to be consistent with the terms and provisions of this Agreement.

(b)     *Other Documents.*  The Members shall execute and acknowledge such other documents as may be necessary or desirable, as determined by the Managing Member in its reasonable discretion, to give effect to the terms of this Agreement.

(c)     *Special Power of Attorney.*  Each Member hereby grants to the Managing Member a special power of attorney (with full rights of assignment) irrevocably appointing the Managing Member as the granting Member's attorney-in-fact with power and authority to execute and/or acknowledge, in the granting Member's name and on its behalf, any document described in Section 2.7(a) or (b); provided, however, that no such power of attorney shall be used to execute or acknowledge a document on behalf of a Member if the action to be taken by such document has not received the level of consent of the Members required under this Agreement.  Each special power of attorney granted under this Section 2.7(c) is coupled with an interest and shall not be revoked by the bankruptcy, death, disability or other event of legal incapacity of the granting Member.

2.8     *Title to Property.*  Title to all Company property shall be held in the name of the Company.

2.9     *Additional Members.*

(a)     Except as otherwise provided in this Section 2.9, an Additional Member may be admitted to the Company only with the consent of the Majority-in-Interest of the Members.

(b)     In the event that the Managing Member becomes a Withdrawn Member (other than by reason of the Bankruptcy of the Managing Member), the Members agree to admit the Person designated by the former Managing Member as an Additional Member to serve as replacement Managing Member.  Such Additional Member's interest in the Company shall be derived solely from the former Managing Member's Vested Percentage in his Membership Interest or from his unvested Vesting Interest, as set forth in Section 7.5(a).

---

## SECTION 3

## CAPITALIZATION

---

3.1     *Capital Contributions.*  All Capital Contributions shall be in cash.  Each Member, upon and as a condition to admission as a Member of the Company, shall make the Capital Contribution set forth in such Member's Subscription Agreement (for each of the Non-Managing Members, the initial Capital Contribution shall be 1% of the capital such Member initially invests in the Fund).

3.2     *Limitation on Capital Contributions.*  Except as specifically provided in this Section 3 or Section 4.2, no Person shall be required to make a contribution to the capital of the Company.

3.3     *Withdrawal and Return of Capital.*  No Member may withdraw any portion of its Capital Contribution or Capital Account balance.  Except as provided in Sections 5, 7, and 8, no Member shall be entitled to the return of such Member's Capital Contribution or to a distribution in respect of such Member's Capital Account balance.

3.4     *Loans to the Company.*  No Member shall be required to lend any money to the Company or to guarantee any Company indebtedness.

3.5    *Limitation of Liability; Return of Certain Distributions.*

(a)    Except as otherwise required by the Act or this Section 3.5, a Member shall have no personal liability for the debts and obligations of the Company and shall not be required to return any distributions received from the Company.  Without limiting the foregoing, the failure to observe any formalities relating to the management or administration of the Company shall not be grounds for imposing upon any Member personal liability to third parties for the Company's debts and obligations.

(b)    A Member that receives a distribution (i) in violation of this Agreement or (ii) that is required to be returned to the Company under the Act shall return such distribution immediately upon demand therefor by any Member.

(c)    The Company may, in its sole and absolute discretion, elect to withhold from any distributions otherwise payable to a Member amounts due to the Company from such Member.

(d)    Nothing in this Section 3.5 shall be applied to release any Member from (i) its obligation to make capital contributions pursuant to this Section 3 or other payments specifically required under this Agreement or (ii) its obligations pursuant to any relationship between the Company and such Member acting in a capacity other than as a Member (including, for example, as a borrower or independent contractor).

3.6    *Interest on Capital.*  No Member shall be entitled to interest on such Member's Capital Contribution or Capital Account balance.

---

# SECTION 4

## PROFITS AND LOSSES

---

4.1    *Allocations of Company Profits and Losses.*

(a)    *General.*  Except as otherwise provided in this Section 4.1, the items of Profit and Loss of the Company for each fiscal quarter (or shorter period selected by the Managing Member) shall be allocated as follows.

(i)    Items of Profit and Loss attributable to Incentive Fees and to Management Fees shall be allocated among the Members in proportion to their respective Membership Interests.

(ii)    All other items of Profit and Loss shall be allocated among the Members in proportion to their respective Capital Contributions.

(iii)    Items of loss, expense or deduction attributable to the Company's indemnification obligation under Section 9.2 shall be allocated among the Members in proportion to their respective Membership Interests.

(b)      *Excess Losses Otherwise Allocable to a Member.* If and to the extent that any items of net Loss otherwise allocable to a Member under Section 4.1(a) would create a negative balance in the Capital Account of such Member (or increase the amount by which such Capital Account balance is negative), the items shall not be allocated to such Member pursuant to Section 4.1(a), but shall instead be specially allocated as follows:

(i)      First, to the Members as a group, in proportion to their respective positive Capital Account balances, until the Capital Account balance of each Member has been reduced to (but not less than) zero; and

(ii)      Next, to the Members as a group in proportion to their respective Membership Interests.

To the extent that there have been special allocations of Loss away from a Member under this Section 4.1(b) that have not subsequently been reversed pursuant to this sentence or Section 4.1(g), the next available items of Profit otherwise allocable to such Member pursuant to Section 4.1(a) shall be specially allocated to the Members to whom such items of Loss had been specially allocated under this Section 4.1(b) so as to first offset in reverse order such special allocations of Loss.

(c)      *Book - Tax Accounting Disparities.* Solely for Federal income tax purposes, if Company property is reflected in the Capital Accounts of the Members at a book value (i.e., the property's basis for purposes of determining Profit and Loss with respect thereto as determined in accordance with the principles set forth in the definition of Profits and Losses in Section 1) that differs from the adjusted tax basis of such property, allocations of depreciation, amortization, income, gain or loss with respect to such property shall be made among the Members in a manner which takes such difference into account in accordance with Section 704(c) of the Code and the Treasury Regulations issued thereunder.

(d)      *Adjustment to Capital Accounts for Distributions of Property.* If property distributed in kind is reflected in the Capital Accounts of the Members at a book value (i.e., the property's basis for purposes of determining Profit and Loss with respect thereto as determined in accordance with the principles set forth in the definition of Profits and Losses in Section 1) that differs from the fair market value of the property at the time of distribution, the difference shall be treated as Profit or Loss on the sale of the property and shall be allocated among the Members in accordance with the provisions of this Section 4.1.

(e)      *Allocations in Event of Transfer.* If an interest in the Company is Transferred in accordance with this Agreement, allocations of Profits and Losses as between the transferor and transferee shall be made pursuant to any method chosen by the Managing Member that is permitted under Section 706 of the Act.

(f)      *Tax Allocations.* Taking into account the requirements of Section 4.1(c), items of Company income, gain, loss, deduction or credit recognized for Federal income tax purposes shall be allocated among the Members for Federal income tax purposes in a manner that is consistent with the requirements of the Code and the Treasury Regulations.

(g)      *Reallocation of Certain Losses.* To the extent that: (i) Losses which otherwise would have been allocated to a Member under this Section 4.1 were allocated to one or more other Members under Section 4.1(b); (ii) such allocation has not been reversed pursuant to the subsequent operation of Section 4.1(b) or this Section 4.1(g); and (iii) the Member thereafter returns a distributed amount as required under Section 3.5 or otherwise makes a contribution to the capital of the Company, the Capital Accounts of the Members shall be adjusted in connection with such return or contribution (to the extent of the value thereof) to effect a reallocation of such Losses to the Member.

(h)    *Allocations upon Dissolution of the Fund.*  Upon a final determination of the Company's obligation to make a contribution to the Fund in connection with the Fund's dissolution and liquidation (and immediately prior to the determination of the contribution obligations of the Members under Section 3.5), the current fiscal period of the Company shall be deemed to close and all items of Company Profit and Loss (including, without limitation, items allocated to the Company in connection with the Fund's dissolution and liquidation) shall be allocated among the Members in accordance with this Section 4.1.

4.2    *Modifications to Preserve Underlying Economic Objectives.*

(a)    *Change in Law.*  If, in the opinion of counsel to the Company, there is a change in the Federal income tax law (including the Code as well as the Treasury Regulations, rulings, and administrative practices thereunder) which makes it necessary or prudent to modify the allocation provisions of this Section 4 in order to preserve the underlying economic objectives of the Members as reflected in this Agreement, the Managing Member shall make the minimum modification necessary to achieve such purpose.

(b)    *Borrowing.*  In the event the Company borrows money or property, the Managing Member shall modify the allocation provisions of this Section 4 to the minimum extent necessary to ensure that allocations relating to such borrowing are respected for Federal income tax purposes while, to the maximum extent possible, preserving the underlying economic objectives of the Members as reflected in this Agreement.

(c)    *Section 754 Election.*  In the event the Company makes an election to adjust the basis of the Company's assets under Section 754 of the Code, the Managing Member shall modify the allocation provisions of this Section 4 to the minimum extent necessary to ensure that subsequent allocations relating to such adjusted basis are respected for Federal income tax purposes while, to the maximum extent possible, preserving the underlying economic objectives of the Members as reflected in this Agreement.

4.3    *Withholding Taxes.*

(a)    The Company shall withhold taxes from distributions to, and allocations among, the Members to the extent required by law (as determined by the Managing Member in its reasonable discretion).  Except as otherwise provided in this Section 4.3, any amount so withheld by the Company with regard to a Member shall be treated for purposes of this Agreement as an amount actually distributed to such Member pursuant to Section 5.1.  An amount shall be considered withheld by the Company if, and at the time, remitted to a governmental agency without regard to whether such remittance occurs at the same time as the distribution or allocation to which it relates; provided, however, that an amount actually withheld from a specific distribution or designated by the Managing Member as withheld from a specific allocation shall be treated as if distributed at the time such distribution or allocation occurs.

(b)    To the extent that operation of Section 4.3(a) would create a negative balance in a Member's Capital Account or increase the amount by which such Capital Account balance is negative (in each case determined as if, immediately prior to the deemed distribution of the withheld amount, all of the Company's assets had been valued pursuant to Section 6.10 and any previously unallocated Profits or Losses allocated pursuant to this Section 4), the amount of the deemed distribution shall instead be treated as a loan by the Company to such Member, which loan shall be payable upon demand by the Managing Member and shall bear interest at a floating rate equal to the prime rate as announced from time to time by the Bank, compounded daily.

(c)    Each Member hereby agrees to indemnify the Company and the other Members for any liability they may incur for failure to properly withhold taxes in respect of such Member; moreover, each Member hereby agrees that neither the Company nor any other Member shall be liable for any excess taxes withheld in respect of such

Member's interest in the Company and that, in the event of overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate governmental authority.

        (d)        Taxes withheld by third parties from payments to the Company shall be treated as if withheld by the Company for purposes of this Section 4.3. Such withholding shall be deemed to have been made in respect of all the Members in proportion to their respective allocative shares under Section 4.1 of the underlying items of Profit to which such third party payments are attributable unless, and to the extent that, the Managing Member selects a different apportionment method in respect of a specific withholding tax following a determination by the Managing Member in his reasonable discretion that such method is necessary, in light of the nature of such tax, to achieve a fair and equitable apportionment among the Members. In the event that the Company receives a refund of taxes previously withheld by a third party from one or more payments to the Company, the economic benefit of such refund shall be apportioned among the Members in a manner reasonably determined by the Managing Member to offset the prior operation of this Section 4.3(d) in respect of such withheld taxes.

## SECTION 5

## DISTRIBUTIONS

        5.1    *Discretionary Distributions.* The Managing Member in his sole discretion shall determine the amount and timing of all distributions by the Company and whether such distributions will be in cash or in kind or partly in cash and partly in kind. Except as otherwise provided herein, all distributions shall be made in proportion to the Members' closing Capital Account balances determined as of the close of the allocation period for which such distribution occurs. Distributions in kind shall be made at valuations determined as provided in Section 6.10.

        5.2    *Liquidating Distributions.* Notwithstanding the provisions of Section 5.1, cash and property of the Fund available for distribution upon the dissolution of the Company shall be distributed in accordance with the provisions of Section 8.3.

        5.3    *Limitation on Distributions.* No distribution shall be made to a Member to the extent that such distribution would (i) create a negative balance in such Member's Capital Account or increase the amount by which such Capital Account is negative (in each case determined as if, immediately prior to such distribution, all of the Company's assets had been valued pursuant to Section 6.10 and any previously unallocated Profits or Losses had been allocated pursuant to Section 4), (ii) cause the Company to be insolvent, or (iii) render the Member liable for a return of such distribution under the Act.

## SECTION 6

## ADMINISTRATIVE PROVISIONS

6.1      *Management Rights of the Non-Managing Members.*   Except as specifically set forth in this Agreement, the Non-Managing Members shall take no part in the management or control of the Company or its business and shall have no power or authority to act for the Company, bind the Company under agreements or arrangements with third parties, or vote on Company matters.

6.2      *Management Rights of the Managing Member.*

(a)      The Managing Member shall be the sole "manager" of the Company within the meaning of the Act.  Subject to the provisions of this Agreement (including, without limitation, Sections 2.3 and 6.4), the Managing Member shall have the exclusive power and authority to perform acts associated with the management and control of the Company and its business and, in furtherance thereof, shall have all of the power and authority available to a "manager" under the Act.

(b)      Without limiting in any way the restrictions and limitations on the authority of the Managing Member set forth in this Agreement, any contract, agreement, deed, lease, note or other document or instrument executed on behalf of the Company by the Managing Member shall be deemed to have been duly executed.  No other Member's signature shall be required in connection with the foregoing and third parties shall be entitled to rely upon the Managing Member's authority under the provisions of this Section 6.2(b) without otherwise ascertaining that the requirements of this Agreement have been satisfied.

6.3      *The Managing Member.*   The Managing Member initially shall be Peter Thiel.  The Managing Member shall remain and continue as Managing Member until he becomes a Withdrawn Member.

6.4      *Other Ventures.*

(a)      Subject to the provisions of Section 6.5, the Members: (i) acknowledge that the Members and their respective Affiliates, equity holders, and other related Persons, and their respective clients are or may be involved in other financial, investment and professional activities, including, but not limited to, management of other investment funds, venture capital, private equity and real estate investing, purchases and sales of Securities, investment and management counseling, providing mergers and acquisitions, restructuring and other financial advisory services and serving as officers, directors, advisors and agents of other companies and (ii) agree that, except as otherwise specifically set forth in Section 6.5, each Member and its Affiliates, equity holders, and other related Persons, and their respective clients may engage for their own accounts and for the accounts of others in any such ventures and activities (without regard to whether the interests of such ventures and activities conflict with those of the Company).  Except as specifically set forth in Sections 4.2 and 6.5: (i) neither the Company nor any Member shall have any right by virtue of this Agreement in and to such ventures or activities or to the income or profits derived therefrom; and (ii) the Members, their Affiliates, equity holders, and other related Persons, and their respective clients shall have no duty or obligation to make any reports to the Members or the Company with respect to any such ventures or activities.

(b)      The Non-Managing Members hereby acknowledge that the Managing Member may be prohibited from taking action for the benefit of the Company: (i) due to confidential information acquired or obligations

I:\PUBLIC\BAB\0212323.04                     -11-

incurred in connection with an outside activity permitted to the Managing Member, its Affiliates, or other related Persons under this Section 6.4; or (ii) in connection with activities undertaken by an Affiliate or other related Person of the Managing Member prior to the date first above written. No Person shall be liable to the Company or any Member for any failure to act for the benefit of the Company in consequence of a prohibition described in the preceding sentence.

6.5     *Duties to the Company and the Fund.*

(a)     A Member shall not take or permit any action that would cause the Company to be in breach of its duties and obligations arising under the Fund Agreement.

(b)     Without limiting the general applicability of Section 6.5(a), neither any Member nor the Company shall accept for its own benefit transaction fees (*i.e.*, fees of the same nature as those typically received by investment bankers for facilitating investment transactions) in connection with investments made by the Fund unless such fees are thereafter promptly remitted to the Fund.

6.6     *Reimbursement of Member Expenses.*

(a)     The Managing Member shall be reimbursed by the Company for out-of-pocket expenses incurred on behalf of the Company or the Fund.

(b)     Except as otherwise approved by the Managing Member, a Non-Managing Member shall not be reimbursed by the Company for expenses incurred on behalf of the Company or the Fund.

6.7     *Member Compensation.*  No Member shall be entitled to receive a salary or other compensation for services performed in its capacity as a Member. Subject to the prior approval of the Managing Member, a Member shall be entitled to receive reasonable compensation for services performed for the Company as an employee or independent contractor.

6.8     *Tax Matters Partner.*  The Managing Member is hereby designated the "tax matters partner" of the Company within the meaning of Section 6231(a)(7) of the Code. Except to the extent specifically provided in the Code or the Treasury Regulations (or the laws of other relevant taxing jurisdictions), the Managing Member in its sole and absolute discretion shall have exclusive authority to act for or on behalf of the Company with regard to tax matters, including, without limitation, the authority to make (or decline to make) any available tax elections.

6.9     *Records and Financial Statements.*

(a)     The Company shall maintain true and proper books, records, reports, and accounts in which shall be entered all transactions of the Company. Such books, records, reports and accounts shall be located at the Principal Office and shall be available to any Member for inspection and copying during reasonable business hours.

(b)     The Company shall maintain all Schedules to this Agreement and shall update such Schedules promptly upon receipt of new information relating thereto. Schedules to this Agreement shall be treated as records of the Company for purposes of Section 6.9(a).

(c)     Within 90 days after the end of each Fiscal Year, the Company shall furnish to each Member a statement of (i) the assets and liabilities of the Company, (ii) the net Profit or Loss of the Company, and (iii) the Capital Account balance of such Member. In addition, within 90 days after the end of each Fiscal Year, the Company

shall supply all information reasonably necessary to enable the Members to prepare their Federal income tax returns and (upon request therefor) to comply with other reporting requirements imposed by law.

        (d)      Within 30 days after the value of any asset is determined pursuant to Section 6.10, the Company shall furnish to each Member a statement identifying the asset valued and the value determined therefor.

        (e)      The Company shall promptly deliver to the Members copies of all financial reports delivered by the Fund to its constituent members.

6.10    *Valuation of Company Assets.*

        (a)      The Managing Member (or the Liquidating Member, if appropriate, either being the "Valuation Member"), shall value the Company's assets each time items of Profit or Loss are allocated pursuant to Section 4.1, upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by such Member in its sole and absolute discretion.  The Valuation Member shall also value distributed assets in accordance with the provisions of Section 4.1(d).  In valuing the assets of the Company, the Valuation Member shall not be required to disclose to the Company or any Member information that the Valuation Member is prohibited from disclosing in consequence of any legal, contractual, or similar obligation and the Valuation Member shall not be deemed to have breached any obligation to the Company or the other Members as a consequence of acquiring, holding, or declining to disclose any such information.

        (b)      Except as otherwise provided in this Agreement, in determining the value of Company property or a Member's interest in the Company, or in any accounting among any or all of the Members, no value shall be placed on the goodwill, going concern value, name, records, files, statistical data or similar assets of the Company not normally reflected in the Company's accounting records, but there shall be taken into consideration any items of income earned but not yet received, expenses incurred but not yet paid, liabilities fixed or contingent, and prepaid expenses to the extent not otherwise reflected in the books of account as well as the fair market value of options or commitments to purchase or sell Securities pursuant to agreements entered into on or prior to the valuation date.

6.11    *Confidentiality.*  The Members acknowledge and agree that all information provided to them by or on behalf of the Company or any Member concerning the business of the Company or any Member shall be deemed strictly confidential and shall not, except as required by law, be disclosed to any Person (other than a Member) without the prior consent of the Managing Member and any other Member whose confidential information is proposed to be disclosed. The Members hereby consent to the disclosure by each Member of such information to such Member's accountants, attorneys and similar advisors bound by a duty of confidentiality; moreover, the foregoing requirements of this Section 6.11 shall not apply to a Member with regard to any information that is currently or becomes (i) publicly known or available in the absence of any improper or unlawful action on the part of such Member (including, without limitation, any action in violation of this Section 6.11), or (ii) known or available to such Member other than through or on behalf of the Company or any Member (acting in its capacity as such).  Provided that the Company and the Managing Member may disclose any information to the extent necessary or convenient for the formation, operation, dissolution, or liquidation of the Company or the Fund (as determined by the Managing Member in its reasonable discretion), the Company and the Managing Member shall similarly refrain from disclosing any confidential information furnished by a Member pursuant to Section 6.12.

6.12    *Disclosures.*  Each Member shall furnish to the Company upon request any information with respect to such Member reasonably determined by the Managing Member to be necessary or convenient for the formation, operation, dissolution, or liquidation of the Company or the Fund.

6.13    *Related Party Transactions.*  The Company may enter into contracts or other arrangements with any Member or Affiliate of a Member; provided, however, that the terms of any such contract or arrangement shall be no less advantageous, taking account of all relevant facts and circumstances, to the Company than would be available from an unrelated third party.

---

### SECTION 7

### TRANSFERS OF COMPANY INTERESTS;
### WITHDRAWALS AND REMOVALS;
### VESTING OF MEMBERSHIP INTERESTS

---

7.1    *Transfers of Company Interests.*

(a)    Except as otherwise provided in this Section 7.1, a Member shall not Transfer all or any portion of its interest in the Company without the prior consent of the Managing Member.

(b)    There shall be no Transfer of an interest in the Company unless, in the opinion of counsel for the Company, such Transfer will not:

(i)    Give rise to a requirement that the Company effect a registration pursuant to Section 5 of the Securities Act of 1933, as amended;

(ii)    Give rise to a requirement that the Company or the Fund register as an investment company or elect to be a "business development company" under the Investment Company Act of 1940, as amended;

(iii)    Otherwise subject the Company, the Fund or any Member, officer, or employee of the Company to additional regulatory requirements under Federal, state, local or foreign law, compliance with which would subject the Company or such other Person to material expense or burden;

(iv)    Cause the Company to be classified as an association taxable as a corporation for Federal income tax purposes;

(v)    Cause the Company to be a "publicly traded partnership" within the meaning of Section 7704 of the Code;

(vi)    Violate any law, regulation or other governmental rule applicable to such Transfer;

(vii)    Violate the terms of this Agreement or the Fund Agreement; or

(viii)    Effect a termination of the Company under Section 708 of the Code.

(c)    In the case of a voluntary Transfer, the transferring Member shall provide to the Managing Member notice that it wishes to make a Transfer and either (i) an opinion of counsel to such transferring Member satisfactory in form and substance to counsel for the Company with respect to the matters referred to in Section 7.1(b) or (ii) sufficient information to allow counsel to the Company to make a determination that the proposed Transfer will

not result in any of the consequences referred to in Section 7.1(b). Once all other conditions to the Transfer of a Member's interest have been satisfied, such Transfer shall be effective as of the Close of Business on the last day of the next ending fiscal quarter of the Company.

(d)    Any act in violation of this Section 7.1: (i) shall be null and void as against the Company and the other Members; and (ii) shall not be recognized or permitted by, or duly reflected in the official books and records of, the Company. In the event of any Transfer or attempted Transfer of a Company interest in violation of this Section 7.1, without limiting any other rights of the Company, the Managing Member shall have the right, in its sole and absolute discretion, to require the withdrawal of the transferring Member (or its successor(s) in interest) from the Company.

(e)    In the event of any Transfer which results in multiple ownership of a Member's interest in the Company, the Managing Member may require that one or more trustees or nominees be designated to represent all or a portion of the interest transferred for the purpose of receiving all notices which may be given and all payments which may be made under this Agreement and for the purpose of exercising all rights of the transferees under the provisions of this Agreement.

(f)    In connection with each Transfer pursuant to this Section 7.1: (i) the transferor and transferee shall execute and acknowledge an instrument of transfer in form and substance reasonably satisfactory to the Company and (ii) the transferee shall assume in writing all obligations of the transferor associated with the transferred interest.

(g)    In the event a Member Transfers (or proposes to Transfer) all or any portion of its interest in the Company, all reasonable legal and other out-of-pocket expenses incurred by the Company on account of the Transfer (or proposed Transfer) shall be paid by such Member. Following the effective date of any Transfer, the transferor and transferee shall be jointly and severally liable for all such expenses.

(h)    Except as otherwise specifically provided in this Agreement or with the consent of the Managing Member, all economic attributes of a transferor Member's interest in the Company (such as the Member's Membership Interest, Capital Contribution, and Capital Account balance) shall carry over to a transferee in proportion to the percentage of the interest so transferred.

7.2    *Withdrawal.*

(a)    Except as provided in this Section 7.2, a Member shall not be required to withdraw without its consent.

(b)    A Member may be required to withdraw from the Company as provided in Section 7.1(d).

(c)    If a Member effects a withdrawal from the Fund which reduces such Member's capital account in the Fund to a level which does not exceed such Member's initial capital contribution to the Fund (such shortfall shall be defined as the "Capital Reduction"), then such Member's unvested interest in the Company shall be reduced by a share equal to the product of the unvested interest and a fraction, the numerator of which is the Capital Reduction and the denominator of which is such Member's initial capital contribution to the Fund.

(d)    A Member shall be deemed to have withdrawn upon such Member's death, Bankruptcy, Dissolution, termination or permanent incapacity, or upon the occurrence of any other event that mandates termination of such Member's status as a Member under the Act.

(e)    A Member shall not be liable to the Company or the other Members in consequence of a deemed withdrawal resulting from such Member's death or permanent incapacity. Except as provided in the preceding sentence, if all or any portion of a Member's interest in the Company is or has been subject to vesting pursuant to Section 7.5, the operation of Section 7.5 shall provide the sole and exclusive remedy of the Company and the other Members in the event of such Member's withdrawal.

7.3    *Removal.* A Member may not be removed as a Member without its consent.

7.4    *Procedures Following Withdrawal or Removal.* A Member that withdraws from the Company in accordance with the provisions of Section 7.2 or is removed as a Member within the meaning of Section 7.3 (a "Withdrawn Member") shall be treated as an Assignee and, accordingly, shall have the rights and obligations of an Assignee as described in Section 7.6. A Withdrawn Member shall not be entitled to any distribution or other payment in connection with its withdrawal or removal.

7.5    *Vesting of Members' Interests.*

(a)    Except as otherwise provided in this Section 7.5, if a Member becomes a Withdrawn Member, then its share of the Profits and Losses allocable under Section 4.1(a)(i) (the "Vesting Interest"), shall cease vesting as of the date of such event and shall be reduced to the product of the Member's Vesting Interest and its Vested Percentage as of such date. The unvested portion of such Member's Vesting Interest shall be apportioned among the other Members in proportion to their respective Membership Interests or, at the option of the Managing Member, apportioned to one or more other Members (whether existing or newly admitted) that have agreed to assume the responsibilities to the Company of the Withdrawn Member.

(b)    Each Member's Vesting Interest shall vest as follows:

(i)    In the case of a Member admitted to the Company on or before the date of the Fund's initial closing, the following vesting schedule shall apply (with all dates determined in respect of the Fund's initial closing date).

| Vesting Reference Date | Vested Percentage |
|------------------------|-------------------|
| Prior to first anniversary | 10 percent |
| First anniversary | 30 percent |
| Second anniversary | 50 percent |
| Third anniversary | 70 percent |
| Fourth anniversary | 100 percent |

(ii)    In the case of a Member admitted to the Company after the Fund's initial closing date, the vesting schedule set forth in Section 7.5(b)(i) shall apply; provided, however, that the vesting reference date for such Member shall be determined with respect to the date of such Member's admission to the Company rather than the initial closing date of the Fund.

(c)    Any portion of a Member's Vesting Interest that has not fully vested by the time of the Company's dissolution and liquidation shall vest at such time.

7.6     *Status of Assignees.*

(a)     Notwithstanding any provision of this Agreement to the contrary, an Assignee shall not be admitted to the Company as a Substitute Member without the consent of the Majority-in-Interest of the Members, which consent may be withheld in such Members' sole and absolute discretion.

(b)     Notwithstanding any provision of this Agreement to the contrary: (i) all rights and privileges associated with an Assignee interest in the Company shall be derived solely from the interest of which such rights and privileges were previously a component part; and (ii) no Assignee shall hold, by virtue of such Assignee's interest in the Company, any rights and privileges that were not specifically transferred to such Assignee by the prior holder of such interest.

(c)     Subject to Sections 4.1(e) and 7.5, an Assignee that holds an interest in the Company shall be entitled to receive the allocations attributable to such interest pursuant to Section 4, to receive the distributions attributable to such interest pursuant to Sections 5 and 8, and to Transfer such interest in accordance with the terms of this Section 7. Notwithstanding the foregoing, the Company and the Members shall incur no liability for allocations and distributions made in good faith to a transferor until a valid written instrument of assignment has been received by the Company and recorded on its books and the effective date of the assignment has passed.

(d)     An Assignee that holds an interest in the Company shall be responsible for any obligation to return distributions or make other payments to the Company associated with such interest; provided, however, that the transferor of such interest, if a Member, also shall continue to be responsible for the satisfaction of such other obligations until such time as a Substitute Member is admitted in respect of such interest. To the extent otherwise applicable to the interest in the Company that has been transferred to an Assignee, the Assignee shall be subject to, and bound by, all of the terms and provisions of this Agreement that inure to the benefit of the Company and/or other Members (including, without limitation, the provisions of this Agreement concerning penalties for breach of this Agreement, confidentiality of Company information, Transfers of Company interests, and resolution of disputes). The foregoing provisions of this Section 7.6(d) shall apply to any Assignee that becomes bound by this Agreement pursuant to Section 10.7 without regard to whether such Assignee has executed a written instrument of assignment as described in Section 7.6(c) or an assumption of obligations as described in Section 7.1(f).

(e)     Solely to the extent necessary to give effect to the Assignee rights and obligations set forth in Section 7.6(c) and (d), an Assignee shall be treated as a Member for purposes of this Agreement.

(f)     An Assignee shall not, solely by virtue of its status as such, hold any non-economic rights in respect of the Company. Without limiting the preceding sentence, an Assignee's interest in the Company shall not entitle such Assignee to participate in the management of the Company, vote on any Company matters or bind the Company under agreements with third parties. An Assignee shall not hold itself out as a Member in any forum or for any purpose; provided, however, that, to the extent necessary to maintain consistency with the Company's income tax returns, reports and other filings, an Assignee shall take the position that it is a Member solely for income tax purposes. Notwithstanding the foregoing provisions of this Section 7.6(f), an Assignee shall have the amendment consent rights specified in Section 10.4(e).

(g)     Except as otherwise specifically provided in this Agreement, an Assignee's interest in the Company shall not be redeemed or Transferred without such Assignee's consent.

## SECTION 8

## DISSOLUTION AND LIQUIDATION

8.1    *Dissolving Events.*  The Company shall be dissolved upon the occurrence of any of the following events:

(a)    Expiration of the Company Term;

(b)    Issuance of an order by a court of competent jurisdiction requiring the dissolution of the Company;

(c)    Permanent cessation of the Company's business;

(d)    The Bankruptcy of the Managing Member;

(e)    Failure of the Company to have at least two Members; or

(f)    Any other event which results in a mandatory dissolution of the Company under the Act.

8.2    *Election to Continue the Company Following Certain Dissolution Events.*  Upon the occurrence of a dissolution event described in Section 8.1(d) or (e), the remaining Member having the largest Capital Account balance shall promptly notify the other Members, if any, of a special meeting of the Members to be held not less than 20 nor more than 60 days after the date of such event.  At that meeting, the Members may by unanimous vote (in person or by proxy) elect to continue the Company in accordance with the terms of this Agreement.  In the case of a dissolution event described in Section 8.1(e), continuation of the Company shall require the admission of a second Member at or prior to the time of the election to continue.  If the Members do not elect to continue the Company and there is no Managing Member or the Managing Member is unavailable to serve as the Liquidating Member, a Liquidating Member shall be elected by a Majority-in-Interest of the Members present (in person or by proxy) at the special meeting.

8.3    *Winding Up of the Company.*

(a)    Upon dissolution of the Company, the Liquidating Member shall promptly wind up the affairs of the Company in accordance with the provisions of this Section 8.3.  In furtherance thereof, the Liquidating Member shall: (i) have all of the administrative and management rights and powers of the Managing Member; (ii) have the power to bind the Company under Section 6.2(b) in the same manner as the Managing Member; and (iii) be reimbursed for its reasonable out-of-pocket expenses on behalf of the Company.  Following dissolution, the Company shall sell or otherwise dispose of assets determined by the Liquidating Member to be unsuitable for distribution to the Members, but shall engage in no other business activities except as may be necessary, in the reasonable discretion of the Liquidating Member, to preserve the value of the Company's assets during the period of dissolution and liquidation. In any event, the Liquidating Member shall use its reasonable efforts to prevent the period of dissolution and liquidation of the Company from extending beyond the date which is two years from the Company's date of dissolution.

(b)    Distributions to the Members in liquidation may be made in cash or in kind, or partly in cash and partly in kind, as determined by the Liquidating Member. Distributions in kind shall be valued at fair market value as determined by the Liquidating Member in accordance with the provisions of Section 6.10 and shall be subject to such conditions and restrictions as may be necessary or advisable in the reasonable discretion of the Liquidating Member to preserve the value of the property so distributed or to comply with applicable law.

(c)    The Profits and Losses of the Company during the period of dissolution and liquidation shall be allocated among the Members in accordance with the provisions of Section 4.1. If any property is to be distributed in kind, the Capital Accounts of the Members shall be adjusted with regard to such property in accordance with the provisions of Section 4.1(d).

(d)    The assets of the Company (including without limitation proceeds from the sale or other disposition of any assets during the period of dissolution and liquidation) shall be applied as follows:

(i)    First, to repay any indebtedness of the Company, whether to third parties or to the Members, in the order of priority required by law;

(ii)    Next, to any reserves which the Liquidating Member reasonably deems necessary for contingent or unforeseen liabilities or obligations of the Company (which reserves when they become unnecessary shall be distributed in accordance with the provisions of clause (iii), below); and

(iii)    Next, to the Members in proportion to their respective positive Capital Account balances (after taking into account all adjustments to the Members' Capital Accounts required under Section 8.3(c)).

## SECTION 9

## LIABILITY PROVISIONS

9.1    *Liability.*  Except as otherwise specifically provided in this Agreement, no Indemnified Person shall be personally liable for the return of any contributions made to the capital of the Company by the Members. In the absence of Material Misconduct (which misconduct shall have given rise to the matter at issue) on the part of an Indemnified Person, such Indemnified Person shall not be liable to the Company or the Members for any act or omission concerning the Company. An Indemnified Person shall not be liable to the Company or the Members for losses due to the fraud, bad faith, willful misconduct or negligence, whether of omission or commission, of any independent contractor, employee or other agent of the Company unless such Indemnified Person was or should have been directly involved with the selection, engagement or supervision of such Person and the action or omission of such Indemnified Person in connection therewith constituted Material Misconduct.

9.2    *Indemnification.*

(a)    In the absence of Material Misconduct (which misconduct shall have given rise to the matter at issue) on the part of an Indemnified Person, the Company shall indemnify and hold such Indemnified Person harmless from and against any loss, expense, damage or injury suffered or sustained by such Indemnified Person by reason of any actual or threatened claim, demand, action, suit or proceeding (civil, criminal, administrative or investigative) in which

such Indemnified Person may be involved, as a party or otherwise, by reason of its actual or alleged management of, or involvement in, the affairs of the Company. This indemnification shall include, but not be limited to: (i) payment as incurred of reasonable attorneys fees and other expenses incurred in investigating or settling any claim or threatened action (where, in the case of a settlement, such settlement is determined to be reasonable by the Managing Member), or incurred in preparing for, or conducting a defense pursuant to, any proceeding up to and including a final non-appealable adjudication; and (ii) the removal of any liens affecting the property of an Indemnified Person.

(b)     Indemnification payments shall be made pursuant to this Section 9.2 only to the extent that the Indemnified Person is not entitled to receive (or will not in any event receive) from the Fund or other third party equal or greater indemnification payments in respect of the same loss, expense, damage or injury.

(c)     If a Person receives an indemnification payment pursuant to this Section 9.2 and it is determined that such Person was not entitled to receive such payment (whether by virtue of such Person's Material Misconduct or otherwise), such Person shall return such payment to the Company promptly upon demand therefor by any Member.

(d)     Notwithstanding the foregoing provisions of this Section 9.2, the Company shall be under no obligation to indemnify an Indemnified Person from and against any reduction in the value of such Person's interest in the Company that is attributable to losses, expenses, damages or injuries suffered by the Company or to any other decline in the value of the Company's assets.

9.3     *Contribution.* In the event that, notwithstanding the provisions of Sections 3.5 and 9.1, two or more Members share joint and several personal liability:

(a)     In connection with any action, omission or situation that would entitle such Members to indemnification pursuant to the provisions of Section 9.2 but for the fact that such action, omission or situation included or constituted Material Misconduct on the part of such Members; or

(b)     In connection with any action, omission or situation that entitles such Members to indemnification pursuant to the provisions of Section 9.2, but the assets of the Company are insufficient to provide for the full amount of indemnification to which such Members are entitled or their entitlement to indemnification is otherwise unenforceable; then

(c)     Such Members shall share the burden of the liability in a manner that is fair and reasonable as determined by such Members or, if they are unable to agree within a reasonable period of time, by an arbitrator selected and acting in accordance with the provisions of Section 10.17.

---

## SECTION 10

## GENERAL PROVISIONS

---

10.1     *Special Meetings.* A Majority-in-Interest of the Non-Managing Members or the Managing Member may call a special meeting of all Members, to be held at any reasonable time and place within the same county as the Principal Office, on not less than 10 nor more than 60 days notice. Reasonable accommodation shall be made for any Member that elects to attend a special meeting via telephonic or similar means.

10.2    *Status Under the Act.* This Agreement is the "limited liability company agreement" of the Company within the meaning of Section 18-101(7) of the Act.

10.3    *Entire Agreement.* This Agreement contains the entire understanding among the Members and supersedes any prior written or oral agreement between them respecting the Company. There are no representations, agreements, arrangements, or understandings, oral or written, among the Members relating to the Company which are not fully expressed in this Agreement.

10.4    *Amendments.*

    (a)    Except as otherwise provided in this Section 10.4, this Agreement may be amended, in whole or in part, only through a written amendment executed by a Two-Thirds-Interest of the Members.

    (b)    An amendment to any provision of this Agreement that calls for a higher level of approval of the Members or the approval of certain specified Members shall, in addition to the execution percentage set forth in Section 10.4(a), require the same form of approval as is set forth in such provision.

    (c)    Except with regard to amendments otherwise specifically required under this Agreement, there shall be no amendment to this Agreement which would have a material adverse effect upon a Member unless the amendment: (i) is consented to by such Member or (ii) by its terms applies to all Members and could have a disproportionately adverse effect upon such Member only due to some attribute of the Member itself (other than the Member's status as such). Except with regard to an amendment that mandates the return of previously distributed amounts, there shall be no amendment that increases a Member's obligation to make capital contributions to the Company unless the amendment is consented to by such Member.

    (d)    Notwithstanding the foregoing provisions of this Section 10.4, the Managing Member may, without the consent of the other Members, amend this Agreement in any manner determined by the Managing Member to be necessary or desirable to comply with applicable law or to resolve an ambiguity in the terms and provisions of this Agreement. The Managing Member shall not have the authority under this Section 10.4(d) to amend this Agreement in a manner that is materially adverse to any other Member; provided, however, that a Member's right to object to an amendment pursuant to this Section 10.4(d) on the grounds that such amendment is materially adverse to such Member shall expire at the Close of Business on the 30th day following notice to such Member of such amendment unless such Member has provided written notice of such objection prior to such date.

    (e)    If an Assignee holds an economic interest in the Company in respect of which there are (but for the operation of this Section 10.4(e)) no corresponding amendment consent rights held by any Member (*e.g.*, in the case of an economic interest acquired by the Assignee pursuant to a transaction or event in which amendment consent rights are extinguished, such as upon the death or Dissolution of a Member), then, solely with regard to an amendment to this Agreement that would materially reduce or diminish such economic interest, the Assignee shall have the same consent rights in respect of such amendment as would have been held by the assignor Member of such economic interest if the assignor Member had continued as a Member and continued to hold such economic interest (but no other economic interest in the Company). Except as set forth in this Section 10.4(e), an Assignee shall not, solely by virtue of its status as such, have any right to consent or withhold consent in respect of an amendment to this Agreement.

    (f)    Any amendment to this Section 10.4 shall require the unanimous consent of the Members.

10.5    *Governing Law.* All questions with respect to the interpretation of this Agreement and the rights and liabilities of the Members shall be governed by the laws of the State of Delaware as they are applied to contracts entered

into and to be wholly performed in Delaware by residents of Delaware. To the extent permitted by the Act and other applicable law, the provisions of this Agreement governing the rights and obligations of the Members shall supersede any contrary provisions of the Act or other applicable law.

10.6    *Severability.*  In the event any provision of this Agreement is determined to be invalid or unenforceable, such provision shall be deemed severed from the remainder of this Agreement and replaced with a valid and enforceable provision as similar in intent as reasonably possible to the provision so severed, and shall not cause the invalidity or unenforceability of the remainder of this Agreement.

10.7    *Counterparts; Binding upon Member and Assignees.*  This Agreement may be executed in any number of counterparts and when so executed, all of such counterparts shall constitute a single instrument binding upon all parties notwithstanding the fact that all parties are not signatory to the original or to the same counterpart. In addition, to the maximum extent permitted by applicable law, a Person shall become bound in accordance with the terms of this Agreement as an Assignee or Member if such Person (or a representative authorized by such Person orally, in writing or by other action such as payment for an interest in the Company) executes any other writing evidencing the intent of such Person to become a Member or Assignee or if such Person or representative complies with the conditions for becoming a Member or Assignee as set forth in this Agreement or any other writing and requests (orally, in writing or by other action such as payment for an interest in the Company or acceptance of distributions from the Company) that the records of the Company reflect such admission or assignment.

10.8    *Survival of Rights.*  Except as otherwise specifically set forth in this Agreement, the provisions of this Agreement shall inure to the benefit of and be binding upon each Member and Assignee and such Member's or Assignee's heirs, devises, legatees, personal representatives, successors, and assigns.

10.9    *Survival of Obligations.*  The following obligations of the Members shall survive the dissolution and termination of the Company:

(a)    The obligation to return certain distributions as set forth in Section 3.5;

(b)    The indemnity for withholding taxes set forth in Section 4.3;

(c)    The obligation to maintain the confidentiality of another Member's information pursuant to Section 6.11;

(d)    The obligation to return certain indemnification payments as set forth in Section 9.2(c);

(e)    The obligation to share the burden of certain liabilities as set forth in Section 9.3;

(f)    The obligation to pay certain fees and costs as set forth in Section 10.17(c); and

(g)    Any obligation arising from a breach of this Agreement.

10.10    *No Third Party Beneficiaries.*  Except as otherwise provided in Section 10.8, the provisions of this Agreement are not intended to be for the benefit of or enforceable by any third party. Without limiting the foregoing, no third party shall have any right to (i) enforce or demand enforcement of a Member's obligation to return distributions, or obligation to make other payments to the Company as set forth in this Agreement or (ii) demand that the Company issue any capital call.

10.11  *Notices.*  Any notice required or permitted to be given under this Agreement or applicable law shall be in writing.

(a)  *Notice to Members.*  Notice to a Member shall be deemed duly given: (i) when personally delivered to such Member; (ii) at the Close of Business on the third day after being deposited in the United States mail, registered, postage prepaid and addressed to the address set forth on Schedule A for such Member, or to any other address of which the Company is notified by such Member in writing; (iii) at the Close of Business on the first day after being deposited in the United States with a nationally recognized overnight delivery service, with delivery charges prepaid and addressed as provided in the preceding clause; or (iv) when actually received by such Member via public or private mail, telecopy, telex or telegram.

(b)  *Notice to the Company.*  Notice to the Company shall be deemed duly given when duly given to the Managing Member, or when actually received at the Principal Office, in accordance with the same procedures set forth in Section 10.11(a).

10.12  *Consents.*  Subject to the provisions of Section 10.7, all consents, agreements, elections and approvals provided for or permitted by this Agreement or applicable law shall be in writing and signed copies thereof shall be retained with the books of the Company.

10.13  *No Partition.*  Except as otherwise permitted by this Agreement, no Member shall have the right, and each Member does hereby agree that it shall not seek, to cause a partition of the Company's property whether by court action or otherwise.

10.14  *Representations by Members.*

(a)  Each Member hereby represents that, with respect to its interest in the Company:  (i) it is acquiring or has acquired such interest for purposes of investment only, for its own account (or a trust account if such Member is a trustee), and not with a view to resell or distribute the same or any part thereof; and (ii) no other Person has any interest in such interest or in the rights of such Member under this Agreement other than a spouse having a community property or similar interest under applicable law.  Each Member also represents to the Company and the other Members that it has the business and financial knowledge and experience necessary to acquire an interest in the Company on the terms contemplated herein and that it has the ability to bear the risks of such investment (including the risk of sustaining a complete loss of all its capital contributions) without the need for the investor protections provided by the registration requirements of the Securities Act of 1933, as amended.

(b)  Each Member hereby acknowledges that certain provisions of this Agreement (including Sections 6.4 and 9.1) have the effect of limiting the fiduciary duties of the Members to the Company and the other Members under applicable law.  Each Member hereby represents that it has carefully considered each such provision and has made an informed decision to consent thereto.

10.15  *No Usury.*  Notwithstanding any provision of this Agreement to the contrary, the rate of interest charged by the Company to any Member in connection with an obligation of the Member to the Company shall not exceed the maximum rate permitted by applicable law.  To the extent that any interest otherwise paid or payable by a Member to the Company shall have been finally adjudicated to exceed the maximum amount permitted by applicable law, such interest shall be retroactively deemed to have been a required repayment of principal (and any such amount paid in excess of the outstanding principal amount shall be promptly returned to the payor Member).

10.16  *Partnership for Tax Purposes Only.*  As set forth in Section 2.1, the Members hereby form the Company as a limited liability company under the Act.  The Members expressly do not intend hereby to form a partnership except insofar as the Company may be treated as a partnership solely for tax purposes.

10.17  *Dispute Resolution.*

(a)  *Mediation and Arbitration.*  Except as otherwise specifically provided in this Agreement, the Members shall make a reasonable attempt to resolve any controversy or claim arising out of or relating to this Agreement through non-binding mediation.  Any such controversy or claim not resolved after such reasonable attempt shall be resolved through arbitration conducted in accordance with the rules of the American Arbitration Association, and judgment upon an award arising in connection therewith may be entered in any court of competent jurisdiction.

(b)  *Venue.*  To the extent permitted by applicable law, any arbitration, mediation, court action, or other adjudicative proceeding arising out of or relating to this Agreement shall be held in San Mateo County, California or, if such proceeding cannot be lawfully held in such location, as near thereto as applicable law permits.

(c)  *Fees and Costs.*  The prevailing party or parties in any arbitration, mediation, court action, or other adjudicative proceeding arising out of or relating to this Agreement shall be reimbursed by the party or parties who do not prevail for their reasonable attorneys, accountants and experts fees and for the costs of such proceeding. In the event that two or more parties are deemed liable for a specific amount payable or reimbursable under this Section 10.17(c), such parties shall be jointly and severally liable therefor.

10.18  *Legal Counsel.*  The Managing Member has engaged Wilson, Sonsini, Goodrich & Rosati, Professional Corporation ("WSGR"), as legal counsel to the Managing Member and the Company.  No legal counsel has been engaged by the Company to protect or otherwise represent the interests of the Non-Managing Members.  Moreover, WSGR has previously represented and/or concurrently represents the interests of the Managing Member and/or parties related thereto in connection with matters other than the preparation of this Agreement and may represent such Persons in the future.  Each Member: (i) approves WSGR's representation of the Managing Member and the Company in the preparation of this Agreement; (ii) acknowledges that no legal counsel has been engaged by the Company to protect or otherwise represent the interests of the Non-Managing Members, that WSGR has not been engaged by any Non-Managing Member to protect or represent the interests of such Non-Managing Member vis-a-vis the Company or the preparation of this Agreement, and that actual or potential conflicts of interest may exist among the Members in connection with the preparation of this Agreement (with the consequence that a Non-Managing Member's interests may not be vigorously represented unless such Non-Managing Member engages its own legal counsel); and (iii) acknowledges further that such Non-Managing Member has been afforded the opportunity to engage and seek the advice of its own legal counsel before entering into this Agreement.  In addition, each Member: (i) acknowledges the possibility of a future conflict or dispute among Members or between any Member or Members and the Company; (ii) agrees that WSGR may represent the Company and/or any Member (or any equityholder thereof) in connection with any such conflict or dispute and, to the extent permitted under the California Rules of Professional Conduct and any other applicable rules governing the professional conduct of attorneys (the "Professional Rules"), waives its right to object to such representation (including, without limitation, on the grounds of any actual or potential conflict of interests); and (iii) acknowledges the possibility that, pursuant to operation of the Professional Rules, WSGR may be precluded from representing the Company and/or any Member (or any equityholder thereof) in connection with any such conflict or dispute.  Each Non-Managing Member hereby agrees that neither this Agreement nor the transactions contemplated hereby are intended to create a relationship between WSGR and such Non-Managing Member pursuant to which such Non-Managing Member (acting other than in the name of the Company) would have a right to object to WSGR's representation of any Person.  Nothing in this Section 10.18 shall preclude the Company from selecting different legal counsel to represent it at any time in the future and, except as provided in the preceding sentence, no Member shall be

deemed by virtue of this Section 10.18 to have waived its right to object to any conflict of interest relating to matters other than this Agreement or the transactions contemplated herein.

10.19 *Miscellaneous.* Except as otherwise set forth in this Agreement, no failure or delay by any party in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof; any actual waiver shall be contained in a writing signed by the party against whom enforcement of such waiver is sought. The section headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. Unless the context clearly requires to the contrary, all references in this Agreement to designated "Sections" are to the designated Sections and other subdivisions of this Agreement. This Agreement shall not be construed for or against any party by reason of the authorship or alleged authorship of any provisions hereof or by reason of the status of the respective parties. Except where the context clearly requires to the contrary: (i) instances of gender or entity-specific usage (e.g., "his" "her" "its" "person" or "individual" ) shall not be interpreted to preclude the application of any provision of this Agreement to any individual or entity; (ii) the word "or" shall not be applied in its exclusive sense; and (iii) "including" shall mean "including, without limitation." References to laws, regulations and other governmental rules shall mean such laws, regulations and rules as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the effective date of this Agreement). References to "$" or "dollars" shall mean the lawful currency of the United States of America. References to "federal" or "Federal" shall be references to laws, agencies or other attributes of the United States of America (and not to any State or locality thereof). The meaning of the terms "domestic" and "foreign" shall be determined by reference to the United States of America. References to "days" shall mean calendar days; references to "business days" shall mean all days other than Saturdays, Sundays and days that are legal holidays in the State of California. All dates and times specified in this Agreement are of the essence and shall be strictly enforced.

# **EXHIBIT C**

| | |
|---|---|
| Investor: | *AMISIL HOLDINGS LTD.* |
| Contact Person: | *AMIT CHOUDHURY* |
| Telephone Number: | *415 - 616 - 5909* |
| Fax No.: | *415- 616 - 5910* |
| State of Domicile: | *CYPRUS* |
| Subscription Amount: | *$ 300,000* |

THIEL CAPITAL INTERNATIONAL, LLC,
A DELAWARE LIMITED LIABILITY COMPANY

THIEL CAPITAL MANAGEMENT, LLC,
A DELAWARE LIMITED LIABILITY COMPANY

SUBSCRIPTION AND INVESTMENT REPRESENTATION AGREEMENT

THE MEMBERSHIP INTERESTS REFERRED TO IN THIS SUBSCRIPTION AND INVESTMENT REPRESENTATION AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") IN THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION. SUCH MEMBERSHIP INTERESTS ARE BEING OFFERED AND SOLD UNDER THE EXEMPTION PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT AND/OR PURSUANT TO REGULATION D THEREUNDER.

THIEL CAPITAL INTERNATIONAL, LLC,
A DELAWARE LIMITED LIABILITY COMPANY

THIEL CAPITAL MANAGEMENT, LLC,
A DELAWARE LIMITED LIABILITY COMPANY

SUBSCRIPTION AND INVESTMENT REPRESENTATION AGREEMENT

TO:    Thiel Capital International, LLC
Thiel Capital Management, LLC
c/o Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, California 94304-1050
Attn: Eric W. Wright, Esq.

Ladies and Gentlemen:

You have informed the undersigned that Thiel Capital International, LLC, a Delaware limited liability company (the "Fund"), and its managing member, Thiel Capital Management, LLC, a Delaware limited liability company (the "Company"), have been formed pursuant to the Delaware Limited Liability Company Act, and that the Manager of the Company is Peter Thiel (the "Manager"). The Fund is operated in accordance with its operating agreement (the "Fund Operating Agreement") substantially in the form furnished to the undersigned, and as described in the Confidential Memorandum relating to the Fund, dated May 12, 1997 (the "Confidential Memorandum"), furnished to the undersigned. The Company is operated in accordance with its operating agreement (the "Management Operating Agreement") substantially in the form furnished to the undersigned.

1.    <u>Subscription</u>. Subject to the terms and conditions hereof, the undersigned hereby tenders this subscription (the "Subscription") in the amount set forth on the undersigned's signature page hereto for an interest in the Fund (the "Fund Membership Interest") and an interest in the Company (the "Company Membership Interest"), simultaneously with the delivery of an executed copy of this Subscription and Investment Representation Agreement (this "Subscription Agreement") as required by the Instructions to Subscribers accompanying this Subscription Agreement. The undersigned understands that, of the subscription amount indicated on the cover of this Subscription Agreement and on the signature page hereto, 99% of such amount will be the undersigned's capital contribution to the Fund and 1% of such amount will be the undersigned's capital contribution to the Company. The undersigned further understands that, for every $300,000 of capital contributions to the Fund and the Company, the undersigned will receive a 1.0% "Membership Interest" in the Company, as such term is defined in the Management Operating Agreement.

2.    <u>Acceptance of Subscription; Obligations Under Fund Operating Agreement and Management Operating Agreement</u>. It is understood and agreed that this Subscription Agreement is made subject to the following terms and conditions:

(a)    The Manager shall have the right to accept or reject this Subscription, in whole or in part, in its sole and absolute discretion and this Subscription shall be deemed to be accepted by the Manager only when the undersigned has been admitted as a member of the Fund and of the Company (a "Member") by execution of the Fund Operating Agreement and of the Management Operating Agreement.

(b)    If this Subscription is accepted by the Manager and the conditions to Closing set forth in Section 3 below are satisfied, the Manager will execute, both on behalf of the Fund and of the Company and as attorney-in-fact for the undersigned, the Fund Operating Agreement and the Management Operating Agreement in substantially the form furnished to the undersigned.

(c)    The undersigned hereby ratifies, adopts and accepts the Fund Operating Agreement and the Management Operating Agreement in substantially the form furnished to the undersigned. If the undersigned becomes a Member as provided for in Section 2(b), the undersigned will be bound by all the terms and provisions of the Fund Operating Agreement and the Management Operating Agreement in substantially the form furnished to the undersigned, and any amendments thereto, and will perform all obligations therein imposed upon a Member with respect to the undersigned's Fund Membership Interest and Company Membership Interest.

(d)    The undersigned understands that the undersigned's Fund Membership Interest and Company Membership Interest will not be evidenced by a certificate subject to Article 8 of the Uniform Commercial Code.

3.    <u>Closing; Conditions to Closing.</u>

(a)    <u>Time and Place of Closing.</u>  The closing of the sale and purchase of the undersigned's Fund Membership Interest and Company Membership Interest (the "Closing") will take place at the offices of Wilson Sonsini Goodrich & Rosati, 650 Page Mill Road, Palo Alto, California 94304, at such date and time as all of the conditions to the Closing set forth in Section 3(b) shall have been satisfied or waived (the "Closing Date"). The Closing shall be subject to the satisfaction or waiver (which waiver shall be in the form of a writing executed by the undersigned) of the respective conditions set forth below in this Section 3.

(b)    <u>Conditions to Closing of the Fund and the Company.</u>  The Fund's obligation to sell the Fund Membership Interest and the Company's obligation to sell the Company Membership Interest, both to be purchased by the undersigned at the Closing, are subject to acceptance by the Manager of the undersigned's Subscription, and to the fulfillment, prior to or at the Closing, of each of the following conditions:

(i)    <u>Representations and Warranties.</u>  The representations and warranties of the undersigned contained in this Subscription Agreement shall be true and correct at the Closing.

        (ii)    <u>Performance</u>.  The undersigned shall have performed and complied with all conditions required by this Subscription Agreement, by the Fund Operating Agreement and by the Management Operating Agreement prior to or at the Closing, and there shall exist no condition or event which constitutes a default under the Fund Operating Agreement or under the Management Operating Agreement or which with notice or lapse of time, or both, would constitute such a default.

        (iii)    <u>Proceedings and Documents</u>.  All proceedings in connection with the transactions contemplated hereby and all documents and instruments incident to such transactions shall be satisfactory in form and substance to the Fund, the Company and Wilson Sonsini Goodrich & Rosati, their counsel, and the Fund, the Company and their counsel shall have received all such counterpart originals or certified or other copies of such documents as the Fund or the Company may reasonably request.

    4.    <u>Representation as to Investor Status</u>.

        (a)    In order for the Fund to offer and sell the Fund Membership Interests in conformance with federal and state securities laws, and for the Company to offer and sell the Company Membership Interests in conformance with federal and state securities laws, the following information must be obtained regarding your investor status.  Please <u>initial each category</u> applicable to you as an investor in the Fund and the Company.

        \_\_\_    (1)    A natural person whose net worth, either individually or jointly with such person's spouse, at the time of the undersigned's purchase, exceeds $1,000,000;

        \_\_\_    (2)    A natural person who had an income in excess of $200,000, or joint income with that person's spouse in excess of $300,000, in 1995 and 1996 and reasonably expects to have individual income reaching the same level in 1997;

        \_\_\_    (3)    A bank as defined in Section 3(a)(2) of the Securities Act of 1933, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act of 1933, whether acting in its individual or fiduciary capacity;

        \_\_\_    (4)    A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934;

        \_\_\_    (5)    An insurance company as defined in Section 2(13) of the Securities Act of 1933;

        \_\_\_    (6)    An investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act;

03/09/98    18:44

FROM : AHL                    PHONE NO. :                        MAR. 09 1998 10:42PM P2
03/09/98  17:57    WILSON SONSINI → 415 616 5910                      NO. 311  P003/006

(7)    A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958;

(8)    A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000;

(9)    An employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(10)    A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;



(11)    An organization described in Section 501(c)(3) of the Internal Revenue Code, a corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the Fund Membership Interest or the Company Membership Interest, with total assets in excess of $5,000,000;

(12)    A trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Fund Membership Interest or the Company Membership Interest, whose purchase is directed by a sophisticated person who has such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of investing in the Fund and in the Company;

(13)    An entity in which all of the equity owners qualify under any of the above subparagraphs.  If the undersigned belongs to this investor category only, a list of the equity owners of the undersigned, and the investor category which each such equity owner satisfies, should be attached to this Subscription Agreement as Attachment W;

(14)    The undersigned does not qualify under any of the investor categories defined above.  IF THIS CATEGORY (14) IS CHECKED, PLEASE NOTIFY ERIC W. WRIGHT, ESQ., BY TELEPHONE AT (650) 493-9300 OR BY FACSIMILE AT (650) 493-6811 AS SOON AS POSSIBLE.

(b)    The term "net worth" means the excess of total assets over total liabilities.  In calculating "net worth," the undersigned may include the estimated fair market value of the undersigned's principal residence as an asset.

::ODMA\PCDOCS\SQL2\179319\4                           -4-

(c)    In determining individual "income," the undersigned should add to the undersigned's individual adjusted gross income (exclusive of any spousal income) any amounts attributable to tax exempt income received, losses claimed as a limited partner in any limited partnership, deductions claimed for depletion, contributions to an IRA or Keogh retirement plan, alimony payments, and any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income and should subtract from the undersigned's individual adjusted gross income any unrealized capital gain.

(d)    Indicate the form of entity of the undersigned:

___    Individual

       If an individual, please check here if you are investing through an IRA (Individual Retirement Account), Keogh or other retirement plan):

       _____

___    Limited Partnership

___    General Partnership

X_    Corporation

___    Limited Liability Company

___    Revocable Trust (in Attachment X, identify each grantor and indicate under what circumstances the trust is revocable by the grantor)

___    Other Type of Trust (indicate type of trust and, for trusts other than pension trusts, name the grantors and beneficiaries in Attachment X: _____)

___    Other form of organization (indicate form of organization: _____)

(e)    If the undersigned is not an individual, indicate the approximate date the undersigned's entity was formed: MAY 1997

(f)    If the undersigned is not an individual, initial the appropriate blank below which correctly describes the application of the following statement to your situation:  the undersigned (i) was not organized or reorganized for the specific purpose of acquiring the Fund

Membership Interest or the Company Membership Interest, (ii) has made investments prior to the date hereof, and each beneficial owner thereof has and will share in the same proportion in each investment made by the Fund or the Company, and (iii) the undersigned's investment in the Fund or the Company will not constitute more than forty percent (40%) of the undersigned's total capital:

    __X__   True

    _____   False

If the "False" box is checked, name in Attachment Y the partners, shareholders or other persons participating in the entity, and the percentage interest which each such person has in such entity. Each participating person will be required to fill out a Subscription Agreement, including making the representations as to investor status set forth in this Section 4.

(g)    If the undersigned is not an individual, initial the box below which correctly describes the application of the following statement to your situation:

The undersigned is an "investment company"[1] under the Investment Company Act , or would be an investment company but for the exemptions provided for in Sections 3(c)(1)[2] or 3(c)(7)[3] of that Act.

_____ True

__X__ False

(h)    If the undersigned has responded "True" to Section 4(g) above, the undersigned has _____ holders of its outstanding securities (other than short-term paper).

---

[1]    The undersigned is an "investment company" if it (1) is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities; (2) is engaged or proposes to engage in the business of issuing face-amount certificates of the installment type, or has been engaged in such business and has any such certificate outstanding; or (3) is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire Investment Securities having a value exceeding 40 per centum of the value of the undersigned's total assets (exclusive of Government securities and cash items) on an unconsolidated basis.  Investment Securities are defined to include all securities other than Government securities, securities issued by employees' securities companies (as defined in the Investment Company Act), and securities issued by majority-owned subsidiaries of the issuer which are not investment companies and are not relying on either of the exceptions from the definition of "investment company" in Sections 3(c)(1) and 3(c)(7) of the Investment Company Act.  Notwithstanding the foregoing, paragraphs (2) - (6) and (8) - (14) of Section 3(c) of the Investment Company Act, and rules promulgated pursuant to Section 3(a) of the Investment Company Act, contain additional exceptions from the definition of "investment company."

[2]    Section 3(c)(1)(A) provides, in pertinent part:
"[N]one of the following persons is an investment company . . .
"(1) Any issuer whose outstanding securities (other than short-term paper) are beneficially owned by not more than one hundred persons and which is not making and does not presently propose to make a public offering of its securities.  For purposes of this paragraph: . . . (A) Beneficial ownership by a company shall be deemed to be beneficial ownership by one person, except that, if the company owns 10 per centum or more of the outstanding voting securities of the issuer, and is, but for the exception provided for in this paragraph or paragraph (7), would be an investment company, the beneficial ownership shall be deemed to be that of the holders of such company's outstanding securities (other than short-term paper)."

[3]    Section 3(c)(7) provides, in part:
"[N]one of the following is an investment company . . . (A)  Any issuer, the outstanding securities of which are owned exclusively by persons who, at the time of acquisition of such securities, are qualified purchasers, and which is not making and does not at that time propose to make a public offering of such securities."

5.    <u>Other Representations and Warranties of the Undersigned</u>.  The undersigned hereby represents and warrants to the Manager, the Fund and the Company as follows:

(a)    The Fund Membership Interest and the Company Membership Interest are being acquired for the undersigned's own account for investment, with no intention of distributing or selling any portion thereof within the meaning of the Securities Act of 1933, and will not be transferred by it in violation of the Securities Act of 1933 or the then-applicable rules or regulations thereunder or any other applicable law.  No one other than the undersigned has any interest in or any right to acquire the Fund Membership Interest or the Company Membership Interest.  The undersigned hereby confirms and makes all of the representations and warranties contained in the Fund Operating Agreement and the Management Operating Agreement.  The undersigned understands and acknowledges that the Fund or the Company will have no obligation to recognize the ownership, beneficial or otherwise, of such Fund Membership Interest or Company Membership Interest by anyone but the undersigned, except as provided in the Fund Operating Agreement and the Management Operating Agreement;

(b)    The undersigned's financial condition is such that the undersigned is able to bear the risk of holding the Fund Membership Interest and the Company Membership Interest for an indefinite period of time and the risk of loss of the undersigned's entire investment in the Fund and the Company;

(c)    The undersigned has received, has read and understood and is familiar with the Confidential Memorandum, the Fund Operating Agreement, the Management Operating Agreement and this Subscription Agreement;

(d)    The Manager has made available all additional information which the undersigned has requested in connection with the transactions contemplated by the Confidential Memorandum, the Fund Operating Agreement and the Management Operating Agreement;

(e)    No representations or warranties have been made to the undersigned by the Fund, the Company, the Manager, or any agent of the Manager other than as set forth herein or in the Confidential Memorandum;

(f)    The undersigned has been afforded an opportunity to ask questions of and receive answers from the Manager concerning the terms and conditions of the Fund Operating Agreement and the purchase of the Fund Membership Interest and the terms and conditions of the Management Operating Agreement and the purchase of the Company Membership Interest and the opportunity to obtain any additional information (to the extent the Manager has such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of information otherwise furnished by the Manager;

(g)     The undersigned has investigated the acquisition of the Fund Membership Interest and the Company Membership Interest to the extent the undesigned deemed necessary or desirable and the Manager has provided the undersigned with any assistance the undersigned has requested in connection therewith;

(h)     The undersigned has such knowledge and experience in financial and business matters that the undersigned is capable of evaluating the merits and risks of acquisition of the Fund Membership Interest, the Company Membership Interest and of making an informed investment decision with respect thereto;

(i)     The undersigned is aware that the undersigned's rights to transfer the Fund Membership Interest and the Company Membership Interest are restricted by the Securities Act of 1933 and applicable state securities laws, the Fund Operating Agreement and the Management Operating Agreement and the absence of a market for the Fund Membership Interests and the Company Membership Interests, and the undersigned will not offer for sale, sell or otherwise transfer the Fund Membership Interest or the Company Membership Interest without complying with the provisions of the Fund Operating Agreement and the Management Operating Agreement;

(j)     The undersigned has read, is familiar with and understands this Subscription Agreement, the Fund Operating Agreement and the Management Operating Agreement;

(k)     The address set forth below is the undersigned's true and correct domicile;

(l)     The undersigned understands that the Fund Membership Interest and the Company Membership Interest have not been registered under the Securities Act of 1933 or any state securities act in reliance on an exemption for private offerings, the availability of which depends in part upon the accuracy of the representations and warranties of the undersigned contained herein, and the undersigned acknowledges that it is purchasing an interest in the Fund and the Company without being furnished any offering literature or prospectus other than the Confidential Memorandum;

(m)     The undersigned has furnished (or, prior to the Closing, will furnish) to the Manager or its agents, to the best of its knowledge and ability, any and all relevant information to assist the Manager in limiting the number of investors to fewer than one hundred beneficial owners within the meaning of the Investment Company Act;

(n)     The undersigned has full power and authority to make the representations referred to herein, and to purchase the Fund Membership Interest and the Company Membership Interest pursuant to the Confidential Memorandum, the Fund Operating Agreement and the Management Operating Agreement, and to execute and deliver the Fund Operating Agreement, the Management Operating Agreement and this Subscription Agreement;

(o)     The undersigned acknowledges and is aware of the following:

(i)     The investment in the Fund Membership Interest and in the Company Membership Interest are speculative and involve a high degree of risk of loss of the entire investment in the Fund and in the Company;

(ii)     There are substantial restrictions on the transferability of the Fund Membership Interest and the Company Membership Interest; the Fund Membership Interest and the Company Membership Interest will not be, and investors in the Fund and the Company have no rights to require that the Fund Membership Interests and the Company Membership Interests be, registered under the Securities Act of 1933; there will be no public market for the Fund Membership Interest and the Company Membership Interest; the undersigned may not be able to avail itself of the provisions of Rule 144 adopted by the Securities and Exchange Commission under the Securities Act of 1933 with respect to the resale of the Fund Membership Interest and the Company Membership Interest, and accordingly, may have to hold the Fund Membership Interest and the Company Membership Interest indefinitely, and it may not be possible for the undersigned to liquidate the investment in the Fund and the Company;

(iii)     No federal or state agency has made any finding or determination as to the fairness of the terms of the offering and sale of the Fund Membership Interest or of the Company Membership Interest, or of the Fund Operating Agreement or of the Management Operating Agreement;

(p)     The Manager does not intend to register under the United States Investment Advisers Act of 1940, as amended (the "Advisers Act"), or any other statutes of any jurisdiction applicable to investment advisers.  The undersigned acknowledges, however, that the Manager is relying upon exemptions from various provisions of the Advisers Act (including prohibitions upon certain types of advisory fees) and that the availability of one or more of such exemptions may depend upon the truth of the representations and warranties of the undersigned set forth in this Section 5(p). Accordingly, the undersigned represents and warrants to the Fund, the Company and the Manager that:

(i)     the undersigned understands the financial arrangement between the Fund, the Company and the Manager and the risks associated therewith as disclosed in the Confidential Memorandum;

(ii)     if the undersigned is not a natural person, the representative of the undersigned whose signature appears on the signature page of this Subscription Agreement qualifies as a client's independent agent under Rule 205-3(g)(4) of the Advisers Act, and the undersigned is an eligible client because (A) the undersigned entity is none of (1) an investment company registered under the Investment Company Act of 1940 (or a company that is required to be registered under the Investment Company Act of 1940 but is not registered), (2) an entity which would be defined as an investment company under Section 3(a) of the Investment Company Act of 1940 (e.g., an entity

primarily engaged in investing, owning, holding or trading in securities), but for the exclusion from such definition provided by Section 3(c)(1) of the Investment Company Act of 1940 (which Section provides an exclusion from the definition of investment company for entities which have not publicly offered their securities and whose outstanding securities are beneficially owned by not more than one hundred persons), or (3) a business development company as defined in Section 202(a)(22) of the Advisers Act, or (B) each of the undersigned's equity owners has a net worth in excess of $1,000,000 (which, in the case of a natural person, may include assets held jointly with such person's spouse) and none of the undersigned's equity owners is an entity described in (A)(1), (2) or (3) of this Section 5(p)(ii) unless each of such entity's equity owners meets the requirements of this Section 5(p)(ii)(B);

(iii)    the undersigned understands that the Incentive Allocation (as defined in the Fund Operating Agreement) may create an incentive for the Manager to cause the Fund to make investments that are riskier or more speculative than would be the case in the absence of such Incentive Allocation;

(iv)    the undersigned understands that for purposes of determining payments to the Manager, valuation of securities for which market quotations are not readily available will be determined by the Manager in its sole discretion without any independent determination.

The foregoing representations and warranties are true and accurate as of the date hereof and shall be true and accurate as of the Closing Date and shall survive such date. *If in any respect such representations and warranties shall not be true and accurate prior to or at the Closing, the undersigned shall give immediate notice of such fact to the Manager in c/o Wilson Sonsini Goodrich & Rosati, 650 Page Mill Road, Palo Alto, California 94304 (Fax: (650) 493-6811), Attn: Eric W. Wright, Esq., by telex, telegram or facsimile with written confirmation of receipt, specifying which representations and warranties are not true and accurate and the reasons therefor.*

6.    Indemnification.  The undersigned acknowledges that the undersigned understands the meaning and legal consequences of the representations and warranties made by the undersigned herein, and that the Manager is relying on such representations and warranties in making its determination to accept or reject this Subscription.  The undersigned hereby agrees to indemnify and hold harmless the Fund, the Company, the Manager and if at any time the Manager is an entity, the Manager's members, partners (general and limited), directors, officers or employees from and against any and all loss, damage or liability due to or arising out of a breach of any representation or warranty of the undersigned contained in this Subscription Agreement.

7.    Transferability.  The undersigned agrees not to transfer or assign this Subscription Agreement, or any interest herein, and further agrees that the assignment and transferability of the Fund Membership Interest and the Company Membership Interest acquired pursuant hereto shall be made only in accordance with the Fund Operating Agreement and the Management Operating Agreement.

8.    No Revocation.  The undersigned agrees that this Subscription Agreement and any agreement of the undersigned made hereunder is irrevocable, and that this Subscription Agreement shall survive the death or disability of the undersigned, except as provided below in Section 9.

9.    Termination of Agreement.  If the Closing does not take place as contemplated by Section 3(a) or if this Subscription is rejected by the Manager, then and in any such event this Subscription Agreement shall be null and void and of no further force and effect, and no party shall have any rights against any other party hereunder or under the Fund Operating Agreement or the Management Operating Agreement, and the Manager shall promptly return or cause to be returned to the undersigned this Subscription Agreement.

10.    Notices.  All notices or other communications given or made hereunder shall be in writing and shall be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, or delivered by telex or telegram or facsimile with written confirmation of receipt to the undersigned at the address set forth below and to the Manager in c/o Wilson Sonsini Goodrich & Rosati, 650 Page Mill Road, Palo Alto, California 94304 (Fax:  (650) 493-6811), Attn:  Eric W. Wright, Esq., or at such other place as the Manager may designate by written notice to the undersigned.

11.    Power of Attorney.

(a)    By executing this Subscription Agreement, the undersigned is hereby granting to the Manager a special power of attorney, making, constituting and appointing the Manager as the undersigned's attorney-in-fact, with full power of substitution and with power and authority to act in the undersigned's name and on the undersigned's behalf to execute, acknowledge and swear to the execution, acknowledgment and filing of the following documents:

(i)    The Fund Operating Agreement, in the form provided to the undersigned (with the exception of Schedule A thereto), and the Certificate of Formation, as well as any amendments to the foregoing which, under the laws of the State of Delaware or the laws of any other jurisdiction, are required to be filed or which the Manager deems advisable to file and are permitted by the terms of the Fund Operating Agreement;

(ii)    Any other instrument or document which may be required to be filed by the Fund or the Company under the laws of any jurisdiction or by any governmental agency, or which the Manager deems advisable to file; and

(iii)    Any instrument or document which may be required to effect the continuation of the Fund or the Company, the admission of an additional or substituted Member, or the dissolution and termination of the Fund or the Company (provided such continuation, admission or dissolution, and termination are in accordance with the terms of the Fund Operating Agreement and the Management Operating Agreement).

(b)    The special power of attorney being granted hereby by the undersigned:

(i)    is a special power of attorney coupled with an interest, is irrevocable, and shall survive the death or legal incapacity of the undersigned;

(ii)    may be exercised by the Manager signing individually for each Member or for all of the Members executing any particular instrument;

(iii)    shall survive an assignment by the undersigned of its interest in the Fund or the Company except that, where the assignee of the interest owned by a Member has been approved by the Manager for admission to the Fund or the Company as a substituted Member, the special power of attorney shall survive such assignment for the sole purpose of enabling the Manager to execute, acknowledge and file any instrument or document necessary to effect such substitution.

(c)    In the event of any conflict between the Fund Operating Agreement and any document filed pursuant to this power of attorney, the Fund Operating Agreement shall control.

(d)    In the event of any conflict between the Management Operating Agreement and any document filed pursuant to this power of attorney, the Management Operating Agreement shall control.

12.    Survival of Agreements, Representations and Warranties, etc.  All agreements, representations and warranties contained herein or made in writing by or on behalf of the Fund, the Company or the Manager in connection with the transactions contemplated by this Subscription Agreement shall survive the execution and delivery of this Subscription Agreement, any investigation at any time made by the undersigned or on the undersigned's behalf, and the sale and purchase of the undersigned's Fund Membership Interest and the Company Membership Interest and payment therefor.

13.    Expenses.  The undersigned will pay the undersigned's own expenses relating to this Subscription Agreement and the purchase of the undersigned's Fund Membership Interest and the Company Membership Interest hereunder.  The Fund shall bear expenses relating to this Subscription Agreement and the purchase of the undersigned's Fund Membership Interest and Company Membership Interest hereunder as set forth in the Fund Operating Agreement and the Management Operating Agreement.

14.    Amendments.  Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated orally but only with the written consent of the undersigned and the Fund or the Company.

15.    Counterparts.  This Subscription Agreement may be executed in any number of counterparts, each of which shall be an original but all of which taken together shall constitute one agreement.

16. <u>Governing Law</u>.  This Subscription Agreement and all amendments hereto shall be governed by and construed in accordance with the laws of the State of Delaware as such laws are applied to agreements entered into and to be performed entirely within Delaware by Delaware residents.

<u>INDIVIDUALS</u>

Dated: _____, 1997

_____

SIGNATURE

_____

_____

SUBSCRIPTION AMOUNT

99% of this amount will be
invested in the Fund directly;
the remaining 1% will be used
to purchase an interest in the
Company

NAME (PLEASE PRINT)

RESIDENCE ADDRESS:

_____

NUMBER AND STREET

_____

CITY/STATE/ZIP CODE

_____

SOCIAL SECURITY NUMBER

      (Please have signature notarized on following page or, if the jurisdiction where you are
located provides for a different form of notarization, please have signature notarized on such form
and attach such form to this Subscription Agreement.)

ACCEPTED BY:

THIEL CAPITAL INTERNATIONAL, LLC
   By:   THIEL CAPITAL MANAGEMENT, LLC
        Managing Member

By:   _____
       Peter Thiel, Managing Member

STATE OF _____     )
                             ) ss.:
COUNTY OF _____    )

On _____, 1997, before me, _____, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature: _____          (Seal)
           Notary Public

## CORPORATIONS, PARTNERSHIPS, TRUSTS OR OTHER ENTITIES

Dated: __FEBRUARY 27__ , ~~1997~~ 1998

_[signature]_
_____
SIGNATURE

$300,000
_____
SUBSCRIPTION AMOUNT

AMIT CHOUDHURY ; SENIOR VICE PRESIDENT
_____
NAME (PLEASE PRINT)

99% of this amount will be
invested in the Fund directly;
the remaining 1% will be used
to purchase an interest in the
Company

RESIDENCE ADDRESS:

CLARENDON HOUSE
2 CHURCH STREET
_____
NUMBER AND STREET

HAMILTON   HM DX  BERMUDA
_____
CITY/STATE/COUNTRY/ZIP CODE

N/A
_____
FEDERAL I.D. NUMBER
(if a United States investor)

(Please have signature notarized on following page or, if the jurisdiction where you are
located provides for a different form of notarization, please have signature notarized on such form
and attach such form to this Subscription Agreement.)

ACCEPTED BY:

THIEL CAPITAL INTERNATIONAL, LLC
  By:  THIEL CAPITAL MANAGEMENT, LLC
       Managing Member

By:  _Peter Thiel_
     _____
     Peter Thiel, Managing Member

::ODMA\PCDOCS\SQL2\179319\4

~~STATE~~ ISLANDS OF BERMUDA )
 CITY )  ss.:
~~COUNTY~~ OF HAMILTON )

On FEBRUARY 27, 1998, before me, JAMES M. MACDONALD, personally
appeared AMIT CHOUDHURY , personally known to me (or proved to me on the
basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature: _J. M. Macdonald_
          Notary Public



::ODMA\PCDOCS\SQL2\179319\4

-18-

ATTACHMENT W

ATTACHMENT X

ATTACHMENT Y

ATTACHMENT Z

# **EXHIBIT D**

# THIEL CAPITAL MANAGEMENT, LLC

3000 Sand Hill Road, Building 1, Suite 255, Menlo Park, CA 94025
TELEPHONE: (650) 561-9370    FAX: (650) 561-9371


May 2, 2002


Amit Choudhury
2000 Van Ness Ave.  Suite 500
San Franciso, CA  94109


Dear Mr. Choudhury:

Enclosed is a check representing full payment for your interest in Thiel Capital Management, LLC ("TCM").  This payment equals your share of total net income through 2001 as well as your ownership percentage of the equity value of TCM.  TCM's equity value is 5% of funds under management at the end of 2001.  As the income generated to date by TCM has been small, we feel this simplification will relieve us of a huge administrative burden.  For the past three years, I have personally paid the taxes for each TCM limited partner rather than issue separate K-1s to everyone.  At this point, we are anxious to finalize this and avoid having to issue separate K-1s to each investor going forward.

The payment should be reported on Schedule D of your 2002 tax return as proceeds from sales.  Your basis equals 1% allocation of the original investment in TCI.  If you already liquidated your TCI investment then you will have zero basis in the TCM investment.

To show your acceptance of this offer, please sign in the space provided below.  Please return a copy of this letter to Thiel Capital Management in the self-addressed stamped envelope included with this letter.

If you have any questions, as always feel free to contact me at (650) 561-9370.

Sincerely yours,

Peter Thiel
Managing Member, Thiel Capital Management, LLC,
Managing Member, Thiel Capital International, LLC


I agree to sell my ownership interest in Thiel Capital Management, LLC, at the terms described above.

Sign: _____    Date: _____



# <u>EXHIBIT E</u>

Clarium Capital Management LLC    One Letterman Drive, Building C, Suite 1700    The Presidio, San Francisco    www.clariumllc.com
400    California 94129

Bruce Gibney_General Counsel
bgibney@clariumcapital.com

p _ 415
  248
  5161

f _ 415
  248
  5141

m_ 415
  871
  3081

July 20, 2006

*VIA FACSIMILIE (w/o enclosures) & EXPRESS MAIL (w enclosure)*

Daniel R. Formeller, Esq.
Tressler, Soderstrom, Maloney & Priess LLP
233 S. Wacker Drive
Chicago, IL 60606

Re: AMISIL/Clarium

Dear Mr. Formeller:

This letter shall serve as notice that, pursuant to section 7.3 of the Second Amended And
Restated Limited Liability Company Agreement of Clarium Capital Management LLC,
Amisil Holdings Ltd. ("Amisil"), to the extent it retains an interest in Clarium Capital
Management LLC ("Clarium") is hereby mandatorily retired as a Member of Clarium as
of July 26, 2006.   Copies of the Agreement, previously sent to Steve Thayer, Amisil's
prior counsel, are attached for your reference.

An accounting and, where applicable, settlement of Amisil's Capital Account and
Membership Interest, if any, will be provided within thirty (30) days of July 26, 2006.

Very truly yours,

Bruce Gibney
General Counsel

cc:    Amisil c/o Mr. Amit Choudhury
       Alda Leu, Esq.
       Howard S. Caro, Esq.

Encl.