# EXHIBIT A

# OPERATING AGREEMENT

# OF

# THIEL CAPITAL INTERNATIONAL, LLC

# A DELAWARE LIMITED LIABILITY COMPANY

**September 9, 1996**

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE REGULATORY AUTHORITY HAS APPROVED OR DISAPPROVED THIS OPERATING AGREEMENT OR THE LIMITED LIABILITY COMPANY INTERESTS ("INTERESTS") PROVIDED FOR HEREIN. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THE INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE COMPANY HAS NO OBLIGATION TO REGISTER THE INTERESTS UNDER THE SECURITIES ACT IN THE FUTURE.

THE COMMODITY FUTURES TRADING COMMISSION HAS NOT PASSED UPON THE MERITS OF THE INTERESTS PROVIDED FOR HEREIN NOR HAS THE COMMISSION PASSED ON THE ADEQUACY OR ACCURACY OF THIS OPERATING AGREEMENT.

AN INTEREST MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION UNDER THE SECURITIES ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED. ADDITIONAL RESTRICTIONS ON THE TRANSFER OF INTERESTS ARE CONTAINED IN SECTION 7 OF THIS AGREEMENT. BASED UPON THE FOREGOING, EACH ACQUIROR OF AN INTEREST MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF INVESTMENT THEREIN FOR AN INDEFINITE PERIOD OF TIME.

# TABLE OF CONTENTS


| | | Page |
|---|---|---|
| SECTION 1 | DEFINITIONS | 1 |
| SECTION 2 | FORMATION | 5 |
| 2.1 | Formation and Name | 5 |
| 2.2 | Term | 5 |
| 2.3 | Purpose and Scope | 5 |
| 2.4 | Principal Office | 5 |
| 2.5 | Delaware Office and Agent for Service of Process | 5 |
| 2.6 | Members, Additional Members and Assignees | 5 |
| 2.7 | Required Documents | 6 |
| 2.8 | Title to Property | 6 |
| SECTION 3 | CAPITALIZATION | 7 |
| 3.1 | Capital Contributions | 7 |
| 3.2 | Minimum Issue Price | 7 |
| 3.3 | Additional Capital Contributions | 7 |
| 3.4 | Permitted Withdrawal and Return of Capital | 7 |
| 3.5 | Required Withdrawal and Return of Capital | 8 |
| 3.6 | Procedure Upon Early Withdrawal | 9 |
| 3.7 | Capital Withdrawals by the Manager | 9 |
| 3.8 | Loans to the Fund | 9 |
| 3.9 | Limitation of Liability; Return of Certain Distributions | 9 |
| 3.10 | Interest on Capital | 10 |
| SECTION 4 | PROFITS AND LOSSES | 10 |
| 4.1 | Allocations of Profits and Losses | 10 |
| 4.2 | Reallocation of Organization and Syndication Expenses | 11 |
| 4.3 | Withholding Taxes | 12 |
| SECTION 5 | DISTRIBUTIONS | 12 |
| 5.1 | Discretionary Distributions | 12 |
| 5.2 | Liquidating Distributions | 12 |
| 5.3 | Limitation on Distributions | 12 |
| SECTION 6 | ADMINISTRATIVE PROVISIONS | 13 |
| 6.1 | Management by the Manager. | 13 |
| 6.2 | Special Limitations on the Authority of the Manager. | 14 |
| 6.3 | Other Ventures and Activities. | 15 |
| 6.4 | Policies With Respect to Investment Opportunities. | 15 |

## TABLE OF CONTENTS
(continued)


| | | Page |
|---|---|---|
| 6.5 | Expenses. | 15 |
| 6.6 | Member Compensation. | 16 |
| 6.7 | Limitations on Payments to the Manager | 16 |
| 6.8 | Reports, Records and Financial Statements | 17 |
| 6.9 | Confidentiality | 17 |
| 6.10 | Disclosures | 17 |
| 6.11 | Tax Matters Member | 17 |
| 6.12 | Valuation | 18 |
| SECTION 7 | TRANSFERS AND WITHDRAWALS | 18 |
| 7.1 | General Provisions Regarding Transfers | 18 |
| 7.2 | Withdrawal by a Member | 18 |
| 7.3 | Expulsion | 19 |
| 7.4 | Status of Assignees | 19 |
| SECTION 8 | DISSOLUTION AND LIQUIDATION | 20 |
| 8.1 | Dissolving Events | 20 |
| 8.2 | Special Meeting to Dissolve or Continue the Fund | 20 |
| 8.3 | Winding Up of the Fund | 20 |
| 8.4 | Designation of Liquidating Agent | 21 |
| SECTION 9 | LIABILITY PROVISIONS | 21 |
| 9.1 | Liability | 21 |
| 9.2 | Indemnification | 22 |
| SECTION 10 | GENERAL PROVISIONS | 22 |
| 10.1 | Status Under the Act | 22 |
| 10.2 | Entire Agreement | 22 |
| 10.3 | Amendments | 22 |
| 10.4 | Governing Law | 23 |
| 10.5 | Severability | 23 |
| 10.6 | Counterparts; Binding Upon Members and Assignees | 23 |
| 10.7 | Survival of Rights | 24 |
| 10.8 | No Third Party Beneficiaries | 24 |
| 10.9 | Arbitration | 24 |
| 10.10 | Notices | 24 |
| 10.11 | Consents | 24 |
| 10.12 | No Partition | 24 |
| 10.13 | Representation by Members and Assignees | 24 |
| 10.14 | No Usury | 25 |

## TABLE OF CONTENTS
**(continued)**

| | | Page |
|---|---|---|
| 10.15 | Partnership for Tax Purposes Only | 25 |
| 10.16 | Legal Counsel | 25 |
| 10.17 | Miscellaneous | 26 |

SCHEDULE A

THIS OPERATING AGREEMENT of Thiel Capital International, LLC, a Delaware limited liability company, is entered into as of September 9, 1996.

---

## SECTION 1

## DEFINITIONS

---

As used in this Agreement:

*Act* shall mean the Delaware Limited Liability Company Act, as amended.

*Affiliate* shall mean, with respect to any person, any other person with regard to which the person is controlling, controlled or commonly controlled. For purposes of the preceding sentence, "control" shall mean the power to direct the principal business management and activities of such person, whether through ownership of voting securities, by agreement, or otherwise.

*Agreement* shall mean this Operating Agreement of Thiel Capital International, LLC, a Delaware limited liability company.

*Allocation Period* shall mean a period beginning immediately following the determination of Members' Closing Capital Accounts and ending upon the next occurrence of a Closing Event, provided that the Fund's first Allocation Period shall begin on the Initial Closing Date.

*Anniversary* means, with respect to a Member, the first anniversary of such Member's admission to the Fund.

*Assignee* shall mean a person that has acquired an interest in the Fund (including, without limitation, a person that has acquired such interest by means of a Transfer permitted under Section 7), but that has not been admitted as a Member.

*Bank* shall mean Bank of America NT & SA.

*Bankruptcy* shall mean, with respect to a Member: (i) the commencement of any bankruptcy or insolvency case or proceeding against such Member which shall continue and remain unstayed and in effect for a period of 60 consecutive days; (ii) the filing by such Member of a petition, answer or consent seeking relief under any bankruptcy, insolvency or similar law; or (iii) the occurrence of any other event that is deemed to constitute bankruptcy for purposes of the Act.

*Capital Account* shall mean, for each Member, a separate account that is:

(a) Increased by: (i) the amount of such Member's Capital Contributions and (ii) allocations of Profits to such Member pursuant to Section 4.1;

(b) Decreased by: (i) the amount of cash distributed to such Member by the Fund (whether pursuant to Section 3.4, 3.5, 5, 8.3 or otherwise), (ii) the fair market value of any other property distributed to such Member by the Fund (whether pursuant to Section 3.4, 3.5, 5, 8.3 or otherwise) determined as of the date

of distribution in accordance with the provisions of Section 6.12 and net of liabilities secured by such property that such Member assumes or to which such Member's ownership of the property is subject, and (iii) allocations of Losses to such Member pursuant to Section 4.1;

(c) Adjusted in accordance with Incentive Allocations and Management Fees pursuant to Sections 4.1(b) and 6.6(c); and

(d) Otherwise adjusted in accordance with the provisions of this Agreement.

*Capital Contribution* shall mean, for any Member, the net amount of cash and the fair market value of any other property (determined as of the date of contribution in accordance with the provisions of Section 6.12 and net of liabilities secured by such property that the Fund assumes or to which the Fund's ownership of such property is subject) contributed by such Member to the capital of the Fund.

*Close of Business* shall mean 5:00 p.m., local time, in San Francisco, California.

*Closing Capital Account* shall mean, with respect to an Allocation Period and a Member, the Opening Capital Account of such Member for such Allocation Period adjusted as provided in this Agreement to reflect the Closing Event triggering the closing of such Allocation Period in the following order: (i) first, allocations pursuant to Section 4.1 and distributions pursuant to Section 5.1, (ii) next, the Closing Event, and (iii) finally, the close of the Allocation Period and the determination of such Member's Closing Capital Account balance.

*Closing Event* shall mean any of the following: (i) a Capital Contribution by a Member, (ii) a distribution by the Fund to a Member, (iii) an allocation made to a Member, (iv) the end of each Fiscal Quarter, (v) the date of dissolution of the Fund, and (vi) such other dates as the Manager may determine.

*Code* shall mean the Internal Revenue Code of 1986, as amended.

*Company Act* shall mean the Investment Company Act of 1940, as amended.

*Dissolution* of a Member that is not a natural person shall mean that such Member has terminated its existence (whether as a partnership, corporation, limited liability company or other legal entity) and dissolved; *provided, however,* that a change in the membership of a Member that is a partnership or limited liability company shall not constitute a "Dissolution" of such Member so long as the business of the Member is continued in partnership or limited liability company form, regardless of whether such Member is deemed technically dissolved for partnership, limited liability company or tax law purposes.

*ERISA* shall mean the Employee Retirement Income Security Act of 1974, as amended.

*Exempt Companies* shall have the meaning set forth in Section 3.5(a).

*FCM* shall mean a "futures commission merchant" as defined in 17 C.F.R. § 1.3(p).

*Financial Instruments* shall mean (a) commodity futures contracts, including commodity futures contracts on foreign currencies, and options on commodity futures contracts; (b) forward contracts, including foreign exchange contracts, and options on forward contracts; (c) instruments commonly referred to as "securities," such as stocks, warrants, bonds, convertible instruments of indebtedness, and options; and (d) any other instruments necessary to effect the trading of the above, such as margin account agreements.

*Fiscal Quarter* shall mean each of the four three-month periods commencing on January 1, April 1, July 1 and October 1 and ending on March 31, June 30, September 30 and December 31.

*Fiscal Year* shall mean the period from January 1 through December 31 of each year (unless otherwise required by law).

*Fund* shall mean Thiel Capital International, LLC, a Delaware limited liability company.

*Fund Expenses* shall have the meaning set forth in Section 6.5(b).

*GAAP* shall mean United States generally accepted accounting principles, consistently applied.

*Incentive Allocation* shall have the meaning set forth in Section 4.1(b)(i).

*Incentive Allocation Period* shall have the meaning set forth in Section 4.1(b)(i).

*Indemnified Person* shall mean the Manager and each: (i) business entity of which the Manager is an officer, director or member, or any officer, director, member, employee or agent thereof; and (ii) Affiliate of the Manager.

*Initial Closing Date* shall mean the date of the first closing at which membership interests are issued and persons are admitted as Members in accordance with the provisions of Section 2.6.

*Interests* shall have the meaning set forth on the cover page of this Agreement.

*Liquidating Agent* shall have the meaning set forth in Section 8.4.

*Loss Recovery Account* shall have the meaning set forth in Section 4.1(b)(iv).

*Majority-In-Interest of the Members* shall mean a group of Members whose aggregate Capital Account balances are in excess of 50% of the total Capital Account balances of all the Members.

*Management Fee* shall have the meaning set forth in Section 6.6(c).

*Manager* shall mean Thiel Capital Management, LLC, a Delaware limited liability company.

*Material Misconduct* shall mean, with respect to an Indemnified Person, gross negligence, a willful and material breach of this Agreement, fraud, breach of fiduciary duty, or a material violation of applicable law (except in the case of a violation of applicable law where the Indemnified Person reasonably believed that no such violation would occur in consequence of such Indemnified Person's action or inaction, as the case may be).

*Measuring Period* shall have the meaning set forth in Section 4.1(b)(iii).

*Member* shall mean any person (i) listed on Schedule A as a Member or (ii) admitted to the Fund pursuant to the terms of this Agreement as a Substitute Member or additional Member, but only if such person has not withdrawn from the Fund within the meaning of Section 7.2 or been expelled pursuant to Section 7.3 or Transferred its entire membership interest to one or more other Members and/or persons admitted to the Fund

as Substitute Members pursuant to Section 7. Without limiting the foregoing, a Member shall not cease to be a Member or lose its non-economic rights in respect of the Fund solely by virtue of having Transferred to one or more persons its entire economic interest in the Fund. Except where the context requires otherwise, a reference in this Agreement to "the Members" shall mean all of the Members (taken together or acting unanimously, as appropriate).

*Net Decrease* shall have the meaning set forth in Section 4.1(b)(iv).

*Net Increase* shall have the meaning set forth in Section 4.1(b)(i).

*Opening Capital Account* shall mean, with respect to an Allocation Period and a Member, such Member's Closing Capital Account, as determined at the close of the immediately preceding Allocation Period, reduced by any allocation made pursuant to Section 6.6; *provided, however,* that the Fund's initial Allocation Period will commence on the Initial Closing Date and each Member admitted to the Fund on the Initial Closing Date will have an Opening Capital Account balance at that time equal to such Member's initial Capital Contribution, reduced by any allocation made pursuant to Section 6.6.

*Permitted Withdrawal Date* shall have the meaning set forth in Section 3.4.

*Principal Office* shall have the meaning set forth in Section 2.4.

*Profits and Losses* shall mean, for any period, the Fund's items of income and gain as well as loss, expense and deduction as determined under GAAP; *provided, however,* that Profits and Losses as computed for each Allocation Period under Section 4 shall be determined by taking into account all unrealized gains and losses in respect of attributable to such allocation period (for purposes of determining such unrealized gains and losses, as well as any realized gains or losses that ultimately may arise, the basis of each Financial Instrument shall be deemed to be its fair market value determined in accordance with the provisions of Section 6.12 as of the start of such Allocation Period or, if the Financial Instrument was acquired by the Fund during such period, its cost).

*Risk-Free Rate* means, with respect to a date, the interest rate on such date of U.S. government debt having a maturity of one year, as determined by the Manager.

*Securities Act* shall have the meaning set forth on the cover page of this Agreement.

*Subscription Agreement* shall mean the subscription agreement between the Fund and each Member in the form prescribed by the Manager.

*Substitute Member* shall mean an Assignee of all or a portion of a Member's interest in the Fund that becomes a Member and succeeds, to the extent of the interest assigned, to the rights and powers and becomes subject to the restrictions and liabilities of the assignor Member.

*Tax Matters Member* shall have the meaning set forth in Section 6.11(a).

*Transfer* shall mean any sale, exchange, transfer, gift, encumbrance, assignment, pledge, mortgage, hypothecation or other disposition, whether voluntary or involuntary.

## SECTION 2

## FORMATION

2.1 *Formation and Name.*

(a) The Members are entering into and forming the Fund as a limited liability company governed by the Act for the limited purpose and scope set forth in this Agreement.

(b) The name of the Fund shall be "Thiel Capital International, LLC."

2.2 *Term.* The term of the Fund shall commence upon the later of: (i) the filing of the Fund's certificate of formation with the office of the Delaware Secretary of State, or (ii) the execution of this Agreement by two or more persons. Except as specifically provided in Section 8, the term of the Fund shall continue until the Close of Business on December 31, 2005, and shall not end prior to such date in consequence of the death, retirement, resignation, expulsion, Bankruptcy, or Dissolution of a Member or the occurrence of any other event which terminates the continued membership of a Member in the Fund.

2.3 *Purpose and Scope.* The purpose and scope of the Fund shall be to:

(a) Seek income and gain through the acquisition, holding and disposition of Financial Instruments, with the principal focus on acquiring and holding for gain equity index futures, debt futures and foreign exchange futures; *provided, however,* that the Fund will not acquire illiquid Financial Instruments to the extent that following any such acquisition greater than 10% of the Fund's assets as determined in accordance with Section 6.12 would be invested in illiquid Financial Instruments;

(b) Temporarily invest the assets of the Fund in cash and cash equivalents; and

(c) Engage in all other lawful activities (including, without limitation, those activities described in Section 6.1) determined by the Manager to be necessary, advisable or desirable in furtherance of the foregoing.

2.4 *Principal Office.* The Fund shall have a single "Principal Office" that initially shall be at 19 Coleman Place 37, Menlo Park, California 94025, and may thereafter be changed from time to time by the Manager upon notice to the other Members.

2.5 *Delaware Office and Agent for Service of Process.* The Fund shall maintain a Delaware registered office and agent for service of process as required by Section 18-104 of the Act. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Manager shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be.

2.6 *Members, Additional Members and Assignees.*

(a) Each person whose name is listed on Schedule A is hereby admitted as a Member.

(b) Set forth below the name of each Member on Schedule A shall be appropriate contact information for such Member (including, without limitation, such Member's mailing address, telephone number, and facsimile number as well as, in the case of a Member that is an entity, the name or title of an individual to whom correspondence should be directed). Each Member shall promptly provide the Fund with the information required to be set forth for such Member on Schedule A and shall thereafter promptly notify the Fund of any change to such information.

(c) With the approval of the Manager, additional persons may be admitted as Members upon their proper completion, due execution and delivery of a Subscription Agreement, and no consent of any other Member shall be required for such admissions.

(d) The Fund shall not issue Assignee interests.

(e) Notwithstanding Sections 2.6(c) and (d), the provisions of Section 7 shall apply with regard to the admission of Substitute Members and the Transfer of Assignee interests by Members and Assignees.

2.7 ***Required Documents.***

(a) ***Fund Documents.*** The Manager shall cause to be executed, filed, recorded, or amended, as necessary, articles of organization and any other documents required or desirable to be executed, filed, recorded, or amended in connection with the formation, operation or dissolution of the Fund, including without limitation this Agreement, pursuant to the laws of the State of Delaware or any other jurisdiction in which the Fund's business is conducted. The terms and provisions of each document described in the preceding sentence shall be initially established and shall be amended as necessary to cause such terms and provisions to be consistent with the terms and provisions of this Agreement.

(b) ***Other Documents.*** The Members shall execute and acknowledge such other documents as may be necessary or desirable, as determined by the Manager in his reasonable discretion, to give effect to the terms of this Agreement.

(c) ***Special Power of Attorney.*** Each Member hereby grants to the Manager a special power of attorney (with full rights of assignment) irrevocably appointing the Manager as the granting Member's attorney-in-fact with power and authority to execute and acknowledge, in the granting Member's name and on its behalf, any document described in Section 2.7(a) or (b); *provided, however,* that no such power of attorney shall be used to execute or acknowledge a document on behalf of a Member if the action to be taken by such document has not received the level of consent of the Members required under the Act or this Agreement. Each special power of attorney granted under this Section 2.7(c) is coupled with an interest and shall not be revoked by the bankruptcy, death, disability or other event of legal incapacity of the granting Member.

2.8 ***Title to Property.*** Title to all Fund property shall be held in the name of the Fund.

## SECTION 3

## CAPITALIZATION

3.1 *Capital Contributions.* Each Member, upon and as a condition to admission to the Fund, shall make the Capital Contribution set forth in such Member's Subscription Agreement. The Manager will maintain a Capital Account balance of at least 1% of the aggregate Capital Account balances of all of the Members and Assignees.

3.2 *Minimum Issue Price.* The Fund shall not admit any Member in exchange for a Capital Contribution of less than $5,000.

3.3 *Additional Capital Contributions.* A Member may make one or more additional Capital Contributions at any time, and in the amount of at least $5,000, with the consent of the Manager (which consent may be withheld in the Manager's sole discretion).

3.4 *Permitted Withdrawal and Return of Capital.* Except as provided in this Section 3 or in Section 5 or 8, no Member shall be entitled to the return of such Member's Capital Contribution or to a distribution in respect of such Member's Capital Account balance. On or after a Member's Anniversary, such Member may, on at least 30 days' prior written notice to the Manager and as of the last day of the fiscal quarter specified in such notice, withdraw all or part of its Capital Account balance (each such date being a "Permitted Withdrawal Date"); *provided, however*, that:

(a) On the applicable Permitted Withdrawal Date the Incentive Allocation shall be made with respect to the amount withdrawn as set forth in Section 4.1(b).

(b) No partial withdrawal may be made in an amount less than $50,000 without the prior consent of the Manager.

(c) Partial withdrawals of up to 95% of a Member's Capital Account balance shall be paid within 10 days after the applicable Permitted Withdrawal Date.

(d) If a Member withdraws in excess of 95% of such Member's Capital Account balance, then 95% of such balance shall be paid within 10 days after the applicable Permitted Withdrawal Date and the remainder of the withdrawal (the "Withdrawal Balance") shall be paid within 10 days after the Fund receives audited financial statements for the Fiscal Year in which the withdrawal occurs. The Withdrawal Balance will bear interest from the applicable Permitted Withdrawal Date to the date paid at the Risk-Free Rate determined as of the applicable Permitted Withdrawal Date. A Member will receive no allocations or distributions with respect to the Withdrawal Balance. Notwithstanding the foregoing, the total withdrawal paid may not exceed the value of the Member's Capital Account as shown by such financial statements, and if the Fund's independent accountants determine that the amount paid by the Fund exceeds the balance of that Capital Account, the Member shall forthwith, on demand by the Manager, repay such excess to the Fund in cash.

(e) In the sole discretion of the Manager, the amount withdrawn may be paid by assigning to the Member any of the Fund's non-cash assets, or a combination of cash and such assets, having an aggregate value at the applicable Permitted Withdrawal Date equal to the amount to be withdrawn determined in the manner set forth in Section 6.12.

(f) The Manager may suspend the right of withdrawal or postpone the date of payment for any period during which (i) any futures or commodities exchange or market on which a substantial part of the Financial Instruments owned by the Fund are traded is closed (other than weekend and holiday closings) or trading on any such exchange or market is restricted or suspended, (ii) there exists a state of affairs that constitutes a state of emergency, as a result of which disposal of the Financial Instruments owned by the Fund is not reasonably practicable, (iii) a breakdown occurs in any of the means normally employed in ascertaining the value of a substantial part of the assets of the Fund or when for any other reason the value of such assets cannot reasonably be ascertained, (iv) the amount of requested withdrawals would result in a disorderly liquidation of Fund investments or a violation of the Fund's investment policies, or (v) there exist such other extraordinary circumstances, as determined in good faith by the Manager, that cause withdrawals or such payments to be impracticable under existing economic or market conditions or conditions relating to the Fund (including, without limitation, receipt from Members of notices of withdrawals of amounts aggregating more than 50% of the Capital Account balances of all Members). At the conclusion of such period, the Manager shall resume permitting withdrawals on the next available Permitted Withdrawal Date and shall resume any payments required pursuant to this Section 3.4 as soon as reasonably practicable.

(g) No withdrawal or distribution shall be made (i) if such withdrawal or distribution would violate any contract or agreement to which the Fund is then a party or any law then applicable to the Fund, or (ii) to the extent that the Manager, in its sole discretion, determines that it is necessary or advisable for the Fund to retain any amount otherwise withdrawable or distributable to pay, or to establish a reserve for the payment of, any liability or obligation of the Fund, whether known or unknown, liquidated, fixed, contingent or otherwise.

(h) The Manager in its sole discretion may waive the requirement that a Member making a withdrawal give 30 days' notice, make such withdrawal on or after such Member's Anniversary or on a Permitted Withdrawal Date, or otherwise comply with the terms of this Section 3.4.

(i) Funds withdrawn by a Member shall be paid in the order in which credited to such Member's Capital Account as determined by the Manager in consultation with the Fund's independent accountants.

3.5 *Required Withdrawal and Return of Capital.*

(a) Anything herein to the contrary notwithstanding, except as the Manager may in its sole discretion otherwise determine, a single Member that is a corporation, partnership, trust or other entity may not at any time hold Interests totaling 10% or more of all Interests then outstanding, unless such Member has less than 10% of its assets invested in one or more companies, including the Fund, that rely on the exclusion from the definition of "investment company" under Section 3(c)(1) of the Company Act ("Exempt Companies") and each such Member agrees to inform the Manager (i) immediately upon investing 10% or more of its assets in Exempt Companies, and (ii) from time to time at the request of the Manager, of the percentage of its assets invested in Exempt Companies. If at any time the Manager becomes aware that any Member holding Interests totaling 10% or more of all Interests then outstanding has invested 10% or more of its assets in Exempt Companies, such Member shall be deemed to have given notice of withdrawal pursuant to Section 3.4 of such portion or all of the Capital Account balance of such Member as the Manager may determine is necessary or advisable to cure such

violation, and such withdrawal shall be consummated as provided in Section 3.4 to the maximum extent feasible. In the event that a Member's partial or complete withdrawal pursuant to the preceding sentence or the Member's expulsion pursuant to Section 7.3 results from such Member's additional investment in Exempt Companies, including the Fund, such withdrawal shall be treated as having been made on a Permitted Withdrawal Date. By notice to such Member, the Fund may exercise its rights under this Section 3.5(a) at any time while such violation continues.

(b) Anything herein to the contrary notwithstanding, except as the Manager may in its sole discretion otherwise determine, if at any time the Manager becomes aware that the participation in the Fund by one or more Members that are employee benefit plans subject to ERISA would cause the Fund's assets to be considered "plan assets" subject to regulation under ERISA, then the Manager may by notice to such Members cause the withdrawal of a portion or all of such Members' Capital Account balances as the Manager may determine is necessary or advisable to prevent the Fund from being subject to such regulation.

3.6 *Procedure Upon Early Withdrawal.*

(a) If a withdrawal is made by a Member prior to such Member's Anniversary, (i) no Incentive Allocation shall be made with respect to the amount withdrawn, but an additional management fee equal to 2% of the amount withdrawn shall be deducted from the amount withdrawn and paid to the Manager, and (ii) payment of the withdrawn amount shall be made as described in Sections 3.4(c), (d) and (e) as if the date of withdrawal were a Permitted Withdrawal Date.

(b) If a withdrawal is made by a Member on a date on or after such Member's Anniversary but on a date other than a Permitted Withdrawal Date at the end of a fiscal year, then (i) the Incentive Allocation shall be made on the date of withdrawal with respect to the amount withdrawn, and (ii) payment of the withdrawn amount shall be made as described in Sections 3.4(c), (d) and (e) as if the date of withdrawal were a Permitted Withdrawal Date.

3.7 *Capital Withdrawals by the Manager.* The Manager may withdraw funds from its Capital Account in accordance with Sections 3.4 and 3.5 in the sole discretion of the Manager including, without limitation, withdrawals on dates other than Permitted Withdrawal Dates, but only to the extent that such withdrawals do not reduce the Manager's Capital Account balance below 1% of the aggregate Capital Account balances of all of the Members and Assignees.

3.8 *Loans to the Fund.* No Member shall be required to lend any money to the Fund or to guaranty any Fund indebtedness.

3.9 *Limitation of Liability; Return of Certain Distributions.*

(a) Except as otherwise set forth in this Agreement, a Member will be liable to the Fund only to the extent (i) that any Member receiving a distribution in violation of this Agreement shall return such distribution promptly following the Member's receipt of a request therefor from the Fund, and (ii) required by Delaware law.

(b) No Member of the Fund shall be obligated personally for any debt, obligation or liability of the Fund solely by reason of being a Member of the Fund.

3.10 *Interest on Capital.* No Member shall be entitled to interest on such Member's Capital Contribution or Capital Account balance.

## SECTION 4

## PROFITS AND LOSSES

4.1 *Allocations of Profits and Losses.*

(a) *General.* Except as otherwise provided in this Section 4.1, Profits and Losses of the Fund shall be allocated at the close of each Allocation Period among the Members as follows.

(i) Profits shall be allocated to the Members' Capital Accounts in proportion to their respective positive Opening Capital Account balances.

(ii) Losses shall be allocated to the Members' Capital Accounts in proportion to their respective positive Opening Capital Account balances, provided that items of loss that represent organization and syndication expenses of the Fund in excess of $50,000 shall be specially allocated to the Manager.

(b) *Incentive Allocations.* Notwithstanding the provisions of Section 4.1(a), the following special allocation rules shall apply:

(i) If for an Incentive Allocation Period the amount of Net Increase that otherwise would be allocated to a Member for that Incentive Allocation Period pursuant to Section 4.1(a) exceeds the amount of any unrecovered balance in that Member's Loss Recovery Account, then 20% of such excess shall instead be allocated to the Manager (the "Incentive Allocation") and 80% of such excess shall be allocated to that Member. "Incentive Allocation Period" shall mean, with respect to a Member, the following: (i) the first Incentive Allocation Period shall be the period from the date of such Member's admission to the Fund to such Member's Anniversary, (ii) the second Incentive Allocation Period shall correspond to the period from the date of such Anniversary through the end of the Fiscal Year in which such Anniversary occurs, and (iii) succeeding Incentive Allocation Periods will correspond to subsequent Fiscal Years of the Fund. "Net Increase" shall mean, with respect to an Incentive Allocation Period and a Member's Capital Account, the net Profit allocable to such Member for that Incentive Allocation Period reduced (but not below zero) by the amount that would have accrued on such Capital Account during such Incentive Allocation Period at the Risk-Free Rate, as determined on the first day of such Incentive Allocation Period.

(ii) Except as otherwise set forth in this Section 4.1(b), the Incentive Allocation shall be debited as of the end of each Incentive Allocation Period from the Capital Account of each Member. The total amount so debited shall be credited as of the end of that Incentive Allocation Period to the Capital Account of the Manager.

(iii) If a Member has been a Member for at least four full fiscal quarters from the date of such Member's admission to the Fund and withdraws from the Fund as of a date other than the last day of a Fiscal Year, an Incentive Allocation determined in the following manner shall be allocated to the Manager:

An amount equal to 20% of such Member's Net Increase from the first day of the preceding Fiscal Year (or, if later, from the date of admission of the Member to the Fund) through the date of the Member's withdrawal (the "Measuring Period") shall be determined (disregarding any Incentive Allocation credited to the Manager during the Measuring Period). The excess, if any, of such amount over the Incentive Allocation credited to the Manager during the Measuring Period shall be reallocated to the Capital Account of the Manager as an Incentive Allocation. The Manager shall have no obligation to pay or otherwise compensate such Member in the event that the Incentive Allocation determined pursuant to this Section 4.1(b)(iii) is less than the Incentive Allocation credited during the Measuring Period.

(iv) There shall be established on the books of the Fund for each Member a memorandum account (the "Loss Recovery Account"), the opening balance of which shall be zero. At the end of each Incentive Allocation Period or at such other date as the calculation of an Incentive Allocation is required to be made under this Section 4.1(b), the balance in each Member's Loss Recovery Account shall be adjusted as follows: (i) If there has been, in the aggregate, Net Decrease with respect to such Member since the immediately preceding date as of which a calculation of an Incentive Allocation with respect to such Member was made (or if no calculation has yet been made with respect to such Member, since such Member's admission to the Fund), an amount equal to such Net Decrease shall be charged to such Member's Loss Recovery Account, or (ii) if there has been Net Increase with respect to such Member since the immediately preceding date as of which a calculation of an Incentive Allocation was made, an amount equal to such Net Increase, before any Incentive Allocation to the Manager, shall be credited to and reduce any unrecovered balance in such Member's Loss Recovery Account, but not below zero. "Net Decrease" shall mean, with respect to an Incentive Allocation Period and a Member's Capital Account, the amount that would have accrued on such Capital Account during such Incentive Allocation Period at the Risk-Free Rate reduced (but not below zero) by the net Profit allocable to such Member for that Incentive Allocation Period and increased by the net Loss allocable to such Member for that Incentive Allocation Period.

In the event that a Member with an unrecovered balance in its Loss Recovery Account withdraws all or a portion of its capital in the Fund, the unrecovered balance in such Member's Loss Recovery Account shall be reduced as of the beginning of the next Incentive Allocation Period by an amount equal to the product obtained by multiplying the balance in such Member's Loss Recovery Account by a fraction, the numerator of which is the amount of the withdrawal made by such Member and the denominator of which is the balance in such Member's Capital Account, calculated without regard for such withdrawal, on the date of such withdrawal. Additional Capital Contributions shall not affect any Member's Loss Recovery Account.

(v) The Manager, in its sole discretion, may waive all or any portion of any Incentive Allocation with respect to any Member.

(c) *Adjustment to Capital Accounts for Distributions of Property.* If property distributed in kind is reflected in the Capital Accounts of the Members at a book value that differs from the fair market value of such property on the date of distribution, the difference shall be treated as Profit or Loss on the sale of the property and shall be allocated among the Members in accordance with the provisions of this Section 4.

(d) *Tax Allocations.* Subject to applicable law, items of Fund income, gain, loss, expense, deduction and credit shall be allocated among the Members for income tax purposes in such manner as shall be determined by the Manager in its sole discretion.

4.2 *Reallocation of Organization and Syndication Expenses.* Upon each initial or additional Capital Contribution to the Fund made prior to the third anniversary of the Initial Closing Date, the Capital

Accounts of all Members will be adjusted by the Manager so that the organization and syndication costs of the Fund (as determined by the Manager in its sole discretion), are borne by the Members pro rata based upon their respective aggregate Capital Contributions to the date of such adjustment. In no event will the aggregate organization and syndication costs of the Fund borne by the Members pursuant to this Section 4.2 exceed $50,000.

4.3 *Withholding Taxes.* The Fund shall withhold taxes from distributions to, and allocations among, the Members to the extent required by law. Except as otherwise provided in this Section 4.3, any amount so withheld by the Fund with regard to a Member shall be treated for purposes of this Agreement as an amount actually distributed to such Member pursuant to Section 5.1. An amount shall be considered withheld by the Fund if remitted to a governmental agency without regard to whether such remittance occurs at the same time as the distribution or allocation to which it relates; *provided, however,* that an amount actually withheld from a specific distribution or designated by the Manager as withheld from a specific allocation shall be treated as if distributed at the time such distribution or allocation occurs. To the extent operation of the foregoing provisions of this Section 4.3 would create a negative balance in a Member's Capital Account (or increase the amount by which such Capital Account balance is negative), the amount withheld shall be treated as a loan by the Fund to such Member, which loan shall be payable upon demand and shall bear interest at a floating rate equal to 200 basis points above the prime rate as announced from time to time by the Bank. Each Member hereby agrees to indemnify the Fund and the other Members for any liability they may incur for failure to properly withhold taxes in respect of such Member; moreover, each Member hereby agrees that neither the Fund nor any other Member shall be liable for any excess taxes withheld in respect of such Member's interest in the Fund and that, in the event of overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate governmental authority.

## SECTION 5

## DISTRIBUTIONS

5.1 *Discretionary Distributions.* Subject to Section 3.4(g), the Manager in its sole discretion shall determine the amount and timing of all distributions by the Fund and whether such distributions will be in cash or in kind or partly in cash and partly in kind. Except as otherwise provided herein, all distributions shall be made in proportion to the Members' Closing Capital Account balances determined as of the close of the Allocation Period for which such distribution occurs. Distributions in kind shall be made at valuations determined as provided in Section 6.12.

5.2 *Liquidating Distributions.* Notwithstanding the provisions of Section 5.1, cash and property of the Fund available for distribution upon the dissolution of the Fund shall be distributed in accordance with the provisions of Section 8.3.

5.3 *Limitation on Distributions.* Notwithstanding any provision of this Agreement to the contrary, no distribution shall be made to a Member to the extent that such distribution would (i) be in violation of the Act, (ii) render the Fund insolvent, (iii) render the Member liable for a return of such distribution under the Act, or (iv) exceed the amount of the Member's positive Capital Account balance determined as if, immediately prior to such distribution, all of the Fund's assets had been sold for fair market value (as determined in accordance with

Section 6.12), and the Profits and Losses attributable thereto had been allocated among the Members in accordance with the provisions of Section 4.1.

## SECTION 6

## ADMINISTRATIVE PROVISIONS

6.1 *Management by the Manager.* The Manager is the sole "manager" of the Fund within the meaning of Section 18-101(10) of the Act. Subject to the provisions of this Agreement and applicable law, the Manager shall have the exclusive power and authority to perform acts (solely in furtherance of the Fund's purpose) associated with the management of the Fund and its business including, without limitation, the power and authority to:

(a) Acquire, purchase, invest in, hold for investment, own, exchange, assign, sell or otherwise dispose of, trade in (on margin with FCMs, brokerage firms, banks or other financial institutions, or otherwise), sell short, or otherwise deal in Financial Instruments;

(b) Exercise all powers, privileges and other incidents of ownership or possession with respect to Financial Instruments held or owned by the Fund;

(c) Enter into custodian agreements with FCMs, brokerage firms, banks or other financial institutions, to open, maintain and close bank and other brokerage accounts and to draw checks or other orders for payments of money or the delivery of instruments;

(d) Employ or retain any qualified person to perform services or provide advice on behalf of the Fund and pay reasonable compensation therefor;

(e) Compromise, arbitrate or otherwise adjust claims in favor of or against the Fund and commence or defend litigation with respect to the Fund or any assets of the Fund, at the Fund's expense;

(f) Cause the Fund to maintain, at the Fund's expense, insurance coverage reasonably satisfactory to the Manager with regard to any circumstance or condition that may affect the Fund, or the liability of the Manager in its capacity as such;

(g) Cause the Fund to enter into, make and perform such contracts, agreements and other undertakings, and to do such other acts, as he may deem necessary or advisable for, or as may be incidental to, the conduct of the business of the Fund, including, without limitation, contracts, agreements, undertakings and transactions with any Member or with any other person related to any Member; *provided, however*, that transactions with such persons for the account of the Fund shall be on terms no less favorable to the Fund than are generally afforded to unrelated third parties in comparable transactions;

(h) Open, conduct business regarding, draw checks or other payment orders upon, and close cash, checking, custodial or similar accounts with banks or brokers on behalf of the Fund and pay the customary fees and charges applicable to transactions in respect of all such accounts;

(i) Cause the Fund to compensate FCMs, brokerage firms, banks or other financial institutions for record keeping, custodial, and related services through brokerage compensation and use such compensation to repay brokers for computer equipment, software, and services used for Fund accounting and reporting to Members, as well as for paying other Fund expenses, such as accounting and legal fees and expenses, telecommunications and postage chargers incurred in the Fund's business;

(j) Use Fund commissions and other transaction compensation other than "soft dollars" to pay for such items as rent, office services, office supplies, telephone charges, and salaries of administrative personnel that would otherwise be borne by the Manager;

(k) Determine the FCM or brokerage firm to be used for Fund transactions and the commission rates at which transactions will be effected. The Manager may employ several FCMs or brokerage firms to undertake all activities incident to the receipt and delivery of Financial Instruments purchased, sold, sold short or covered, making and receiving payments, custody of Financial Instruments, compliance with margin and maintenance requirements, custody of all cash, dividends and other rights accruing to a client's account, and other services;

(l) Cause the Fund to purchase Financial Instruments from a primary market maker acting as principal on a net basis with no brokerage commission;

(m) Purchase from an FCM or brokerage firm or allow a broker to pay for certain research services and market information, portfolio strategy advice, industry and company comments, technical data, recommendations, general reports, consultations, news wire charges, and Quotron rent. The Manager may pay a brokerage commission in excess of the commission another FCM or brokerage firm might charge for effecting the same transaction in recognition of the value of the brokerage and research provided. In each case, however, the Manager will determine in good faith that such commission is reasonable in relation to the value of brokerage and research services provided by such FCM or brokerage firm, viewed in terms of either the specific transaction or the Manager's overall responsibilities to the portfolios over which the Manager exercises investment authority;

(n) Implement a program of FCM or brokerage firm compensation that consists of directing a certain amount of business to an FCM or brokerage firm or in return for the FCM's or brokerage firm's referral of prospective clients; and

(o) Assume and exercise all powers and responsibilities permitted to or imposed upon a limited liability company manager by the laws of the State of Delaware.

Without limiting the foregoing, (i) any contract, agreement, deed, lease, note or other document or instrument executed on behalf of the Fund by the Manager shall be deemed to have been duly executed, (ii) no other Member's signature shall be required in connection with the foregoing and third parties shall be entitled to rely upon the Manager's authority under the provisions of this sentence without otherwise ascertaining that the requirements of this Agreement have been satisfied, and (iii) no Member other than the Manager shall have any right, power or authority to participate in the management of the Fund, vote on any Fund matter or act on behalf of the Fund, except as specifically provided in this Agreement.

6.2 *Special Limitations on the Authority of the Manager.* Unless approved by the Manager and the vote or consent of a Majority-In-Interest of the Members, the Fund shall not: (i) merge or consolidate with any corporation or other entity, (ii) incur indebtedness other than in the ordinary course of business or as otherwise provided herein, or (iii) purchase from or sell to the Manager Financial Instruments of private companies.

6.3 *Other Ventures and Activities.*

(a) Any Member (including the Manager) and such Member's Affiliates may engage in any activities, whether or not related to the business of the Fund. Each Member specifically recognizes that some or all of the Members and their Affiliates may be engaged in various aspects of the securities business, including, without limitation, engaging in securities portfolio management and the formation and management of investment funds, both for their own accounts and for others. Such Members may continue, or initiate further, such activities. Each Member agrees that any Member and any Affiliate of any Member (i) may engage in or possess an interest, direct or indirect, in any business venture of any nature or description for its own account, independently or with others, including, without limitation, any business, industry or activity in which the Fund may be interested in investing or may also have investments, and (ii) may do so without any obligation to report the same to the Fund or any Member or to afford the Fund or any Member any opportunity to participate therein. Neither the Fund nor any Member shall have any right in or to any such independent venture or investment or the revenues or profits derived therefrom. The Manager and other Fund personnel may trade in the same Financial Instruments traded for the Fund; however, it is the policy of Manager not to give preference to its orders or those of other Fund personnel regarding such trading.

(b) The Members hereby acknowledge that the Manager may be prohibited from taking action for the benefit of the Fund: (i) due to confidential information acquired or obligations incurred in connection with an outside activity permitted to the Manager, its Affiliates, shareholders or other related persons under this Section 6.3, or (ii) in connection with activities undertaken by a shareholder, Affiliate or other related person of the Manager prior to the date first above written. No person shall be liable to the Fund or any Member for any failure to act for the benefit of the Fund in consequence of a prohibition described in the preceding sentence.

6.4 *Policies With Respect to Investment Opportunities.*

(a) The Members recognize that decisions concerning investments and potential investments involve the exercise of judgment and the risk of loss.

(b) While the Manager generally intends to offer to the Fund at least some portion of all investment opportunities that meet the Fund's investment criteria, the Manager will apply its reasonable business judgment in determining when an investment opportunity meets the Fund's investment criteria and whether it is in the best interests of the Fund to take advantage of an investment opportunity (even if the opportunity otherwise satisfies such criteria).

(c) Notwithstanding any provision of this Agreement to the contrary, the Manager, in its sole discretion, may elect to make available investment opportunities which come to its attention, in whole or in part, to one or more of the Fund or any other person or persons.

6.5 *Expenses.*

(a) Except as otherwise provided in Section 6.1 or 6.5(b), expenses of the Fund shall not include the normal operating expenses of the Manager and its Affiliates (including salaries paid to employees of the Manager or its Affiliates, rent, communications, travel and similar expenses, investment consultant fees, and other expenses incurred in investigating or evaluating investment opportunities).

(b) Expenses to be borne by the Fund ("Fund Expenses") shall include the following costs and expenses associated with the organization, operation, dissolution, or liquidation of the Fund: (i) up to $50,000 in expenses associated with the organization of the Fund or the syndication of Interests therein, (ii) legal, accounting, audit, bookkeeping, custodial, consulting and other professional fees, (iii) banking and trading expenses (including, without limitation, expenses relating to short sales, brokerage commissions, clearing and settlement charges, option premiums, service fees and costs incurred in acquiring, holding, selling or otherwise disposing of Fund assets and liabilities), (iv) insurance premiums, indemnifications, costs of litigation and other extraordinary expenses, (v) costs of financial statements and other reports to Members, as well as costs of all governmental returns, reports and other filings, (vi) costs of meetings of the Members (including, without limitation, the reasonable travel and other out-of-pocket costs incurred by the Manager in attending such meetings), (vii) interest expenses (including margin expenses), (viii) expenses incurred after the first anniversary of the Initial Closing Date for equipment used in the business of the Fund, (ix) costs of dissolving and liquidating the Fund, (x) any other expenses not listed in the preceding clauses (i) through (ix) that are normal operating expenses of the Manager in conducting the business of the Fund and are incurred after the first anniversary of the Initial Closing Date. Any costs incurred in connection with special services requested by a Member will be required to be paid by that Member.

(c) The Manager shall be promptly reimbursed by the Fund for Fund Expenses paid or incurred by the Manager on the Fund's behalf.

(d) There will be no sales charges in connection with the offering of interests in the Fund. The Manager may from time to time engage persons to introduce prospective Members to the Fund and may pay them compensation for such services. All such payments will be made by the Manager and not borne by any of the other Members or reimbursed by the Fund.

6.6 *Member Compensation.*

(a) *General.* Except as otherwise provided in this Section 6.6, no Member shall be entitled to compensation for services provided by such Member to, or for the benefit of, the Fund.

(b) *Members.* A Member that, with the consent of the Manager, performs services for the Fund as an employee or independent contractor shall be entitled to receive fair market value compensation for such services (as determined by the Manager in its reasonable discretion).

(c) *Management Fee.* There shall be deducted from each Capital Contribution made by a Member a fee to be paid and/or allocated to the Manager an amount equal to 1% per annum of such Member's Capital Contribution, calculated through the end of the Fiscal Quarter in which such Capital Contribution is made. Thereafter, there shall be deducted from the Capital Account of such Member and paid and/or accrued as a fee to the Manager on the first day of each Fiscal Quarter an amount equal to .25% of the value of such Member's Opening Capital Account balance on such day, including, without limitation, the value of any Capital Contribution made on such day. Each of the foregoing fees is referred to as a "Management Fee." The Manager,

in its sole discretion, may waive all or any portion of the Management Fee with respect to any Member in any Fiscal Quarter.

6.7 *Limitations on Payments to the Manager.* Notwithstanding anything in this Agreement to the contrary, any payment to the Manager or any Affiliate of the Manager, including without limitation capital withdrawals, Incentive Allocations, Management Fees and reimbursed expenses, shall first have been reviewed by an independent representative who is an attorney or an independent public accountant other than the Manager or an Affiliate of the Manager (but which in the sole discretion of the Manager may be the Fund's independent accountant) and shall have been found by such independent representative to be in accordance with this Agreement.

6.8 *Reports, Records and Financial Statements.*

(a) The Fund shall maintain true and proper books, records, reports, and accounts in which shall be entered all transactions of the Fund. Such books, records, reports and accounts shall be located at the Principal Office and shall be available for inspection by any Member at such times and intervals as are reasonable. Schedule A shall be treated as a record of the Fund and updated each time the Fund is notified of new or changed information to be shown thereon.

(b) As soon as is reasonably practicable after the close of each Fiscal Year, and in any event within 90 days after the end of such Fiscal Year, the Manager shall make or cause to be made a full and accurate inventory and accounting of the affairs of the Fund as of the close of that Fiscal Year and shall deliver to the Members the following financial statements, audited by the Fund's independent accountants: a statement of financial condition as of the close of such Fiscal Year, a statement of operations for such Fiscal Year, and a statement of changes of net assets during such Fiscal Year. In addition, the Manager shall furnish to each Member information regarding the Fund necessary for such Member to complete such Member's federal and state income tax returns. The Manager shall also furnish a copy of the Fund's tax returns to any Member requesting the same.

(c) The Manager shall make or cause to be made and shall timely deliver to the Members all such statements, reports and other information as may be required pursuant to the Commodity Exchange Act and the rules and regulations promulgated thereunder.

6.9 *Confidentiality.* The Members acknowledge and agree that all information provided to them by or on behalf of the Fund concerning the business of the Fund or any Member shall be deemed strictly confidential and shall not, except as required by law, be disclosed to any person (other than a Member) without the prior consent of the Manager. The Members hereby consent to the disclosure by each Member of Fund information to such Member's accountants, attorneys and similar advisors bound by a duty of confidentiality; moreover, the foregoing requirements of this Section 6.9 shall not apply to a Member with regard to any information that is currently or becomes (i) publicly known or available in the absence of any improper or unlawful action on the part of such Member (including, without limitation, any action in violation of this Section 6.9), or (ii) known or available to such Member other than through or on behalf of the Fund.

6.10 *Disclosures.* Each Member shall furnish any data with respect to itself reasonably required in connection with the formation, operation or dissolution of the Fund.

6.11 *Tax Matters Member.*

(a) *General.* The Manager is hereby designated the "Tax Matters Member" of the Fund within the meaning of Section 6231(a)(7) of the Code. Except to the extent specifically provided in the Code and the regulations issued thereunder (or the laws of other relevant taxing jurisdictions), the Tax Matters Member shall have the exclusive power to act for or on behalf of the Fund in respect of tax matters.

(b) *Notice of Inconsistent Treatment of Fund Item.* No Member shall file a notice with the Internal Revenue Service under Section 6222(b) of the Code in connection with such Member's intention to treat an item on such Member's Federal income tax return in a manner that is inconsistent with the treatment of such item on the Fund's Federal income tax return unless such Member has, not less than 30 days prior to the filing of such notice, provided the Tax Matters Member with a copy of the notice and thereafter in a timely manner provides such other information related thereto as the Tax Matters Member shall reasonably request.

(c) *Notice of Settlement Agreement.* Any Member entering into a settlement agreement with the Department of the Treasury which concerns a Fund item shall notify the Tax Matters Member of such settlement agreement and its terms within 60 days from the date thereof.

6.12 *Valuation.* The value or amount of the Fund's assets and liabilities shall be determined by the Manager in good faith in a commercially reasonable manner. Subject to the preceding sentence, illiquid Financial Instruments normally will be valued at cost. In all events, the value of the Fund's assets and liabilities determined by the Manager shall be conclusive and binding on all of the Members and all those claiming through or under them; *provided, however,* that if within 30 days of the distribution of illiquid Financial Instruments to a Member pursuant to Section 3.4, 3.5, 5 or 8.3, such Member notifies the Manager or the Liquidating Agent, as the case may be, of any objection to such valuation and the Manager or the Liquidating Agent, as the case may be, declines to adjust such valuation in a manner that eliminates such objection, the matter shall be resolved as provided in Section 10.9.

---

## SECTION 7

## TRANSFERS AND WITHDRAWALS

---

7.1 *General Provisions Regarding Transfers.* No Member may sell, assign, pledge, grant a security interest in, or otherwise transfer or encumber all or any portion of such Member's Interest in the Fund without the prior written consent of the Manager, which consent may be (i) withheld in the Manager's sole discretion, and (ii) conditioned upon the review and approval by the Fund's outside legal counsel of the instruments effecting such transfer or encumbrance. Subject to Section 7.2, any attempted transfer or encumbrance in violation of the provisions of this Section 7.1 shall be void and ineffective.

7.2 *Withdrawal by a Member.* Except as provided in Section 3.4 and this Section 7.2, a Member may not withdraw from the Fund. A Member shall be deemed to have withdrawn as a Member of the Fund (i) on its death, (ii) on the entry of any court order charging its entire Interest in the Fund with the unsatisfied amount of any judgment, (iii) on the vesting of its Interest in the Fund in any other person as the result of the Member's insolvency or incapacity, or for any other reason, or (iv) on notice given by the Manager to such Member pursuant to Section 7.3, which withdrawal shall be effective as of the end of the Fiscal Quarter in which any of the events described in the foregoing clauses (i)-(iii) occurs, or, in the case of an event described in the foregoing clause (iv), on the date specified in Section 7.3, as appropriate.

In the event of a deemed withdrawal, a Member or the successor of such Member's Interest shall be treated as an Assignee.

7.3 *Expulsion.* The Manager may at any time, in its sole discretion, expel any Member from the Fund, with or without cause, on 5 days' notice to such Member specifying the effective date of such expulsion. In the event of such expulsion, the expelled Member shall be deemed to have withdrawn such Member's entire Capital Account balance from the Fund as provided in Section 3.4 effective as of the date fixed therefor by the Manager. Except as provided in Section 3.5(a), the expelled Member's withdrawal date shall be treated as a Permitted Withdrawal Date for purposes of Section 3.4. Notwithstanding anything to the contrary in this Agreement, the Manager may not be removed from its position as such without its consent.

7.4 *Status of Assignees.*

(a) An Assignee that holds an Interest in the Fund shall be entitled to receive the allocations attributable to such Interest pursuant to Section 4, to receive the distributions attributable to such Interest pursuant to Sections 5 and 8, and to Transfer such Interest in accordance with the terms of this Section 7. Notwithstanding the foregoing, the Fund and the Members shall incur no liability for allocations and distributions made to a transferor, and an assignment need not otherwise be recognized by the Fund, until the Fund has received and had reasonable opportunity to record on its books an effective written instrument of assignment pursuant to which the Assignee agrees to be bound by the provisions of this Agreement.

(b) An Assignee that holds an Interest in the Fund shall be responsible for any obligation to return distributions or make other payments to the Fund associated with such Interest pursuant to this Agreement; *provided, however,* that the transferor of such Interest, if a Member, also shall continue to be responsible for the satisfaction of such obligations until such time as a Substitute Member is admitted in respect of such Interest. To the extent otherwise applicable to the Interest in the Fund that has been transferred to an Assignee, the Assignee shall be subject to, and bound by, all of the terms and provisions of this Agreement that inure to the benefit of the Fund and/or other Members (including, without limitation, the provisions of this Agreement concerning confidentiality of Fund information, Transfers of Fund Interests, and resolution of disputes). The foregoing provisions of this Section 7.4(b) shall apply to any Assignee that becomes bound by this Agreement pursuant to Section 10.6 without regard to whether such Assignee has executed a written instrument of assignment as described in Section 7.4(a).

(c) Solely to the extent necessary to give effect to the Assignee rights and obligations set forth in Sections 7.4(a) and (b), an Assignee shall be treated as a Member for purposes of this Agreement.

(d) An Assignee shall not, solely by virtue of its status as such, hold any non-economic rights in respect of the Fund. Without limiting the preceding sentence, an Assignee's interest in the Fund shall not entitle such Assignee to participate in the management of the Fund, vote on any Fund matters or bind the Fund under agreements with third parties. An Assignee shall not hold itself out as a Member in any forum or for any purpose; *provided, however,* that, to the extent necessary to maintain consistency with the Fund's income tax returns, reports, and other filings, an Assignee shall take the position that it is a Member solely for income tax purposes.

(e) Subject to Section 7.4(a), the Manager may in its sole discretion elect to redeem any Assignee's Interest at any time by paying to such Assignee in cash or in kind the amount that such Assignee would have received if, on the effective date of redemption, such Assignee had withdrawn its entire Capital Account

balance from the Fund. Payments of the withdrawn amounts shall be made as described in Sections 3.4 (c), (d) and (e) as if the date of withdrawal were a Permitted Withdrawal Date.

## SECTION 8

## DISSOLUTION AND LIQUIDATION

8.1 *Dissolving Events.* The Fund shall be dissolved upon the occurrence of any of the following events:

(a) Expiration of the Fund's term;

(b) Issuance of an order by a court of competent jurisdiction requiring the dissolution of the Fund;

(c) Failure of the Fund to have at least two Members;

(d) Permanent cessation of the Fund's business;

(e) The withdrawal, retirement, death, incapacity, Dissolution or Bankruptcy of the Manager;

(f) When the Manager elects, by written notice to the Fund, to dissolve the Fund.

8.2 *Special Meeting to Dissolve or Continue the Fund.* Upon the withdrawal, retirement, death, incapacity, Dissolution or Bankruptcy of the Manager, the Liquidating Agent shall notify the remaining Members of a special meeting of the Members to be held not less than 10 days nor more than 60 days after the date of such event. At that meeting, the Members may by unanimous vote elect to continue the business of the Fund and agree to the appointment of a new Manager. If the Members do not elect to continue the business of the Fund and to appoint a new Manager, the Liquidating Agent or the Liquidating Agent's designee shall then cause the Fund to be liquidated in accordance with Section 8.3.

8.3 *Winding Up of the Fund.*

(a) Upon dissolution of the Fund, the Liquidating Agent shall promptly wind up the affairs of the Fund in accordance with the provisions of this Section 8.3. The Fund shall engage in no further business except as may be necessary, in the reasonable discretion of the Liquidating Agent, to preserve the value of the Fund's assets during the period of dissolution and liquidation.

(b) Distributions to the Members in liquidation may be made in cash or in kind, or partly in cash and partly in kind, as determined by the Liquidating Agent. Distributions in kind shall be valued in accordance with Section 6.12 and shall be subject to such conditions and restrictions as may be necessary or advisable in the reasonable discretion of the Liquidating Agent to preserve the value of the property so distributed.

(c) The Profits and Losses of the Fund during the period of dissolution and liquidation shall be allocated among the Members in accordance with the provisions of Section 4.1. If any property is to be distributed in kind, the Capital Accounts of the Members shall be adjusted with regard to such property in accordance with the provisions of Section 4.1(c).

(d) The assets of the Fund (including, without limitation, proceeds from the sale or other disposition of any assets during the period of dissolution and liquidation) shall be applied as follows:

(i) First, to repay any indebtedness of the Fund, whether to third parties or any of the Members, in the order of priority required by law;

(ii) Next, to any reserves which the Liquidating Agent reasonably deems necessary for contingent or unforeseen liabilities or obligations of the Fund (which reserves when they become unnecessary shall be distributed in accordance with the provisions of (iii), below); and

(iii) Next, to the Members in proportion to their respective positive Closing Capital Account balances (after taking into account all adjustments to the Members' Capital Accounts required under Section 8.3(c)).

8.4 *Designation of Liquidating Agent.* The "Liquidating Agent" shall initially be the Manager and shall thereafter be the person or entity designated from time to time by the Manager. In the event the Manager has resigned as Liquidating Agent without designating a replacement Liquidating Agent or the Manager or its designee is unable to carry out its duties as Liquidating Agent, the Liquidating Agent shall be the Member having the largest Capital Account balance. The Liquidating Agent may be a non-Member, if in the opinion of counsel to the Fund this would not cause the Fund to be classified as an association taxable as a corporation for Federal income tax purposes.

---

## SECTION 9

## LIABILITY PROVISIONS

---

9.1 *Liability.* Except as otherwise specifically provided in this Agreement, no Indemnified Person shall be personally liable for the return of any contributions made to the capital of the Fund by the Members. In the absence of Material Misconduct (which misconduct shall have given rise to the matter at issue) on the part of an Indemnified Person, such Indemnified Person shall not be liable to the Fund or the Members for any act or omission concerning the Fund's business. An Indemnified Person may consult with legal counsel or accountants in respect of Fund affairs and, so long such advisors were selected with reasonable care, shall be deemed to have acted in good faith and without negligence with regard to any action or inaction that is taken in accordance with the advice or opinion of such advisors. An Indemnified Person shall not be liable to the Fund or the Members for losses due to the fraud, bad faith, willful misconduct or negligence, whether of omission or commission, of any independent contractor, employee or other agent of the Fund unless such Indemnified Person was or should have been directly involved with the selection, engagement or supervision of such person and failed to exercise reasonable care in connection therewith. Nothing in this Agreement to the contrary shall in any way constitute a waiver or limitation of any right that Members may have under Federal securities laws.

9.2 *Indemnification.* In the absence of Material Misconduct (which misconduct shall have given rise to the matter at issue) on the part of an Indemnified Person, the Fund shall indemnify and hold each Indemnified Person harmless from and against any loss, expense, damage or injury suffered or sustained by any of them by reason of any acts, omissions, or alleged acts or omissions arising out of any activity performed or required to have been performed by, for, on behalf of, or otherwise in furtherance of the interests of the Fund. This indemnification shall include, but not be limited to, (i) payment of reasonable attorneys fees and other expenses incurred in settling any claim or threatened action or in connection with any legal proceeding, and (ii) the removal of any liens affecting the property of an Indemnified Person. Neither any amendment or repeal of this Section 9.2, nor the adoption of any provision of this Agreement inconsistent with this Section 9.2, shall eliminate or reduce the effect of this Section 9.2 in respect of any matter occurring, or any action or proceeding accruing or arising or that, but for this Section 9.2, would accrue or arise, prior to such amendment, repeal or adoption.

---

## SECTION 10

## GENERAL PROVISIONS

---

10.1 *Status Under the Act.* This Agreement is the "limited liability company agreement" of the Fund within the meaning of Section 18-101(7) of the Act.

10.2 *Entire Agreement.* This Agreement contains the entire understanding among the Members and supersedes any prior written or oral agreement between them respecting the Fund. There are no representations, agreements, arrangements, or understandings, oral or written, among the Members relating to the Fund which are not fully expressed in this Agreement.

10.3 *Amendments.*

(a) Except as provided in this Section 10.3, this Agreement is subject to amendment only with the consent of the Manager and a Majority-In-Interest of the Members.

(b) Notwithstanding the foregoing, the Manager may, without the consent of the other Members, amend this Agreement: (i) to reflect changes validly made in the membership of the Fund, the Capital Contributions, and the Interests issued to the Members, (ii) to change the provisions relating to the Incentive Allocation so that such provisions conform to any applicable requirements of the Commodity Futures Trading Commission, the Securities and Exchange Commission and other regulatory authorities, so long as such amendment does not increase the Incentive Allocation with respect to any Member to more than 20% of the aggregate Net Increase for any Incentive Allocation Period, (iii) to reflect a change in the name of the Fund, (iv) to make a change that is necessary or, in the opinion of the Manager, advisable to qualify the Fund as a limited liability company in which the Members have limited liability under the laws of any state, or to ensure that the Fund will not be treated as an association taxable as a corporation for Federal income tax purposes, (v) to make a change that is necessary or desirable to cure any ambiguity, to correct or supplement any provision in this Agreement that would be inconsistent with any other provision in this Agreement, or to make any other provision with respect to matters or questions arising under this Agreement that will not be inconsistent with the provisions of this Agreement, in each case so long as such change does not adversely affect the Members, (vi) to make a change that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any

opinion, directive, order, ruling or regulation under or of any Federal or state statute, so long as such change is made in a manner which minimizes any adverse effect on the Members; or to make a change that is required or contemplated by this Agreement, (vii) to make a change in any provision of this Agreement that requires any action to be taken by or on behalf of the Manager or the Fund pursuant to the requirements of applicable Delaware law if the provisions of applicable Delaware law are amended, modified or revoked so that the taking of such action is no longer required, (viii) to prevent the Fund or the Manager from in any manner being deemed an "investment company" subject to the provisions of the Company Act, or (ix) to make any other amendments that will not affect the rights and duties of the Members in any material respect.

(c) An amendment to any provision of this Agreement that calls for a higher level of approval of the Members or the approval of certain specified Members shall, in addition to the execution percentages set forth in Section 10.3(a), require the same form of approval as is set forth in such provision.

(d) Except with regard to amendments otherwise specifically required under this Agreement, there shall be no amendment to this Agreement which would have a material adverse effect upon a Member unless the amendment: (i) is consented to by such Member or (ii) by its terms applies to all Members and could have a disproportionately adverse effect upon such Member only due to some attribute of the Member itself (other than the Member's status as such).

(e) Any amendment to this Section 10.3 shall require the unanimous consent of the Members.

10.4 *Governing Law.* All questions with respect to the interpretation of this Agreement and the rights and liabilities of the Members shall be governed by the laws of the State of Delaware as they are applied to contracts entered into and wholly performed upon in Delaware by residents of Delaware. To the extent permitted by the Act and other applicable law, the provisions of this Agreement governing the rights and obligations of the Members shall supersede any contrary provisions of the Act or other applicable law.

10.5 *Severability.* In the event that any provision of this Agreement is determined to be invalid or unenforceable, such provision shall be deemed severed from the remainder of this Agreement and replaced with a valid and enforceable provision as similar in intent as reasonably possible to the provision so severed, and shall not cause the invalidity or unenforceability of the remainder of this Agreement.

10.6 *Counterparts; Binding Upon Members and Assignees.* This Agreement may be executed in any number of counterparts and when so executed, all of such counterparts shall constitute a single instrument binding upon all parties notwithstanding the fact that all parties are not signatory to the original or to the same counterpart. In addition, to the maximum extent permitted by applicable law, a person shall become bound in accordance with the terms of this Agreement as an Assignee or Member if such person (or a representative authorized by such person orally, in writing or by other action such as payment for an Interest in the Fund) executes any other writing evidencing the intent of such person to become a Member or Assignee or if such person or representative complies with the conditions for becoming a Member or Assignee as set forth in this Agreement or any other writing and requests (orally, in writing or by other action such as payment for an interest in the Fund or acceptance of distributions from the Fund) that the records of the Fund reflect such admission or assignment.

10.7 *Survival of Rights.* Subject to the restrictions against unauthorized Transfer set forth in this Agreement, the provisions of this Agreement shall inure to the benefit of and be binding upon each Member and Assignee and such Member's or Assignee's heirs, devises, legatees, personal representatives, successors, and assigns.

10.8 *No Third Party Beneficiaries.* Except as otherwise provided in this Section 10.8, the provisions of this Agreement are not intended to be for the benefit of or enforceable by any third party. Without limiting the foregoing, no third party shall have any right to enforce or demand enforcement of a Member's obligation to return distributions or obligation to make other payments to the Fund as set forth in this Agreement.

10.9 *Arbitration.* Any controversy or claim arising out of or relating to this Agreement, the Fund or the Members' respective rights and duties shall be settled by arbitration in San Mateo County, California, or the county in which the Principal Office is then located. Such arbitration shall be in accordance with the rules of the American Arbitration Association and judgment upon the award may be entered in any court of competent jurisdiction. The prevailing party or parties in such arbitration and any ensuing legal action shall be reimbursed by the party or parties who do not prevail for their reasonable attorneys', accountants' and experts' fees and the costs of such actions, and such non-prevailing parties shall be jointly and severally liable for such amounts.

10.10 *Notices.* Any notice required or permitted to be given under this Agreement or the Act shall be in writing.

(a) *Notice to Members.* Notice to a Member shall be deemed duly given: (i) when personally delivered to such Member; (ii) at the Close of Business on the third day after being deposited in the United States mail, registered or certified, postage prepaid and addressed to the address set forth on Schedule A for such Member, or to any other address of which the Fund is notified by such Member in writing; (iii) at the Close of Business on the first day after being deposited in the United States with a nationally recognized overnight delivery service, with delivery charges prepaid and addressed as provided in the preceding clause; or (iv) when actually received by such Member via public or private mail, telecopy, telex or telegram.

(b) *Notice to the Fund.* Notice to the Fund shall be deemed duly given when duly given to a Member or when actually received at the Principal Office, in accordance with the same procedures set forth in Section 10.10(a).

10.11 *Consents.* Subject to the provisions of Section 10.6, all consents, agreements, elections and approvals provided for or permitted by this Agreement or the Act shall be in writing and signed copies thereof shall be retained with the books of the Fund.

10.12 *No Partition.* Except as otherwise permitted by this Agreement, no Member shall have the right, and each Member does hereby agree that it shall not seek, to cause a partition of the Fund's property whether by court action or otherwise.

10.13 *Representation by Members and Assignees.*

(a) Each Member and each Assignee hereby represents that, with respect to its Interest in the Fund: (i) it is acquiring or has acquired such Interest for purposes of investment only, for its own account (or a trust account if such Member or Assignee is a trustee), and not with a view to resell or distribute the same or any part thereof; and (ii) no other person has any interest in such Interest or in the rights of such Member or Assignee under this Agreement other than a spouse having a community property or similar interest under

applicable state law. Each Member or Assignee also warrants to the Fund and the other Members that it has the business and financial knowledge and experience necessary to acquire an Interest in the Fund on the terms contemplated herein and that it has the ability to bear the risks of such investment (including the risk of sustaining a complete loss of all its capital contributions) without the need for the investor protections provided by the registration requirements of the Securities Act.

(b) The Members and Assignees hereby acknowledge that certain provisions of this Agreement (including, without limitation, Sections 6.3 and 6.4) have the effect of reducing the fiduciary duties of the Members to the Fund under applicable law. Each Member and Assignee hereby represents that it has carefully considered each such provision and has made an informed decision to consent thereto.

10.14 *No Usury.* Notwithstanding any provision of this Agreement to the contrary, the rate of interest charged by the Fund to any Member in connection with an obligation of the Member to the Fund shall not exceed the maximum rate permitted by applicable law. To the extent that any interest otherwise paid or payable by a Member to the Fund shall have been finally adjudicated to exceed the maximum amount permitted by applicable law, such interest shall be retroactively deemed to have been a required repayment of principal (and any such amount paid in excess of the outstanding principal amount shall be promptly returned to the payor Member).

10.15 *Partnership for Tax Purposes Only.* As set forth in Section 2.1, the Members hereby form the Fund as a limited liability company under the Act. The Members expressly do not intend hereby to form a partnership except insofar as the Fund may be treated as a partnership solely for tax purposes.

10.16 *Legal Counsel.* The Manager and the Fund have engaged Wilson, Sonsini, Goodrich & Rosati, Professional Corporation, and David Hodge, Esq., as legal counsel ("Legal Counsel") to the Manager and the Fund. No legal counsel has been engaged by the Fund to protect or otherwise represent the interests of any other Member. Moreover, Legal Counsel may represent the Fund, the Manager and/or certain parties related thereto in the future. Each Member: (i) approves Legal Counsel's representation of the Manager and the Fund in the preparation of this Agreement, (ii) acknowledges that no legal counsel has been engaged by the Manager and the Fund to protect or otherwise represent the interests of the Members other than the Manager, that Legal Counsel has not been engaged by any Member other than the Manager to protect or represent the interests of such Member vis-a-vis the Fund or the preparation of this Agreement, and that actual or potential conflicts of interest may exist among the Members in connection with the preparation of this Agreement (with the consequence that a Member's interests may not be vigorously represented unless such Member engages its own legal counsel), and (iii) acknowledges further that such Member has been afforded the opportunity to engage and seek the advice of its own legal counsel before entering into this Agreement. In addition, each Member: (x) acknowledges the possibility of a future conflict or dispute among Members or between any Member or Members and the Fund, (y) agrees that Legal Counsel may represent the Fund and/or any Member in connection with any such conflict or dispute and, to the extent permitted under the California Rules of Professional Conduct and any other applicable rules governing the professional conduct of attorneys (the "Professional Rules"), waives its right to object to such representation (including, without limitation, on the grounds of any actual or potential conflict of interests), and (z) acknowledges the possibility that, pursuant to operation of the Professional Rules, Legal Counsel may be precluded from representing the Fund and/or any Member in connection with any such conflict or dispute (even if Legal Counsel has represented such Member with regard to other matters). Nothing in this Section 10.16 shall preclude the Fund from selecting different legal counsel to represent it at any time in the future and no Member shall be deemed by virtue of this Section 10.16 to have waived its right to object to any conflict of interest relating to matters other than this Agreement or the transactions contemplated herein.

10.17 *Miscellaneous.* No failure or delay by any party in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof; any actual waiver shall be contained in a writing signed by the party against whom enforcement of such waiver is sought. The section headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. Unless the context clearly requires to the contrary, all references in this Agreement to designated "Sections" are to the designated Sections and other subdivisions of this Agreement. This Agreement shall not be construed for or against any party by reason of the authorship or alleged authorship of any provisions hereof or by reason of the status of the respective parties. Except where the context clearly requires to the contrary, instances of gender or entity-specific usage (*e.g.*, "his," "her," "its," "person," or "individual" ) shall not be interpreted to preclude the application of any provision of this Agreement to any individual or entity. References to laws, regulations and other governmental rules shall mean such laws, regulations and rules as in effect on the date of determination (taking into account any amendments thereto prior or subsequent to the date of this Agreement). All dates and times specified in this Agreement are of the essence and shall be strictly enforced. Except as otherwise specifically provided in this Agreement, the remedies set forth in this Agreement are cumulative and shall not exclude any other remedies to which a person may be lawfully entitled.

: A

IN WITNESS WHEREOF, the parties have ex