# EXHIBIT B

# OPERATING AGREEMENT

# OF

# THIEL CAPITAL MANAGEMENT, LLC

# A DELAWARE LIMITED LIABILITY COMPANY

**September 9, 1996**

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE REGULATORY AUTHORITY HAS APPROVED OR DISAPPROVED THIS OPERATING AGREEMENT OR THE LIMITED LIABILITY COMPANY MEMBERSHIP INTERESTS ("INTERESTS") PROVIDED FOR HEREIN. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THE INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"), AND THE COMPANY IS UNDER NO OBLIGATION TO REGISTER THE INTERESTS UNDER THE 1933 ACT IN THE FUTURE.

AN INTEREST MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION UNDER THE 1933 ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED. ADDITIONAL RESTRICTIONS ON THE TRANSFER OF INTERESTS ARE CONTAINED IN SECTION 7 OF THIS AGREEMENT. BASED UPON THE FOREGOING, EACH ACQUIROR OF AN INTEREST MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF INVESTMENT THEREIN FOR AN INDEFINITE PERIOD OF TIME.

# TABLE OF CONTENTS


| | | Page |
|---|---|---|
| SECTION 1 | DEFINITIONS | 1 |
| SECTION 2 | FORMATION | 4 |
| 2.1 | Formation and Name | 4 |
| 2.2 | Term of the Company | 4 |
| 2.3 | Purpose and Scope | 5 |
| 2.4 | Principal Office | 5 |
| 2.5 | Delaware Office and Agent for Service of Process | 5 |
| 2.6 | Names and Contact Information of the Members | 5 |
| 2.7 | Required Documents | 5 |
| 2.8 | Title to Property | 6 |
| 2.9 | Additional Members | 6 |
| SECTION 3 | CAPITALIZATION | 6 |
| 3.1 | Capital Contributions | 6 |
| 3.2 | Limitation on Capital Contributions | 6 |
| 3.3 | Withdrawal and Return of Capital | 6 |
| 3.4 | Loans to the Company | 6 |
| 3.5 | Limitation of Liability; Return of Certain Distributions | 7 |
| 3.6 | Interest on Capital | 7 |
| SECTION 4 | PROFITS AND LOSSES | 7 |
| 4.1 | Allocations of Company Profits and Losses | 7 |
| 4.2 | Modifications to Preserve Underlying Economic Objectives | 9 |
| 4.3 | Withholding Taxes | 9 |
| SECTION 5 | DISTRIBUTIONS | 10 |
| 5.1 | Discretionary Distributions | 10 |
| 5.2 | Liquidating Distributions | 10 |
| 5.3 | Limitation on Distributions | 10 |
| SECTION 6 | ADMINISTRATIVE PROVISIONS | 11 |
| 6.1 | Management Rights of the Non-Managing Members | 11 |
| 6.2 | Management Rights of the Managing Member | 11 |
| 6.3 | The Managing Member | 11 |
| 6.4 | Other Ventures | 11 |
| 6.5 | Duties to the Company and the Fund | 12 |
| 6.6 | Reimbursement of Member Expenses | 12 |
| 6.7 | Member Compensation | 12 |
| 6.8 | Tax Matters Partner. | 12 |
| 6.9 | Records and Financial Statements | 12 |
| 6.10 | Valuation of Company Assets | 13 |
| 6.11 | Confidentiality. | 13 |

## TABLE OF CONTENTS
**(continued)**


**Page**

6.12 Disclosures . . . . . 13
6.13 Related Party Transactions . . . . . 14

SECTION 7 TRANSFERS OF COMPANY INTERESTS; WITHDRAWALS AND REMOVALS; VESTING OF MEMBERSHIP INTERESTS . . . . . 14
7.1 Transfers of Company Interests . . . . . 14
7.2 Withdrawal . . . . . 15
7.3 Removal . . . . . 16
7.4 Procedures Following Withdrawal or Removal . . . . . 16
7.5 Vesting of Members' Interests . . . . . 16
7.6 Status of Assignees . . . . . 17

SECTION 8 DISSOLUTION AND LIQUIDATION . . . . . 18
8.1 Dissolving Events . . . . . 18
8.2 Election to Continue the Company Following Certain Dissolution Events . . . . . 18
8.3 Winding Up of the Company . . . . . 18

SECTION 9 LIABILITY PROVISIONS . . . . . 19
9.1 Liability . . . . . 19
9.2 Indemnification . . . . . 19
9.3 Contribution . . . . . 20

SECTION 10 GENERAL PROVISIONS . . . . . 20
10.1 Special Meetings . . . . . 20
10.2 Status Under the Act . . . . . 21
10.3 Entire Agreement . . . . . 21
10.4 Amendments . . . . . 21
10.5 Governing Law . . . . . 21
10.6 Severability . . . . . 22
10.7 Counterparts; Binding upon Member and Assignees . . . . . 22
10.8 Survival of Rights . . . . . 22
10.9 Survival of Obligations . . . . . 22
10.10 No Third Party Beneficiaries . . . . . 22
10.11 Notices . . . . . 23
10.12 Consents . . . . . 23
10.13 No Partition . . . . . 23
10.14 Representations by Members . . . . . 23
10.15 No Usury . . . . . 23
10.16 Partnership for Tax Purposes Only . . . . . 24
10.17 Dispute Resolution . . . . . 24
10.18 Legal Counsel . . . . . 24
10.19 Miscellaneous . . . . . 25

**TABLE OF CONTENTS**
**(continued)**

**Page**

SCHEDULE A

THIS OPERATING AGREEMENT of Thiel Capital Management, LLC, a Delaware limited liability company, is entered into as of September 9, 1996.

---

## SECTION 1

## DEFINITIONS

---

As used in this Agreement:

***Act*** shall mean the Delaware Limited Liability Company Act, Title 6, Delaware Code Ann., Section 18-101, et seq., as amended.

***Additional Member*** shall mean any Person, other than a Substitute Member, admitted to the Company as a Member after the date first above written.

***Affiliate*** shall mean, with respect to any Person, any other Person with regard to which the Person is controlling, controlled, or commonly controlled. For purposes of the preceding sentence, "control" shall mean the power to direct the principal business management and activities of a Person, whether through ownership of voting Securities, by agreement, or otherwise.

***Agreement*** shall mean this Operating Agreement of Thiel Capital Management, LLC, a Delaware limited liability company.

***Assignee*** shall mean a Person that has acquired an interest in the Company (including, without limitation, a Person that has acquired such interest by means of a Transfer permitted under Section 7), but that has not been admitted as a Member.

***Bank*** shall mean the Bank of America National Trust & Savings Assn., San Francisco main branch.

***Bankruptcy*** shall mean, with respect to a Member: (i) an assignment of all or substantially all of the assets of such Member for the benefit of its creditors generally; (ii) the commencement of any bankruptcy or insolvency case or proceeding against such Member which shall continue and remain unstayed and in effect for a period of 60 consecutive days; (iii) the filing by such Member of a petition, answer or consent seeking relief under any bankruptcy, insolvency or similar law; or (iv) the occurrence of any other event that is deemed to constitute bankruptcy for purposes of the Act.

***Capital Account*** shall mean, for each Member, a separate account that is:

(a) Increased by: (i) the amount of such Member's Capital Contribution and (ii) allocations of Profit to such Member pursuant to Section 4;

(b) Decreased by: (i) the amount of cash distributed to such Member by the Company, (ii) the fair market value of any other property distributed to such Member by the Company (determined as of the time of distribution and net of liabilities secured by such property that the Member assumes or to which the Member's ownership of the property is subject), and (iii) allocations of Loss to such Member pursuant to Section 4; and

(c) Otherwise adjusted in accordance with the provisions of this Agreement.

*Capital Contribution* shall mean, for any Member, the sum of the net amount of cash and the fair market value of any other property (determined as of the time of contribution and net of liabilities secured by such property that the Company assumes or to which the Company's ownership of the property is subject) contributed by such Member to the capital of the Company. The term "capital contribution" (where not capitalized) shall mean any contribution to the capital of the Company valued in accordance with the rules set forth in the preceding sentence.

*Close of Business* shall mean 5:00 p.m., local time, in San Francisco, California.

*Code* shall mean the Internal Revenue Code of 1986, as amended.

*Company* shall mean Thiel Capital Management, LLC, a Delaware limited liability company.

*Dissolution* shall mean, with respect to a Member that is not a natural person, that such Member has terminated its existence (whether as a partnership, corporation, limited liability company or other legal entity) and dissolved; provided, however, that a change in the membership of a Member that is a partnership or limited liability company shall not constitute a "Dissolution" of such Member, so long as the business of the Member is continued in partnership or limited liability company form, regardless of whether such Member is deemed technically dissolved for partnership, limited liability company or tax law purposes.

*Fiscal Year* shall mean the period from January 1 through December 31 of each year (unless otherwise required by law).

*Fund* shall mean Thiel Capital International, LLC, to be organized as a limited liability company under the laws of the State of Delaware.

*Fund Agreement* shall mean the Operating Agreement of the Fund, as amended.

*GAAP* shall mean United States generally accepted accounting principles, consistently applied.

*Incentive Fee* shall mean the "incentive allocation," as defined in the Fund Agreement.

*Indemnified Person* shall mean each Member as well as each officer, director or member of a Member. In addition, "Indemnified Person" shall also include any employee or agent of the Company to the extent determined by the Managing Member in its reasonable discretion.

*Liquidating Member* shall mean the Managing Member unless another Person is selected to serve as Liquidating Member pursuant to Section 8.2.

*Majority-In-Interest of the Members or the Non-Managing Members* shall mean a group of Members or Non-Managing Members whose aggregate Membership Interests at the time of determination exceed fifty percent of the total Membership Interests of all the Members or Non-Managing Members, as applicable, at such time.

*Management Fee* shall mean the quarterly management fee payable to the Company by the Fund pursuant to the Fund Agreement.

*Managing Member* shall mean the Member that, at the time of determination, is designated as such pursuant to Section 6.3.

*Material Misconduct* shall mean, with respect to an Indemnified Person, gross negligence, a willful and material breach of this Agreement, fraud, breach of a fiduciary duty arising under this Agreement, or a commission of a felony (except in the case of a felony where the Indemnified Person reasonably believed that no such felony would occur in consequence of such Indemnified Person's action or inaction, as the case may be). For purposes of the preceding sentence: (i) an Indemnified Person that consults with legal counsel or an accountant in respect of Company affairs shall be deemed to have acted in good faith and without negligence with regard to any action or inaction that is taken in accordance with the advice or opinion of such advisor so long as such advisor was selected with reasonable care; and (ii) an Indemnified Person's reliance upon the truth and accuracy of any written statement, representation or warranty of a Member shall be deemed to have been reasonable and in good faith absent such Indemnified Person's actual knowledge that such statement, representation or warranty was not, in fact, true and accurate.

*Member* shall mean any Person (i) listed on Schedule A as a Member or (ii) admitted to the Company pursuant to the terms of this Agreement as an Additional Member or a Substitute Member, but only if such Person has not withdrawn or been removed from the Company within the meaning of Section 7.2 or 7.3 or Transferred its entire membership interest to one or more Members and/or Persons admitted to the Company as Substitute Members pursuant to Section 7.1 or 7.6. Except where the context requires otherwise, a reference in this Agreement to "the Members" shall mean all of the Members (taken together or acting unanimously, as appropriate).

*Membership Interest* shall mean, with respect to each Member, such Member's interest in the Company; Membership Interests shall be apportioned among the Members as set forth on Schedule A.

*Non-Managing Member* shall mean any Member other than the Managing Member. Except where the context requires otherwise, a reference in this Agreement to "the Non-Managing Members" shall mean all of the Non-Managing Members (taken together or acting unanimously, as appropriate).

*Person* shall mean an individual, partnership, corporation, limited liability company, unincorporated organization, trust, joint venture, governmental agency, or other entity, whether domestic or foreign.

*Principal Office* shall have the meaning set forth in Section 2.4.

*Profits and Losses* shall mean, for any period, the Company's items of income and gain as well as loss, expense and deduction as determined under GAAP; provided, however, that Profits and Losses as computed for each allocation period under Section 4 shall in any event include (i) all items allocated to the Company by the Fund during such allocation period (whether or not realized at the time of such allocation), and (ii) all items of unrealized gain or loss in respect of Securities held by the Company attributable to such allocation period (except, in the case of the Company's interest in the Fund, to the extent that changes in the value thereof are accounted for under the preceding clause (i)). For purposes of determining unrealized gains and losses, as well as any realized gains or losses that ultimately may arise, the basis of each Security shall be deemed to be its fair market value as of the start of such allocation period or, if the Security was acquired by the Company during such period, its cost.

*Securities* shall mean debt, equity and synthetic securities of any type.

*Subscription Agreement* shall mean the subscription agreement between the Company, the Fund and each Member in the form prescribed by the Managing Member.

***Substitute Member*** shall mean an Assignee of all or a portion of a Member's interest in the Company that becomes a Member and succeeds, to the extent of the interest assigned, to the rights and powers and becomes subject to the restrictions and liabilities of the assignor Member.

***Term*** shall have the meaning set forth in Section 2.2. Where not capitalized, "term" shall mean the entire period of the Company's existence, including any period of winding-up and liquidation following the dissolution of the Company pursuant to Section 8.1.

***Transfer*** shall mean any sale, exchange, transfer, gift, encumbrance, assignment, pledge, mortgage, hypothecation or other disposition, whether voluntary or involuntary.

***Treasury Regulation*** shall mean a regulation issued by the United States Treasury Department and relating to a matter arising under the Code.

***Two-Thirds-Interest of the Members or the Non-Managing Members*** shall mean a group of Members or Non-Managing Members whose aggregate Membership Interests at the time of determination equals or exceeds two-thirds of the total Membership Interests of all the Members or Non-Managing Members, as applicable, at such time.

***Valuation Member*** shall have the meaning set forth in Section 6.10(a).

***Vested Percentage*** shall have the meaning set forth in Section 7.5(b)(i).

***Vesting Interest*** shall have the meaning set forth in Section 7.5(a).

***Withdrawn Member*** shall have the meaning set forth in Section 7.4.

---

## SECTION 2

## FORMATION

---

2.1 *Formation and Name.*

(a) The Members hereby enter into and form the Company as a limited liability company governed by the Act for the limited purpose and scope set forth in this Agreement.

(b) The name of the Company shall be "Thiel Capital Management, LLC."

2.2 *Term of the Company.* The "Term" of the Company shall commence upon the later of: (i) the filing of the Company's certificate of formation with the office of the Delaware Secretary of State or (ii) the execution of this Agreement by two or more Members. Except as specifically provided in Section 8, the Company's term shall continue until the Close of Business on the date which is one year after the final dissolution and liquidation of the Fund and shall not end prior to such date in consequence of the death, retirement, resignation, expulsion, Bankruptcy, or Dissolution of a Member or the occurrence of any other event which terminates the continued membership of a Member in the Company.

2.3 *Purpose and Scope.* The purpose and scope of the Company shall be to:

(a) Serve as the sole constituent managing member of the Fund;

(b) Provide management and management-related services to the Fund;

(c) Hold for investment, distribute and/or otherwise dispose of cash, Securities or other property (i) distributed to the Company by the Fund or (ii) otherwise received by the Company in connection with its business;

(d) Engage in such other activities as are customary for the sole constituent managing member of an investment fund such as the Fund; and

(e) Engage in any other lawful activities reasonably determined by the Managing Member to be necessary or advisable in furtherance of the foregoing.

2.4 *Principal Office.* The Company shall have a single "Principal Office" which shall at all times be located within the United States. The Principal Office initially shall be located at 19 Coleman Place 37, Menlo Park, California 94025, and may thereafter be changed from time to time by the Managing Member upon notice to the other Members.

2.5 *Delaware Office and Agent for Service of Process.* The Company shall maintain a Delaware registered office and agent for the service of process as required by the Act. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Managing Member shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be.

2.6 *Names and Contact Information of the Members.*

(a) Each Person whose name is listed on Schedule A is hereby admitted as a Member of the Company.

(b) Set forth below the name of each Member on Schedule A shall be appropriate contact information for such Member (including, without limitation, such Member's mailing address, telephone number, and telecopy number as well as, in the case of a Member that is an entity, the name or title of an individual to whom correspondence should be directed). Each Member shall promptly provide the Company with the information required to be set forth for such Member on Schedule A and shall thereafter promptly notify the Company of any change to such information.

2.7 *Required Documents.*

(a) *Company Documents.* The Members shall cause to be executed, filed, recorded or amended, as necessary, a certificate of formation and any other documents required or desirable, as determined by the Managing Member in its reasonable discretion, to be executed, filed, recorded or amended in connection with the formation, operation or dissolution of the Company pursuant to the laws of the State of Delaware or any other jurisdiction in which the Company's business is conducted. The terms and provisions of each document described in the preceding sentence shall be initially established and shall be amended as necessary to cause such terms and provisions to be consistent with the terms and provisions of this Agreement.

(b) *Other Documents.* The Members shall execute and acknowledge such other documents as may be necessary or desirable, as determined by the Managing Member in its reasonable discretion, to give effect to the terms of this Agreement.

(c) *Special Power of Attorney.* Each Member hereby grants to the Managing Member a special power of attorney (with full rights of assignment) irrevocably appointing the Managing Member as the granting Member's attorney-in-fact with power and authority to execute and/or acknowledge, in the granting Member's name and on its behalf, any document described in Section 2.7(a) or (b); provided, however, that no such power of attorney shall be used to execute or acknowledge a document on behalf of a Member if the action to be taken by such document has not received the level of consent of the Members required under this Agreement. Each special power of attorney granted under this Section 2.7(c) is coupled with an interest and shall not be revoked by the bankruptcy, death, disability or other event of legal incapacity of the granting Member.

2.8 *Title to Property.* Title to all Company property shall be held in the name of the Company.

2.9 *Additional Members.*

(a) Except as otherwise provided in this Section 2.9, an Additional Member may be admitted to the Company only with the consent of the Majority-in-Interest of the Members.

(b) In the event that the Managing Member becomes a Withdrawn Member (other than by reason of the Bankruptcy of the Managing Member), the Members agree to admit the Person designated by the former Managing Member as an Additional Member to serve as replacement Managing Member. Such Additional Member's interest in the Company shall be derived solely from the former Managing Member's Vested Percentage in his Membership Interest or from his unvested Vesting Interest, as set forth in Section 7.5(a).

---

## SECTION 3

## CAPITALIZATION

---

3.1 *Capital Contributions.* All Capital Contributions shall be in cash. Each Member, upon and as a condition to admission as a Member of the Company, shall make the Capital Contribution set forth in such Member's Subscription Agreement (for each of the Non-Managing Members, the initial Capital Contribution shall be 1% of the capital such Member initially invests in the Fund).

3.2 *Limitation on Capital Contributions.* Except as specifically provided in this Section 3 or Section 4.2, no Person shall be required to make a contribution to the capital of the Company.

3.3 *Withdrawal and Return of Capital.* No Member may withdraw any portion of its Capital Contribution or Capital Account balance. Except as provided in Sections 5, 7, and 8, no Member shall be entitled to the return of such Member's Capital Contribution or to a distribution in respect of such Member's Capital Account balance.

3.4 *Loans to the Company.* No Member shall be required to lend any money to the Company or to guarantee any Company indebtedness.

3.5 *Limitation of Liability; Return of Certain Distributions.*

(a) Except as otherwise required by the Act or this Section 3.5, a Member shall have no personal liability for the debts and obligations of the Company and shall not be required to return any distributions received from the Company. Without limiting the foregoing, the failure to observe any formalities relating to the management or administration of the Company shall not be grounds for imposing upon any Member personal liability to third parties for the Company's debts and obligations.

(b) A Member that receives a distribution (i) in violation of this Agreement or (ii) that is required to be returned to the Company under the Act shall return such distribution immediately upon demand therefor by any Member.

(c) The Company may, in its sole and absolute discretion, elect to withhold from any distributions otherwise payable to a Member amounts due to the Company from such Member.

(d) Nothing in this Section 3.5 shall be applied to release any Member from (i) its obligation to make capital contributions pursuant to this Section 3 or other payments specifically required under this Agreement or (ii) its obligations pursuant to any relationship between the Company and such Member acting in a capacity other than as a Member (including, for example, as a borrower or independent contractor).

3.6 *Interest on Capital.* No Member shall be entitled to interest on such Member's Capital Contribution or Capital Account balance.

---

## SECTION 4

## PROFITS AND LOSSES

---

4.1 *Allocations of Company Profits and Losses.*

(a) *General.* Except as otherwise provided in this Section 4.1, the items of Profit and Loss of the Company for each fiscal quarter (or shorter period selected by the Managing Member) shall be allocated as follows.

(i) Items of Profit and Loss attributable to Incentive Fees and to Management Fees shall be allocated among the Members in proportion to their respective Membership Interests.

(ii) All other items of Profit and Loss shall be allocated among the Members in proportion to their respective Capital Contributions.

(iii) Items of loss, expense or deduction attributable to the Company's indemnification obligation under Section 9.2 shall be allocated among the Members in proportion to their respective Membership Interests.

(b) *Excess Losses Otherwise Allocable to a Member.* If and to the extent that any items of net Loss otherwise allocable to a Member under Section 4.1(a) would create a negative balance in the Capital Account of such Member (or increase the amount by which such Capital Account balance is negative), the items shall not be allocated to such Member pursuant to Section 4.1(a), but shall instead be specially allocated as follows:

(i) First, to the Members as a group, in proportion to their respective positive Capital Account balances, until the Capital Account balance of each Member has been reduced to (but not less than) zero; and

(ii) Next, to the Members as a group in proportion to their respective Membership Interests.

To the extent that there have been special allocations of Loss away from a Member under this Section 4.1(b) that have not subsequently been reversed pursuant to this sentence or Section 4.1(g), the next available items of Profit otherwise allocable to such Member pursuant to Section 4.1(a) shall be specially allocated to the Members to whom such items of Loss had been specially allocated under this Section 4.1(b) so as to first offset in reverse order such special allocations of Loss.

(c) *Book - Tax Accounting Disparities.* Solely for Federal income tax purposes, if Company property is reflected in the Capital Accounts of the Members at a book value (i.e., the property's basis for purposes of determining Profit and Loss with respect thereto as determined in accordance with the principles set forth in the definition of Profits and Losses in Section 1) that differs from the adjusted tax basis of such property, allocations of depreciation, amortization, income, gain or loss with respect to such property shall be made among the Members in a manner which takes such difference into account in accordance with Section 704(c) of the Code and the Treasury Regulations issued thereunder.

(d) *Adjustment to Capital Accounts for Distributions of Property.* If property distributed in kind is reflected in the Capital Accounts of the Members at a book value (i.e., the property's basis for purposes of determining Profit and Loss with respect thereto as determined in accordance with the principles set forth in the definition of Profits and Losses in Section 1) that differs from the fair market value of the property at the time of distribution, the difference shall be treated as Profit or Loss on the sale of the property and shall be allocated among the Members in accordance with the provisions of this Section 4.1.

(e) *Allocations in Event of Transfer.* If an interest in the Company is Transferred in accordance with this Agreement, allocations of Profits and Losses as between the transferor and transferee shall be made pursuant to any method chosen by the Managing Member that is permitted under Section 706 of the Act.

(f) *Tax Allocations.* Taking into account the requirements of Section 4.1(c), items of Company income, gain, loss, deduction or credit recognized for Federal income tax purposes shall be allocated among the Members for Federal income tax purposes in a manner that is consistent with the requirements of the Code and the Treasury Regulations.

(g) *Reallocation of Certain Losses.* To the extent that: (i) Losses which otherwise would have been allocated to a Member under this Section 4.1 were allocated to one or more other Members under Section 4.1(b); (ii) such allocation has not been reversed pursuant to the subsequent operation of Section 4.1(b) or this Section 4.1(g); and (iii) the Member thereafter returns a distributed amount as required under Section 3.5 or otherwise makes a contribution to the capital of the Company, the Capital Accounts of the Members shall be adjusted in connection with such return or contribution (to the extent of the value thereof) to effect a reallocation of such Losses to the Member.

(h) *Allocations upon Dissolution of the Fund.* Upon a final determination of the Company's obligation to make a contribution to the Fund in connection with the Fund's dissolution and liquidation (and immediately prior to the determination of the contribution obligations of the Members under Section 3.5), the current fiscal period of the Company shall be deemed to close and all items of Company Profit and Loss (including, without limitation, items allocated to the Company in connection with the Fund's dissolution and liquidation) shall be allocated among the Members in accordance with this Section 4.1.

4.2 *Modifications to Preserve Underlying Economic Objectives.*

(a) *Change in Law.* If, in the opinion of counsel to the Company, there is a change in the Federal income tax law (including the Code as well as the Treasury Regulations, rulings, and administrative practices thereunder) which makes it necessary or prudent to modify the allocation provisions of this Section 4 in order to preserve the underlying economic objectives of the Members as reflected in this Agreement, the Managing Member shall make the minimum modification necessary to achieve such purpose.

(b) *Borrowing.* In the event the Company borrows money or property, the Managing Member shall modify the allocation provisions of this Section 4 to the minimum extent necessary to ensure that allocations relating to such borrowing are respected for Federal income tax purposes while, to the maximum extent possible, preserving the underlying economic objectives of the Members as reflected in this Agreement.

(c) *Section 754 Election.* In the event the Company makes an election to adjust the basis of the Company's assets under Section 754 of the Code, the Managing Member shall modify the allocation provisions of this Section 4 to the minimum extent necessary to ensure that subsequent allocations relating to such adjusted basis are respected for Federal income tax purposes while, to the maximum extent possible, preserving the underlying economic objectives of the Members as reflected in this Agreement.

4.3 *Withholding Taxes.*

(a) The Company shall withhold taxes from distributions to, and allocations among, the Members to the extent required by law (as determined by the Managing Member in its reasonable discretion). Except as otherwise provided in this Section 4.3, any amount so withheld by the Company with regard to a Member shall be treated for purposes of this Agreement as an amount actually distributed to such Member pursuant to Section 5.1. An amount shall be considered withheld by the Company if, and at the time, remitted to a governmental agency without regard to whether such remittance occurs at the same time as the distribution or allocation to which it relates; provided, however, that an amount actually withheld from a specific distribution or designated by the Managing Member as withheld from a specific allocation shall be treated as if distributed at the time such distribution or allocation occurs.

(b) To the extent that operation of Section 4.3(a) would create a negative balance in a Member's Capital Account or increase the amount by which such Capital Account balance is negative (in each case determined as if, immediately prior to the deemed distribution of the withheld amount, all of the Company's assets had been valued pursuant to Section 6.10 and any previously unallocated Profits or Losses allocated pursuant to this Section 4), the amount of the deemed distribution shall instead be treated as a loan by the Company to such Member, which loan shall be payable upon demand by the Managing Member and shall bear interest at a floating rate equal to the prime rate as announced from time to time by the Bank, compounded daily.

(c) Each Member hereby agrees to indemnify the Company and the other Members for any liability they may incur for failure to properly withhold taxes in respect of such Member; moreover, each Member hereby agrees that neither the Company nor any other Member shall be liable for any excess taxes withheld in respect of such

Member's interest in the Company and that, in the event of overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate governmental authority.

(d) Taxes withheld by third parties from payments to the Company shall be treated as if withheld by the Company for purposes of this Section 4.3. Such withholding shall be deemed to have been made in respect of all the Members in proportion to their respective allocative shares under Section 4.1 of the underlying items of Profit to which such third party payments are attributable unless, and to the extent that, the Managing Member selects a different apportionment method in respect of a specific withholding tax following a determination by the Managing Member in his reasonable discretion that such method is necessary, in light of the nature of such tax, to achieve a fair and equitable apportionment among the Members. In the event that the Company receives a refund of taxes previously withheld by a third party from one or more payments to the Company, the economic benefit of such refund shall be apportioned among the Members in a manner reasonably determined by the Managing Member to offset the prior operation of this Section 4.3(d) in respect of such withheld taxes.

---

## SECTION 5

## DISTRIBUTIONS

---

5.1 *Discretionary Distributions.* The Managing Member in his sole discretion shall determine the amount and timing of all distributions by the Company and whether such distributions will be in cash or in kind or partly in cash and partly in kind. Except as otherwise provided herein, all distributions shall be made in proportion to the Members' closing Capital Account balances determined as of the close of the allocation period for which such distribution occurs. Distributions in kind shall be made at valuations determined as provided in Section 6.10.

5.2 *Liquidating Distributions.* Notwithstanding the provisions of Section 5.1, cash and property of the Fund available for distribution upon the dissolution of the Company shall be distributed in accordance with the provisions of Section 8.3.

5.3 *Limitation on Distributions.* No distribution shall be made to a Member to the extent that such distribution would (i) create a negative balance in such Member's Capital Account or increase the amount by which such Capital Account is negative (in each case determined as if, immediately prior to such distribution, all of the Company's assets had been valued pursuant to Section 6.10 and any previously unallocated Profits or Losses had been allocated pursuant to Section 4), (ii) cause the Company to be insolvent, or (iii) render the Member liable for a return of such distribution under the Act.

## SECTION 6

## ADMINISTRATIVE PROVISIONS

6.1 *Management Rights of the Non-Managing Members.* Except as specifically set forth in this Agreement, the Non-Managing Members shall take no part in the management or control of the Company or its business and shall have no power or authority to act for the Company, bind the Company under agreements or arrangements with third parties, or vote on Company matters.

6.2 *Management Rights of the Managing Member.*

(a) The Managing Member shall be the sole "manager" of the Company within the meaning of the Act. Subject to the provisions of this Agreement (including, without limitation, Sections 2.3 and 6.4), the Managing Member shall have the exclusive power and authority to perform acts associated with the management and control of the Company and its business and, in furtherance thereof, shall have all of the power and authority available to a "manager" under the Act.

(b) Without limiting in any way the restrictions and limitations on the authority of the Managing Member set forth in this Agreement, any contract, agreement, deed, lease, note or other document or instrument executed on behalf of the Company by the Managing Member shall be deemed to have been duly executed. No other Member's signature shall be required in connection with the foregoing and third parties shall be entitled to rely upon the Managing Member's authority under the provisions of this Section 6.2(b) without otherwise ascertaining that the requirements of this Agreement have been satisfied.

6.3 *The Managing Member.* The Managing Member initially shall be Peter Thiel. The Managing Member shall remain and continue as Managing Member until he becomes a Withdrawn Member.

6.4 *Other Ventures.*

(a) Subject to the provisions of Section 6.5, the Members: (i) acknowledge that the Members and their respective Affiliates, equity holders, and other related Persons, and their respective clients are or may be involved in other financial, investment and professional activities, including, but not limited to, management of other investment funds, venture capital, private equity and real estate investing, purchases and sales of Securities, investment and management counseling, providing mergers and acquisitions, restructuring and other financial advisory services and serving as officers, directors, advisors and agents of other companies and (ii) agree that, except as otherwise specifically set forth in Section 6.5, each Member and its Affiliates, equity holders, and other related Persons, and their respective clients may engage for their own accounts and for the accounts of others in any such ventures and activities (without regard to whether the interests of such ventures and activities conflict with those of the Company). Except as specifically set forth in Sections 4.2 and 6.5: (i) neither the Company nor any Member shall have any right by virtue of this Agreement in and to such ventures or activities or to the income or profits derived therefrom; and (ii) the Members, their Affiliates, equity holders, and other related Persons, and their respective clients shall have no duty or obligation to make any reports to the Members or the Company with respect to any such ventures or activities.

(b) The Non-Managing Members hereby acknowledge that the Managing Member may be prohibited from taking action for the benefit of the Company: (i) due to confidential information acquired or obligations

incurred in connection with an outside activity permitted to the Managing Member, its Affiliates, or other related Persons under this Section 6.4; or (ii) in connection with activities undertaken by an Affiliate or other related Person of the Managing Member prior to the date first above written. No Person shall be liable to the Company or any Member for any failure to act for the benefit of the Company in consequence of a prohibition described in the preceding sentence.

6.5 *Duties to the Company and the Fund.*

(a) A Member shall not take or permit any action that would cause the Company to be in breach of its duties and obligations arising under the Fund Agreement.

(b) Without limiting the general applicability of Section 6.5(a), neither any Member nor the Company shall accept for its own benefit transaction fees (*i.e.*, fees of the same nature as those typically received by investment bankers for facilitating investment transactions) in connection with investments made by the Fund unless such fees are thereafter promptly remitted to the Fund.

6.6 *Reimbursement of Member Expenses.*

(a) The Managing Member shall be reimbursed by the Company for out-of-pocket expenses incurred on behalf of the Company or the Fund.

(b) Except as otherwise approved by the Managing Member, a Non-Managing Member shall not be reimbursed by the Company for expenses incurred on behalf of the Company or the Fund.

6.7 *Member Compensation.* No Member shall be entitled to receive a salary or other compensation for services performed in its capacity as a Member. Subject to the prior approval of the Managing Member, a Member shall be entitled to receive reasonable compensation for services performed for the Company as an employee or independent contractor.

6.8 *Tax Matters Partner.* The Managing Member is hereby designated the "tax matters partner" of the Company within the meaning of Section 6231(a)(7) of the Code. Except to the extent specifically provided in the Code or the Treasury Regulations (or the laws of other relevant taxing jurisdictions), the Managing Member in its sole and absolute discretion shall have exclusive authority to act for or on behalf of the Company with regard to tax matters, including, without limitation, the authority to make (or decline to make) any available tax elections.

6.9 *Records and Financial Statements.*

(a) The Company shall maintain true and proper books, records, reports, and accounts in which shall be entered all transactions of the Company. Such books, records, reports and accounts shall be located at the Principal Office and shall be available to any Member for inspection and copying during reasonable business hours.

(b) The Company shall maintain all Schedules to this Agreement and shall update such Schedules promptly upon receipt of new information relating thereto. Schedules to this Agreement shall be treated as records of the Company for purposes of Section 6.9(a).

(c) Within 90 days after the end of each Fiscal Year, the Company shall furnish to each Member a statement of (i) the assets and liabilities of the Company, (ii) the net Profit or Loss of the Company, and (iii) the Capital Account balance of such Member. In addition, within 90 days after the end of each Fiscal Year, the Company

shall supply all information reasonably necessary to enable the Members to prepare their Federal income tax returns and (upon request therefor) to comply with other reporting requirements imposed by law.

(d) Within 30 days after the value of any asset is determined pursuant to Section 6.10, the Company shall furnish to each Member a statement identifying the asset valued and the value determined therefor.

(e) The Company shall promptly deliver to the Members copies of all financial reports delivered by the Fund to its constituent members.

6.10 *Valuation of Company Assets.*

(a) The Managing Member (or the Liquidating Member, if appropriate, either being the "Valuation Member"), shall value the Company's assets each time items of Profit or Loss are allocated pursuant to Section 4.1, upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by such Member in its sole and absolute discretion. The Valuation Member shall also value distributed assets in accordance with the provisions of Section 4.1(d). In valuing the assets of the Company, the Valuation Member shall not be required to disclose to the Company or any Member information that the Valuation Member is prohibited from disclosing in consequence of any legal, contractual, or similar obligation and the Valuation Member shall not be deemed to have breached any obligation to the Company or the other Members as a consequence of acquiring, holding, or declining to disclose any such information.

(b) Except as otherwise provided in this Agreement, in determining the value of Company property or a Member's interest in the Company, or in any accounting among any or all of the Members, no value shall be placed on the goodwill, going concern value, name, records, files, statistical data or similar assets of the Company not normally reflected in the Company's accounting records, but there shall be taken into consideration any items of income earned but not yet received, expenses incurred but not yet paid, liabilities fixed or contingent, and prepaid expenses to the extent not otherwise reflected in the books of account as well as the fair market value of options or commitments to purchase or sell Securities pursuant to agreements entered into on or prior to the valuation date.

6.11 *Confidentiality.* The Members acknowledge and agree that all information provided to them by or on behalf of the Company or any Member concerning the business of the Company or any Member shall be deemed strictly confidential and shall not, except as required by law, be disclosed to any Person (other than a Member) without the prior consent of the Managing Member and any other Member whose confidential information is proposed to be disclosed. The Members hereby consent to the disclosure by each Member of such information to such Member's accountants, attorneys and similar advisors bound by a duty of confidentiality; moreover, the foregoing requirements of this Section 6.11 shall not apply to a Member with regard to any information that is currently or becomes (i) publicly known or available in the absence of any improper or unlawful action on the part of such Member (including, without limitation, any action in violation of this Section 6.11), or (ii) known or available to such Member other than through or on behalf of the Company or any Member (acting in its capacity as such). Provided that the Company and the Managing Member may disclose any information to the extent necessary or convenient for the formation, operation, dissolution, or liquidation of the Company or the Fund (as determined by the Managing Member in its reasonable discretion), the Company and the Managing Member shall similarly refrain from disclosing any confidential information furnished by a Member pursuant to Section 6.12.

6.12 *Disclosures.* Each Member shall furnish to the Company upon request any information with respect to such Member reasonably determined by the Managing Member to be necessary or convenient for the formation, operation, dissolution, or liquidation of the Company or the Fund.

6.13 *Related Party Transactions.* The Company may enter into contracts or other arrangements with any Member or Affiliate of a Member; provided, however, that the terms of any such contract or arrangement shall be no less advantageous, taking account of all relevant facts and circumstances, to the Company than would be available from an unrelated third party.

---

## SECTION 7

## TRANSFERS OF COMPANY INTERESTS; WITHDRAWALS AND REMOVALS; VESTING OF MEMBERSHIP INTERESTS

---

7.1 *Transfers of Company Interests.*

(a) Except as otherwise provided in this Section 7.1, a Member shall not Transfer all or any portion of its interest in the Company without the prior consent of the Managing Member.

(b) There shall be no Transfer of an interest in the Company unless, in the opinion of counsel for the Company, such Transfer will not:

(i) Give rise to a requirement that the Company effect a registration pursuant to Section 5 of the Securities Act of 1933, as amended;

(ii) Give rise to a requirement that the Company or the Fund register as an investment company or elect to be a "business development company" under the Investment Company Act of 1940, as amended;

(iii) Otherwise subject the Company, the Fund or any Member, officer, or employee of the Company to additional regulatory requirements under Federal, state, local or foreign law, compliance with which would subject the Company or such other Person to material expense or burden;

(iv) Cause the Company to be classified as an association taxable as a corporation for Federal income tax purposes;

(v) Cause the Company to be a "publicly traded partnership" within the meaning of Section 7704 of the Code;

(vi) Violate any law, regulation or other governmental rule applicable to such Transfer;

(vii) Violate the terms of this Agreement or the Fund Agreement; or

(viii) Effect a termination of the Company under Section 708 of the Code.

(c) In the case of a voluntary Transfer, the transferring Member shall provide to the Managing Member notice that it wishes to make a Transfer and either (i) an opinion of counsel to such transferring Member satisfactory in form and substance to counsel for the Company with respect to the matters referred to in Section 7.1(b) or (ii) sufficient information to allow counsel to the Company to make a determination that the proposed Transfer will

not result in any of the consequences referred to in Section 7.1(b). Once all other conditions to the Transfer of a Member's interest have been satisfied, such Transfer shall be effective as of the Close of Business on the last day of the next ending fiscal quarter of the Company.

(d) Any act in violation of this Section 7.1: (i) shall be null and void as against the Company and the other Members; and (ii) shall not be recognized or permitted by, or duly reflected in the official books and records of, the Company. In the event of any Transfer or attempted Transfer of a Company interest in violation of this Section 7.1, without limiting any other rights of the Company, the Managing Member shall have the right, in its sole and absolute discretion, to require the withdrawal of the transferring Member (or its successor(s) in interest) from the Company.

(e) In the event of any Transfer which results in multiple ownership of a Member's interest in the Company, the Managing Member may require that one or more trustees or nominees be designated to represent all or a portion of the interest transferred for the purpose of receiving all notices which may be given and all payments which may be made under this Agreement and for the purpose of exercising all rights of the transferees under the provisions of this Agreement.

(f) In connection with each Transfer pursuant to this Section 7.1: (i) the transferor and transferee shall execute and acknowledge an instrument of transfer in form and substance reasonably satisfactory to the Company and (ii) the transferee shall assume in writing all obligations of the transferor associated with the transferred interest.

(g) In the event a Member Transfers (or proposes to Transfer) all or any portion of its interest in the Company, all reasonable legal and other out-of-pocket expenses incurred by the Company on account of the Transfer (or proposed Transfer) shall be paid by such Member. Following the effective date of any Transfer, the transferor and transferee shall be jointly and severally liable for all such expenses.

(h) Except as otherwise specifically provided in this Agreement or with the consent of the Managing Member, all economic attributes of a transferor Member's interest in the Company (such as the Member's Membership Interest, Capital Contribution, and Capital Account balance) shall carry over to a transferee in proportion to the percentage of the interest so transferred.

7.2 *Withdrawal.*

(a) Except as provided in this Section 7.2, a Member shall not be required to withdraw without its consent.

(b) A Member may be required to withdraw from the Company as provided in Section 7.1(d).

(c) If a Member effects a withdrawal from the Fund which reduces such Member's capital account in the Fund to a level which does not exceed such Member's initial capital contribution to the Fund (such shortfall shall be defined as the "Capital Reduction"), then such Member's unvested interest in the Company shall be reduced by a share equal to the product of the unvested interest and a fraction, the numerator of which is the Capital Reduction and the denominator of which is such Member's initial capital contribution to the Fund.

(d) A Member shall be deemed to have withdrawn upon such Member's death, Bankruptcy, Dissolution, termination or permanent incapacity, or upon the occurrence of any other event that mandates termination of such Member's status as a Member under the Act.

(e) A Member shall not be liable to the Company or the other Members in consequence of a deemed withdrawal resulting from such Member's death or permanent incapacity. Except as provided in the preceding sentence, if all or any portion of a Member's interest in the Company is or has been subject to vesting pursuant to Section 7.5, the operation of Section 7.5 shall provide the sole and exclusive remedy of the Company and the other Members in the event of such Member's withdrawal.

7.3 *Removal.* A Member may not be removed as a Member without its consent.

7.4 *Procedures Following Withdrawal or Removal.* A Member that withdraws from the Company in accordance with the provisions of Section 7.2 or is removed as a Member within the meaning of Section 7.3 (a "Withdrawn Member") shall be treated as an Assignee and, accordingly, shall have the rights and obligations of an Assignee as described in Section 7.6. A Withdrawn Member shall not be entitled to any distribution or other payment in connection with its withdrawal or removal.

7.5 *Vesting of Members' Interests.*

(a) Except as otherwise provided in this Section 7.5, if a Member becomes a Withdrawn Member, then its share of the Profits and Losses allocable under Section 4.1(a)(i) (the "Vesting Interest"), shall cease vesting as of the date of such event and shall be reduced to the product of the Member's Vesting Interest and its Vested Percentage as of such date. The unvested portion of such Member's Vesting Interest shall be apportioned among the other Members in proportion to their respective Membership Interests or, at the option of the Managing Member, apportioned to one or more other Members (whether existing or newly admitted) that have agreed to assume the responsibilities to the Company of the Withdrawn Member.

(b) Each Member's Vesting Interest shall vest as follows:

(i) In the case of a Member admitted to the Company on or before the date of the Fund's initial closing, the following vesting schedule shall apply (with all dates determined in respect of the Fund's initial closing date).

| Vesting Reference Date | Vested Percentage |
|---|---|
| Prior to first anniversary | 10 percent |
| First anniversary | 30 percent |
| Second anniversary | 50 percent |
| Third anniversary | 70 percent |
| Fourth anniversary | 100 percent |

(ii) In the case of a Member admitted to the Company after the Fund's initial closing date, the vesting schedule set forth in Section 7.5(b)(i) shall apply; provided, however, that the vesting reference date for such Member shall be determined with respect to the date of such Member's admission to the Company rather than the initial closing date of the Fund.

(c) Any portion of a Member's Vesting Interest that has not fully vested by the time of the Company's dissolution and liquidation shall vest at such time.

7.6 ***Status of Assignees.***

(a) Notwithstanding any provision of this Agreement to the contrary, an Assignee shall not be admitted to the Company as a Substitute Member without the consent of the Majority-in-Interest of the Members, which consent may be withheld in such Members' sole and absolute discretion.

(b) Notwithstanding any provision of this Agreement to the contrary: (i) all rights and privileges associated with an Assignee interest in the Company shall be derived solely from the interest of which such rights and privileges were previously a component part; and (ii) no Assignee shall hold, by virtue of such Assignee's interest in the Company, any rights and privileges that were not specifically transferred to such Assignee by the prior holder of such interest.

(c) Subject to Sections 4.1(e) and 7.5, an Assignee that holds an interest in the Company shall be entitled to receive the allocations attributable to such interest pursuant to Section 4, to receive the distributions attributable to such interest pursuant to Sections 5 and 8, and to Transfer such interest in accordance with the terms of this Section 7. Notwithstanding the foregoing, the Company and the Members shall incur no liability for allocations and distributions made in good faith to a transferor until a valid written instrument of assignment has been received by the Company and recorded on its books and the effective date of the assignment has passed.

(d) An Assignee that holds an interest in the Company shall be responsible for any obligation to return distributions or make other payments to the Company associated with such interest; provided, however, that the transferor of such interest, if a Member, also shall continue to be responsible for the satisfaction of such other obligations until such time as a Substitute Member is admitted in respect of such interest. To the extent otherwise applicable to the interest in the Company that has been transferred to an Assignee, the Assignee shall be subject to, and bound by, all of the terms and provisions of this Agreement that inure to the benefit of the Company and/or other Members (including, without limitation, the provisions of this Agreement concerning penalties for breach of this Agreement, confidentiality of Company information, Transfers of Company interests, and resolution of disputes). The foregoing provisions of this Section 7.6(d) shall apply to any Assignee that becomes bound by this Agreement pursuant to Section 10.7 without regard to whether such Assignee has executed a written instrument of assignment as described in Section 7.6(c) or an assumption of obligations as described in Section 7.1(f).

(e) Solely to the extent necessary to give effect to the Assignee rights and obligations set forth in Section 7.6(c) and (d), an Assignee shall be treated as a Member for purposes of this Agreement.

(f) An Assignee shall not, solely by virtue of its status as such, hold any non-economic rights in respect of the Company. Without limiting the preceding sentence, an Assignee's interest in the Company shall not entitle such Assignee to participate in the management of the Company, vote on any Company matters or bind the Company under agreements with third parties. An Assignee shall not hold itself out as a Member in any forum or for any purpose; provided, however, that, to the extent necessary to maintain consistency with the Company's income tax returns, reports and other filings, an Assignee shall take the position that it is a Member solely for income tax purposes. Notwithstanding the foregoing provisions of this Section 7.6(f), an Assignee shall have the amendment consent rights specified in Section 10.4(e).

(g) Except as otherwise specifically provided in this Agreement, an Assignee's interest in the Company shall not be redeemed or Transferred without such Assignee's consent.

## SECTION 8

## DISSOLUTION AND LIQUIDATION

8.1 *Dissolving Events.* The Company shall be dissolved upon the occurrence of any of the following events:

(a) Expiration of the Company Term;

(b) Issuance of an order by a court of competent jurisdiction requiring the dissolution of the Company;

(c) Permanent cessation of the Company's business;

(d) The Bankruptcy of the Managing Member;

(e) Failure of the Company to have at least two Members; or

(f) Any other event which results in a mandatory dissolution of the Company under the Act.

8.2 *Election to Continue the Company Following Certain Dissolution Events.* Upon the occurrence of a dissolution event described in Section 8.1(d) or (e), the remaining Member having the largest Capital Account balance shall promptly notify the other Members, if any, of a special meeting of the Members to be held not less than 20 nor more than 60 days after the date of such event. At that meeting, the Members may by unanimous vote (in person or by proxy) elect to continue the Company in accordance with the terms of this Agreement. In the case of a dissolution event described in Section 8.1(e), continuation of the Company shall require the admission of a second Member at or prior to the time of the election to continue. If the Members do not elect to continue the Company and there is no Managing Member or the Managing Member is unavailable to serve as the Liquidating Member, a Liquidating Member shall be elected by a Majority-in-Interest of the Members present (in person or by proxy) at the special meeting.

8.3 *Winding Up of the Company.*

(a) Upon dissolution of the Company, the Liquidating Member shall promptly wind up the affairs of the Company in accordance with the provisions of this Section 8.3. In furtherance thereof, the Liquidating Member shall: (i) have all of the administrative and management rights and powers of the Managing Member; (ii) have the power to bind the Company under Section 6.2(b) in the same manner as the Managing Member; and (iii) be reimbursed for its reasonable out-of-pocket expenses on behalf of the Company. Following dissolution, the Company shall sell or otherwise dispose of assets determined by the Liquidating Member to be unsuitable for distribution to the Members, but shall engage in no other business activities except as may be necessary, in the reasonable discretion of the Liquidating Member, to preserve the value of the Company's assets during the period of dissolution and liquidation. In any event, the Liquidating Member shall use its reasonable efforts to prevent the period of dissolution and liquidation of the Company from extending beyond the date which is two years from the Company's date of dissolution.

(b) Distributions to the Members in liquidation may be made in cash or in kind, or partly in cash and partly in kind, as determined by the Liquidating Member. Distributions in kind shall be valued at fair market value as determined by the Liquidating Member in accordance with the provisions of Section 6.10 and shall be subject to such conditions and restrictions as may be necessary or advisable in the reasonable discretion of the Liquidating Member to preserve the value of the property so distributed or to comply with applicable law.

(c) The Profits and Losses of the Company during the period of dissolution and liquidation shall be allocated among the Members in accordance with the provisions of Section 4.1. If any property is to be distributed in kind, the Capital Accounts of the Members shall be adjusted with regard to such property in accordance with the provisions of Section 4.1(d).

(d) The assets of the Company (including without limitation proceeds from the sale or other disposition of any assets during the period of dissolution and liquidation) shall be applied as follows:

(i) First, to repay any indebtedness of the Company, whether to third parties or to the Members, in the order of priority required by law;

(ii) Next, to any reserves which the Liquidating Member reasonably deems necessary for contingent or unforeseen liabilities or obligations of the Company (which reserves when they become unnecessary shall be distributed in accordance with the provisions of clause (iii), below); and

(iii) Next, to the Members in proportion to their respective positive Capital Account balances (after taking into account all adjustments to the Members' Capital Accounts required under Section 8.3(c)).

---

## SECTION 9

## LIABILITY PROVISIONS

---

9.1 ***Liability.*** Except as otherwise specifically provided in this Agreement, no Indemnified Person shall be personally liable for the return of any contributions made to the capital of the Company by the Members. In the absence of Material Misconduct (which misconduct shall have given rise to the matter at issue) on the part of an Indemnified Person, such Indemnified Person shall not be liable to the Company or the Members for any act or omission concerning the Company. An Indemnified Person shall not be liable to the Company or the Members for losses due to the fraud, bad faith, willful misconduct or negligence, whether of omission or commission, of any independent contractor, employee or other agent of the Company unless such Indemnified Person was or should have been directly involved with the selection, engagement or supervision of such Person and the action or omission of such Indemnified Person in connection therewith constituted Material Misconduct.

9.2 ***Indemnification.***

(a) In the absence of Material Misconduct (which misconduct shall have given rise to the matter at issue) on the part of an Indemnified Person, the Company shall indemnify and hold such Indemnified Person harmless from and against any loss, expense, damage or injury suffered or sustained by such Indemnified Person by reason of any actual or threatened claim, demand, action, suit or proceeding (civil, criminal, administrative or investigative) in which

such Indemnified Person may be involved, as a party or otherwise, by reason of its actual or alleged management of, or involvement in, the affairs of the Company. This indemnification shall include, but not be limited to: (i) payment as incurred of reasonable attorneys fees and other expenses incurred in investigating or settling any claim or threatened action (where, in the case of a settlement, such settlement is determined to be reasonable by the Managing Member), or incurred in preparing for, or conducting a defense pursuant to, any proceeding up to and including a final non-appealable adjudication; and (ii) the removal of any liens affecting the property of an Indemnified Person.

(b) Indemnification payments shall be made pursuant to this Section 9.2 only to the extent that the Indemnified Person is not entitled to receive (or will not in any event receive) from the Fund or other third party equal or greater indemnification payments in respect of the same loss, expense, damage or injury.

(c) If a Person receives an indemnification payment pursuant to this Section 9.2 and it is determined that such Person was not entitled to receive such payment (whether by virtue of such Person's Material Misconduct or otherwise), such Person shall return such payment to the Company promptly upon demand therefor by any Member.

(d) Notwithstanding the foregoing provisions of this Section 9.2, the Company shall be under no obligation to indemnify an Indemnified Person from and against any reduction in the value of such Person's interest in the Company that is attributable to losses, expenses, damages or injuries suffered by the Company or to any other decline in the value of the Company's assets.

9.3 *Contribution.* In the event that, notwithstanding the provisions of Sections 3.5 and 9.1, two or more Members share joint and several personal liability:

(a) In connection with any action, omission or situation that would entitle such Members to indemnification pursuant to the provisions of Section 9.2 but for the fact that such action, omission or situation included or constituted Material Misconduct on the part of such Members; or

(b) In connection with any action, omission or situation that entitles such Members to indemnification pursuant to the provisions of Section 9.2, but the assets of the Company are insufficient to provide for the full amount of indemnification to which such Members are entitled or their entitlement to indemnification is otherwise unenforceable; then

(c) Such Members shall share the burden of the liability in a manner that is fair and reasonable as determined by such Members or, if they are unable to agree within a reasonable period of time, by an arbitrator selected and acting in accordance with the provisions of Section 10.17.

---

## SECTION 10

## GENERAL PROVISIONS

---

10.1 *Special Meetings.* A Majority-in-Interest of the Non-Managing Members or the Managing Member may call a special meeting of all Members, to be held at any reasonable time and place within the same county as the Principal Office, on not less than 10 nor more than 60 days notice. Reasonable accommodation shall be made for any Member that elects to attend a special meeting via telephonic or similar means.

10.2 *Status Under the Act.* This Agreement is the "limited liability company agreement" of the Company within the meaning of Section 18-101(7) of the Act.

10.3 *Entire Agreement.* This Agreement contains the entire understanding among the Members and supersedes any prior written or oral agreement between them respecting the Company. There are no representations, agreements, arrangements, or understandings, oral or written, among the Members relating to the Company which are not fully expressed in this Agreement.

10.4 *Amendments.*

(a) Except as otherwise provided in this Section 10.4, this Agreement may be amended, in whole or in part, only through a written amendment executed by a Two-Thirds-Interest of the Members.

(b) An amendment to any provision of this Agreement that calls for a higher level of approval of the Members or the approval of certain specified Members shall, in addition to the execution percentage set forth in Section 10.4(a), require the same form of approval as is set forth in such provision.

(c) Except with regard to amendments otherwise specifically required under this Agreement, there shall be no amendment to this Agreement which would have a material adverse effect upon a Member unless the amendment: (i) is consented to by such Member or (ii) by its terms applies to all Members and could have a disproportionately adverse effect upon such Member only due to some attribute of the Member itself (other than the Member's status as such). Except with regard to an amendment that mandates the return of previously distributed amounts, there shall be no amendment that increases a Member's obligation to make capital contributions to the Company unless the amendment is consented to by such Member.

(d) Notwithstanding the foregoing provisions of this Section 10.4, the Managing Member may, without the consent of the other Members, amend this Agreement in any manner determined by the Managing Member to be necessary or desirable to comply with applicable law or to resolve an ambiguity in the terms and provisions of this Agreement. The Managing Member shall not have the authority under this Section 10.4(d) to amend this Agreement in a manner that is materially adverse to any other Member; provided, however, that a Member's right to object to an amendment pursuant to this Section 10.4(d) on the grounds that such amendment is materially adverse to such Member shall expire at the Close of Business on the 30th day following notice to such Member of such amendment unless such Member has provided written notice of such objection prior to such date.

(e) If an Assignee holds an economic interest in the Company in respect of which there are (but for the operation of this Section 10.4(e)) no corresponding amendment consent rights held by any Member (*e.g.*, in the case of an economic interest acquired by the Assignee pursuant to a transaction or event in which amendment consent rights are extinguished, such as upon the death or Dissolution of a Member), then, solely with regard to an amendment to this Agreement that would materially reduce or diminish such economic interest, the Assignee shall have the same consent rights in respect of such amendment as would have been held by the assignor Member of such economic interest if the assignor Member had continued as a Member and continued to hold such economic interest (but no other economic interest in the Company). Except as set forth in this Section 10.4(e), an Assignee shall not, solely by virtue of its status as such, have any right to consent or withhold consent in respect of an amendment to this Agreement.

(f) Any amendment to this Section 10.4 shall require the unanimous consent of the Members.

10.5 *Governing Law.* All questions with respect to the interpretation of this Agreement and the rights and liabilities of the Members shall be governed by the laws of the State of Delaware as they are applied to contracts entered

into and to be wholly performed in Delaware by residents of Delaware. To the extent permitted by the Act and other applicable law, the provisions of this Agreement governing the rights and obligations of the Members shall supersede any contrary provisions of the Act or other applicable law.

10.6 *Severability.* In the event any provision of this Agreement is determined to be invalid or unenforceable, such provision shall be deemed severed from the remainder of this Agreement and replaced with a valid and enforceable provision as similar in intent as reasonably possible to the provision so severed, and shall not cause the invalidity or unenforceability of the remainder of this Agreement.

10.7 *Counterparts; Binding upon Member and Assignees.* This Agreement may be executed in any number of counterparts and when so executed, all of such counterparts shall constitute a single instrument binding upon all parties notwithstanding the fact that all parties are not signatory to the original or to the same counterpart. In addition, to the maximum extent permitted by applicable law, a Person shall become bound in accordance with the terms of this Agreement as an Assignee or Member if such Person (or a representative authorized by such Person orally, in writing or by other action such as payment for an interest in the Company) executes any other writing evidencing the intent of such Person to become a Member or Assignee or if such Person or representative complies with the conditions for becoming a Member or Assignee as set forth in this Agreement or any other writing and requests (orally, in writing or by other action such as payment for an interest in the Company or acceptance of distributions from the Company) that the records of the Company reflect such admission or assignment.

10.8 *Survival of Rights.* Except as otherwise specifically set forth in this Agreement, the provisions of this Agreement shall inure to the benefit of and be binding upon each Member and Assignee and such Member's or Assignee's heirs, devises, legatees, personal representatives, successors, and assigns.

10.9 *Survival of Obligations.* The following obligations of the Members shall survive the dissolution and termination of the Company:

(a) The obligation to return certain distributions as set forth in Section 3.5;

(b) The indemnity for withholding taxes set forth in Section 4.3;

(c) The obligation to maintain the confidentiality of another Member's information pursuant to Section 6.11;

(d) The obligation to return certain indemnification payments as set forth in Section 9.2(c);

(e) The obligation to share the burden of certain liabilities as set forth in Section 9.3;

(f) The obligation to pay certain fees and costs as set forth in Section 10.17(c); and

(g) Any obligation arising from a breach of this Agreement.

10.10 *No Third Party Beneficiaries.* Except as otherwise provided in Section 10.8, the provisions of this Agreement are not intended to be for the benefit of or enforceable by any third party. Without limiting the foregoing, no third party shall have any right to (i) enforce or demand enforcement of a Member's obligation to return distributions, or obligation to make other payments to the Company as set forth in this Agreement or (ii) demand that the Company issue any capital call.

10.11 *Notices.* Any notice required or permitted to be given under this Agreement or applicable law shall be in writing.

(a) *Notice to Members.* Notice to a Member shall be deemed duly given: (i) when personally delivered to such Member; (ii) at the Close of Business on the third day after being deposited in the United States mail, registered, postage prepaid and addressed to the address set forth on Schedule A for such Member, or to any other address of which the Company is notified by such Member in writing; (iii) at the Close of Business on the first day after being deposited in the United States with a nationally recognized overnight delivery service, with delivery charges prepaid and addressed as provided in the preceding clause; or (iv) when actually received by such Member via public or private mail, telecopy, telex or telegram.

(b) *Notice to the Company.* Notice to the Company shall be deemed duly given when duly given to the Managing Member, or when actually received at the Principal Office, in accordance with the same procedures set forth in Section 10.11(a).

10.12 *Consents.* Subject to the provisions of Section 10.7, all consents, agreements, elections and approvals provided for or permitted by this Agreement or applicable law shall be in writing and signed copies thereof shall be retained with the books of the Company.

10.13 *No Partition.* Except as otherwise permitted by this Agreement, no Member shall have the right, and each Member does hereby agree that it shall not seek, to cause a partition of the Company's property whether by court action or otherwise.

10.14 *Representations by Members.*

(a) Each Member hereby represents that, with respect to its interest in the Company: (i) it is acquiring or has acquired such interest for purposes of investment only, for its own account (or a trust account if such Member is a trustee), and not with a view to resell or distribute the same or any part thereof; and (ii) no other Person has any interest in such interest or in the rights of such Member under this Agreement other than a spouse having a community property or similar interest under applicable law. Each Member also represents to the Company and the other Members that it has the business and financial knowledge and experience necessary to acquire an interest in the Company on the terms contemplated herein and that it has the ability to bear the risks of such investment (including the risk of sustaining a complete loss of all its capital contributions) without the need for the investor protections provided by the registration requirements of the Securities Act of 1933, as amended.

(b) Each Member hereby acknowledges that certain provisions of this Agreement (including Sections 6.4 and 9.1) have the effect of limiting the fiduciary duties of the Members to the Company and the other Members under applicable law. Each Member hereby represents that it has carefully considered each such provision and has made an informed decision to consent thereto.

10.15 *No Usury.* Notwithstanding any provision of this Agreement to the contrary, the rate of interest charged by the Company to any Member in connection with an obligation of the Member to the Company shall not exceed the maximum rate permitted by applicable law. To the extent that any interest otherwise paid or payable by a Member to the Company shall have been finally adjudicated to exceed the maximum amount permitted by applicable law, such interest shall be retroactively deemed to have been a required repayment of principal (and any such amount paid in excess of the outstanding principal amount shall be promptly returned to the payor Member).

10.16 *Partnership for Tax Purposes Only.* As set forth in Section 2.1, the Members hereby form the Company as a limited liability company under the Act. The Members expressly do not intend hereby to form a partnership except insofar as the Company may be treated as a partnership solely for tax purposes.

10.17 *Dispute Resolution.*

(a) *Mediation and Arbitration.* Except as otherwise specifically provided in this Agreement, the Members shall make a reasonable attempt to resolve any controversy or claim arising out of or relating to this Agreement through non-binding mediation. Any such controversy or claim not resolved after such reasonable attempt shall be resolved through arbitration conducted in accordance with the rules of the American Arbitration Association, and judgment upon an award arising in connection therewith may be entered in any court of competent jurisdiction.

(b) *Venue.* To the extent permitted by applicable law, any arbitration, mediation, court action, or other adjudicative proceeding arising out of or relating to this Agreement shall be held in San Mateo County, California or, if such proceeding cannot be lawfully held in such location, as near thereto as applicable law permits.

(c) *Fees and Costs.* The prevailing party or parties in any arbitration, mediation, court action, or other adjudicative proceeding arising out of or relating to this Agreement shall be reimbursed by the party or parties who do not prevail for their reasonable attorneys, accountants and experts fees and for the costs of such proceeding. In the event that two or more parties are deemed liable for a specific amount payable or reimbursable under this Section 10.17(c), such parties shall be jointly and severally liable therefor.

10.18 *Legal Counsel.* The Managing Member has engaged Wilson, Sonsini, Goodrich & Rosati, Professional Corporation ("WSGR"), as legal counsel to the Managing Member and the Company. No legal counsel has been engaged by the Company to protect or otherwise represent the interests of the Non-Managing Members. Moreover, WSGR has previously represented and/or concurrently represents the interests of the Managing Member and/or parties related thereto in connection with matters other than the preparation of this Agreement and may represent such Persons in the future. Each Member: (i) approves WSGR's representation of the Managing Member and the Company in the preparation of this Agreement; (ii) acknowledges that no legal counsel has been engaged by the Company to protect or otherwise represent the interests of the Non-Managing Members, that WSGR has not been engaged by any Non-Managing Member to protect or represent the interests of such Non-Managing Member vis-a-vis the Company or the preparation of this Agreement, and that actual or potential conflicts of interest may exist among the Members in connection with the preparation of this Agreement (with the consequence that a Non-Managing Member's interests may not be vigorously represented unless such Non-Managing Member engages its own legal counsel); and (iii) acknowledges further that such Non-Managing Member has been afforded the opportunity to engage and seek the advice of its own legal counsel before entering into this Agreement. In addition, each Member: (i) acknowledges the possibility of a future conflict or dispute among Members or between any Member or Members and the Company; (ii) agrees that WSGR may represent the Company and/or any Member (or any equityholder thereof) in connection with any such conflict or dispute and, to the extent permitted under the California Rules of Professional Conduct and any other applicable rules governing the professional conduct of attorneys (the "Professional Rules"), waives its right to object to such representation (including, without limitation, on the grounds of any actual or potential conflict of interests); and (iii) acknowledges the possibility that, pursuant to operation of the Professional Rules, WSGR may be precluded from representing the Company and/or any Member (or any equityholder thereof) in connection with any such conflict or dispute. Each Non-Managing Member hereby agrees that neither this Agreement nor the transactions contemplated hereby are intended to create a relationship between WSGR and such Non-Managing Member pursuant to which such Non-Managing Member (acting other than in the name of the Company) would have a right to object to WSGR's representation of any Person. Nothing in this Section 10.18 shall preclude the Company from selecting different legal counsel to represent it at any time in the future and, except as provided in the preceding sentence, no Member shall be

deemed by virtue of this Section 10.18 to have waived its right to object to any conflict of interest relating to matters other than this Agreement or the transactions contemplated herein.

10.19 *Miscellaneous.* Except as otherwise set forth in this Agreement, no failure or delay by any party in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof; any actual waiver shall be contained in a writing signed by the party against whom enforcement of such waiver is sought. The section headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. Unless the context clearly requires to the contrary, all references in this Agreement to designated "Sections" are to the designated Sections and other subdivisions of this Agreement. This Agreement shall not be construed for or against any party by reason of the authorship or alleged authorship of any provisions hereof or by reason of the status of the respective parties. Except where the context clearly requires to the contrary: (i) instances of gender or entity-specific usage (e.g., "his" "her" "its" "person" or "individual" ) shall not be interpreted to preclude the application of any provision of this Agreement to any individual or entity; (ii) the word "or" shall not be applied in its exclusive sense; and (iii) "including" shall mean "including, without limitation." References to laws, regulations and other governmental rules shall mean such laws, regulations and rules as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the effective date of this Agreement). References to "$" or "dollars" shall mean the lawful currency of the United States of America. References to "federal" or "Federal" shall be references to laws, agencies or other attributes of the United States of America (and not to any State or locality thereof). The meaning of the terms "domestic" and "foreign" shall be determined by reference to the United States of America. References to "days" shall mean calendar days; references to "business days" shall mean all days other than Saturdays, Sundays and days that are legal holidays in the State of California. All dates and times specified in this Agreement are of the essence and shall be strictly enforced.