Howard S. Caro (SBN 202082)
Cecilia Y. Chan (SBN 240971)
Nathaniel R. Spencer-Mork (SBN 226886)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA  94104-2878
Telephone: +1.415.772.6000
Facsimile: +1.415.772.6268
Howard.Caro@hellerehrman.com
Cecilia.Chan@hellerehrman.com
Nate.SpencerMork@hellerehrman.com

Robert B. Hawk (SBN 118054)
HELLER EHRMAN LLP
275 Middlefield Road
Menlo Park, CA 94025-3506
Phone: +1.650.324.7000
Facsimile: +1.650.324.0638
Robert.Hawk@hellerehrman.com

Attorneys for Defendant
Clarium Capital Management, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMISIL HOLDINGS LTD., a Cyprus Corporation,<br><br>                              Plaintiff,<br><br>      v.<br><br>CLARIUM CAPITAL MANAGEMENT, LLC, et al.,<br><br>                              Defendants. | Case No.: C 06 5255 MJJ<br><br>**NOTICE OF MOTION; DEFENDANT CLARIUM CAPITAL MANAGEMENT, LLC'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR FAILURE TO STATE A CLAIM; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>**F.R.C.P. 12(B)(6)**<br><br>Hearing Date:    November 7, 2006<br>Time:               9:30 a.m.<br>Courtroom:       11<br><br>The Honorable Martin J. Jenkins |

# Table of Contents

Page

I.    INTRODUCTION ........................................................................................... 1

II.   STATEMENT OF FACTS ............................................................................. 3

      A.    The Clarium Companies and Amisil's Investment Therein............................ 3

      B.    Amisil Withdraws Its Interest in the Fund and Forefeits Non-
            Economic Rights in the Manager. ................................................ 3

      C.    Members and Withdrawn Members Have Limited Rights to
            Distributions. ................................................................. 5

      D.    The May 2002 Offer................................................................... 5

      E.    The PayPal Investment. ............................................................. 5

      F.    The 2003 Amendment to the Operating Agreement. ....................... 6

      G.    Clarium's 2006 Offer to Amisil. .............................................. 6

      H.    Amisil's Mandatory Retirement.................................................. 6

III.  ARGUMENT ................................................................................................. 7

      A.    Applicable Legal Standards ....................................................... 7

      B.    The Complaint's Claim for Securities Fraud Under Section
            10(b) Must Be Dismissed for Failure to Plead the Required
            Elements. ......................................................................... 9

            1.    Neither Amisil's 1998 Initial Investment in Clarium, Nor
                  Clarium's 2002 Offer to Buy Out Amisil's Stake
                  Constitute the Purchase or Sale Required as the Basis for
                  a Section 10(b) Claim........................................................ 10

            2.    The Complaint Fails to Allege Any Actionable
                  Misleading Statements or Omissions. ............................... 11

                  a.    Clarium's "statement" that Amisil had only a
                        three-tenths of a percentage membership interest
                        in Clarium was not misleading because it is true ............ 11

                  b.    Clarium was under no duty to grant Amisil
                        access to Clarium's books and records, so Clarium's

i

Heller
Ehrman LLP

alleged failure to provide Amisil with substantiation
for its assessment of its ownership stake was not
an actionable "omission." ………………………………… 12

3.    The Complaint Fails to Meet the PSLRA's Scienter
Pleading Standard................................................................ 13

4.    The Complaint Fails to Plead Reliance with Particularity................. 13

C.    The Complaint Fails to Plead Common Law Fraud Because
Clarium Had No Duty to Disclose the Alleged Omissions And
Because Amisil Could Not Have Relied on the Alleged
Misrepresentation. ...................................................................... 14

1.    Defendants Had No Duty to Provide the Information
Amisil Claims It Was Deprived of................................................... 15

2.    The Complaint Fails to Plead How the 2002 Offer Was
False Or that Amisil Relied on this Offer. ......................................... 16

3.    The Allegation that Clarium Concealed the Distribution
to Mr. Thiel Is Contradicted by the Factual Allegations of
the Complaint. ............................................................................ 16

D.    Amisil Cannot State a Claim for Breach of Contract Because
Clarium Complied with the Operating and Subscription
Agreements...................................................................................... 17

1.    Amisil Has No Right of Access to Books or to Receive
Reports Under the Operating Agreement........................................... 17

2.    The Complaint Fails to Set Forth a Claim for Breach of
Contract Based on the Failure to Pay Discretionary
Distributions. ............................................................................. 18

a.    Section 4.1 does not authorize distributions. …...………… 18

b.    Amisil fails to state a claim for breach of Section 5.1........ 19

c.    Clarium has not breached any obligation to make
a payment for the mandatory retirement...................……… 19

3.    Amisil's Claim that Clarium "Oppressed its Rights" As
A Minority Member Is Contrary to the Facts of this Case
and Fails to Allege a Breach of the Operating Agreement. ............... 20

Heller
Ehrman LLP

ii

E.    Plaintiff's Claim Under the Investment Advisers Act of 1940
      Fails Because There Is No Private Right of Action for Damages
      Under the Act. .............................................................................................. 20

F.    Plaintiff's Conversion Claim Should be Dismissed Because
      Delaware Law Does Not Recognize Conversion for Monetary
      Claims............................................................................................................. 21

G.    Plaintiff Fails to State a Claim for Breach of the Implied
      Covenant of Good Faith and Fair Dealing. ..................................................... 21

H.    Amisil Cannot State a Claim for Unfair Business Practices
      Under Cal. Bus. & Prof. Code § 17200 *et seq.* ............................................. 22

I.    Plaintiff's Accounting and Constructive Trust and Injunction
      Claims Must be Dismissed Because They Are Remedies and
      Not Claims...................................................................................................... 24

IV.   CONCLUSION ........................................................................................................ 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Heller
Ehrman LLP

NOTICE OF MOTION & MOTION TO DISMISS; MEM. OF P&A IN SUPPORT, Case No. C 06-5255 MJJ

# Table of Authorities

Page

## Cases

*Allied Grape Growers v. Bronco Wine Co.*,
 203 Cal. App. 3d 432 (1988)................................................................................. 23

*Bardin v. Daimlerchrysler Corp.*,
 136 Cal. App. 4th 1255 (2006)............................................................................. 23

*Basic, Inc. v. Levinson*,
 485 U.S. 224 (1988) .............................................................................................. 12

*Binder v. Gillespie*,
 184 F.3d 1059 (9th Cir. 1999) .............................................................................. 10

*Blue Chip Stamps v. Manor Drug Stores*,
 421 U.S. 723 (1975) ...................................................................................... 9, 10, 11

*Cel-Tech Commc'n, Inc. v. Los Angeles Cellular Tel. Co.*,
 20 Cal. 4th 163 (1999).......................................................................................... 23

*Crescent/Mach I Partners, L.P. v. Turner*,
 846 A.2d 963 (Del. Ch. 2000) .............................................................................. 24

*Dave Greytak Enterp., Inc. v. Mazda Motors of Am., Inc.*,
 622 A.2d 14  (Del. Ch. 1992) .......................................................................... 21, 22

*DCV Holdings, Inc. v. Conagra, Inc.*,
 889 A.2d 954 (Del. 2005)...................................................................................... 14

*DiLeo v. Ernst & Young*,
 901 F.2d 624 (7th Cir. 1990) .................................................................................. 9

*Dura Pharm., Inc. v. Broudo et al.*,
 544 U.S. 336 (2005) ................................................................................................ 9

*Durning v. First Boston Corp.*,
 815 F.2d 1265 (9th Cir. 1987)................................................................................. 8

*Epstein v. Wash. Energy Co.*,
 83 F.3d 1136 (9th Cir. 1996)................................................................................. 12

*Gen. Signal Corp. v. MCI Telecom. Corp.*,
 66 F.3d 1500 (9th Cir. 1995)................................................................................... 8

Heller Ehrman LLP

iv

*Globespan, Inc. v. O'Neill*,
    151 F. Supp. 2d 1229 (C.D. Cal. 2001).................................................................. 23

*Goodrich v. E.F. Hutton Group, Inc.*,
    542 A.2d 1200 (Del. Ch. 1988).......................................................................... 21

*In re GlenFed, Inc. Sec. Litig.*,
    42 F.3d 1541 (9th Cir. 1994).......................................................................... 9, 11

*In re Silicon Graphics, Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999).......................................................................... 6, 13

*In re Turbodyne Technologies, Inc. Sec. Litig.*,
    2000 WL 33961193 (C.D. Cal. Mar. 15, 2000) ................................................ 13

*In re Van Wagoner Funds, Inc., Sec. Litig.*
    382 F. Supp. 2d 1173 (N.D. Cal. 2004) ............................................................ 13

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002).................................................................. 10, 11, 12

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
    927 F. Supp. 1297 (C.D. Cal. 1996).................................................................. 13

*Medimatch, Inc. v. Lucent Technologies Inc.*,
    120 F. Supp. 2d 842 (N.D. Cal. 2000) .............................................................. 22

*National Rural Telecommunications Co-op. v. DIRECTV, Inc.*,
    319 F. Supp. 2d 1059 (C.D. Cal. 2003)............................................................. 23

*Nedlloyd Lines, B.V. v. Super. Ct.*,
    3 Cal. 4th 459 (1992)..................................................................................... 8, 22

*People ex rel. Lockyer v. Fremont Life Ins. Co.*,
    104 Cal. App. 4th 508 (2002)............................................................................ 22

*Pfizer Inc. v. Super. Ct.*,
    141 Cal. App. 4th 290 (2006)............................................................................ 23

*Rasidescu v. Midland Credit Mgmt., Inc.*,
    435 F. Supp. 2d 1090 (S.D. Cal. 2006) ............................................................. 20

*Robertson v. Dean Witter Reynolds, Inc.*,
    749 F.2d 530 (9th Cir. 1984).............................................................................. 8

*Roth v. Garcia Marquez*,
    942 F.2d 617 (9th Cir. 1991).......................................................................... 3, 8

Heller
Ehrman LLP

v

*Shah v. County of Los Angeles*,
    797 F.2d 743 (9th Cir. 1986) ........................................................................ 8

*Silicon Knights, Inc. v. Crystal Dynamics, Inc.*,
    983 F. Supp. 1303 (N.D. Cal. 1997) ...................................................... 22, 23

*Teachers Retirement Sys. of Louisiana v. Aidinoff*,
    900 A.2d 654 (Del. Ch. 2006) .................................................................... 24

*Thompson v. Illinois Dept. of Prof Reg.*,
    300 F.3d 750 (7th Cir. 2002) .............................................................. 3, 8, 12

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*,
    444 U.S. 11 (1979) ....................................................................................... 20

*Union Fire Ins. Co. of the State of Pennsylvania v. Pan Am. Energy LLC*,
    2003 WL 1432419, No. Civ. A. 19629-NC (Del. Ch. Mar. 19, 2003) ...................... 22

*VLIW Technology, LLC v. Hewlett-Packard Co.*,
    840 A.2d 606 (Del. 2003) ............................................................................ 17

*Weisbuch v. County of Los Angeles*,
    119 F.3d 778 (9th Cir. 1997) ....................................................................... 16

*Yourish v. California Amplifier*,
    191 F.3d 983 (9th Cir. 1999) ......................................................................... 9

**Rules and Statutes**

Cal. Bus. & Prof. Code § 17200 ........................................................................ 22

10 Del. C. § 8106 ................................................................................... 14, 18

Fed. R. Civ. P. 9(b) ................................................................................... 9, 14

15 U.S.C. § 78u-4(b)(2) .................................................................................... 13

15 U.S.C. § 80b-1 *et seq.* ................................................................................ 20

28 U.S.C. § 1658 .............................................................................................. 11

**Other Authorities**

Dan B. Dobbs, *Law of Remedies*, Vol. 1, 223, 587-88 (2d ed. 1993) ................................. 24

Heller
Ehrman LLP

NOTICE OF MOTION & MOTION TO DISMISS; MEM. OF P&A IN SUPPORT, Case No. C 06-5255 MJJ

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:  PLEASE TAKE**

**NOTICE** that on November 7, 2006, at 9:30 a.m., or as soon thereafter as the matter may be heard, in Courtroom 11 of the United States District Court for the Northern District of California, located at 450 Golden Gate Ave., San Francisco, California, Defendant Clarium Capital Management, LLC will, and hereby does, present its Motion to Dismiss Plaintiff's Complaint (the "Motion") pursuant to the Rule 12 of the Federal Rules of Civil Procedure.

This Motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Request for Judicial Notice, all pleadings and papers on file in this action, such matters of which the Court may take judicial notice, and such additional evidence and authority as may be offered at the time of oral argument, if any.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

At issue in this Motion is whether Plaintiff, through contractual misinterpretations and innuendo, can spin a $3,000 investment into millions of dollars in securities litigation windfall.  But as the documents attached to the Complaint make clear, there has been no contractual breach that could give rise to the claims Plaintiff asserts, and certainly no fraud.

In February 1998, defendant Clarium Capital Management LLC f/k/a Thiel Capital Management (the "Manager" or "Clarium") offered plaintiff Amisil Holdings Ltd. ("Amisil") a deal:  invest in the fund managed by Clarium and receive both the opportunity to realize gain on that investment and also to make a small investment in the fund Manager, subject to a four year vesting schedule.  The deal came with a corollary:  if the Fund investment were withdrawn, the investor would both lose the opportunity for further gain in the Fund, and all vesting in the Manager would cease.  That February, Amisil invested $300,000 with Clarium, with one percent of that, or $3000, being allocated to investment in the Manager.  Thirteen months later, Amisil — by its own admission — redeemed its entire investment in the Fund, stopping the clock on the vesting of its "interest" in the Manager. Yet, now Amisil asks that it be granted a fully vested interest in the Manager.

Combined with Amisil's own admissions, the plain language of the contracts between the parties, which are attached to the Complaint, makes clear as a matter of law that Amisil is not entitled to a fully vested interest in Clarium. The contracts also make clear that Amisil is entitled to virtually none of the asserted "rights" on which its Complaint is premised, because Amisil's withdrawal from the Fund eliminated its membership in the Manager as well as most of its non-economic rights in the Manager — an outcome disclosed to Amisil when it made its investments:

*No Right to a Fully Vested Interest.* Because the vesting of Amisil's "interest" in the Manager was conditioned on continued investment in the Fund, Amisil's admission that it withdrew its entire investment in the Fund just one year into a four year vesting schedule is necessarily an admission that Amisil's "interest" in the Manager did not fully vest. Rather than a one percent (1%) ownership stake in the manager, Plaintiff's partially vested stake was, at most, 0.3%.

*No Right to Distributions on Demand.* As the Complaint's exhibits make clear, distributions of the Manager's property occur at a time and in an amount left to the sole discretion of the Managing Member. No investor in the Manager is entitled to regular distributions; and no investor can simply demand distributions from the Manager.

*No Right to Inspection.* Having redeemed its investment in the Fund, Amisil voluntarily relinquished all of its non-economic rights in the Manager — including rights to inspect Clarium's books and records.

*No Right to Remain a Member.* The plain language of the current operating agreement provides that a member may be expelled at any time, for any reason or no reason. Nothing in the parties' agreements obligates the Manager to refrain from retiring a member who has breached its agreements and impugned the Manager and its officers.

Lest these outcomes seem severe, it is essential to realize that they are a product of Amisil's own choosing: Amisil could have maintained its investment in the Fund and retain a panoply of rights; instead, it voluntarily redeemed and lost most of those rights. Amisil represented that it was a highly sophisticated investor at the time it placed money in the

Fund and knew what the consequences of its actions would be.  Amisil prays that the Court, in effect, retroactively confer on Amisil the benefits of Membership in the Manager even though it refused to bear any of the responsibilities or risks.  That, in conjunction with Clarium's offer to redeem Amisil's interest in the Manager for $300,000 — a nearly 10,000% increase on its initial $3,000 investment — defeats each and every claim asserted.

## II.    STATEMENT OF FACTS[1]

### A.    The Clarium Enterprise and Amisil's Investment.

The Clarium Enterprise is a hedge fund comprised of the Manager and the Fund (Thiel Capital International, LLC).  The Manager selects investments for the Fund and provides administrative support; for these services, the Fund pays the Manager a fee.  1996 Operating Agreement § 2.3(a); Compl. ¶¶ 18, 20, 21.  The Manager's Operating Agreement[2] provides the terms and conditions of investment in the Manager; investments in the Fund are governed by a separate agreement not at issue here.  Compl. ¶ 14.

On February 27, 1998, Amisil invested $300,000 with the Fund; of that investment, $297,000 was invested in the Fund and $3,000 in the Manager.  *Id.* ¶ 19; Subscription Agreement § 1.  Amisil alleges that it fully redeemed its interest in the Fund on or about March 31, 1999.  Compl. ¶ 22.  Amisil therefore advances its claims solely on the basis of its purported interest in the Manager.

### B.    Amisil Withdraws Its Interest in the Fund and Forfeits Non-Economic Rights in the Manager.

Amisil alleges that its $3,000 investment in the Manager — the event that underlies the Complaint — entitles it to a 1.0% ownership interest in the Manager.   However, that theoretical 1.0% interest was expressly subject to a four year vesting schedule.  1996

---

[1] This Statement of Facts is taken from the allegations of Plaintiff's Complaint and the documents attached as exhibits thereto.  For purposes of this motion to dismiss only, Clarium accepts these allegations as true — except when they are contradicted by the plain terms of the documents attached as exhibits.  *See Roth v. Garcia Marquez*, 942 F.2d 617, 625 n.1 (9th Cir. 1991); *Thompson v. Illinois Dept. of Prof Reg.*, 300 F.3d 750, 754 (7th Cir. 2002).  Citations to the "1996 Operating Agreement" reference Exhibit B to Plaintiff's Complaint; the "Subscription Agreement" refers to Exhibit C to the Complaint.

[2] The 1996 Operating Agreement was updated in 1998, 2000 and 2003.

Heller
Ehrman LLP

NOTICE OF MOTION & MOTION TO DISMISS; MEM. OF P&A IN SUPPORT, Case No. C 06-5255 MJJ

Operating Agreement §7.5(b)(i). Because the vesting clock was driven by Amisil's investment in the Fund, redemption of that investment stopped the vesting of an interest in the Manager. *Id.* §7.2(c); 7.5(b)(i). Amisil alleges that it fully redeemed its interest in the Fund on or about March 31, 1999. Compl. ¶22. That act stopped the vesting clock at the first anniversary of Amisil's investment in the Fund:

> If a Member effects a withdrawal from the Fund which reduces such Member's capital account in the Fund to a level which does not exceed such Member's initial capital contribution to the fund (such shortfall shall be defined as the "Capital Reduction"), then such Member's *unvested interest in the Company shall be reduced by a share equal to the product of the unvested interest and a fraction, the numerator of which is the Capital Reduction and the denominator of which is such Member's initial capital contribution to the Fund*.

1996 Operating Agreement § 7.2(c) (emphasis added). Because Amisil redeemed before the second anniversary of its investment in the Fund, 70% of its 1.0% interest expired unvested. *Id.* § 7.5(b)(i), § 7.2(c).[3] Amisil's interest in Clarium after withdrawing its investment in the Fund was therefore 30% of 1% — 0.3%.[4]

Amisil's redemption from the Fund had additional consequences: when a Member withdraws its investment the Fund, it becomes a "Withdrawn Member" of the Manager and "shall be treated as an Assignee and, accordingly, shall have the rights and obligations of an Assignee described in Section 7.6." *Id.* §§ 7.2, 7.4. As a Withdrawn Member, Amisil held *no* "non-economic rights in respect of" the Manager. *Id.* § 7.6(f). Also, because it was a Withdrawn Member under the Operating Agreement, Amisil lost any rights it might have had to inspect Clarium's books and records or to receive periodic financial reports from

---

[3] To be specific, Amisil's potential 1% interest in Clarium was reduced by a fraction consisting of Capital Reduction as the numerator and initial capital contribution to the Fund as the denominator. 1996 Operating Agreement § 7.2(c). The initial capital contribution to the Fund was $297,000. Amisil "withdrew the remaining balance of its investment in the Fund," Compl. ¶ 22, so the Capital Reduction was also $297,000. The fraction is therefore $297,000/$297,000, or 1. Amisil therefore forfeited its entire unvested interest of 70%.

[4] Because Amisil withdrew its investment in the Fund before its first anniversary, its vested interest in the Manager was in fact only 10% of its total possible ownership interest. However, the facts supporting this position are not before the Court on this Motion, and for purposes of this Motion only, Clarium assumes that Amisil earned 30 percent of its total potential interest — leaving it with a 0.3% interest in the Manager.

Heller
Ehrman LLP

NOTICE OF MOTION & MOTION TO DISMISS; MEM. OF P&A IN SUPPORT, Case No. C 06-5255 MJJ

Clarium. *Id.* §6.9(a), (c). By voluntarily reducing its original investment by 99%, Amisil extinguished its non-economic rights in the Manager.

### C.    Members and Withdrawn Members Have Limited Rights to Distributions.

The entire value of a Member's interest in the Manager is expressed in its "Capital Account," which is the Member's initial capital contribution plus the net of profits and losses allocable to the Account. 1996 Operating Agreement at 1. There is no other value to a Member's interest and, indeed, the Operating Agreement specifically excludes any value attributable to intangibles such as "the goodwill, going concern value, name, records, files, statistical data or other similar assets of" Clarium. *Id.* § 6.10(b).

As with other private investment companies, and in the interests of fiscal stability, the members of Clarium have limited access to their capital prior to the dissolution of the company, a fact known to Amisil at the time of its investment, as the Complaint's exhibits show. *Id.* § 3.3; Subscription Agreement §5 (o)(ii). Indeed, aside from payments in conjunction with the dissolution of the firm (not at issue here) or mandatory retirement, members may only receive the proceeds of their capital account when the Managing Member, in its "sole discretion," declares a distribution. 1996 Operating Agreement §5.1. The amount and timing of the distribution are matters left solely to the judgment of the Managing Member, and no member is entitled to a distribution absent the Managing Member's consent. *Id.* That is the bargain to which sophisticated investors like Amisil agree when investing in management companies such as Clarium.

### D.    The May 2002 Offer.

On May, 2, 2002, in an effort to reduce administrative burdens associated with de minimis accounts, Clarium offered to redeem Amisil's interest in Clarium for $372, an offer that Amisil alleges it rejected. Compl. ¶ 29 & Ex. D.

### E.    The PayPal Investment.

In December 1998, the Fund made a private equity investment in the company that was to become PayPal, Inc. ("PayPal"). *Id.* ¶ 23. On February 14, 2002 PayPal conducted an IPO; in October 2002, eBay purchased PayPal for $1.5 billion in stock. *Id.* ¶¶ 30, 32.

Heller
Ehrman LLP

Plaintiff does not allege that the Manager invested in PayPal; nor could it, as the Manager does not invest in any third-party securities. *See* 1996 Operating Agreement § 2.3.

### F.    The 2003 Amendment to the Operating Agreement.

In February 2003, Clarium informed Amisil of proposed changes to the Operating Agreement. Compl. ¶ 34. The proposed changes included adding a provision allowing Clarium to mandatorily retire members' interests in Clarium. *Id.* Amisil alleges it "objected" to this proposed amendment. *Id.* Notwithstanding that objection, the 1996 Operating Agreement provides that it "may be amended, in whole or in part, only through a written amendment executed by Two-Thirds-Interest of the Members."[5] 1996 Operating Agreement § 10.4(a). As of the date of the amendment, Mr. Thiel's interest in Clarium was at least 98.66%, giving him the right to amend the Agreement notwithstanding any objection by Amisil. Second Amended and Restated Limited Liability Company Agreement of Capital Clarium Management, LLC, dated March 28, 2003 ("2003 Operating Agreement") §10.4(a) and page 30 (RJN Ex. A);[6] *see also* Compl. ¶ 38.

### G.    Clarium's 2006 Offer to Amisil.

For more than three years after the May 2003 amendment of the Operating Agreement, Amisil had no contact with Clarium. *See generally* Compl. On March 14, 2006, Clarium again contacted Amisil to inform it that Clarium's Managing Member, Mr. Thiel, had received a $31 million distribution from Clarium.[7] *Id.* ¶¶ 36, 38. Shortly

---

[5] "Two-Thirds Interest" is defined by reference to the size of members' interests in Clarium. 1996 Operating Agreement at 4.

[6] Even though the 2003 Operating Agreement is not attached to the Complaint, this Court may nonetheless consider it on a motion to dismiss. *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp. 746, 758 (N.D. Cal. 1997). Under the incorporation by reference doctrine, a defendant may attach to the motion to dismiss documents that plaintiff does not attach to the complaint, but that are referred to in the plaintiff's complaint and are central to her claim. *Id.* The 2003 Operating Agreement adopts the mandatory retirement provision that forms the basis of many of Amisil's allegations, *see e.g.,* Compl. ¶¶ 45, 55(a), 62(f), 69(e), 116, and Amisil "cannot preclude consideration of [this agreement] by artful pleading." *Silicon Graphics*, 970 F. Supp. at 758.

[7] Mr. Thiel, as well as two other officers of Clarium, are also named as Defendants to this suit. These defendants will submit a separate motion to dismiss Plaintiff's complaint, noticed for hearing concurrently with this motion. The Individual Defendants, as well as Clarium, also filed on September 14, 2006 a Motion to Compel Arbitration and to Stay

*(Footnote Continued)*

thereafter, Amisil requested the right to inspect Clarium's books and records, allegedly "as provided by the Operating Agreement." *Id.* ¶ 39. In May and June 2006, Clarium offered to resolve Amisil's interest — the fruit of Amisil's $3,000 investment in Clarium — for $300,000. *Id.* ¶¶ 41-42. Although this offer represented a 10,000% total return on Amisil's contribution of working capital to the Manager, Amisil rejected it. Clarium then proposed to resolve the dispute through an independent appraisal process, in the spirit of the informal dispute resolution provisions of the Operating Agreement. *Id.* ¶ 43. During negotiations, Amisil demanded to review Clarium's books and records, though it had no rights to do so. *Id.* ¶¶ 39-44; 1996 Operating Agreement, §§ 6.9(a), (c), 7.6 (f), *see supra* Section II.B.

### H. Amisil's Mandatory Retirement.

On July 20, 2006, Clarium sent a letter to Amisil retiring Amisil under the terms of the mandatory retirement provision in the 2003 Operating Agreement (the "2006 Retirement"). Compl. ¶ 45 & Ex. E. Consistent with the retirement provision, the letter informed Amisil that "[a]n accounting and, where applicable, settlement of Amisil's Capital Account and Membership Interest, if any, will be provided within thirty (30) days of July 26, 2006." Compl. Ex. E. The parties continued to negotiate an appraisal agreement during this period, and to facilitate those discussions Amisil agreed to postponement of Clarium's provision of the promised accounting and settlement of Amisil's interest. However, almost immediately thereafter Amisil abruptly filed this suit on August 28, 2006, alleging among other claims that Clarium failed to provide the promised accounting.[8]

## III. ARGUMENT

### A. Applicable Legal Standards.

Dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) is

---

Litigation Pending Arbitration [Docket No. 12]. To the extent the Court grants the Motion to Compel, it need not decide this Motion now.

[8] After realizing that Amisil's assurances that it was still interested in an informal resolution were rendered insincere by the filing of this lawsuit, Clarium completed the accounting and settlement process. While Clarium takes the facts in the Complaint as true for the purposes of this Motion, it does not believe that Rule 11 will allow Amisil's counsel to endorse the allegations of lack of accounting in subsequent papers filed with the Court.

appropriate either where the complaint is not based on a cognizable legal theory or where it fails to allege sufficient facts under a cognizable legal theory. *See Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533-34 (9th Cir. 1984). As demonstrated below, both grounds for dismissal apply to all of the claims alleged by Amisil in its Complaint.

On a motion to dismiss, the court accepts the facts alleged in the complaint as true. *See Shah v. County of Los Angeles*, 797 F.2d 743, 745 (9th Cir. 1986). However, the court is not confined to the allegations of the complaint in deciding this motion to dismiss for failure to state a claim. Where a plaintiff has attached exhibits to the complaint, they are properly considered as well. *See Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 (9th Cir. 1989); *Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987). Indeed, where a plaintiff's allegations contradict the plain terms of an exhibit attached to the pleading, the allegations should be disregarded, *see Roth,* 942 F.2d at 625 n.1, and the terms of the exhibit given controlling effect, *see Thompson*, 300 F.3d at 754. If the attached document negates a plaintiff's claim, the claim should be dismissed. *See id.*

The Operating Agreement provides that "the rights and liabilities of the Members shall be governed by the laws of the State of Delaware." 1996 Operating Agreement § 10.5.[9] A federal court applies the choice of law rules of the forum state. *Gen. Signal Corp. v. MCI Telecom. Corp.*, 66 F.3d 1500, 1505 (9th Cir. 1995). Under California law, a "choice-of-law clause, which provides that a specified body of law 'governs' the 'agreement' between the parties, encompasses all causes of action arising from or related to that agreement, regardless of how they are characterized, including tortious breaches of duties emanating from the agreement or the legal relationships it creates." *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 470 (1992); *General Signal*, 66 F.3d at 1506. Delaware law therefore applies to Plaintiff's common law claims.

---

[9] The Fund Operating Agreement (§ 10.4) and the Subscription Agreement (§ 16) are also governed by Delaware law.

Heller
Ehrman LLP

**B.    The Complaint's Claim for Securities Fraud Under Section 10(b) Must Be Dismissed for Failure to Plead the Required Elements.**

In its First Claim for Relief, Amisil alleges that Clarium's retirement of Amisil from the Manager; Clarium's statement that Amisil had a 0.3% interest in Clarium prior to the retirement; and Defendants' alleged failure to provide Amisil with information to allow Amisil to "independently ascertain the fair market value" of its alleged interest in Clarium violated Section 10(b) of the Securities and Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.  Compl. ¶¶ 51-59.

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead:  (1) a material misrepresentation or omission; (2) scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *See, e.g., Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

A plaintiff alleging violations of Section 10(b) must also meet the special pleading requirements for fraud under both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  Rule 9(b) provides that the "circumstances constituting fraud or mistake shall be stated with particularity."  FED. R. CIV. P. 9(b).  To satisfy the requirements of Rule 9(b), a plaintiff must set forth the "neutral facts" of the transaction.  *See Yourish v. California Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999); *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (*en banc*).  As one court has explained, "[t]his means the who, what, when, where, and how:  the first paragraph of any newspaper story."  *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).  But these details alone are not enough — plaintiffs must also "set forth … an *explanation* as to why the disputed statement was untrue or misleading when made"; mere conclusions of falsity are insufficient.  *GlenFed*, 42 F.3d at 1548-49 (emphasis added).  Where allegations of fraud or mistake fail to meet the standard set forth in Rule 9(b), dismissal is the appropriate remedy.  *See Vess v. Ciby-Geigy Corp. USA*, 317 F.3d 1097, 1107-1108 (9th Cir. 2003).  The PSLRA further heightened the pleading requirements in private securities fraud litigation by requiring plaintiffs to plead both falsity and scienter

1  with particularity.  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir. 2002).

2  Amisil's Complaint not only falls far short of these heightened pleading standards, it

3  fails to plead virtually any of the required Section 10(b) elements.  As discussed below, the

4  only transaction that could provide the basis for a Section 10(b) claim is the 2006

5  Retirement, and the Complaint fails to allege a Section 10(b) violation with respect to this

6  transaction.  Amisil's Section 10(b) claim must, therefore, be dismissed in its entirety.

7        **1.  Neither Amisil's 1998 Initial Investment in Clarium Nor Clarium's
           2002 Offer to Buy Out Amisil's Stake Constitute the Purchase or
8          Sale Required as the Basis for a Section 10(b) Claim.**

9  Section 10(b) and Rule 10b-5 only apply to misrepresentations or omissions made

10  "in connection with the purchase or sale of any security" — in other words, there must be

11  an actual purchase or sale.  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 732

12  (1975); *Binder v. Gillespie*, 184 F.3d 1059, 1066 (9th Cir. 1999).  Amisil's Complaint,

13  however, fails to adequately allege which transaction(s) is the supposed basis for its Section

14  10(b) claim.  Only three alleged events could conceivably qualify as a purchase or sale:  (1)

15  the initial 1998 Purchase; (2) Clarium's 2002 offer to redeem Amisil's remaining stake in

16  the Manager (the "2002 Offer"); and (3) the 2006 Retirement.

17  Notwithstanding Plaintiff's conclusory allegation that Defendants disseminated false

18  statements "[i]n connection with the purchase *and* sale of Amisil's security," Compl. ¶ 54

19  (emphasis added), neither of the first two transactions can form the basis of a Rule 10b-5

20  claim.  The original 1998 Purchase plainly does not suffice:  the Complaint does not allege

21  any misrepresentation or omission in connection with Amisil's initial investment in the

22  Clarium Enterprise.  Nor can Plaintiff plead a Section 10(b) claim with respect to the 2002

23  Offer, because, as Plaintiff alleges, it refused Clarium's offer and no sale occurred.  *See*

24  *supra* Section II.D; *Blue Chip Stamps*, 421 U.S. at 731 (there must be an actual sale or

25  purchase to state a Section 10(b) claim).  As to the 2006 Retirement, the Complaint alleges

26  that it was "null and void."  Compl. ¶ 53.  If this allegation is credited, there was no sale and

27

28

there could be no Section 10(b) claim arising from this "transaction."[10] *Blue Chip Stamps*, 421 U.S. at 731.

That leaves only the Complaint's "alternative" allegation that Clarium's retirement of Amisil was effective, Compl. ¶ 53, arguably amounting to a predicate transaction for Section 10(b). The remaining arguments in this discussion, therefore, address the deficiencies in Amisil's boilerplate allegations relating to the 2006 Retirement.[11]

### 2. The Complaint Fails to Allege Any Actionable Misleading Statements or Omissions.

To satisfy Rule 9(b) and the PSLRA's heightened standard for pleading a misstatement, a Section 10(b) plaintiff must specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading. *Vantive*, 283 F.3d at 1085; *GlenFed*, 42 F.3d at 1547. Even putting aside the fact that the Complaint is devoid of such specific allegations, it suffers from a more fundamental problem: none of Clarium's alleged statements are or were misleading. *GlenFed*, 42 F.3d at 1548 ("[t]he statement in question must be false to be fraudulent").

### a. Clarium's "statement" that Amisil had only a three-tenths of a percentage membership interest in Clarium was not misleading because it is true.

Amisil purports to identify only a single alleged misstatement in connection with the 2006 Retirement — Clarium's assertion that Plaintiff had a "0.3% membership interest" (rather than "at least" a 1% interest) in Clarium. Compl. ¶ 55(a). This is not a misleading

---

[10] Claims premised on the 1998 Purchase and the 2002 Offer fail for an additional reason: both are barred by the statute of limitations. *See* 28 U.S.C. § 1658 (Section 10(b) claims must be brought two years from discovery or five years from the alleged violation).

[11] Plaintiff appears to concede that statements relating the 2006 Retirement are the only conceivable bases for a Section 10(b) claim. In its First Claim for Relief, the Complaint describes only the following alleged misstatements and omissions: statements relating to the size of Amisil's membership interest; and Clarium's alleged failure to provide a basis for Amisil to ascertain the fair market value of its interest. Compl. ¶ 55(a) & (b). Amisil does append the conclusory tag line "among others" to its description of the allegedly actionable statements, but it describes no "other" alleged misstatements or omissions in its Section 10(b) claim, and a general allusion to some other unknown misstatements does not meet the heightened particularity pleading requirement under the PSLRA. *Vantive*, 283 F.3d at 1085 (a securities fraud complaint must "specify *each* statement alleged to have been misleading") (emphasis added).

statement because *it is true*.  As described more fully in Section I.B, *supra*, Amisil's 1999 withdrawal of its investment in the Fund — which the Complaint acknowledges — locked in its vested interest in Clarium at no more than 0.3%.  Thus, by *plaintiff's own allegations* and the documents attached to its Complaint, *Thompson*, 300 F.3d at 754, Clarium's statement was truthful, and the Complaint's conclusory allegation that this statement is misleading cannot support a securities fraud claim.[12]

<strong>b.    Clarium was under no duty to grant Amisil access to Clarium's books and records, so Clarium's alleged failure to provide Amisil with substantiation for its assessment of its ownership stake was not an actionable "omission."</strong>

Plaintiff also alleges that Clarium "failed to furnish any financial information to Amisil or provide Amisil access to Clarium's books and records so that Amisil could independently ascertain the fair market value of its interest in Clarium."  Compl. ¶ 55(b).  This, Plaintiff claims, is a wrongful omission.  It is well settled, however, that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5."  *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988); *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).  Clarium was under no legal duty to provide such access to the firm's books and records because, after its divestment from the Fund, Amisil was reduced in status from Member to a Withdrawn Member, and it no longer enjoyed rights to information under Sections 6.9 and 7.6 of the Operating Agreement.  *See supra* Section II.B.  In sum, because neither Clarium's statement regarding Amisil's ownership stake in the Manager nor Clarium's alleged failure to provide Plaintiff with access to its books and records was misleading, Plaintiff's Complaint fails to allege any actionable misstatement or omission.

---

[12] In connection with its allegation that Clarium falsely characterized Amisil's interest as no more than 0.3%, Amisil also alleges that Clarium failed to disclose "the basis on which that reduced membership interest was calculated, or the basis on which the value of such interest would be calculated."  Compl. ¶ 55(a).  Although Clarium does not agree that it was required to furnish the basis for that calculation, the Complaint's allegation that Defendants failed to do so does not support a Rule 10b-5 claim: "[i]f the challenged statement is not false or misleading, *it does not become actionable merely because it is incomplete*."  *Vantive*, 283 F.3d at 1085 (emphasis added).  More fundamentally, the basis for the calculation is evident from the terms of the Subscription and Operating Agreements, so Clarium was allegedly "omitting" to disclose something that Plaintiff knew.

### 3.    The Complaint Fails to Meet the PSLRA's Scienter Pleading Standard.

Even if its failure to allege an actionable misstatement did not doom Plaintiff's Section 10(b) claim, it would have to be dismissed for another, independent reason:  the Complaint does not allege, let alone allege with the requisite particularity, that any defendant acted with the scienter required to be liable under Section 10(b) and Rule 10b-5. Under the PSLRA, a complaint alleging violations of Section 10(b) "shall, with respect to each act or omission alleged to violate this [title], *state with particularity facts* giving rise to a *strong inference* that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2) (emphasis added).  The Ninth Circuit requires plaintiffs to plead "no less than a degree of recklessness that strongly suggests actual intent," by pleading, "in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct."  *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 979 (9th Cir. 1999).

Plaintiff's Complaint falls far short, alleging only:  "Defendants disseminated false statements and/or concealments described above, which they knew or recklessly disregarded were materially false and misleading…"  Compl. ¶ 54.  This conclusory pleading is insufficient under the PSLRA's pleading regime.  *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1309 (C.D. Cal. 1996) (a plaintiff cannot satisfy his or her pleading burden merely by making conclusory allegations of fraudulent intent).

### 4.    The Complaint Fails to Plead Reliance with Particularity.

Under Rule 9(b), a complaint alleging a claim under Section 10(b) and Rule 10b-5 must also plead reliance with particularity.  *In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1187 (N.D. Cal. 2004) (general allegations of reliance insufficient because all averments of fraud must be pled with particularity); *In re Turbodyne Tech., Inc. Sec. Litig.*, 2000 WL 33961193 at *12 (C.D. Cal. Mar. 15, 2000) ("Rule 9(b) requires that reliance be pled with particularity.").  Amisil's allegations fail to meet this standard.

Plaintiff's Complaint alleges only that "[c]ulminating with the purported confiscation of its membership interest in Clarium, Amisil relied on Defendants' manipulative and

Heller
Ehrman LLP

deceptive conduct, to its detriment." Compl. ¶ 56. This conclusory allegation says nothing about what alleged misstatements led up to or caused Plaintiff to change position in connection with the 2006 Retirement.

Perhaps sensing this vulnerability, the Complaint alleges that "[h]ad Amisil known of the truth … Amisil would have demanded an immediate accounting and, absent voluntary acquiescence by Clarium, would have immediately filed legal action to block further wrongful acts and secure damages." Compl. ¶ 56. But this allegation defies common sense, because "fil[ing] legal action to block [purported] wrongful acts" is exactly what Amisil has done by bringing this lawsuit. In other words, indisputable facts show that Amisil *did not* rely on any alleged misrepresentations to its detriment, because it actually took the very action that it *would have taken* had it been aware of such purported misrepresentations. Having sued, Amisil cannot bootstrap a securities claim based on a hypothetical failure to sue.

> **C.    The Complaint Fails to Plead Common Law Fraud Because Clarium Had No Duty to Disclose the Alleged Omissions And Because Amisil Could Not Have Relied on the Alleged Misrepresentation.**

Amisil's common law fraud claim fails for similar reasons.[13] To state a fraud claim under Delaware law, a plaintiff must plead facts supporting an inference that "(1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance." *DCV Holdings, Inc. v. Conagra, Inc.*, 889 A.2d 954, 958 (Del. 2005). Like the Section 10(b) claim, the common law fraud claim must also meet the particularity pleading requirements of Federal Rule of Civil Procedure 9(b). FED. R. CIV. P. 9(b) (in "all averments of fraud …, the circumstances constituting fraud …

---

[13] To the extent this claim is founded on alleged breaches that occurred more than three years prior to the filing of the lawsuit, they are barred by the statute of limitations. 10 Del. C. § 8106 (statute of limitation is three years).

1  shall be stated with particularity").

2      Amisil's common law fraud claim alleges five "misrepresentations and omissions,"

3  which can be summarized as follows:  (a) Clarium failed to furnish yearly financial

4  statements; (b) Clarium's representation of the value of Amisil's interest in Clarium in the

5  2002 Offer was misleadingly low; (c) Clarium fraudulently failed to disclose information

6  relating to the PayPal transaction; (d) in 2005 and thereafter, Clarium concealed the fact that

7  Clarium made a $31 million distribution to Mr. Thiel; and (e) Defendants failed to disclose

8  the basis for the calculation of the fair value of Amisil's interest in connection with the 2006

9  Retirement.  Compl. ¶ 69.

10      None of these alleged misstatements or omissions support a claim of fraud.  They are

11  either wholly unparticularized or fall far short of pleading the required elements.

12          **1.**      **Defendants Had No Duty to Provide the Information Amisil**
                     **Claims It Was Deprived of.**

13

14      Three of the five alleged fraudulent omissions suffer from the same fatal flaw:

15  Clarium had no duty to disclose the alleged omission.  Where a defendant is under no duty

16  to disclose certain information, allegations of its failure to do so cannot form the basis of a

17  fraud claim.  *DCV Holdings, Inc.*, 889 A.2d at 958 (plaintiff must plead facts demonstrating

18  that defendant omitted facts that it had a duty to disclose).

19      Clarium had no duty to furnish to Amisil its yearly financial statements since 2000

20  — the fraudulent omission alleged in Paragraph 65(a).  As explained above, Amisil had no

21  right to receive reports or to demand inspection rights after it redeemed its investment in the

22  Fund in March 1999, because it was no longer a "Member."  *See supra* Section II.B.

23      Similarly, Clarium had no duty to "divulge information" to Amisil relating to the

24  alleged PayPal transaction in October 2002.  *See* Compl. ¶ 62(c).  As Amisil concedes, the

25  investment in PayPal was made through the Fund, not the Manager.  *Id*. ¶ 23.  By the time

26  of the alleged PayPal transaction, October 2002, Amisil was no longer invested in the Fund,

27  and it no longer had rights to information from either the Manager or particular transactions

28  in the Fund.  *Id*. ¶ 22; *see supra* Section II.B.

Lastly, under the Operating Agreement, Clarium had no duty to disclose, in connection with the 2006 Retirement, detailed financial information that Amisil contends it needed to "value" its own interest. Compl. ¶ 65(e). Amisil can point to no provision of the Agreements on which its claims rest to support its contention that any more detailed disclosure was required. In fact, there is no such obligation.

In sum, sub-paragraphs 65 (a), (c) and (e) do not describe acts or omissions that can be the predicate for any common law fraud claim, because Clarium had no duty to disclose the information described under the operative agreements.

### 2. The Complaint Fails to Plead How the 2002 Offer Was False Or that Amisil Relied on this Offer.

Similarly, Amisil's allegation relating to the 2002 Offer — that Clarium's representation of the value of Amisil's interest in Clarium ($372) was misleadingly low — cannot be actionable. As Amisil alleges in its Complaint, Amisil did not accept this offer. Compl. ¶ 14. Amisil therefore was not misled and did not rely on this representation. This lack of reliance renders this representation irrelevant and not actionable. Sub-paragraph 65(b) cannot form the basis of a common law fraud claim.

### 3. The Allegation that Clarium Concealed the Distribution to Mr. Thiel Is Contradicted by the Factual Allegations of the Complaint.

Finally, the conclusory allegation in paragraph 65(d) of the Complaint contradicts other allegations in the Complaint and should be disregarded. *See Weisbuch v. County of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997). Specifically, this sub-paragraph alleges that "*[i]n 2005 and thereafter*, Defendants concealed the fact that Clarium made a distribution to Thiel in the amount of at least $31 million and failed to furnish any explanation or accounting for such distribution" (emphasis added). This allegation cannot be squared with paragraph 38 of the Complaint, which alleges that Messrs. Portnoy and Woolway informed Amisil in March 2006 that Clarium made a $31 million distribution to Mr. Thiel for fiscal year 2005. Clarium's 2005 fiscal year ended on December 31, 2005, and any distributions relating to closing the books on the 2005 fiscal year occurred after that date. 1996 Operating Agreement § 1 (defining "fiscal year" as the calendar year). To assert

that Clarium "concealed" a fact in 2005 that did not occur until 2006 is nonsensical.  At most, Clarium did not disclose the fact of the distribution to Mr. Thiel from January 1, 2006 to March 14, 2006, but there is no allegation in the Complaint that Amisil changed its position during this period of "concealment."  This allegation, therefore, is also not actionable as fraud.

### D.    Amisil Cannot State a Claim for Breach of Contract Because Clarium Complied with the Operating and Subscription Agreements.

Amisil alleges that Clarium breached the Subscription Agreement and Operating Agreement by (1) failing to make available Clarium's books and records, or to furnish annual financial reports; (2) failing to make any distributions to Amisil; (3) "seiz[ing] control" over Amisil's membership interest by allocating funds that should have been distributed to Amisil; and (4) "oppress[ing] Amisil's exercise of its rights under" the agreements.  Compl. ¶ 95.  The first three of these alleged actions were demonstrably consistent with the terms of the agreements themselves, and so cannot furnish the grounds for a breach of contract claim.  And Plaintiff's fourth supposed basis for its breach of contract claim also fails, as it is too vague to support a claim.[14]

### 1.    Amisil Has No Right of Access to Books or to Receive Reports Under the Operating Agreement.

Citing to Section 6.9 of the Operating Agreement, Amisil asserts that Clarium failed to provide access to its books and failed to furnish financial reports, and that these failures are actionable breaches of contract.  Compl. ¶¶ 15, 35, 39, 44, 50, 95.  However, Section 6.9 grants rights of access and rights to annual financial reports only to "Members."  1996 Operating Agreement § 6.9 (a), (c).  Amisil ceased to be a Member of Clarium when it withdrew its investment in the Fund.  *See supra Section* II.B.  This change of status and corresponding change of rights was clear on the face of the Operating Agreement.   1996

---

[14]  To state a claim for breach of contract, a plaintiff must plead the existence of the contract, the breach of an obligation imposed by that contract, and resultant damage to the plaintiff.  *VLIW Technology, LLC v. Hewlett-Packard Co.*,  840 A.2d 606, 612 (Del. 2003).  Where the breach of contract allegation sounds in fraud, as Amisil's contract claim does, *see* Compl. ¶ 92 (incorporating by reference prior allegations of Complaint, including fraud allegations), these elements must be pled with particularity under Rule 9(b).

Operating Agreement §§ 7.2, 7.4, 7.6.  Accordingly, Clarium did not breach the contract by not providing access to books and records or providing reports.[15]

**2.    The Complaint Fails to Set Forth a Claim for Breach of Contract Based on the Failure to Pay Discretionary Distributions.**

**a.    Section 4.1 does not authorize distributions.**

Plaintiff alleges that Clarium breached Sections 4.1 and 5.1 of the Operating Agreement by failing to make any distributions to Amisil.  Contrary to Plaintiff's allegations (Compl. ¶ 95), however, Section 4.1 on its face does not require Clarium to make distributions.  Rather, it provides that profits and losses attributable to management and incentive fees are "*allocated* among the Members in proportion to their respective Membership Interests," and that "[a]ll other items of Profit and Loss shall be allocated among the Members in proportion to their respective Capital Contributions."  1996 Operating Agreement § 4.1(a).  In other words, Section 4.1 describes only ***allocation*** of profits and losses to Members' accounts.  Under the definition of Capital Account, an allocation of profit to an account is an assignment of positive value to that account.  An allocation of loss is an assignment of negative value to the account.  *Id*. § 1.  Neither implies or requires a cash pay-out.  A ***distribution***, on the other hand, is a separate ground for decreasing the value of the account.  *Id*.

An allocation is therefore not a distribution, and Section 4.1 does not provide for distributions of profits, just as it does not, for instance, require payments to the Manager from a Member for losses.  This is confirmed by Section 3.3, which provides that distributions from the Capital Account can only be made under the circumstances set forth in Sections 5, 7 and 8 of the Operating Agreement.  1996 Operating Agreement § 3.3.[16]  In short, this provision requires that the Manager keep track of the value of each Member's,

---

[15] To the extent this claim is founded on alleged breaches that occurred more than three years prior to the filing of the lawsuit, it is time-barred.  10 Del. C. § 8106.

[16] Section 7.6(c) permits Assignees to receive distributions under Sections 5 and 8. Section 8 governs dissolution and liquidation of the Company and is not relevant here. Section 7.3 of the 2003 Operating Agreement addresses the rights of a Member to payment in the event of mandatory retirement.

Heller
Ehrman LLP

NOTICE OF MOTION & MOTION TO DISMISS; MEM. OF P&A IN SUPPORT, Case No. C 06-5255 MJJ

Withdrawn Member's, and Assignee's stake in the Manager, *not* that it has to regularly pay those stakes out (or collect cash when the balance is negative). If the Manager were required to make regular distributions, it would be constantly stripped of its operating capital — the money required to run the main business of the Clarium Enterprise, the Fund. Accordingly, Clarium did not breach Section 4.1 by not paying distributions to Amisil.

### b.    Amisil fails to state a claim for breach of Section 5.1.

Amisil claims it was entitled to receive discretionary distributions under the Operating Agreement, presumably because a distribution was allegedly made to Mr. Thiel but not to it for the 2005 fiscal year. Compl. ¶¶ 15, 35, 48, 95; 1996 Operating Agreement § 5.1. Plaintiff's contention that Section 5.1 entitled it to distributions is again contradicted by the Operating Agreement, which unambiguously grants to "The Managing Member … sole discretion [to] determine the amount and timing of all distributions." 1996 Operating Agreement §5.1. No other provision of the Operating Agreement entitles Amisil to distributions. *Id*. § 3.3; *see also supra Section* II.B. The lack of distributions therefore cannot be a breach of the Operating Agreement and this contention should be dismissed.

### c.    Clarium has not breached any obligation to make a payment for the mandatory retirement.

Section 7.3 of the 2003 Operating Agreement provides:

> A Member who is required to retire pursuant to this Section 7.3 shall be entitled to receive … the value of such Member's Membership Interest, to the extent vested under Section 7.5(b), computed as of the date on which such Member's retirement shall become effective.

When Clarium expelled Amisil effective July 26, 2006, it stated that "[a]n accounting and, where applicable, settlement of Amisil's Capital Account and Membership Interest, if any, will be provided…." Compl. Ex. E. Accordingly, Clarium has never refused to make a retirement payment to Amisil for the value of Amisil's interest in Clarium. To the contrary, the filing of this lawsuit short-circuited the appraisal process, and Clarium's promise to provide an accounting and settlement constituted its continuing performance under the Operating Agreement.

### 3. Amisil's Claim that Clarium "Oppressed its Rights" As A Minority Member Is Contrary to the Facts of this Case and Fails to Allege a Breach of the Operating Agreement.

Amisil also alleges that Clarium breached its contract with Amisil based on an unspecified "oppress[ion of] Amisil's exercise of its rights under the … Operating Agreement." Compl. ¶ 95. Even if it were consistent with the facts, this allegation is too indefinite to state a claim. This purported theory of breach makes no reference to breach of specific terms of the contract and fails under Rules 8(a) and 9 of Federal Rules of Civil Procedure to provide notice to Clarium of either the nature of its alleged wrongdoing or the manner in which such alleged wrongdoing violates the terms of the contract. A mere conclusory allegation of breach is insufficient; a plaintiff must specify the manner in which the contract was breached by reference to specific terms of the contract. *Rasidescu v. Midland Credit Mgmt., Inc.*, 435 F. Supp. 2d 1090, 1099 (S.D. Cal. 2006).

### E. Plaintiff's Claim under the Investment Advisers Act of 1940 Fails Because There Is No Private Right of Action for Damages Under the Act.

In its Second Claim for Relief, Amisil alleges an unspecified "Violation of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq*." While the Complaint does not expressly invoke the Act's antifraud provision (15 U.S.C. § 80b-6), there can be no doubt that this is a fraud claim as it is based on Clarium's alleged misrepresentations as to the value of Clarium and its failure to provide information to Amisil. Compl. ¶ 62. But putting aside the question of whether any of the alleged misrepresentations or omissions is actionable,[17] the claim suffers from a fundamental and fatal flaw: there is no private right of action for damages under the antifraud provision of the 1940 Act. *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 24 (1979). The only private right of action is a right to bring an action for rescission to void a contract. *Id*. Amisil seeks "damages and equitable relief" under this cause of action. Compl. ¶ 67. While its request for "equitable relief" could encompass rescission, that is the last thing Amisil claims it wants in this

---

[17] The alleged "omissions" — refusal to grant access to Clarium's books — were entirely justified under the terms of the Operating Agreement. *See supra* Section II.B.

action:  Amisil expressly seeks to affirm and enforce the terms of the contract.  *Id*. Prayer

¶ 2.  Because there is no private right of action under this statute for the relief Amisil seeks,

the Complaint's Second Claim for Relief must be dismissed.

**F.    Plaintiff's Conversion Claim  Should be Dismissed Because Delaware Law Does Not Recognize Conversion for Monetary Claims.**

Amisil's Fourth Claim for Relief is founded on Clarium's alleged obligation to pay

money and/or distribute shares of stock to it.  Compl. ¶ 79.  Generally, "the necessary

elements for a conversion under Delaware law are that a plaintiff had a property interest in

the converted goods; that the plaintiff had a right to possession of the goods; and that the

plaintiff sustained damages."  *Goodrich v. E.F. Hutton Group, Inc.*, 542 A.2d 1200, 1203

(Del. Ch. 1988).  Money can be the subject of a conversion claim "only when it can be

described or identified as a specific chattel, but not where an indebtedness may be

discharged by the payment of money generally." *Id*.  Under the Operating Agreement, the

distributions Amisil seeks can be paid in cash or securities at the Manager's option.  1996

Operating Agreement § 5.1.  Accordingly, any alleged obligation to Amisil "may be

discharged by payment of money," and a conversion claim cannot be sustained.

**G.    Plaintiff Fails to State a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.**

In its Eighth Claim for Relief, Amisil alleges that Clarium breached an implied

covenant of good faith and fair dealing that "imposes on each party the duty to do

everything the contract presupposes that party will do to accomplish the purpose of the

contract," and that "Clarium has breached the implied covenant of good faith and fair

dealing by interfering with or failing to cooperate with [] Amisil" in accordance with the

alleged contracts.  Compl. ¶¶ 98-99.

While Delaware law recognizes the implied duty of good faith and fair dealing, "the

duty arises only where it is clear from what the parties have expressly agreed" that there is

some other conduct that they would have expressly proscribed if they had only "thought to

negotiate with respect to the matter."  *Dave Greytak Enterp., Inc. v. Mazda Motors of Am.,*

*Inc.*, 622 A.2d 14, 22-23 (Del. Ch. 1992).  Thus, "where the subject at issue is expressly

covered by the contract, … the implied duty to perform in good faith does not come into play." *Id.* at 23. Likewise, "when a contract expressly grants a party the right to take actions that otherwise might be considered in breach of the implied covenant of good faith, the express terms of the contract override the implied covenant." *Union Fire Ins. Co. of the State of Pennsylvania v. Pan Am. Energy LLC*, No. Civ. A. 19629-NC, 2003 WL 1432419, at *6 n.42 (Del. Ch. Mar. 19, 2003). Each and every wrong Amisil complains of — the failure to provide information; the lack of distributions; the allegedly improper mandatory retirement — is addressed by one or several contractual provisions, and the Complaint fails to identify a single provision the parties would have included in any of the contracts if only they had thought to negotiate on the point. For this reason alone the claim should be dismissed. Moreover, as discussed above, Clarium's conduct is fully justified by, and consistent with, the express terms of the Operating Agreement, and this claim fails on that basis as well.

### H.    Amisil Cannot State a Claim for Unfair Business Practices Under Cal. Bus. & Prof. Code Section 17200 *et seq.*

In its Ninth Claim for Relief, Amisil attempts to state a claim for unfair business practices violating California's unfair competition law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL"). But because the parties have chosen to apply Delaware law under the terms of the Operating Agreement and other contracts, Amisil cannot now invoke California's UCL. *Medimatch, Inc. v. Lucent Technologies Inc.*, 120 F. Supp. 2d 842, 861 (N.D. Cal. 2000) (no UCL claim where contract provided for application of New Jersey law); *Nedlloyd*, 3 Cal. 4th at 465-66.

The UCL claim fails substantively as well. Violations of the UCL must be based on an "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. The "unlawful" prong "borrows violations of other laws and treats these violations … as unlawful practices" under the UCL. *People ex rel. Lockyer v. Fremont Life Ins. Co.*, 104 Cal. App. 4th 508, 515 (2002). A plaintiff alleging unfair business practices under the UCL must state with particularity the facts supporting the statutory elements of the violation. *Silicon Knights, Inc. v. Crystal Dynamics, Inc.*, 983 F. Supp. 1303, 1316

Heller Ehrman LLP

22

(N.D. Cal. 1997). Amisil does not specify any statutes or other laws Clarium has violated in its UCL claim and merely makes the conclusory allegation that "[t]he acts and practices described above … were unlawful, unfair and fraudulent." Compl. ¶ 104. This conclusory allegation is entitled to no weight. *See Silicon Knights*, 983 F. Supp. at 1316. As set forth in this Motion, Clarium's alleged conduct violates no law. Moreover, alleged breaches of contract standing alone cannot support a UCL claim. *Nat'l Rural Telecom. Co-op. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1074 (C.D. Cal. 2003); *Allied Grape Growers v. Bronco Wine Co.*, 203 Cal. App. 3d 432, 451-54 (1988). Because any Amisil UCL claim for "unlawful" conduct is derivative of other insufficient claims, the claim fails because Amisil does not adequately plead a predicate "unlawful" act. *Silicon Knights*, 983 F. Supp. at 1316; *see also Globespan, Inc. v. O'Neill*, 151 F. Supp. 2d 1229, 1236 (C.D. Cal. 2001).

The "unfair" prong has no application to the facts alleged in the Complaint. "Courts may not simply impose their own notions of the day as to what is fair or unfair." *Cel-Tech Commc'n, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 182 (1999). "Unfair" conduct in a non-consumer context must violate some public policy "tethered to specific constitutional, statutory or regulatory provisions." *Id*. at 186-87; *Bardin v. Daimlerchrysler Corp.*, 136 Cal. App. 4th 1255, 1272 (2006). Amisil's UCL claim not is "tethered" to any public policy, much less a "constitutional, statutory or regulatory" provision expressing a public policy, and fails to allege unfair conduct. *Id*. at 1273.

This leaves only the "fraudulent" prong. A UCL claim founded on a fraudulent business practice requires actual reliance on a misrepresentation in entering into a transaction. *Pfizer Inc. v. Super. Ct.*, 141 Cal. App. 4th 290, 305 (2006). But as explained above with respect to Amisil's Section 10(b) and common law fraud claims, Clarium's affirmative representation that Amisil's interest was 0.3% was true, and Clarium had no duty to otherwise disclose information to Amisil. *See supra* Section II.B. Nor did Amisil actually rely on any purported representation or omission. There was no reliance with respect to any representation made in connection with the 2002 Offer, because the offer was rejected, *see supra* Section II.D, and there was no reliance on any delay in informing Amisil

of the Thiel distribution, because Amisil did not enter into a transaction during the period of the alleged concealment, *see supra* Sections II.G and III.C.3. Thus the only potentially relevant transaction is the mandatory retirement. Yet when the retirement occurred, there was no decision for Amisil to make and no need for it to consider information. It therefore cannot have actually relied on any misrepresentation or omission.

### I.    Plaintiff's Accounting and Constructive Trust and Injunction Claims Must be Dismissed Because They Are Remedies, Not Claims.

Amisil's final two causes of actions are not causes of action at all. Specifically, the Tenth Claim for Relief seeks "Accounting and Constructive Trust" and the Eleventh Claim seeks "Preliminary and Permanent Injunction." These misguided "claims" are in fact *remedies*. *Teachers Retirement Sys. of Louisiana v. Aidinoff*, 900 A.2d 654, 670 n.22 (Del. Ch. 2006) ("no controlling authority from our Supreme Court holds that there is such a thing as a 'claim for a constructive trust' with its own unique elements"), citing *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 991 (Del. Ch. 2000) ("A constructive trust is simply one of many conceivable alternative remedies which might be available after trial should plaintiffs prevail on one or more of their theories of recovery."); Dan B. Dobbs, *Law of Remedies*, Vol. 1, 223, 587-88 (2d ed. 1993) (injunction, constructive trust and accounting are remedies). These counts fail to state a claim and should be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, Clarium respectfully submits that Amisil's claims against it should be dismissed.

September 19, 2006                 Respectfully submitted,

                                  HELLER EHRMAN LLP


                                  By _____/s/ Howard S. Caro_____
                                       HOWARD S. CARO

                                  Attorneys for Defendant
                                  CLARIUM CAPITAL MANAGEMENT, LLC

Heller
Ehrman LLP