1   Harvey L. Leiderman (SBN 55838)
    Email: hleiderman@reedsmith.com
2   Tita K. Bell (SBN 206735)
    Email: tkbell@reedsmith.com
3   REED SMITH LLP
    Two Embarcadero Center, Suite 2000
4   San Francisco, CA  94111-3922
    Mailing Address:
5   P.O. Box 7936
    San Francisco, CA  94120-7936
6   Telephone:     415.543.8700
    Facsimile:      415.391.8269
7
    Daniel R. Formeller (admitted *pro hac vice*)
8   Email:  dformeller@tsmp.com
    Basileios Katris (admitted *pro hac vice*)
9   Email:  bkatris@tsmp.com
    Tressler, Soderstrom, Maloney & Priess
10  Sears Tower, 22nd Floor
    233 South Wacker Drive
11  Chicago, Illinois  60606-6308
    Telephone:     312.627.4000
12  Facsimile:      312.627.1717
13  Attorneys for Plaintiff Amisil Holdings Ltd.

14              UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16                 SAN FRANCISCO DIVISION

17

18  AMISIL HOLDINGS LTD., a Cyprus          Case No.: C 06 5255 MJJ
    Corporation,
19                                          **PLAINTIFF'S OPPOSITION TO**
                    Plaintiff,              **MOTIONS OF DEFENDANTS PETER**
                                            **THIEL, JASON PORTNOY AND MARK**
20        v.                                **WOOLWAY TO DISMISS PLAINTIFF'S**
                                            **COMPLAINT FOR FAILURE TO STATE**
21  CLARIUM CAPITAL MANAGEMENT, LLC         **A CLAIM; OR, IN THE ALTERNATIVE**
    f/k/a/ THIEL CAPITAL MANAGEMENT, LLC,   **TO STRIKE TIME BARRED**
22  a Delaware Limited Liability Company, PETER  **ALLEGATIONS**
    ANDREAS THIEL, a California resident, JASON
23  PORTNOY, a California resident, MARK    **F.R.C.P. 12(b)(6) & 12(f)**
    WOOLWAY, a California resident,
24                                          Hearing Date:    November 7, 2006
                    Defendants.            Time:            9:30 a.m.
25                                          Courtroom:       11
26                                          The Honorable Martin J. Jenkins
27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................1

II.   FACTS ...............................................................................................................1

III.  ARGUMENT ......................................................................................................2

    A.    Amisil's Allegations of Fraud Against the Individual Defendants Are
        Sufficiently Specific and Individualized to Apprise Defendants of the
        Misconduct Being Attributed to Them ...........................................................2

        1.    The Allegations of Fraud Committed by Thiel, Portnoy and
            Woolway Are Specific Enough to Give Notice of the Charges
            Being Made Against Them .........................................................2

        2.    The Complaint Alleges Numerous Misrepresentations and
            Omissions Made by Each Individual Defendant ...............................4

    B.    Amisil Has Properly Pled Scienter Under the PSLRA Because the
        Complaint and Attached Exhibits Specifically Connect Thiel to
        Misstatements Made in Connection with Fraudulent Attempts to Purchase
        Amisil's Interest ............................................................................................7

    C.    Amisil Has Stated a Claim for Breach of Fiduciary Duty Because the
        Operating Agreement Does Not Limit the Fiduciary Duties Owed to
        Amisil by the Individual Defendants .............................................................9

        1.    The Complaint Sufficiently Alleges a Prima Facie Case for
            Breach of Fiduciary Duty against Thiel, Portnoy and Woolway.....................9

        2.    The Operating Agreement Does Not Limit the Fiduciary Duties
            These Individual Defendants Owed to Amisil.................................9

        3.    The Operating Agreement Does Not Limit the Fiduciary Duties
            Owed by the Individual Defendants to Assignees ...........................10

    D.    Amisil's Claim for Civil Conspiracy Is Proper Because Amisil Has
        Alleged Actionable Fraud by the Individual Defendants ................................11

    E.    Amisil Has Stated a Claim for Relief on All Remaining Claims for the
        Same Reasons Stated in the Opposition to Clarium's Motion to Dismiss.................14

    F.    The Individual Defendants' Motion to Strike Should Be Denied Because
        Amisil's Allegations Are Not Time Barred and Are Material to Amisil's
        Claims ............................................................................................................14

        1.    The Statute of Limitations for Amisil's Fraud Claim Was Tolled
            Until the Last Overt Act of the Conspiracy ....................................15

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

PLAINTIFF'S OPPOSITION TO INDIVIDUAL DEFS MOTION TO DISMISS FOR FAILURE TO STATE CLAIM OR IN
ALTERNATIVE TO STRIKE TIME BARRED ALLEGATIONS

1

**TABLE OF CONTENTS**
**(CONTINUED)**

2

3

**Page**

4

      2.     The Statute of Limitations for Amisil's Claims Was Tolled Under the Discovery Rule Because Amisil Had No Reason to Suspect the Individual Defendants' Wrongful Conduct until March 2006...................15

5

6

      3.     In the Alternative, the Motion to Strike Should Be Denied Because These Allegations Provide Material and Pertinent Background Information...............................................................................17

7

IV.     CONCLUSION.................................................................................................18

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

PLAINTIFF'S OPPOSITION TO INDIVIDUAL DEFS MOTION TO DISMISS FOR FAILURE TO STATE CLAIM OR IN ALTERNATIVE TO STRIKE TIME BARRED ALLEGATIONS

# TABLE OF AUTHORITIES

Page

*Allen v. Beverly Hills,*
911 F.2d 367 (9th Cir. 1990) ........................................................................ 18

*Barefield v. Cal. State Univ. Bakersfield,*
2006 U.S. Dist. LEXIS 21677 (E.D. Cal. 2006) ........................................... 17

*Bosse v. Crowell Colllier & MacMillan,*
565 F.2d 602 (9th Cir. 1977) .......................................................................... 2

*General American Life Ins. Co. v. Rana,*
769 F. Supp. 1121 (N.D. Cal. 1991)) ........................................................... 11

*Gibson v. United States,*
781 F.2d 1334 (9th Cir. 1986) ...................................................................... 15

*In re Alstom SA Sec. Litig.,*
406 F. Supp. 2d 402 (D.N.Y. 2005) .............................................................. 16

*In re Equity Funding Corp. of Am. Sec. Litig.,*
416 F. Supp. 161 (C.D. Cal. 1976) ........................................................... 6, 13

*In re Silicon Graphics Sec. Litig.,*
970 F. Supp. 746 (N.D. Cal. 1997) ............................................................ 6, 7

*In re Syncor Int'l Corp. Sec. Litig.,*
327 F. Supp. 2d 1149 (C.D. Cal. 2004) .................................................. 4, 7, 8

*In re U.S. Grant  Hotel Assoc. Ltd. Sec. Litig.,*
740 F. Supp. 1460 (S.D. Cal. 1990) ............................................................... 3

*Lewis v. Sporck,*
612 F. Supp. 1316 (N.D. Cal. 1985) ............................................................... 5

*Medical Instrument Dev. Labs. v. Alcon Labs.,*
2005 U.S. Dist. LEXIS 41411 (N.D. Cal. 2005) .......................................... 12

*Neubronner v. Milken,*
6 F.3d 666 (9th Cir. 1993) ........................................................................... 2, 5

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,*
380 F.3d 1226 (9th Cir. 2004) ........................................................................ 7

*Occhionero v. City of Fresno,*
2006 U.S. Dist. LEXIS 12025 (E.D. Cal. 2006) ........................................... 17

*Rhoades v. Powell,*
644 F. Supp. 645 (E.D. Cal. 1986) ................................................................. 4

*Roberts v. Heim,*
670 F. Supp. 1466 (N.D. Cal. 1987) ....................................................... 12, 13

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

PLAINTIFF'S OPPOSITION TO INDIVIDUAL DEFS MOTION TO DISMISS FOR FAILURE TO STATE CLAIM OR IN ALTERNATIVE TO STRIKE TIME BARRED ALLEGATIONS

*Semegen v. Weidner*,
    780 F.2d 727 (9th Cir. 1985) ................................................................................................3

*State of Cal. ex rel. Mueller v. Walgreen Corp.*,
    175 F.R.D. 638 (N.D. Cal. 1997) .........................................................................................3

## STATE CASES

*Chicago Title Ins. Co. v. Great Western Financial Corp.*,
    69 Cal.2d 305 (1968) ...................................................................................................12, 13

*Emerald Partners v. Berlin*,
    787 A.2d 85 (Del. 2001) ......................................................................................................10

*Fox v. Ethicon Endo-Surgery, Inc.*,
    35 Cal.4th 797 (2005) .........................................................................................................15

*Heller v. Kiernan*,
    2002 Del. Ch. LEXIS 17 (Del. Ch. 2002) ...........................................................................9

*Kortum v. Webasto Sunroofs Inc.*,
    769 A.2d 113 (Del. Ch. 2000) ............................................................................................11

*Krahmer v. Christie's, Inc.*,
    903 A.2d 773 (Del. Ch. 2006) ............................................................................................15

*Weinber v. UOP, Inc.*,
    426 A.2d 1333 (Del. Ch. 1981) ..........................................................................................12

*Wyatt v. Union Mortg. Co.*,
    24 Cal. 3d 773 (1979) .........................................................................................................15

## STATUTES AND RULES

Cal. Bus. & Prof. Code § 17200 .................................................................................................14

6 Del. C. § 18-1101(c) .................................................................................................................11

Fed. R.Civ. Proc. 12(f)..........................................................................................................12, 14

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF'S OPPOSITION TO INDIVIDUAL DEFS MOTION TO DISMISS FOR FAILURE TO STATE CLAIM OR IN
ALTERNATIVE TO STRIKE TIME BARRED ALLEGATIONS

Plaintiff Amisil Holdings Ltd. ("Amisil") hereby submits its Opposition to Individual Defendants' Motions to Dismiss for Failure to State a Claim or in the Alternative Motion to Strike Time Barred Allegations as follows:

## I.     INTRODUCTION

The individual defendants' motions closely follow the form of defendant Clarium's shotgun motion. These motions simply add to the ever-growing list of acts of avoidance and disregard of obligations that are aimed at preventing Amisil from determining the true value of its investment in the fund management company operated by defendant Peter Thiel. Rather than respond to the detailed charges alleged against them, the individual defendants bring motions that raise numerous untenable arguments in an attempt to prevent Amisil from pursuing its claims. The motions have no merit.

## II.     FACTS

Amisil incorporates by reference the fact summary set forth in its Opposition to Defendant Clarium Capital Management, LLC's Motion to Dismiss. Moreover, as the Complaint makes clear: Clarium is but a shell entity that is entirely manipulated by defendant Peter Thiel ("Thiel"), who is the company's Managing Member and who owns over 98% of its interests. *See* Compl. ¶¶ 9, 38. Thiel dominates Clarium and its investment portfolio. Compl. ¶ 2. Through a pattern and practice of unlawful activity, Thiel, assisted by other individual co-defendants, has oppressed Amisil's rights as holder of a minority membership interest in Clarium (Compl. ¶¶ 2, 14, 15), while allowing Thiel to reward himself with tens of millions of dollars in distributions from the company (Compl. ¶ 38). In the last year alone Thiel and his colleagues distributed over $60 million out of Clarium to themselves – but not a penny to Amisil. *Id.*

In essence, Thiel, assisted by Jason Portnoy ("Portnoy") and Mark Woolway ("Woolway"), employed a three-part scheme to "hide the money" from Amisil: first, make no distributions over eight years to Amisil (Compl. ¶ 15); second, purport to buy-out Amisil's interest at a unilaterally set price (Compl. ¶¶ 29, 41); and third, prevent Amisil's access to Clarium's books and records so that Amisil would not be able to determine the true value of its membership interest (Compl. ¶¶ 39, 40). In response to an inquiry from Amisil this year as to the extent and value of its membership interest,

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

PLAINTIFF'S OPPOSITION TO INDIVIDUAL DEFS MOTION TO DISMISS FOR FAILURE TO STATE CLAIM OR IN ALTERNATIVE TO STRIKE TIME BARRED ALLEGATIONS

Thiel (through Clarium), simply issued a notice claiming to expel Amisil as a member of Clarium and confiscating Amisil's interest, at a fraction of its value.  Compl. ¶¶ 44, 45.  In short, Thiel, et al. have fraudulently seized control over Amisil's property, deprived Amisil of its rightful distributions, and oppressed Amisil as a minority member of Clarium.

## III.    ARGUMENT

### A.    Amisil's Allegations of Fraud Against the Individual Defendants Are Sufficiently Specific and Individualized to Apprise Defendants of the Misconduct Being Attributed to Them

Amisil's fraud allegations have the requisite level of particularity to put defendants on notice of the wrongful conduct they are charged with.  Particularly because the allegations involve instances of corporate fraud consisting of material omissions, Amisil's allegations are more than sufficient to satisfy the requirements of Rule 9(b).  The factual allegations supporting the claim for fraud, including the preceding facts re-alleged and incorporated therein, specifically identify the conduct of each individual defendant, and each defendant's role in the fraudulent scheme.  Taken as a whole, Amisil's Complaint asserts fraud with particularity such that defendants can adequately prepare a response to the charges against them.

#### 1.    The Allegations of Fraud Committed by Thiel, Portnoy and Woolway Are Specific Enough to Give Notice of the Charges Being Made Against Them

For the same reasons presented in Amisil's opposition to Clarium's motion to dismiss, Amisil's claim for fraud and the factual allegations incorporated therein are sufficiently particularized to put the individual defendants on notice of the wrongful acts alleged against them. Moreover, given the nature of the claims, involving corporate fraud and material omissions, Amisil's Complaint more than meets the particularized pleading standard required by Rule 9(b).

As a general matter, a plaintiff adequately states a claim for fraud under Rule 9(b) if the Complaint identifies the general time, place and nature of the alleged fraudulent activity so that a defendant may formulate a response to the charges against him.  *Bosse v. Crowell Colllier & MacMillan*, 565 F.2d 602, 611 (9th Cir. 1977); *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

PLAINTIFF'S OPPOSITION TO INDIVIDUAL DEFS MOTION TO DISMISS FOR FAILURE TO STATE CLAIM OR IN ALTERNATIVE TO STRIKE TIME BARRED ALLEGATIONS

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1993).[1]  As explained in Amisil's opposition to Clarium's motion, the facts supporting Amisil's allegations of fraudulent misrepresentation are exclusively in the individual defendants' possession. *See State of Cal. ex rel. Mueller v. Walgreen Corp.*, 175 F.R.D. 638, 640 (N.D. Cal. 1997) (stating "an exception to Rule 9(b)'s heightened pleading standard exists where pertinent information is exclusively within the defendant's knowledge or possession").  Defendants have not provided Amisil access to Clarium's financial records, in spite of the fact that Amisil has a right to view these materials under the Operating Agreement.  As such, Amisil has been unable to allege what the true value of its interest in Clarium is, and to what extent defendants have misrepresented or failed to disclose the value of that interest.

Nevertheless, despite defendants' omissions, Amisil's Complaint states particularized facts regarding the time and nature of defendants' fraudulent representations which are adequate to put defendants on notice of the charges against them.  Among other allegations, described in greater detail below and in Amisil's opposition to Clarium's motion to dismiss, Amisil specifically alleges that on May 2, 2002 Thiel attempted to buy-out Amisil's interest for only $372 despite the fact that Clarium at the time owned a stake in PayPal worth over $4.9 million (Compl. ¶¶ 28, 29, 69(b)) and that on July 20, 2006, defendants fraudulently attempted to expel Amisil from Clarium, in violation of the Operating Agreement, in order to acquire Amisil's interest for far less than its true value (Compl. ¶¶ 45, 69(e)).

In addition, Amisil has specifically alleged numerous fraudulent omissions meant to deceive Amisil as to the true value of its interest in Clarium.  Rule 9(b)'s particularity requirements are relaxed with regard to pleading fraudulent omissions because, where plaintiff alleges a failure to act, he generally cannot plead either the specific time of the omission or the place.  *In re U.S. Grant*

---

[1] The Ninth Circuit has identified an additional purpose for Rule 9(b), noting that in the securities fraud context Rule 9(b) "prevents the filing of a complaint as a pretext for discovery of unknown wrongs." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).  Amisil does not seek to uncover any unknown wrongs; it has alleged in its complaint defendants' wrongful conduct constituting fraud.  Rather, Amisil merely seeks to discover the true value of its interest in Clarium which it has been prevented from doing due to the fraudulent conduct of the individually named defendants.

*Hotel Assoc. Ltd. Sec. Litig.*, 740 F. Supp. 1460, 1466-67 (S.D. Cal. 1990).  As such, Amisil's more general allegations that defendants failed to furnish yearly financial statements (Compl. ¶ 69(a)) that defendants failed to divulge information about Clarium's interest in PayPal (Compl. ¶ 69(c)) and that defendants failed to make disclosures in 2005 about distributions made to Thiel (Compl. ¶ 69(d)) are wholly consistent with Rule 9(b)'s pleading requirements for material omissions.

Because the factual allegations stated above are more than sufficient to put the individual defendants on notice of the fraudulent conduct they are charged with, Amisil's complaint has alleged fraud with adequate particularity to state a claim under Rule 9(b).

### 2.     The Complaint Alleges Numerous Misrepresentations and Omissions Made by Each Individual Defendant

The factual allegations specifically supporting Amisil's claim for fraud, including preceding allegations which are incorporated and re-alleged therein, contradict the assertion that the various misstatements and omissions alleged have not been sufficiently attributed to the individual defendants.  *See Rhoades v. Powell,* 644 F. Supp. 645, 660 (E.D. Cal. 1986) (stating factual basis for plaintiff's claim of fraud may be set forth in paragraphs incorporated by reference for purposes of satisfying Rule 9(b)).  The Complaint specifically sets forth the misrepresentations made by each individual defendant.  For example, Amisil specifically alleges that Thiel, by correspondence dated May 2, 2002, materially misrepresented that Amisil's interest in Clarium was worth only $372 in an attempt to fraudulently purchase Amisil's interest for far less than its value.  Compl. ¶¶ 28, 69(b), Exhibit D (correspondence dated May 2, 2002, signed by Peter Thiel); *see In re Syncor Int'l Corp. Secs. Litig.*, 327 F. Supp. 2d 1149, 1172 (C.D. Cal. 2004) (stating "[s]pecific facts that would tie a corporate officer to a statement include a signature on a document").  Additionally Amisil specifically alleges that, on March 21, 2006, following Amisil's March 20 written request to inspect certain books and records of Clarium, Portnoy informed Amisil that the requested documents would be forthcoming, despite the fact that the defendants had no intention of producing those documents.  Compl. ¶¶ 40, 41.  Portnoy's actions were part of a fraudulent scheme carried on over the next several months to prevent Amisil from accessing these documents and thereby prevent Amisil from

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

PLAINTIFF'S OPPOSITION TO INDIVIDUAL DEFS MOTION TO DISMISS FOR FAILURE TO STATE CLAIM OR IN ALTERNATIVE TO STRIKE TIME BARRED ALLEGATIONS

assessing the true value of its interest in Clarium. Compl. ¶¶ 40, 41, 69(a). Moreover, Amisil specifically alleges that this fraudulent course of stonewalling culminated, on July 20, 2006, with Thiel, in his capacity as Managing Member of Clarium, purporting to expel Amisil and acquire its interest in Clarium in response to Amisil's continued requests to inspect Clarium's books as was its right under the Operating Agreement. Compl. ¶¶ 45, 60(e).

The Complaint also sets forth material omissions made by each individual defendant. Among other things, Amisil alleges that it received no information concerning Clarium's interest in PayPal on the eve of the eBay acquisition (Compl. ¶62(c), 69(c)), yet at that time, Thiel, Portnoy and Woolway held dual roles at Clarium and Confinity/FieldLink/PayPal. Thiel was Clarium's Managing Member as well as PayPal's CEO. Compl. ¶9, 24. Portnoy was Clarium's Chief Financial Officer and PayPal's Vice President of Financial Planning and Analysis. Compl. ¶¶ 10, 25. Woolway was Clarium's Managing Director, and meanwhile also played an instrumental role in the initial public offering of PayPal. Compl. ¶¶ 11, 26. Clearly these individuals possessed material information concerning the extent and value of Clarium's interest in PayPal at the time; yet, as the Complaint alleges, none made Amisil aware that Clarium held an interest in PayPal, let alone how much that interest was worth or would potentially be worth. These particularized allegations are specific enough to put each individual defendant on notice of his alleged fraud so that he may prepare an answer and defense to the charges. *See Neubronner*, 6 F.3d at 671.

The individual defendants' argument also fails because "pleading group conduct may in some cases meet Rule 9(b) requirements." *Lewis v. Sporck*, 612 F. Supp. 1316, 1325 (N.D. Cal. 1985). Amisil alleges fraud against a specific and distinct group of named high-level directors. Compl. ¶¶ 9-11; *Cf. Lewis*, 612 F. Supp. at 1325 (group pleading is proper under 9(b) where the complaint delineates the involvement of the different groups of defendants).[2] Clarium itself is nothing more than a shell entity, manipulated by these individual defendants to hide the true value of

_____

[2] Unlike the complaint in *Lewis*, Amisil's claims for fraud are directed at a distinct group of high-level directors. *See Lewis v. Sporck*, 612 F. Supp. 1316, 1325 (N.D. Cal. 1985) (observing that categorization may give adequate notice in some cases, but finding allegations excessively broad where complaint purported to sue "directors, accounting officers, *and* mid-level employees") (emphasis in original).

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

PLAINTIFF'S OPPOSITION TO INDIVIDUAL DEFS MOTION TO DISMISS FOR FAILURE TO STATE CLAIM OR IN ALTERNATIVE TO STRIKE TIME BARRED ALLEGATIONS

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Amisil's interest while siphoning profits to Thiel and his colleagues.  Given the concealed nature of the company's operations and the managerial role each defendant plays in those operations, Amisil has complied with the demands of Rule 9(b) by alleging specific acts of fraud and identifying the group responsible.  *See In re Silicon Graphics Sec. Litig.,* 970 F. Supp. 746, 764 (N.D. Cal. 1997) (holding group pleading satisfied Rule 9(b) where, based on information pled regarding time and content of statements, "[the company] and its executives can identify who is being charged and with what.").

Group pleading is particularly appropriate in this case because Thiel, Portnoy and Woolway individually participated in a continuing course of conduct to prevent Amisil from exercising its rights under the Agreement and to ultimately force the sale of Amisil's interest in Clarium for a fraction of its true value.  Compl. ¶ 73.  In the context of similar allegations courts have recognized that "[it is not] necessary for the complaint, once it has adequately identified a particular defendant with a category of defendants allegedly responsible for some continuing course of conduct, to plead more than the group conduct of the defendants."  *In re Equity Funding Corp. of Am. Sec. Litig.*, 416 F. Supp. 161, 181 (C.D. Cal. 1976).  Amisil's complaint alleges that the defendants each had exclusive knowledge of facts material to the value of Amisil's interest in Clarium, that each had a duty as officers and directors to disclose these material facts to Amisil, and that as a group all willfully concealed and misrepresented information within their exclusive knowledge to prevent Amisil from receiving fair distributions and to prevent Amisil from exercising its rights under the Agreement.  Compl. ¶¶ 9-11, 24-26, 71-73.  Given the continuous course of deception that precipitated this complaint, the purposes of Rule 9(b) are fully satisfied by naming the defendants individually, identifying their role in the fraudulent scheme, and pleading specific acts of fraud against the group.

Amisil's allegations are sufficient to put the individual defendants on notice regarding the charges against them.  Amisil has therefore properly stated a claim for fraud against each individual defendant.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**B.**      **Amisil Has Properly Pled Scienter Under the PSLRA Because the Complaint and Attached Exhibits Specifically Connect Thiel to Misstatements Made in Connection with Fraudulent Attempts to Purchase Amisil's Interest**

Amisil's complaint connects defendant Thiel to two separate attempts to purchase Amisil's interest for far less than its true value.  Compl. ¶¶ 29, 42.  In addition, Amisil alleges that Thiel, in his capacity as Managing Member, was specifically responsible for the purported expulsion of Amisil and forced sale of its interest.  Compl. ¶ 45.  In the context of these attempted purchases and the forced sale, Thiel made material misstatements intended to mislead Amisil about the value of its interest in Clarium.  Combined with the financial gains Thiel anticipated upon acquiring Amisil's interest and his exclusive knowledge about the value of Clarium by virtue of his position as Managing Member; the facts Amisil specifically alleges and links to Thiel create a reasonable inference that Thiel intended to mislead Amisil in connection with the purchase of Amisil's interest in Clarium.  *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004).

Amisil has pled scienter with the requisite level of particularity to satisfy the pleading requirements of the Personal Securities Litigation Reform Act ("PSLRA").  The PSLRA requires that "[plaintiff's] pleadings must, as a whole, raise a strong inference the defendants knowingly or with deliberate recklessness made false and misleading statements."  *In re Syncor*, 327 F. Supp. 2d at 1171.  In determining whether plaintiff's pleadings are sufficient to create an inference of scienter courts consider the totality of the allegations.  *Oracle*, 380 F.3d  at 1230.  Taken together with the totality of Amisil's allegations, the specific facts alleged against Thiel are sufficiently particularized to raise an inference that Thiel knowingly made false statements with the intention of gaining financially by acquiring Amisil's interest for less than its true value.

Contrary to the individual defendants' assertion, Amisil has specifically pled a connection between Thiel and the fraudulent statements made in connection with Thiel's attempts to purchase Amisil's interest.  *See In re Syncor*, 327 F. Supp. 2d at 1172.  As stated above, Amisil specifically alleges that Thiel, by correspondence dated May 2, 2002, materially misrepresented the value of Amisil's interest in Clarium in an attempt to fraudulently purchase that interest for only $372.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  Compl. ¶¶ 28, 69(b), Exhibit D.  The Ninth Circuit has held that "a signature on a document" is the

2  very type of specific fact "that would tie a corporate officer to a statement." *In re Syncor Int'l Corp.*

3  *Secs. Litig.*, 327 F. Supp. 2d at 1172.  Indeed the correspondence purporting to purchase Amisil's

4  interest for far less than its true value is signed by Peter Thiel.  Compl. Exhibit D (correspondence

5  dated May 2, 2002, signed by Peter Thiel).  Based on Amisil's allegation that Clarium owned a $4.9

6  million stake in PayPal when this correspondence was sent, a reasonable inference can be drawn that

7  Thiel knowingly made the false statements contained in that correspondence with the intent to

8  defraud Amisil.  Compl. ¶ 28, Exhibit D (correspondence signed by Thiel representing that income

9  generated by Clarium had been small as basis for $372 offer of purchase).

10      Similarly, Amisil's Complaint specifically ties Thiel to a verbal offer on June 14, 2006 to

11  purchase Amisil's interest in Clarium for $300,000.  Compl. ¶ 42.  Again, a reasonable inference that

12  Thiel's offer was a knowing false statement regarding the value of Amisil's interest can be drawn

13  from the fact that defendants have not at any time given Amisil access to Clarium's books or

14  provided annual reports about Clarium's operations that would allow Amisil to evaluate the true

15  value of its interest.  This inference is bolstered by the fact that Thiel bought out all other members

16  of Clarium in 2002 and thus planned to, and stood to, profit substantially by purchasing Amisil's

17  interest for less than its true value.  Compl. ¶¶ 38, 73.

18      For the same reasons, the purported expulsion of Amisil from Clarium on July 20, 2006, and

19  the facts alleged to have led up to this culminating event, demonstrate a willful attempt on Thiel's

20  part to misrepresent the value of Amisil's interest in Clarium and to acquire it for far less than its

21  true value.  As with the earlier attempts to purchase Amisil's interest, the Complaint specifically

22  alleges that Thiel, in his capacity as Managing Member of Clarium, directed Clarium to expel Amisil

23  with the intention of forcing the sale of Amisil's membership interest.  Compl. ¶ 45.  Taken together

24  with the factual allegations regarding Thiel's earlier buy-out attempts, and the course of stonewalling

25  carried out by all defendants in the face of Amisil's requests to review Clarium's books, this final

26  attempt to acquire Amisil's interest by improper means is sufficient to raise an inference that Thiel

27  acted with deliberate recklessness in attempting to force a fraudulent sale of Amisil's interest.

28

PLAINTIFF'S OPPOSITION TO INDIVIDUAL DEFS MOTION TO DISMISS FOR FAILURE TO STATE CLAIM OR IN
ALTERNATIVE TO STRIKE TIME BARRED ALLEGATIONS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

For the foregoing reasons, Amisil has properly pled scienter under the PSLRA against defendant Thiel.  Likewise, for the reasons stated in Amisil's opposition to Clarium's motion to dismiss, Amisil has properly pled all other elements necessary to state a claim for securities fraud under Section 10b-5 against defendant Thiel.

**C.    Amisil Has Stated a Claim for Breach of Fiduciary Duty Because the Operating Agreement Does Not Limit the Fiduciary Duties Owed to Amisil by the Individual Defendants**

Amisil has adequately pled a prima facie case for breach of fiduciary duty against Thiel, Portnoy and Woolway and nothing in the Operating Agreement contradicts that.  The individual defendants rely on a completely faulty interpretation of the Operating Agreement in seeking to prevent Amisil from pursuing a breach of fiduciary duty claim against them.  Their arguments have no merit.

**1.    The Complaint Sufficiently Alleges a Prima Facie Case for Breach of Fiduciary Duty against Thiel, Portnoy and Woolway.**

To state a claim for breach of fiduciary duty under Delaware law the complaint must allege: "(i) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty."  *Heller v. Kiernan*, 2002 Del. Ch. LEXIS 17 (Del. Ch. 2002).  The Complaint alleges that the individual defendants in their capacity as officers and directors of and majority members in Clarium, owe Amisil a duty of loyalty, honesty and candor regarding the conduct of Clarium's affairs and their handling of Amisil's interest in Clarium.  Compl. ¶ 84.  This duty requires them to use their ability to control the company in a fair, just and equitable manner to ensure that all members of Clarium benefited proportionately. Compl. ¶ 84.  Amisil alleges that the individual defendants breached their fiduciary duties by intentionally and recklessly misstating material facts and by using their power to control the company to benefit themselves in a manner detrimental to Amisil.  Compl. ¶ 85.  Amisil has thus alleged all elements necessary to state a claim for breach of fiduciary duty under Delaware law.

**2.    The Operating Agreement Does Not Limit the Fiduciary Duties These Individual Defendants Owed to Amisil**

Not one provision in the Operating Agreement limits the primary fiduciary duties that Thiel,

1  Portnoy and Woolway owed to Amisil. Defendants do not deny the fact that "[t]he directors of

2  Delaware corporations have a triad of primary fiduciary duties: due care, loyalty, and good faith."

3  *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001). Rather defendants assert that the

4  Operating Agreement has some how limited these common law fiduciary duties with respect to

5  Amisil's membership interest in Clarium. However, while defendants cite a multitude of authority

6  to establish that Delaware law allows a limited liability company to limit a director's fiduciary

7  duties, defendants do not cite a single provision in the Operating Agreement that purports to limit the

8  fiduciary duties these individual defendants owed to Amisil. This is because none exists.

9      Here, instead of citing a provision in the Operating Agreement which in any way limits the

10  common law triad of primary fiduciary duties, defendants rely on the faulty assertion that a

11  "Withdrawn Member" with limited non-economic rights, as defined by the Operating Agreement, is

12  owed limited fiduciary duties. This argument has no merit because, as explained in detail in

13  Amisil's opposition to Clarium's motion to dismiss, Amisil's withdrawal from the fund did not alter

14  its status as a member of Clarium. As such, defendants Thiel, Portnoy and Woolway by virtue of

15  their positions as officers, directors and managing members of Clarium at all times owed Amisil a

16  duty of due care, loyalty, and good faith unaffected by the terms of the Operating Agreement.

17      **3.    The Operating Agreement Does Not Limit the Fiduciary Duties Owed by
            the Individual Defendants to Assignees**

18

19      Even assuming *arguendo* that Amisil's withdrawal from the fund reduced its status to that of

20  an Assignee, nothing in the Operating Agreement limits the fiduciary duties these defendants owe to

21  Assignees. Section 7.6 of the Operating Agreement (dealing with the status of Assignees) in no way

22  limits the fiduciary duties an officer, director or majority member owes to an Assignee. Moreover,

23  by the Operating Agreement's terms, "an Assignee that holds an interest in the Company shall be

24  entitled to receive the allocations attributable to such interest." Compl. Ex B, Operating Agreement

25  § 7.6(c). Implicit in this directive is the imposition of a fiduciary duty on Clarium's officers and

26  directors to make, in good faith, "the distributions attributable to [Amisil's] interest pursuant to"

27  provisions of the Agreement dealing with distributions. *Id.*

28      Additionally these individual defendants had a fiduciary duty to make disclosures to Amisil

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

PLAINTIFF'S OPPOSITION TO INDIVIDUAL DEFS MOTION TO DISMISS FOR FAILURE TO STATE CLAIM OR IN
ALTERNATIVE TO STRIKE TIME BARRED ALLEGATIONS

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  regarding the value of its interest in Clarium. Nothing in the Operating Agreement suggests that a

2  fiduciary of Clarium may withhold information or fail to make disclosures about the financial status

3  of Clarium based on an Assignee's status. On the contrary, the Operating Agreement clearly states

4  that "to the extent necessary to give effect to the Assignee rights and obligations set forth in Section

5  7.6(c) [dealing with distributions] . . . an Assignee shall be treated as a Member for purposes of this

6  Agreement." *Id.* § 7.6(e). An Assignee's right to distributions logically includes the right to

7  determine the value of that interest. *See e.g. Kortum v. Webasto Sunroofs Inc.*, 769 A.2d 113, 123

8  (Del. Ch. 2000) (determining the value of a shareholder's interest in the company is a "genuine and

9  substantial" reason for demanding disclosures). To allow a fiduciary to withhold such essential

10 financial information from Amisil would permit a breach of the duty of good faith and fair dealing as

11 it relates to Amisil's contractual right, as either a Member or Assignee of Clarium, to receive

12 proportionate distributions based on the value of its interest. *See* 6 Del. C. § 18-1101(c) (providing

13 "the limited liability company agreement may not eliminate the implied contractual covenant of

14 good faith and fair dealing).

15        For these reasons, regardless of Amisil's alleged status under the Agreement, defendants

16 Thiel, Portnoy and Woolway had a fiduciary duty to provide Amisil with proportionate distributions,

17 material information relating to Amisil's interest in Clarium, and access to Clarium's financial

18 records for determining the value of that interest. Amisil has therefore stated a claim for breach of

19 fiduciary duty against the individual defendants.

20        **D.    Amisil's Claim for Civil Conspiracy Is Proper Because Amisil Has Alleged
              Actionable Fraud by the Individual Defendants**

21

22        To state a cause of action for civil conspiracy under California law "the complaint must

23 allege (1) the formation and operation of a conspiracy; (2) the wrongful act or acts done pursuant

24 thereto; and (3) the damage resulting from such act or acts." *General American Life Ins. Co. v.*

25 *Rana*, 769 F. Supp. 1121, 1125 (N.D. Cal. 1991), *citing Younan v. Equifax Inc.*, 111 Cal. App. 3d

26 498, 511 n. 9 (1980).[3] To establish the "wrongful act" element of civil conspiracy to defraud the

27        ───────────────

28        [3] California substantive law, rather than the contractual choice of Delaware law, controls
          Amisil's claim for civil conspiracy to defraud because fraud is tortious conduct neither related to nor

PLAINTIFF'S OPPOSITION TO INDIVIDUAL DEFS MOTION TO DISMISS FOR FAILURE TO STATE CLAIM OR IN
ALTERNATIVE TO STRIKE TIME BARRED ALLEGATIONS

complaint must plead all the required elements of fraud under California law.  *See Id.*  Because Amisil has alleged actionable fraud against the individual defendants, Amisil's claim for civil conspiracy to defraud is proper.

Amisil alleges that defendants Thiel, Portnoy and Woolway "had knowledge of and agreed to the objective and course of action to injure Amisil."  Compl. ¶ 87.  While Rule 9(b) requires particularity in pleading the underlying facts of civil conspiracy, courts have recognized that, as a matter of equity, "great leeway should be allowed the pleader of a conspiracy since the details are often in the hands of the defendants."  *Roberts v. Heim*, 670 F. Supp. 1466, 1485 (N.D. Cal. 1987).  Moreover, "a conspiracy claim may survive a motion to dismiss if it includes sufficient facts to support an inference of agreement."  *Id.*  For these reasons courts permit plaintiffs to allege an agreement based on information and belief, particularly where the "facts corroborating this belief are in the exclusive possession of defendants."  *Id.* at 1484.[4]

In addition to specifically pleading an agreement to defraud, Amisil has also alleged facts supporting an inference that Thiel, Portnoy and Woolway entered an agreement to conceal the value of Amisil's interest and to prevent Amisil from exercising its rights with the intention of acquiring Amisil's interest for a mere fraction of its true value.  *See Chicago Title Ins. Co. v. Great Western Financial Corp.*, 69 Cal. 2d 305, 316 (1968) (holding an agreement "may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances.").  Amisil alleges that this conspiracy was perpetrated by a small, distinct group of high-level directors, each of whom had exclusive knowledge of Clarium's operations and a duty to disclose material information.  *See Roberts*, 670 F. Supp. at 1485 (observing that courts have

arising out of the Operating Agreement.  *See Medical Instrument Dev. Labs. v. Alcon Labs.,* 2005 U.S. Dist. LEXIS 41411 (N.D. Cal. 2005), *citing Sutter Home Winery, Inc. v. Vintage* Selections, Ltd., 971 F.2d 401, 407 (9th Cir. 1992).  Delaware law and California law however are in accord with regard to the elements necessary to state a cause of action for civil conspiracy.  *See Weinber v. UOP, Inc.*, 426 A.2d 1333, 1348 (Del. Ch. 1981).

[4] The dates and details of specific meetings leading up to and forming the agreement are in the exclusive control of the defendants.  To the extent the court requires, Amisil respectfully requests leave to amend to indicate those facts it believes are in the exclusive possession of defendants.  *See Roberts v. Heim*, 670 F. Supp. 1466, 1484 (N.D. Cal. 1987).

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

PLAINTIFF'S OPPOSITION TO INDIVIDUAL DEFS MOTION TO DISMISS FOR FAILURE TO STATE CLAIM OR IN ALTERNATIVE TO STRIKE TIME BARRED ALLEGATIONS

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    inferred a conspiracy where the "alleged scheme involved a relatively modest number of actors, all

2    of whom were directly involved in the tortious activity"); *see also Chicago Title Ins.*, 69 Cal.2d at

3    785 (finding evidence of conspiracy where all alleged conspirators either had a controlling interest in

4    the company or were officers or directors of the corporation). Given the fact that none of the

5    defendants acted upon their individual duty to disclose material facts to Amisil, an inference may be

6    made that they agreed as a group to breach their duty. This inference is bolstered by Amisil's

7    assertion that, as directors, each individual defendant stood to enjoy significant pecuniary benefits by

8    preventing Amisil from receiving income distributions and by ultimately attempting to expel Amisil

9    and force a sale of its interest in Clarium for far less than its value. Compl. ¶ 88; *see Chicago Title

10    Ins.*, 69 Cal.2d at 785 (finding evidence of conspiracy where fraudulent scheme created "a great

11    source of income" for conspirators). Taken together, these facts suggest a concerted effort

12    evidencing an agreement to defraud Amisil and capture its interest for the conspirators' pecuniary

13    gain.

14            Defendants do not contest the allegation that an agreement was made. Rather they argue

15    there has been no wrongful act by reasserting their contention that the Operating Agreement

16    authorizes their fraudulent conduct and by characterizing Amisil's claims for fraud as "vacuous

17    allegations." For the reasons stated above, and in opposition to Clarium's motion to dismiss,

18    defendants' contractual argument is without merit. Amisil's withdrawal from the Fund in no way

19    affected its status as a member in Clarium. Furthermore, regardless of whether Amisil is

20    characterized as a Member or Assignee of Clarium, defendants had a duty to provide Amisil a

21    proportionate share of distributions and to disclose material information regarding Amisil's interest.

22            Likewise, for the reasons stated above, Amisil's claims for fraud are sufficiently

23    particularized to put defendants on notice of their alleged wrongful acts as co-conspirators.

24    Conspiracies by nature involve concerted ongoing group conduct; group pleading is therefore wholly

25    consistent with a claim of conspiracy to defraud. *See In re Equity Funding Corp. of Am. Sec. Litig.*,

26    416 F. Supp. at 181.

27            Finally, because Amisil has properly stated a claim for fraud, Amisil has also clearly alleged

28    an injury caused by the unlawful acts of the conspiracy. *See Roberts*, 670 F. Supp. at 1484 (holding

PLAINTIFF'S OPPOSITION TO INDIVIDUAL DEFS MOTION TO DISMISS FOR FAILURE TO STATE CLAIM OR IN
ALTERNATIVE TO STRIKE TIME BARRED ALLEGATIONS

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

injury element of conspiracy claim was alleged where plaintiffs stated a claim under Section 10(b) of the Securities Exchange Act of 1934).

Because Amisil's Complaint specifically alleges an agreement, wrongful act and resulting damage, Amisil properly states a claim for civil conspiracy against the individual defendants.

### E.    Amisil Has Stated a Claim for Relief on All Remaining Claims for the Same Reasons Stated in the Opposition to Clarium's Motion to Dismiss

Amisil has properly stated a claim for relief for conversion, violation of California Business & Professions Code § 17200, accounting, constructive trust and injunctions against the individual defendants for the same reasons stated in its opposition to Clarium's motion to dismiss.

### F.    The Individual Defendants' Motion to Strike Should Be Denied Because Amisil's Allegations Are Not Time Barred and Are Material to Amisil's Claims

As an initial matter, any reference to Amisil's claims for breach of contract and breach of implied covenant in the individual defendants' Motion to Strike is improper and irrelevant because these claims were not brought against the individual defendants.[5]

The individual defendants' motion to strike allegations pre-dating August 28, 2003, has no merit both because the challenged allegations fall within the applicable limitations period and further because they are material and pertinent to Amisil's claims. Because Amisil has properly alleged a civil conspiracy to defraud, the three-year statue of limitations for fraud is tolled until the last overt act of the conspiracy. Likewise, because Amisil did not discover or have reason to investigate the individual defendant's fraudulent conduct until Amisil's meeting with Jason Portnoy and Mark Woolway on March 14, 2006, the statute of limitations for Amisil's § 10(b) claims and various tort claims was tolled until that date. Additionally, Thiel's May 2, 2002, attempted purchase of Amisil's interest falls within the five-year statute of repose applicable to Amisil's § 10(b) claim. However, even if these allegations are found to be time barred, the motion to strike should still be denied

---

5 Additionally, a motion to strike on behalf of Clarium would be improper under Rule 12(f) because Clarium failed to bring such motion "within 20 days after service of the [complaint] upon [Clarium]." Fed. Rules Civ. Proc. R. 12(f).

Case No. C 06 5255 MJJ                                    – 14 –                                    DOCSSFO-12455493.4-BWCORBRI

PLAINTIFF'S OPPOSITION TO INDIVIDUAL DEFS MOTION TO DISMISS FOR FAILURE TO STATE CLAIM OR IN ALTERNATIVE TO STRIKE TIME BARRED ALLEGATIONS

because these allegations provide background information that is both material and pertinent to Amisil's § 10(b) and tort claims.

**1.     The Statute of Limitations for Amisil's Fraud Claim Was Tolled Until the Last Overt Act of the Conspiracy**

Under California law, "when a civil conspiracy is properly alleged and proved, the statute of limitations does not begin to run on any part of the plaintiff's claims until the 'last overt act' pursuant to the conspiracy has been completed."  *Wyatt v. Union Mortg. Co.*, 24 Cal.3d 773, 786 (1979); *Gibson v. United States*, 781 F.2d 1334, 1340 (9th Cir. 1986).  Here the "last overt act" was the purported expulsion of Amisil from Clarium on July 20, 2006, whereby the conspiracy attempted a forced sale of Amisil's interest for far less than its actual value.  This was the culminating act in a conspiracy to defraud Amisil which encompassed repeated failures to make distribution to Amisil dating back to 2002, refusals to allow Amisil to inspect Clarium's records to assess the value of its interest as was its right, and repeated material misrepresentations and omissions coupled with attempts to purchase Amisil's interest for far less than its true value.  To the extent that these individual defendants "continu[ed] to commit wrongful acts in furtherance of a conspiracy to harm another, [they] can neither claim unfair prejudice . . . nor disturbance of any justifiable repose built upon the passage of time."  *Wyatt*, 24 Cal.3d at 787.

Therefore, under the last overt act rule, the three-year statute of limitations for fraud was tolled until July 20, 2006.

**2.     The Statute of Limitations for Amisil's Claims Was Tolled Under the Discovery Rule Because Amisil Had No Reason to Suspect the Individual Defendants' Wrongful Conduct until March 2006**

Both California and Delaware law recognize that the statute of limitations for a given claim does not begin to run until "the plaintiff has reason to suspect an injury and some wrongful cause." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 797, 803 (2005); *Krahmer v. Christie's, Inc.*, 903 A.2d 773, 778-779 (Del. Ch. 2006).  Amisil alleges that in 1999, the fund managed by Clarium had poor performance.  Compl. ¶ 22.  Amisil then alleges that it was not until March 14, 2006, that Amisil learned that Clarium was managing, among other investments, a hedge fund that was actually profitable.  Compl. ¶ 37.  Thus, the Complaint alleges that at no time prior to March 14, 2006, did Amisil know or have reason to know that its interest in Clarium was worth anything other than what

PLAINTIFF'S OPPOSITION TO INDIVIDUAL DEFS MOTION TO DISMISS FOR FAILURE TO STATE CLAIM OR IN ALTERNATIVE TO STRIKE TIME BARRED ALLEGATIONS

1  the individual defendants represented it to be.

2        Similarly, the Complaint sufficiently alleges that because authority to make distributions was

3  at the exclusive discretion of defendants (Compl. Ex. B, Operating Agreement § 5.1), and because

4  Amisil never received any distributions from Clarium whatsoever, Amisil did not know or have

5  reason to suspect prior to March 14, 2006, that any distributions had been made, let alone that it

6  should seek to enforce its right to receive a proportionate share.

7        Thus, the Complaint sufficiently alleges that Amisil relied on defendants' representations and

8  non-disclosures which, at all times prior to March 2006, led Amisil to believe that its investment in

9  Clarium was nearly worthless.  The allegations concerning PayPal serve only to illustrate the

10  individual defendant's deceitful conduct.  One such example is that while Amisil was kept in the

11  dark about Clarium's interest in PayPal as well as the individual defendants' involvement in PayPal

12  (Compl. ¶¶ 14, 15), the individual defendants drove the IPO effort for PayPal which, by the second

13  day of trading, translated into a $100 million stakeholding for Thiel personally and a $4.9 million

14  stake for Clarium (Compl. ¶¶ 23-28).  It was not until March 2006, when Amisil learned that

15  Clarium was actually profitable (Compl. ¶ 37) and contrasted that information with the May 2002

16  buy-out attempt (Compl. ¶ 29) and the fact that it had received no distributions or information

17  concerning Clarium's operations in preceding years (Comp. ¶¶14, 15, 35), that Amisil had any

18  reason to suspect that something was not quite right.  The allegations clearly support the application

19  of the discovery rule to Amisil's fraud claim against the individual defendants.

20        Finally, Thiel's May 2, 2002 letter attempting to purchase Amisil's interest, and the

21  misstatements made therein, fall within the five-year statute of repose for § 10(b) claims and are thus

22  not time barred because Amisil had no reason to suspect that Thiel's statements were fraudulent

23  when made.  *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 419 (D.N.Y. 2005) (recognizing

24  "Sarbanes-Oxley, in overturning *Lampf*, extended [the] limitations period, such that an action under

25  Section 10(b) 'may be brought not later than the earlier of . . . (1) 2 years after the discovery of the

26  facts constituting the violation; or (2) 5 years after such violation.'").

27        For the foregoing reasons defendants' motion to strike is improper because the above factual

28  allegations are not time barred.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

PLAINTIFF'S OPPOSITION TO INDIVIDUAL DEFS MOTION TO DISMISS FOR FAILURE TO STATE CLAIM OR IN
ALTERNATIVE TO STRIKE TIME BARRED ALLEGATIONS

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1

3.    **In the Alternative, the Motion to Strike Should Be Denied Because These Allegations Provide Material and Pertinent Background Information**

2

3    Even if these allegations are held to be time barred, defendants still have not made a proper

4    showing that the allegations are "immaterial [or] impertinent" as is required by Rule 12(f).  "Motions

5    to strike are generally viewed with disfavor and are not frequently granted."  *Barefield v. Cal. State*

6    *Univ. Bakersfield*, 2006 U.S. Dist. LEXIS 21677 (E.D. Cal. 2006).  Accordingly, a party moving to

7    strike allegations from a pleading must show that "those issues could have no possible bearing on the

8    issues in litigation."  *Id.*  Contrary to defendants' assertion, the conduct alleged demonstrates a

9    continuing course of deception which supports Amisil's various fraud based claims.

10    The challenged allegations demonstrate a pattern of omissions and misrepresentations

11    intended to keep Amisil in the dark about the value of its interest.  In particular, the continuous buy-

12    out offers, specifically the May 2, 2002, offer of $372, underscore the ultimate goal of this

13    fraudulent scheme: to acquire Amisil's interest for far less than its true value which would result in

14    significant financial gain for the individual defendants.  To the extent that these defendants

15    ultimately opted to force Amisil to sell its interest for a fraction of its value, these allegations place

16    this culminating act in context and demonstrate a motive ultimately going to the question of the

17    defendants' intent to defraud Amisil.  *See Occhionero v. City of Fresno,* 2006 U.S. Dist. LEXIS

18    12025 (E.D. Cal. 2006) (denying motion to strike where time barred acts "may be used as evidence

19    to establish motive and to put timely-filed claims in context.").

20    Because the events occurring before August 28, 2003, may be considered as background

21    evidence and to establish intent to defraud these events are not redundant, immaterial or impertinent

22    and are not the proper subject of a motion to strike.

23    / / /

24    / / /

25    / / /

26    / / /

27    / / /

28    / / /

PLAINTIFF'S OPPOSITION TO INDIVIDUAL DEFS MOTION TO DISMISS FOR FAILURE TO STATE CLAIM OR IN ALTERNATIVE TO STRIKE TIME BARRED ALLEGATIONS

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**IV.    CONCLUSION**

For the foregoing reasons, the Court should deny the individual defendants' motion to dismiss the Complaint and the motion to strike.[6]

DATED:  October 17, 2006.

REED SMITH LLP


By    /s/
Tita K. Bell

Attorneys for Plaintiff
Amisil Holdings Ltd.

---

[6] If this Court grants said motion with respect to any claim, Amisil respectfully requests that it be allowed leave to amend. *Allen v. Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990) (leave to amend should be freely given when justice so requires).

PLAINTIFF'S OPPOSITION TO INDIVIDUAL DEFS MOTION TO DISMISS FOR FAILURE TO STATE CLAIM OR IN ALTERNATIVE TO STRIKE TIME BARRED ALLEGATIONS

1  Harvey L. Leiderman (SBN 55838)
   Email: hleiderman@reedsmith.com
2  Tita K. Bell (SBN 206735)
   Email: tkbell@reedsmith.com
3  REED SMITH LLP
   Two Embarcadero Center, Suite 2000
4  San Francisco, CA 94111-3922
   Mailing Address:
5  P.O. Box 7936
   San Francisco, CA 94120-7936
6  Telephone:    415.543.8700
   Facsimile:    415.391.8269
7
   Daniel R. Formeller (admitted *pro hac vice*)
8  Email: dformeller@tsmp.com
   Basileios Katris (admitted *pro hac vice*)
9  Email: bkatris@tsmp.com
   Tressler, Soderstrom, Maloney & Priess
10 Sears Tower, 22nd Floor
   233 South Wacker Drive
11 Chicago, Illinois 60606-6308
   Telephone:    312.627.4000
12 Facsimile:    312.627.1717

13  Attorneys for Plaintiff Amisil Holdings Ltd.

14              UNITED STATES DISTRICT COURT

15            NORTHERN DISTRICT OF CALIFORNIA

16               SAN FRANCISCO DIVISION

17

| | |
|---|---|
| 18  AMISIL HOLDINGS LTD., a Cyprus Corporation, | Case No.: C 06 5255 MJJ |
| 19                    Plaintiff, | **APPENDIX OF UNPUBLISHED AUTHORITY CITED IN PLAINTIFF'S OPPOSITION TO MOTIONS OF** |
| 20        v. | **DEFENDANTS PETER THIEL, JASON PORTNOY AND MARK WOOLWAY TO DISMISS PLAINTIFF'S COMPLAINT FOR** |
| 21  CLARIUM CAPITAL MANAGEMENT, LLC f/k/a/ THIEL CAPITAL MANAGEMENT, LLC, | **FAILURE TO STATE A CLAIM; OR, IN THE ALTERNATIVE TO STRIKE TIME BARRED ALLEGATIONS** |
| 22  a Delaware Limited Liability Company, PETER ANDREAS THIEL, a California resident, JASON | |
| 23  PORTNOY, a California resident, MARK WOOLWAY, a California resident, | **F.R.C.P. 12(b)(6) & 12(f)** |
| 24                    Defendants. | Hearing Date:    November 7, 2006 |
| 25 | Time:           9:30 a.m. Courtroom:      11 |
| 26 | |
| 27 | The Honorable Martin J. Jenkins |
| 28 | |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Plaintiff Amisil Holdings Ltd. submits copies of the following unpublished authorities for the Court's reference:

1.    *Barefield v. Cal. State Univ. Bakersfield*, 2006 U.S. Dist. LEXIS 21677 (E.D. Cal. 2006)

2.    *Medical Instrument Dev. Labs. v. Alcon Labs.*, 2005 U.S. Dist. LEXIS 41411 (N.D. Cal. 2005); and

3.    *Heller v. Kiernan*, 2002 Del. Ch. LEXIS 17 (Del. Ch. 2002).

DATED:  October 17, 2006.

REED SMITH LLP

By___/s/_____
    Tita K. Bell

Attorneys for Plaintiff
Amisil Holdings Ltd.

APPENDIX OF UNPUBLISHED AUTHORITY CITED IN PLAINTIFF'S OPPOSITION TO INDIVIDUAL DEFS' MOTIONS TO DISMISS FOR FAILURE TO STATE CLAIM OR IN ALTERNATIVE TO STRIKE

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

LEXSEE 2006 U.S. DIST. LEXIS 21677

**LASHAWN BAREFIELD, Plaintiff, v. CALIFORNIA STATE UNIVERSITY BA-
KERSFIELD, and DOES 1 through 50 inclusive, Defendants.**

**CIV-F-05-0633 AWI TAG**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
CALIFORNIA**

*2006 U.S. Dist. LEXIS 21677*

**March 28, 2006, Decided
March 28, 2006, Filed**

**COUNSEL:** [*1] For Lashawn Barefield, an Individual, Plaintiff: Waukeen Q. McCoy, Law Offices of Waukeen Q McCoy, San Francisco, CA.

For California State University, Bakersfield, a California Public Entity, Defendant: Charles Trudrung Taylor, Kirsten O'Brien Zumwalt, Lang, Richert & Patch, Fresno, CA.

**JUDGES:** Anthony W. Ishii, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Anthony W. Ishii

**OPINION:**

### ORDER RE: MOTION TO DISMISS

### ORDER DENYING PRIOR MOTION TO DISMISS FIRST AMENDED COMPLAINT AS MOOT (DOC. 11)

Defendant has made a motion to dismiss parts of Plaintiff's second amended complaint. Plaintiff has opposed the motion, and the matter was taken under submission without oral argument.

### I. History

Plaintiff Lashawn Barefield ("Barefield") is an African American female who has been employed by Defendant California State University Bakersfield ("CSUB" n1) as a Student Services Professional/ Academic Related I since January 2001. On August 19, 2003, CSUB posted an opening for the position of Director of Student Activities n2. Barefield, who already had a master's degree, applied for the position. In September 2003, CSUB hired another existing CSUB employee, Marina Avalos-Kegley, a non-African American [*2] female who was in the process of obtaining her master's degree, as Interim Director of Student Activities. By letter dated December 9, 2003, Barefield was informed that she was no longer being considered for the permanent position without ever having been interviewed. Marina Abvalos-Kegley completed her master's degree in 2004 and was ultimately hired as the permanent Director of Student Activities.

n1 CSUB represents that the true defendant in this case is the Board of Trustees of the California State University instead of California State University Bakersfield. Doc. 36, Brief, at 1:19-20.

n2 In the Second Amended Complaint, Barefield makes reference to both "Director of Student Activities" and "Director of Student Services." The court understands the two titles to refer to the same position.

Barefield alleges that starting on or about October 10, 2003, CSUB racially discriminated against her in failing to promote her to the permanent Director of Student Activities position. Barefield represents that she [*3] had received positive reviews of her work as a Student Services Professional in her annual Unit Retention, Promotion, and Tenure Evaluation and a previous supervisor (retired) wrote a letter of recommendation to the committee which produced the review. Her supervisors in 2003 were Bill Perry, CSUB Assistant Vice President of Student Life, and Diane Hendrickson, CSUB Interim Division Director. Barefield states she discussed her intention to seek the promotion with them prior to actually submitting her application, receiving positive responses from both. According to Barefield, Hendrickson advised Barefield to prepare for an interview as she was sure to

get one. Barefield also claims that Hendrickson told her she would probably get the position as she was the most qualified of the people who expressed interest. As a result of the denial of her promotion, Barefield alleges she has suffered emotional and physical harm for which she has been receiving medical care.

Barefield filed suit on May 10, 2005 against CSUB and Doe defendants. Doc. 1. The complaint was addressed to the Superior Court of California, County of Kern but was filed in the United States District Court in Fresno. Her initial [*4] complaint alleged the following causes of action: violation of *Cal. Gov't Code § 12940 et seq.* ("FEHA"), violation of *42 U.S.C. § 1981*, breach of contract, breach of the covenant of good faith and fair dealing, and intentional infliction of emotional distress. Barefield filed an amended complaint on July 21, 2005 which was identical to her initial complaint, only addressed to the United States District Court. Doc. 6. CSUB filed a motion to dismiss on August 16, 2005. Doc. 11. The motion sought to dismiss Barefield's breach of contract, breach of the covenant of good faith and fair dealing, and *Section 1981* claims for failure to state a claim upon which relief can be granted under *Fed. R. Civ. Proc. 12(b)(6)*. CSUB further sought the dismissal of the entire suit for lack of federal subject matter jurisdiction under *Fed. R. Civ. Proc. 12(b)(1)* on the assumption that the *Section 1981* claims would be dismissed. Alternatively, the motion sought to strike Barefield's request for punitive damages under *Fed. R. Civ. Proc. 12(f)* [*5] . Barefield opposed the motion in its entirety. The matter was taken under submission without oral argument. Contemporaneously, Barefield filed a motion to amend her complaint under *Fed. R. Civ. Proc. 15* on September 8, 2005. Doc. 13. Magistrate Judge Theresa Goldner granted the request by order of November 1, 2005. Doc. 29. Barefield filed a corrected second amended complaint, the operative complaint, on November 17, 2005 which added a claim for violation of *42 U.S.C. § 2000e et seq.* ("Title VII"). Doc. 31. The second amended complaint mooted CSUB's submitted motion to dismiss as federal subject matter jurisdiction would remain regardless of any dismissal of Barefield's *Section 1981* claim.

On November 30, 2005, CSUB filed a new motion to dismiss. Doc. 35. The new motion is in fact identical to the old motion minus the request for dismissal of the suit for lack of federal subject matter jurisdiction. Barefield filed an opposition on December 23, 2005. Doc. 38. CSUB filed a reply on January 3, 2006. Doc. 39. The matter was taken under submission without oral argument by order of January 5, 2006. Doc. 40.

## II. Legal [*6]  Standards

### A. *Fed. R. Civ. Proc. 12(b)(6)*

In considering a motion to dismiss under *Rule 12(b)(6)*, the court must accept as true the allegations of the complaint in question. *Hospital Bldg. Co. v. Rex Hospital Trustees, 425 U.S. 738, 740, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976).* The court will construe the pleading in the light most favorable to the party opposing the motion and resolve all doubts in the pleader's favor. *Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S. Ct. 1843, 23 L. Ed. 2d 404 (1969).* A motion to dismiss for failure to state a claim should not be granted unless it appears beyond doubt that plaintiff can prove no set of facts in support of the claim that would entitle him to relief. See *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984),* citing *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957);* see also *Palmer v. Roosevelt Lake Log Owners Ass'n, 651 F.2d 1289, 1294 (9th Cir. 1981).* Absent unusual circumstances, dismissal without leave to amend is improper unless it is clear that the complaint could not be saved by amendment. *Chang v. Chen, 80 F.3d 1293, 1296 (9th Cir. 1996).*

When a defendant [*7] challenges the legal sufficiency of a complaint, the court's review is limited to the complaint. *Cervantes v. City of San Diego, 5 F.3d 1273, 1274 (9th Cir. 1993).* As a general matter, a district court may not consider any material outside of the pleadings when ruling on a *Rule 12(b)(6)* motion. *Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001); Branch v. Tunnell, 14 F.3d 449, 453 (9th Cir. 1994).* Material properly submitted as part of the complaint and materials the court may take judicial notice of may be considered. *Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001).* If the parties present the court with any other evidence and the court considers it, the court must converting the *Rule 12(b)(6)* motion into a motion for summary judgment. *Fed. R. Civ. Pro. 12(b)(6); Anderson v. Angelone, 86 F.3d 932, 934-35 (9th Cir. 1996).*

### B. *Fed. R. Civ. Proc. 12(f)*

*Rule 12(f)* allows the court to strike from "any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous [*8]  matter." The purpose of a *Rule 12(f)* motion is to avoid the costs that arise from litigating spurious issues by dispensing with those issues prior to trial. See *Sidney-Vinstein v. A.H. Robins Co., 697 F.2d 880, 885 (9th Cir.1983).* Immaterial matter is defined as matter that "has no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir 1993),* rev'd on other grounds *510 U.S: 517, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994).* Impertinent matter is defined as "statements that do not pertain, and are not necessary, to the issues in question." *Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir 1993).* Motions to

strike are generally viewed with disfavor and are not frequently granted. See *Bassiri v. Xerox Corp., 292 F. Supp. 2d 1212, 1220 (C.D. Cal. 2003).* Courts must view the pleading under attack in the light more favorable to the pleader. *Bassiri v. Xerox Corp., 292 F. Supp. 2d 1212, 1220 (C.D. Cal. 2003).* Accordingly, "motions to strike should not be granted unless it can be shown that no evidence in support of the allegation would [*9] be admissible, or those issues could have no possible bearing on the issues in the litigation." *Gay-Straight Alliance Network v. Visalia Unified School Dist., 262 F. Supp.2d 1088, 1099 (E.D. Cal. 2001).* Nevertheless, a motion to strike may be used to strike a prayer for relief where the damages sought are not recoverable as a matter of law. See *Gay-Straight Alliance Network v. Visalia Unified School Dist., 262 F. Supp.2d 1088, 1110-11 (E.D. Cal. 2001); Bureerong v. Uvawas, 922 F. Supp. 1450, 1479 n.34 (C.D. Cal. 1996); Nurse v. United States, 226 F.3d 996, 1004-05 (9th Cir. 2000).* Granting a motion to strike may be proper if it will make the trial less complicated or if allegations being challenged are so unrelated to plaintiff's claims as to be unworthy of any consideration as a defense and that their presence in the pleading will be prejudicial to the moving party. *Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir 1993).*

### III. Discussion

### A. State Contract Claims

CSUB seeks to have the breach of contract and breach of the covenant of good faith and fair dealing claims (the second [*10] and third causes of action) dismissed. These claims are purely state law matters and CSUB cites to California Supreme Court precedent. "[I]t is well settled in California that public employment is not held by contract but by statute and that, insofar as the duration of such employment is concerned, no employee has a vested contractual right to continue in employment beyond the time or contrary to the terms and conditions fixed by law." *Miller v. State, 18 Cal. 3d 808, 813, 135 Cal. Rptr. 386, 557 P.2d 970 (Cal. 1977).* "Plaintiff has also attempted to state a cause of action for breach of contract or breach of the implied covenant of good faith and fair dealing. However, because plaintiff is a civil service employee, he cannot state such a cause of action." *Shoemaker v. Myers, 52 Cal. 3d 1, 23, 276 Cal. Rptr. 303, 801 P.2d 1054 (Cal. 1990).*

Barefield cites to a number of cases that purport to demonstrate how public employees can indeed sue for breach of contract and breach of the covenant of good faith. See Doc. 38, Opposition, at 6:1-15. First, Barefield cites to two old California Supreme Court cases: *Kern v. Long Beach, 29 Cal. 2d 848, 852, 179 P.2d 799 (Cal. 1947)* and *Dryden v. Board of Pension Comm'rs, 6 Cal. 2d 575, 59 P.2d 104 (Cal. 1936).* [*11] In both cases,

the issue was whether public employees' pension benefits were deemed to be protected by contract. Miller makes a distinction between employment and pension benefits, finding that while public employment is statutory and not subject to suit based on contract, already accrued pension benefits are protected under contract. *Miller v. State, 18 Cal. 3d 808, 813, 135 Cal. Rptr. 386, 557 P.2d 970 (Cal. 1977).* Another case cited, *Foley v. Interactive Data Corp., 47 Cal. 3d 654, 254 Cal. Rptr. 211, 765 P.2d 373 (Cal. 1988),* dealt with private employment, not public employment, and stated generally that there is no tort (independent of contract) for a breach of the implied covenant of good faith and fair dealing in an employment contract.

The slightly puzzling case is *Mouchette v. Board of Education, 217 Cal. App. 3d 303, 266 Cal. Rptr. 1 (Cal. Ct. App. 1990).* In Mouchette, a coordinator of risk and insurance programs for the Oakland Unified School District was fired. He sued the school board, the school district, and a member of the board for wrongful termination, including a claim for breach of the implied covenant of good faith and fair dealing. CSUB tries to distinguish the case by saying that the [*12] case dealt with a breach of the implied covenant of good faith and fair dealing based in tort, and not in contract. Doc. 39, Reply, at 3:16-17. However, the opinion states, "The Board contends that Mouchette's claim for tortious breach of the implied covenant of good faith and fair dealing must be dismissed in light of Foley [which] held that tort remedies are not available for breach of the implied covenant of good faith and fair dealing in the employment context. The Foley court, however, did not eliminate the cause of action but simply limited plaintiffs to contractual remedies for breaches of the implied covenant." *Mouchette v. Board of Education, 217 Cal. App. 3d 303, 315, 266 Cal. Rptr. 1 (Cal. Ct. App. 1990).* While the opinion does not then go on to explicitly state the damages were based on contract and not tort, the quoted language heavily implies that conclusion. The court does note that statutory employment was not raised as a defense in the opinion. See *Mouchette v. Board of Education, 217 Cal. App. 3d 303, 309, 266 Cal. Rptr. 1 (Cal. Ct. App. 1990).* The explanation for the confusion may just be that defendants in that case neglected to raise the defense.

As [*13] Shoemaker unequivocally states with regard to breach of contract, "because plaintiff is a civil service employee, he cannot state such a cause of action." *Shoemaker v. Myers, 52 Cal. 3d 1, 23, 276 Cal. Rptr. 303, 801 P.2d 1054 (Cal. 1990).* CSUB's motion to dismiss Barefield's second and third causes of action is granted. As amendment would be futile, leave to amend is denied.

### B. Section 1981

2006 U.S. Dist. LEXIS 21677, *

Plaintiff's first cause of action includes a claim under *42 U.S.C. § 1981.* "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts. . . . For purposes of this section, the term make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *42 U.S.C. § 1981.* Whether or not employees of the State of California, whose terms of employment are governed by statute, can sue under *Section 1981* is an unresolved question. As the state can change the terms and conditions of the employment by statute without the consent of the employees, [*14] there is question as to whether they work under a "contract" as conventionally understood. At least two Ninth Circuit panels have looked at this issue in unpublished opinions, coming to opposite conclusions.

One published Ninth Circuit opinion, dealing with the analogous State of Washington employment scheme, concluded that the state employee in that case did not have standing to sue. See *Judie v. Hamilton, 872 F.2d 919, 923 (9th Cir. 1989).* In Judie, the court stated that the analysis must follow a three step process outlined by the U.S. Supreme Court:

> The century-old Civil Rights Acts do not contain every rule of decision required to adjudicate claims asserted under them. In the absence of specific guidance, Congress has directed federal courts to follow a three-step process to borrow an appropriate rule. First, courts are to look to the laws of the United States so far as such laws are suitable to carry the civil and criminal civil rights statutes into effect. If no suitable federal rule exists, courts undertake the second step by considering application of state common law, as modified and changed by the constitution and statutes of the forum State. [*15] A third step asserts the predominance of the federal interest: courts are to apply state law only if it is not inconsistent with the Constitution and laws of the United States.

*Burnett v. Grattan, 468 U.S. 42, 47-48, 104 S. Ct. 2924, 82 L. Ed. 2d 36 (1984),* citations omitted. The court in Judie concluded that (1) there is "no federal common law of contracts for *section 1981* claims"; (2) Washington law is such that "the terms of public employment, other than pension rights, do not create contractual expectan-

cies"; and (3) there is "no similar inconsistency in Washington state contract law." *Judie v. Hamilton, 872 F.2d 919, 922-23 (9th Cir. 1989).* Ultimately, the Ninth Circuit stated point blank: "If the terms of public employment affecting compensation, layoffs, and reemployment do not create contractual expectancies, then we do not believe that Judie's job description creates contractual expectancies either. Judie, therefore, has not established a cognizable claim for violation of the right to contract under *section 1981.*" *Judie v. Hamilton, 872 F.2d 919, 923 (9th Cir. 1989).*

At least one district court judge of the Northern District, Judge Martin Jenkins, [*16] has come to the same conclusion regarding California employees. In one case, a plaintiff alleged that he was subject to disparate treatment in receiving a suspension on the basis of race. "Since a contract of employment does not control the terms and conditions of civil service employment with the City, Zimmerman cannot establish a claim under *§ 1981.*" *Zimmerman v. City & County of San Francisco, No. C 93-4045 MJJ, 2000 U.S. Dist. LEXIS 10866 at *32 (N.D. Cal., July 27, 2000).* In another case heard by Judge Jenkins, the dicta included the statement that "Plaintiff cannot state any violation of *42 U.S.C. § 1981* because the Court did not grant him leave to pursue this claim; California's two-year personal injury statute of limitations bars this claim; and public employees hold employment pursuant to statute, not contract." *Batiste v. City of Emeryville, No. C-03-4392 MJJ, 2004 U.S. Dist. LEXIS 15789 at *5 (N.D. Cal., August 2, 2004).*

Not all courts agree. In one case arising in the Eastern District of Pennsylvania, plaintiff was an at-will employee of the public library without a contract. Pennsylvania precedent found that a public employer [*17] could not enter into an employment contract absent statutory authority, which was not present in this case. Nevertheless, the court said, "the presence or absence of a contract' is not dispositive of Plaintiff's *§ 1981* claim. Therefore, that Defendants could not have possibly entered into an employment contract with Plaintiff is superfluous. A *§ 1981* claim is cognizable when brought by an at-will employee such as Plaintiff when it is alleged that an employer adversely altered an employee's working conditions because of or in consideration of said employee's race." *Marquess v. City of Philadelphia, NO. 98-1117, 1999 U.S. Dist. LEXIS 15958 at *4 (E.D. Pa., October 5, 1999).*

Barefield cites to one published Ninth Circuit case where an individual sued was denied employment by the San Mateo District Attorney's office and then successfully brought suit under *Sections 1981* and *1983. Ramirez v. San Mateo County Dist. Attorney's Office, 639 F.2d 509, 510 (9th Cir. 1981).* However, the opinion does not discuss the issue raised by CSUB: whether state

employment, regulated by statute, is a "contract" within the meaning of *Section 1981*. Again, in the absence [*18] of any mention of the issue, the court will not presume that it was raised in the proceedings.

In the end, the Ninth Circuit's ruling *Judie* is persuasive. Judie identified the analysis to be undertaken and found that the Washington system of statutory employment, which did not involve "contracts" with employees cognizable under *Section 1981*, was not inconsistent with federal law. As discussed above, California law similarly finds state employment to be statutory. Barefield's *Section 1981* claim must be dismissed.

## C. Punitive Damages

CSUB seeks to have Barefield's request for punitive damages stricken under *Fed. R. Civ. Proc. 12(f)*. Doc. 36, Brief, at 6:6-9. Barefield makes three arguments in opposition: (1) a prayer for punitive damages in a complaint is not subject to a motion to strike, (2) Barefield may add individual defendants against whom she will seek punitive damages, and (3) CSUB may indemnify these additional defendants against any punitive damage awards. Doc. 38, Opposition, at 6:22-7:5.

As to the first argument, courts regularly use *Fed. R. Civ. Proc. 12(f)* to strike from [*19] complaints requests for damages that can not be awarded as a matter of law. See *Loskot v. Lulu's Rest., No. CIV. S-00-1497 WBS PAN, 2000 U.S. Dist. LEXIS 22252 (E.D. Cal., November 15, 2000); Gay-Straight Alliance Network v. Visalia Unified School Dist., 262 F. Supp.2d 1088, 1110-11 (E.D. Cal. 2001); Bureerong v. Uvawas, 922 F. Supp. 1450, 1479 (C.D. Cal. 1996); Nurse v. United States, 226 F.3d 996, 1004-05 (9th Cir. 2000)*. Barefield's second argument is speculative. In order to name additional defendants, Barefield must comply with *Fed. R. Civ. Proc. 15* in seeking amendment to her complaint, at which point she may seek to renew her request for punitive damages. Argument three is similarly premature. The fact that CSUB may or may not indemnify these potential defendants does not change the fact that many laws prohibit the award of punitive damages against governmental bodies. *Cal. Gov't Code § 825(b)* allows a public entity to voluntarily indemnify for punitive damages "in its sole discretion"; no part of that law allows the punitive damage award to be levied [*20] directly against the public entity or forces that entity to pay for the punitive damage award levied against another.

As to the substance of the motion to strike, the breach of contract, breach of the covenant of good faith and fair dealing and *Section 1981* claims have been dismissed, leaving only the Title VII, FEHA, and intentional infliction of emotional distress claims. CSUB asserts in general that punitive damages may not be assessed against it pursuant to *Cal. Gov't Code § 818* which states, "Notwithstanding any other provision of law, a public entity is not liable for damages awarded under *Section 3294* of the Civil Code or other damages imposed primarily for the sake of example and by way of punishing the defendant." As applied against FEHA, the prohibition on punitive damages is valid and any such request is subject to being stricken. *State Pers. Bd. v. Fair Employment & Hous. Com, 39 Cal. 3d 422, 434, 217 Cal. Rptr. 16, 703 P.2d 354 (Cal. 1985); Inland Mediation Bd. v. City of Pomona, 158 F. Supp. 2d 1120, 1159 (C.D. Cal. 2001); Daniels v. County of San Francisco, No. C-99-05372 CRB, 2000 U.S. Dist. LEXIS 10839 at *5 (N.D. Cal., July 25, 2000)*. [*21] Similarly, punitive damages are unavailable against a public entity under the intentional infliction of emotional distress cause of action. *McAllister v. South Coast Air Quality Etc. Dist., 183 Cal. App. 3d 653, 656, 228 Cal. Rptr. 351 (Cal. Ct. App. 1986); Austin v. Regents of University of California, 89 Cal. App. 3d 354, 358, 152 Cal. Rptr. 420 (Cal. Ct. App. 1979)*.

*Section 818* does not apply against federal laws. However, under the terms of Title VII itself, punitive damages are not recoverable against governmental entities. "A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *42 U.S.C. § 1981a(b)(1)*. Barefield cannot collect punitive damages from CSUB under Title VII. See *Singleton v. University of California, No. C-93-3496 MHP, 1995 U.S. Dist. LEXIS 329 at *11 (N.D. Cal., January 6, 1995)* (finding in dicta that [*22] the University of California and its Regents are government entities against which punitive damages can not be awarded in a Title VII suit).

## IV. Conclusion

Defendant CSUB's motion to dismiss and strike is GRANTED. Plaintiff Barefield's breach of contract, breach of the covenant of good faith and fair dealing, and *42 U.S.C. § 1981* causes of action are DISMISSED with PREJUDICE. Plaintiff Barefield's prayer for punitive damages is STRICKEN. The remaining causes of action are *Cal. Gov't Code § 12940 et seq.*, Title VII, and intentional infliction of emotional distress; Plaintiff Barefield does not have leave to amend.

IT IS SO ORDERED.

**Dated: March 28, 2006**

/s/ Anthony W. Ishii

2006 U.S. Dist. LEXIS 21677, *

UNITED STATES DISTRICT JUDGE

LEXSEE 2005 U.S. DIST. LEXIS 41411

**MEDICAL INSTRUMENT DEVELOPMENT LABORATORIES, Plaintiff, v. ALCON LABORATORIES, Defendants.**

**No. C-05-1138 MJJ**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2005 U.S. Dist. LEXIS 41411*

**August 10, 2005, Decided**
**August 10, 2005, Filed**

**COUNSEL:** [*1] For Medical Instrument Development Laboratories a California corporation, Plaintiff: Mark B. Fredkin, William Siamas, Morgan,Franich,Fredkin & Marsh, San Jose, Ca.

For Alcon Laboratories Inc, a Delaware corporation, Defendant: Benjamin P. Smith, Joan M. Haratani, William W. Friedman, Morgan, Lewis & Bockius, LLP, San Francisco, CA.

**JUDGES:** MARTIN J. JENKINS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** MARTIN J. JENKINS

**OPINION:**

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

**INTRODUCTION**

Before the Court is Defendant Alcon Laboratories' ("Defendant" or "Alcon") Rule 12(b)(6) Motion to Dismiss, or in the alternative, Rule 12(e) Motion for a More Definite Statement ("Motion"). For the following reasons, the Court **GRANTS** Defendant's Motion without prejudice.

**FACTUAL BACKGROUND**

Defendant Alcon is a leading pharmaceutical company specializing in researching, developing, manufacturing, and marketing ophthalmic surgical, vision care, and optical products. n1 Part of Alcon's business is to develop and sell surgical devices for use in the treatment of ocular diseases. Defendant Alcon asserts that for the past three decades, it has been in the process [*2] of developing and improving a virectomy probe used in surgical procedures to treat retinal disorders, but as of

2000 it had yet to develop an adequate probe. Plaintiff Medical Instrument Development Laboratories ("Plaintiff" or "MID Labs") is a California corporation which develops and manufactures medical instruments for use in vitreoretinal (ophthalmic) surgery, including a product known as a High Speed Single Use Virectomy Probe (the "Probe"). MID Labs was founded by Dr. Carl Wang ("Wang") in 1981, and the company was subsequently purchased by Alcon in 1985. After the purchase, Wang re-started his own business, which he again named MID Labs.

n1 The facts are derived from Alcon's Motion and MID Labs' Complaint.

On or about October 12, 2000, MID Labs and Alcon entered into a contract entitled Release and Supply Agreement (the "Agreement"). Seven provisions of the Agreement are relevant for purposes of resolving the instant motion. Section 3.01 of the Agreement states, "[s]ubject to its rights to self-manufacture [*3] the Products pursuant to section 4.05 Alcon agrees that it will purchase its requirements of the Products from MID Labs and will not have the right to make or have made the Products." (Complaint ("Comp."), Ex. A at § 3.01.) Section 4.01 of the Agreement states that "[n]othing in this Agreement shall be construed to require Alcon to purchase any minimum quantities of Products from MID Labs." (*Id.* at § 4.01.) Section 4.05 of the Agreement states that "[i]n the event that MID Labs fails to either (i) provide Alcon with Products meeting the Specifications in the quantities requested by Alcon pursuant to section 4.03 [] or (ii) maintain the Quality Standards for all of the Products pursuant to section 4.04 [], then Alcon may, at its option, give MID Labs written notice of such nonperformance . . . Alcon shall have the right to terminate

this Agreement and/or it or its Affiliate shall have the right to self manufacture the Products." (*Id.* at § 4.05.) Section 4.06 of the Agreement states that "Alcon will have the right to acquire from any third party or internally develop similar technology or products which may compete against or replace any of MID Labs Products." ([*4] *Id.* at § 4.06.) Section 7.01 of the Agreement states that "the party receiving . . . confidential information shall not make use of said confidential information, except for purposes authorized by this Agreement." (*Id.* at § 7.01.) Section 8.02(c) of the Agreement states that the Agreement may be terminated by "Alcon at any time without cause or for any reason by providing MID Labs with thirty (30) days prior written notice[.]" (*Id.* at § 8.01(c).) Finally, section 12.07 of the Agreement states that the "Agreement is to be performed in accordance with the laws of the State of Texas and shall be construed and enforced in accordance with the laws of the State of Texas." (*Id.* at § 12.07.)

Approximately a year after the Agreement was entered into and continuing through March 2002, Alcon representatives requested assurances that MID Labs would be able to meet the technological requirements of a high volume purchase order of Probes. Subsequently, Alcon and its engineers were granted access to MID Labs' facility in order to inspect and audit MID Labs' development, manufacturing, and testing processes for the Probes. Sometime during this inspection period, the parties' [*5] relationship deteriorated.

Plaintiff MID Labs alleges that Defendant Alcon breached the Agreement and committed various acts of fraud by developing its own probe and ceasing to purchase all of its needed Probes from MID Labs. Defendant Alcon argues, to the contrary, that the Agreement left it free and clear to acquire Probes from any third party or to internally develop its own probe for manufacture and sale at any time during the term of the Agreement and thereafter. Plaintiff MID Labs filed a Complaint on February 18, 2005, in the Superior Court of the State of California, Alameda County. Plaintiff's Complaint contains three state law causes of action: (1) common law fraud and deceit; (2) breach of contract; and (3) unfair business practices in violation of *California Business and Professions Code section 17200*. Defendant removed the case to this Court on diversity grounds.

**LEGAL STANDARD**

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the claims asserted in the complaint. *See Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337 (9th Cir. 1996). Dismissal of an action pursuant to *Rule 12(b)(6)* is appropriate only [*6] where it "appears beyond [a] doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to re-

lief." *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1482 (9th Cir. 1991) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-6, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)). In reviewing such a motion, the Court must assume all factual allegations to be true and must construe them in the light most favorable to the nonmoving party. *See North Star v. Arizona Corp. Comm.*, 720 F.2d 578, 580 (9th Cir. 1983). Therefore, the Court will dismiss the complaint or any claim in it without leave to amend only if "it is absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir. 1987).

**ANALYSIS**

**I. Choice of Law**

As an initial matter, the Court addresses the parties' disagreement regarding what state's substantive law applies to Plaintiff's claims. The Agreement contains a choice of law provision specifying that the Agreement "shall be construed and enforced in accordance with the law of the State of Texas." (Comp., Ex. A at § 12.07.) Defendant contends [*7] that pursuant to that provision, Texas law governs all claims arising out of the Agreement. Thus, Defendant argues, Plaintiff's Second Cause of Action, brought under *California Business & Professions Code*, § § 17200, *et seq.*, is not viable. Plaintiff MID Labs argues that pursuant to section 12.07 of the Agreement, Texas law governs only as to "contract claims relating to performance and construction," and "does not require tort or statutory causes of action." (Opposition ("Opp.") at 4.) Specifically, Plaintiff asserts that the Agreement's choice of law provision should apply neither to Plaintiff's tort claim for fraud and deceit, nor to its *section 17200* claim, the first and third causes of action.

In suits based on diversity jurisdiction, district courts are to apply the choice of law principles of the forum state. *Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4, 96 S. Ct. 167, 46 L. Ed. 2d 3 (1975). Since this lawsuit was brought in the Northern District of California, California law properly determines whether Texas law should control the present dispute. Under California law, a choice of law clause agreed upon through arm's length negotiations by sophisticated [*8] commercial parties is generally enforced unless it is contrary to California public policy. *Medimatch, Inc. v. Lucent Technologies, Inc.*, 120 F. Supp. 2d 842, 861-62 (N.D. Cal. 2000) (citation omitted). However, the Ninth Circuit has held that "[c]laims arising in tort are not ordinarily controlled by a contractual choice of law provision. Rather they are decided according to the law of the forum state." *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992) (citation omitted).

Here, Defendant has not established that the choice of law provision, as written, should apply to *all matters* arising out of the Agreement. n2 Section 12.07 of the Agreement simply states that the "Agreement is to be performed in accordance with the laws of the State of Texas and shall be *construed and enforced* with the laws of the State of Texas." (Comp., Ex. A at § 12.07 (emphasis added).) While this statement establishes that Texas law will govern interpretation and construction of the contract, the narrowly-worded choice of law provision does not explicitly control non-contractual claims that are related to the contract. *Thompson & Wallace of Memphis, Inc. v. Falconwood Corp., 100 F.3d 429, 432-33 (5th Cir. 1996)* [*9] (tort claims not governed by choice of law clause providing that chosen law applied to the "agreement and its enforcement"). Therefore, the Court finds that because Plaintiff's fraud and deceit claim and its *section 17200* claim are non-contractual "claims arising in tort," they are not contemplated by the Agreement's choice of law provision and should be "decided according to the law of the forum state." *Sutter, 971 F.2d 407.* The Court also finds that the choice of law provision does not bar Plaintiff's *section 17200* claim, a claim brought under California law. In sum, the Court finds that the First and Third Causes of Action are governed by California law. Only the breach of contract claim is governed by Texas law.

n2 In support of its argument, Defendant relies on *Ribbens International, S.A. de C. V. v. Transport International Pool, Inc.,* for the proposition that a contractual choice of law provision should be applied "unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice of law, or (b) application of the law of the chosen state would be contrary to the fundamental policy of the state which has materially greater interest than the chosen state[.]" *47 F. Supp. 2d 1117, 1120 (N.D. Cal. 2000).* *Ribbens* is not controlling, however, as the plaintiff's complaint in that case alleged only breach of contract. Thus, the *Ribbens'* court determination, as to the application of a choice of law provision, does not speak to tort and statutory causes of action alleged here.

[*10]

## II. Motion to Dismiss

### A. First Cause of Action -- Fraud and Deceit

Plaintiff MID Labs claims that Defendant Alcon made false representations to Plaintiff in order to induce disclosure of and obtain access to MID Labs' confidential and proprietary information related to the development, testing, and manufacturing processes of its Probes. Defendant alleges that Plaintiff's fraud claim should be dismissed because it has not been pled with sufficient particularity under *Rule 9(b) of the Federal Rules of Civil Procedure.* Plaintiff asserts that *Rule 9(b)* is not applicable here because it applies only to federal claims. Plaintiff contends that, in any event, its Complaint adequately alleges the facts necessary to support a claim of fraud. The Court disagrees.

Under California law, there are four required elements of a fraud claim: (1) a false promise or representation as to a material fact; (2) knowledge of the falsity of the representation when made (or lack of reasonable ground to believe in its truth), or without any intention of performing or fulfilling the promise; (3) an intent to deceive and to cause reliance at the time of [*11] the promise; and (4) reliance thereon with resulting injury and damage. *Serpa v. Jolly King Restaurants, Inc., 62 F.R.D. 626, 636 (S.D. Cal. 1974)* (citation omitted). *Rule 9(b)*'s requirement that fraud claims be pled with particularity is satisfied when the complaint states the time, place, and nature of the alleged fraudulent activities, and the identities of the parties alleged to have made the misrepresentations. *Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986)* (citations omitted).

Even construing the Complaint in the light most favorable to Plaintiff, as the Court must, it is apparent that Plaintiff has not met the requirements for a viable fraud claim under California law. First, Plaintiff alleges that Alcon representatives falsely told MID Labs that it planned to purchase a very high volume of MID Labs' Probes. In addition, Plaintiff MID Labs alleges that Defendant Alcon made these false representations with the purpose of gaining access to MID Labs' facilities under the false pretense of inspection. However, Plaintiff fails to allege any facts that, if proven, show that at the time the representation was [*12] made, Alcon did not intend to place such an order. Specifically, the point at which MID Labs claims it became aware of Alcon's allegedly false and fraudulent representations, Alcon was still inspecting MID Labs' facilities. Therefore, Defendant Alcon could still have fulfilled the promises made by its representatives once it was assured that MID Labs could handle the forecasted order. Thus, the Complaint fails to allege a false or misleading statement, or that Alcon's representatives knew their statements to be false at the time they were made.

Second, Plaintiff alleges $ 24 million in damages, but fails to allege the specific purchase order or any set of facts which, if proven, show that MID Labs would have received $ 24 million in profits absent Alcon's al-

leged fraudulent misrepresentations. Thus, the Complaint fails to allege an injury or damages that directly resulted from Alcon's representations, and the Court finds that MID Labs' Complaint fails to sufficiently plead a claim for fraud under California law. n3 The Court **GRANTS** Alcon's Motion to Dismiss on the First Cause of Action without prejudice.

n3 Since Plaintiff fails to sufficiently plead a fraud claim under California law, it cannot meet the heightened pleading requirements of *Rule 9(b)*.

[*13]

**B. Third Cause of Action -- *Section 17200* n4**

n4 Following the parties' lead, the Court addresses Plaintiff's three claims out of order.

Plaintiff MID Labs claims that Defendant Alcon's alleged fraudulent misrepresentations and misappropriation of MID Labs' confidential and proprietary information are acts and practices that violate *California Business and Professions Code section 17200*. Defendant argues that MID Labs' section 17200 cause of action is not viable because it is based on the insufficiently pled common law claims of fraud and misappropriation. Plaintiff disagrees. Defendant further asserts that Plaintiff's *section 17200* cause of action is deficient because Plaintiff has not alleged in its Complaint that members of the public are likely to be deceived by Defendant's allegedly fraudulent conduct.

Under *section 17200*, "unfair competition" is defined as "any unlawful, unfair or fraudulent business act or practice." This tripartite test is disjunctive and the plaintiff [*14] need only allege one of the three theories to properly plead a claim under *section 17200. Accuimage Diagnostics Corp. v. Terarecon, Inc., 260 F. Supp. 2d 941, 954 (N.D. Cal. 2003)* (citation omitted). As an initial matter, the Court notes that MID Labs has not alleged a violation of *section 17200* under the theory of unfair business practices. Thus, at issue is only whether MID Labs' cause of action may go forward under the theories of fraudulent or unlawful business practices. The Court addresses these separately.

**1. Fraudulent Business Practices**

Plaintiff asserts that the fraudulent business practices prong of *section 17200* is established by its common law claim for fraud. The Court disagrees. *Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.,* is instructive here. *178 F. Supp. 2d 1099 (C.D. Cal. 2001)*. In *Watson,*

a pharmaceutical company sued its supplier under the fraudulent business practices theory of *section 17200*, arguing that it was deliberately misled by the defendant's statements about its supply capabilities and its intent to resume supplying the pharmaceutical company with a hypertension drug. *Id. at 1120.* [*15] The district court held that "it is necessary under the fraudulent prong to show deception to some members of the public interest, and not merely to the direct competitor or other non-consumer party to the contract." *Id. at 1121.* The court noted the absolute lack of case authority establishing any principle that fraudulent business acts are "separately actionable by business competitors absent a showing that the public, rather than merely the plaintiff, is likely to be deceived." *Id.* The court held that the pharmaceutical company "is not a member of the public or a consumer entitled to [section 17200] protection." *Id.*

Here, similarly, Plaintiff's Complaint alleges a violation of the fraudulent prong of *section 17200* based on Defendant's alleged misrepresentation that it would purchase Probes from Plaintiff, which allegedly resulted in Plaintiff suffering lost profits. However, as in *Watson,* Plaintiff fails to allege in its Complaint that any "members of the public are likely to be deceived" by Defendant's allegedly fraudulent conduct. *Comm. on Children's Television, Inc. v. Gen. Foods Corp., 35 Cal. 3d 197, 211, 197 Cal. Rptr. 783, 673 P.2d 660 (1983)* (citation omitted). [*16] Furthermore, like the plaintiff in *Watson,* Plaintiff MID Labs is Alcon's direct competitor or, at least, a non-consumer, and "is not a member of the public or a consumer entitled to" protection under the fraudulent business practices theory of *section 17200. Watson, 178 F. Supp. 2d at 1120.* Therefore, the Court finds that Plaintiff has not satisfied the necessary elements of a fraudulent business practices theory of *section 17200* claim.

**2. Unlawful Business Practices**

A claim under the unlawful business practices theory of *section 17200* includes "any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *Id.* (citing *Saunders v. Superior Court, 27 Cal. App. 4th 832, 833, 33 Cal. Rptr. 2d 438 (1994)).* Plaintiff asserts that its unlawful business practices theory of *section 17200* is established by an underlying misappropriation claim. The parties dispute whether a common law claim can serve to undergird an unlawful business practices theory of a *section 17200* claim. However, the Court need not decide that question at this juncture since Plaintiff has not adequately pled a claim for misappropriation [*17] here. Plaintiff's Second Cause of Action, alleging breach of contract, vaguely alleges that Alcon breached the parties' Agreement by using MID Labs' confidential information. This is not a claim for unlawful misappropriation

of trade secrets. Hence, the Court finds that Plaintiff's unlawful business practices theory of its *section 17200* claim is not rendered tenable by any misappropriation claim.

The Court also notes that Plaintiff's First Cause of Action, alleging common law fraud, cannot support an unlawful business practices theory of its *section 17200* claim because, as discussed *supra*, the fraud claim is not adequately pled.

In sum, Plaintiff has failed to adequately plead either a fraudulent or unlawful business practices theory of its *section 17200* claim. Therefore, the Court **GRANTS** Defendant's motion to dismiss the Third Cause of Action, but **GRANTS** Plaintiff leave to amend.

### C. Second Cause of Action -- Breach of Contract

Plaintiff alleges in its Second Cause of Action that Alcon breached the parties' Agreement in three ways: (1) by manufacturing high speed probes; (2) by misappropriating confidential information; and (3) by ceasing to purchase all of [*18] its requirements for the Probes from MID Labs. Alcon argues that Plaintiff's breach of contract claim fails because Plaintiff has not alleged conduct constituting a breach of the parties' Agreement. MID Labs disagrees. At issue is the meaning of certain provisions of the Agreement.

Whether a contract is ambiguous is a question of law. *Coker v. Coker*, 650 S.W. 2d 391, 393-94, 26 Tex. Sup. Ct. J. 368 (Tex. 1983). n5 When interpreting a contract, courts should "give effect to the written expression of the parties' intent." *AT&T Corp. and AT&T Communications of the Southwest, Inc. v. Rylander*, 2 S.W. 3d 546, 559 (Tex. 1999) (citation omitted). "To determine the parties' intent, the courts must consider the entire writing in an effort to harmonize all of the provisions of the instrument" so that none will be rendered meaningless. n6 *Id.* Mere disagreement over the meaning of a provision in the contract does not necessarily mean that a term is ambiguous. *Richardson Lifestyle Ass'n v. Houston*, 853 S.W. 2d 796, 800 (Tex. App. 1993). However, "a contract is ambiguous if its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning. [*19] " *CMS Partners, Ltd. v. Plumrose USA, Incorporated*, 101 S.W. 3d 730, 732 (Tex. App. 2003). A court must determine "whether there is more than one reasonable interpretation of this contract such that a fact issue was created concerning the parties' intent." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W. 2d 587, 589, 40 Tex. Sup. Ct. J. 42 (Tex. 1999).

n5 The Court analyzes the viability of this claim pursuant to Texas law.

n6 "[T]he contract may be read in light of the surrounding circumstances to determine whether an ambiguity exists[,]" but all other extrinsic evidence is inadmissible. *AT&T*, 2 S.W. at 559 (citation omitted) (internal quotations omitted).

### 1. Alcon's Manufacture of the Probes

Pointing to sections 3.01 and 4.05 of the Agreement, Plaintiff alleges that the Agreement specifically prevents Alcon from manufacturing MID Labs' probes except "[i]n the event that MID Labs fails to either (i) provide Alcon with Products meeting the Specifications [*20] in the quantities requested by Alcon . . . or (ii) maintain the quality and standards for all of the Products." (Comp., Ex. A at § 3.01.) Defendant Alcon points to section 4.06 of the Agreement, which expressly allows it to "acquire from any third party or internally develop similar technology or products which may compete against or replace any of MID Labs Products." (*Id at § 4.06.*) At issue is the definition of "similar" used in section 4.06. If "similar" products includes the "virtually identical" probes that Plaintiff alleges Alcon manufactured here, there is no breach of contract. However, if the definition of "similar" does not incorporate the "virtually identical" probes produced by Alcon, Plaintiff has a breach of contract claim. Both interpretations are reasonable and thus, there is ambiguity in the contract terms. *See Columbia*, 940 S.W. 2d at 589. Such ambiguity raises factual questions that are not properly decided in the 12(b)(6) context. Accordingly, Defendant's Motion is **DENIED** on this ground.

### 2. Misappropriation of Proprietary and Confidential Information

Plaintiff claims that Alcon misappropriated MID Labs' confidential information [*21] to manufacture its own probe. Defendant contends that its use of MID Labs' confidential information was not prohibited by the Agreement because section 3.01 granted it an exclusive license to "make, use, offer for sale, and sell any product in the Territory." (Comp., Ex. A at § 3.01.) Plaintiff observes that section 3.01 of the Agreement does not expressly refer to the Probes at issue nor is "any product" capitalized (which, Plaintiff contends, would suggest the language was intended to refer to the Probes pursuant to section 1.01 of the Agreement). Thus, Plaintiff argues that section 3.01 of the Agreement does not grant Alcon license to use MID Labs' confidential information (i.e. Probe schematics) to make its own Probes except pursuant to section 4.05 of the Agreement (when MID Labs fails to provide adequate probes). According to Plaintiff, because section 3.01 does not apply here, section 7.01, which prohibits Alcon from using MID Labs' confiden-

tial information except for purposes authorized by the Agreement, bars Alcon's use of MID Labs' schematics.

Plaintiff's argument is creative. However, while it is a stretch to find that the "any product" language used in section 3.01 was [*22] intended to exclude the Probes (the only products contemplated by the Agreement), the Court again finds that the Agreement is sufficiently ambiguous that resolution of the parties' dispute over the proper meaning of various provisions of the Agreement would not be appropriate in the motion to dismiss context. *See Columbia, 940 S.W. 2d at 589.* Accordingly, Defendant's Motion is **DENIED** on this ground.

### 3. Alcon's Failure to Purchase Probes from MID Labs

According to section 4.01 of the Agreement, "[n]othing in this Agreement shall be construed to require Alcon to purchase any minimum quantities of Products from MID Labs." (Comp., Ex. A at § 4.01.) Defendant contends that section 4.06 of the Agreement, as discussed above, reserved Alcon's right to manufacture similar technology that could replace MID Labs' Probes. However, Plaintiff alleges that Alcon breached the Agreement by not purchasing the Probes it needed from MID Labs pursuant to section 3.01 of the Agreement and that the purpose of section 4.01 was to provide for the possibility that Alcon would get out of the probe business altogether and would not need to purchase (or manufacture) any probes. [*23] Plaintiff argues, however, that the Agreement is clear that should Alcon require probes, it was required to purchase those probes from MID Labs.

In light of the three competing provisions and the parties' reasonable interpretations of each (as well as their interpretations of the effect of all the provisions read in concert), the Court finds that there is ambiguity in the Agreement regarding Defendant Alcon's purchase requirement. *Columbia, 940 S.W. 2d at 589.* As discussed above, this raises factual questions that cannot be decided on a motion to dismiss. Thus, the Court **DENIES** Defendant's Motion as to Plaintiff's breach of contract claim for Defendant's failure to purchase its probes from MID Labs.

In sum, MID Labs' assertion that Alcon breached the contract by manufacturing high speed Probes, by misappropriating confidential information, and by ceasing to purchase all of its needed Probes from Mid Labs, raises questions of fact regarding the proper interpretation of the Agreement that cannot be decided on a motion to dismiss. Thus, the Court **DENIES** Defendant's motion to dismiss as to Plaintiff's breach of contract claim.

### CONCLUSION

For the foregoing [*24] reasons, the Court **GRANTS** Defendant's Motion to Dismiss as to Plaintiff's First and Third Causes of Action without prejudice, and **DENIES** the motion as to Plaintiff's Second Cause of Action for breach of contract. To the extent that Plaintiff's Complaint is dismissed, Plaintiff may file an amended complaint within 30 days within the date of this Order.

**IT IS SO ORDERED.**

Dated: August 10, 2005

MARTIN J. JENKINS

UNITED STATES DISTRICT JUDGE

LEXSEE 2002 DEL. CH. LEXIS 17

**TODD HELLER, Plaintiff, v. JAMES KIERNAN, RONNIE MOORE, COLD-WELL-BANKER REHOBOTH RESORT REALTY, a domestic entity, and HOUS-TON VENTURES, L.L.C., a Limited Liability Company, Defendants.**

**C.A. No. 1484-K**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2002 Del. Ch. LEXIS 17*

**January 29, 2002, Submitted
February 27, 2002, Decided**

**DISPOSITION:** [*1] Judgment entered in favor of defendants as to all claims.

**COUNSEL:** Steven Schwartz, Esquire, SCHWARTZ & SCHWARTZ, Dover, Delaware, Attorney for Plaintiff.

Stephen P. Ellis, Esquire, SERGOVIC, ELLIS & SHIREY, P.A., Georgetown, Delaware, Attorney for Defendants.

**JUDGES:** Stephen P. Lamb, Vice Chancellor.

**OPINION BY:** Stephen P. Lamb

**OPINION:**

*MEMORANDUM OPINION*

LAMB, Vice Chancellor

I.

This post-trial opinion considers the parameters of the relationship that exists, in the absence of any written or express oral contract, between a real estate brokerage company and its principals and employees, on the one hand, and a person who is shopping for real property and uses the services of that company and its employees to identify and inspect candidate properties, on the other.

Plaintiff claims that no person affiliated with the real estate company then assisting him in identifying potential properties had the right to bid on or agree to purchase a property in which plaintiff was expressing some interest but as to which he had not decided to make a bid. As a remedy, he seeks to impose a constructive trust on any profits realized from the subsequent development of such property. The defendants [*2] contend that they owed no duty to plaintiff because, they say, no agency relationship had arisen between them and plaintiff when the affiliated person made the offer or when it was accepted by the seller.

The evidence and relevant case law leave little room for doubt that no agency relationship existed between plaintiff and the defendant real estate company at any time. There is also no question, as a matter of fact, that anyone misused or appropriated any information belonging to plaintiff or relating to his possible interest in the property. Thus, there is no basis in law on which either to impose a constructive trust or to award plaintiff any other relief.

II.

Todd Heller, the plaintiff, has considerable experience in buying and selling real estate outside the State of Delaware. But, while he had long held an interest in acquiring real estate in Rehoboth Beach, Delaware, as of the time of the events at issue he had never owned, nor made a bid to purchase, any real estate in that town.

Heller planned a trip to Rehoboth for the weekend of April 7-8, 2001, to look for suitable real estate opportunities. He contacted Harry F. Faust, III, a sales representative for defendant [*3] Coldwell-Banker Rehoboth Resorts Realty ("Realty") and asked him to cull through and forward to Heller information about suitable properties listed for sale. Faust complied, sending him a package containing a large number of properties on the market at that time. Heller reviewed this package and told Faust to arrange inspections at several of those properties for Saturday.

On Saturday morning, before he was scheduled to meet with Faust, Heller drove around town making "street inspections" of properties in which he was interested. Among other properties, he looked at 15 Hickman Street, the subject of this litigation. That property con-

2002 Del. Ch. LEXIS 17, *

sisted of about one-quarter of an acre, on which sat a very large old home used as a rooming house. The lot had a slightly irregular shape, causing Heller to wonder about its potential for subdivision.

Before the time arranged for their meeting, Heller called Faust and asked him about the potential to subdivide 15 Hickman Street. To learn the answer to this question, Faust spoke to defendant James Kiernan in the same office as Faust. Kiernan is a shareholder of Realty and operates as a real estate salesperson. Kiernan told Faust that the land could certainly [*4] be subdivided into two lots for single family homes and that it might be possible to erect three townhouses. To get a more definite answer on this point, Kiernan then telephoned the person in charge of the Rehoboth Beach zoning department and confirmed that, if one moved quickly, the townhouse development was possible. He also learned that the lot was only a few square feet too small to allow for the development of four townhouses. Kiernan conveyed this information to Faust, who told Heller.

Kiernan is also a partner, together with defendant Ronnie Moore, in defendant Houston Ventures, a developer of real estate in the Rehoboth Beach area. Moore is a builder with considerable experience in construction in Sussex County. Kiernan and Moore were looking for a project for Houston Ventures to work on over the summer. In fact, the two of them met that same morning and discussed the possibility of buying 15 Hickman Street, tearing it down and building two townhouses. It is reasonable to infer that Kiernan's interest in that property was piqued by Faust's call.

To get more information about the property, Kiernan called David Liegey, the listing agent for 15 Hickman Street. Kiernan learned [*5] two things: first, that Liegey was expecting an offer that weekend; and second, that the sellers were interested in a September closing. The reasons for the delayed closing related to the use of the house as a rooming house and the existence of early bookings for the summer. Kiernan and Moore were only interested in the property if the sellers would close immediately.

Kiernan spoke to Faust and informed him of all these facts, including the fact that Houston Ventures (i.e. Kiernan and Moore) was considering making an offer. Kiernan asked if Faust was preparing to make an offer. Faust told Kiernan that Heller was looking at a number of properties and that he was not due to inspect 15 Hickman Street until 5:30 p.m. Faust conveyed all of this information to Heller except for the fact that Kiernan was considering making an offer. Kiernan submitted an offer later that afternoon conditioned on immediate settlement but did not tell Faust.

In the early evening, Heller and Faust met with Liegey at the property. At that time, Liegey told them that an offer "within 75% of the asking price" had been received. Liegey also told Faust that the offer looked good to the sellers and that Heller should [*6] move quickly. The record is clear that Heller learned about the offer and discussed it with Faust. Heller denies ever hearing Liegey say that he should move quickly or being so advised by Faust. Faust testified credibly that he related this advice to Heller. Given Faust's undoubted interest in seeing Heller make an offer on the property, it is likely that Faust did convey this information.

Liegey did not tell either Heller or Faust that the offer in hand was from Kiernan.

After the inspection, Heller and Faust stood in the parking lot and discussed 15 Hickman Street. There is some evidence that they discussed the possibility of Heller making an offer at $ 950,000. Although Heller testified at trial that he actually authorized Faust to submit such a bid, Faust strongly denies that this ever happened.

I conclude that Heller's testimony on this point is fabricated. The evidence pointing to this conclusion may be summarized as follows:

1. The complaint filed on June 5, 2001, and verified by Heller, does not allege that Heller ever authorized Faust to make an offer. On the contrary, it alleges that on Sunday, April 8, 2001, Heller met with Faust and "told him that he would make an offer [*7] but would think about it until Monday to decide upon the amount of his opening price offer." The Pretrial Stipulation and Order also does not contain any contention that Heller ever authorized Faust to make an offer.

2. Heller and Faust parted company on Saturday evening after the discussion in the parking lot, planning to meet the next day in order to inspect other properties. Faust did not prepare a written contract for Heller's signature, but spent Saturday evening preparing a work-up of the costs and expected profits to be derived from building either 2 houses or 3 townhouses. Faust testified that if Heller had decided to make an offer, he would have taken Heller back to his office immediately to prepare a written contract for immediate submission to Liegey.

3. The two men met on Sunday, but Heller neither looked at the written work-up nor asked Faust about the "offer" he claims to have authorized the night before.

4. Heller left Rehoboth later that day and, on Monday, discussed with his lawyer legal issues bearing on appropriate ownership structure Heller should use in bidding on property in Rehoboth Beach.

On Monday, April 9, 2001, the sellers accepted the offer from Houston [*8] Ventures for $ 1.1 million with an immediate settlement.

Heller brought suit on June 8, 2001.

## III.

Plaintiff brings this action to impose a constructive trust on the property at issue. A constructive trust is a remedy that proceeds on the theory that equitable title to property properly lies in the plaintiff and, as a result, the court will deem the defendant to have been simply holding the property as a constructive trustee for the plaintiff: n1

> If one party obtains the legal title to property, not only by fraud or by violation of confidence or of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it and who is considered in equity as the beneficial owner. . . . n2

A constructive trust may be imposed when a defendant's fraudulent, unfair or unconscionable conduct causes him or her to be unjustly enriched at the expense of another. n3 Thus, the question is whether Kiernan owed a duty to [*9] Heller to refrain from bidding himself on 15 Hickman Street. If so, it is clear from the facts that he knowingly breached his duty and profited thereby.

n1 *Sannini v. Casscells, 401 A.2d 927, 931 (Del. 1979).*

n2 *Adams v. Jankouskas, 452 A.2d 148, 152 n.4 (Del. 1982)* (quoting 1 POMEROY'S EQUITY JURISPRUDENCE § 166, at 210-11 (5th ed. 1941)).

n3 *Bird's Constr. v. Milton Equestrian Ctr., 2001 Del. Ch. LEXIS 140* at *10.

## IV.

The elements of breach of fiduciary duty that must be proven by a preponderance of evidence by the plaintiff are: (i) that a fiduciary duty exists; and (ii) that a fi-

duciary breached that duty. n4 On the facts of this case, no fiduciary duty existed between either Faust or Kiernan and Heller. Thus, there is no need to reach the second prong of the analysis.

n4 *York Linings v. Roach, 1999 Del. Ch. LEXIS 160* at *5.

[*10]

This court has traditionally been hesitant to expand the definition of fiduciary relationship, requiring that a "special trust in another" or a "special duty" exists between parties rising to the level that "the relationship connotes a dependence." n5 As this court has noted, "attention must be paid to the word "special" lest the statement be thought to describe too broadly Chancery's concerns with relationships where an element of trust, as commonly understood, is present." n6 The relationship between a realtor and customer is not one that ordinarily qualifies as a fiduciary relationship until an agent/principal relationship arises.

n5 *Cheese Shop Int'l, Inc. v. Steele, 303 A.2d 689, 690 (Del. Ch. 1973), rev'd on other grounds, 311 A.2d 870 (Del. 1973).*

n6 *McMahon v. New Castle Associates, 532 A.2d 601, 604 (Del. 1987).*

The distinguishing feature of an agent is that he represents his principal contractually. n7 An agent normally binds not himself but his [*11] principal by the contracts he makes. n8 The ability to so bind his principal results from the agent having been authorized, or appearing to an unsuspecting third party to have been authorized, with the power to do so. In this context, "real authority" is:

> Simply the fact presupposed in the ordinary concept of agency, namely that a person called a principal has manifested to another person, called an agent, his willingness that the agent act on his behalf in some specified way in some specified transaction. n9

Because Heller never manifested to either Realty or Faust "his willingness that [they] act on his behalf in some specified way in some specified transaction" nei-

2002 Del. Ch. LEXIS 17, *

ther Realty nor Faust were ever vested with the power necessary to make them agents of Heller.

n7 MECHEM OUTLINE OF THE LAW OF AGENCY, § 12(A), (4th Ed. 1952).

n8 *Id.* § 19.

n9 *Id.* § 35.

Heller relies on *Sannini v. Casscells* to support the finding of an agency relationship between Heller and Realty. That [*12] case did recognize that, where a real estate firm has agreed to act on behalf of a buyer in presenting a contract for purchase and sale of real property, an agency relationship comes into existence. Such a relationship was found to have been breached in *Casscells*, where

[Casscells] was aware that the offer against which she was competing was being made by her employing agent on behalf of an existing principal even if she did not know the identity of the latter. Despite this, she proceeded to obtain for herself . . . a property which her employer's principals were still willing to buy, and at a higher price, had they known all the facts. n10

Thus, when Casscells learned information about the principal's bid in the course of her employment by the agent, she was not free to use that information or to compete herself against her employer's principal. When she did so, she violated her fiduciary duty, thus justifying the imposition of a constructive trust on the property so acquired for the benefit of her employer's principal. Notably, the rationale of *Casscells* depended on the finding of an agency relationship from which fiduciary duties arose.

n10 *Sannini v. Casscells, 1975 Del. Ch. LEXIS 189* at * 15.

[*13]

*Casscells* reasonably assumed that an agency relationship existed because the real estate company that employed Casscells was acting for Sannini in presenting a bid. However, there is nothing in *Casscells* to support a finding that an agency relationship arose between Heller

and Realty based solely on Heller's use of Faust as a source of information. In this case, Heller never told Faust that he wanted to make an offer on 15 Hickman Street and never reached the point of authorizing Realty to act on his behalf in "some specified way in some specified transaction." Because no agency relationship existed between Heller and Realty, Faust owed no fiduciary duty to Heller.

It is useful to look for guidance regarding the threshold for the creation of such a relationship to the rules that govern the realty business. n11 These rules confirm that Heller's interest in 15 Hickman Street had not advanced to the point that a fiduciary relationship with Realty (or, through Realty, with Kiernan) had arisen. Under the rules, any realtor "who has any personal interest in a transaction, must disclose his or her status . . . to all persons with whom he or she is transacting such business, prior [*14] to the execution of any agreements." n12 A broker's duty to a buyer includes a written disclosure acknowledging the broker's fiduciary responsibilities to be made in any contract prepared for the purchase of real estate. n13 It is uncontested that no agreement was ever drawn up for Heller to bid on 15 Hickman Street. As a result, the relationship between Heller and Realty simply had not progressed to the point that any disclosure was necessary under the applicable rules.

n11 DELAWARE ADMINISTRATIVE CODE, tit. 24, Professional Regulation, 2900 Real Estate Commission, § 10.0 Disclosure (2001), promulgated under the authority of *24 Del. C. § 2905*.

n12 *Id.* § 10.1 (emphasis added).

n13 *Id.* § 10.3.1.2 ("With respect to agent for buyer: 'This broker, and any salesperson working for this broker, is representing the buyer's interests and has fiduciary responsibilities to the buyer, but is obligated to treat all parties with honesty. The broker, and any salesperson working for the broker, without breaching the fiduciary responsibilities to the buyer, may, among other services, provide a seller with information about the transaction. The broker, and any salesperson working for the broker, also has the duty to respond accurately and honestly to a seller's questions and disclose material facts about the transaction, submit promptly all offers to purchase through proper procedures, and serve without unlawful discrimination.'").

2002 Del. Ch. LEXIS 17, *

[*15]

## V.

For the foregoing reasons, I find that there is no basis in law on which either to impose a constructive trust or to award plaintiff any other relief. The enclosed Order entering judgment in favor of defendants as to all claims has been entered this day.

Stephen P. Lamb

Vice Chancellor

### *ORDER*

NOW, THIS 27th day of February, 2002, pursuant to the Opinion of this Court, judgment is entered in favor of the defendants. Costs to the plaintiff.

Stephen P. Lamb

Vice Chancellor