REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Harvey L. Leiderman (SBN 55838)
Email:  hleiderman@reedsmith.com
Tita K. Bell (SBN 206735)
Email:  tkbell@reedsmith.com
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA  94111-3922
Mailing Address:
P.O. Box 7936
San Francisco, CA  94120-7936
Telephone:     415.543.8700
Facsimile:     415.391.8269

Daniel R. Formeller (admitted *pro hac vice*)
Email:  dformeller@tsmp.com
Basileios Katris (admitted *pro hac vice*)
Email:  bkatris@tsmp.com
Tressler, Soderstrom, Maloney & Priess
Sears Tower, 22nd Floor
233 South Wacker Drive
Chicago, Illinois  60606-6308
Telephone:     312.627.4000
Facsimile:     312.627.1717

Attorneys for Plaintiff Amisil Holdings Ltd.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMISIL HOLDINGS LTD., a Cyprus Corporation,<br><br>                    Plaintiff,<br><br>          v.<br><br>CLARIUM CAPITAL MANAGEMENT, LLC f/k/a/ THIEL CAPITAL MANAGEMENT, LLC, a Delaware Limited Liability Company, PETER ANDREAS THIEL, a California resident, JASON PORTNOY, a California resident, MARK WOOLWAY, a California resident,<br><br>                    Defendants. | Case No. C 06 5255 MJJ<br><br>**APPENDIX OF UNPUBLISHED AUTHORITY CITED IN PLAINTIFF'S OPPOSITION TO DEFENDANT CLARIUM CAPITAL MANAGEMENT, LLC'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**<br><br>Hearing Date:     November 7, 2006<br>Time:               9:30 a.m.<br>Courtroom:         11<br><br>Honorable Martin J. Jenkins |

Case No. C 06 5255 MJJ

APPENDIX OF UNPUBLISHED AUTHORITY CITED IN PLAINTIFF'S OPPOSITION TO DEFENDANT
CLARIUM CAPITAL MANAGEMENT, LLC'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Plaintiff Amisil Holdings Ltd. submits copies of the following unpublished authorities for the Court's reference:

1.  *Medical Instrument Dev. Labs. v. Alcon Labs.*, 2005 U.S. Dist. LEXIS 41411 (N.D. Cal. 2005)

2.  *Albert v. Alex Brown Management Services, Inc.*, 2005 WL 2130607 (Del. Ch. 2005)

3.  *Castiel v. Virtual Geosatellite Holdings, Inc.*, 2000 WL 1277372 (Del. Ch. 2000).

DATED:  October 17, 2006.

REED SMITH LLP

By____/s/_____
    Tita K. Bell

    Attorneys for Plaintiff
    Amisil Holdings Ltd.

APPENDIX OF UNPUBLISHED AUTHORITY CITED IN PLAINTIFF'S OPPOSITION TO DEFENDANT CLARIUM CAPITAL MANAGEMENT, LLC'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

LEXSEE 2005 U.S. DIST. LEXIS 41411

**MEDICAL INSTRUMENT DEVELOPMENT LABORATORIES, Plaintiff, v. AL-CON LABORATORIES, Defendants.**

**No. C-05-1138 MJJ**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2005 U.S. Dist. LEXIS 41411*

**August 10, 2005, Decided**
**August 10, 2005, Filed**

**COUNSEL:** [*1] For Medical Instrument Development Laboratories a California corporation, Plaintiff: Mark B. Fredkin, William Siamas, Morgan,Franich,Fredkin & Marsh, San Jose, Ca.

For Alcon Laboratories Inc, a Delaware corporation, Defendant: Benjamin P. Smith, Joan M. Haratani, William W. Friedman, Morgan, Lewis & Bockius, LLP, San Francisco, CA.

**JUDGES:** MARTIN J. JENKINS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** MARTIN J. JENKINS

**OPINION:**

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

#### INTRODUCTION

Before the Court is Defendant Alcon Laboratories' ("Defendant" or "Alcon") Rule 12(b)(6) Motion to Dismiss, or in the alternative, Rule 12(e) Motion for a More Definite Statement ("Motion"). For the following reasons, the Court **GRANTS** Defendant's Motion without prejudice.

#### FACTUAL BACKGROUND

Defendant Alcon is a leading pharmaceutical company specializing in researching, developing, manufacturing, and marketing ophthalmic surgical, vision care, and optical products. n1 Part of Alcon's business is to develop and sell surgical devices for use in the treatment of ocular diseases. Defendant Alcon asserts that for the past three decades, it has been in the process [*2] of developing and improving a virectomy probe used in surgical procedures to treat retinal disorders, but as of 2000 it had yet to develop an adequate probe. Plaintiff Medical Instrument Development Laboratories ("Plaintiff" or "MID Labs") is a California corporation which develops and manufactures medical instruments for use in vitreoretinal (ophthalmic) surgery, including a product known as a High Speed Single Use Virectomy Probe (the "Probe"). MID Labs was founded by Dr. Carl Wang ("Wang") in 1981, and the company was subsequently purchased by Alcon in 1985. After the purchase, Wang re-started his own business, which he again named MID Labs.

n1 The facts are derived from Alcon's Motion and MID Labs' Complaint.

On or about October 12, 2000, MID Labs and Alcon entered into a contract entitled Release and Supply Agreement (the "Agreement"). Seven provisions of the Agreement are relevant for purposes of resolving the instant motion. Section 3.01 of the Agreement states, "[s]ubject to its rights to self-manufacture [*3] the Products pursuant to section 4.05 Alcon agrees that it will purchase its requirements of the Products from MID Labs and will not have the right to make or have made the Products." (Complaint ("Comp."), Ex. A at § 3.01.) Section 4.01 of the Agreement states that "[n]othing in this Agreement shall be construed to require Alcon to purchase any minimum quantities of Products from MID Labs." (*Id.* at § 4.01.) Section 4.05 of the Agreement states that "[i]n the event that MID Labs fails to either (i) provide Alcon with Products meeting the Specifications in the quantities requested by Alcon pursuant to section 4.03 [] or (ii) maintain the Quality Standards for all of the Products pursuant to section 4.04 [], then Alcon may, at its option, give MID Labs written notice of such non-performance . . . Alcon shall have the right to terminate

this Agreement and/or it or its Affiliate shall have the right to self manufacture the Products." (*Id.* at § 4.05.) Section 4.06 of the Agreement states that "Alcon will have the right to acquire from any third party or internally develop similar technology or products which may compete against or replace any of MID Labs Products." ( [*4] *Id.* at § 4.06.) Section 7.01 of the Agreement states that "the party receiving . . . confidential information shall not make use of said confidential information, except for purposes authorized by this Agreement." (*Id.* at § 7.01.) Section 8.02(c) of the Agreement states that the Agreement may be terminated by "Alcon at any time without cause or for any reason by providing MID Labs with thirty (30) days prior written notice[.]" (*Id.* at § 8.01(c).) Finally, section 12.07 of the Agreement states that the "Agreement is to be performed in accordance with the laws of the State of Texas and shall be construed and enforced in accordance with the laws of the State of Texas." (*Id.* at § 12.07.)

Approximately a year after the Agreement was entered into and continuing through March 2002, Alcon representatives requested assurances that MID Labs would be able to meet the technological requirements of a high volume purchase order of Probes. Subsequently, Alcon and its engineers were granted access to MID Labs' facility in order to inspect and audit MID Labs' development, manufacturing, and testing processes for the Probes. Sometime during this inspection period, the parties' [*5] relationship deteriorated.

Plaintiff MID Labs alleges that Defendant Alcon breached the Agreement and committed various acts of fraud by developing its own probe and ceasing to purchase all of its needed Probes from MID Labs. Defendant Alcon argues, to the contrary, that the Agreement left it free and clear to acquire Probes from any third party or to internally develop its own probe for manufacture and sale at any time during the term of the Agreement and thereafter. Plaintiff MID Labs filed a Complaint on February 18, 2005, in the Superior Court of the State of California, Alameda County. Plaintiff's Complaint contains three state law causes of action: (1) common law fraud and deceit; (2) breach of contract; and (3) unfair business practices in violation of *California Business and Professions Code section 17200*. Defendant removed the case to this Court on diversity grounds.

**LEGAL STANDARD**

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the claims asserted in the complaint. *See Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337 (9th Cir. 1996). Dismissal of an action pursuant to *Rule 12(b)(6)* is appropriate only [*6] where it "appears beyond [a] doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to re-

lief." *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1482 (9th Cir. 1991) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-6, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)). In reviewing such a motion, the Court must assume all factual allegations to be true and must construe them in the light most favorable to the nonmoving party. *See North Star v. Arizona Corp. Comm.*, 720 F.2d 578, 580 (9th Cir. 1983). Therefore, the Court will dismiss the complaint or any claim in it without leave to amend only if "it is absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir. 1987).

**ANALYSIS**

**I. Choice of Law**

As an initial matter, the Court addresses the parties' disagreement regarding what state's substantive law applies to Plaintiff's claims. The Agreement contains a choice of law provision specifying that the Agreement "shall be construed and enforced in accordance with the law of the State of Texas." (Comp., Ex. A at § 12.07.) Defendant contends [*7] that pursuant to that provision, Texas law governs all claims arising out of the Agreement. Thus, Defendant argues, Plaintiff's Second Cause of Action, brought under *California Business & Professions Code, § § 17200, et seq.*, is not viable. Plaintiff MID Labs argues that pursuant to section 12.07 of the Agreement, Texas law governs only as to "contract claims relating to performance and construction," and "does not speak to tort or statutory causes of action." (Opposition ("Opp.") at 4.) Specifically, Plaintiff asserts that the Agreement's choice of law provision should apply neither to Plaintiff's tort claim for fraud and deceit, nor to its *section 17200* claim, the first and third causes of action.

In suits based on diversity jurisdiction, district courts are to apply the choice of law principles of the forum state. *Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4, 96 S. Ct. 167, 46 L. Ed. 2d 3 (1975). Since this lawsuit was brought in the Northern District of California, California law properly determines whether Texas law should control the present dispute. Under California law, a choice of law clause agreed upon through arm's length negotiations by sophisticated [*8] commercial parties is generally enforced unless it is contrary to California public policy. *Medimatch, Inc. v. Lucent Technologies, Inc.*, 120 F. Supp. 2d 842, 861-62 (N.D. Cal. 2000) (citation omitted). However, the Ninth Circuit has held that "[c]laims arising in tort are not ordinarily controlled by a contractual choice of law provision. Rather they are decided according to the law of the forum state." *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992) (citation omitted).

Here, Defendant has not established that the choice of law provision, as written, should apply to *all matters* arising out of the Agreement. n2 Section 12.07 of the Agreement simply states that the "Agreement is to be performed in accordance with the laws of the State of Texas and shall be *construed and enforced* with the laws of the State of Texas." (Comp., Ex. A at § 12.07 (emphasis added).) While this statement establishes that Texas law will govern interpretation and construction of the contract, the narrowly-worded choice of law provision does not explicitly control non-contractual claims that are related to the contract. *Thompson & Wallace of Memphis, Inc. v. Falconwood Corp.*, 100 F.3d 429, 432-33 (5th Cir. 1996) [*9] (tort claims not governed by choice of law clause providing that chosen law applied to the "agreement and its enforcement"). Therefore, the Court finds that because Plaintiff's fraud and deceit claim and its *section 17200* claim are non-contractual "claims arising in tort," they are not contemplated by the Agreement's choice of law provision and should be "decided according to the law of the forum state." *Sutter, 971 F.2d 407.* The Court also finds that the choice of law provision does not bar Plaintiff's *section 17200* claim, a claim brought under California law. In sum, the Court finds that the First and Third Causes of Action are governed by California law. Only the breach of contract claim is governed by Texas law.

n2 In support of its argument, Defendant relies on *Ribbens International, S.A. de C. V. v. Transport International Pool, Inc.*, for the proposition that a contractual choice of law provision should be applied "unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice of law, or (b) application of the law of the chosen state would be contrary to the fundamental policy of the state which has materially greater interest than the chosen state[.]" *47 F. Supp. 2d 1117, 1120 (N.D. Cal. 2000).* *Ribbens* is not controlling, however, as the plaintiff's complaint in that case alleged only breach of contract. Thus, the *Ribbens'* court determination, as to the application of a choice of law provision, does not speak to tort and statutory causes of action alleged here.

[*10]

## II. Motion to Dismiss

### A. First Cause of Action -- Fraud and Deceit

Plaintiff MID Labs claims that Defendant Alcon made false representations to Plaintiff in order to induce disclosure of and obtain access to MID Labs' confidential and proprietary information related to the development, testing, and manufacturing processes of its Probes. Defendant alleges that Plaintiff's fraud claim should be dismissed because it has not been pled with sufficient particularity under *Rule 9(b) of the Federal Rules of Civil Procedure.* Plaintiff asserts that *Rule 9(b)* is not applicable here because it applies only to federal claims. Plaintiff contends that, in any event, its Complaint adequately alleges the facts necessary to support a claim of fraud. The Court disagrees.

Under California law, there are four required elements of a fraud claim: (1) a false promise or representation as to a material fact; (2) knowledge of the falsity of the representation when made (or lack of reasonable ground to believe in its truth), or without any intention of performing or fulfilling the promise; (3) an intent to deceive and to cause reliance at the time of [*11] the promise; and (4) reliance thereon with resulting injury and damage. *Serpa v. Jolly King Restaurants, Inc.*, 62 F.R.D. 626, 636 (S.D. Cal. 1974) (citation omitted). *Rule 9(b)*'s requirement that fraud claims be pled with particularity is satisfied when the complaint states the time, place, and nature of the alleged fraudulent activities, and the identities of the parties alleged to have made the misrepresentations. *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986) (citations omitted).

Even construing the Complaint in the light most favorable to Plaintiff, as the Court must, it is apparent that Plaintiff has not met the requirements for a viable fraud claim under California law. First, Plaintiff alleges that Alcon representatives falsely told MID Labs that it planned to purchase a very high volume of MID Labs' Probes. In addition, Plaintiff MID Labs alleges that Defendant Alcon made these false representations with the purpose of gaining access to MID Labs' facilities under the false pretense of inspection. However, Plaintiff fails to allege any facts that, if proven, show that at the time the representation was [*12] made, Alcon did not intend to place such an order. Specifically, the point at which MID Labs claims it became aware of Alcon's allegedly false and fraudulent representations, Alcon was still inspecting MID Labs' facilities. Therefore, Defendant Alcon could still have fulfilled the promises made by its representatives once it was assured that MID Labs could handle the forecasted order. Thus, the Complaint fails to allege a false or misleading statement, or that Alcon's representatives knew their statements to be false at the time they were made.

Second, Plaintiff alleges $ 24 million in damages, but fails to allege the specific purchase order or any set of facts which, if proven, show that MID Labs would have received $ 24 million in profits absent Alcon's al-

leged fraudulent misrepresentations. Thus, the Complaint fails to allege an injury or damages that directly resulted from Alcon's representations, and the Court finds that MID Labs' Complaint fails to sufficiently plead a claim for fraud under California law. n3 The Court **GRANTS** Alcon's Motion to Dismiss on the First Cause of Action without prejudice.

n3 Since Plaintiff fails to sufficiently plead a fraud claim under California law, it cannot meet the heightened pleading requirements of *Rule 9(b).*

[*13]

**B. Third Cause of Action -- *Section 17200* n4**

n4 Following the parties' lead, the Court addresses Plaintiff's three claims out of order.

Plaintiff MID Labs claims that Defendant Alcon's alleged fraudulent misrepresentations and misappropriation of MID Labs' confidential and proprietary information are acts and practices that violate *California Business and Professions Code section 17200*. Defendant argues that MID Labs' section 17200 cause of action is not viable because it is based on the insufficiently pled common law claims of fraud and misappropriation. Plaintiff disagrees. Defendant further asserts that Plaintiff's *section 17200* cause of action is deficient because Plaintiff has not alleged in its Complaint that members of the public are likely to be deceived by Defendant's allegedly fraudulent conduct.

Under *section 17200*, "unfair competition" is defined as "any unlawful, unfair or fraudulent business act or practice." This tripartite test is disjunctive and the plaintiff [*14] need only allege one of the three theories to properly plead a claim under *section 17200*. *Accuimage Diagnostics Corp. v. Terarecon, Inc., 260 F. Supp. 2d 941, 954 (N.D. Cal. 2003)* (citation omitted). As an initial matter, the Court notes that MID Labs has not alleged a violation of *section 17200* under the theory of unfair business practices. Thus, at issue is only whether MID Labs' cause of action may go forward under the theories of fraudulent or unlawful business practices. The Court addresses these separately.

**1. Fraudulent Business Practices**

Plaintiff asserts that the fraudulent business practices prong of *section 17200* is established by its common law claim for fraud. The Court disagrees. *Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.*, is instructive here. *178 F. Supp. 2d 1099 (C.D. Cal. 2001)*. In *Watson*, a pharmaceutical company sued its supplier under the fraudulent business practices theory of *section 17200*, arguing that it was deliberately misled by the defendant's statements about its supply capabilities and its intent to resume supplying the pharmaceutical company with a hypertension drug. *Id. at 1120.* [*15] The district court held that "it is necessary under the fraudulent prong to show deception to some members of the public interest, and not merely to the direct competitor or other non-consumer party to the contract." *Id. at 1121.* The court noted the absolute lack of case authority establishing any principle that fraudulent business acts are "separately actionable by business competitors absent a showing that the public, rather than merely the plaintiff, is likely to be deceived." *Id.* The court held that the pharmaceutical company "is not a member of the public or a consumer entitled to *[section 17200]* protection." *Id.*

Here, similarly, Plaintiff's Complaint alleges a violation of the fraudulent prong of *section 17200* based on Defendant's alleged misrepresentation that it would purchase Probes from Plaintiff, which allegedly resulted in Plaintiff suffering lost profits. However, as in *Watson*, Plaintiff fails to allege in its Complaint that any "members of the public are likely to be deceived" by Defendant's allegedly fraudulent conduct. *Comm. on Children's Television, Inc. v. Gen. Foods Corp., 35 Cal. 3d 197, 211, 197 Cal. Rptr. 783, 673 P.2d 660 (1983)* (citation omitted). [*16] Furthermore, like the plaintiff in *Watson*, Plaintiff MID Labs is Alcon's direct competitor or, at least, a non-consumer, and "is not a member of the public or a consumer entitled to" protection under the fraudulent business practices theory of *section 17200*. *Watson, 178 F. Supp. 2d at 1120*. Therefore, the Court finds that Plaintiff has not satisfied the necessary elements of a fraudulent business practices theory of *section 17200* claim.

**2. Unlawful Business Practices**

A claim under the unlawful business practices theory of *section 17200* includes "any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *Id.* (citing *Saunders v. Superior Court, 27 Cal. App. 4th 832, 833, 33 Cal. Rptr. 2d 438 (1994))*. Plaintiff asserts that its unlawful business practices theory of *section 17200* is established by an underlying misappropriation claim. The parties dispute whether a common law claim can serve to undergird an unlawful business practices theory of a *section 17200* claim. However, the Court need not decide that question at this juncture since Plaintiff has not adequately pled a claim for misappropriation [*17] here. Plaintiff's Second Cause of Action, alleging breach of contract, vaguely alleges that Alcon breached the parties' Agreement by using MID Labs' confidential information. This is not a claim for unlawful misappropriation

of trade secrets. Hence, the Court finds that Plaintiff's unlawful business practices theory of its *section 17200* claim is not rendered tenable by any misappropriation claim.

The Court also notes that Plaintiff's First Cause of Action, alleging common law fraud, cannot support an unlawful business practices theory of its *section 17200* claim because, as discussed *supra*, the fraud claim is not adequately pled.

In sum, Plaintiff has failed to adequately plead either a fraudulent or unlawful business practices theory of its *section 17200* claim. Therefore, the Court **GRANTS** Defendant's motion to dismiss the Third Cause of Action, but **GRANTS** Plaintiff leave to amend.

### C. Second Cause of Action -- Breach of Contract

Plaintiff alleges in its Second Cause of Action that Alcon breached the parties' Agreement in three ways: (1) by manufacturing high speed probes; (2) by misappropriating confidential information; and (3) by ceasing to purchase all of [*18] its requirements for the Probes from MID Labs. Alcon argues that Plaintiff's breach of contract claim fails because Plaintiff has not alleged conduct constituting a breach of the parties' Agreement. MID Labs disagrees. At issue is the meaning of certain provisions of the Agreement.

Whether a contract is ambiguous is a question of law. *Coker v. Coker, 650 S.W. 2d 391, 393-94, 26 Tex. Sup. Ct. J. 368 (Tex. 1983).* n5 When interpreting a contract, courts should "give effect to the written expression of the parties' intent." *AT&T Corp. and AT&T Communications of the Southwest, Inc. v. Rylander, 2 S.W. 3d 546, 559 (Tex. 1999)* (citation omitted). "To determine the parties' intent, the courts must consider the entire writing in an effort to harmonize all of the provisions of the instrument" so that none will be rendered meaningless. n6 *Id.* Mere disagreement over the meaning of a provision in the contract does not necessarily mean that a term is ambiguous. *Richardson Lifestyle Ass'n v. Houston, 853 S.W. 2d 796, 800 (Tex. App. 1993).* However, "a contract is ambiguous if its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning. [*19] " CMS *Partners, Ltd. v. Plumrose USA, Incorporated, 101 S.W. 3d 730, 732 (Tex. App. 2003).* A court must determine "whether there is more than one reasonable interpretation of this contract such that a fact issue was created concerning the parties' intent." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W. 2d 587, 589, 40 Tex. Sup. Ct. J. 42 (Tex. 1999).*

n5 The Court analyzes the viability of this claim pursuant to Texas law.

n6 "[T]he contract may be read in light of the surrounding circumstances to determine whether an ambiguity exists[,]" but all other extrinsic evidence is inadmissible. *AT&T, 2 S.W. at 559* (citation omitted) (internal quotations omitted).

### 1. Alcon's Manufacture of the Probes

Pointing to sections 3.01 and 4.05 of the Agreement, Plaintiff alleges that the Agreement specifically prevents Alcon from manufacturing MID Labs' probes except "[i]n the event that MID Labs fails to either (i) provide Alcon with Products meeting the Specifications [*20] in the quantities requested by Alcon . . . or (ii) maintain the quality and standards for all of the Products." (Comp., Ex. A at § 3.01.) Defendant Alcon points to section 4.06 of the Agreement, which expressly allows it to "acquire from any third party or internally develop similar technology or products which may compete against or replace any of MID Labs Products." (*Id at §* 4.06.) At issue is the definition of "similar" used in section 4.06. If "similar" products includes the "virtually identical" probes that Plaintiff alleges Alcon manufactured here, there is no breach of contract. However, if the definition of "similar" does not incorporate the "virtually identical" probes produced by Alcon, Plaintiff has a breach of contract claim. Both interpretations are reasonable and thus, there is ambiguity in the contract terms. *See Columbia, 940 S.W. 2d at 589.* Such ambiguity raises factual questions that are not properly decided in the 12(b)(6) context. Accordingly, Defendant's Motion is **DENIED** on this ground.

### 2. Misappropriation of Proprietary and Confidential Information

Plaintiff claims that Alcon misappropriated MID Labs' confidential information [*21] to manufacture its own probe. Defendant contends that its use of MID Labs' confidential information was not prohibited by the Agreement because section 3.01 granted it an exclusive license to "make, use, offer for sale, and sell any product in the Territory." (Comp., Ex. A at § 3.01.) Plaintiff observes that section 3.01 of the Agreement does not expressly refer to the Probes at issue nor is "any product" capitalized (which, Plaintiff contends, would suggest the language was intended to refer to the Probes pursuant to section 1.01 of the Agreement). Thus, Plaintiff argues that section 3.01 of the Agreement does not grant Alcon license to use MID Labs' confidential information (i.e. Probe schematics) to make its own Probes except pursuant to section 4.05 of the Agreement (when MID Labs fails to provide adequate probes). According to Plaintiff, because section 3.01 does not apply here, section 7.01, which prohibits Alcon from using MID Labs' confiden-

tial information except for purposes authorized by the Agreement, bars Alcon's use of MID Labs' schematics.

Plaintiff's argument is creative. However, while it is a stretch to find that the "any product" language used in section 3.01 was [*22] intended to exclude the Probes (the only products contemplated by the Agreement), the Court again finds that the Agreement is sufficiently ambiguous that resolution of the parties' dispute over the proper meaning of various provisions of the Agreement would not be appropriate in the motion to dismiss context. *See Columbia, 940 S.W. 2d at 589.* Accordingly, Defendant's Motion is **DENIED** on this ground.

### 3. Alcon's Failure to Purchase Probes from MID Labs

According to section 4.01 of the Agreement, "[n]othing in this Agreement shall be construed to require Alcon to purchase any minimum quantities of Products from MID Labs." (Comp., Ex. A at § 4.01.) Defendant contends that section 4.06 of the Agreement, as discussed above, reserved Alcon's right to manufacture similar technology that could replace MID Labs' Probes. However, Plaintiff alleges that Alcon breached the Agreement by not purchasing the Probes it needed from MID Labs pursuant to section 3.01 of the Agreement and that the purpose of section 4.01 was to provide for the possibility that Alcon would get out of the probe business altogether and would not need to purchase (or manufacture) any probes. [*23] Plaintiff argues, however, that the Agreement is clear that should Alcon require probes, it was required to purchase those probes from MID Labs.

In light of the three competing provisions and the parties' reasonable interpretations of each (as well as their interpretations of the effect of all the provisions read in concert), the Court finds that there is ambiguity in the Agreement regarding Defendant Alcon's purchase requirement. *Columbia, 940 S.W. 2d at 589.* As discussed above, this raises factual questions that cannot be decided on a motion to dismiss. Thus, the Court **DENIES** Defendant's Motion as to Plaintiff's breach of contract claim for Defendant's failure to purchase its probes from MID Labs.

In sum, MID Labs' assertion that Alcon breached the contract by manufacturing high speed Probes, by misappropriating confidential information, and by ceasing to purchase all of its needed Probes from Mid Labs, raises questions of fact regarding the proper interpretation of the Agreement that cannot be decided on a motion to dismiss. Thus, the Court **DENIES** Defendant's motion to dismiss as to Plaintiff's breach of contract claim.

### CONCLUSION

For the foregoing [*24] reasons, the Court **GRANTS** Defendant's Motion to Dismiss as to Plaintiff's First and Third Causes of Action without prejudice, and **DENIES** the motion as to Plaintiff's Second Cause of Action for breach of contract. To the extent that Plaintiff's Complaint is dismissed, Plaintiff may file an amended complaint within 30 days within the date of this Order.

**IT IS SO ORDERED.**

Dated: August 10, 2005

MARTIN J. JENKINS

UNITED STATES DISTRICT JUDGE

Westlaw.

Not Reported in A.2d                                                                    Page 1
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: 2005 WL 2130607 (Del.Ch.))**

**H**

**Motions, Pleadings and Filings**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Todd ALBERT, Joseph M. Bryan, Jr., Kevin
Calderwood, Katherine D. Crothall,
Scott W. Frazier, FU Family Revocable Trust, Robert
B. Goergen, Sr., Robert G.
Goergen, Jr., Todd A. Goergen, Hasan 1995 Living
Trust, Wai Yan Ho, Willis
James Hindman, Johnson Family Living Trust,
Michael R. Kidder Revocable Trust,     .
Mark and Ann Kington, Jeffrey A. Koser, Marlenko
Inc., Elaine McKay Family, LP,
David Mixer, MRW Trust, James Murray, Jim K.
Omura 1996 Trust, Jennifer Owen
and Michael J. Ross, Nicholas Peay, Douglas G.
Smith, Frederick G. Smith, Jane
Vei-Chun Sun, Mark Wabschall, Karen L. Walsh,
Warmenhoven 1995 Children's
Trust, Yan 1996 Revocable Trust, Barbara J. Zale,
and Charles A. Ziering,
Plaintiffs,
v.
ALEX. BROWN MANAGEMENT SERVICES,
INC.; Deutsche Bank Securities, Inc.; Deutsche
Bank, AG; Richard Hale; Gary Fearnow; Bruns
Grayson; E. Robert Kent, Jr.;
Truman T. Semans; DC Investment Partners, LLC;
Doctor Robert Cants, III; and
Michael W. Devlin, Defendants.
Elizabeth J. BAKER, Bender 1996 Revocable Trust,
Dr. Steven J. Berlin, Estate
of Robert B. Blow, Luther C. Boliek, Stephen E.
Coit, Sara Crowder, Gerald K.
and Teresa K. Fehr, FU Family Revocable Trust,
Ralph Glasgal, Robert G.
Goergen, Jr.1985 Trust, Todd A. Goergen 1985
Trust, Peter O. Hausmann, Willis
James Hindman, William F. Kaiser, Mark and Ann
Kington, Timothy K. Krauskopf,
William T. McConnell, Philip R. McKee, David
Mixer, MRW Trust, James Murray,
Paul D. and Judith F. Newman, W.L. Norton,
Gregory Packer, Howard E. Rose,
Ruben Family Limited Partnership, 5 S Trust,

Saladrigas Family Ltd.
Partnership, Ricardo A. Salas, Jose M. Sanchez,
Samuel Siegel, Silverman 1996
Irrevocable Trust, Douglas G. Smith, Frederick G.
Smith, Ronald B. Stakland,
Strauch Kulhanjain Family Trust, Bruce E. Toll,
Alexander R. and Marjorie L.
Vaccaro, Yanover Family Ltd. Partnership, Michael
Yokell, and Justin A. Zivin,
Plaintiffs,
v.
ALEX. BROWN MANAGEMENT SERVICES;
Deutsche Bank Securities, Inc.; Deutsche Bank,
AG; Richard Hale; E. Robert Kent, Jr.; Truman T.
Semans; DC Investment
Partners, LLC; Doctor Robert Crants, III, and
Michael W. Devlin, Defendants.
**No. Civ.A. 762-N, Civ.A. 763-N.**

Submitted July 22, 2005.
Decided Aug. 26, 2005.
<u>Jeffrey S. Goddess</u>, <u>Jessica Zeldin</u>, Rosenthal,
Monhait, Gross & Goddess, P.A., Wilmington,
Delaware; <u>Steven E. Fineman</u>, <u>Hector D. Geribon</u>,
<u>Daniel P. Chiplock</u>, Lieff, Cabraser, Heimann &
Bernstein, LLP, New York, New York, for the
Plaintiffs.

<u>Michael D. Goldman</u>, <u>Peter J. Walsh, Jr.</u>, <u>Melony R.</u>
<u>Anderson</u>,     Potter Anderson & Corroon LLP,
Wilmington, Delaware; <u>Christopher P. Hall</u>, <u>Kevin</u>
<u>Rover</u>, <u>John Vassos</u>, <u>Marilyn B. Ampolsk</u>, Morgan
Lewis & Bockius, LLP, New York, New York, for
the Defendants Alex. Brown Management Services,
Inc., Deutsche Bank Securities, Inc. and Deutsche
Bank A.G.

<u>Daniel Griffith</u>, Marshall Dennehey, Warner,
Coleman & Goggin, Wilmington, Delaware, for
Defendants DC Investment Partners, LLC, Dr. Robert
Crants, III, and <u>Michael W. Devlin</u>.

<u>Richard D. Allen</u>, <u>Thomas W. Briggs, Jr.</u>, Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware, for
Defendants Richard Hale, Gary Fearnow, Bruns
Grayson, E. Robert Kent, Jr. and Truman T. Semans.

*MEMORANDUM OPINION*

<u>LAMB</u>, Vice Chancellor.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
(Cite as: 2005 WL 2130607 (Del.Ch.))

Page 2

I.

*1 In a recent opinion in these two related cases on the defendants' motion to dismiss under Court of Chancery Rule 12(b)(6), the court addressed the defendants' statute of limitations argument and concluded that any claims arising before November 11, 2000, the date upon which the parties entered into an agreement tolling the statute of limitations, were barred. [FN1] Because it was unclear which, if any, claims for relief set out in the complaints arise after that date, the court requested additional submissions from the parties.

> FN1. The facts alleged in the complaints are recited in detail in the earlier opinion. *Albert v. Alex. Brown Mgmt. Servs.*, 2005 Del. Ch. LEXIS 100, at *43-58 (Del. Ch. June 29, 2005). Reference is made to that opinion for a complete recitation of the facts and for the definition of terms used herein. However, to avoid confusion, the court refers in this opinion to Alex. Brown Management Services, Inc. as "AB Management." Unless otherwise noted, the facts recited in this opinion are taken from the well-pleaded allegations of the complaints.

In this opinion, the court now addresses the issues raised in the additional submissions as well as the remaining issues raised by the defendants' motion to dismiss. Included among the latter are: (i) whether any surviving claims are derivative, rather than direct claims as to which demand was neither made nor excused; and (ii) whether the court can exercise personal jurisdiction over several defendants (the "DCIP Defendants") who served as agents, or employees of agents, of the partnerships.

II.

In the earlier opinion, the court noted that some of the factual allegations in the complaints occurred after November 11, 2000 and that, therefore, viable claims based on these factual allegations are not time-barred. [FN2] The Plaintiffs' Response Brief [FN3] identified five other factual allegations in the complaints (all involving allegedly material misrepresentations or non-disclosures) which, they contend, support viable claims for relief. These are: (i) the Managers' failure in the December 2000 semi-annual reports (dated on or about February 28, 2001) to inform the defendants that hedging was desirable, but the Funds could not afford to do so; (ii) the allegedly misleading statement in the December 31, 2000 report to the unitholders that the Managers remained "comfortable with the broad diversification

achieved by the Fund[s'] portfolio of public securities and private investments ....;" (iii) the defendants' failure to inform the unitholders of the Funds' "liquidity issues," "steps that the management could take to improve liquidity," and "alternatives to raise additional liquidity," although these themes were the focus of the Management Committee meetings of October 3, 2000, March 23, 2001, and September 6, 2001; (iv) the defendants' failure to inform the unitholders that, in June of 2001, AmSouth Bank withdrew from the credit syndicates for the Funds, thereby leaving Bank of America as the only lender for the Funds; and (v) the defendants' failure to inform the unitholders of the Funds violation of their credit arrangements with their lenders, including their eventual defaults, on June 5, 2002 (for the Fund I loan), and June 28 and September 30, 2002 (for the Fund II loan).

> FN2. The factual allegations specifically discussed in the earlier opinion are as follows: First, the Managers failed to provide financial statements and reports as they are required to under the Partnership Agreements and Delaware law. Second, the Managers wrongfully allowed certain withdrawals from the Funds, thereby causing or exacerbating a liquidity crisis. Specifically, the Fund II Complaint alleges that three withdrawals from Fund II occurred after November 11, 2000. These allegedly occurred on January 17, 2001, October 25, 2001, and December 31, 2001 (the "Fund II 2001 Withdrawals"). Additionally, the Fund I Complaint alleges approximately $8.0 million in withdrawals occurred in December of 2000 from Fund I (the "Fund I December 2000 Withdrawals"). Third, the Managers failed to provide active and competent management of the Funds. *Alex. Brown,* 2005 Del. Ch. LEXIS 100, at *78-*79.

> FN3. The Plaintiffs' Response Brief is titled "Plaintiffs' Brief In Response To The Court's Memorandum Opinion And Order Of June 29, 2005" and was filed on July 15, 2005.

All five of these factual allegations are found in the complaints. Furthermore, they allegedly occurred after November 11, 2000. Therefore, claims based on these allegations are timely. However, a threshold question is whether the information that the plaintiffs allege should have been disclosed, or was disclosed but was allegedly false and misleading, is material. If

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: 2005 WL 2130607 (Del.Ch.))**

Page 3

this information is not material as a matter of law, the allegations will not support claims that the Managers violated their disclosure duties.

**\*2** The determination of materiality is a mixed question of fact and law that generally cannot be resolved on the pleadings. [FN4] Therefore, the court cannot (and does not) make any final findings on the materiality of these alleged disclosure allegations. However, on a Rule 12(b)(6) motion, the court must determine whether, under the facts alleged in the complaints, these disclosure (or non-disclosure) allegations support a reasonable inference of materiality. If they do not, these factual allegations cannot support a claim for relief.

FN4. *O'Malley v. Boris,* 742 A.2d 845, 850 (Del.1999)

An omitted fact is material if "under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." [FN5]

FN5. *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1983) (quoting *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)).

The first alleged non-disclosure is that the Managers' failed in the December 2000 semi-annual reports to inform the unitholders that hedging was desirable, but the Funds could not afford to do so. This allegation of non-disclosure, viewed in the context of the allegations contained in the complaints, supports a reasonable inference that this information is material. According to the complaints, the defendants marketed the Funds as being actively managed by experienced, professional managers. Viewed in this context, a unitholder would likely find it important to know that the Managers could not manage the Funds in what they believed to be the Funds' best interests, because they were facing liquidity problems and could not afford to purchase collars.

The second alleged non-disclosure is that the defendants failed to inform the unitholders of the Funds' "liquidity issues," "steps that the management could take to improve liquidity," and "alternatives to raise additional liquidity." As alleged in the complaints, the real cause of the Funds' losses was the lack of liquidity. The lack of liquidity allegedly

prevented the Managers from properly hedging the Funds as they (allegedly) thought was best for the Funds. Viewed in that context, a reasonable investor would likely find it important to know such information.

The third alleged non-disclosure is that the defendants failed to inform the unitholders that, in June of 2001, AmSouth Bank withdrew from the credit syndicates for the Funds, thereby leaving Bank of America as the only lender for the Funds. Under the facts alleged, the court cannot reasonably infer that this information is material. The complaints allege that the unitholders understood from the very beginning that the Funds would have to borrow money. This is because the contributed securities were illiquid and the Funds needed cash to purchase collars. Given that fact, it is unlikely that a reasonable investor would find it important to know that the Funds were borrowing from one lender as opposed to multiple lenders. In fact, such information would likely only confuse an investor by giving him more information than is necessary to understand the Funds. Therefore, the plaintiffs cannot bring any claims based on this factual allegation.

**\*3** The fourth alleged non-disclosure is that the defendants failed to inform the unitholders of the Funds' violations of the credit arrangements with their lenders, including the eventual defaults, on June 5, 2002 (for the Fund I loan), and June 28 and September 30, 2002 (for the Fund II loan). This allegation supports a reasonable inference of materiality. As opposed to the information about a bank withdrawing from the credit syndicate, the fact that the Funds were in default on their loans directly speaks to the financial condition of the Funds. A reasonable investor would want to know this information.

Finally, the plaintiffs allege that the claim in the December 31, 2000 report that the Managers remained "comfortable with the broad diversification achieved by the Fund[s'] portfolio of public securities and private investments" was materially false and misleading. This allegation does *not* support a reasonable inference that this information is material. It is simply a statement of the Managers' opinion. Furthermore, there is no allegation in the complaints that this statement of opinion was not honestly held, i.e. false. Therefore, the plaintiffs cannot bring any claims based on this factual allegation.

The Non-Disclosure Allegations [FN6] relate to failures to disclose allegedly material information.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: 2005 WL 2130607 (Del.Ch.))**

Page 4

There is not, of course, any general duty to disclose information. To bring a non-disclosure claim, a party must allege either a fiduciary duty or a contractual duty to disclose. The plaintiffs have attempted to allege both. Therefore, the court will address the Non-Disclosure Allegations in the context of the plaintiffs' claims for breach of fiduciary duty and breach of contract.

> FN6. Collectively, the court refers to the three remaining factual allegations of non-disclosure as the "Non-Disclosure Allegations."

### III.

The allegations set out in the two complaints are nearly identical and the complaints are both set out in eleven counts: breach of fiduciary duty (Count 1); aiding and abetting a breach of fiduciary duty (Count 2); common law fraud (Count 3); aiding and abetting common law fraud (Count 4); breach of contract against AB Management (with respect to Fund I) and breach of contract against DCIP (with respect to Fund II) (Count 5); breach of the covenant of good faith and fair dealing against AB Management (with respect to Fund I) and breach of the covenant of good faith and fair dealing against DCIP (with respect to Fund II) (Count 6); gross negligence (Count 7); unjust enrichment against all defendants (Count 8); conspiracy liability (Count 9); an accounting (Count 10); and agency liability against Deutsche Bank and DBSI (Count 11). The court first addresses each of the substantive claims (Counts 1, 3, 5-8, & 10). The court then considers the vicarious liability claims (Counts 2, 4, 9, & 11).

### A. *Breach Of Fiduciary Duty (Count 1)*

#### 1. *Failure To Provide Financial Statements*

The complaints allege that the Managers failed to provide the unitholders with the 2001 audited financial statements until 2003, and failed to provide any investor reports or audited financial statements for 2002. The plaintiffs argue that this amounted to a breach of the Managers' fiduciary duties.

**\*4** There is not, of course, a general fiduciary duty to provide financial statements. Instead, under the Partnership Agreements, the Managers had a contractual duty to provide the unitholders with such reports. [FN7] The plaintiffs have not articulated why the violation of this contractual right amounted to a breach of fiduciary duty. [FN8] Thus, this factual allegation does not state a claim for breach of

fiduciary duty.

> FN7. Partnership Agreements § 11.2.

> FN8. In the Plaintiffs' Response Brief, the plaintiffs argue that the Managers failed to make material disclosures, when they had a fiduciary obligation to do so. They further outline specific factual allegations, the Non-Disclosure Allegations, they contend are material and should have been disclosed. The Non-Disclosure Allegations are discussed below.

#### 2. *Withdrawal Allegations*

The plaintiffs argue that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals. The plaintiffs contend that the defendants violated their fiduciary duties "by failing to ensure that the Funds had 'sufficient financial resources' to accomplish their 'investment objectives,' and failed to ensure that the Managers were providing professional and active supervision, oversight and management of the Funds." [FN9]

> FN9. Pls.'s Resp. Br. at 7.

From these factual allegations, the court cannot reasonably infer a breach of the fiduciary duty of loyalty. The complaints do not allege that the Managers benefited personally in any way by allowing the withdrawals. In fact, the amount of fees that the Managers received were based on the amount of money the Funds had under management. Therefore, if anything, the Managers had an incentive *not* to allow redemptions.

Likewise, the plaintiffs' allegations relating to the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals do not rise to the level of a breach of the duty of care. Director liability for breaching the duty of care "is predicated upon concepts of gross negligence." [FN10] A court faced with an allegation of lack of due care should look for evidence of whether a board has acted in a deliberate and knowledgeable way in identifying and exploring alternatives. [FN11]

> FN10. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984); *accord Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 66 (Del.1989).

> FN11. *Citron*, 569 A.2d at 66

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 5
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: 2005 WL 2130607 (Del.Ch.))**

Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one "which involves a devil-may-care attitude or indifference to duty amounting to recklessness." [FN12] "In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." [FN13] In order to prevail on a claim of gross negligence, a plaintiff must plead and prove that the defendant was "recklessly uninformed" or acted "outside the bounds of reason." [FN14]

> FN12. William T. Allen, Jack B. Jacobs and Leo E. Strine, Jr., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law,* 56 BUS. LAW. 1287, 1300 (2001); *accord Tomczak v. Morton Thiokol, Inc.,* 1990 Del. Ch. LEXIS 47, at *35 (Del. Ch. Apr. 5, 1990) ("In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions which are 'without the bounds of reason.' ") (citations omitted).

> FN13. *In re Walt Disney Co. Derivative Litig.,* 2005 Del. Ch. LEXIS 113, at *162, ___ A.2d. ___, (Del. Ch. Aug. 9, 2005) (internal citations and quotations omitted).

> FN14. *Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.,* 1996 Del. Ch. LEXIS 116, at *42 (Del. Ch. Sept. 3, 1996) (citations omitted), *aff'd,* 692 A.2d 411 (Del.1997) (TABLE); *see also Solash v. Telex Corp.,* 1988 Del. Ch. LEXIS 7, at *24-*25 (Del. Ch. Jan. 19, 1988) (stating that the standard for gross negligence is a high one, requiring proof of "reckless indifference" or "gross abuse of discretion") (citations omitted).

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals were actionably wrongful. Yet, the plaintiffs specifically allege in the complaints that the Partnership Agreements gave limited partners, in defined circumstances, the right to redeem. While the agreements also gave the Managers the power to delay or deny redemption requests in "[their] sole discretion," [FN15] it is difficult to read that discretionary power as imposing a positive duty to exercise that power to prevent or delay a withdrawal in order "to ensure that the Funds had 'sufficient financial resources' to accomplish their 'investment objectives.' " Thus, while the redemptions may have exacerbated the Funds' liquidity crunch, this is not enough to say that the Managers' failure to delay or deny those redemptions can give rise to a duty of care claim.

> FN15. Fund I Compl. ¶ 82; Fund II Compl. ¶ 94.

**\*5** Therefore, the factual allegation that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals does not give rise to a claim for breach of fiduciary duty.

### 3. *Active And Competent Management And Disclosure Allegations*

First, the complaints allege that the Managers lacked the experience and expertise to manage the Funds. Second, the complaints allege that the Managers devoted inadequate time and attention to managing the Funds. The complaints also allege that the Managers failed to disclose material information, and made misleading disclosures.

The claim that the Managers lacked the experience and expertise to manage the Funds is completely without merit. The defendants disclosed the qualifications of the Funds' Management Committee in the Private Placement Memoranda (the "PPMs") that the defendants gave to all of the unitholders. The "Management" sections of the PPMs disclosed the names, titles, affiliations, ages, educations, and experience of the Management Committee members, DCIP's principals, and DCIP's degree of experience with exchange funds. [FN16] The unitholders received this information before they ever made their investment in the Funds. They, therefore, implicitly agreed that the Managers were sufficiently qualified to manage the Funds.

> FN16. *See* Fund I PPM at 27-29; Fund II PPM at 29-31.

However, the plaintiffs' other claim, that the Managers devoted inadequate time and attention to managing the Funds and committed disclosure violations, is more substantial. The complaints allege that the Managers made false and misleading statements to the unitholders, and failed to disclose material information. While many of the alleged

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: 2005 WL 2130607 (Del.Ch.))**

misstatements took place before November 11, 2000, some (specifically, the Non-Disclosure Allegations) took place after this date.

The complaints allege that the Managers met only sporadically, less than once a year since the inception of the Funds. During this time, the Funds were facing difficult challenges. The Managers originally set up the Funds with collars, attempting to limit the upside and downside potential of the Funds. [FN17] The appreciation of certain contributed securities (especially Yahoo!) was causing the Funds to blow through the collars. The Managers then made the decision to remove the collars on the Funds, a decision that had beneficial effects in the short-term, but over the long-term, when the defendants failed to reinstate the collars, resulted in sharp losses.

> FN17. "Collaring" is financial jargon for purchasing offsetting calls and puts on a security to limit upside and downside exposure. At the inception of the Funds, the Managers attempted to limit upside and downside exposure to roughly 10%. *Alex. Brown,* 2005 Del. Ch. LEXIS 100, at *9.

Viewed in the light most favorable to the plaintiffs, these alleged facts do (just barely) raise a duty of care claim. Whether the Managers exercised the requisite amount of due care in managing the Funds is, of course, a fact sensitive inquiry. In certain circumstances, meeting once a year to manage an investment vehicle would be sufficient. This would be the case when the investment is relatively straight-forward, or where the complexity of the investment lies in its original design. In fact, a typical exchange fund could require less active management than other types of investments. These funds are often designed to avoid tax liability and to provide diversification, *not* to generate spectacular returns. Therefore, under normal circumstances, a properly hedged and diversified exchange fund might need less active management than, say, a typical mutual fund.

*6 The facts alleged in the complaints, however, paint a picture of the Funds being faced with exceptional challenges, first by the sharply rising value of the securities that made up the Funds, and second by the rapid fall in value of those same securities. The response of the Managers was, allegedly, almost nonexistent, meeting less than once a year.

Furthermore, the complaints allege that the Managers failed to disclose the challenges facing the Funds and the meager steps they were taking to meet those challenges. These alleged disclosure violations were potentially material because, had the plaintiffs known the truth, they could have asked for withdrawals, or brought suit before the value of the Funds plummeted.

It is quite possible that the Managers acted appropriately in both the amount of time they spent managing the Funds and the disclosures they made. However, the complaints paint a picture of the Managers taking almost *no* action over the course of several years to protect the unitholders' investments, while the value of the Funds first skyrocketed and later plummeted. Under the circumstances, the plaintiffs should at least be allowed discovery to find out if, as the complaints imply, the Managers received millions of dollars in fees for doing almost nothing.

Therefore, for all of the above reasons, the court holds that the plaintiffs have plead sufficient facts to give rise to a duty of care claim.

B. *Breach Of Contract And The Implied Covenant Of Good Faith And Fair Dealing (Counts 5 & 6)*

In order to survive a motion to dismiss for failure to state a breach of contract claim, a plaintiff must demonstrate: (i) the existence of the contract, (ii) a breach of an obligation imposed by that contract, and (iii) resultant damages to the plaintiff. [FN18]

> FN18. *VLIW Tech., L.L.C. v. Hewlett-Packard Co.,* 840 A.2d 606, 612 (Del.2003).

1. *Failure To Provide Financial Statements Allegations*

The complaints allege that the Managers had a contractual duty under the Partnership Agreements to provide semi-annual unaudited financial statements reporting on the financial condition of the Funds, and an annual audited report. The complaint further alleges that the Managers did not provide the unitholders with these reports for 2002 and did not provide the 2001 audited financial statements until 2003. Further, the court reasonably infers from the facts alleged in the complaints that the plaintiffs were harmed by either not being able to ask for a redemption, or not being able to sue for rescission or a like remedy. Therefore, the plaintiffs have satisfied the pleading requirements for a breach of contract claim and this claim cannot be dismissed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: 2005 WL 2130607 (Del.Ch.))**

Page 7

*2. Withdrawal Allegations*

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals constituted a breach of contract. They argue that the withdrawals caused, or made worse, the Funds' liquidity crunch. However, the Partnership Agreements gave the unitholders the right to withdraw their investments after two years. [FN19] As alleged in the complaints, the unitholders' right to withdraw was limited by the power of the Managers to delay or deny redemptions "in [their] sole discretion." [FN20]

> FN19. *See* Partnership Agreements ¶ ¶ 6.3.

> FN20. Fund I Compl. ¶ 82, Fund II Compl. ¶ 94.

*7 This contractual provision did not create a duty for the Managers to individually assess the financial position of the Funds and the effect that such a withdrawal would have each time a unitholder requested a withdrawal. Instead, it placed a restriction on the unitholders' right to receive withdrawals. It gave the Managers the power to limit withdrawals, in their sole discretion. Therefore, the plaintiffs have not identified a contractual obligation that the Managers have violated and this claim must be dismissed. [FN21]

> FN21. In the Plaintiffs' Response Brief, the plaintiffs implicitly admit that the Managers had the authority to allow the withdrawals. Instead of arguing this point, the plaintiffs argue that the Managers had a contractual obligation to report the withdrawals.

*3. Active And Competent Management And Disclosure Allegations*

The plaintiffs allege that the defendants owed them a contractual duty to provide active management and to disclose all material information. The complaints allege that the Managers made false and misleading statements to the unitholders, failed to disclose material information, and that the Managers met only sporadically, less than once a year since the inception of the Funds.

As stated above, the Managers are alleged to have owed the unitholders a contractual duty to provide regular financial reports. Of course, concomitant to the duty to provide information is the duty that such information not be false or misleading. In other words, the defendants had a contractual duty to provide the information in good faith. The complaints allege that the Managers failed to provide reports when they were contractually obligated to do so, and that, when they did provide the reports, they were false and misleading. Specifically, the plaintiffs argue that the Managers failed to disclose certain material information--the Non-Disclosure Allegations and the withdrawals.

These allegations, if proven, are sufficient to support a claim for breach of contract. Therefore, this claim survives the motion to dismiss.

*C. Fraud (Count 3)*

The plaintiffs' third claim is for fraud. Common law fraud in Delaware requires that: (1) the defendant made a false representation, usually one of fact; (2) the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; (3) the defendant had the intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or did not act in justifiable reliance on the representation; and (5) the plaintiff suffered damages as a result of such reliance. [FN22] In addition to overt representations, where there is a fiduciary relationship, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak. [FN23] Fraud claims are subject to the heightened pleading standards of Rule 9(b). This means that the pleading must identify the "time, place and contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby." [FN24]

> FN22. *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983).

> FN23. *Id.*

> FN24. *York Linings v. Roach,* 1999 Del. Ch. LEXIS 160, at *25 (Del. Ch. July 28, 1999). (internal quotations and citations omitted).

The plaintiffs argue that the defendants committed fraud by failing to disclose material information which they had a contractual and fiduciary duty to disclose, specifically the Non-Disclosure Allegations. Obviously, this claim (resting principally on alleged omissions) is merely a rehash of Count 1's claim of breach of fiduciary duty and Count 5's claim for breach of contract. It does not independently support

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: 2005 WL 2130607 (Del.Ch.))**

a claim for relief. Moreover, the plaintiffs fail to plead with particularity what the defendants obtained through their alleged fraud. The plaintiffs plead generally that the Managers received management fees based on the amount of money the Funds had under management, thereby giving them an incentive to keep money in the Funds. But the plaintiffs' arguments on this score are inherently contradictory. While they argue that the defendants had an incentive to keep money in the Funds to earn great management fees, they also argue that the Managers wrongfully allowed withdrawals, thereby reducing the amount of money they had under management. Are the withdrawals also part of the alleged fraud?

**\*8** For the above reasons, the plaintiffs have failed to adequately state a claim for fraud. Therefore, Count 3 will be dismissed without prejudice to the claims asserted in Count 1 or Count 5.

### D. *Gross Negligence (Count 7)*

The plaintiffs' fourth claim is for gross negligence. Both of the Funds' Partnership Agreements contain an exculpatory provision, limiting the liability of the Managers for losses the unitholders incurred with respect to the Funds. Except for misrepresentation or breach of the Partnership Agreements, the General Partners of the Funds (AB Management for Fund I and DCIP for Fund II), and those who perform service on their behalf, are not liable to the unitholders, unless their conduct constituted "gross negligence or intentional misconduct." [FN25] As such, the unitholders are forced to argue that the Managers' alleged misconduct amounted to gross negligence.

FN25. Partnership Agreements § 3.5.

First, as discussed above, the allegations of the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals do not state a claim for gross negligence. Second, also as stated above, claims for breach of the duty of care are predicated on concepts of gross negligence. The court has already found that the plaintiffs' claim for breach of the duty of care survive the motion to dismiss. Therefore, this claim survives as well.

### E. *Unjust Enrichment (Count 8)*

The plaintiffs, in the alternative, plead both a claim for breach of contract and a claim for unjust enrichment. In some circumstances, alternative

pleading allows a party to seek recovery under theories of contract or quasi-contract. This is generally so, however, only when there is doubt surrounding the enforceability or the existence of the contract. Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls . [FN26] It is undisputed that a written contract existed between the unitholders and the defendants. The Partnership Agreements for the Funds spelled out the relationship between the parties, and the plaintiffs specifically brought claims based on these contracts.

> FN26. *Rossdeutscher v. Viacom, Inc.,* 768 A.2d 8, 24 (Del.2001) (applying New York law); *ID Biomedical Corp. v. TM Tech., Inc.,* 1995 WL 130743, at \*15 (Del. Ch. Mar. 16, 1995) (applying Delaware law).

Notwithstanding the existence of these contractual relationships, the plaintiffs make the bald claim that the Managers were unjustly enriched at the unitholders expense. This is insufficient to state a claim for unjust enrichment, when the existence of a contractual relationship is not controverted. Thus, this claim must be dismissed.

### F. *Agency Liability (Count 11)*

The plaintiffs also bring claims against Deustche Bank and DBSI (as controlling persons of AB Management) based on agency liability. A parent corporation can be held liable for the acts of its subsidiary under either of two theories of agency liability. The first is where "piercing the corporate veil" is appropriate. While many factors are considered in deciding whether to pierce the corporate veil, "the concept of complete domination by the parent is decisive." [FN27]

> FN27. *Phoenix Canada Oil Co. v. Texaco, Inc.,* 842 F.2d 1466, 1477 (3d Cir.1988).

**\*9** Second, while one corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company, a corporation--completely independent of a second corporation--may assume the role of the second corporation's agent in the course of one or more specific transactions. This restricted agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting. Under this second theory, total domination or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: 2005 WL 2130607 (Del.Ch.))**

general alter ego criteria need not be proven. [FN28]

>    FN28. *Id.* (citing Restatement (Second) of Agency § 14M, cmt. (a) (1958)).

With respect to DBSI, the plaintiffs argue that AB Management was dominated and controlled by DBSI. In essence, the plaintiffs ask the court to disregard AB Management's corporate form  [FN29] and impose liability on DBSI. The complaints allege that: (i) DBSI and AB Management operate out of the same Maryland office; (ii) AB Management, although incorporated, has no functioning board of directors and no business other than the management of the Funds; (iii) AB Management is run by its Management Committee, which is comprised of employees and executives of DBSI; (iv) DBSI provided margin accounts for the Funds; and (v) DBSI served as the placement agent and custodian for the Funds' accounts. [FN30]

>    FN29. AB Management is a corporation, organized under the laws of Maryland.

>    FN30. Fund I Compl. ¶ ¶  44, 45, 247, 250, 332, 334; Fund II Compl. ¶ ¶  54, 179, 253-259.

"Persuading a Delaware Court to disregard the corporate entity is a difficult task. The legal entity of a corporation will not be disturbed until sufficient reason appears."  [FN31] Allegations (i), (iv) and (v) above, while consistent with an obviously close relationship between DBSI and its wholly owned subsidiary, do not alone or together support any inference that would lead this court to disregard the separate legal existence of AB Management; nor does the allegation that AB Management's business is run by DBSI employees. However, the well pleaded factual allegation that AB Management has "no functioning board of directors," when viewed most favorably to the plaintiffs in light of the other facts alleged, if proven, could provide a basis to conclude that the corporate form should be ignored. The corporate veil may be pierced where a subsidiary is in fact a mere instrumentality or alter ego of its parent. [FN32] The complaints allege that AB Management does not have board meetings or follow other corporate formalities. Instead, employees of DBSI allegedly perform the activities that, in a properly functioning corporation, the board of directors would perform. If these facts are true and the other relationships are shown to exist, an adequate basis for piercing the corporate veil could be established. Therefore, this claim against DBSI cannot be

dismissed.

>    FN31. *Mason v. Network of Wilmington, Inc.,* 2005 Del. Ch. LEXIS 99, at *9 (Del. Ch. July 1, 2005) (internal quotations omitted).

>    FN32. *Mabon, Nugent & Co. v. Texas Amer. Energy Corp.,* 1990 Del. Ch. LEXIS 46, at *14-*15 (Del. Ch. Apr. 12, 1990); *Phoenix Canada Oil,* 842 F.2d at 1477.

The complaints make additional allegations as to why AB Management is a mere agent of Deutsche Bank. These are: (i) Deutsche Bank purchased Alex. Brown, Inc. (the parent company of AB Management) thereby acquiring 100% ownership of AB Management; (ii) Deutsche Bank changed the name of the Funds the reflect the "Deutsche Bank" name; (iii) when the liquidity crisis became acute, the Management Committee decided that it needed to alert officials at Deutsche Bank; and (iv) in July of 2002, Deutsche Bank fired all the members of the Management Committee. [FN33]

>    FN33. Fund I Compl. ¶ ¶  153, 163, 239-240; Fund II Compl. ¶ ¶  179, 253- 259.

*10 First, these factual allegations do not give rise a reasonable inference that Deutsche Bank dominated and controlled AB Management and the Management Committee. These factual allegations show little more than Deutsche Bank owned the parent company of AB Management and, indirectly, AB Management itself. Ownership alone is not sufficient proof of domination or control. [FN34] The complaints allege that Deutsche Bank bought AB Management in June of 1999 and changed its name a few months later. The complaints do not allege any action by Deutsche Bank to influence or control the management of the Funds until July of 2002, when it fired the majority of the Management Committee. From these bare factual allegations, the court simply cannot infer domination or control.

>    FN34. *Aronson,* 473 A.2d at 815; *see also In re W. Nat'l S'holders Litig.,* 2000 Del. Ch. LEXIS 82, (Del. Ch. May 22, 2000) (holding that a 46% shareholder does not control or dominate the board due to stock ownership alone).

Second, these factual allegations do not give rise a reasonable inference that, in the managing and/or sale of the Funds, AB Management and the Management

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                  Page 10
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: 2005 WL 2130607 (Del.Ch.))**

Committee were Deutsche Bank's agent. Under the rubric of agency liability, there are two main theories--actual authority and apparent authority. Because the plaintiffs do not describe which theory of liability they assert, the court addresses both.

Actual authority is that authority which a principal expressly or implicitly grants to an agent. [FN35] There is simply no allegation in the complaints that Deutsche Bank expressly gave either AB Management or the Management Committee the authority to bind it as its agent.

> FN35. *Billops v. Magness Constr. Co.,* 391 A.2d 196, 197 (Del.1978).

Apparent authority is that authority which, though not actually granted, the principal knowingly or negligently permits an agent to exercise, or which he holds himself out as possessing. [FN36] In order to hold a defendant liable under apparent authority, a plaintiff must show reliance on indicia of authority originated by principal, and such reliance must have been reasonable. [FN37] The plaintiffs have not alleged any facts showing that Deutsche Bank held out either AB Management or the Management Committee as its agent; nor have the plaintiffs alleged facts from which the court can reasonably infer reliance.

> FN36. *Henderson v. Chantry,* 2002 Del. Ch. LEXIS 14, at *14 (Del. Ch. Feb. 5, 2002).

> FN37. *Billops,* 391 A.2d at 198.

For the above reasons, the plaintiffs have failed to plead sufficient facts to support a claim for agency liability against Deutsche Bank and Count 11 against Deutsche Bank must be dismissed. However, the plaintiffs plead sufficient facts to support a claim for liability against DBSI. Therefore, Count 11 against DBSI will not be dismissed.

*G. Conspiracy, Aiding And Abetting Fraud, And Breach Of Fiduciary Duty (Count 2, 4, & 9)*

The plaintiffs allege that the defendants conspired to commit fraud and to commit a breach of fiduciary duty. The elements for civil conspiracy under Delaware law are: (i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) damages resulting from the action of the conspiracy parties. [FN38] While the plaintiffs caption their claim as aiding and abetting breach of fiduciary duty, the court treats it as a claim for civil conspiracy. Claims for civil conspiracy are sometimes called aiding and abetting. [FN39] However, the basis of such a claim, regardless of how it is captioned, is the idea that a third party who *knowingly* participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship. [FN40]

> FN38. *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus.,* 871 A.2d 428, 437 n.8 (Del.2005); *Nicolet, Inc. v. Nutt,* 525 A.2d 146, 149-50 (Del.1987).

> FN39. *See Benihana of Tokyo, Inc. v. Benihana, Inc.,* 2005 Del. Ch. LEXIS 19, at *26 (Del. Ch. Feb. 28, 2005).

> FN40. *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1057 (Del. Ch.1984), *aff'd,* 575 A.2d 1131 (Del.1990).

*11 However captioned, civil conspiracy is vicarious liability. [FN41] It holds a third party, not a fiduciary, responsible for a violation of fiduciary duty. [FN42] Therefore, it does not apply to the defendants which owe the unitholders a direct fiduciary duty. Instead, the plaintiffs attempt to hold Deustche Bank and DBSI responsible for the Managers' alleged breaches of fiduciary duty.

> FN41. *See, e.g., Parfi Holding AB v. Mirror Image Internet, Inc.,* 794 A.2d 1211, 1238 (Del. Ch.2001) ("Civil conspiracy thus provides a mechanism to impute liability to those not a direct party to the underlying tort."), *rev'd on other grounds,* 817 A.2d 149 (Del.2002).

> FN42. *Gilbert,* 490 A.2d at 1057.

The defendants argue that the plaintiffs have not adequately alleged that Deustche Bank and DBSI had knowledge of the alleged wrongful acts, the breach of fiduciary duty and fraud. Where a complaint alleges fraud or conspiracy to commit fraud, the Rules of this court call for a higher pleading standard, requiring the circumstances constituting the fraud or conspiracy to "be pled with particularity." [FN43] While Rule 9(b) provides that "knowledge ... may be averred generally," where pleading a claim of fraud or breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this "something" was knowable and that the defendant

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                     Page 11
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: 2005 WL 2130607 (Del.Ch.))**

was in a position to know it. [FN44]

> FN43. *Atlantis Plastics Corp. v. Sammons,*
> 558 A.2d 1062, 1066 (Del. Ch.1989) (citing
> Rule 9(b), which states: "In all averments of
> fraud or mistake, the circumstances
> constituting fraud or mistake shall be stated
> with particularity.").

> FN44. *IOTEX Communs., Inc. v. Defries,*
> 1998 Del. Ch. LEXIS 236, at *12-*13 (Del.
> Ch. Dec. 21, 1998).

Furthermore, Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal. [FN45] With respect to DBSI, the complaints allege repeatedly that its employees, acting within the scope of their employment, had knowledge of the underlying factual allegations. Specifically, the complaints allege that the Funds were run by the Management Committee, all the members of which were employees of DBSI. [FN46] This knowledge is thereby imputed to DBSI.

> FN45. *J.I. Kislak Mtg. Corp. v. William*
> *Matthews Bldr., Inc.,* 287 A.2d 686, 689
> (Del.Super.1972), *aff'd,* 303 A.2d 648
> (Del.1972).

> FN46. Fund I Compl. ¶ ¶ 45, 47-51, 247-
> 251; Fund II Compl. ¶ ¶ 55, 57- 61, 261-
> 266.

With respect to Deutsche Bank, the plaintiffs allege that AB Management and the Management Committee are mere agents of Deutsche Bank. However, as discussed above, the factual allegations in the complaints are insufficient to infer that AB Management and the Management Committee are the agents of Deutsche Bank.

For the above reasons, the court holds that the plaintiffs have not adequately pleaded facts that, if proven, would support an inference that Deustche Bank had knowledge of the alleged wrongful acts, the breach of fiduciary duty and fraud. The plaintiffs have adequately pleaded that DBSI had knowledge of the alleged wrongful acts. Therefore, with respect to Deutsche Bank, Counts 2, 4, and 9 must be dismissed. With respect to DBSI, these counts will not be dismissed.

*H. Accounting (Count 10)*

The plaintiffs' tenth claim is for an accounting. An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be due to either as a result. [FN47] As it is a remedy, should the plaintiffs ultimately be successful on one or more of their claims, the court will address their arguments for granting an accounting.

> FN47. *Jacobson v. Dryson Acceptance*
> *Corp.,* 2002 Del. Ch. LEXIS 4, at *12-*13
> (Del. Ch.2002).

V.

The defendants argue that several of the claims in the complaints are derivative and that, since the plaintiffs did not make demand upon the Funds, and demand was not excused, these claims should be dismissed pursuant to Rule 23.1. [FN48]

> FN48. The claims that the defendants
> contend are derivative are as follows: breach
> of fiduciary duty (Count 1), aiding and
> abetting breach of fiduciary duty (Count 2),
> breach of contract (Count 5), breach of the
> covenant of good faith (Count 6), gross
> negligence (Count 7), unjust enrichment
> (Count 8), accounting (Count 10), and
> agency liability (Count 11). As the court has
> already dismissed the claim for unjust
> enrichment (Count 8) and agency liability as
> to Deutsche Bank (Count 11), and deferred
> granting the equitable remedy of an
> accounting (Count 10), it will not discuss
> those claims here.

*12 The demand requirement in the limited partnership context is codified in 6 *Del. C.* § 17-1001. That statute states:

> A limited partner or an assignee of a partnership
> interest may bring an action in the Court of
> Chancery in the right of a limited partnership to
> recover a judgment in its favor if general partners
> with authority to do so have refused to bring the
> action or if an effort to cause those general partners
> to bring the action is not likely to succeed.

Likewise, the determination of whether a claim is derivative or direct in nature is substantially the same for corporate cases as it is for limited partnership cases. [FN49] Accordingly, throughout this decision, the court relies on corporate as well as partnership case law for its determination of this lawsuit's nature.

> FN49. *Litman v. Prudential-Bache Prop.,*
> *Inc.,* 611 A.2d 12, 15 (Del. Ch.1992).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 12
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
(Cite as: 2005 WL 2130607 (Del.Ch.))

The Delaware Supreme Court's recent decision in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.* revised the standard for determining whether a claim is direct or derivative. Now, the determination "turn[s] solely on the following questions: (i) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (ii) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" [FN50] "[U]nder *Tooley,* the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint." [FN51] "Instead the court must look to all the facts of the complaint and determine for itself whether a direct claim exists." [FN52]

FN50. 845 A.2d 1031, 1033 (Del.2004).

FN51. *In re Syncor Int'l Corp. S'holders Litig.,* 857 A.2d 994, 997 (Del. Ch.2004).

FN52. *Dieterich v. Harrer,* 857 A.2d 1017, 1027 (Del. Ch.2004).

As they are factually distinct, the court deals with the claims separately. First, the court addresses the claims for breach of contract and the breach of fiduciary duty based on the Non-Disclosure Allegations. Second, the court addresses the claims for gross negligence and failing to provide active and competent management, and the fiduciary duty claims based thereon.

A. *Breach Of Contract And The Non-Disclosure Allegations*

The claims for breach of contract and the claims for breach of fiduciary duty based on the Non-Disclosure Allegations are direct. First, the unitholders, not the partnerships, suffered the alleged harm. In order to show a direct injury under *Tooley,* a unitholder "must demonstrate that the duty breached was owed to the [unitholder] and that he or she can prevail without showing an injury to the [partnership]." [FN53] The gravamen of these claims is that the Managers failed to disclose material information when they had a duty to disclose it and made other misleading or fraudulent statements, in violation of their contractual and fiduciary duties. Generally, non-disclosure claims are direct claims. [FN54] Moreover, the partnerships were not harmed by the alleged disclosure violations. Any harm was to the unitholders, who either lost their opportunity to request a withdrawal from the Funds from the Managers, or to bring suit to force the

Managers to redeem their interests.

FN53. *Tooley,* 845 A.2d at 1039.

FN54. *See, e.g., Dieterich,* 857 A.2d at 1029 (characterizing non-disclosure claims as direct claims); *Abajian v. Kennedy,* 1992 Del. Ch. LEXIS 6, at *10 (Del. Ch. Jan. 17, 1992) (same).

*13 Second, the unitholders would receive any recovery, not the Funds. Under the second prong of *Tooley,* in order to maintain a direct claim, stockholders must show that they will receive the benefit of any remedy. [FN55] While the best remedy for a disclosure violation is to force the partnership to disclose the information, due to the passage of time since the alleged wrongdoing, that remedy would likely be inadequate. In order to compensate the unitholders for their alleged harm, the court may find it appropriate to grant monetary damages. Such damages would be awarded to the unitholders, and not the partnerships.

FN55. *Tooley,* 845 A.2d at 1033.

For all of the above reasons, the court concludes that the claims based on the Non-Disclosure Allegations and the alleged breach of contract are direct claims and, thus, demand was not required.

B. *Gross Negligence And Failure To Provide Competent And Active Management*

The claims for gross negligence and failure to provide competent and active management are clearly derivative. First, as stated above, in order to show a direct injury under *Tooley,* a unitholder "must demonstrate that the duty breached was owed to the [unitholder] and that he or she can prevail without showing an injury to the [partnership]." [FN56] The gravamen of these claims is that the Managers devoted inadequate time and effort to the management of the Funds, thereby causing their large losses. Essentially, this a claim for mismanagement, a paradigmatic derivative claim. [FN57] The Funds suffered any injury that resulted from the Managers' alleged inattention. Any injury that the unitholders suffered is derivative of the injury to the Funds.

FN56. *Tooley,* 845 A.2d at 1039.

FN57. *See, e.g., Kramer v. W. Pac. Indus., Inc.,* 546 A.2d 348, 353 (Del.1988) ("A claim of mismanagement ... represents a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 13
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: 2005 WL 2130607 (Del.Ch.))**

direct wrong to the corporation that is indirectly experienced by all shareholders. Any devaluation of stock is shared collectively by all the shareholders, rather than independently by the plaintiff or any other individual shareholder. Thus, the wrong alleged is entirely derivative in nature.").

Second, the Funds, not the unitholders, would receive any recovery. Again, under the second prong of *Tooley*, in order to maintain a direct claim, stockholders must show that they will benefit from the remedy. [FN58] If the court finds that the Managers violated their fiduciary duties by failing to devote adequate time and effort to managing the Funds, any recovery would go to the party harmed, namely the Funds. Thus, these claims are derivative claims.

> FN58. *Tooley*, 845 A.2d at 1033.

If a party brings derivative claims without first making demand, and demand is not excused, those claims must be dismissed. [FN59] In this case, the plaintiffs have not alleged that they made demand on the Fund, nor have they alleged why demand should be excused. Accordingly, the derivative claim must be dismissed. However, in the interest of justice, the court dismisses these claims with leave to replead. [FN60]

> FN59. *Haber v. Bell*, 465 A.2d 353, 357 (Del. Ch.1983).

> FN60. In a letter to the court, the plaintiffs stated that AB Management sent letters to all the unitholders of the Funds (the "Redemption Letters"), stating that the Managers would allow the unitholders to redeem their units and that the Managers are pursuing the dissolution of the Partnerships. The plaintiffs argue that the Redemption Letters bolster their contention that their claims are direct, not derivative. However, the complaints do not contain the information in the Redemption Letters and the Redemption Letters are not referenced in the complaints. Therefore, these documents are not properly before the court on a Rule 12(b)(6) motion.

VI.

The DCIP Defendants argue that, with respect to the Fund I Complaint, this court lacks personal

jurisdictions over them. With respect to the Fund II Complaint, they argue that this court lacks personal jurisdiction over Crants and Devlin. [FN61]

> FN61. DCIP is the General Partner of Fund II. As such, there is no dispute that the court has personal jurisdiction over DCIP viz. Fund II. *See RJ Assocs. v. Health Payors' Org. Ltd. P'ship.*, 1999 Del. Ch. LEXIS 161, at *12 (Del. Ch. July 16, 1999) (quoting 6 Del. C. § 17-109(a) and holding that, as a matter of law, by accepting the position of general partner, a corporation consents to be subjected to a Delaware court's jurisdiction if the limited partnership has chosen to incorporate under Delaware law).

In support of their Rule 12(b)(2) motion, the DCIP Defendants adduced affidavits of both Devlin and Crants. The plaintiffs have not adduced any affidavits rebutting the Devlin and Crants affidavits, nor have they asked to take discovery. Instead, they have decided to rely on the well-pleaded allegations in their complaint. Moreover, since they have not been rebutted, the court must take as true the facts contained in the Devlin and Crants affidavits. However, where the well-pleaded allegations in the complaints are not rebutted by affidavit, the court will, for the purposes of this Rule 12(b)(2) motion, assume the truthfulness of those allegations. [FN62]

> FN62. *See Hart Holding Co. v. Drexel Burnham Lambert, Inc.*, 593 A.2d 535, 539 (Del. Ch.1991) (citing *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2nd Cir.1981)) (stating that a trial court is vested with broad discretion in shaping the procedure by which a motion under Rule 12(b)(2) is resolved).

*14 According to the Devlin and Crants affidavits, DCIP is a Tennessee limited liability company, with its principal place of business in Nashville, Tennessee. Both Crants and Devlin are residents of Tennessee and perform the vast majority of their duties from their office in Nashville. Neither Crants nor Devlin recall ever traveling to Delaware. None of the DCIP Defendants solicit any business in Delaware or engage in any regular conduct with Delaware.

When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the nonresident defendant. [FN63] In

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 14
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: 2005 WL 2130607 (Del.Ch.))**

determining whether it has personal jurisdiction over a nonresident defendant, the court will generally engage in a two-step analysis. First, was service of process on the nonresident authorized by statute? Second, does the exercise of jurisdiction, in the context presented, comport with due process? [FN64]

> FN63. *See Plummer & Co. Realtors v. Crisafi*, 533 A.2d 1242, 1244 (Del.Super.1987); *see also Finkbiner v. Mullins*, 532 A.2d 609, 617 (Del.Super.1987) (stating that, on a Rule 12(b)(2) motion, "the burden is on the plaintiff to make a specific showing that this Court has jurisdiction under a long-arm statute.") (citing *Greenly v. Davis*, 486 A.2d 669 (Del.1984)).

> FN64. *LaNuova D & B, S.P.A. v. Bowe Co.*, 513 A.2d 764, 768 (Del.1986).

A. *The Long-Arm Statute*

The plaintiffs argue that the court has personal jurisdiction over the DCIP Defendants under 10 *Del. C.* § 3104, the Delaware long-arm statute. Section 3104(c) provides, in relevant part: "As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident ... who ... (1) Transacts any business or performs any character of work or service in the State ... [or] (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State...." Section 3104 has been broadly construed to confer jurisdiction to the maximum extent possible under the due process clause. [FN65] Furthermore, when *in personam* jurisdiction is challenged on a motion to dismiss, the record is construed most strongly against the moving party. [FN66]

> FN65. *Id.*

> FN66. *RJ Assocs.*, 1999 Del. Ch. LEXIS 161, at *13.

The complaints lay out detailed allegations of the connections between the DCIP Defendants and the Funds. The Funds were established as Delaware limited partnerships and are governed by Delaware law. DCIP is the Sub-Advisor of Fund I and the General Partner and Sub-Advisor of Fund II. Crants and Devlin are the managing members and owners of DCIP. DCIP acts principally through Crants and Devlin. The PPMs touted the DCIP Defendants' experience and qualifications in order to sell units in the Funds.

The PPMs also state that DCIP is responsible for the day-to-day management of the Funds. DCIP, in the persons of Crants and Devlin, attended every meeting of the Management Committee (none of which took place in Delaware). Also, DCIP, which acted through Crants and Devlin, was primarily responsible for choosing the securities included in the Funds.

In *RJ Associates*, Justice (then-Vice Chancellor) Jacobs held that this court could exercise personal jurisdiction over a limited partner in a Delaware limited partnership under Section 3104(c)(1). Justice Jacobs held that the following three contacts, taken together, were sufficient to constitute "transacting business" under the Delaware long-arm statute: (i) the limited partner participated in the formation of the limited partnership, (ii) the limited partner indirectly participated in the limited partnership's management by 'controlling' the general partner, and (iii) the limited partner caused the Partnership Agreement to be amended to alter the method of distributions to the partners. [FN67]

> FN67. *RJ Assocs.*, 1999 Del. Ch. LEXIS 161, at *18.

*15 The operative facts of this case, as alleged in the complaints, are similar to those in *RJ Associates*. First, DCIP participated in the formation of the Funds. In fact, DCIP was primarily responsible for selecting the initial securities accepted by the Funds. [FN68] Second, DCIP not only participated in the management of the Funds, DCIP was primarily responsible for the management of the Funds. The PPMs state that "the Sub-Advisor will provide day-to-day management and administration of the Fund and investment advisory services, including, among other matters, the screening of contributed securities, advice regarding the selection of the illiquid Assets and hedging and borrowing strategies." [FN69] Finally, DCIP received millions of dollars in fees to manage the two Delaware entities.

> FN68. *See* Fund I Compl. ¶ 71; Fund II Compl. ¶¶ 82, 241.

> FN69. Fund I PPM at 3-4, Fund II PPM at 3.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: 2005 WL 2130607 (Del.Ch.))**

Page 15

With respect to Crants and Devlin, the complaints allege that they are the owners and managing partners of DCIP. The complaints further allege that DCIP only acts through Crants and Devlin. In essence, the complaints allege that it was Crants and Devlin who selected the securities for the Funds, and managed the Funds on a day-to-day basis.

The court finds that these contacts are sufficient to constitute "transacting business" under the long-arm statute.

B. *Due Process*

The focus of a minimum contacts inquiry is whether a nonresident defendant engaged in sufficient minimum contacts with the State of Delaware to require it to defend itself in the courts of the state consistent with the traditional notions of fair play and justice. [FN70] In order to establish jurisdiction over a nonresident defendant, the nonresident defendant's contacts with the forum must rise to such a level that it should reasonably anticipate being required to defend itself in Delaware's courts. [FN71] The minimum contacts which are necessary to establish jurisdiction must relate to some act by which the defendant has deliberately created obligations between itself and the forum. [FN72] Consequently, the defendant's activities are shielded by the benefits and protection of the forum's laws and it is not unreasonable to require it to submit to the forum's jurisdiction. [FN73]

FN70. *AeroGlobal,* 871 A.2d at 440 (citing *Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945)).

FN71. *Id.*

FN72. *Sternberg v. O'Neil,* 550 A.2d 1105, 1120 (Del.1988).

FN73. *Id.; see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (U.S.1985) (requiring "purposeful availment" of the benefits of the state's laws to satisfy the minimum contacts test).

In addition to the contacts outlined above that the complaints allege between DCIP Defendants and the Funds, the plaintiffs also allege that the DCIP Defendants enjoyed the benefits of Delaware law. They claim that the DCIP Defendants have received millions of dollars in fees for managing the Delaware

partnerships and are entitled to claim limited liability under the terms of the Partnership Agreements, which established the Funds and limit the DCIP Defendants' liability to cases of gross negligence. [FN74]

FN74. Partnership Agreements § 3.5.

In *RJ Associates,* Justice Jacobs found that the following contacts were sufficient to satisfy due process: (i) the limited partner took an active role in establishing the Delaware Partnership; (ii) the limited partner owned a 50% interest in the partnership's general partner, and appointed four of the general partner's seven board members; (iii) the limited partner received 49 . 5% of the partnership's cash flow distributions; (iv) the limited partner allegedly controlled the partnership; (v) the limited partner allegedly caused the partnership agreement to be amended under Delaware law to change the agreed-upon cash flow distribution payments to the limited partners; and (vi) the limited partner agreed to a Delaware choice of law provision in the partnership agreement. [FN75]

FN75. *RJ Assocs.,* 1999 Del. Ch. LEXIS 161, at *19-*20.

**\*16** While not exactly the same, the contacts that DCIP has with Delaware are substantially similar to those in *RJ Associates.* DCIP took part in the formation of the Funds, two Delaware entities. DCIP managed the Funds on a day-to-day basis and received millions of dollars in fees for doing so. In addition, the Partnership Agreements which established the Funds limited the DCIP Defendants' liability to cases of gross negligence. [FN76] They have, thereby, benefited by expressly limiting their liability under Delaware law. Given all of these contacts, DCIP should have reasonably expected to be haled before the courts in Delaware.

FN76. Partnership Agreements § 3.5.

Crants and Devlin also should have reasonably expected to be haled before the courts of this state. As stated above, the complaints allege that DCIP could only act through Crants and Devlin. All the actions attributed to DCIP were really performed by them. Moreover, in the case of Fund II, Crants and Devlin are alleged to be the managing partners of the general partner of a Delaware limited partnership. In the case of Fund I, Crants and Devlin are alleged to have managed a Delaware limited partnership, despite the fact that DCIP is not that entity's general

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: 2005 WL 2130607 (Del.Ch.))**

partner.

In *In re USACafes,* former Chancellor Allen found that the directors of a corporation that was the general partner of a Delaware limited partnership were subject to the jurisdiction of this state's courts, due to their positions with the general partner . [FN77] Chancellor Allen focused on the important state interest that Delaware has in regulating entities created under its laws, and how that interest could only be served by exercising jurisdiction over those who managed the Delaware entity.

FN77. 600 A.2d 43, 52 (Del. Ch.1991).

The relationship between the General Partner and the limited partners was created by the law of Delaware. The state empowered defendants to act, and this state is obliged to govern the exercise of that power insofar as the issues of corporate power and fiduciary obligation are concerned. These factors bear importantly on the fairness of exercising supervisory jurisdiction at this point in the relationship of the various parties. The wrongs here alleged are not tort or contract claims unconnected with the internal affairs or corporate governance issues that Delaware law is especially concerned with. [FN78]

FN78. *Id.*

Likewise, the wrongs alleged in this case go essentially to the management of a Delaware limited partnership. The DCIP Defendants voluntarily undertook to mange the Funds and received millions of dollars in compensation for doing so. Now, limited partners in the Delaware entity seek to hold them accountable for alleged wrongs they committed. It is both necessary and proper for the courts of this state to ensure that the managers of a Delaware entity are held responsible for their actions in managing the Delaware entity. When a person manages a Delaware entity, and receives substantial benefit from doing so, he should reasonably expect to be held responsible for his wrongful acts relating to the Delaware entity in Delaware. [FN79]

FN79. *See Assist Stock Mgmt. L.L.C. v. Rosheim,* 753 A.2d 974, 975 (Del. Ch.2000) ("When nonresidents agree to serve as directors or managers of Delaware entities, it is only reasonable that they anticipate that ... they will be subject to personal jurisdiction in Delaware courts.").

*17 For the above reasons, the court concludes that it has personal jurisdiction over the DCIP Defendants in both cases. Therefore, the DCIP Defendants' motion to dismiss pursuant to Rule 12(b)(2) must be denied.

VII.

For the above reasons, the defendants' motion to dismiss is GRANTED in part and DENIED in part. The defendants are directed to submit a form of order, on notice, within 10 days.

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 850324 (Trial Motion, Memorandum and Affidavit) DC Investment Partners, LLC's, D. Robert Crants, III's and Michael W. Devlin's Reply Brief in Support of Their Motion to Dismiss Plaintiffs' Complaint (Mar. 18, 2005)

• 2005 WL 850325 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Motion to Dismiss of Defendants Alex. Brown Management Services, Inc., Deutsche Bank Securities, Inc., and Deutsche Bank, AG (Mar. 18, 2005)

• 2005 WL 850387 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answering Brief in Opposition to Defendants' Motions to Dismiss (Mar. 8, 2005)

• 2005 WL 850386 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answering Brief in Opposition to Defendants' Motions to Dismiss (Mar. 7, 2005)

• 2005 WL 418240 (Trial Motion, Memorandum and Affidavit) Opening Brief of Defendants Alex. Brown Management Services, Inc., Deutsche Bank Securities, Inc. and Deutsche Bank A.G. in Support of Their Motion to Dismiss (Jan. 25, 2005)

• 2005 WL 418241 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of DC Investment Partners, LLC, Doctor Robert Crants, III and Michael W. Devlin's Motion to Dismiss Plaintiffs' Complaint (Jan. 25, 2005)

• 2005 WL 418242 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of DC Investment Partners, LLC, D. Robert Crants, III and Michael W. Devlin's Motion to Dismiss Plaintiffs' Complaint (Jan. 25, 2005)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267

**(Cite as: 2005 WL 2130607 (Del.Ch.))**

• <u>2005 WL 418243</u> (Trial Motion, Memorandum and Affidavit) Opening Brief of Defendants Alex. Brown Management Services, Inc., Deutsche Bank Securities Inc. and Deutsche Bank A.G. in Support of Their Motion to Dismiss (Jan. 25, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1277372 (Del.Ch.), 27 Del. J. Corp. L. 454
**(Cite as: 2000 WL 1277372 (Del.Ch.))**

Page 1

▷

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
VGS, INC., Plaintiff,
v.
David CASTIEL, Virtual Geosatellite Holdings, Inc.,
and Ellipso, Inc.,
Defendants,
VIRTUAL GEOSATELLITE HOLDINGS, INC.,
and Ellipso, Inc., Counterclaim
Plaintiffs,
and
VIRTUAL GEOSATELLITE LLC, Counterclaim
Plaintiff-Intervenor,
v.
VGS, INC., Peter D. Sahagen, Thomas Quinn, Neel
Howard and Sahagen Satellite
Technology Group, LLC, Counterclaim Defendants.
**No. C.A. 17995.**

Submitted July 5, 2000.
Decided Aug. 31, 2000.
Stuart M. Grant and Megan D. McIntyre of Grant &
Eisenhofer, Wilmington, Delaware, for VGS, Inc.

Brian A. Sullivan and Duane D. Werb of Werb &
Sullivan, Wilmington, Delaware, John W. Bickel II
and James S. Renard of Bickel & Brewer, Dallas,
Texas, for Peter D. Sahagen and Sahagen Satellite
Technology Group, LLC., of counsel.

Thomas R. Hunt, Jr. of Morris, Nichols, Arsht &
Tunnell, Wilmington, Delaware, William H. Jeffress,
Jr., R. Stan Mortenson, Jody Manier Kris and Kelli
C. McTaggart of Miller, Cassidy, Larroca & Lewin,
LLP, Washington, D.C., for Defendant-Counterclaim
Plaintiffs Virtual Geosatellite Holdings, Inc. and
Ellipso, Inc. and Counterplaintiff-Intervenor Virtual
Geosatellite LLC., of counsel.

*MEMORANDUM OPINION*

STEELE, Vice Chanellor.

*1 One entity controlled by a single individual forms
a one "member" limited liability company. Shortly
thereafter, two other entities, one of which is
controlled by the owner of the original member,
become members of the LLC. The LLC Agreement
creates a three-member Board of Managers with
sweeping authority to govern the LLC. The
individual owning the original member has the
authority to name and remove two of the three
managers. He also acts as CEO. The unaffiliated third
member becomes disenchanted with the original
member's leadership. Ultimately the third member's
owner, also the third manager, convinces the original
member's owner's appointed manager to join him in a
clandestine strategic move to merge the LLC into a
Delaware corporation. The appointed manager and
the disaffected third member do not give the original
member's owner, still a member of the LLC's board
of managers, notice of their strategic move. After the
merger, the original member finds himself relegated
to a minority position in the surviving corporation.
While a majority of the board acted by written
consent, as all involved surely knew, had the original
member's manager received notice beforehand that
his appointed manager contemplated action against
his interests he would have promptly attempted to
remove him. Because the two managers acted
without notice to the third manager under
circumstances where they knew that with notice that
he could have acted to protect his majority interest,
they breached their duty of loyalty to the original
member and their fellow manager by failing to act in
good faith. The purported merger must therefore be
declared invalid.

The parties tried this case from June 15, 2000
through June 23, 2000. In further detail below, I
describe the case's relevant facts and explain the
rationale for my ruling.

I. Facts

David Castiel formed Virtual Geosatellite LLC (the
"LLC") on January 6, 1999 in order to pursue a
Federal Communications Commission ("FCC")
license to build and operate a satellite system which
its proponents claim could dramatically increase the
"real estate" in outer space capable of transmitting
high speed internet traffic and other communications.
[FN1] When originally formed, it had only one
Member--Virtual Geosatellite Holdings, Inc.
("Holdings"). On January 8, 1999, Ellipso, Inc.
("Ellipso") joined the LLC as its second Member.
Several weeks later, on January 29, 1999, Sahagen
Satellite Technology Group LLC ("Sahagen
Satellite") became the third Member of the LLC.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1277372 (Del.Ch.), 27 Del. J. Corp. L. 454
(Cite as: 2000 WL 1277372 (Del.Ch.))

FN1. In more technologically precise terms, the LLC's purpose was "to construct, launch and operate a global fixed-satellite service system employing nongeostationary satellites in subgeosynchronous elliptical orbits developing the related [ground] segment and offering the related communications services." LLC Agreement, at 15, § 4.01(a).

David Castiel controls both Holdings and Ellipso. Peter Sahagen, an aggressive and apparently successful venture capitalist, controls Sahagen Satellite.

Pursuant to the LLC Agreement, Holdings received 660 units (representing 63.46% of the total equity in the LLC), Sahagen Satellite received 260 units (representing 25%), and Ellipso received 120 units (representing 11.54%). The founders vested management of the LLC in a Board of Managers. As the majority unitholder, Castiel had the power to appoint, remove, and replace two of the three members of the Board of Managers. Castiel, therefore, had the power to prevent any Board decision with which he disagreed. Castiel named himself and Tom Quinn to the Board of Managers. Sahagen named himself as the third member of the Board.

*2 Not long after the formation of the LLC, Castiel and Sahagen were at odds. Castiel contends that Sahagen wanted to control the LLC ever since he became involved, and that Sahagen repeatedly offered, unsuccessfully, to buy control of the LLC. Sahagen maintains that Castiel ran the LLC so poorly that its mission had become untracked, additional necessary capital could not be raised, and competent managers could not be attracted to join the enterprise. Further, Sahagen claims that Castiel directed LLC assets to Ellipso in order to prop up a failing, cash-strapped Ellipso. At trial, these issues and other similar accusations from both sides were explored in great detail. For our purposes here, all that need be concluded is the unarguable fact that Castiel and Sahagen had very different ideas about how the LLC should be managed and operated.

Sahagen ultimately convinced Quinn that Castiel must be ousted from leadership in order for the LLC to prosper. As a result, Quinn (Castiel's nominee) covertly "defected" to Sahagen's camp, and he and Sahagen decided to wrest control of the LLC from Castiel. Many LLC employees and even some of Castiel's lieutenants testified that they believed it to be in the LLC's best interest to take control from Castiel.

On April 14, 2000, without notice to Castiel, Quinn and Sahagen acted by written consent to merge the LLC under Delaware law into VGS, Inc. ("VGS"), a Delaware corporation. Accordingly, the LLC ceased to exist, its assets and liabilities passed to VGS, and VGS became the LLC's legal successor-in-interest. VGS's Board of Directors is comprised of Sahagen, Quinn, and Neel Howard. Of course, the incorporators did not name Castiel to VGS's Board.

On the day of the merger, Sahagen executed a promissory note to VGS in the amount of $10 million plus interest. In return, he received two million shares of VGS Series A Preferred Stock. VGS also issued 1,269,220 shares of common stock to Holdings, 230,800 shares of common stock to Ellipso, and 500,000 shares of common stock to Sahagen Satellite. Once one does the math, it is apparent that Holdings and Ellipso went from having a 75% controlling combined ownership interest in the LLC to having only a 37.5% interest in VGS. On the other hand, Sahagen and Sahagen Satellite went from owning 25% of the LLC to owning 62.5% of VGS.

There can be no doubt why Sahagen and Quinn, acting as a majority of the LLC's board of managers did not notify Castiel of the merger plan. Notice to Castiel would have immediately resulted in Quinn's removal from the board and a newly constituted majority which would thwart the effort to strip Castiel of control. Had he known in advance, Castiel surely would have attempted to replace Quinn with someone loyal to Castiel who would agree with his views. Clandestine machinations were, therefore, essential to the success of Quinn and Sahagen's plan.

II. Analysis
A. The Board of Managers did have authority to act by majority vote.

*3 The LLC Agreement does not expressly state whether the Board of Managers must act unanimously or by majority vote. Sahagen and Quinn contend that because a number of provisions would be rendered meaningless if a unanimous vote was required, a majority vote is implied. Castiel, however, maintains that a unanimous vote must be implied when the majority owner has blocking power.

Section 8.01(b)(i) of the LLC Agreement states that, "[t]he Board of Managers shall initially be composed

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1277372 (Del.Ch.), 27 Del. J. Corp. L. 454
(Cite as: 2000 WL 1277372 (Del.Ch.))

of three (3) Managers." Sahagen Satellite has the right to designate one member of the initial board, and if the Board of Managers increased in number, Sahagen Satellite could "designate a number of representatives on the Board of Managers that is less than Sahagen's then current Percentage Interest." [FN2] If unanimity were required, the number of managers would be irrelevant--Sahagen, and his minority interest, would have veto power in any event. The existence of language in the LLC Agreement discussing expansion of the Board is therefore quite telling.

FN2. LLC Agreement, at § 8.01(b)(i).

Also persuasive is the fact that Section 8.01(c) of the LLC Agreement, entitled "Matters Requiring Consent of Sahagen," provides that Sahagen's approval is needed for a merger, consolidation, or reorganization of the LLC. If a unanimity requirement indeed existed, there would have been no need to expressly list matters on which Sahagen's minority interest had veto power.

Section 12.01(a)(i) of the LLC Agreement also supports Sahagen's argument. This section provides that the LLC may be dissolved by written consent by either the Board of Managers or by Members holding two-thirds of the Common Units. The effect of this Section is to allow any combination of Holdings and Sahagen Satellite, or Holdings and Ellipso, as Members, to dissolve the LLC. It seems unlikely that the Members designed the LLC Agreement to permit Members holding two-thirds of the Common Units to dissolve the LLC but denied their appointed Managers the power to reach the same result unless the minority manager agreed.

Castiel takes the position that while the Members can act by majority vote, the Board of Managers can act only by unanimous vote. He maintains that if the Board fails to agree unanimously on an issue the issue should be put to an LLC Members' vote with the majority controlling. The practical effect of Castiel's interpretation would be that whenever Castiel and Sahagen disagreed, Castiel would prevail because the issue would be submitted to the Members where Castiel's controlling interest would carry the vote. If that were the case, both Sahagen's Board position and Quinn's Board position would be superfluous. I am confident that the parties never intended that result, or if they had so intended, that they would have included plain and simple language in the agreement spelling it out clearly.

B. By failing to give notice of their proposed action, Sahagen and Quinn failed to discharge their duty of loyalty to Castiel in good faith

*4 Section 18-404(d) of the LLC Act states in pertinent part:
Unless otherwise provided in a limited liability company agreement, on any matter that is to be voted on by managers, the managers may take such action without a meeting, *without prior notice* and without a vote if a consent or consents in writing, setting forth the action so taken, shall be signed by the managers having not less than the minimum number of votes that would be necessary to authorize such action at a meeting (emphasis added).

Therefore, the LLC Act, read literally, does not require notice to Castiel before Sahagen and Quinn could act by written consent. The LLC Agreement does not purport to modify the statute in this regard.

Those observations can not complete the analysis of Sahagen and Quinn's actions, however. Sahagen and Quinn knew what would happen if they notified Castiel of their intention to act by written consent to merge the LLC into VGS, Inc. Castiel would have attempted to remove Quinn, and block the planned action. Regardless of his motivation in doing so, removal of Quinn in that circumstance would have been within Castiel's rights as the LLC's controlling owner under the Agreement.

Section 18-404(d) has yet to be interpreted by this Court or the Supreme Court. Nonetheless, it seems clear that the purpose of permitting action by written consent without notice is to enable LLC managers to take quick, efficient action in situations where a minority of managers could not block or adversely affect the course set by the majority even if they were notified of the proposed action and objected to it. The General Assembly never intended, I am quite confident, to enable two managers to deprive, clandestinely and surreptitiously, a third manager representing the majority interest in the LLC of an opportunity to protect that interest by taking an action that the third manager's member would surely have opposed if he had knowledge of it. My reading of Section 18-404(d) is grounded in a classic maxim of equity--"Equity looks to the intent rather than to the form." [FN3] In this hopefully unique situation, this application of the maxim requires construction of the statute to allow action without notice only by a *constant or fixed majority*. It can not apply to an illusory, will-of-the wisp majority which would

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1277372 (Del.Ch.), 27 Del. J. Corp. L. 454
**(Cite as: 2000 WL 1277372 (Del.Ch.))**

Page 4

implode should notice be given. Nothing in the statute suggests that this court of equity should blind its eyes to a shallow, too clever by half, manipulative attempt to restructure an enterprise through an action taken by a "majority" that existed only so long as it could act in secrecy.

> FN3. DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY, at vii (1998) (listing the maxims of equity). *See also Westendorf v. Gateway 2000*, Del. Ch., C.A. No. 16913, 2000 WL 307369, at *5, Steele, V.C. (March 16, 2000) ("A long-standing equitable maxim states that equity looks to the intent rather than to the form"); *Infinity Investors Limited v. Takefman*, Del. Ch., C.A. No. 17347, 2000 WL 130622, at *5, Chandler, C. (Jan. 28, 2000) ("As equity looks to the intent rather than to the form, this Court should not permit parties to manipulate procedural rules for the purpose of avoiding resolution on the merits"); *The Estate of Helen Lattimore Speare*, Del. Ch., 2000 WL 130622, at *4, Brown, C. (Aug. 11, 1982) (quoting the maxim and citing 2 POMEROY, EQUITY JURISPRUDENCE, § 363-- § 384 (5 th ed. (1941)))

Sahagen and Quinn each owed a duty of loyalty to the LLC, its investors and Castiel, their fellow manager. Castiel or his entities owned a majority interest in the LLC and he sat as a member of the board representing entities and interests empowered by the Agreement to control the majority membership of the board. The majority investor protected his equity interest in the LLC through the mechanism of appointment to the board rather than by the statutorily sanctioned mechanism of approval by members owning a majority of the LLC's equity interests. It may seem somewhat incongruous, but this Agreement allows the action to merge, dissolve or change to corporate status to be taken by a simple majority vote of the board of managers rather than rely upon the default position of the statute which requires a majority vote of the equity interest. Instead the drafters made the critical assumption, known to all the players here, that the holder of the majority equity interest has the right to appoint and remove two managers, ostensibly guaranteeing control over a three member board. When Sahagen and Quinn, fully recognizing that this was Castiel's protection against actions adverse to his majority interest, acted in secret, without notice, they failed to discharge their

duty of loyalty to him in good faith. They owed Castiel a duty to give him prior notice even if he would have interfered with a plan that they conscientiously believed to be in the best interest of the LLC. [FN4] Instead, they launched a preemptive strike that furtively converted Castiel's controlling interest in the LLC to a minority interest in VGS without affording Castiel a level playing field on which to defend his interest. "[Another] traditional maxim of equity holds that equity regards and treats that as done which in good conscience ought to be done." [FN5] In good conscience, under these circumstances, Sahagen and Quinn should have given Castiel prior notice.

> FN4. I make no ruling here as to whether I believe the merger and the resulting recapitalization of the LLC was in the LLC's best interests, nor do I rule here regarding the wisdom of Castiel's actions had he in fact been able to remove Quinn before the merger.

> FN5. WOLFE & PITTENGER, *supra*, at § 2-3(b)(1)(i), *citing* 2 JOHN NORTON POMEROY, A TREATISE ON EQUITY JURISPRUDENCE § 363 et seq. (5 th ed. (1941).

*5 Many hours were spent at trial focusing on contentions that Castiel has proved to be an ineffective leader in whom employees and investors have lost confidence. I listened to testimony regarding delayed FCC licensing, a suggested new management team for the LLC, and the alleged unlocked value of the LLC. A substantial record exists fully flushing out the rancorous relationships of the members and their wildly disparate views on the existing state of affairs as well as the LLC's prospects for the future. But the issue of who is best suited to run the LLC should not be resolved here but in board meetings where all managers are present and all members appropriately represented, and/or in future litigation, if it unfortunately becomes necessary.

Likewise, the parties spent much time and effort arguing over the standard to be applied to the actions taken by Sahagen and Quinn. Specifically, the parties debated whether the standard should be entire fairness or the business judgment rule. It should be clear that the actions of Sahagen and Quinn, in their capacity as managers constituted a breach of their duty of loyalty and that those actions do not, therefore, entitle them to the benefit or protection of the business judgment rule. They intentionally used a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 5
Not Reported in A.2d, 2000 WL 1277372 (Del.Ch.), 27 Del. J. Corp. L. 454
(Cite as: 2000 WL 1277372 (Del.Ch.))

flawed process to merge the LLC into VGS, Inc., in an attempt to prevent the member with majority equity interest in the LLC from protecting his interests in the manner contemplated by the very LLC Agreement under which they purported to act. Analysis beyond a look at the process is clearly unnecessary. Perhaps, had notice been given and an attempt then made to block Castiel's anticipated action to replace Quinn, the allegedly disinterested and independent member that Castiel himself had appointed, the analysis might be different. However, this, as all cases must be reviewed as it is presented, not as it might have been.

### III. Conclusion

For the reasons stated above, I find that a majority vote of the LLC's Board of Managers could properly effect a merger. But, I also find that Sahagen and Quinn failed to discharge their duty of loyalty to Castiel in good faith by failing to give him advance notice of their merger plans under the unique circumstances of this case and the structure of this LLC Agreement. Accordingly, I declare that the acts taken to merge the LLC into VGS, Inc. to be invalid and the merger is ordered rescinded. An order consistent with this opinion, resolving the current claims of the parties is attached.

### ORDER

For the reasons set forth in this Court's opinion entered in this case on August 31, 2000, it is ORDERED that:

1. The purported merger of Virtual Geosatellite LLC (the "LLC") into VGS, Inc. is invalid and is therefore rescinded, and

2. VGS, Inc. is enjoined from continuing to assert ownership or control over the LLC's property including its funds and its license application at the FCC, and

3. Judgment is entered against plaintiff and counter defendant VGS, Inc. and in favor of David Castiel, Virtual Geostellite Holdings, Inc. and Ellipso, Inc., defendants and counterclaim plaintiffs.

*6 4. Judgment is further entered in favor of Virtual Geosatellite LLC, counterclaim plaintiff intervenor and against counterclaim defendants VGS, Inc., Sahagen, Quinn, Howard and Sahagen Satellite Technology Group, LLC.

5. The requests for attorneys' fees by David Castiel, Virtual Geosatellite Holdings, Inc., and Ellipso, Inc.

are taken under advisement until briefed and supported by appropriate affidavits.

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.