Howard S. Caro (SBN 202082)
Cecilia Y. Chan (SBN 240971)
Nathaniel R. Spencer-Mork (SBN 226886)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: +1.415.772.6000
Facsimile: +1.415.772.6268
Howard.Caro@hellerehrman.com
Cecilia.Chan@hellerehrman.com
Nate.SpencerMork@hellerehrman.com

Robert B. Hawk (SBN 118054)
HELLER EHRMAN LLP
275 Middlefield Road
Menlo Park, CA 94025-3506
Phone: +1.650.324.7000
Facsimile: +1.650.324.0638
Robert.Hawk@hellerehrman.com

Attorneys for Defendants
Clarium Capital Management, LLC, Peter Thiel, Jason Portnoy and Mark Woolway

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMISIL HOLDINGS LTD., a Cyprus Corporation,<br><br>　　　　　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>CLARIUM CAPITAL MANAGEMENT, LLC, et al.,<br><br>　　　　　　　　　　　　　Defendants. | Case No.: C 06 5255 MJJ<br><br>**DEFENDANTS' CONSOLIDATED REPLY MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM AND TO STRIKE TIME-BARRED ALLEGATIONS**<br><br>F.R.C.P. 12(b)(6) & 12(f)<br><br>Hearing Date:　November 7, 2006<br>Time:　　　　　9:30 a.m.<br>Courtroom:　　11<br><br>The Honorable Martin J. Jenkins |

Heller
Ehrman LLP

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ............................................................................................................. 1

II. ARGUMENT ..................................................................................................................... 1

    A. Amisil Fails to State a Claim for Breach of Contract. ............................................. 1

        1. Legal Standard .............................................................................................. 1

        2. Amisil's Divestment Stripped it of Some Rights in Clarium. ...................... 2

            a. The contract provides that Amisil lost its unvested interest. ........... 2

            b. When it divested from the Fund, Amisil became a Withdrawn Member of Clarium. ...................................................... 3

        3. Clarium Properly Amended the Operating Agreement. ............................... 4

        4. Allocations are Not Distributions. ................................................................ 5

    B. Amisil Has Failed to State a Section 10(b) Claim. .................................................. 5

        1. The Aborted Purchaser-Seller Doctrine Does Not Apply. ........................... 5

        2. Plaintiff's Section 10(b) Claim Fails Because Amisil Has Not Alleged the Requisite Elements. ............................................................ 6

            a. Defendants made no misstatements. ................................................ 6

            b. Amisil does not allege reliance. ....................................................... 7

        3. Even if Amisil Successfully Pleaded Some Elements of a Section 10(b) Claim as to *Some* Statements, It Has Not Alleged that any Statement Satisfied *All* of the Elements of Section 10(b). ................................................................................................ 8

    C. Amisil Has Failed to Plead a Common Law Fraud Claim. ..................................... 9

    D. Amisil Fails to Assert a Claim for Breach of Fiduciary Duty Against the Individual Defendants. ......................................................................... 10

    E. Amisil Fails to State a Claim for Conspiracy ......................................................... 11

    F. Amisil Fails to State a Claim for Conversion. ....................................................... 11

G. Plaintiff's Investment Advisors Act Claim Fails Because Plaintiff Has Not Alleged the Elements of Liability, And Because Its Claim for Rescission Is Baseless. ................................................................. 12

H. Amisil Fails to Allege a Claim For Breach of the Implied Covenant ................................................................................................... 13

I. The Section 17200 Claim Is Barred By the Operating Agreement's Broad Choice of Law Provision. ........................................................... 13

J. The "Claims" for Remedies Fail for the Reasons the Substantive Claims Fail. ........................................................................................... 14

K. Amisil Fails to Plead a Basis for Tolling. ........................................... 14

III. CONCLUSION ................................................................................................ 15

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alfus v. Pyramid Tech. Corp*,
   745 F. Supp. 1511 (N.D. Cal. 1990) ........................................................................... 11

*Bamdad Mechanic Co., Ltd. v. United Tech. Corp.*,
   586 F. Supp. 551 (D. Del. 1984) .................................................................................. 1

*Blackin v. Red Brick Sys., Inc.*,
   No. C 98-1206 MJJ, 1999 WL 33953501 (N.D. Cal. 1999) ........................................ 8

*Cel-Tech Commc'n, Inc. v. Los Angeles Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) ............................................................................................... 13

*Dave Greytak Enterprises, Inc. v. Mazda Motors of America, Inc.*,
   622 A.2d 14 (Del. Ch. 1992) ...................................................................................... 10

*Doll v. Stars Holding Co.*,
   No. C 05-1132 MMC, 2005 WL 2811767 (N.D. Cal. Oct. 27, 2005) ......................... 8

*Douzinas v. Am. Bureau of Shipping, Inc.*,
   888 A.2d 1146 (Del. Ch. 2006) .................................................................................. 10

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ..................................................................................................... 8

*Elf Atochem N. Am., Inc. v. Jaffari*,
   727 A.2d 286 (Del. 1999) .......................................................................................... 10

*Falkenberg Capital Corp. v. Dakota Cellular, Inc.*,
   925 F. Supp. 231 (D. Del. 1996) .................................................................................. 1

*Falkowski v. Imation Corp.*,
   309 F.3d 1123 (9th Cir. 2002) ..................................................................................... 6

*Frank Russell Co. v. Wellington Mgmt. Co.*,
   154 F.3d 97 (3d Cir. 1998) ........................................................................................ 12

*Henis v. Compania Agricola De Guatemala*,
   116 F. Supp. 223 (Del. 1953) .................................................................................... 14

*In re Northwestern Corp.*,
   313 B.R 595 (Bankr. D. Del. 2004) ............................................................................. 1

*Masco Contractors Servs. West v. New Hampshire Ins. Co.*,
   No. C 04-4183 MJJ, 2005 WL 405361 (N.D. Cal. Feb. 17, 2005) ............................................ 11

*Medical Instrument Dev. Labs. v. Alcon Labs.*,
   No. C 05-1138 MJJ, 2005 WL 1926673 (N.D. Cal. Aug. 10, 2005) ........................................ 12

*Medimatch, Inc. v. Lucent Technologies, Inc.*,
   120 F. Supp. 2d 842 (N.D. Cal. 2000) ..................................................................................... 14

*Miller v. Am. Real Estate Partners, L.P.*,
   No. CIV.A.16788, 2001 WL 1045643 (Del. Ch. Sept. 6, 2001) ....................................... 10, 11

*Mosher v. Kane*,
   784 F.2d 1385 (9th Cir. 1986) ..................................................................................................... 6

*Nedlloyd Lines, B.V. v. Super. Ct.*,
   3 Cal. 4th 459 (1992) .................................................................................................. 11, 13, 14

*Norman v. Salomon Smith Barney, Inc.*,
   350 F. Supp. 2d 382 (S.D.N.Y. 2004) ....................................................................................... 13

*Pegasus Holdings v. Veterinary Ctr. of Am., Inc.*,
   38 F. Supp. 2d 1158 (C.D. Cal. 1998) ........................................................................................ 9

*Pomeranz v. Museum Partners, L.P.*,
   NO. CIV. A. 20211, 2005 WL 217039 (Del.Ch. Jan 24, 2005) ............................................... 15

*Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*,
   971 F.2d 401 (9th Cir. 1992) ................................................................................................ 11-12

*Wasco Products, Inc. v. Southwall Tech., Inc.*,
   435 F.3d 989 (9th Cir. 2006) ............................................................................................. 11, 14

*Wise v. Southern Pac. Co.*,
   223 Cal. App. 2d 50 (1963) ...................................................................................................... 11

**STATUTES**

15 U.S.C § 80b-9(e)(1) ...................................................................................................................... 12

28 U.S.C. § 1658 ........................................................................................................................... 12-13

**OTHER AUTHORITIES**

Restatement, Second of Conflict of Laws § 187 com. f ................................................................. 13

Heller
Ehrman LLP

iv

## I. INTRODUCTION

In an attempt to rescue Amisil's sell-your-cake-and-eat-it-too theory of liability, Plaintiff's oppositions to Defendants' motions to dismiss rehash the conclusory allegations of the Complaint, paying no heed to legal precedent or the express language of the Clarium Operating Agreement on which Amisil purports to base its claims. As Defendants' demonstrated, Amisil's allegations are contradicted by the terms of the Agreement, unavailing as a matter of law and entitled to no weight.

Much of Amisil's argument rests on the faulty premise that it remained a full member of Clarium Capital Management ("Clarium," or the "Manager"), after it withdrew its entire investment in Clarium's investment vehicle, the Fund. While Amisil retained part of its interest in Clarium after withdrawing from the Fund, its status in Clarium changed fundamentally at that time, and Amisil sacrificed many of its rights in Clarium. These consequences are plainly set forth in the Operating Agreement, and all of Amisil's contract-based claims fail because its conclusory allegations are directly contradicted by the terms of the Operating Agreement. Amisil's fraud and other tort claims derive from the same flawed premises as its contract claims, and fail for the same reasons. The claims also fail because Amisil did not allege the elements of these claims at all, much less with the particularity required under applicable pleading standards. Because none of these defects can be cured, this Court should dismiss Amisil's Complaint with prejudice.

## II. ARGUMENT
### A. Amisil Fails to State a Claim for Breach of Contract.
#### 1. Legal Standard.

Amisil rightly points out that if a provision of the Operating Agreement is susceptible to more than one reasonable interpretation, it should be construed in Amisil's favor. The problem for Amisil is that it does not offer interpretations of the Operating Agreement. Instead, it merely reasserts conclusory allegations contrary to the provisions of the Agreement. Amisil's purported interpretations cannot be credited because they are unreasonable and would lead to absurd results. *See Bamdad Mechanic Co., Ltd. v. United Tech. Corp.*, 586 F. Supp. 551, 555 (D. Del. 1984), *vacated on other grounds*, 760 F.2d 255 (3rd Cir. 1985); *In re Northwestern Corp.*, 313 B.R 595, 601 (Bankr. D. Del. 2004). Even Amisil's assertion that the contract is ambiguous is a legal conclusion. *Falkenberg Capital Corp. v. Dakota Cellular, Inc.*, 925 F. Supp. 231, 236 (D. Del.

Heller
Ehrman LLP

1

DEFS' JOINT REPLY MEM. ISO MOTION TO DISMISS & STRIKE, Case No. C 06-5255 MJJ

1996) (ambiguity of contract is a matter of law). A contract can only be ambiguous if two or more competing reasonable interpretations are before the court. Only Clarium has offered a reasonable interpretation, one supported by the plain language of the agreement, and under that interpretation Defendants have complied with all of their contractual obligations to Amisil.

### 2. Amisil's Divestment Stripped it of Some Rights in Clarium.

The parties agree that Amisil invested in the Fund and the Manager in early 1998, and fully withdrew its investment about a year later.[1] Amisil's investment in the Fund could have entitled it to *up to* a one percent (1%) ownership stake in the Manager — depending on how long Amisil maintained that investment, and subject to certain vesting criteria established in the Operating Agreement. Clarium Opp. at 2; Operating Agreement § 7.5(b). Under that vesting schedule, if Amisil maintained its investment in the Fund beyond its first anniversary, 30% of its potential 1% interest (*i.e.*, 0.3%) in Clarium vested. *Id.* Seventy percent remained unvested. When Amisil divested from the Fund, two contractual consequences ensued: First, its unvested interest in Clarium was extinguished, leaving it with only a 0.3% vested interest and no unvested interest. Operating Agreement § 7.2(c). Second, Amisil ceased to be a full Member of Clarium, and became a "Withdrawn Member." *Id.* §§ 7.2, 7.4. Amisil (without support in the allegations of its own Complaint) contests both of these conclusions.

### a. The contract provides that Amisil lost its unvested interest.

Amisil contends that the vesting provisions of the Operating Agreement give it a greater interest in Clarium than 0.3%. Clarium Opp. at 3 (emphasis added). This analysis first misreads the language of the vesting provision, and then abandons it altogether. Amisil states that "Amisil's redemption of its investment in the Fund established a *minimum* ownership in [Clarium] of 0.3%." Clarium Opp. at 3. This is not a reasonable reading of the vesting provision. The 0.3% vesting is triggered by holding an investment in the Fund on a series of "Vesting Reference Dates," and not by the date of Amisil's *redemption* of its monies from the Fund. Operating Agreement § 7.5(b). If it divested from the Fund after one year but before two years had passed, as Amisil contends, its

---

[1] In fact, Amisil withdrew from the Fund before a year had passed, but for purposes of these motions only, Defendants will assume that Amisil withdrew from the Fund after the one-year anniversary of its investment in the Clarium enterprise. Compl. ¶ 22.

vested interest as of the divestment was at most 0.3%. *Id.* § 7.2(c).

Amisil next contends that "because the amount redeemed from the Fund was less than the initial contribution, Section 7.2(c) immediately increased Amisil's minimum ownership in the Company to 0.4%."[2] Clarium Opp. at 3. This misreads the Operating Agreement and is nonsensical. As explained in Clarium's opening brief, the "Capital Reduction" amount referenced in Section 7.2(c) is defined as the difference between the initial capital contribution to the Fund and the *balance* of its capital account (in this case, zero) in the Fund following a withdrawal. Amisil fully withdrew from the Fund, so its Capital Reduction for purposes of Section 7.2(c) was the same amount as its initial $297,000 contribution, and its unvested interest was extinguished.[3] The actual size of its withdrawal — as opposed to the fact that it withdrew its entire investment in the Fund — is immaterial to this calculation. If it were otherwise, investors in both the Fund and the Manager would have been rewarded with an increased stake in the Manager for withdrawing their monies from the Fund at a time when its value had declined.

### b. When it divested from the Fund, Amisil became a Withdrawn Member of Clarium.

Amisil's complete withdrawal from the Fund had a second consequence under the express terms of the Operating Agreement: Amisil became a "Withdrawn Member" of Clarium. Operating Agreement § 7.2(c). According to Amisil, "Clarium attempts to paint Amisil's withdrawal of money from the Fund in 1999 as a withdrawal from the Company." *See, e.g.,* Clarium Opp. at 4; *see also id.* at 16. This both misses Clarium's point and misinterprets the Operating Agreement.

The term "Withdrawn Member" refers to a party who, like Amisil, has withdrawn its investment in the Fund but *retains an interest in Clarium*, the Manager. Operating Agreement §§ 7.2, 7.4; Clarium MPA at 4, 5. The Operating Agreement provides that — as befits investors with

---

[2] Amisil elsewhere asserts that its interest "could be as high as 1.34%, if not more." Clarium Opp. at 6. This contradicts the terms of the Operating and Subscription Agreement.

[3] Because Amisil was left with only its 0.3% vested share, its assertion that its interest fully vested on a purported dissolution of Clarium (Clarium Opp. at 6) — an assertion not pleaded in the Complaint — is immaterial. Also, contrary to Amisil's suggestion that its withdrawal from the Fund somehow increased its vested share, Section 7.2(c) can only *decrease* a member's interest by reducing the unvested portion. *Id.* ("If a Member effects a withdrawal from the Fund … then such Member's unvested interest in the Company shall be *reduced*….") (emphasis added).

no stake in the Fund, the main part of the Clarium Enterprise — Withdrawn Members sacrifice some rights in the Manager.  Specifically, when Amisil became a Withdrawn Member, it lost its rights to (1) obtain periodic financial reports from Clarium; and (2) access Clarium's books and records.  Operating Agreement §§ 6.9(a), (c).  Amisil's arguments to the contrary are belied by the clear terms of the contract and merely reiterate the conclusory allegations of the Complaint.[4]

### 3. Clarium Properly Amended the Operating Agreement.

Amisil asserts that the 2003 amendment to the Operating Agreement was ineffective because Amisil objected to it.  Clarium Opp. at 3.  As explained in the opening brief, the Operating Agreement could be amended by a vote of a two-thirds-interest of the members,[5] unless the amendment "could have a disproportionately adverse effect upon such Member … due to some attribute of the Member itself (*other than the Member's status as such*)."  Operating Agreement § 10.4(c) (emphasis added).  Because the amendment to the Operating Agreement affected all members equally — because of their "status as such" — Amisil's "objection" was irrelevant.

Amisil's argument that subsection 10.4(d) purportedly prevents the Managing Member from amending the contract pursuant to that subsection when such an amendment would be "materially adverse to any other member" is a red herring.  Subsection 10.4(d) is a narrow provision allowing the Managing Member to amend the Operating Agreement, even if such an amendment is not contemplated by the other subparts of Section 10.4 — "[n]otwithstanding the foregoing provisions of this Section 10.4" — where an amendment is required to "comply with applicable law or to resolve an ambiguity in the terms and provisions" of the Agreement.  Clarium's amendment to the 1996 Operating agreement was *not* made pursuant to subsection 10.4(d) — Amisil concedes this, Clarium Opp. at 3 n.1 — so subsection 10.4(d)'s specific provision allowing non-Managing

---

[4] By way of counterargument, Amisil simply ignores relevant provisions of the Operating Agreement, citing only a selection of the ways in which a Member can have its rights reduced, none of which are at issue here.  Clarium Opp. at 4 (selectively citing § 7.2(d)).  Section 7 of the Agreement provides that any withdrawal under any of the "provision<u>s</u>" of Section 7.2 changes a member's status to that of an Assignee.  Operating Agreement §7.4 (emphasis added).  The provision at issue is Section 7.2(c), which deems withdrawal from the Fund to trigger status as a Withdrawn Member of Clarium.  *Id.* §7.2(c); *cf. also id.* §7.2(e) (withdrawal under Section 7.2(c) equivalent to a withdrawal under Section 7.2(d), the section cited by Amisil).

[5] Amisil does not dispute that at the time of the amendment Mr. Thiel held more than 98% of Clarium.  Mr. Thiel's vote alone was sufficient to amend the agreement over Amisil's objection.

Members to object to amendments in certain specific circumstances is irrelevant.

### 4. Allocations are Not Distributions.

Throughout its oppositions, Amisil continues to confuse "allocations" with "distributions." Clarium explained in its Opening Brief why allocations (which are accounting "credits" and "debits" to a Member's account) are not the same as distributions (actual cash payments), and why Amisil was not entitled to periodic distributions. Clarium MPA at 5. For example, Amisil asserts without citation that "Clarium has not provided Amisil with any 'profit and loss' allocations or distributions."[6] Clarium Opp. at 4. Elsewhere Amisil admits that the Operating Agreement vests Clarium with discretion to determine the amount and timing of all distributions. Indiv. Opp. at 16. But any reading of the Operating Agreement that conflates allocations and distributions is contrary to the terms of the agreement itself, and leads to absurd results: it renders the operation of a Member's "Capital Account," as defined in the Operating Agreement, meaningless, because the account would simultaneously be increased and decreased by an allocation/distribution.

In short, Clarium followed the terms of the Operating Agreement precisely in all of its conduct with respect to Amisil's ownership interest in the Manager, and none of the conduct described in Amisil's Complaint was, on the face of the Agreement, a breach. *See* Clarium MPA at 17-20. Amisil's breach of contract claim must accordingly be dismissed.

### B. Amisil Has Failed to State a Section 10(b) Claim.

Amisil's haphazard arguments in defense of its Section 10(b) claim all appear to rely on one of the following three strategies: (1) misapplication of legal principles; (2) reference to conclusory allegations that are contradicted by the documents in the record; and (3) attempts to mix and match different elements to cobble together a fraud claim. We address each in turn.

### 1. The Aborted Purchaser-Seller Doctrine Does Not Apply.

As explained in Clarium's opening papers, only Clarium's 2006 mandatory retirement of Amisil's remaining stake in the Manager could possibly qualify as a purchase or sale for purposes of stating a Section 10(b) claim. Clarium MPA at 10-11. Clarium's offers to purchase Amisil's

---

[6] Amisil asserts that "Clarium concedes this in its Motion." Clarium Opp. at 4. The pages cited ("32-33") are not in Clarium's motion, and Clarium made no such concession.

interest, in May 2002 and March 2006, respectively, were not accepted; these offers cannot be the basis of a Rule 10b-5 claim because no sale took place. Amisil argues that a purchase or sale is not required under these facts, mistakenly relying on the "aborted purchase-sale doctrine" — a doctrine that can only apply where parties actually contract for a future sale that is later aborted.

Amisil seems to suggest that the mere fact of a contractual relationship between it and Clarium is a sufficient basis for application of this doctrine. Clarium Opp. at 11. But as Amisil's own cases demonstrate, the aborted purchaser-seller doctrine allows a plaintiff to sue only where it enters into a contract with the defendant for the future purchase or sale of a security, and where the future transaction is not consummated due to an alleged fraud. The cases cited by Amisil applied the doctrine where an employee obtained stock options contractually obligating the employer to sell a security at a later date, but where the employee never exercised the option because of a defendant's fraud. *Falkowski v. Imation Corp.*, 309 F.3d 1123 (9th Cir. 2002), *opinion amended on other grounds*, 320 F.3d 905 (9th Cir. 2003); *see also Mosher v. Kane*, 784 F.2d 1385 (9th Cir. 1986), *overruled on other grounds*, *In re Washington Public Power Supply System Securities Litig.*, 823 F.3d 1349 (9th Cir. 1987). The doctrine has no application to Amisil's alleged dealings with Clarium because the parties never had an agreement for the future sale of Amisil's purported interest in Clarium. The mere existence of a contractual relationship between Amisil and Clarium is insufficient; there must be an agreement to consummate a sale, and an allegation that an intervening fraud prevented the transaction from being completed. The 2006 Retirement the only conceivable transaction that could form the basis of a Section 10(b) claim.

      **2.**      **Amisil Has Not Alleged the Requisite Elements of Section 10(b).**
            **a.**      **Defendants made no misstatements.**

In their opening briefs, Defendants established that none of their statements about Amisil's rights as a "Withdrawn Member" with (at most) a 0.3% interest in Clarium were actionable because they were true. Clarium MPA at 11-12. Amisil's response is to ignore the relevant terms of the Operating Agreement and argue that it was entitled to a fully-vested 1% interest (as opposed to a 0.3% interest) in the Manager, and enjoyed all of the non-economic rights and rights to distributions belonging to full "Members" of Clarium — even after it withdrew its investment in the Fund.

Heller
Ehrman LLP

Clarium Opp. at 9, citing Compl. ¶ 55(a), (b). Defendants' statements about these issues are the only two alleged "misstatements" or "omissions" identified by Amisil. *Id*. As established above, Clarium's statements about Amisil's ownership interest were demonstrably accurate under the terms of the contract.[7] *See supra* Part II.A.2.a. As to the alleged "omissions," under the Operating Agreement Amisil sacrificed many of its rights to information by divesting from the Fund. *See supra* Part II.A.2.b; *see also* Clarium MPA at 3-5. Amisil's assertions have no basis in the Operating Agreement, and cannot save the claim.

In short, even if Clarium and the Individual Defendants did and said to Amisil all of the things alleged in the Complaint, none of those actions or statements (or omissions) could subject Defendants to liability under Section 10(b) and Rule 10b-5 because they were all consistent with the parties' duties, rights and obligations under the Operating Agreement.

### b.  Amisil does not allege reliance.

Amisil's argument that it has adequately alleged reliance with respect to its Section 10(b) claim is also far off the mark. For example, Amisil argues that "it relied, to its detriment, upon Clarium's statements that it would produce documents related to its financial status.…" Clarium Opp. at 12, citing Compl. ¶¶ 39-45. Presumably, Amisil is referring to the allegation that "On March 21, 2006, Portnoy informed Amisil that the requested documents would be forthcoming." *Id*. ¶ 40. But on their face, paragraphs 39-45, cited in Amisil's brief, do not allege reliance. Nor could Amisil have relied on any misstatement or omission in connection with the 2006 Offer, because Amisil did not accept the offer and sell its interest in the Manager. More fundamentally, Amisil's argument that if it were not for this alleged March 21, 2006 statement it would have enforced its rights to inspect the books and records is logically impossible — because the Complaint alleges that Amisil *did* attempt to invoke this purported right on March 20, 2006, the day *before* Portnoy purportedly made the statement. *Id*. ¶ 39.

---

[7] Amisil also argues that the basis for the 0.3% figure was never disclosed to it. Clarium's description of the calculation and Amisil's recognition of that calculation are documented in correspondence between the parties, correspondence that Clarium will furnish the Court should Amisil continue to advance an argument barred by Rule 11.

### 3. Amisil Has Not Alleged that any Statement Satisfied *All* of Elements of Section 10(b) Liability.

Amisil has also failed to explain how these allegations address other required elements — for instance, materiality and scienter — of a Section 10(b) claim. *See, e.g., Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). While Amisil's briefs address Clarium's purported scienter with respect to the alleged statements surrounding the 2002 Offer and the PayPal investment, Clarium Opp. at 10, Amisil does not even attempt to argue that it relied on these statements. Nor does Amisil explain how Defendants' actions consistent with the terms of the Operating Agreement — actions Amisil consented to — could possibly be done with an intent to defraud.[8]

Moreover, while Plaintiff argues that *some* of the elements of a Section 10(b) claim are satisfied by *some* of Defendants' alleged conduct, it fails to tie all of the elements together with respect to any one statement (let alone all of the alleged misstatements catalogued in the Complaint). But *each* element of the claim must be met as to *each* alleged misstatement or omission; Amisil cannot plead a Section 10(b) claim by pleading that statement A meets one element and statement B meets another element, and, taking these two statements together, it has pleaded both. *See e.g.*, *Doll v. Stars Holding Co.*, No. C 05-1132 MMC, 2005 WL 2811767, *3 (N.D. Cal. Oct. 27, 2005) (PSLRA requires a plaintiff to plead with specificity the elements of falsity and scienter as to *each* statement).[9]

Amisil's First Claim for Relief fails for all of these reasons, and must be dismissed.[10]

---

[8] The 2002 Offer itself specifically enumerated the basis on which the buyout was calculated. Compl. Ex. D. Complying with the terms of a contract and doing so transparently cannot be transmuted into fraudulent intent.

[9] After paying lip service to Rule 9(b) and the particularity requirements of the PSLRA, Amisil repeatedly invokes the "notice pleading" standard of Rule 8, and pre-PSLRA authority.

[10] Amisil appears to have abandoned attempts to state a Section 10(b) claim against Messrs. Woolway and Portnoy. Indiv. Opp. at 7-9 (arguing that Plaintiff has alleged scienter as to Mr. Thiel only). Amisil contends that additional misstatements or omissions — that defendants failed to divulge information about Clarium's interest in PayPal and that defendants failed to make disclosures in 2005 about distributions to Thiel — provide a basis for its Section 10(b) claim against Mr. Thiel. *Id.* at 3-6. These statements are not alleged in the First Claim for Relief (and do not relate to a "purchase or sale") and should be disregarded.

Amisil also argues that it has pleaded material omissions or misstatements against all the Individual Defendants under the "group pleading doctrine." Even if it had survived the PSLRA (it did not), the group pleading doctrine would only apply to "*published documents* such as financial reports," *Blackin v. Red Brick Sys., Inc.*, No. C 98-1206 MJJ, 1999 WL 33953501, *4 (N.D. Cal.

*(Footnote Continued)*

### C. Amisil Has Failed to Plead a Common Law Fraud Claim.

In support of its assertion that it has pleaded fraud with particularity, Amisil points to a hodge-podge of purportedly false statements allegedly made by the various defendants. For instance, Amisil asserts that "Portnoy informed Amisil that the requested documents would be forthcoming, despite the fact that *the defendants* had no intention of producing these documents." Indiv. Opp. at 4, citing Compl. ¶¶ 40-41. As noted above, Amisil has not alleged how it relied on this statement, so it can no more form the basis of a common law fraud claim than it can support a securities fraud claim. Nor is this allegation sufficiently particularized to pass muster under Rule 9(b) — Mr. Portnoy allegedly made the statement, but it was an undifferentiated mass of "the defendants" that supposedly had "no intention" of complying with the purported promise.[11] Likewise, Amisil's arguments that it has alleged a material misrepresentation as to the May 2002 Offer, Clarium Opp. at 14; Indiv. Opp. at 4, fails because Amisil has not pleaded how it could have relied on any such statements — it did not accept the offer. Amisil's claim that it relied on the valuation of the 2002 Offer when it learned *nearly four years later* of the $31 million distribution to Mr. Thiel for fiscal year 2005, Clarium Opp. at 15, is illogical.

Amisil also asserts that "Rule 9(b)'s particularity requirement is relaxed" with respect to omissions. Clarium Opp. at 13. Even if this were the case, the relaxed pleading standard does not save Amisil's claims, because Amisil relinquished its rights to information when it divested from the Fund. Amisil points to a series of supposed omissions relating to Defendants' alleged statements about Clarium's distribution to Mr. Thiel and Clarium's interest in PayPal. *Id*. at 14-15; Indiv. Opp. at 4-6. As noted above and in Defendants' opening briefs, Clarium was under *no duty to disclose* the allegedly omitted information to Amisil, so these omissions cannot for the basis of a fraud claim. *See supra* Section II.A.2.b; *see also* Clarium MPA at 3-5. For reasons set forth above and in Defendants' opening briefs, these arguments are without merit.

---

1999) (emphasis added), and not to oral statements, *Pegasus Holdings v. Veterinary Ctr. of Am., Inc.*, 38 F. Supp. 2d 1158, 1165 (C.D. Cal. 1998). Therefore, none of the alleged purported omissions and oral statements can be attributed to the Individual Defendants as a group.

[11] Amisil again attempts to invoke the group pleading doctrine in defense of its common law fraud claims, but provides no authority that Delaware law recognizes the doctrine.

### D. Amisil Fails to Assert a Claim for Breach of Fiduciary Duty.

Amisil claims that its "Complaint alleges that the individual defendants … owe Amisil a duty of loyalty, honesty and candor." Indiv. Opp. at 9, citing Compl. ¶ 84. However, the Complaint makes only vague references to "fiduciary duties," and does not enumerate the duties supposedly owed. *Id.* Under Delaware law, LLC members have great flexibility to structure their relationships under the terms of governing contracts. *Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1149 (Del. Ch. 2006), *quoting* 6 Del. C. § 18-1101(c)(2); *see also Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 290 (Del. 1999). Members of an LLC are free to reduce or eliminate traditional common law fiduciary duties, and courts will look to such duties only where an LLC agreement is silent or ambiguous. *Miller v. Am. Real Estate Partners, L.P.*, No. CIV.A.16788, 2001 WL 1045643, at *8 (Del. Ch. Sept. 6, 2001). Cases concerning fiduciary duties in traditional corporations have little relevance in the LLC context, especially where, as here, a member has contracted away such duties. *Id.*

Amisil's claim for breach of fiduciary duty is negated by the express terms of the contract. These include the provisions limiting Amisil's access to information (Operating Agreement §§ 7.2, 7.4, 7.6(f)); granting Clarium discretion to make distributions (*id.* § 5.1); allowing amendment of the Agreement (*id.* § 10.4); and permitting Amisil's mandatory retirement (2003 Operating Agreement § 7.3).[12] The Operating Agreement also expressly provides: "[T]he rights and obligations of the Members shall supersede any contrary provisions of the [LLC] Act or other applicable law." Operating Agreement § 10.5. Amisil — a sophisticated investor — chose to invest in the Fund and in Clarium according to the terms of the Operating Agreement. It is that document — with whose provisions Clarium has fully complied — that defines the universe of rights and obligations between the parties. Amisil cannot "escape the consequences of" its

---

[12] Amisil attempts to read into the Operating Agreement an implied term giving it access to information to determine the value of its interest in a distribution. Any such implied term is contradicted by the express terms of the contract limiting Amisil's access to information as a Withdrawn Member. Under Delaware law, an implied term cannot be read into a contract if it contradicts an express term. *Dave Greytak Enterprises, Inc. v. Mazda Motors of America, Inc.*, 622 A.2d 14, 23 (Del. Ch. 1992). ("Although an implied covenant of good faith exists in every contract such subjective standards cannot override the literal terms of an agreement.").

agreements with Clarium and withdrawal from the Fund. *Miller*, 2001 WL 1045643 at *8.

### E. Amisil Fails to State a Claim for Conspiracy.

In response to Defendants' points about the failure of Plaintiff's conspiracy claim, Amisil simply ignores that it failed to plead an underlying fraud, a requirement under Delaware law.[13] The Complaint also fails to plead defendants' mental state with the particularity required by Rule 9(b). Amisil's allegation that these defendants "had knowledge of and agreed to the objective and course of action to injure Amisil," Indiv. Opp. at 12, quoting Compl. ¶ 87, is wholly conclusory and lacks the requisite factual particularity. *Wasco Products, Inc. v. Southwall Tech., Inc.*, 435 F.3d 989, 991 (9th Cir. 2006), *cert. denied*, No. 05-1518, 2006 WL 1522609 (Oct. 2, 2006); *see also Masco Contractors Servs. West v. New Hampshire Ins. Co.*, No. C 04-4183 MJJ, 2005 WL 405361 (N.D. Cal. Feb. 17, 2005). Amisil also cannot simply point to the fact that the Individual Defendants were senior executives of Clarium to raise an inference of agreement. *Alfus v. Pyramid Tech. Corp*, 745 F. Supp. 1511, 1521 (N.D. Cal. 1990). Moreover, as discussed *supra* at nn. 10 & 11, the group pleading doctrine cannot apply to the claims in this case.

### F. Amisil Fails to State a Claim for Conversion.

As set forth in Clarium's Opening Brief, Amisil fails to state a claim for conversion under Delaware law. Amisil counters that it can state such a claim under California law, but it ignores the most important factor in deciding the effect of a choice of law clause: The language used by the parties. When sophisticated parties provide that a state's law "governs" (Operating Agreement § 10.5), they intend that it will encompass all disputes arising out of or relating to the contract, including tort claims. *Nedlloyd*, 3 Cal. 4th at 470. The cases Amisil cites do not apply to the language at issue. *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.* (decided under Arizona, not

---

[13] Amisil appears to have abandoned its claim for conspiracy to breach fiduciary duty. Amisil also claims that the alleged conspiracy neither arises out of or relates to the Operating Agreement for choice of law purposes. Because the entirety of the parties' relationship is governed by the Operating Agreement, this assertion cannot be credited. *See Nedlloyd Lines, B.V. v. Super. Ct.*, 3 Cal. 4th 459, 470 (1992).

Moreover, Amisil's opposition improperly relies on California law. *See infra* Part II.F & II.*I*. Even if California law did apply, it would not permit a civil conspiracy claim where the claim is brought against agents or employees of a company acting in their official capacity. *Wise v. Southern Pac. Co.*, 223 Cal.App.2d 50, 72 (1963) (no claim of conspiracy between corporation and its officers to induce corporation to breach contract).

Heller
Ehrman LLP

11

DEFS' JOINT REPLY MEM. ISO MOTION TO DISMISS & STRIKE, Case No. C 06-5255 MJJ

California, law) involved a liquor distribution contract that included language expressly looking to "applicable local … law." 971 F.2d 401, 405-06 (9th Cir. 1992). And the contract in *Medical Instrument Dev. Labs. v. Alcon Labs.* contained a narrow choice of law clause specifically applied only to breach of contract actions, not to all causes of action. No. C 05-1138 MJJ, 2005 WL 1926673, at *2-3 (N.D. Cal. Aug. 10, 2005). Delaware law applies to this claim, and it should be dismissed because Delaware does not generally recognize conversion claims where the alleged indebtedness "may be discharged by the payment of money."[14] Clarium MPA at 21.

### G. The Investment Advisors Act Claim Fails Because Amisil Cannot Allege the Required Elements, And Because It Has No Claim for Rescission.

In their opening briefs, Defendants focused on a fundamental failure of Amisil's Second Claim for Relief: The absence of a private right of action for damages under the Act. Clarium MPA at 20-21, *citing Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 24 (1979). Sidestepping that point,[15] Amisil attempts to recharacterize its claim as a claim for rescission. No matter what remedy it claims to seek, the claim fails. First, Amisil seeks to reaffirm and enforce the contract, not to void it from the outset. Where a plaintiff sues to enforce duties imposed by a contract, it sues on the contract, not to void the contract, and it has no claim under the Investment Advisers Act. *Frank Russell Co. v. Wellington Mgmt. Co.*, 154 F.3d 97, 102 (3d Cir. 1998). Second, Amisil cannot assert that it has suffered restitutionary damages under a claim for rescission. The measure of Amisil's restitutionary damages for rescission of the Operating Agreement is, of course, the amount of its investment in Clarium — $3,000. Yet Clarium has offered Amisil over $300,000. Compl. ¶ 42. Accordingly, Amisil has not suffered damages under such a claim. Finally, any claim for rescission of the Operating Agreement is time-barred. 28

---

[14] Even if California law did apply, Amisil could not state a claim for conversion because it has not pleaded that Clarium improperly divested Amisil of ownership rights (if any) it had in Clarium, or that Amisil was damaged by Defendants' alleged conduct.

[15] Amisil does not dispute that the Supreme Court has expressly held that there is no private right of action for damages under the Investment Advisors Act. Plaintiff asserts that "[a] violation of § 80b-1-6 of the Act is also punishable by monetary sanctions pursuant to § 80b-9," but neglects to inform the Court that this section only gives the Securities and Exchange Commission authority to impose such sanctions. 15 U.S.C § 80b-9(e)(1).

Amisil does argue, however, that Defendants do not dispute that it has alleged the requisite elements of a claim under the Investment Advisors Act. Clarium Opp. at 22. Of course, Defendants' opening briefs establish the substantive failure of each of Plaintiff's claims.

Heller Ehrman LLP

12

DEFS' JOINT REPLY MEM. ISO MOTION TO DISMISS & STRIKE, Case No. C 06-5255 MJJ

U.S.C. § 1658 (statute of limitations on securities claim two years from discovery and five years from date of conduct); *see Norman v. Salomon Smith Barney, Inc.*, 350 F. Supp. 2d 382, 390 (S.D.N.Y. 2004) (applying 28 U.S.C. § 1658 to Investment Advisers Act claim).

### H.   Amisil Fails to Allege a Claim For Breach of the Implied Covenant.

Amisil argues that it has a claim for breach of the implied covenant of good faith, because Delaware law provides that "if one party is given discretion in determining whether [a] condition in fact has occurred[,] that party must use good faith in making that determination." Clarium Opp. at 24, citing *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984). Amisil then claims that Clarium removed it in bad faith. *Id.* Amisil's argument is a *non sequitur*. Amisil does not allege that there was an applicable "condition of fact," and there was none: Clarium had an *unconditional* right to mandatorily retire Amisil. 2003 Operating Agreement § 7.3. Amisil's claim for breach of an implied covenant is an improper attempt to rewrite the contract.

### I.   The Section 17200 Claim Is Barred By the Operating Agreement's Broad Choice of Law Provision.

In contending that the choice of law provision does not bar the Section 17200 ("UCL") claim, Amisil once again ignores the breadth of the choice of law clause in the Operating Agreement. Like the clause in *Nedlloyd*, the Amisil/Clarium clause was negotiated between two sophisticated parties, and encompasses all causes of action arising out of or relating to the Operating Agreement. *Nedlloyd*, 3 Cal. 4th at 470; Operating Agreement § 10.5; Subscription Agreement §§ 4, 5(h). Accordingly this Court should apply Delaware law, not California law, and Amisil has no claim under the UCL.[16]

Amisil asserts that the choice of law clause cannot be enforced here because Delaware has an insufficient connection to the Agreement. But California law recognizes that the state of incorporation has a substantial interest in applying its law to a business entity created under its laws. *Nedlloyd*, 3 Cal. 4th at 467; *see also* Restatement, Second of Conflict of Laws § 187 com. f.

---

[16] Amisil also largely ignores Clarium's authority establishing that its purported Section 17200 claim fails on the merits. *See* Clarium MPA at 22-23. It fails to support the UCL unlawful prong, relying only on its meritless claim under the securities laws (*id*. at 24); it fails even to make an argument in defense of any claim under the fraudulent prong (*id.*); and the standard it proposes in support of the unfair prong has been disapproved as "too amorphous" by the California Supreme Court. *Cel-Tech Commc'n, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 184-85 (1999).

Amisil also contends that refusing to apply the UCL contravenes a public policy of California. Again, it is wrong. "The mere fact that the chosen law provides greater or lesser protection than California law, or that in a particular application the chosen law would not provide protection while California law would, are not reasons for applying California law." *Medimatch, Inc. v. Lucent Technologies, Inc.*, 120 F. Supp. 2d 842, 861 (N.D. Cal. 2000), *citing Wong v. Tenneco, Inc.*, 39 Cal. 3d 126, 135-36 (1985). Allowing Amisil as matter of expediency in this litigation to "disregard[] the law [it] voluntarily agreed to accept as binding — the law of a state that also happens to be [Clarium's] own corporate domicile … would further no ascertainable fundamental policy of California; indeed, it would undermine California's policy of respecting the choices made by parties to voluntarily negotiated agreements." *Nedlloyd*, 3 Cal. 4th at 471.

**J.    The Remedies "Claims" Fail for the Reasons the Substantive Claims Fail.**

As set forth above, Amisil fails to state a claim for relief. Its "claims" for constructive trust, accounting, and injunctive relief cannot stand without these bases for liability. Because the substantive claims fail, so too do the claims for remedies.

**K.    Amisil Was On Notice of its Claims And Can Plead No Basis for Tolling.**

In response to the Individual Defendants' motion to strike,[17] Amisil claims that its otherwise time-barred claims are saved by tolling on the basis of conspiracy and fraudulent concealment. Indiv. Opp. at 14-16. Any conspiracy-based claim for tolling fails for the reasons the claim for relief for conspiracy fails. *Wasco Products, Inc. v. Southwall Tech., Inc.*, 435 F.3d 989, 991-92 (9th Cir. 2006) (plaintiff must plead tolling based on conspiracy with particularity as required by Rule 9(b)). Furthermore, Delaware law does not toll an action for civil conspiracy until the last overt act; the applicable statute of limitations runs from the time of the commission of that act which is alleged to cause the damage. *Henis v. Compania Agricola De Guatemala*, 116 F. Supp. 223, 226-227 (Del. 1953). Therefore each act of fraud alleged by Amisil which occurred before August 28, 2003 should be stricken. Plaintiff's theory of tolling based on fraudulent concealment must also be pled with particularity — which, as demonstrated above, it was not. *Wasco*, 435 F.3d at 991-92.

---

[17] Amisil does not oppose Clarium's limitations arguments raised in its motion to dismiss. Clarium MPA at n.10, n.13, n.15. The Court should dismiss time-barred claims against Clarium.

Heller
Ehrman LLP

14

DEFS' JOINT REPLY MEM. ISO MOTION TO DISMISS & STRIKE, Case No. C 06-5255 MJJ

More fundamentally, Amisil was on notice of its claims long before this action was commenced. The statutes of limitation are triggered where plaintiff knew or should have known of a potential injury. *Pomeranz v. Museum Partners, L.P.*, NO. CIV. A. 20211, 2005 WL 217039 (Del.Ch. Jan 24, 2005). Where plaintiffs "have sufficient knowledge to raise their suspicions to the point where persons of ordinary intelligence and prudence would commence an investigation that, if pursued would lead to the discovery of the injury," they are on inquiry notice, and tolling is inapplicable. *Id*. Plaintiff's argument again boils down to an attempt to have it both ways. Amisil alleges that "serious" injuries were inflicted upon it: a failure to provide statements since at least 2000; a buyout offer in early 2002 so low that Amisil allegedly rejected it out of hand; and an amendment to the Operating Agreement in early 2003 that gave Clarium the right to expel Amisil at any time for any reason. Clarium contests that these acts constituted breaches of its agreements, but to the extent Amisil's characterizations are credited they defeat the claims on limitations grounds. Nothing prevented Amisil from investigating its supposedly significant claims, or from demanding statements, accountings, or distributions prior to 2006.[18] Amisil's claims are time-barred.

## III. CONCLUSION

For the reasons set forth above, Amisil's claims fail as a matter of law. Because nothing about the parties' relationship will change if Amisil is allowed to amend its deficient pleading, this Court should dismiss Amisil's claims with prejudice.

October 24, 2006                    Respectfully submitted,
                                    HELLER EHRMAN LLP


                                    By    /s/ Howard S. Caro
                                            HOWARD S. CARO
                                    Attorneys for Defendants
                                    CLARIUM CAPITAL MANAGEMENT, PETER THIEL, JASON PORTNOY and MARK WOOLWAY

---

[18] Amisil's alleged behavior is inexplicable, given that Amisil was purportedly "waiting for its investment to continue to mature" (without any periodic reporting from Clarium about that investment and despite repeated communications from Clarium purporting to "confiscate" Amisil's investment). Compl. ¶14.

Heller Ehrman LLP

15

DEFS' JOINT REPLY MEM. ISO MOTION TO DISMISS & STRIKE, Case No. C 06-5255 MJJ