Howard Caro (SBN 202082)
Cecilia Chan (SBN 240971)
Nathaniel Spencer-Mork (SBN 226886)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA  94104-2878
Telephone: +1.415.772.6000
Facsimile: +1.415.772.6268

Robert Hawk (SBN 118054)
HELLER EHRMAN LLP
275 Middlefield Road
Menlo Park, CA 94025-3506
Phone: +1.650.324.7000
Facsimile: +1.650.324.0638

Attorneys for Defendants
Clarium Capital Management, LLC, Peter Thiel, Jason Portnoy and Mark Woolway

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMISIL HOLDINGS LTD., a Cyprus Corporation,<br><br>                                  Plaintiff,<br><br>     v.<br><br>CLARIUM CAPITAL MANAGEMENT, LLC, et al.,<br><br>                                  Defendants. | Case No.: C 06 5255 MJJ<br><br>**APPENDIX OF UNPUBLISHED AUTHORITY IN SUPPORT OF DEFENDANT'S OPENING AND CONSOLIDATED REPLY BRIEFS IN SUPPORT OF MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM AND TO STRIKE TIME-BARRED ALLEGATIONS**<br><br>Hearing Date:   November 7, 2006<br>Time:                9:30 a.m.<br>Courtroom:      11<br><br>The Honorable Martin J. Jenkins |

Heller
Ehrman LLP

APPENDIX OF UNPUBLISHED AUTHORITIES IN SUPPORT OF DEF'S OPENING AND CONSOLIDATED REPLY BRIEFS IN SUPPORT
OF MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM AND TO STRIKE TIME-BARRED ALLEGATIONS
CASE NO.: C 06 5255 MJJ

**INDEX**

TAB

**CASES**

*Albert v. Alex.Brown Mgmt. Servs., Inc.*,
    No. Civ.A. 762-N, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005)................................. 1

*Blackin v. Red Brick Sys., Inc.*,
    No. C 98-1206 MJJ, 1999 WL 33953501 (N.D. Cal. 1999) ........................................ 2

*Doll v. Stars Holding Co.*,
    No. C 05-1132 MMC, 2005 WL 2811767 (N.D. Cal. Oct. 27, 2005) ........................ 3

*E.I. Du Pont De Nemours and Co. v. Monsanto Co.*,
    No. CIV.A. 00-359-SLR, 2001 WL 652019 (D. Del. Feb. 14, 2001)......................... 4

*Masco Contractors Servs. West v. New Hampshire Ins. Co.*,
    No. C 04-4183 MJJ, 2005 WL 405361 (N.D. Cal. Feb. 17, 2005) .............................5

*Medical Instrument Dev. Labs. v. Alcon Labs.*,
    No. C 05-1138 MJJ, 2005 WL 1926673 (N.D. Cal. Aug. 10, 2005) ......................... 6

*Miller v. Am. Real Estate Partners, L.P.*,
    No. CIV.A.16788, 2001 WL 1045643 (Del. Ch. Sept. 6, 2001)................................. 7

*Pomeranz v. Museum Partners, L.P.*,
    NO. CIV. A. 20211, 2005 WL 217039 (Del.Ch. Jan 24, 2005)................................. 8

*In re Turbodyne Technologies, Inc. Sec. Litig.*,
    No. CV 9900697 MMMBQRX, 2000 WL 33961193 (C.D. Cal. Mar.
    15, 2000)................................................................................................................... 9

*Union Fire Ins. Co. of the State of Pennsylvania v. Pan Am. Energy LLC*,
    No. Civ. A. 19629-NC, 2003 WL 1432419 (Del. Ch. Mar. 19, 2003) ..................... 10

Heller
Ehrman LLP

APPENDIX OF UNPUBLISHED AUTHORITIES IN SUPPORT OF DEF'S OPENING AND CONSOLIDATED REPLY BRIEFS IN SUPPORT OF MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM AND TO STRIKE TIME-BARRED ALLEGATIONS
CASE NO.: C 06 5255 MJJ

# TAB 1

Westlaw.

Not Reported in A.2d                                                                                           Page 1
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

**H**

Briefs and Other Related Documents

Albert v. Alex. Brown Management Services,
Inc.Del.Ch.,2005.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Todd ALBERT, Joseph M. Bryan, Jr., Kevin Calder-
wood, Katherine D. Crothall, Scott W. Frazier, FU
Family Revocable Trust, Robert B. Goergen, Sr.,
Robert G. Goergen, Jr., Todd A. Goergen, Hasan
1995 Living Trust, Wai Yan Ho, Willis James Hind-
man, Johnson Family Living Trust, Michael R. Kid-
der Revocable Trust, Mark and Ann Kington, Jeffrey
A. Koser, Marlenko Inc., Elaine McKay Family, LP,
David Mixer, MRW Trust, James Murray, Jim K.
Omura 1996 Trust, Jennifer Owen and Michael J.
Ross, Nicholas Peay, Douglas G. Smith, Frederick G.
Smith, Jane Vei-Chun Sun, Mark Wabschall, Karen
L. Walsh, Warmenhoven 1995 Children's Trust, Yan
1996 Revocable Trust, Barbara J. Zale, and Charles
A. Ziering, Plaintiffs,
v.
ALEX. BROWN MANAGEMENT SERVICES,
INC.; Deutsche Bank Securities, Inc.; Deutsche
Bank, AG; Richard Hale; Gary Fearnow; Bruns
Grayson; E. Robert Kent, Jr.; Truman T. Semans; DC
Investment Partners, LLC; Doctor Robert Crants, III;
and Michael W. Devlin, Defendants.
Elizabeth J. BAKER, Bender 1996 Revocable Trust,
Dr. Steven J. Berlin, Estate of Robert B. Blow, Luth-
er C. Boliek, Stephen E. Coit, Sara Crowder, Gerald
K. and Teresa K. Fehr, FU Family Revocable Trust,
Ralph Glasgal, Robert G. Goergen, Jr.1985 Trust,
Todd A. Goergen 1985 Trust, Peter O. Hausmann,
Willis James Hindman, William F. Kaiser, Mark and
Ann Kington, Timothy K. Krauskopf, William T.
McConnell, Philip R. McKee, David Mixer, MRW
Trust, James Murray, Paul D. and Judith F. Newman,
W.L. Norton, Gregory Packer, Howard E. Rose,
Ruben Family Limited Partnership, 5 S Trust, Salad-
rigas Family Ltd. Partnership, Ricardo A. Salas, Jose
M. Sanchez, Samuel Siegel, Silverman 1996 Irrevoc-
able Trust, Douglas G. Smith, Frederick G. Smith,
Ronald B. Stakland, Strauch Kulhanjain Family

Trust, Bruce E. Toll, Alexander R. and Marjorie L.
Vaccaro, Yanover Family Ltd. Partnership, Michael
Yokell, and Justin A. Zivin, Plaintiffs,
v.
ALEX. BROWN MANAGEMENT SERVICES;
Deutsche Bank Securities, Inc.; Deutsche Bank, AG;
Richard Hale; E. Robert Kent, Jr.; Truman T. Se-
mans; DC Investment Partners, LLC; Doctor Robert
Crants, III, and Michael W. Devlin, Defendants.
**No. Civ.A. 762-N, Civ.A. 763-N.**

Submitted July 22, 2005.
Decided Aug. 26, 2005.

Jeffrey S. Goddess, Jessica Zeldin, Rosenthal, Mon-
hait, Gross & Goddess, P.A., Wilmington, Delaware;
Steven E. Fineman, Hector D. Geribon, Daniel P.
Chiplock, Lieff, Cabraser, Heimann & Bernstein,
LLP, New York, New York, for the Plaintiffs.
Michael D. Goldman, Peter J. Walsh, Jr., Melony R.
Anderson, Potter Anderson & Corroon LLP, Wilm-
ington, Delaware; Christopher P. Hall, Kevin Rover,
John Vassos, Marilyn B. Ampolsk, Morgan Lewis &
Bockius, LLP, New York, New York, for the De-
fendants Alex. Brown Management Services, Inc.,
Deutsche Bank Securities, Inc. and Deutsche Bank
A.G.
Daniel Griffith, Marshall Dennehey, Warner, Cole-
man & Goggin, Wilmington, Delaware, for Defend-
ants DC Investment Partners, LLC, Dr. Robert
Crants, III, and Michael W. Devlin.
Richard D. Allen, Thomas W. Briggs, Jr., Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware, for
Defendants Richard Hale, Gary Fearnow, Bruns
Grayson, E. Robert Kent, Jr. and Truman T. Semans.

*MEMORANDUM OPINION*
LAMB, Vice Chancellor.

I.

*1 In a recent opinion in these two related cases on
the defendants' motion to dismiss under Court of
Chancery Rule 12(b)(6), the court addressed the de-
fendants' statute of limitations argument and con-
cluded that any claims arising before November 11,

Not Reported in A.2d                                                                                                              Page 2
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
(Cite as: Not Reported in A.2d)

2000, the date upon which the parties entered into an agreement tolling the statute of limitations, were barred.[FN1] Because it was unclear which, if any, claims for relief set out in the complaints arise after that date, the court requested additional submissions from the parties.

> FN1. The facts alleged in the complaints are recited in detail in the earlier opinion. *Albert v. Alex. Brown Mgmt. Servs.*, 2005 Del. Ch. LEXIS 100, at *43-58 (Del. Ch. June 29, 2005). Reference is made to that opinion for a complete recitation of the facts and for the definition of terms used herein. However, to avoid confusion, the court refers in this opinion to Alex. Brown Management Services, Inc. as "AB Management." Unless otherwise noted, the facts recited in this opinion are taken from the well-pleaded allegations of the complaints.

In this opinion, the court now addresses the issues raised in the additional submissions as well as the remaining issues raised by the defendants' motion to dismiss. Included among the latter are: (i) whether any surviving claims are derivative, rather than direct claims as to which demand was neither made nor excused; and (ii) whether the court can exercise personal jurisdiction over several defendants (the "DCIP Defendants") who served as agents, or employees of agents, of the partnerships.

## II.

In the earlier opinion, the court noted that some of the factual allegations in the complaints occurred after November 11, 2000 and that, therefore, viable claims based on these factual allegations are not time-barred.[FN2] The Plaintiffs' Response Brief[FN3] identified five other factual allegations in the complaints (all involving allegedly material misrepresentations or non-disclosures) which, they contend, support viable claims for relief. These are: (i) the Managers' failure in the December 2000 semi-annual reports (dated on or about February 28, 2001) to inform the defendants that hedging was desirable, but the Funds could not afford to do so; (ii) the allegedly misleading statement in the December 31, 2000 re-

port to the unitholders that the Managers remained "comfortable with the broad diversification achieved by the Fund[s'] portfolio of public securities and private investments ....;" (iii) the defendants' failure to inform the unitholders of the Funds' "liquidity issues," "steps that the management could take to improve liquidity," and "alternatives to raise additional liquidity," although these themes were the focus of the Management Committee meetings of October 3, 2000, March 23, 2001, and September 6, 2000; (iv) the defendants' failure to inform the unitholders that, in June of 2001, AmSouth Bank withdrew from the credit syndicates for the Funds, thereby leaving Bank of America as the only lender for the Funds; and (v) the defendants' failure to inform the unitholders of the Funds violation of their credit arrangements with their lenders, including their eventual defaults, on June 5, 2002 (for the Fund I loan), and June 28 and September 30, 2002 (for the Fund II loan).

> FN2. The factual allegations specifically discussed in the earlier opinion are as follows: First, the Managers failed to provide financial statements and reports as they are required to under the Partnership Agreements and Delaware law. Second, the Managers wrongfully allowed certain withdrawals from the Funds, thereby causing or exacerbating a liquidity crisis. Specifically, the Fund II Complaint alleges that three withdrawals from Fund II occurred after November 11, 2000. These allegedly occurred on January 17, 2001, October 25, 2001, and December 31, 2001 (the "Fund II 2001 Withdrawals"). Additionally, the Fund I Complaint alleges approximately $8.0 million in withdrawals occurred in December of 2000 from Fund I (the "Fund I December 2000 Withdrawals"). Third, the Managers failed to provide active and competent management of the Funds. *Alex. Brown,* 2005 Del. Ch. LEXIS 100, at *78-*79.

> FN3. The Plaintiffs' Response Brief is titled "Plaintiffs' Brief In Response To The Court's Memorandum Opinion And Order Of June 29, 2005" and was filed on July 15, 2005.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 3
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
(Cite as: Not Reported in A.2d)

All five of these factual allegations are found in the complaints. Furthermore, they allegedly occurred after November 11, 2000. Therefore, claims based on these allegations are timely. However, a threshold question is whether the information that the plaintiffs allege should have been disclosed, or was disclosed but was allegedly false and misleading, is material. If this information is not material as a matter of law, the allegations will not support claims that the Managers violated their disclosure duties.

**\*2** The determination of materiality is a mixed question of fact and law that generally cannot be resolved on the pleadings.[FN4] Therefore, the court cannot (and does not) make any final findings on the materiality of these alleged disclosure allegations. However, on a Rule 12(b)(6) motion, the court must determine whether, under the facts alleged in the complaints, these disclosure (or non-disclosure) allegations support a reasonable inference of materiality. If they do not, these factual allegations cannot support a claim for relief.

> FN4. *O'Malley v. Boris*, 742 A.2d 845, 850 (Del.1999)

An omitted fact is material if "under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[FN5]

> FN5. *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del.1983) (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

The first alleged non-disclosure is that the Managers' failed in the December 2000 semi-annual reports to inform the unitholders that hedging was desirable, but the Funds could not afford to do so. This allegation of non-disclosure, viewed in the context of the allegations contained in the complaints, supports a reasonable inference that this information is material. According to the complaints, the defendants marketed the Funds as being actively managed by experi-

enced, professional managers. Viewed in this context, a unitholder would likely find it important to know that the Managers could not manage the Funds in what they believed to be the Funds' best interests, because they were facing liquidity problems and could not afford to purchase collars.

The second alleged non-disclosure is that the defendants failed to inform the unitholders of the Funds' "liquidity issues," "steps that the management could take to improve liquidity," and "alternatives to raise additional liquidity." As alleged in the complaints, the real cause of the Funds' losses was the lack of liquidity. The lack of liquidity allegedly prevented the Managers from properly hedging the Funds as they (allegedly) thought was best for the Funds. Viewed in that context, a reasonable investor would likely find it important to know such information.

The third alleged non-disclosure is that the defendants failed to inform the unitholders that, in June of 2001, AmSouth Bank withdrew from the credit syndicates for the Funds, thereby leaving Bank of America as the only lender for the Funds. Under the facts alleged, the court cannot reasonably infer that this information is material. The complaints allege that the unitholders understood from the very beginning that the Funds would have to borrow money. This is because the contributed securities were illiquid and the Funds needed cash to purchase collars. Given that fact, it is unlikely that a reasonable investor would find it important to know that the Funds were borrowing from one lender as opposed to multiple lenders. In fact, such information would likely only confuse an investor by giving him more information than is necessary to understand the Funds. Therefore, the plaintiffs cannot bring any claims based on this factual allegation.

**\*3** The fourth alleged non-disclosure is that the defendants failed to inform the unitholders of the Funds' violations of the credit arrangements with their lenders, including the eventual defaults, on June 5, 2002 (for the Fund I loan), and June 28 and September 30, 2002 (for the Fund II loan). This allegation supports a reasonable inference of materiality. As opposed to the information about a bank withdrawing from the credit syndicate, the fact that the Funds were

Not Reported in A.2d                                                                                           Page 4
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
(Cite as: Not Reported in A.2d)

in default on their loans directly speaks to the financial condition of the Funds. A reasonable investor would want to know this information.

Finally, the plaintiffs allege that the claim in the December 31, 2000 report that the Managers remained "comfortable with the broad diversification achieved by the Fund[s'] portfolio of public securities and private investments" was materially false and misleading. This allegation does *not* support a reasonable inference that this information is material. It is simply a statement of the Managers' opinion. Furthermore, there is no allegation in the complaints that this statement of opinion was not honestly held, i.e. false. Therefore, the plaintiffs cannot bring any claims based on this factual allegation.

The Non-Disclosure Allegations [FN6] relate to failures to disclose allegedly material information. There is not, of course, any general duty to disclose information. To bring a non-disclosure claim, a party must allege either a fiduciary duty or a contractual duty to disclose. The plaintiffs have attempted to allege both. Therefore, the court will address the Non-Disclosure Allegations in the context of the plaintiffs' claims for breach of fiduciary duty and breach of contract.

> FN6. Collectively, the court refers to the three remaining factual allegations of non-disclosure as the "Non-Disclosure Allegations."

### III.

The allegations set out in the two complaints are nearly identical and the complaints are both set out in eleven counts: breach of fiduciary duty (Count 1); aiding and abetting a breach of fiduciary duty (Count 2); common law fraud (Count 3); aiding and abetting common law fraud (Count 4); breach of contract against AB Management (with respect to Fund I) and breach of contract against DCIP (with respect to Fund II) (Count 5); breach of the covenant of good faith and fair dealing against AB Management (with respect to Fund I) and breach of the covenant of good faith and fair dealing against DCIP (with respect to Fund II) (Count 6); gross negligence (Count 7); unjust enrichment against all defendants (Count 8); con-

spiracy liability (Count 9); an accounting (Count 10); and agency liability against Deutsche Bank and DBSI (Count 11). The court first addresses each of the substantive claims (Counts 1, 3, 5-8, & 10). The court then considers the vicarious liability claims (Counts 2, 4, 9, & 11).

### A. *Breach Of Fiduciary Duty (Count 1)*

#### 1. *Failure To Provide Financial Statements*

The complaints allege that the Managers failed to provide the unitholders with the 2001 audited financial statements until 2003, and failed to provide any investor reports or audited financial statements for 2002. The plaintiffs argue that this amounted to a breach of the Managers' fiduciary duties.

*4 There is not, of course, a general fiduciary duty to provide financial statements. Instead, under the Partnership Agreements, the Managers had a contractual duty to provide the unitholders with such reports.[FN7] The plaintiffs have not articulated why the violation of this contractual right amounted to a breach of fiduciary duty.[FN8] Thus, this factual allegation does not state a claim for breach of fiduciary duty.

> FN7. Partnership Agreements § 11.2.

> FN8. In the Plaintiffs' Response Brief, the plaintiffs argue that the Managers failed to make material disclosures, when they had a fiduciary obligation to do so. They further outline specific factual allegations, the Non-Disclosure Allegations, they contend are material and should have been disclosed. The Non-Disclosure Allegations are discussed below.

#### 2. *Withdrawal Allegations*

The plaintiffs argue that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals. The plaintiffs contend that the defendants violated their fiduciary duties "by failing to ensure that the Funds had 'sufficient financial resources' to accomplish their 'investment objectives,' and failed to ensure that the Managers were providing professional and active supervision, over-

Not Reported in A.2d                                                                    Page 5
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
(Cite as: Not Reported in A.2d)

sight and management of the Funds." [FN9]

> FN9. Pls.'s Resp. Br. at 7.

From these factual allegations, the court cannot reasonably infer a breach of the fiduciary duty of loyalty. The complaints do not allege that the Managers benefited personally in any way by allowing the withdrawals. In fact, the amount of fees that the Managers received were based on the amount of money the Funds had under management. Therefore, if anything, the Managers had an incentive *not* to allow redemptions.

Likewise, the plaintiffs' allegations relating to the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals do not rise to the level of a breach of the duty of care. Director liability for breaching the duty of care "is predicated upon concepts of gross negligence." [FN10] A court faced with an allegation of lack of due care should look for evidence of whether a board has acted in a deliberate and knowledgeable way in identifying and exploring alternatives.[FN11]

> FN10. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984); *accord Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 66 (Del.1989).

> FN11. *Citron*, 569 A.2d at 66

Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one "which involves a devil-may-care attitude or indifference to duty amounting to recklessness." [FN12] "In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." [FN13] In order to prevail on a claim of gross negligence, a plaintiff must plead and prove that the defendant was "recklessly uninformed" or acted "outside the bounds of reason." [FN14]

> FN12. William T. Allen, Jack B. Jacobs and Leo E. Strine, Jr., *Function over Form: A Reassessment of Standards of Review in*

> *Delaware Corporation Law*, 56 BUS. LAW. 1287, 1300 (2001); *accord Tomczak v. Morton Thiokol, Inc.*, 1990 Del. Ch. LEXIS 47, at *35 (Del. Ch. Apr. 5, 1990) ("In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions which are 'without the bounds of reason." ') (citations omitted).

> FN13. *In re Walt Disney Co. Derivative Litig.*, 2005 Del. Ch. LEXIS 113, at *162, ___ A.2d. ___, (Del. Ch. Aug. 9, 2005) (internal citations and quotations omitted).

> FN14. *Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.*, 1996 Del. Ch. LEXIS 116, at *42 (Del. Ch. Sept. 3, 1996) (citations omitted), *aff'd*, 692 A.2d 411 (Del.1997) (TABLE); *see also Solash v. Telex Corp.*, 1988 Del. Ch. LEXIS 7, at *24-*25 (Del. Ch. Jan. 19, 1988) (stating that the standard for gross negligence is a high one, requiring proof of "reckless indifference" or "gross abuse of discretion") (citations omitted).

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals were actionably wrongful. Yet, the plaintiffs specifically allege in the complaints that the Partnership Agreements gave limited partners, in defined circumstances, the right to redeem. While the agreements also gave the Managers the power to delay or deny redemption requests "in [their] sole discretion," [FN15] it is difficult to read that discretionary power as imposing a positive duty to exercise that power to prevent or delay a withdrawal in order "to ensure that the Funds had 'sufficient financial resources' to accomplish their 'investment objectives." ' Thus, while the redemptions may have exacerbated the Funds' liquidity crunch, this is not enough to say that the Managers' failure to delay or deny those redemptions can give rise to a duty of care claim.

> FN15. Fund I Compl. ¶ 82; Fund II Compl. ¶ 94.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 6
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
(Cite as: Not Reported in A.2d)

**\*5** Therefore, the factual allegation that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals does not give rise to a claim for breach of fiduciary duty.

### 3. Active And Competent Management And Disclosure Allegations

First, the complaints allege that the Managers lacked the experience and expertise to manage the Funds. Second, the complaints allege that the Managers devoted inadequate time and attention to managing the Funds. The complaints also allege that the Managers failed to disclose material information, and made misleading disclosures.

The claim that the Managers lacked the experience and expertise to manage the Funds is completely without merit. The defendants disclosed the qualifications of the Funds' Management Committee in the Private Placement Memoranda (the "PPMs") that the defendants gave to all of the unitholders. The "Management" sections of the PPMs disclosed the names, titles, affiliations, ages, educations, and experience of the Management Committee members, DCIP's principals, and DCIP's degree of experience with exchange funds.<u>FN16</u> The unitholders received this information before they ever made their investment in the Funds. They, therefore, implicitly agreed that the Managers were sufficiently qualified to manage the Funds.

> <u>FN16.</u> *See* Fund I PPM at 27-29; Fund II PPM at 29-31.

However, the plaintiffs' other claim, that the Managers devoted inadequate time and attention to managing the Funds and committed disclosure violations, is more substantial. The complaints allege that the Managers made false and misleading statements to the unitholders, and failed to disclose material information. While many of the alleged misstatements took place before November 11, 2000, some (specifically, the Non-Disclosure Allegations) took place after this date.

The complaints allege that the Managers met only sporadically, less than once a year since the inception of the Funds. During this time, the Funds were facing

difficult challenges. The Managers originally set up the Funds with collars, attempting to limit the upside and downside potential of the Funds. <u>FN17</u> The appreciation of certain contributed securities (especially Yahoo!) was causing the Funds to blow through the collars. The Managers then made the decision to remove the collars on the Funds, a decision that had beneficial effects in the short-term, but over the long-term, when the defendants failed to reinstate the collars, resulted in sharp losses.

> <u>FN17.</u> "Collaring" is financial jargon for purchasing offsetting calls and puts on a security to limit upside and downside exposure. At the inception of the Funds, the Managers attempted to limit upside and downside exposure to roughly 10%. *Alex. Brown,* 2005 Del. Ch. LEXIS 100, at \*9.

Viewed in the light most favorable to the plaintiffs, these alleged facts do (just barely) raise a duty of care claim. Whether the Managers exercised the requisite amount of due care in managing the Funds is, of course, a fact sensitive inquiry. In certain circumstances, meeting once a year to manage an investment vehicle would be sufficient. This would be the case when the investment is relatively straight-forward, or where the complexity of the investment lies in its original design. In fact, a typical exchange fund could require less active management than other types of investments. These funds are often designed to avoid tax liability and to provide diversification, *not* to generate spectacular returns. Therefore, under normal circumstances, a properly hedged and diversified exchange fund might need less active management than, say, a typical mutual fund.

**\*6** The facts alleged in the complaints, however, paint a picture of the Funds being faced with exceptional challenges, first by the sharply rising value of the securities that made up the Funds, and second by the rapid fall in value of those same securities. The response of the Managers was, allegedly, almost nonexistent, meeting less than once a year.

Furthermore, the complaints allege that the Managers failed to disclose the challenges facing the Funds and the meager steps they were taking to meet those chal-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267

**(Cite as: Not Reported in A.2d)**

lenges. These alleged disclosure violations were potentially material because, had the plaintiffs known the truth, they could have asked for withdrawals, or brought suit before the value of the Funds plummeted.

It is quite possible that the Managers acted appropriately in both the amount of time they spent managing the Funds and the disclosures they made. However, the complaints paint a picture of the Managers taking almost *no* action over the course of several years to protect the unitholders' investments, while the value of the Funds first skyrocketed and later plummeted. Under the circumstances, the plaintiffs should at least be allowed discovery to find out if, as the complaints imply, the Managers received millions of dollars in fees for doing almost nothing.

Therefore, for all of the above reasons, the court holds that the plaintiffs have plead sufficient facts to give rise to a duty of care claim.

B. *Breach Of Contract And The Implied Covenant Of Good Faith And Fair Dealing (Counts 5 & 6)*

In order to survive a motion to dismiss for failure to state a breach of contract claim, a plaintiff must demonstrate: (i) the existence of the contract, (ii) a breach of an obligation imposed by that contract, and (iii) resultant damages to the plaintiff.[FN18]

> FN18. *VLIW Tech., L.L.C. v. Hewlett-Packard Co.,* 840 A.2d 606, 612 (Del.2003).

1. *Failure To Provide Financial Statements Allegations*

The complaints allege that the Managers had a contractual duty under the Partnership Agreements to provide semi-annual unaudited financial statements reporting on the financial condition of the Funds, and an annual audited report. The complaint further alleges that the Managers did not provide the unitholders with these reports for 2002 and did not provide the 2001 audited financial statements until 2003. Further, the court reasonably infers from the facts alleged in the complaints that the plaintiffs were harmed by either not being able to ask for a redemption, or not being able to sue for rescission or a like

remedy. Therefore, the plaintiffs have satisfied the pleading requirements for a breach of contract claim and this claim cannot be dismissed.

2. *Withdrawal Allegations*

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals constituted a breach of contract. They argue that the withdrawals caused, or made worse, the Funds' liquidity crunch. However, the Partnership Agreements gave the unitholders the right to withdraw their investments after two years.[FN19] As alleged in the complaints, the unitholders' right to withdraw was limited by the power of the Managers to delay or deny redemptions "in [their] sole discretion."[FN20]

> FN19. *See* Partnership Agreements ¶¶ 6.3.

> FN20. Fund I Compl. ¶ 82, Fund II Compl. ¶ 94.

**\*7** This contractual provision did not create a duty for the Managers to individually assess the financial position of the Funds and the effect that such a withdrawal would have each time a unitholder requested a withdrawal. Instead, it placed a restriction on the unitholders' right to receive withdrawals. It gave the Managers the power to limit withdrawals, in their sole discretion. Therefore, the plaintiffs have not identified a contractual obligation that the Managers have violated and this claim must be dismissed.[FN21]

> FN21. In the Plaintiffs' Response Brief, the plaintiffs implicitly admit that the Managers had the authority to allow the withdrawals. Instead of arguing this point, the plaintiffs argue that the Managers had a contractual obligation to report the withdrawals.

3. *Active And Competent Management And Disclosure Allegations*

The plaintiffs allege that the defendants owed them a contractual duty to provide active management and to disclose all material information. The complaints allege that the Managers made false and misleading statements to the unitholders, failed to disclose material information, and that the Managers met only

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 8
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
(Cite as: Not Reported in A.2d)

sporadically, less than once a year since the inception of the Funds.

As stated above, the Managers are alleged to have owed the unitholders a contractual duty to provide regular financial reports. Of course, concomitant to the duty to provide information is the duty that such information not be false or misleading. In other words, the defendants had a contractual duty to provide the information in good faith. The complaints allege that the Managers failed to provide reports when they were contractually obligated to do so, and that, when they did provide the reports, they were false and misleading. Specifically, the plaintiffs argue that the Managers failed to disclose certain material information-the Non-Disclosure Allegations and the withdrawals.

These allegations, if proven, are sufficient to support a claim for breach of contract. Therefore, this claim survives the motion to dismiss.

### C. Fraud (Count 3)

The plaintiffs' third claim is for fraud. Common law fraud in Delaware requires that: (1) the defendant made a false representation, usually one of fact; (2) the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; (3) the defendant had the intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or did not act in justifiable reliance on the representation; and (5) the plaintiff suffered damages as a result of such reliance.FN22 In addition to overt representations, where there is a fiduciary relationship, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.FN23 Fraud claims are subject to the heightened pleading standards of Rule 9(b). This means that the pleading must identify the "time, place and contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby."FN24

> FN22. Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1074 (Del.1983).

> FN23. Id.

> FN24. York Linings v. Roach, 1999 Del. Ch. LEXIS 160, at *25 (Del. Ch. July 28, 1999). (internal quotations and citations omitted).

The plaintiffs argue that the defendants committed fraud by failing to disclose material information which they had a contractual and fiduciary duty to disclose, specifically the Non-Disclosure Allegations. Obviously, this claim (resting principally on alleged omissions) is merely a rehash of Count 1's claim of breach of fiduciary duty and Count 5's claim for breach of contract. It does not independently support a claim for relief. Moreover, the plaintiffs fail to plead with particularity what the defendants obtained through their alleged fraud. The plaintiffs plead generally that the Managers received management fees based on the amount of money that the Funds had under management, thereby giving them an incentive to keep money in the Funds. But the plaintiffs' arguments on this score are inherently contradictory. While they argue that the defendants had an incentive to keep money in the Funds to earn great management fees, they also argue that the Managers wrongfully allowed withdrawals, thereby reducing the amount of money they had under management. Are the withdrawals also part of the alleged fraud?

*8 For the above reasons, the plaintiffs have failed to adequately state a claim for fraud. Therefore, Count 3 will be dismissed without prejudice to the claims asserted in Count 1 or Count 5.

### D. Gross Negligence (Count 7)

The plaintiffs' fourth claim is for gross negligence. Both of the Funds' Partnership Agreements contain an exculpatory provision, limiting the liability of the Managers for losses the unitholders incurred with respect to the Funds. Except for misrepresentation or breach of the Partnership Agreements, the General Partners of the Funds (AB Management for Fund I and DCIP for Fund II), and those who perform service on their behalf, are not liable to the unitholders, unless their conduct constituted "gross negligence or intentional misconduct."FN25 As such, the unitholders are forced to argue that the Managers' alleged

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 9
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
(Cite as: Not Reported in A.2d)

misconduct amounted to gross negligence.

FN25. Partnership Agreements § 3.5.

First, as discussed above, the allegations of the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals do not state a claim for gross negligence. Second, also as stated above, claims for breach of the duty of care are predicated on concepts of gross negligence. The court has already found that the plaintiffs' claim for breach of the duty of care survive the motion to dismiss. Therefore, this claim survives as well.

### E. Unjust Enrichment (Count 8)

The plaintiffs, in the alternative, plead both a claim for breach of contract and a claim for unjust enrichment. In some circumstances, alternative pleading allows a party to seek recovery under theories of contract or quasi-contract. This is generally so, however, only when there is doubt surrounding the enforceability or the existence of the contract. Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls.[FN26] It is undisputed that a written contract existed between the unitholders and the defendants. The Partnership Agreements for the Funds spelled out the relationship between the parties, and the plaintiffs specifically brought claims based on these contracts.

FN26. *Rossdeutscher v. Viacom, Inc.,* 768 A.2d 8, 24 (Del.2001) (applying New York law); *ID Biomedical Corp. v. TM Tech., Inc.,* 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995) (applying Delaware law).

Notwithstanding the existence of these contractual relationships, the plaintiffs make the bald claim that the Managers were unjustly enriched at the unitholders expense. This is insufficient to state a claim for unjust enrichment, when the existence of a contractual relationship is not controverted. Thus, this claim must be dismissed.

### F. Agency Liability (Count 11)

The plaintiffs also bring claims against Deustche

Bank and DBSI (as controlling persons of AB Management) based on agency liability. A parent corporation can be held liable for the acts of its subsidiary under either of two theories of agency liability. The first is where "piercing the corporate veil" is appropriate. While many factors are considered in deciding whether to pierce the corporate veil, "the concept of complete domination by the parent is decisive."[FN27]

FN27. *Phoenix Canada Oil Co. v. Texaco, Inc.,* 842 F.2d 1466, 1477 (3d Cir.1988).

**\*9** Second, while one corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company, a corporation-completely independent of a second corporation-may assume the role of the second corporation's agent in the course of one or more specific transactions. This restricted agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting. Under this second theory, total domination or general alter ego criteria need not be proven.[FN28]

FN28. *Id.* (citing Restatement (Second) of Agency § 14M, cmt. (a) (1958)).

With respect to DBSI, the plaintiffs argue that AB Management was dominated and controlled by DBSI. In essence, the plaintiffs ask the court to disregard AB Management's corporate form[FN29] and impose liability on DBSI. The complaints allege that: (i) DBSI and AB Management operate out of the same Maryland office; (ii) AB Management, although incorporated, has no functioning board of directors and no business other than the management of the Funds; (iii) AB Management is run by its Management Committee, which is comprised of employees and executives of DBSI; (iv) DBSI provided margin accounts for the Funds; and (v) DBSI served as the placement agent and custodian for the Funds' accounts.[FN30]

FN29. AB Management is a corporation, organized under the laws of Maryland.

FN30. Fund I Compl. ¶¶ 44, 45, 247, 250, 332, 334; Fund II Compl. ¶¶ 54, 179,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 10
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
(Cite as: Not Reported in A.2d)

253-259.

"Persuading a Delaware Court to disregard the corporate entity is a difficult task. The legal entity of a corporation will not be disturbed until sufficient reason appears." [FN31] Allegations (i), (iv) and (v) above, while consistent with an obviously close relationship between DBSI and its wholly owned subsidiary, do not alone or together support any inference that would lead this court to disregard the separate legal existence of AB Management; nor does the allegation that AB Management's business is run by DBSI employees. However, the well pleaded factual allegation that AB Management has "no functioning board of directors," when viewed most favorably to the plaintiffs in light of the other facts alleged, if proven, could provide a basis to conclude that the corporate form should be ignored. The corporate veil may be pierced where a subsidiary is in fact a mere instrumentality or alter ego of its parent. [FN32] The complaints allege that AB Management does not have board meetings or follow other corporate formalities. Instead, employees of DBSI allegedly perform the activities that, in a properly functioning corporation, the board of directors would perform. If these facts are true and the other relationships are shown to exist, an adequate basis for piercing the corporate veil could be established. Therefore, this claim against DBSI cannot be dismissed.

> FN31. *Mason v. Network of Wilmington, Inc.,* 2005 Del. Ch. LEXIS 99, at *9 (Del. Ch. July 1, 2005) (internal quotations omitted).

> FN32. *Mabon, Nugent & Co. v. Texas Amer. Energy Corp.,* 1990 Del. Ch. LEXIS 46, at *14-*15 (Del. Ch. Apr. 12, 1990); *Phoenix Canada Oil,* 842 F.2d at 1477.

The complaints make additional allegations as to why AB Management is a mere agent of Deutsche Bank. These are: (i) Deutsche Bank purchased Alex. Brown, Inc. (the parent company of AB Management) thereby acquiring 100% ownership of AB Management; (ii) Deutsche Bank changed the name of the Funds the reflect the "Deutsche Bank" name; (iii) when the liquidity crisis became acute, the Man-

agement Committee decided that it needed to alert officials at Deutsche Bank; and (iv) in July of 2002, Deutsche Bank fired all the members of the Management Committee. [FN33]

> FN33. Fund I Compl. ¶¶ 153, 163, 239-240; Fund II Compl. ¶¶ 179, 253-259.

*10 First, these factual allegations do not give rise a reasonable inference that Deutsche Bank dominated and controlled AB Management and the Management Committee. These factual allegations show little more than Deutsche Bank owned the parent company of AB Management and, indirectly, AB Management itself. Ownership alone is not sufficient proof of domination or control. [FN34] The complaints allege that Deutsche Bank bought AB Management in June of 1999 and changed its name a few months later. The complaints do not allege any action by Deutsche Bank to influence or control the management of the Funds until July of 2002, when it fired the majority of the Management Committee. From these bare factual allegations, the court simply cannot infer domination or control.

> FN34. *Aronson,* 473 A.2d at 815; *see also In re W. Nat'l S'holders Litig.,* 2000 Del. Ch. LEXIS 82, (Del. Ch. May 22, 2000) (holding that a 46% shareholder does not control or dominate the board due to stock ownership alone).

Second, these factual allegations do not give rise a reasonable inference that, in the managing and/or sale of the Funds, AB Management and the Management Committee were Deutsche Bank's agent. Under the rubric of agency liability, there are two main theories-actual authority and apparent authority. Because the plaintiffs do not describe which theory of liability they assert, the court addresses both.

Actual authority is that authority which a principal expressly or implicitly grants to an agent. [FN35] There is simply no allegation in the complaints that Deutsche Bank expressly gave either AB Management or the Management Committee the authority to bind it as its agent.

> FN35. *Billops v. Magness Constr. Co.,* 391

Case 4:06-cv-05255-SBA     Document 46-2     Filed 10/24/2006     Page 12 of 19

Not Reported in A.2d                                                                    Page 11
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

A.2d 196, 197 (Del.1978).

Apparent authority is that authority which, though not actually granted, the principal knowingly or negligently permits an agent to exercise, or which he holds him out as possessing.[FN36] In order to hold a defendant liable under apparent authority, a plaintiff must show reliance on indicia of authority originated by principal, and such reliance must have been reasonable.[FN37] The plaintiffs have not alleged any facts showing that Deutsche Bank held out either AB Management or the Management Committee as its agent; nor have the plaintiffs alleged facts from which the court can reasonably infer reliance.

> FN36. *Henderson v. Chantry*, 2002 Del. Ch. LEXIS 14, at *14 (Del. Ch. Feb. 5, 2002).

> FN37. *Billops*, 391 A.2d at 198.

For the above reasons, the plaintiffs have failed to plead sufficient facts to support a claim for agency liability against Deutsche Bank and Count 11 against Deutsche Bank must be dismissed. However, the plaintiffs plead sufficient facts to support a claim for liability against DBSI. Therefore, Count 11 against DBSI will not be dismissed.

### G. Conspiracy, Aiding And Abetting Fraud, And Breach Of Fiduciary Duty (Count 2, 4, & 9)

The plaintiffs allege that the defendants conspired to commit fraud and to commit a breach of fiduciary duty. The elements for civil conspiracy under Delaware law are: (i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) damages resulting from the action of the conspiracy parties.[FN38] While the plaintiffs caption their claim as aiding and abetting breach of fiduciary duty, the court treats it as a claim for civil conspiracy. Claims for civil conspiracy are sometimes called aiding and abetting.[FN39] However, the basis of such a claim, regardless of how it is captioned, is the idea that a third party who *knowingly* participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship.[FN40]

> FN38. *AeroGlobal Capital Mgmt., LLC v.*

*Cirrus Indus.*, 871 A.2d 428, 437 n.8 (Del.2005); *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149-50 (Del.1987).

> FN39. *See Benihana of Tokyo, Inc. v. Benihana, Inc.*, 2005 Del. Ch. LEXIS 19, at *26 (Del. Ch. Feb. 28, 2005).

> FN40. *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1057 (Del. Ch.1984), *aff'd*, 575 A.2d 1131 (Del.1990).

**\*11** However captioned, civil conspiracy is vicarious liability.[FN41] It holds a third party, not a fiduciary, responsible for a violation of fiduciary duty.[FN42] Therefore, it does not apply to the defendants which owe the unitholders a direct fiduciary duty. Instead, the plaintiffs attempt to hold Deutsche Bank and DB-SI responsible for the Managers' alleged breaches of fiduciary duty.

> FN41. *See, e.g., Parfi Holding AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1238 (Del. Ch.2001) ("Civil conspiracy thus provides a mechanism to impute liability to those not a direct party to the underlying tort."), *rev'd on other grounds*, 817 A.2d 149 (Del.2002).

> FN42. *Gilbert*, 490 A.2d at 1057.

The defendants argue that the plaintiffs have not adequately alleged that Deustche Bank and DBSI had knowledge of the alleged wrongful acts, the breach of fiduciary duty and fraud. Where a complaint alleges fraud or conspiracy to commit fraud, the Rules of this court call for a higher pleading standard, requiring the circumstances constituting the fraud or conspiracy to "be pled with particularity."[FN43] While Rule 9(b) provides that "knowledge ... may be averred generally," where pleading a claim of fraud or breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this "something" was knowable and that the defendant was in a position to know it.[FN44]

> FN43. *Atlantis Plastics Corp. v. Sammons,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 4:06-cv-05255-SBA     Document 46-2     Filed 10/24/2006     Page 13 of 19

Not Reported in A.2d                                                    Page 12
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
(Cite as: Not Reported in A.2d)

558 A.2d 1062, 1066 (Del. Ch.1989) (citing Rule 9(b), which states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").

FN44. *IOTEX Communs., Inc. v. Defries,* 1998 Del. Ch. LEXIS 236, at *12–*13 (Del. Ch. Dec. 21, 1998).

Furthermore, Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal. FN45 With respect to DBSI, the complaints allege repeatedly that its employees, acting within the scope of their employment, had knowledge of the underlying factual allegations. Specifically, the complaints allege that the Funds were run by the Management Committee, all the members of which were employees of DBSI. FN46 This knowledge is thereby imputed to DBSI.

FN45. *J.I. Kislak Mtg. Corp. v. William Matthews Bldr., Inc.,* 287 A.2d 686, 689 (Del.Super.1972), *aff'd,* 303 A.2d 648 (Del.1972).

FN46. Fund I Compl. ¶¶ 45, 47-51, 247-251; Fund II Compl. ¶¶ 55, 57-61, 261-266.

With respect to Deutsche Bank, the plaintiffs allege that AB Management and the Management Committee are mere agents of Deutsche Bank. However, as discussed above, the factual allegations in the complaints are insufficient to infer that AB Management and the Management Committee are the agents of Deutsche Bank.

For the above reasons, the court holds that the plaintiffs have not adequately pleaded facts that, if proven, would support an inference that Deustche Bank had knowledge of the alleged wrongful acts, the breach of fiduciary duty and fraud. The plaintiffs have adequately pleaded that DBSI had knowledge of the alleged wrongful acts. Therefore, with respect to Deutsche Bank, Counts 2, 4, and 9 must be dismissed. With respect to DBSI, these counts will not be dismissed.

*H. Accounting (Count 10)*

The plaintiffs' tenth claim is for an accounting. An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be due to either as a result. FN47 As it is a remedy, should the plaintiffs ultimately be successful on one or more of their claims, the court will address their arguments for granting an accounting.

FN47. *Jacobson v. Dryson Acceptance Corp.,* 2002 Del. Ch. LEXIS 4, at *12–*13 (Del. Ch.2002).

V.

The defendants argue that several of the claims in the complaints are derivative and that, since the plaintiffs did not make demand upon the Funds, and demand was not excused, these claims should be dismissed pursuant to Rule 23.1. FN48

FN48. The claims that the defendants contend are derivative are as follows: breach of fiduciary duty (Count 1), aiding and abetting breach of fiduciary duty (Count 2), breach of contract (Count 5), breach of the covenant of good faith (Count 6), gross negligence (Count 7), unjust enrichment (Count 8), accounting (Count 10), and agency liability (Count 11). As the court has already dismissed the claim for unjust enrichment (Count 8) and agency liability as to Deutsche Bank (Count 11), and deferred granting the equitable remedy of an accounting (Count 10), it will not discuss those claims here.

*12 The demand requirement in the limited partnership context is codified in 6 *Del. C.* § 17-1001. That statute states:

A limited partner or an assignee of a partnership interest may bring an action in the Court of Chancery in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 13
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

Likewise, the determination of whether a claim is derivative or direct in nature is substantially the same for corporate cases as it is for limited partnership cases.[FN49] Accordingly, throughout this decision, the court relies on corporate as well as partnership case law for its determination of this lawsuit's nature.

> FN49. *Litman v. Prudential-Bache Prop., Inc.,* 611 A.2d 12, 15 (Del. Ch.1992).

The Delaware Supreme Court's recent decision in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.* revised the standard for determining whether a claim is direct or derivative. Now, the determination "turn[s] solely on the following questions: (i) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (ii) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[FN50] "[U]nder *Tooley,* the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint."[FN51] "Instead the court must look to all the facts of the complaint and determine for itself whether a direct claim exists."[FN52]

> FN50. 845 A.2d 1031, 1033 (Del.2004).

> FN51. *In re Syncor Int'l Corp. S'holders Litig.,* 857 A.2d 994, 997 (Del. Ch.2004).

> FN52. *Dieterich v. Harrer,* 857 A.2d 1017, 1027 (Del. Ch.2004).

As they are factually distinct, the court deals with the claims separately. First, the court addresses the claims for breach of contract and the breach of fiduciary duty based on the Non-Disclosure Allegations. Second, the court addresses the claims for gross negligence and failing to provide active and competent management, and the fiduciary duty claims based thereon.

### A. Breach Of Contract And The Non-Disclosure Allegations

The claims for breach of contract and the claims for breach of fiduciary duty based on the Non-Disclosure Allegations are direct. First, the unitholders, not the partnerships, suffered the alleged harm. In order to show a direct injury under *Tooley,* a unitholder "must demonstrate that the duty breached was owed to the [unitholder] and that he or she can prevail without showing an injury to the [partnership]."[FN53] The gravamen of these claims is that the Managers failed to disclose material information when they had a duty to disclose it and made other misleading or fraudulent statements, in violation of their contractual and fiduciary duties. Generally, non-disclosure claims are direct claims.[FN54] Moreover, the partnerships were not harmed by the alleged disclosure violations. Any harm was to the unitholders, who either lost their opportunity to request a withdrawal from the Funds from the Managers, or to bring suit to force the Managers to redeem their interests.

> FN53. *Tooley,* 845 A.2d at 1039.

> FN54. *See, e.g., Dieterich,* 857 A.2d at 1029 (characterizing non-disclosure claims as direct claims); *Abajian v. Kennedy,* 1992 Del. Ch. LEXIS 6, at *10 (Del. Ch. Jan. 17, 1992) (same).

**\*13** Second, the unitholders would receive any recovery, not the Funds. Under the second prong of *Tooley,* in order to maintain a direct claim, stockholders must show that they will receive the benefit of any remedy.[FN55] While the best remedy for a disclosure violation is to force the partnership to disclose the information, due to the passage of time since the alleged wrongdoing, that remedy would likely be inadequate. In order to compensate the unitholders for their alleged harm, the court may find it appropriate to grant monetary damages. Such damages would be awarded to the unitholders, and not the partnerships.

> FN55. *Tooley,* 845 A.2d at 1033.

For all of the above reasons, the court concludes that the claims based on the Non-Disclosure Allegations and the alleged breach of contract are direct claims and, thus, demand was not required.

### B. Gross Negligence And Failure To Provide Competent And Active Management

Not Reported in A.2d                                                                        Page 14
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
(Cite as: Not Reported in A.2d)

The claims for gross negligence and failure to provide competent and active management are clearly derivative. First, as stated above, in order to show a direct injury under *Tooley,* a unitholder "must demonstrate that the duty breached was owed to the [unitholder] and that he or she can prevail without showing an injury to the [partnership]."[FN56] The gravamen of these claims is that the Managers devoted inadequate time and effort to the management of the Funds, thereby causing their large losses. Essentially, this a claim for mismanagement, a paradigmatic derivative claim.[FN57] The Funds suffered any injury that resulted from the Managers' alleged inattention. Any injury that the unitholders suffered is derivative of the injury to the Funds.

> FN56. *Tooley,* 845 A.2d at 1039.

> FN57. *See, e.g., Kramer v. W. Pac. Indus., Inc.,* 546 A.2d 348, 353 (Del.1988) ("A claim of mismanagement ... represents a direct wrong to the corporation that is indirectly experienced by all shareholders. Any devaluation of stock is shared collectively by all the shareholders, rather than independently by the plaintiff or any other individual shareholder. Thus, the wrong alleged is entirely derivative in nature.").

Second, the Funds, not the unitholders, would receive any recovery. Again, under the second prong of *Tooley,* in order to maintain a direct claim, stockholders must show that they will benefit from the remedy.[FN58] If the court finds that the Managers violated their fiduciary duties by failing to devote adequate time and effort to managing the Funds, any recovery would go to the party harmed, namely the Funds. Thus, these claims are derivative claims.

> FN58. *Tooley,* 845 A.2d at 1033.

If a party brings derivative claims without first making demand, and demand is not excused, those claims must be dismissed.[FN59] In this case, the plaintiffs have not alleged that they made demand on the Fund, nor have they alleged why demand should be excused. Accordingly, the derivative claim must be dismissed. However, in the interest of justice, the court dismisses these claims with leave to replead.[FN60]

> FN59. *Haber v. Bell,* 465 A.2d 353, 357 (Del. Ch.1983).

> FN60. In a letter to the court, the plaintiffs stated that AB Management sent letters to all the unitholders of the Funds (the "Redemption Letters"), stating that the Managers would allow the unitholders to redeem their units and that the Managers are pursuing the dissolution of the Partnerships. The plaintiffs argue that the Redemption Letters bolster their contention that their claims are direct, not derivative. However, the complaints do not contain the information in the Redemption Letters and the Redemption Letters are not referenced in the complaints. Therefore, these documents are not properly before the court on a Rule 12(b)(6) motion.

## VI.

The DCIP Defendants argue that, with respect to the Fund I Complaint, this court lacks personal jurisdiction over them. With respect to the Fund II Complaint, they argue that this court lacks personal jurisdiction over Crants and Devlin.[FN61]

> FN61. DCIP is the General Partner of Fund II. As such, there is no dispute that the court has personal jurisdiction over DCIP viz. Fund II. *See RJ Assocs. v. Health Payors' Org. Ltd. P'ship.,* 1999 Del. Ch. LEXIS 161, at *12 (Del. Ch. July 16, 1999) (quoting 6 Del. C. § 17-109(a) and holding that, as a matter of law, by accepting the position of general partner, a corporation consents to be subjected to a Delaware court's jurisdiction if the limited partnership has chosen to incorporate under Delaware law).

In support of their Rule 12(b)(2) motion, the DCIP Defendants adduced affidavits of both Devlin and Crants. The plaintiffs have not adduced any affidavits rebutting the Devlin and Crants affidavits, nor have they asked to take discovery. Instead, they have decided to rely on the well-pleaded allegations in their complaint. Moreover, since they have not been rebut-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                           Page 15
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

ted, the court must take as true the facts contained in the Devlin and Crants affidavits. However, where the well-pleaded allegations in the complaints are not rebutted by affidavit, the court will, for the purposes of this <u>Rule 12(b)(2)</u> motion, assume the truthfulness of those allegations.[FN62]

> FN62. *See <u>Hart Holding Co. v. Drexel Burnham Lambert, Inc.,</u> 593 A.2d 535, 539 (Del. Ch.1991)* (citing *<u>Marine Midland Bank, N.A. v. Miller,</u> 664 F.2d 899, 904 (2nd Cir.1981)*) (stating that a trial court is vested with broad discretion in shaping the procedure by which a motion under <u>Rule 12(b)(2)</u> is resolved).

**\*14** According to the Devlin and Crants affidavits, DCIP is a Tennessee limited liability company, with its principal place of business in Nashville, Tennessee. Both Crants and Devlin are residents of Tennessee and perform the vast majority of their duties from their office in Nashville. Neither Crants nor Devlin recall ever traveling to Delaware. None of the DCIP Defendants solicit any business in Delaware or engage in any regular conduct with Delaware.

When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the nonresident defendant.[FN63] In determining whether it has personal jurisdiction over a nonresident defendant, the court will generally engage in a two-step analysis. First, was service of process on the nonresident authorized by statute? Second, does the exercise of jurisdiction, in the context presented, comport with due process?[FN64]

> FN63. *See <u>Plummer & Co. Realtors v. Crisafi,</u> 533 A.2d 1242, 1244 (Del.Super.1987); see also <u>Finkbiner v. Mullins,</u> 532 A.2d 609, 617 (Del.Super.1987)* (stating that, on a <u>Rule 12(b)(2)</u> motion, "the burden is on the plaintiff to make a specific showing that this Court has jurisdiction under a long-arm statute.") (citing *<u>Greenly v. Davis,</u> 486 A.2d 669 (Del.1984)*).

> FN64. *<u>LaNuova D & B, S.P.A. v. Bowe Co.,</u> 513 A.2d 764, 768 (Del.1986)*.

### A. The Long-Arm Statute

The plaintiffs argue that the court has personal jurisdiction over the DCIP Defendants under <u>10 Del. C. § 3104</u>, the Delaware long-arm statute. <u>Section 3104(c)</u> provides, in relevant part: "As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident ... who ... (1) Transacts any business or performs any character of work or service in the State ... [or] (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State...." <u>Section 3104</u> has been broadly construed to confer jurisdiction to the maximum extent possible under the due process clause.[FN65] Furthermore, when *in personam* jurisdiction is challenged on a motion to dismiss, the record is construed most strongly against the moving party.[FN66]

> FN65. *Id.*

> FN66. *RJ Assocs.,* 1999 Del. Ch. LEXIS 161, at *13.

The complaints lay out detailed allegations of the connections between the DCIP Defendants and the Funds. The Funds were established as Delaware limited partnerships and are governed by Delaware law. DCIP is the Sub-Advisor of Fund I and the General Partner and Sub-Advisor of Fund II. Crants and Devlin are the managing members and owners of DCIP. DCIP acts principally through Crants and Devlin. The PPMs touted the DCIP Defendants' experience and qualifications in order to sell units in the Funds.

The PPMs also state that DCIP is responsible for the day-to-day management of the Funds. DCIP, in the persons of Crants and Devlin, attended every meeting of the Management Committee (none of which took place in Delaware). Also, DCIP, which acted through Crants and Devlin, was primarily responsible for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 16
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
(Cite as: Not Reported in A.2d)

choosing the securities included in the Funds.

In *RJ Associates,* Justice (then-Vice Chancellor) Jacobs held that this court could exercise personal jurisdiction over a limited partner in a Delaware limited partnership under Section 3104(c)(1). Justice Jacobs held that the following three contacts, taken together, were sufficient to constitute "transacting business" under the Delaware long-arm statute: (i) the limited partner participated in the formation of the limited partnership, (ii) the limited partnership indirectly participated in the limited partnership's management by 'controlling' the general partner, and (iii) the limited partner caused the Partnership Agreement to be amended to alter the method of distributions to the partners.[FN67]

> [FN67.] *RJ Assocs.,* 1999 Del. Ch. LEXIS 161, at *18.

*15 The operative facts of this case, as alleged in the complaints, are similar to those in *RJ Associates.* First, DCIP participated in the formation of the Funds. In fact, DCIP was primarily responsible for selecting the initial securities accepted by the Funds.[FN68] Second, DCIP not only participated in the management of the Funds, DCIP was primarily responsible for the management of the Funds. The PPMs state that "the Sub-Advisor will provide day-to-day management and administration of the Fund and investment advisory services, including, among other matters, the screening of contributed securities, advice regarding the selection of the illiquid Assets and hedging and borrowing strategies."[FN69] Finally, DCIP received millions of dollars in fees to manage the two Delaware entities.

> [FN68.] *See* Fund I Compl. ¶ 71; Fund II Compl. ¶¶ 82, 241.

> [FN69.] Fund I PPM at 3-4, Fund II PPM at 3.

With respect to Crants and Devlin, the complaints allege that they are the owners and managing partners of DCIP. The complaints further allege that DCIP only acts through Crants and Devlin. In essence, the complaints allege that it was Crants and Devlin who selected the securities for the Funds, and managed the Funds on a day-to-day basis.

The court finds that these contacts are sufficient to constitute "transacting business" under the long-arm statute.

### B. *Due Process*

The focus of a minimum contacts inquiry is whether a nonresident defendant engaged in sufficient minimum contacts with the State of Delaware to require it to defend itself in the courts of the state consistent with the traditional notions of fair play and justice.[FN70] In order to establish jurisdiction over a nonresident defendant, the nonresident defendant's contacts with the forum must rise to such a level that it should reasonably anticipate being required to defend itself in Delaware's courts.[FN71] The minimum contacts which are necessary to establish jurisdiction must relate to some act by which the defendant has deliberately created obligations between itself and the forum.[FN72] Consequently, the defendant's activities are shielded by the benefits and protection of the forum's laws and it is not unreasonable to require it to submit to the forum's jurisdiction.[FN73]

> [FN70.] *AeroGlobal,* 871 A.2d at 440 (citing *Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945)).

> [FN71.] *Id.*

> [FN72.] *Sternberg v. O'Neil,* 550 A.2d 1105, 1120 (Del.1988).

> [FN73.] *Id.; see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (U.S.1985) (requiring "purposeful availment" of the benefits of the state's laws to satisfy the minimum contacts test).

In addition to the contacts outlined above that the complaints allege between DCIP Defendants and the Funds, the plaintiffs also allege that the DCIP Defendants enjoyed the benefits of Delaware law. They claim that the DCIP Defendants have received millions of dollars in fees for managing the Delaware partnerships and are entitled to claim limited liability under the terms of the Partnership Agreements, which established the Funds and limit the DCIP Defendants' liability to cases of gross negligence.[FN74]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 4:06-cv-05255-SBA    Document 46-2    Filed 10/24/2006    Page 18 of 19

Not Reported in A.2d                                                                    Page 17
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

FN74. Partnership Agreements § 3.5.

In *RJ Associates,* Justice Jacobs found that the following contacts were sufficient to satisfy due process: (i) the limited partner took an active role in establishing the Delaware Partnership; (ii) the limited partner owned a 50% interest in the partnership's general partner, and appointed four of the general partner's seven board members; (iii) the limited partner received 49 .5% of the partnership's cash flow distributions; (iv) the limited partner allegedly controlled the partnership; (v) the limited partner allegedly caused the partnership agreement to be amended under Delaware law to change the agreed-upon cash flow distribution payments to the limited partners; and (vi) the limited partner agreed to a Delaware choice of law provision in the partnership agreement.FN75

FN75. *RJ Assocs.,* 1999 Del. Ch. LEXIS 161, at *19-*20.

**\*16** While not exactly the same, the contacts that DCIP has with Delaware are substantially similar to those in *RJ Associates.* DCIP took part in the formation of the Funds, two Delaware entities. DCIP managed the Funds on a day-to-day basis and received millions of dollars in fees for doing so. In addition, the Partnership Agreements which established the Funds limited the DCIP Defendants' liability to cases of gross negligence.FN76 They have, thereby, benefited by expressly limiting their liability under Delaware law. Given all of these contacts, DCIP should have reasonably expected to be haled before the courts in Delaware.

FN76. Partnership Agreements § 3.5.

Crants and Devlin also should have reasonably expected to be haled before the courts of this state. As stated above, the complaints allege that DCIP could only act through Crants and Devlin. All the actions attributed to DCIP were really performed by them. Moreover, in the case of Fund II, Crants and Devlin are alleged to be the managing partners of the general partner of a Delaware limited partnership. In the case of Fund I, Crants and Devlin are alleged to have managed a Delaware limited partnership, despite the fact that DCIP is not that entity's general partner.

In *In re USACafes,* former Chancellor Allen found that the directors of a corporation that was the general partner of a Delaware limited partnership were subject to the jurisdiction of this state's courts, due to their positions with the general partner .FN77 Chancellor Allen focused on the important state interest that Delaware has in regulating entities created under its laws, and how that interest could only be served by exercising jurisdiction over those who managed the Delaware entity.

FN77. 600 A.2d 43, 52 (Del. Ch.1991).

The relationship between the General Partner and the limited partners was created by the law of Delaware. The state empowered defendants to act, and this state is obliged to govern the exercise of that power insofar as the issues of corporate power and fiduciary obligation are concerned. These factors bear importantly on the fairness of exercising supervisory jurisdiction at this point in the relationship of the various parties. The wrongs here alleged are not tort or contract claims unconnected with the internal affairs or corporate governance issues that Delaware law is especially concerned with.FN78

FN78. *Id.*

Likewise, the wrongs alleged in this case go essentially to the management of a Delaware limited partnership. The DCIP Defendants voluntarily undertook to mange the Funds and received millions of dollars in compensation for doing so. Now, limited partners in the Delaware entity seek to hold them accountable for alleged wrongs they committed. It is both necessary and proper for the courts of this state to ensure that the managers of a Delaware entity are held responsible for their actions in managing the Delaware entity. When a person manages a Delaware entity, and receives substantial benefit from doing so, he should reasonably expect to be held responsible for his wrongful acts relating to the Delaware entity in Delaware.FN79

FN79. *See Assist Stock Mgmt. L.L.C. v. Rosheim,* 753 A.2d 974, 975 (Del. Ch.2000) ("When nonresidents agree to serve as dir-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 4:06-cv-05255-SBA     Document 46-2     Filed 10/24/2006     Page 19 of 19

Not Reported in A.2d                                                          Page 18
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

ectors or managers of Delaware entities, it is only reasonable that they anticipate that ... they will be subject to personal jurisdiction in Delaware courts.").

**\*17** For the above reasons, the court concludes that it has personal jurisdiction over the DCIP Defendants in both cases. Therefore, the DCIP Defendants' motion to dismiss pursuant to Rule 12(b)(2) must be denied.

### VII.

For the above reasons, the defendants' motion to dismiss is GRANTED in part and DENIED in part. The defendants are directed to submit a form of order, on notice, within 10 days.

Del.Ch.,2005.
Albert v. Alex. Brown Management Services, Inc.
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267

Briefs and Other Related Documents (Back to top)

• 2005 WL 850324 (Trial Motion, Memorandum and Affidavit) DC Investment Partners, LLC's, D. Robert Crants, III's and Michael W. Devlin's Reply Brief in Support of Their Motion to Dismiss Plaintiffs' Complaint (Mar. 18, 2005)
• 2005 WL 850325 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Motion to Dismiss of Defendants Alex. Brown Management Services, Inc., Deutsche Bank Securities, Inc., and Deutsche Bank, AG (Mar. 18, 2005)
• 2005 WL 850387 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answering Brief in Opposition to Defendants' Motions to Dismiss (Mar. 8, 2005)
• 2005 WL 850386 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answering Brief in Opposition to Defendants' Motions to Dismiss (Mar. 7, 2005)
• 2005 WL 418240 (Trial Motion, Memorandum and Affidavit) Opening Brief of Defendants Alex. Brown Management Services, Inc., Deutsche Bank Securities, Inc. and Deutsche Bank A.G. in Support of Their Motion to Dismiss (Jan. 25, 2005)
• 2005 WL 418241 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of DC Investment Partners, LLC, Doctor Robert Crants, III

and Michael W. Devlin's Motion to Dismiss Plaintiffs' Complaint (Jan. 25, 2005)
• 2005 WL 418242 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of DC Investment Partners, LLC, D. Robert Crants, III and Michael W. Devlin's Motion to Dismiss Plaintiffs' Complaint (Jan. 25, 2005)
• 2005 WL 418243 (Trial Motion, Memorandum and Affidavit) Opening Brief of Defendants Alex. Brown Management Services, Inc., Deutsche Bank Securities Inc. and Deutsche Bank A.G. in Support of Their Motion to Dismiss (Jan. 25, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 33953501 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Briefs and Other Related Documents

Blackin v. Red Brick Systems, Inc.N.D.Cal.,1999.Only the Westlaw citation is currently available.

United States District Court,N.D. California.
Rob BLACKIN, et al., Plaintiffs,
v.
RED BRICK SYSTEMS, INC., et al., Defendants.
No. C 98-1206 MJJ.

April 30, 1999.

Darren J. Robbins, Milberg Weiss Bershad Hynes & Lerach LLP, Edward M. Gergosian, Stephen R. Basser, Barrack Rodos & Bacine, Karen L. Thomas, San Diego, CA, Leonard Barrack, Gerald J. Rodos, Barrack Rodos & Bacine, Todd S. Collins, Jacob A. Goldberg, Berger & Montague, P.C., Philadelphia, PA, Marian Rosner, Robert C. Finkel, Patricia I. Avery, Wolf Popper LLP, New York, NY, William S. Lerach, Reed R. Kathrein, Lisa C. Atkinson, Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA, for Plaintiffs.

Laurie B. Smilan, Steven M. Schatz, Ignacio E. Salceda, Wilson Sonsini Goodrich & Rosati, Rachael E. Meny, Brobeck Phleger & Harrison, Palo Alto, CA, Tower C. Snow, Kevin P. Muck, John Missing, Holly S. Haskew, Brobeck Phleger & Harrison LLP, San Francisco, CA, for Defendants.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

JENKINS, J.

*1 Defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) was heard on April 27, 1999. The court has read the moving and responding papers and heard the oral argument of counsel. For the reasons set forth below, the court grants defendants' motion to dismiss with leave to amend.

I. BACKGROUND

On September 2, 1998, plaintiffs filed their Amended Complaint in this class action alleging violation of the federal securities laws.[FN1] In their Amended Complaint plaintiffs allege that during the class period, January 15, 1997 through April 15, 1997, defendants [FN2] "perpetrated a scheme to inflate Red Brick's stock price by issuing materially false and misleading public statements about the Company's operations and financial results." Amended Complaint ("AC") ¶ 1.

> FN1. Specifically, plaintiffs allege that defendants have violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Exchange Commission Rule 10b-5.

> FN2. Plaintiffs have named the following defendants in this action: Red Brick Systems, Inc. ("Red Brick"), Christopher G. Erickson ("Erickson"), Robert C. Hausmann ("Hausmann"), John F. Shoch ("Shoch"), Phillip M. Fernandez ("Fernandez") and Thomas W. Henn ("Henn").

Red Brick designs, develops and markets "Red Brick Warehouse" a relational database management system software product. AC ¶ 13. Red Brick was founded in 1986 and is headquartered in Los Gatos, California. AC ¶ 13. Red Brick completed an initial public offering in January 1996. AC ¶ 32.

Plaintiffs allege that defendants misrepresented earnings for the fourth quarter and fiscal year ended December 31, 1996 by failing to reserve adequately for doubtful accounts receivable in violation of generally accepted accounting principles ("GAAP"). AC ¶ 2, 39, 44. Plaintiffs further allege that defendants violated GAAP by deferring expenses from the fourth quarter of 1996 into following quarters. AC ¶ 3, 39, 44. Plaintiffs also allege that defendants artificially inflated revenues by improperly "pulling in" sales, that is recording sales that had not yet been completed, in the fourth quarter of 1996. AC ¶ 5, 39, 44. As a result of these acts, plaintiffs allege that defendant Red Brick's 1996 Annual Report was misleading. AC ¶ 2.

Plaintiffs allege that company insiders took advant-

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 1999 WL 33953501 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

age of Red Brick's false financial statements by selling stock at inflated prices during the class period. AC ¶ 7. Plaintiffs assert that when defendants disclosed the allegedly misrepresented facts on April 15, 1997 Red Brick's stock fell to $6 3/8 per share which was 71 percent below its high during the class period. AC ¶ 7.

Plaintiffs allege that Erickson sold 20,000 shares during the class period, Hausmann sold 15,000 shares during the class period, Fernandez sold 49,500 shares during the class period and Henn sold 75,000 shares during the class period. AC ¶ 14(a), (b), (d), (e). Plaintiffs allege that Shoch was a general partner of AMC Partners 89 L.P. which is a general partner of Asset Management Associates which owned approximately 2.5 million shares of Red Brick and which distributed approximately 1.7 shares during the class period. AC ¶ 14(c).

## II. LEGAL STANDARDS

A court may dismiss a complaint pursuant to Rule 12(b)(6) for either lack of a cognizable legal theory or the pleading of insufficient facts under a cognizable legal theory. *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533-34 (9th Cir.1984). In ruling on a motion to dismiss the court must assume that plaintiff's allegations are true, must construe the complaint in the light most favorable to the plaintiff and must resolve any doubt in plaintiff's favor. *United States v. City of Redwood City,* 640 F.2d 963, 966 (9th Cir.1981). However, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *In re Verifone Sec. Litig.,* 11 F.3d 865, 868 (9th Cir.1993).

**\*2** Rule 9(b) provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Rule 9(b) applies to securities actions brought under section 10(b) and Rule 10b-5. *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1439 (9th Cir.1987). Additionally, there are strict pleading requirements for private actions filed under the federal securities laws. *See* Private Securities Litigation Reform Act ("Reform Act"), 15 U.S.C. § 78u. The Reform Act requires that

claims for securities fraud specify each false or misleading statement and why each statement is false or misleading. 15 U.S.C. § 78u-4(b)(1). Additionally, as to each act or omission, plaintiff must set forth the particular facts that give rise to a strong inference that defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2).

## III. ANALYSIS

A plaintiff bringing suit under section 10(b) and Rule 10b-5 "must prove that the defendant (1) made misstatements of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Kline v. First Western Government Securities, Inc.,* 24 F.3d 480, 487 (3rd Cir.1994). Furthermore, to state a claim for securities fraud, a plaintiff must plead with particularity the circumstances of the fraud, including statements made and an explanation as to why or how such statements are false or misleading. Fed. R. Civ. Proc. 9(b); *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir.1994)(en banc).

### A. *Alleged Statements or Omissions* [FN3]

> FN3. Because the court finds that plaintiffs have not adequately pled specific facts showing that the alleged statements or omissions were false, it does not reach the issue of scienter under the Reform Act at this time. Where plaintiffs have not adequately pled falsity, it is unnecessary to determine whether they have adequately pled scienter. *Polk v. Fritz,* No. 962712 MHP (N.D.Cal. Mar. 5, 1998).
> The court notes, however, that plaintiffs have filed a counter-motion to strike certain documents of which defendants' have requested judicial notice. The court denies plaintiffs' motion to strike as the documents of which defendants request judicial notice are the proper subject of judicial notice. Plaintiffs have also requested judicial notice of documents and defendants have opposed the request for judicial notice on the ground

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 33953501 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

that plaintiffs have inappropriately submitted further argument on the scienter issue in their request. The defendants do not oppose the taking of judicial notice of the documents themselves. Defendants also note that in their counter-motion to strike, plaintiffs make additional argument on the scienter issue. The court agrees. Plaintiffs may not circumvent the rules regarding page limits by filing additional documents containing argument that should have been included in their brief. Accordingly, the court will take judicial notice of the documents themselves but will not consider the additional argument submitted by plaintiffs in either the counter-motion to strike or the request for judicial notice.

Plaintiffs allege that "defendants concealed the fact that in or prior to January 1997, defendants caused Red Brick to shift emphasis and critical resources from sales to customer service." AC ¶ 38. They further allege that defendants "fixed upon a scheme to misrepresent the Company's results for its December 1996 quarter" and that defendants "materially mischaracterized Red Brick's fourth quarter 1996 results." AC ¶¶ 39, 42.

Plaintiffs then allege that defendant Erickson stated on January 15, 1997 that the fourth quarter of 1996 was "the best sales quarter in company history." AC ¶ 44. Plaintiffs contend that the statement was false because defendants omitted that they had engaged in certain accounting improprieties for the fourth quarter of 1996. AC ¶ 44. Plaintiffs contend that it was materially misleading to "extol the alleged consistency of our business" because sales were declining in the first quarter of 1997 and Red Brick had run out of customers. AC ¶¶ 45, 46. Thus, plaintiffs contend that because of (1) concealing that they had engaged in accounting improprieties in the fourth quarter of 1996, i.e. "pulling in" revenues, failing to record expenses already incurred and establishing inadequate reserves, and (2) failing to disclose declining sales for the first quarter of 1997, defendants have violated section 10(b).

*3 Defendants assert that the above referenced alleg-

ations fail to state a claim under section 10(b) because there is no particularized factual support for the allegations as required under the Reform Act. Defendants contend that plaintiffs have failed to identify any transaction for which the accounting treatment was improper or any facts that defendants misstated the results for the fourth quarter of 1996. Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss ("Def.Mot."), p. 10. Defendants further contend that defendants had no duty to disclose declining sales. Def. Mot., p. 13.

Failure to follow GAAP is not, in and of itself, sufficient to establish a violation of section 10(b). *See In re Software Toolworks Inc. Sec. Litig., 50 F.3d 615, 627-28 (9th Cir.1994).* Further, plaintiffs must do more than conclusively plead that defendants violated GAAP. *See Acito v. IMCERA Group, Inc., 47 F.3d 47, 51 (2d Cir.1995).* Plaintiffs have not done so here. Plaintiffs allege three accounting violations, all in conclusory fashion without supporting facts.

Plaintiffs allege that defendants improperly "pulled in" revenues in the fourth quarter of 1996. AC ¶ 43, 44, 62. Plaintiffs fail to plead any facts showing that any sales were booked before they were completed. Plaintiffs also plead that defendants improperly delayed recording expenses that should have been recorded in the fourth quarter of 1996. AC ¶¶ 44, 67, 69. The "fact" on which plaintiffs rely to support this allegation is that expenses increased for the first quarter of 1997 and that the percentage of cost to revenue increased. AC ¶ 67. Finally, plaintiffs, again relying on speculative statistics as their purported "facts," plead that defendants inadequately reserved for doubtful accounts receivable in the fourth quarter of 1996. AC ¶ 60. Plaintiffs contend that because the reserve amount increased percentage-wise in the first quarter of 1997 defendants must have underreserved for the fourth quarter of 1996. AC ¶ 60. Plaintiffs fail to point to any fact showing that any specific receivable was doubtful.

Plaintiffs rely on the pre-Reform Act case of *Cooper v. Pickel, 137 F.3d 616 (9th Cir.1997),* to support the adequacy of their allegations asserting that they do not need to point to any specific transactions. Plaintiffs' Memorandum of Points and Authorities in

Case 4:06-cv-05255-SBA    Document 46-3    Filed 10/24/2006    Page 5 of 7

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 1999 WL 33953501 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Opposition to Motion ("Pls.Mem."), pp. 6-7. While plaintiffs do not have to point to every alleged improper transaction, they must point to some facts that show defendants engaged in improper accounting practices. Conclusory allegations that include accounting "buzzwords" are not sufficient. See *Zeid v. Kimberly*, 973 F.Supp. 910, 922-23 (N.D.Cal.1997) (general, unsupported estimates of improper sales does not meet particularity requirements); *In re Oak Technology Sec. Litig.*, No. 96-20552 SW, 1997 WL 448168 (N.D.Cal.1997) (although plaintiffs need not specify dollar amounts "they must identify particular transactions" where revenues were improperly recorded). Similarly, reliance on statistics, which are easily manipulated and could be indicative of many things, is clearly insufficient to support allegations of fraud. *Stack v. Lobo*, No. 95-20049 SW, 1995 WL 241448 (N.D.Cal.1995) (plaintiffs' reliance on "conclusory accusations, and statistics regarding revenues and receivables which may be indicative of numerous factors aside from accounting fraud" not enough as "an increase in the ratio of receivables to revenue, without more, does not warrant an inference of fraud.").

**\*4** Even the pre-Reform Act *Cooper* case, on which plaintiffs heavily rely, contained allegations more specific than those alleged by plaintiffs in this case related to improper revenue recognition. *Cooper*, 137 F.3d at 626 (complaint alleges that in order to falsify revenue defendant shipped excessive product, promised customers that they would not have to pay for product until they resold it and shipped merchandise that had not been ordered).

Defendants further argue that the alleged failure to disclose the first quarter 1997 declining sales is not actionable because they had no duty to make such a disclosure. See *Verifone*, 11 F.3d at 869. The *Verifone* court held that the failure to disclose future sales and revenue forecasts was not actionable; however, further held that where an issuer speaks on a particular topic the issuer cannot omit specific facts which would render the statements misleading. *Id.* The allegations in this complaint plead more than mere failure to disclose forecasts. Plaintiffs allege that the positive statements made regarding the first quarter of 1997 were misleading based on the falsity of the fin-

ancial results of the fourth quarter of 1996. Thus, under *Verifone*, assuming plaintiffs can adequately state a claim for the accounting improprieties, their allegations regarding declining sales would suffice to state a claim. Because plaintiffs' declining sales allegations are directly tied to their accounting allegations, at this point plaintiffs' allegations do not state a claim.

The court finds that plaintiffs' complaint, as currently pled, is insufficient to state a claim for securities fraud under the Reform Act.[FN4]

> FN4. Plaintiffs allegations also fail because they do not come close to satisfying the heightened pleading standard required for allegations based on information and belief. Under the heading "Basis of Allegations," paragraph 85 of the Amended Complaint states that "plaintiffs have alleged the foregoing based upon the investigation of counsel" and that plaintiffs "believe that after reasonable opportunity for discovery, substantial evidentiary support will likely exist for the allegations set forth herein." Plaintiffs are required to specify each statement or omission alleged to have been misleading, the reason or reasons why the statement or omission is misleading and why the statement was false when made. 15 U.S.C. § 78u-4(b)(1)(B). Paragraph 85 shows that plaintiffs blatantly have failed to do this. Despite plaintiffs' argument to the contrary, a complaint based upon "investigation of counsel" is the same as a complaint based upon "information and belief." *In re Silicon Graphics Sec. Litig.*, 970 F.Supp. 746, 763 (N.D.Cal.1997). Accordingly, plaintiffs must "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(B)(1)(b). Plaintiffs attempt to do this by stating in one paragraph that their counsel reviewed various "SEC filings, securities analysis' reports and advisories about the Company, press releases issued by the Company, media reports about the Company, and discussions with consultants." AC ¶ 85. Paragraph 85 of the Amended Complaint fails to provide the required facts underlying

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 33953501 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

the plaintiffs' allegations. _Silicon Graphics, 970 F.Supp. at 764; see also In re Health Mngmt. Syst. Inc. Sec. Litig., 1998 WL 283286 *3 (S.D.N.Y. June 1, 1998)._ Further, the purpose of the Reform Act was to ensure that plaintiffs have evidence of fraud _before_ filing a complaint. H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. at 32 (1995). Accordingly, plaintiffs are not permitted to pin their hopes of supporting their allegations on future discovery. _Medhekar v. United States Dist. Court, 99 F.3d 325, 328 (9th Cir.1996)_ ("Congress clearly intended that complaints in these securities actions should stand or fall based on the actual knowledge of the plaintiffs _rather than information produced by the defendants after the action has been filed._" )(emphasis added).

B. _Liability of Individual Defendants Shoch, Henn and Fernandez_

The complaint does not allege that Shoch, Henn or Fernandez made any statements or omitted any facts. Plaintiffs attempt to hold these "non-speaking defendants" liable under the group pleading doctrine by claiming that they are liable for group published information even though they specifically did not make any statement or omit to state any material fact. Defendants assert that the group pleading doctrine no longer exists following enactment of the Reform Act which requires that plaintiffs specify their claims against _each defendant._ 15 U.S.C. § 78u-4(b)(2). However, while Rule 9(b) and the Reform Act require that plaintiffs attribute fraudulent statements to a particular defendant, where the statements are contained in published documents such as financial reports "it is reasonable to assume that these statements are the collective actions of the officers." _See Oak Technology, 1997 WL 448168 *14._

To state a claim using the group-pleading doctrine "plaintiffs must plead with particularity defendants' participation in the day-to-day control of the corporation and their participation in the preparation of the allegedly false statements." _Oak Technology, 1997 WL 448168 *11; Head v. Netmanage, Inc.,_ No. C

97-4385 CRB, slip op. at 2 (N.D.Cal. Feb. 24, 1998). Despite plaintiffs' assertions to the contrary, they have failed to make any such allegations.

*5 Plaintiffs allege that Shoch was a director and member of the Audit Committee and owned approximately twenty-one percent of the stock. AC ¶ 14(c). Plaintiffs allege that Fernandez was a Senior Vice-President. AC ¶ 14(d). Plaintiffs allege that Henn was Vice-President and although he resigned before the class period remained on in a "transitional role." AC ¶ 14(e). Plaintiffs further allege that "by reason of their executive management positions," stock ownership and ability to make public statements about the Company, these defendants were "controlling persons." AC ¶ 16. Plaintiffs further allege that each defendant except Shoch "was personally involved in" monitoring reserve levels and expenses. AC ¶ 17. Plaintiffs further allege that these defendants "by virtue of their positions" controlled the dissemination of information and were privy to non-public information which enabled them to participate in the fraud. AC ¶¶ 24-25, 83.

These allegations do not establish liability for group published statements. Defendants do not plead any specific information regarding these defendants' duties or participation in any day-to-day activities or the preparation of any group published document. General allegations that defendants were privy to inside information are insufficient to establish liability for misstatements. _Oak Technology, 1997 WL 448168 *11._ Plaintiffs must plead with particularity the facts showing that Shoch, Henn and Fernandez participated in the day-to-day operations of the company.FN5

> FN5. Because plaintiffs have not adequately pled a claim under section 10(b) they have also failed to plead a claim under section 20(a). Thus, the court does not reach the 20(a) allegations at this time.

IV. ORDER

Based on the foregoing, the court grants defendants' motion to dismiss the amended complaint with leave to amend in accordance with _Federal Rule of Civil_

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 33953501 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

Procedure 9(b) and the Reform Act. Plaintiffs are given twenty days from the date of this order to amend their complaint.

IT IS SO ORDERED.

N.D.Cal.,1999.
Blackin v. Red Brick Systems, Inc.
Not Reported in F.Supp.2d, 1999 WL 33953501 (N.D.Cal.)

Briefs and Other Related Documents (Back to top)

• 3:98CV01206 (Docket) (Mar. 25, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2811767 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**C**

Briefs and Other Related Documents

Doll v. Stars Holding Co.N.D.Cal.,2005.Only the Westlaw citation is currently available.

United States District Court,N.D. California.

Dixon R. DOLL, Plaintiff,

v.

STARS HOLDING COMPANY, et al., Defendants

**No. C-05-1132 MMC.**

Oct. 27, 2005.

Arthur J. Shartsis, Frank A. Cialone, Shartsis Friese LLP, Jennifer L. Jonak, William M. Lukens, Lukens Law Group, San Francisco, CA, for Plaintiff.

Daniel T. Bernhard, Stewart H. Foreman, Freeland Cooper & Foreman LLP, Brian Richard Hochleutner, Munger, Tolles & Olson LLP, San Francisco, CA, Brad D. Brian, Richard E. Drooyan, Tamerlin J. Godley, Munger, Tolles & Olson LLP, Los Angeles, CA, Robert H. Bunzel, Bartko Zankel Tarrant & Miller, San Francisco, CA, Stuart Abrams, Frankel & Abrams, New York, NY, Stephanie Powers Skaff, Farella Braun and Martel LLP, San Francisco, CA, for Defendant.

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS; DISMISSING FIRST AMENDED COMPLAINT WITH LEAVE TO AMEND; VACATING HEARING

CHESNEY, J.

**\*1** Before the Court are four motions: (1) Grant Thornton LLP's ("Grant Thornton") motion to dismiss plaintiff Dixon R. Doll's First Amended Complaint ("FAC"), pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and to strike one paragraph in the FAC, pursuant to Rule 12(f); (2) the motion of Chenery Associates, Chenery Associates, Inc., Chenery Management, Inc., Chenery Investments, Inc., Chenery Services, Inc., Chenery Capital, Inc., Sussex Financial Enterprises, Inc., and Roy E. Hahn (collectively, "Chenery") to dismiss the FAC, pursuant to Rules (9)(b) and 12(b)(6); (3) Sidley Austin Brown & Wood LLP's ("Sidley") motion to dismiss the FAC, pursuant to Rule 12(b)(6); and (4) R.J. Ruble's ("Ruble") motion to dismiss the

FAC, which motion consists solely of a joinder in Sidley's motion. Plaintiff has filed a separate opposition to each motion, to which Grant Thornton, Chenery, and Sidley have separately replied. Having reviewed the papers filed in support of and in opposition to the motions, the Court deems the matters appropriate for decision on the papers, VACATES the hearing scheduled for October 28, 2005, and rules as follows.

BACKGROUND

In his FAC, plaintiff alleges he "purchase[d] the distressed assets of NPL, primarily bankrupt stock of a company called Daewoo." (See FAC ¶ 44.) According to plaintiff, defendants advised and/or encouraged him to purchase such assets and, in so doing, "misrepresented and omitted to state material facts" in violation of federal securities law. (See FAC ¶ 69.) Plaintiff also alleges that defendants, in violation of state law, fraudulently induced him to pay "millions of dollars in fees for NPL," (see FAC ¶ 93), breached contractual provisions, (see FAC ¶¶ 100, 113), failed to comply with their professional and fiduciary duties of care (see FAC ¶¶ 103, 106), were "unjustly enriched," (see FAC ¶ 118), and engaged in unfair business practices, (see FAC ¶ 122).

DISCUSSION

A. Federal Claim

Plaintiff alleges one federal claim, specifically, a claim that defendants violated federal securities law. Grant Thornton and Chenery argue that plaintiff's federal claim is subject to dismissal on the ground plaintiff has failed to comply with the specification requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.FN1 The Court agrees.

> FN1. This argument is not made by Sidley and Ruble; an additional defendant, Stars Holding Company, has not appeared in the instant action. Because the Court's analysis of the argument made by Grant Thornton and Chenery on this issue applies equally to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 2
Not Reported in F.Supp.2d, 2005 WL 2811767 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

all defendants, however, the Court's finding on such issue will apply to all parties. *See Silverton v. Department of Treasury, 644 F.2d 1341, 1345* (9th Cir.) (holding where moving defendants are entitled to dismissal and non-moving defendants are "in a position similar to that of moving defendants," district court may dismiss action as against all defendants), *cert. denied, 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981).*

The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *See 15 U.S.C. § 78u-4(b)(1).* The PSLRA also requires, to the extent an allegation is based on information and belief, that the plaintiff allege "with particularity all facts on which that belief is formed." *See id.* Additionally, with respect to the element of scienter, the plaintiff "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *See DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 388-89* (9th Cir.2002) (internal quotation and citation omitted). The plaintiff must also disclose the sources for the complaint's factual allegations. *See In re Silicon Graphics, Inc. Sec. Litig., 970 F.Supp. 746, 763-64 (N.D.Cal.1997)* (holding plaintiff must allege "confidential informants, employees, competitors, government employees, members of the media, and others who have provided information leading to the filing of the case"), *aff'd, 183 F.3d 970* (9th Cir.1999).

**\*2** Here, the FAC includes a 47-paragraph section titled "General Allegations," in which plaintiff makes reference to a number of statements and omissions by defendants, most of which are paraphrased and a few of which are purported quotes by one or more defendants. In the First Cause of Action, plaintiff's federal securities claim, plaintiff begins by incorporating by reference the "General Allegations" section of the FAC, and then alleges 24 paragraphs, in which, to the extent such paragraphs make reference to statements, plaintiff appears to summarize some, but not all, of the statements paraphrased or purportedly quoted in the "General Allegations" section.

It is unclear from the above-described manner in which plaintiff has pleaded his federal claim, and from plaintiff's oppositions, in which plaintiff generally discusses his federal securities claim and his state fraud claim together,[FN2] precisely which statements plaintiff alleges are false or misleading for purposes of his federal securities claim. Essentially, plaintiff has "left it up to defendants and the court to try to figure out exactly what the misleading statements are." *See In re Autodesk, Inc. Securities Litig., 132 F.Supp.2d 833, 842 (N.D.Cal.2000).* Under such circumstances, dismissal of the complaint, with leave to amend, is appropriate. *See id.; In re Secure Computing Corp. Securities Litig., 120 F.Supp.2d 810, 815-16 (N.D.Cal.2000)* (dismissing complaint with leave to amend where defendants and district court were required to speculate as to which statements were false and misleading).

> FN2. A plaintiff must base a federal securities claim on conduct "in connection with" a purchase or sale of securities. *See Securities and Exchange Comm'n v. Zandford, 535 U.S. 813, 825, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002).* Because a state fraud claim is not so limited, plaintiff's state law claim may well be broader, perhaps significantly broader, than his federal claim.

With respect to the element of falsity, it is apparent that plaintiff, in contravention of the PSLRA, has not alleged "all facts" on which his allegations on "information and belief" are based. For example, plaintiff alleges on information and belief that Sidley and Chenery failed to advise plaintiff about a "kickback" they had received, but fails to allege any facts to support his assertion that defendants, in fact, received a "kickback," and also fails to allege the source who provided plaintiff with such information. (*See* FAC ¶ 34.) As another example, plaintiff alleges Chenery represented that NPL's "investment objective is to generate capital appreciation," but fails to allege any facts to support his implicit assertion that the stated objective was, in fact, not the actual objective, and also fails to allege any source who provided plaintiff with such information. (*See* FAC ¶ 43.)

With respect to the element of scienter, plaintiff has

Not Reported in F.Supp.2d                                                                        Page 3
Not Reported in F.Supp.2d, 2005 WL 2811767 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

not pled in "great detail" facts to support his allegations that defendants made false statements or omissions with the requisite state of mind. *See DS4M Global Value Fund, 288 F.3d at 388-89.* As one example, plaintiff alleges Chenery "predicted" NPL would have a "40-50% annualized return," but fails to set forth any facts, let alone facts in "great detail," to support plaintiff's implicit allegation that Chenery knew such representation was false when made, or the source who provided plaintiff with any such information. (*See* FAC ¶ 77.)

**\*3** In sum, the FAC falls far short of the specificity requirements set forth in the PSLRA. Consequently, the FAC is subject to dismissal, with leave to amend to identify with specificity each statement and omission alleged to be false or misleading for purposes of the federal securities claim, to specify the reasons why each such statement or omission is false or misleading, and to set forth all facts and the sources on which plaintiff bases his allegations of falsity and scienter on "information and belief." [FN3]

> [FN3.] Because the FAC will be dismissed, Grant Thornton's request to strike paragraph 24 therein is denied as moot.

In addition to the above-discussed argument as to specification deficiencies, made by Grant Thornton and Chenery, all defendants argue that plaintiff cannot, as a substantive matter, state a federal securities claim, at least as based on statements of a particular nature. With the exception of one category of statements addressed below, the Court declines to reach defendants' arguments as to the viability of plaintiff's federal claim, for the reason that the current complaint is unclear as to the precise statements on which plaintiff intends to rely in support thereof. Further, because plaintiff has not complied with the PSLRA's directive that he plead with specificity the elements of falsity and scienter as to each statement, reaching the merits of defendants' substantive arguments is premature.

The Court will address, however, the merits of plaintiff's federal claim to the extent it is premised on defendants' alleged statements to the effect that if the securities lost value, the IRS likely would recognize

as legitimate any claimed losses. (*See, e.g.,* FAC ¶ 31.) According to plaintiff, defendants knew such representations were false because defendants "had no reasonable expectation" the IRS would recognize the losses. (*See* FAC ¶ 48.) Similarly, plaintiff alleges that defendants, or certain of them, are liable for omitting to inform him the IRS would not recognize the losses. (*See, e.g.,* FAC ¶ 54.) Plaintiff fails to plead a cognizable securities claim based on such statements and omissions because plaintiff fails to allege the IRS has made a determination that losses claimed by investors in NPL will not be recognized; plaintiff alleges only that Chenery informed him the IRS was "investigating NPL." (*See* FAC ¶ 65.) The fact that the IRS is or was "investigating NPL" does not support a finding that the IRS has not or will not recognize losses claimed by investors in NPL.[FN4] Unless plaintiff is prepared to allege that his claimed losses will not be recognized,[FN5] plaintiff cannot state a securities fraud claim based upon such statements and omissions.[FN6] *Cf. Seippel v. Jenkens & Gilchrist, P.C.,* 341 F.Supp.2d 363, 370, 374 (S.D.N.Y.2004) (holding cognizable under federal securities law plaintiff's claim that defendants promoted "tax shelter" and advised plaintiff IRS would recognize claimed losses, where, *inter alia,* IRS and state tax agency had audited plaintiff's returns and assessed penalties).

> [FN4.] Plaintiff also alleges he "had to file a disclosure for amnesty" with the Franchise Tax Board ("FTB"), a California state tax agency. (*See* FAC ¶ 66.) Plaintiff, however, does not allege that the FTB had given any indication it was going to disallow losses claimed by investors in NPL. Consequently, as pleaded, the FAC merely alleges that plaintiff chose to file for amnesty with the FTB, apparently to avoid or lessen the possibility that he might in the future become liable for penalties if, in the future, the IRS or FTB were to disallow the claimed losses. Such allegation does not suffice to support a finding that defendants' statements concerning the likelihood that claimed losses would be allowed were false when made. Further, as to plaintiff's allegation that he paid the

Case 4:06-cv-05255-SBA    Document 46-4    Filed 10/24/2006    Page 5 of 6

Not Reported in F.Supp.2d                                                        Page 4
Not Reported in F.Supp.2d, 2005 WL 2811767 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

FTB "back taxes and interest," (*see* FAC ¶ 66), even if plaintiff can allege the claimed losses are not allowable, he cannot recover such taxes and interest as damages in a federal securities claim. *See DCD Programs v. Leighton,* 90 F.3d 1442, 1447-1452 (9th Cir.1996).

FN5. As discussed above, if plaintiff makes such an allegation on information and belief, plaintiff is required to allege "all facts" that support such allegation, as well as the source of plaintiff's information.

FN6. Sidley and Ruble argue that a securities claim based on misrepresentation as to IRS recognition is time-barred. The argument is unpersuasive because such defendants have not shown such a claim has accrued, i.e., that plaintiff incurred damages as a result of disallowance of the losses claimed.

B. State Law Claims

*4 Each of plaintiff's remaining claims arises under state law. Because the parties are not of diverse citizenship, (*see* FAC ¶¶ 5, 7), the Court's jurisdiction over the state law claims is supplemental in nature. A district court may decline to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction." *See* 28 U.S.C. § 1367(c)(3). Here, in light of the dismissal of the sole claim over which the Court has original jurisdiction, the Court declines to exercise jurisdiction over the state law claims, and, consequently, will dismiss such claims without prejudice.FN7

FN7. In the event that plaintiff, in a Second Amended Complaint, realleges his state law claims, defendants may renew any arguments directed at those claims.

CONCLUSION

For the reasons discussed above, defendants' motions to dismiss the FAC are hereby GRANTED, and the FAC is hereby DISMISSED with leave to amend. Any Second Amended Complaint shall be filed no

later than December 2, 2005.

This order terminates Docket Nos. 42, 46, 48 and 57.

IT IS SO ORDERED.

N.D.Cal.,2005.
Doll v. Stars Holding Co.
Not Reported in F.Supp.2d, 2005 WL 2811767 (N.D.Cal.)

Briefs and Other Related Documents (Back to top)

- 2005 WL 2869167 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Motion to Dismiss Filed by Sidley Austin Brown & Wood LLP (Oct. 28, 2005) Original Image of this Document (PDF)
- 2005 WL 2869170 (Trial Motion, Memorandum and Affidavit) (Oct. 28, 2005) Original Image of this Document (PDF)
- 2005 WL 3146045 (Trial Motion, Memorandum and Affidavit) Sidley Austin Brown & Wood Llp's Reply in Support of its Motion to Dismiss the Securities Fraud and Non-Fraud Claims Alleged in Plaintiff's First Amended Complaint (Oct. 28, 2005) Original Image of this Document (PDF)
- 2005 WL 3146047 (Trial Motion, Memorandum and Affidavit) Chenery Defendants' Reply to Plaintiff's Opposition to Chenery Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (Oct. 14, 2005) Original Image of this Document (PDF)
- 2005 WL 3146046 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Chenery Defendant's and Defendant Roy E. Han's Motion to Dismiss Plaintiff's First Amended Complaint (Oct. 7, 2005) Original Image of this Document (PDF)
- 2005 WL 2869164 (Trial Motion, Memorandum and Affidavit) (Sep. 16, 2005) Original Image of this Document (PDF)
- 2005 WL 2612965 (Trial Motion, Memorandum and Affidavit) Sidley Austin Brown & Wood LLP's Notice of Motion and Motion to Dismiss the Securities Fraud and Non-Fraud Claims Alleged in Plaintiff's First Amended Complaint (Aug. 26, 2005) Original Image of this Document (PDF)
- 2005 WL 2612968 (Trial Motion, Memorandum and Affidavit) Defendant Grant Thornton LLP's No-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2811767 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

tice of Motion and Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Frcp 12(b)(6) and 9(b), and Motion to Strike Certain Allegations Pursuant to Frcp 12(f) (Aug. 26, 2005) Original Image of this Document (PDF)

• 2005 WL 2155814 (Trial Motion, Memorandum and Affidavit) First Amended, Complaint for Securities Fraud, Fraud, Breach of Contract, Professional Negligence, Breach of Fiduciary Duty, Breach of of Implied Covenant of Good Faith and Fair Dealing, Unjust Enrichment, and Violation of Cal. Bus. & Prof. Code | 17 200 (Jul. 8, 2005) Original Image of this Document (PDF)

• 3:05cv01132 (Docket) (Mar. 18, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 4

Westlaw.

Not Reported in F.Supp.2d                                              Page 1
Not Reported in F.Supp.2d, 2001 WL 652019 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

C

Briefs and Other Related Documents

E.I. Du Pont de Nemours and Co. v. Monsanto
Co.D.Del.,2001.Only the Westlaw citation is cur-
rently available.

United States District Court, D. Delaware.
E.I. DU PONT DE NEMOURS AND COMPANY,
Plaintiff,
v.
MONSANTO COMPANY and ASGROW SEED
COMPANY LLC, Defendants.
**No. CIV.A. 00-359-SLR.**

Feb. 14, 2001.

ORDER

ROBINSON, District J.
*1 At Wilmington, this 14th day of February, 2001,

IT IS ORDERED that defendants' motion to dismiss
(D.I.11) is granted in part and denied in part, for the
reasons that follow:

1. The statute of limitations for a theft of trade secrets
claim is three years from the date the misappropri-
ation was discovered, or by the exercise of reasonable
diligence should have been discovered. *See* 6 Del. C.
§ 2006. Similarly, the statute of limitations for breach
of contract, breach of implied covenant of good faith
and fair dealing, breach of fiduciary duty, tortious in-
terference with contract, and interference with pro-
spective business opportunity is three years from the
date of breach/injury or its discovery. *See* 10 Del. C.
§ 8106; *Merck & Co. v. Smithkline Beecham Pharm.
Co.,* No. 15443-NC, 1999 WL 669354, at *42 (Del.
Ch. Aug. 5, 1999), *aff'd,* 764 A.2d 277 (Del.2000)
(holding that claims for tortious interference with
contract or prospective business relations are subject
to three year statute of limitations of 10 Del .C. ¶
8106).

2. Plaintiff filed a complaint on March 30, 2000
(D.I.1), which requires the above claims to have ac-
crued after March 30, 1997. Plaintiff first became
aware of at least some of the claims at issue on April
19, 1996.

3. Plaintiff has presented insufficient evidence of
equitable estoppel to support tolling of the statute of
limitations. *See Burge v. Fidelity Bond & Mortgage
Co.,* 648 A.2d 414, 420 (Del.1994) (holding that for
estoppel claim to prevail, it must be shown that party
claiming estoppel lacked knowledge or means of ob-
taining knowledge of truth of facts in question, relied
on party against whom estoppel is claimed, and
suffered prejudicial change in position as result of
that reliance).

4. Defendants argue that one single misappropriation
of trade secrets occurred, upon which the contract
claims are based, and that misappropriation accrued
prior to March 30, 1997. However, "[w]hen coinsid-
ering a motion to dismiss, the court should read the
complaint generously, accept all of the allegations
contained therein as true, and construe them in a light
most favorable to the plaintiff." *Johnson v. Gullen,*
925 F.Supp. 244, 247 (D.Del.1996). The plaintiff
should be given the benefit of all reasonable infer-
ences that can be fairly drawn from the complaint.
*See Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20
F.3d 1250, 1261 (3d Cir.1994). Thus, for the pur-
poses of the motion to dismiss, the court accepts
plaintiff's representation that multiple appropriations,
breaches of contract and injuries occurred, some of
which accrued after March 30, 1997.

5. Therefore, any claims that accrued prior to March
30, 1997 are dismissed as time-barred. Defendants'
motion to dismiss is denied as to claims that accrued
after March 30, 1997.

D.Del.,2001.
E.I. Du Pont de Nemours and Co. v. Monsanto Co.
Not Reported in F.Supp.2d, 2001 WL 652019
(D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:00CV00359 (Docket) (Mar. 30, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5

Not Reported in F.Supp.2d                                                                                     Page 1
Not Reported in F.Supp.2d, 2005 WL 405361 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

C

Briefs and Other Related Documents

Masco Contractors Services West v. New Hampshire Ins. Co.N.D.Cal.,2005.Only the Westlaw citation is currently available.

United States District Court,N.D. California.

MASCO CONTRACTORS SERVICES WEST, and Coast Insulation Contractors, Inc. Plaintiffs,

v.

NEW HAMPSHIRE INSURANCE COMPANY, and National Union Fire Insurance Company of Pittsburgh, PA. Defendants.

**No. C 04-4183 MJJ.**

Feb. 17, 2005.

Marc S. Hines, Cindy L. Cannon, Hines Smith, Costa Mesa, CA, for Plaintiffs.
Kevin G. McCurdy, McCurdy & Brown, Menlo Park, CA, for Defendants.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

I. INTRODUCTION

JENKINS, J.

**\*1** Defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union") moves to dismiss Plaintiffs' Masco Contractors Services West, Inc. ("Masco") and Coast Insulation Contractors, Inc., ("Coast") claims for declaratory relief, breach of contract, breach of the implied covenant of good faith and fair dealing, and civil conspiracy pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court finds, for the reasons set forth below, that National Union's motion to dismiss is GRANTED IN PART AND DENIED IN PART.

II. FACTUAL BACKGROUND

In or about March 2002, Coast was served with a summons and complaint in the matter of *Carneros Warehousing Joint Venture, and Vintage Enterprises v. Cranston Steel Structures, Inc.*, et al., Sonoma County Superior Court No. 229440. Masco was sub-sequently named as a defendant in the *Carneros* action. The *Carneros* action alleges that Coast and Masco were negligent in the construction of a winery in Sonoma County. Specifically, the *Carneros* plaintiffs allege that the lack of a continuous vapor, which was to be installed by Coast, caused condensation to form on the underside of the metal roofing, causing rust, and that the resulting damages are in excess of seven million dollars. The *Carneros* action is presently pending in Sonoma County.

Plaintiffs allege that Masco is a parent company of Coast, and both are insureds under the terms of an commercial general liability insurance issued by New Hampshire Insurance Company ("New Hampshire"). The named insured on the declaration face sheet in the New Hampshire policy is plaintiff's parent company, BSI Holdings, Inc. ("BSI"), and the business description is listed as "insulation contractor." Plaintiffs allege that they are both a "subsidiary" of BSI, and therefore insureds under the New Hampshire policy. The New Hampshire policy was effective from 06/01/98 to 06/01/99 and contained an each occurrence limit of $1,000,000 and a general aggregate and completed operation aggregate limit of $2,000,000. New Hampshire contends that there is approximately $900,000 in available indemnity remaining on its policy.

Plaintiffs also allege that they are insureds under a commercial umbrella policy issued by National Union. The named insured on the declaration face sheet of the National Union policy was BSI. The National Union policy was effective from 06/01/98 to 06/01/99 and contained an each occurrence, general aggregate and products completed operations limit of $50 million. Both New Hampshire and National Union are member companies of American International Group ("AIG").

New Hampshire's panel defense counsel appeared for and defended Masco in the *Carneros* action for over five months, during which time neither New Hampshire nor National Union issued either a reservation of rights or declination of coverage to Masco. In or about May 2004, New Hampshire withdrew its de-

Not Reported in F.Supp.2d                                                                     Page 2
Not Reported in F.Supp.2d, 2005 WL 405361 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

fense of Masco, asserting that the defense was provided only as an accommodation. Masco quickly re-tendered the defense of the *Carneros* action to New Hampshire. At that point, New Hampshire issued a declination of coverage letter to Masco. The asserted basis in the denial was that there had been an assignment of the policy and that Masco was not insured under the terms of the New Hampshire policy. Masco alleges that it promptly corresponded to coverage counsel for New Hampshire to request a reversal of New Hampshire's coverage decision. In this correspondence, Masco alleges that it explained Masco's status as a subsidiary of BSI, and the apparent inconsistency in New Hampshire's decision to defend Coast but not Masco. Masco alleges that New Hampshire did not respond to its correspondence. However, National Union alleges that New Hampshire has now agreed to defend Masco.

**\*2** With respect to Coast, New Hampshire and National Union accepted the tender of Coast with a full reservation of rights and appointed panel defense counsel to represent the interests of Coast in the *Carneros* action. According to Plaintiffs, an actual conflict of interest arose during the course of Coast's defense which gave rise to a demand by Coast for independent counsel pursuant to Cal. Civil Code § 2860(c). However, rather than provide Coast with an independent counsel, New Hampshire withdrew its reservation of rights. National Union did not withdraw its reservation of rights.

Given the *Carneros* plaintiffs' claim for seven million dollars, Plaintiffs allege that the indemnity limits of the New Hampshire policy will likely be exhausted regardless of how much New Hampshire expends on the defense of the *Carneros* action. Given this fact, Plaintiffs allege that a conflict of interest exists between Coast and its insurance carriers, as it is in New Hampshire's interest not to provide a vigorous defense to either Coast or Masco. Plaintiffs allege that they will suffer prejudice from being denied a vigorous defense in the *Carneros* action. Furthermore, Plaintiffs assert that their indemnity rights under the National Union policy could be frustrated, as it is possible that National Union may disclaim Plaintiffs' coverage based on National Union's reservation of rights.

## III. LEGAL STANDARD

A court may dismiss a complaint pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6) for either lack of a cognizable legal theory or the pleading of insufficient facts under a cognizable legal theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir.1984). When deciding upon a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to FRCP 12(b)(6), a court must take all of the material allegations in plaintiff's complaint as true, and construe them in the light most favorable to plaintiff. *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995). Moreover, a complaint should not be dismissed unless a plaintiff could prove no set of facts in support of his claim that would entitle him to relief. *Id.* A party may move to have stricken from a pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. Fed.R.Civ.P. 12(f).

## IV. ANALYSIS

### A. Declaratory Relief

*1. Standing as an Insured Under the National Union Excess Policy*

Masco seeks both a declaration that it has standing as an insured under the excess policy and that it has an entitlement to a defense and indemnification under the National Union policy. National Union argues that Masco is not entitled to such a declaration because as a legal matter, an excess carrier has neither a duty to provide any defense or an obligation to respond to an alleged tender of defense until primary insurance is exhausted. Therefore, National Union concludes that the Court does not have jurisdiction to issue declarations as to rights or liabilities that do not yet exist.

**\*3** Initially, the Court finds that Masco has sufficiently alleged that it has standing as an insured under the National Union policy. The only facts seemingly necessary to establish whether an entity is "an insured" would be 1) the terms of the policy, and 2) whether Masco qualifies under those terms. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 3
Not Reported in F.Supp.2d, 2005 WL 405361 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

terms of the excess policy are set out in "Exhibit 2" of the Complaint, and the policy encompasses "BSI Holdings, Inc." as the named insured and includes any "subsidiary" of BSI. Masco has adequately plead, and National Union does not dispute, that Masco is a subsidiary of BSI.

Furthermore, the Court finds that Masco has sufficiently alleged that it is entitled to a defense and indemnification under the National Union policy. In order to prevail in an action seeking declaratory relief on the issue of the duty to defend, "the insured must only prove the existence of a *potential for coverage,* while the insurer must establish *the absence of any such potential.* In other words, the insured need only show that the underlying claim *may* fall within the policy coverage; the insurer must prove that it cannot." *Montrose Chemical Corp. v. Superior Court,* 6 Cal.4th 287, 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (1993). In this case, given the seven million dollar claim against it, Masco has proven the existence of a potential for coverage under National Union's excess policy. Given these facts, the Court DENIES National Union's motion to dismiss Masco's first action for declaratory relief.

### 2. Parties' Right to Independent Counsel

Plaintiffs seek a determination of whether New Hampshire's withdrawal of its reservation of rights with respect to Coast avoided an actual conflict of interest where National Union refused to withdraw its reservation of right under its commercial umbrella policy. National Union contends that there is no legal basis for a claim that New Hampshire is required to appoint independent counsel based upon National Union's action or inaction.

The right to independent counsel is a statutory right which comes into existence under certain prescribed circumstances. *See* Cal. Civil Code § 2860. Section 2860(b) states, in part, that "when an insurer reserves its rights on a given issue and the outcome of that coverage issue can be controlled by counsel first retained by the insurer for the defense of the claim, a conflict of interest may exist...."

The Court finds that Plaintiffs' request for declaratory

relief with respect to this issue is unclear, and at best, premature. The purpose of the declaratory relief request in this action is to determine the parties' respective rights and obligations under the insurance polices. To be sure, New Hampshire and National Union are separate insurance companies that issued separate insurance contracts BSI.[FN1] Thus, Plaintiffs' rights and National Union's obligations under the National Union policy can only be determined based upon an evaluation of the terms and conditions of the National Union policy; not an examination of the rights and obligations that may be owed to Plaintiffs under the primary New Hampshire policy.

> FN1. The fact that both New Hampshire and National Union are member companies of AIG does not change this reality.

**\*4** Plaintiffs have provided the Court with no legal authority to support the proposition that New Hampshire should be required to appoint independent counsel based upon National Union's action or inaction.[FN2] Plaintiffs' assertion that National Union's refusal to withdraw its reservation of rights necessarily created a conflict of interest with New Hampshire is vague and otherwise unsupported by factual allegations contained in the Complaint. At some point in the future, an occasion may arise when Plaintiff's indemnity rights are frustrated because National Union disclaims Plaintiffs' coverage based on National Union's reservation of rights. However, Plaintiffs' present assertions regarding National Union's intentions in reserving such rights, and the alleged "coordination" between Defendants to violate Plaintiffs' contract rights, are at present, only mere speculation. In sum, without a showing of a clear conflict of interest, the Court cannot conclude National Union has an obligation to provide Plaintiffs independent counsel in the *Carneros* action. The Court GRANTS National Union's motion to dismiss Plaintiffs' second claim for declaratory relief.

> FN2. The question of whether Coast has a right to independent counsel under the New Hampshire policy is a different issue than the matter presently before the Court.

### B. Breach of Contract and Breach of the Implied

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 4
Not Reported in F.Supp.2d, 2005 WL 405361 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Covenant of Good Faith and Fair Dealing

As an initial matter, the Court notes that Plaintiff's third claim for relief-breach of contract-and Plaintiffs' fifth claim for relief-breach of the implied covenant of good faith and fair dealing-ultimately rely upon the same set of facts. In both claims, Plaintiffs allege that National Union and New Hampshire coordinated their coverage positions to minimize policy benefits to Plaintiffs, and in doing so, breached their respective insurance policies with Plaintiffs. Plaintiffs are not alleging that National Union breached its duty to defend or indemnify Plaintiffs. To that extent, these claims are more appropriately covered under Plaintiffs' fifth claim of relief-breach of the impaired covenant of good faith and fair dealing. However, "[i]t is well established that a breach of the implied covenant of good faith is a breach of the contract...." *Schwartz v. State Farm Fire & Casualty Co., 88 Cal.App.4th 1329, 1339, 106 Cal.Rptr.2d 523 (2001)*. Accordingly, the Court will treat these claims together for purposes of the current motion.

National Union asserts that Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing must fail because it does not have any present duty to defend or indemnify Plaintiffs under the parties' excess policy, and therefore, there can be no breach of a contractual duty under the policy. *See Love v. Fire Ins. Exch., 221 Cal.App.3d 1136, 1153, 271 Cal.Rptr. 246 (1990)* (stating that "a bad faith claim cannot be maintained unless policy benefits are due is in accord with the policy in which the duty of good faith is rooted"). However, Plaintiffs respond that exhaustion of the primary policy is not a condition precedent to National Union's implied contractual duty of good faith and fair dealing.

*5 "It has long been settled that an implied covenant of good faith and fair dealing exists in every insurance contract that neither party will do anything to injure the right of the other to receive benefits under the agreement." *Schwartz, 88 Cal.App.4th at 1336, 106 Cal.Rptr.2d 523*. "[T]he covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement." *Waller v. Truck Ins. Exchange,*

*Inc., 11 Cal.4th 1, 36, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995)*. The "precise nature and extent of the duty imposed by [the] implied promise will depend on the contractual purposes." *Egan v. Mut. of Omaha Ins. Co., 24 Cal.3d 809, 818, 169 Cal.Rptr. 691, 620 P.2d 141 (1979)*.

In *Schwartz,* the court stated as follows:
We conclude that the duty applies to an excess insurer, just as it does to a primary insurer. We reject the notion that, simply because a condition precedent to a particular obligation-the obligation to pay-has not yet occurred, the insurer is relieved from the implied covenants that inhere in *every* contract. State Farm and the Schwartzes had an insurance contract for which the Schwartzes paid premiums, and State Farm necessarily had contractual obligations to them, albeit contingent on future events, from the moment the parties entered into the contract. The implied duty not to impair the insured's right to benefits arises from the contractual relationship existing between the parties, and indeed is unconditional and independent of the performance of the insured's contractual obligations. The Schwartzes had a reasonable expectation that if their injuries exceeded the limits of their primary policy, coverage would be provided under their excess policy. State Farm plainly had an implied-in-law contractual obligation to the Schwartzes-as well as to the Weinsteins-not to injure their right to receive benefits under the agreement.

88 Cal.App.4th at 1336-37, 106 Cal.Rptr.2d 523.

Given the language in *Schwartz,* the Court cannot accept National Union's argument that Plaintiffs' claim cannot be sustained because National Union does not have a present duty to defend or indemnify Plaintiffs under the excess policy. *Schwartz* clearly stands for the proposition that the implied duty not to impair Plaintiffs' right to benefits exists independently of National Union's duty to defend or indemnify Plaintiffs under the excess policy. Here, given the pending seven million dollar lawsuit against Plaintiffs, it is reasonable for Plaintiff to expect that their injuries will exceed the limits of the New Hampshire policy. In fact, New Hampshire contends that there is only approximately $900,000 in available indemnity remaining on its policy. Given

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 405361 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Plaintiffs' reasonable expectation that the excess policy will be invoked, National Union owes an implied-in-law contractual obligation to Plaintiffs not to injure their rights to insurance proceeds.

National Union argues that *Schwartz* is factually distinguishable from the present case. To support its argument, National Union correctly notes that *Schwartz* involved the determination of contractual obligations of an excess insurer that had notice of competing claims that may exceed the policy limits of the excess insurance coverage. Given that factual scenario, the *Schwartz* court held that an excess insurer with notice of potentially competing claims that exceed policy limits has an obligation to treat both insureds fairly, and hence refrain from impairing one insured's rights under the policy. National Union asserts that given the factual and policy issues at play in *Schwartz,* the Court should find its holding unpersuasive.

**\*6** The Court disagrees. *Schwartz* cannot be read as narrowly as National Union urges. Rather, *Schwartz* stands for the broad proposition that an insurer can be sued for bad faith even if coverage has not yet attached as long as its actions negatively affected the insured's benefits. Here, Plaintiffs have adequately alleged that National Union and New Hampshire have coordinated their coverage position with the intention of depriving Plaintiffs' of their indemnity rights under the excess policy. Given these allegations, the Court finds that Plaintiffs have adequately stated a claim for breach of the implied covenant of good faith and fair dealing. Accordingly, National Union's motion to dismiss Plaintiffs' breach of contract and breach of the covenant of good faith and fair dealing claims is DENIED.

### C. Civil Conspiracy

Plaintiffs' civil conspiracy claim is based on the same set of facts as their contract claims-that National Union and New Hampshire coordinated their coverage positions to minimize policy benefits to Plaintiffs. National Union argues that the claim should be dismissed because it cannot be found liable for any wrongful acts, and in any event, Plaintiffs have not suffered any damages.

When pleading a conspiracy, the complaint should allege: (1) the formation and operation of the conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting. *Kidron v. Movie Acquisition Corp.,* 40 Cal.App.4th 1571, 1581, 47 Cal.Rptr.2d 752 (1995). Civil conspiracy is not an independent tort, but rather a "legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 510-11, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994). When alleging a civil conspiracy, Federal Rule of Civil Procedure 9(b) "requires more than conclusory allegations of the conspiracy." *S. Union Co. v. Southwest Gas Corp.,* 165 F.Supp.2d 1010, 1020 (D.Ariz.2001) (applying California civil conspiracy law). To meet the stringent civil conspiracy pleading requirements of Rule 9(b), a "plaintiff must allege with sufficient factual particularity that defendants reached some explicit or tacit understanding or agreement." *Alfus v. Pyramid Tech. Corp.,* 745 F.Supp. 1511, 1521 (N.D.Cal.1990). "It is not enough to show that defendants might have had a common goal unless there is a factually specific allegation that they directed themselves towards this wrongful goal by virtue of a mutual understanding or agreement." *Id.* (citation omitted).

The Court finds that Plaintiffs' allegations of civil conspiracy are sparse, conclusory, and unspecific. Rather than offering the Court specific facts to support the inference of an agreement between National Union and New Hampshire to coordinate their coverage positions to deprive Plaintiffs of a vigorous defense or indemnity benefits, Plaintiffs have offered nothing more than conclusory allegations and bald assertions. Plaintiffs' complaint does not reference a single document, participant, or conversation that was involved in the alleged agreement between National Union and New Hampshire. Under Rule 9(b)'s heightened pleading requirement, such vague allegations of conspiracy are insufficient. Accordingly, the Court GRANTS National Union's motion to dismiss Plaintiffs' civil conspiracy claim with leave to amend.

### V. CONCLUSION

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 405361 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*7** The Court GRANTS National Union's motion to dismiss Plaintiffs' second claim for declaratory relief and Plaintiffs' civil conspiracy claim. The Court DENIES National Union's motion to dismiss Plaintiffs' first claim for declaratory relief, breach of contract claim, and implied covenant of good faith and fair dealing claim. Plaintiffs should file an amended complaint, if they so choose, within thirty (30) days from the date of this Order.

IT IS SO ORDERED.

N.D.Cal.,2005.
Masco Contractors Services West v. New Hampshire Ins. Co.
Not Reported in F.Supp.2d, 2005 WL 405361 (N.D.Cal.)

Briefs and Other Related Documents (Back to top)

• 3:04cv04183 (Docket) (Oct. 04, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 6

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1926673 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
Medical Instrument Development Laboratories v. Alcon Laboratories.N.D.Cal.,2005.Only the Westlaw citation is currently available.

United States District Court,N.D. California.
MEDICAL INSTRUMENT DEVELOPMENT
LABORATORIES, Plaintiff,
v.
ALCON LABORATORIES, Defendants.
**No. C 05-1138 MJJ.**

Aug. 10, 2005.

Mark B. Fredkin, Morgan, William Siamas, Morgan, Franich, Fredkin & Marsh, San Jose, CA, for Plaintiff.
Benjamin P. Smith, Joan M. Haratani, William W. Friedman, Morgan, Lewis & Bockius, LLP, San Francisco, CA, for Defendants.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS
JENKINS, J.

INTRODUCTION

**\*1** Before the Court is Defendant Alcon Laboratories' ("Defendant" or "Alcon") Rule 12(b)(6) Motion to Dismiss, or in the alternative, Rule 12(e) Motion for a More Definite Statement ("Motion"). For the following reasons, the Court GRANTS Defendant's Motion without prejudice.

FACTUAL BACKGROUND

Defendant Alcon is a leading pharmaceutical company specializing in researching, developing, manufacturing, and marketing ophthalmic surgical, vision care, and optical products.[FN1] Part of Alcon's business is to develop and sell surgical devices for use in the treatment of ocular diseases. Defendant Alcon asserts that for the past three decades, it has been in the process of developing and improving a virectomy probe used in surgical procedures to treat retinal disorders, but as of 2000 it had yet to develop an adequate probe. Plaintiff Medical Instrument Develop-

ment Laboratories ("Plaintiff" or "MID Labs") is a California corporation which develops and manufactures medical instruments for use in vitreoretinal (ophthalmic) surgery, including a product known as a High Speed Single Use Virectomy Probe (the "Probe"). MID Labs was founded by Dr. Carl Wang ("Wang") in 1981, and the company was subsequently purchased by Alcon in 1985. After the purchase, Wang re-started his own business, which he again named MID Labs.

>     FN1. The facts are derived from Alcon's Motion and MID Labs' Complaint.

On or about October 12, 2000, MID Labs and Alcon entered into a contract entitled Release and Supply Agreement (the "Agreement"). Seven provisions of the Agreement are relevant for purposes of resolving the instant motion. Section 3.01 of the Agreement states, "[s]ubject to its rights to self-manufacture the Products pursuant to section 4.05 Alcon agrees that it will purchase its requirements of the Products from MID Labs and will not have the right to make or have made the Products." (Complaint ("Comp."), Ex. A at § 3.01.) Section 4.01 of the Agreement states that "[n]othing in this Agreement shall be construed to require Alcon to purchase any minimum quantities of Products from MID Labs." (Id. at § 4.01.) Section 4.05 of the Agreement states that "[i]n the event that MID Labs fails to either (i) provide Alcon with Products meeting the Specifications in the quantities requested by Alcon pursuant to section 4.03[ ] or (ii) maintain the Quality Standards for all of the Products pursuant to section 4.04[ ], then Alcon may, at its option, give MID Labs written notice of such nonperformance ... Alcon shall have the right to terminate this Agreement and/or it or its Affiliate shall have the right to self manufacture the Products." (Id. at § 4.05.) Section 4.06 of the Agreement states that "Alcon will have the right to acquire from any third party or internally develop similar technology or products which may compete against or replace any of MID Labs Products." (Id. at § 4.06.) Section 7.01 of the Agreement states that "the party receiving ... confidential information shall not make use of said confidential information, except for purposes author-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1926673 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

ized by this Agreement." (*Id.* at § 7.01.) Section 8.02(c) of the Agreement states that the Agreement may be terminated by "Alcon at any time without cause or for any reason by providing MID Labs with thirty (30) days prior written notice[.]" (*Id.* at § 8.01(c).) Finally, section 12.07 of the Agreement states that the "Agreement is to be performed in accordance with the laws of the State of Texas and shall be construed and enforced in accordance with the laws of the State of Texas." (*Id.* at § 12.07.)

**\*2** Approximately a year after the Agreement was entered into and continuing through March 2002, Alcon representatives requested assurances that MID Labs would be able to meet the technological requirements of a high volume purchase order of Probes. Subsequently, Alcon and its engineers were granted access to MID Labs' facility in order to inspect and audit MID Labs' development, manufacturing, and testing processes for the Probes. Sometime during this inspection period, the parties' relationship deteriorated.

Plaintiff MID Labs alleges that Defendant Alcon breached the Agreement and committed various acts of fraud by developing its own probe and ceasing to purchase all of its needed Probes from MID Labs. Defendant Alcon argues, to the contrary, that the Agreement left it free and clear to acquire Probes from any third party or to internally develop its own probe for manufacture and sale at any time during the term of the Agreement and thereafter. Plaintiff MID Labs filed a Complaint on February 18, 2005, in the Superior Court of the State of California, Alameda County. Plaintiff's Complaint contains three state law causes of action: (1) common law fraud and deceit; (2) breach of contract; and (3) unfair business practices in violation of California Business and Professions Code section 17200. Defendant removed the case to this Court on diversity grounds.

LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the claims asserted in the complaint. *See Cahill v. Liberty Mutual Ins. Co.,* 80 F.3d 336, 337 (9th Cir.1996). Dismissal of an action pursuant to Rule 12(b)(6) is appropriate only where it "appears

beyond [a] doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Levine v. Diamanthuset, Inc.,* 950 F.2d 1478, 1482 (9th Cir.1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-6, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In reviewing such a motion, the Court must assume all factual allegations to be true and must construe them in the light most favorable to the nonmoving party. *See North Star v. Arizona Corp. Comm.,* 720 F.2d 578, 580 (9th Cir.1983). Therefore, the Court will dismiss the complaint or any claim in it without leave to amend only if "it is absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Noll v. Carlson,* 809 F.2d 1446, 1448 (9th Cir.1987).

ANALYSIS

I. Choice of Law

As an initial matter, the Court addresses the parties' disagreement regarding what state's substantive law applies to Plaintiff's claims. The Agreement contains a choice of law provision specifying that the Agreement "shall be construed and enforced in accordance with the law of the State of Texas." (Comp., Ex. A at § 12.07.) Defendant contends that pursuant to that provision, Texas law governs all claims arising out of the Agreement. Thus, Defendant argues, Plaintiff's Second Cause of Action, brought under California Business & Professions Code, §§ 17200, *et seq.,* is not viable. Plaintiff MID Labs argues that pursuant to section 12.07 of the Agreement, Texas law governs only as to "contract claims relating to performance and construction," and "does not speak to tort or statutory causes of action." (Opposition ("Opp.") at 4.) Specifically, Plaintiff asserts that the Agreement's choice of law provision should apply neither to Plaintiff's tort claim for fraud and deceit, nor to its section 17200 claim, the first and third causes of action.

**\*3** In suits based on diversity jurisdiction, district courts are to apply the choice of law principles of the forum state. *Day & Zimmerman, Inc. v. Chaloner,* 423 U.S. 3, 4, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975). Since this lawsuit was brought in the Northern District of California, California law properly determines

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 3
Not Reported in F.Supp.2d, 2005 WL 1926673 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

whether Texas law should control the present dispute. Under California law, a choice of law clause agreed upon through arm's length negotiations by sophisticated commercial parties is generally enforced unless it is contrary to California public policy. *Medimatch, Inc. v. Lucent Technologies, Inc.*, 120 F.Supp.2d 842, 861-62 (N.D.Cal.2000) (citation omitted). However, the Ninth Circuit has held that "[c]laims arising in tort are not ordinarily controlled by a contractual choice of law provision. Rather they are decided according to the law of the forum state." *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir.1992) (citation omitted).

Here, Defendant has not established that the choice of law provision, as written, should apply to *all matters* arising out of the Agreement.[FN2] Section 12.07 of the Agreement simply states that the "Agreement is to be performed in accordance with the laws of the State of Texas and shall be *construed and enforced* with the laws of the State of Texas." (Comp., Ex. A at § 12.07 (emphasis added).) While this statement establishes that Texas law will govern interpretation and construction of the contract, the narrowly-worded choice of law provision does not explicitly control non-contractual claims that are related to the contract. *Thompson & Wallace of Memphis, Inc. v. Falconwood Corp.*, 100 F.3d 429, 432-33 (5th Cir.1996) (tort claims not governed by choice of law clause providing that chosen law applied to the "agreement and its enforcement"). Therefore, the Court finds that because Plaintiff's fraud and deceit claim and its section 17200 claim are non-contractual "claims arising in tort," they are not contemplated by the Agreement's choice of law provision and should be "decided according to the law of the forum state." *Sutter*, 971 F.2d 407. The Court also finds that the choice of law provision does not bar Plaintiff's section 17200 claim, a claim brought under California law. In sum, the Court finds that the First and Third Causes of Action are governed by California law. Only the breach of contract claim is governed by Texas law.

> FN2. In support of its argument, Defendant relies on *Ribbens International, S.A. de C.V. v. Transport International Pool, Inc.*, for the proposition that a contractual choice of law

provision should be applied "unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice of law, or (b) application of the law of the chosen state would be contrary to the fundamental policy of the state which has materially greater interest than the chosen state[.]" 47 F.Supp.2d 1117, 1120 (N.D.Cal.2000). *Ribbens* is not controlling, however, as the plaintiff's complaint in that case alleged only breach of contract. Thus, the *Ribbens'* court determination, as to the application of a choice of law provision, does not speak to tort and statutory causes of action alleged here.

II. Motion to Dismiss

A. First Cause of Action-Fraud and Deceit

Plaintiff MID Labs claims that Defendant Alcon made false representations to Plaintiff in order to induce disclosure of and obtain access to MID Labs' confidential and proprietary information related to the development, testing, and manufacturing processes of its Probes. Defendant alleges that Plaintiff's fraud claim should be dismissed because it has not been pled with sufficient particularity under Rule 9(b) of the Federal Rules of Civil Procedure. Plaintiff asserts that Rule 9(b) is not applicable here because it applies only to federal claims. Plaintiff contends that, in any event, its Complaint adequately alleges the facts necessary to support a claim of fraud. The Court disagrees.

*4 Under California law, there are four required elements of a fraud claim: (1) a false promise or representation as to a material fact; (2) knowledge of the falsity of the representation when made (or lack of reasonable ground to believe in its truth), or without any intention of performing or fulfilling the promise; (3) an intent to deceive and to cause reliance at the time of the promise; and (4) reliance thereon with resulting injury and damage. *Sepra v. Jolly King Restaurants, Inc.*, 62 F.R.D. 626, 636 (S.D.Cal.1974) (citation omitted). Rule 9(b)'s requirement that fraud claims be pled with particularity is satisfied when the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1926673 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

complaint states the time, place, and nature of the alleged fraudulent activities, and the identities of the parties alleged to have made the misrepresentations. *Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir.1986)* (citations omitted).

Even construing the Complaint in the light most favorable to Plaintiff, as the Court must, it is apparent that Plaintiff has not met the requirements for a viable fraud claim under California law. First, Plaintiff alleges that Alcon representatives falsely told MID Labs that it planned to purchase a very high volume of MID Labs' Probes. In addition, Plaintiff MID Labs alleges that Defendant Alcon made these false representations with the purpose of gaining access to MID Labs' facilities under the false pretense of inspection. However, Plaintiff fails to allege any facts that, if proven, show that at the time the representation was made, Alcon did not intend to place such an order. Specifically, the point at which MID Labs claims it became aware of Alcon's allegedly false and fraudulent representations, Alcon was still inspecting MID Labs' facilities. Therefore, Defendant Alcon could still have fulfilled the promises made by its representatives once it was assured that MID Labs could handle the forecasted order. Thus, the Complaint fails to allege a false or misleading statement, or that Alcon's representatives knew their statements to be false at the time they were made.

Second, Plaintiff alleges $24 million in damages, but fails to allege the specific purchase order or any set of facts which, if proven, show that MID Labs would have received $24 million in profits absent Alcon's alleged fraudulent misrepresentations. Thus, the Complaint fails to allege an injury or damages that directly resulted from Alcon's representations, and the Court finds that MID Labs' Complaint fails to sufficiently plead a claim for fraud under California law.FN3 The Court GRANTS Alcon's Motion to Dismiss on the First Cause of Action without prejudice.

> FN3. Since Plaintiff fails to sufficiently plead a fraud claim under California law, it cannot meet the heightened pleading requirements of Rule 9(b).

**B. Third Cause of Action-Section 17200** [FN4]

> FN4. Following the parties' lead, the Court addresses Plaintiff's three claims out of order.

Plaintiff MID Labs claims that Defendant Alcon's alleged fraudulent misrepresentations and misappropriation of MID Labs' confidential and proprietary information are acts and practices that violate California Business and Professions Code section 17200. Defendant argues that MID Labs' section 17200 cause of action is not viable because it is based on the insufficiently pled common law claims of fraud and misappropriation. Plaintiff disagrees. Defendant further asserts that Plaintiff's section 17200 cause of action is deficient because Plaintiff has not alleged in its Complaint that members of the public are likely to be deceived by Defendant's allegedly fraudulent conduct.

**\*5** Under section 17200, "unfair competition" is defined as "any unlawful, unfair or fraudulent business act or practice." This tripartite test is disjunctive and the plaintiff need only allege one of the three theories to properly plead a claim under section 17200. *Accuimage Diagnostics Corp. v. Terarecon, Inc., 260 F.Supp.2d 941, 954 (N.D.Cal.2003)* (citation omitted). As an initial matter, the Court notes that MID Labs has not alleged a violation of section 17200 under the theory of unfair business practices. Thus, at issue is only whether MID Labs' cause of action may go forward under the theories of fraudulent or unlawful business practices. The Court addresses these separately.

### 1. Fraudulent Business Practices

Plaintiff asserts that the fraudulent business practices prong of section 17200 is established by its common law claim for fraud. The Court disagrees. *Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.,* is instructive here. 178 F.Supp.2d 1099 (C.D.Cal.2001). In *Watson,* a pharmaceutical company sued its supplier under the fraudulent business practices theory of section 17200, arguing that it was deliberately misled by the defendant's statements about its supply capabilities and its intent to resume supplying the pharma-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2005 WL 1926673 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

ceutical company with a hypertension drug. *Id.* at 1120. The district court held that "it is necessary under the fraudulent prong to show deception to some members of the public interest, and not merely to the direct competitor or other non-consumer party to the contract." *Id.* at 1121. The court noted the absolute lack of case authority establishing any principle that fraudulent business acts are "separately actionable by business competitors absent a showing that the public, rather than merely the plaintiff, is likely to be deceived." *Id.* The court held that the pharmaceutical company "is not a member of the public or a consumer entitled to [section 17200] protection." *Id.*

Here, similarly, Plaintiff's Complaint alleges a violation of the fraudulent prong of section 17200 based on Defendant's alleged misrepresentation that it would purchase Probes from Plaintiff, which allegedly resulted in Plaintiff suffering lost profits. However, as in *Watson,* Plaintiff fails to allege in its Complaint that any "members of the public are likely to be deceived" by Defendant's allegedly fraudulent conduct. *Comm. on Children's Television, Inc. v. Gen. Foods Corp.,* 35 Cal.3d 197, 211, 197 Cal.Rptr. 783, 673 P.2d 660 (1983) (citation omitted). Furthermore, like the plaintiff in *Watson,* Plaintiff MID Labs is Alcon's direct competitor or, at least, a non-consumer, and "is not a member of the public or a consumer entitled to" protection under the fraudulent business practices theory of section 17200. *Watson,* 178 F.Supp.2d at 1120. Therefore, the Court finds that Plaintiff has not satisfied the necessary elements of a fraudulent business practices theory of section 17200 claim.

### 2. Unlawful Business Practices

**\*6** A claim under the unlawful business practices theory of section 17200 includes "any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *Id.* (citing *Saunders v. Superior Court,* 27 Cal.App.4th 832, 833, 33 Cal.Rptr.2d 438 (1994)). Plaintiff asserts that its unlawful business practices theory of section 17200 is established by an underlying misappropriation claim. The parties dispute whether a common law claim can serve to undergird an unlawful business practices theory of a section 17200 claim.

However, the Court need not decide that question at this juncture since Plaintiff has not adequately pled a claim for misappropriation here. Plaintiff's Second Cause of Action, alleging breach of contract, vaguely alleges that Alcon breached the parties' Agreement by using MID Labs' confidential information. This is not a claim for unlawful misappropriation of trade secrets. Hence, the Court finds that Plaintiff's unlawful business practices theory of its section 17200 claim is not rendered tenable by any misappropriation claim.

The Court also notes that Plaintiff's First Cause of Action, alleging common law fraud, cannot support an unlawful business practices theory of its section 17200 claim because, as discussed *supra,* the fraud claim is not adequately pled.

In sum, Plaintiff has failed to adequately plead either a fraudulent or unlawful business practices theory of its section 17200 claim. Therefore, the Court GRANTS Defendant's motion to dismiss the Third Cause of Action, but GRANTS Plaintiff leave to amend.

### C. Second Cause of Action-Breach of Contract

Plaintiff alleges in its Second Cause of Action that Alcon breached the parties' Agreement in three ways: (1) by manufacturing high speed probes; (2) by misappropriating confidential information; and (3) by ceasing to purchase all of its requirements for the Probes from MID Labs. Alcon argues that Plaintiff's breach of contract claim fails because Plaintiff has not alleged conduct constituting a breach of the parties' Agreement. MID Labs disagrees. At issue is the meaning of certain provisions of the Agreement.

Whether a contract is ambiguous is a question of law. *Coker v. Coker,* 650 S.W.2d 391, 393-94 (Tex.1983).FN5 When interpreting a contract, courts should "give effect to the written expression of the parties' intent." *AT & T Corp. and AT & T Communications of the Southwest, Inc. v. Rylander,* 2 S.W.3d 546, 559 (Tex.1999) (citation omitted). "To determine the parties' intent, the courts must consider the entire writing in an effort to harmonize all of the provisions of the instrument" so that none will be

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2005 WL 1926673 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

rendered meaningless.[FN6] *Id.* Mere disagreement over the meaning of a provision in the contract does not necessarily mean that a term is ambiguous. *Richardson Lifestyle Ass'n v. Houston,* 853 S.W.2d 796, 800 (Tex.App.1993). However, "a contract is ambiguous if its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning." *CMS Partners, Ltd. v. Plumrose USA, Incorporated,* 101 S.W.3d 730, 732 (Tex.App.2003). A court must determine "whether there is more than one reasonable interpretation of this contract such that a fact issue was created concerning the parties' intent." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex.1999).

> FN5. The Court analyzes the viability of this claim pursuant to Texas law.

> FN6. "[T]he contract may be read in light of the surrounding circumstances to determine whether an ambiguity exists[,]" but all other extrinsic evidence is inadmissible. *AT & T,* 2 S.W. at 559 (citation omitted) (internal quotations omitted).

### 1. Alcon's Manufacture of the Probes

**\*7** Pointing to sections 3.01 and 4.05 of the Agreement, Plaintiff alleges that the Agreement specifically prevents Alcon from manufacturing MID Labs' probes except "[i]n the event that MID Labs fails to either (i) provide Alcon with Products meeting the Specifications in the quantities requested by Alcon ... or (ii) maintain the quality and standards for all of the Products." (Comp., Ex. A at § 3.01.) Defendant Alcon points to section 4.06 of the Agreement, which expressly allows it to "acquire from any third party or internally develop similar technology or products which may compete against or replace any of MID Labs Products." (*Id* at § 4.06.) At issue is the definition of "similar" used in section 4.06. If "similar" products includes the "virtually identical" probes that Plaintiff alleges Alcon manufactured here, there is no breach of contract. However, if the definition of "similar" does not incorporate the "virtually identical" probes produced by Alcon, Plaintiff has a breach of contract claim. Both interpretations are reasonable and thus, there is ambiguity in the contract terms. *See*

*Columbia,* 940 S.W.2d at 589. Such ambiguity raises factual questions that are not properly decided in the 12(b)(6) context. Accordingly, Defendant's Motion is DENIED on this ground.

### 2. Misappropriation of Proprietary and Confidential Information

Plaintiff claims that Alcon misappropriated MID Labs' confidential information to manufacture its own probe. Defendant contends that its use of MID Labs' confidential information was not prohibited by the Agreement because section 3.01 granted it an exclusive license to "make, use, offer for sale, and sell any product in the Territory." (Comp., Ex. A at § 3.01.) Plaintiff observes that section 3.01 of the Agreement does not expressly refer to the Probes at issue nor is "any product" capitalized (which, Plaintiff contends, would suggest the language was intended to refer to the Probes pursuant to section 1.01 of the Agreement). Thus, Plaintiff argues that section 3.01 of the Agreement does not grant any Alcon license to use MID Labs' confidential information (i.e. Probe schematics) to make its own Probes except pursuant to section 4.05 of the Agreement (when MID Labs fails to provide adequate probes). According to Plaintiff, because section 3.01 does not apply here, section 7.01, which prohibits Alcon from using MID Labs' confidential information except for purposes authorized by the Agreement, bars Alcon's use of MID Labs' schematics.

Plaintiff's argument is creative. However, while it is a stretch to find that the "any product" language used in section 3.01 was intended to exclude the Probes (the only products contemplated by the Agreement), the Court again finds that the Agreement is sufficiently ambiguous that resolution of the parties' dispute over the proper meaning of various provisions of the Agreement would not be appropriate in the motion to dismiss context. *See Columbia,* 940 S.W.2d at 589. Accordingly, Defendant's Motion is DENIED on this ground.

### 3. Alcon's Failure to Purchase Probes from MID Labs

**\*8** According to section 4.01 of the Agreement, "[n]othing in this Agreement shall be construed to re-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1926673 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

quire Alcon to purchase any minimum quantities of Products from MID Labs." (Comp., Ex. A at § 4.01.) Defendant contends that section 4.06 of the Agreement, as discussed above, reserved Alcon's right to manufacture similar technology that could replace MID Labs' Probes. However, Plaintiff alleges that Alcon breached the Agreement by not purchasing the Probes it needed from MID Labs pursuant to section 3.01 of the Agreement and that the purpose of section 4.01 was to provide for the possibility that Alcon would get out of the probe business altogether and would not need to purchase (or manufacture) *any* probes. Plaintiff argues, however, that the Agreement is clear that should Alcon require probes, it was required to purchase those probes from MID Labs.

In light of the three competing provisions and the parties' reasonable interpretations of each (as well as their interpretations of the effect of all the provisions read in concert), the Court finds that there is ambiguity in the Agreement regarding Defendant Alcon's purchase requirement. <u>Columbia, 940 S.W.2d at 589</u>. As discussed above, this raises factual questions that cannot be decided on a motion to dismiss. Thus, the Court DENIES Defendant's Motion as to Plaintiff's breach of contract claim for Defendant's failure to purchase its probes from MID Labs.

In sum, MID Labs' assertion that Alcon breached the contract by manufacturing high speed Probes, by misappropriating confidential information, and by ceasing to purchase all of its needed Probes from Mid Labs, raises questions of fact regarding the proper interpretation of the Agreement that cannot be decided on a motion to dismiss. Thus, the Court DENIES Defendant's motion to dismiss as to Plaintiff's breach of contract claim.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion to Dismiss as to Plaintiff's First and Third Causes of Action without prejudice, and DENIES the motion as to Plaintiff's Second Cause of Action for breach of contract. To the extent that Plaintiff's Complaint is dismissed, Plaintiff may file an amended complaint within 30 days within the date of this Order.

IT IS SO ORDERED.

N.D.Cal.,2005.
Medical Instrument Development Laboratories v. Alcon Laboratories
Not Reported in F.Supp.2d, 2005 WL 1926673 (N.D.Cal.)

Briefs and Other Related Documents <u>(Back to top)</u>

• <u>2005 WL 2869172</u> (Trial Pleading) First Amended Complaint for Farud and Deceit, Breach of Contract, and Unfair Business Practices (Sep. 9, 2005) Original Image of this Document (PDF)
• <u>3:05cv01138</u> (Docket) (Mar. 18, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 7

**Westlaw.**

Not Reported in A.2d

Not Reported in A.2d, 2001 WL 1045643 (Del.Ch.)

**(Cite as: Not Reported in A.2d)**

C

Miller v. American Real Estate Partners, L.P.Del.Ch.,2001.Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

Ruth Ellen MILLER, Charles and Lydia Hoffman, and Joy Lazarus on the behalf of Themselves and all others similarly situated, Plaintiff,

v.

AMERICAN REAL ESTATE PARTNERS, L.P., High Coast Limited Partnership, American Property Investors, Inc., Carl Icahn, Alfred D. Kingsley, Mark H. Rachesky, William A. Leidesdorf, Jack G. Wasserman, and John P. Saldarelli, Defendants.

**No. CIV.A.16788.**

Submitted: Aug. 6, 2001.

Decided: Sept. 6, 2001.

Pamela S. Tikellis and Robert J. Kriner, Jr., Esquires, of Chimicles & Tikellis, Wilmington, Delaware; Of Counsel: Lynda J. Grant, Esquire of Goodkind Labaton Rudoff, New York, New York, Attorneys for Plaintiffs.

R. Franklin Balotti, J. Travis Laster, and Catherine G. Dearlove, Esquires, of Richards Layton & Finger, Wilmington, Delaware; Of Counsel: Theodore Altman, Marilla Ochis, and Joshua Sohn, Esquires, of Piper Marbury Rudnick & Wolf, New York, New York, Attorneys for Defendants Carl C. Icahn and High Coast Limited Partnership.

Josy W. Ingersoll and Danielle B. Gibbs, Esquires, of Young Conaway Stargatt & Taylor, Wilmington, Delaware, Attorneys for Defendants American Property Investors, Inc., Alfred D. Kingsley, Mark H. Rachesky, William A. Leidesdorf, and Jack G. Wasserman.

MEMORANDUM OPINION

STRINE, Vice Chancellor.

**\*1** This is yet another case in which a general partner of a limited partnership contends that the partnership agreement eliminates the applicability of default principles of fiduciary duty, and in which this court finds

that the drafters of the agreement did not make their intent to eliminate such duties sufficiently clear to bar a fiduciary duty claim. Here, the drafters of the American Real Estate Partners, L.P. partnership agreement did not clearly restrict the fiduciary duties owed to the partnership by its general partner, a defendant entity wholly owned by defendant Carl Icahn. Indeed, the agreement seems to contemplate that the general partner and its directors could be liable for breach of fiduciary duty to the partnership if they acted in bad faith to advantage themselves at the expense of the partnership.

The fact that the general partner and other defendants owe fiduciary duties does not, however, mean that the plaintiffs have pled a viable claim. In this opinion addressing the defendants' motion to dismiss, I reject the defendants' argument that they did not owe fiduciary duties, but find that the plaintiffs have failed to make non-conclusory allegations of fact that, if true, support an inference that the defendants breached their fiduciary duty of loyalty. Because the plaintiffs have averred enough to lead the court to suspect that a viable complaint can be pled, however, the complaint is dismissed without prejudice. As to those aspects of the plaintiffs' complaint that are barred by the doctrine of laches, the dismissal shall be with prejudice.

I. *Factual Background Overview Of The Plaintiffs' Allegations*

The plaintiffs are holders of limited partnership units in defendant American Real Estate Partners, L.P. ("American Real Estate" or the "Partnership"). They seek various forms of relief against the entities and persons who control American Real Estate: American Real Estate's general partner, defendant American Property Investors, Inc. ("the General Partner"); the General Partner's directors, including defendant Carl Icahn, the General Partner's owner and chairman of the board; and American Real Estate's majority unitholder, defendant High Coast Limited Partnership ("High Coast"), which is also controlled by Icahn and has American Property Investors as its general partner.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                        Page 2
Not Reported in A.2d, 2001 WL 1045643 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Distilled to its essence, the amended complaint alleges that Icahn (i) acquired the General Partner interest; (ii) used the General Partner to make a rights offering that would enable High Coast to acquire a majority of American Real Estate's units and insulate the General Partner from removal; (iii) cut off all distributions so that Icahn could devote available cash to investments in which other Icahn entities were interested and place pressure on other unitholders to sell out; (iv) amended the Partnership Agreement through a written consent executed by High Coast to broaden the purposes of the Partnership and allow American Real Estate to invest in any securities, thus furthering Icahn's plan to use American Real Estate as a financing agency for the investment goals of his other entities; and (v) bought out additional unitholders at an allegedly unfair price through a tender offer. According to plaintiffs, the sum total of these actions have left the public unitholders of American Real Estate as unitholders in a profitable Partnership that pays no distributions so that it can instead serve as a pool of available capital that Icahn can use for his own personal purposes. Because Icahn has total control over American Real Estate and its cash flow, and has made no secret of his intent to continue to use the Partnership in this self-interested manner, the capital markets have placed a correspondingly low value on Partnership units, to the detriment of the public unitholders.

**\*2** I will now set forth the elements of this supposed scheme, as such elements are pled in the amended complaint.

### A. *High Coast Obtains Voting Control*

American Real Estate was formed in early 1987. Its purpose was to invest and manage real estate, and to engage in other activities related to those purposes. As of the mid-1990s, American Real Estate owned a large portfolio of diverse real estate properties.

By 1995, the Icahn-controlled General Partner was in place at American Real Estate. In February 1995, Icahn's affiliate High Coast controlled 9.89% of American Real Estate's units.

That month, the General Partner caused American

Real Estate to make a "Rights Offering." Each limited partner was issued one freely tradeable and transferable subscription right for each seven units held. The subscription right entitled the right holder to obtain six partnership units and one preferred unit for $55, with $45 of the price being allocated to the six units and $10 to the preferred unit. The price per regular unit was a slight discount to the then-prevailing market price.

All limited partners were also offered the opportunity to participate in an oversubscription privilege. This privilege enabled limited partners to purchase, on a *pro rata* basis, any rights not exercised by other holders. In connection with the Offering, High Coast guaranteed that it would purchase all units it would receive rights to purchase, and any units and preferred units that were not subscribed for by other limited partners.

The unitholders were informed that the Partnership wanted to raise cash to take advantage of "what the General Partner perceived as significant investment opportunities to acquire undervalued properties, such as development properties and non-performing loans, which the General Partner believes have the potential to diversify and enhance the long-term value of the Partnership's investment portfolio."[FN1]

     [FN1] Am. Comp. ¶ 35 (quoting prospectus).

Nearly two million rights were issued, of which only 418,307 were exercised. High Coast was therefore able to use the unexercised rights to acquire an additional 10,324,128 units (plus 1.7 million preferred units). This raised its ownership stake from 9.89% to 50.6%.

Because the Partnership Agreement states that the General Partner can be removed only by the affirmative votes of 75% of the unitholders, High Coast had achieved a level of ownership that rendered Icahn's control of American Real Estate unshakeable.

### B. *The General Partner Eliminates Cash Distributions*

In 1993, the General Partner had halved quarterly distributions from a quarter to twelve and a half cents

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 3
Not Reported in A.2d, 2001 WL 1045643 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

per unit. In December 1995-after High Coast obtained a majority of units-the General Partner ceased all distributions.

According to the plaintiffs, this decision adversely affected the public unitholders. Although the units trade on the New York Stock Exchange, allegedly the trading volume in Partnership units is thin, and the price at which units trade relates principally to the amount of distributions it makes. Because Icahn had locked up control and had ceased to distribute any of the Partnership's cash flow to unitholders, the units' trading price allegedly was depressed.

### C. Icahn Uses His Control To Amend The Partnership Agreement

**\*3** In July 1996, the General Partner disseminated an "Information Statement" to unitholders, informing them that the Partnership Agreement had been amended solely by the votes of High Coast upon recommendation of the General Partner.

The "Amendment" altered § 3.01 of the Partnership Agreement, which defined American Real Estate's business and purpose. The Amendment ended the Partnership's exclusive focus on real estate to enable American Real Estate to invest in securities of any kind, whether or not related to real estate. As the information statement indicated:
The equity securities in which the Partnership may invest may include common stocks, preferred stocks and securities convertible into common stocks, as well as warrants to purchase such securities. The debt securities in which the Partnership may invest may include bonds, debentures, notes, mortgage-related securities and municipal obligations. Certain of such securities may include lower rated securities which may provide the potential for higher yield and therefore may entail higher risk. In addition, the Partnership may engage in ... options and futures transactions, foreign currency transactions and leveraging for either hedging or other purposes.[FN2]

FN2. Am. Comp. ¶ 53 (quoting information statement).

The information statement also indicated that the broadening of American Real Estate's investments could endanger the tax status of the Partnership.

The purpose of the Amendment was articulated as follows:
The Partnership intends to continue to invest its assets available for investment in undervalued assets in the real estate market... [However,] *while the Partnership believes opportunistic real estate investments continue to remain available, such investments have become more competitive to source and the increased competition may have an adverse impact on the spreads and the ability to find quality assets that provide returns sought by the Partnership.* In addition... the Partnership Agreement only permits the Partnership to invest in assets related to real estate unless such investments are of a short-term nature pending investment in real estate assets, such as deposit accounts and money market funds. The General Partner believes that it is in the best interests of the Partnership and the Unitholders for the Partnership to be permitted to invest a portion of the Partnership's funds in assets outside the real estate market that may provide returns on its funds in excess of those available to the Partnership in the current real estate market or those currently received on investments in government securities.[FN3]

FN3. Information Statement at 4 (emphasis added).

The public unitholders were also informed, however, that High Coast's reasons for voting their units to consent to the Amendment to the Partnership Agreement were not entirely related to furthering the interests of American Real Estate as a partnership. Rather,
Icahn's approval of the Amendment to the Partnership Agreement through High Coast and the General Partner's selection of non-real estate investments may be influenced by factors other than the best interests of the Partnership and maximization of Unitholder value. Such factors may include whether the General Partner and its affiliates, including Icahn, have independent investments in such assets which may benefit from investments by the Partnership.[FN4]

Not Reported in A.2d                                                    Page 4
Not Reported in A.2d, 2001 WL 1045643 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

<u>FN4.</u> Information Statement at 5.

**\*4** The unitholders were also told that the Partnership "anticipate[d] that Mr. Icahn, as Chairman, and personnel of the General Partner and the Partnership will be responsible for selecting non-real estate investments by the Partnership as they have with respect to real estate related investments." <u>FN5</u> The Information Statement further warned that "the General Partner's selection of non-real estate investments may be subject to conflicts of interest, including those relating to whether the General Partner or its affiliates have independent investments in such assets which may benefit from investments by the Partnership." <u>FN6</u>

<u>FN5.</u> Information Statement at 2.

<u>FN6.</u> *Id.*

The unitholders were also told that the Audit Committee of the General Partner had approved the Amendment, acting independently of the General Partner's management. The Audit Committee was comprised of defendants Alfred D. Kingsley, William A. Leidesdorf, and Jack G. Wasserman. According to the Information Statement, the Audit Committee, upon advice from Coopers & Lybrand, concluded that the expansion of American Real Estate's permissible investments was in the best interests of the Partnership because of the limited opportunities available in the real estate market; the benefits of a more diversified investment portfolio; and the potential gains that could come from non-real estate investments. After Audit Committee approval, the full board of the General Partner, including Icahn, approved the Amendment and submitted it to High Coast for the necessary votes to adopt it.

D. *High Coast Makes A Tender Offer*

In November 1998, High Coast made a tender offer for 10,000,000-or nearly 40% of all-American Real Estate units at $10.50 per unit. That offer was successful and resulted in High Coast upping its holdings to 89.7% of all units.

According to the plaintiffs-*who did not sell in the offer*-the $10.50 per-unit price was well below the $18.00 per-unit net asset value of American Real Estate. They say that High Coast was able to buy at this

allegedly unfair price because Icahn had left unitholders with no option. Because Icahn controlled American Real Estate, had cut all distributions, had announced that he would invest the Partnership's cash in non-real estate ventures for reasons that were self-interested, and had begun to make such investments, plaintiffs contend that the unitholders had no real choice but to accept what they were being offered.

E. *Icahn's Investments On Behalf Of American Real Estate*

The plaintiffs argue that Icahn and the General Partner have "intentionally and willfully" caused American Real Estate "to make investments which: ( [1] ) are high risk; (2) have no financial benefit to the Partnership; and (3) have depressed the value of the Units." <u>FN7</u> In particular, the plaintiffs contend that American Real Estate has been used as a financing tool to aid Icahn in his efforts to obtain a control position in a number of companies, including RJR Nabisco and Phillips Services Corp. Icahn also caused the Partnership to purchase the bonds of several bankrupt Atlantic City casinos, with the hopes of obtaining control. The complaint further asserts that Icahn caused American Real Estate to purchase an Icahn-owned land development company for over $84 million.

<u>FN7.</u> Am. Comp. ¶ 73.

**\*5** The plaintiffs argue that these investments were risky (*e.g.,* Phillips Services Corp. was bankrupt), and were an imprudent use of cash. Despite impressive cash flow from Partnership operations, Icahn continues to refrain from making distributions, eschewing that choice in favor of using Partnership cash as a source of capital in furtherance of the interests of other entities he controls.

The plaintiffs also allege the Icahn and the General Partner have intentionally disseminated-*unidentified*-negative news about the Partnership in order to depress the market value of units. They further claim that Icahn took advantage of this depression by having High Coast purchase another 400,000 units at less than $8 per unit in early 2000.

F. *The Plaintiffs' Claims And The Defendants' Motion*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2001 WL 1045643 (Del.Ch.)

**(Cite as: Not Reported in A.2d)**

The complaint pleads the story recited above with broad strokes. Most of the allegations are cursory, and unsupported by pled facts. The relief sought by the plaintiffs is pled in a like manner.

The plaintiffs contend that the defendants have violated the Partnership Agreement and their fiduciary duties by effecting the scheme outlined above. As relief, the plaintiffs seek:

• unspecified damages;

• a permanent injunction disabling the General Partner from acting as such;

• dissolution of American Real Estate;

• a mandatory injunction requiring the General Partner to make distributions or to undertake unspecified measures to increase unit value; and/or

• their attorneys fees and costs.

The amended complaint was not served on the defendants until September 22, 2000. The original complaint in this action had been filed on November 18, 1998, but was never served on any of the defendants. The impetus for filing and serving an amended complaint appears to have come mostly from the court, which had inquired as to the status of this matter. The court's inquiry coincided with attempts by the plaintiffs and the defendants to settle this action, efforts which ultimately failed some time after the filing of the original complaint.

After the service of the amended complaint, the defendants filed and briefed a motion to dismiss. In their brief, the defendants have understandably tried to address the plaintiffs' rather unfocussed claims on a transaction-by-transaction basis. The defendants argue that each of the transactions challenged was authorized by the Partnership Agreement, and that the provisions of the Partnership Agreement set forth specific standards of conduct that supplant traditional fiduciary duties. Because the General Partner and the other defendants acted in conformity with the contractually specified standards of conduct, the defendants argue that the amended complaint fails to state a claim upon which relief can be granted. In the alternative, the defendants argue that the complaint does not state a claim even if the defendants owed fiduciary duties to the unitholders. Additionally, the defendants argue that some aspects of plaintiffs' claims

are time-barred, because the plaintiffs did not serve their complaint until three years after the events in question.

## II. *Procedural Standards*

**\*6** On a motion to dismiss, this court must assume the truth of all well-pled allegations of fact.[FN8] The court, however, need not give weight to conclusory allegations that are unsupported by specific allegations of fact.[FN9] After examining the complaint in this pro-plaintiff manner, the court may dismiss the complaint only if it is reasonably certain that the facts pled in the complaint would not support any claim for relief.[FN10]

> FN8. *Rabkin v. Philip A. Hunt Chemical Corp.*, Del.Supr., 498 A.2d 1099, 1104 (1985).

> FN9. *In re Tri-Star Pictures, Inc. Litig.*, Del.Supr., 634 A.2d 319, 326 (1991).

> FN10. *Rabkin*, 498 A.2d at 1104.

## III. *Legal Analysis*

### A. *The Plaintiffs' Claims Related To The Rights Offering Are Time-Barred*

The complaint pleads that the Rights Offering occurred in February 1995. The original, un-served complaint was not filed until November 1998, more than three years after the consummation of the Rights Offering.

There can be no excuse for such late filing. The plaintiffs have failed to allege that the applicable legal limitations period of three years-to which this court ordinarily looks in order to apply the doctrine of laches-was equitably tolled.[FN11] This failure is understandable given the fact that there was litigation filed in this court that contributed to an alteration of the Rights Offering in favor of the limited partners.[FN12] Not only that, the plaintiffs have stood by while High Coast and other investors have conducted transactions pursuant to the Rights Offering and accepted the market risk that came with exercising the Rights. There being no just reason for

Not Reported in A.2d                                                                Page 6
Not Reported in A.2d, 2001 WL 1045643 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

plaintiffs to attack the Rights Offering in an untimely manner, the plaintiffs challenge to that Offering is dismissed.[FN13]

> FN11. *United States Cellular v. Bell Atl. Mobile Sys., Inc.,* Del.Supr., 677 A.2d 497, 502 (1996).

> FN12. *See In re American Real Estate Partners, L.P. Litig.,* Del. Ch., Cons.C.A. No. 13687, mem. op., 1997 WL 770718, Chandler, C. (Dec. 3, 1997).

> FN13. The defendants also argued in their opening brief that all claims addressing actions taken by the defendants more than three years before the *service* of the complaint in September 2000 are barred by laches. That argument has force because the mere filing of a complaint is ordinarily insufficient to toll a statute of limitations, even if service is withheld because of some belief that the defendants would be benefited by a delay. *See Robertson v. Gest,* Del.Supr., 1991 WL 316950, Order, Walsh, J. (Dec. 11, 1991); *Russell v. Olmedo,* Del.Supr., 275 A.2d 249 (1971). The plaintiffs have suggested, however, that the defendants did not wish for the complaint to be served and that plaintiffs held off from effecting service based on an agreement with defendants' counsel and in deference to the parties' settlement discussions. At oral argument, defendants' counsel acknowledged that this issue is not ripe for disposition at this time because the precise nature of the discussions between plaintiffs and defendants about service is unclear. Some factual record might be necessary to determine whether some tolling accord had been reached, and additional briefing would be helpful on whether the approach taken in *Robertson v. Gest* and *Russell v. Olmedo* applies in the equitable context of a laches argument.

### B. *Does The Complaint State A Claim?*

1. *Does The Partnership Agreement Eliminate The*

*General Partner's Fiduciary Duty Of Loyalty?*

The defendants' contention that the plaintiffs have failed to plead a cognizable claim depends heavily on their argument that the Partnership Agreement eliminated any default fiduciary duty of loyalty owed by the General Partner, Icahn, and the other defendant directors to the limited partners of American Real Estate. The defendants base their argument on § 6.13 of the Agreement, and in particular subsection (d). The subsection reads as follows:

*Whenever in this Agreement the General Partner is permitted or required to make a decision (i) in its "sole discretion" or "discretion", with "absolute discretion" or under a grant of similar authority or latitude, the General Partner shall be entitled to consider only such interests and factors as it desires and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Partnership, the Operating Partnership or the Record Holders, or (ii) in its "good faith" or under another express standard, the General Partner shall act under such express standard and shall not be subject to any other or different standards imposed by this Agreement or any other agreement contemplated herein.*[FN14]

> FN14. Partnership Agreement, § 6.13(d) (emphasis added).

According to the defendants, § 6.13(d) sweeps away all default principles of fiduciary duty when the sole and complete discretion standard governs the General Partner's actions. The sole and complete discretion standard, they contend, is utterly inconsistent with the default duty of loyalty, which would require that the General Partner treat the limited partners fairly in any conflict situation. How can one square that duty of fairness with § 6.13(d)'s statement that the General Partner need not consider any particular factor in making decisions subject to the sole and complete discretion standard?

**\*7** The defendants' focus on this question is logical. As they note, several of the acts the plaintiffs complain of fall under the "sole and complete discretion" standard. For example, under the Agreement, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 7
Not Reported in A.2d, 2001 WL 1045643 (Del.Ch.)
(Cite as: Not Reported in A.2d)

General Partner has sole and complete discretion to make or withhold distributions.[FN15] Therefore, § 6.13(d) is implicated by the plaintiffs' challenge to the General Partner's decision to cease distributions.

FN15. Partnership Agreement, § 6.05.

Likewise, the Agreement contains the following broad provision stating:

6.01 Management and Control of Partnership. Except as otherwise expressly provided or limited by the provisions of this Agreement (including, without limitation, the provisions of Article VII), the General Partner shall have full, exclusive and complete discretion to manage and control the business and affairs of the Partnership, to make all decisions affecting the business and affairs of the Partnership, and to take all such actions as it deems necessary or appropriate to accomplish the purposes of the Partnership as set forth herein. The General Partner shall use reasonable efforts to carry out the purposes of the Partnership as set forth herein. The General Partner shall use reasonable efforts to carry out the purposes of the Partnership and shall devote to the management of the business and affairs of the Partnership such time as the General Partner, in its sole and absolute discretion, shall deem to be reasonably required for the operation thereof. No Limited Partner, Record Holder, Non-Consenting Investor or Subsequent Transferee shall have any authority, right or power to bind the Partnership, or to manage or control, or to participate in the management or control of, the business and affairs of the Partnership in any manner whatsoever.[FN16]

FN16. Partnership Agreement, § 6.01.

The defendants argue that this section applies to the General Partner's investment decisions. Because the core purpose of the Partnership is to make investments in real estate and (under the contested Amendment, non-real estate) investments, the defendants argue that § 6.13(d) applies to the plaintiffs' challenges to specific investment decisions made by the General Partner.

Once again, therefore, this court faces a situation where an agreement which does not expressly pre-

clude the application of default principles of fiduciary is argued to do so by implication. Indeed, this case presents the court with an opportunity to address a contractual provision similar to the one it interpreted on two occasions in *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,*[FN17] and contemporaneously with this case in *Gelfman v. Weeden Investors, L.P.,* 792 A.2d 977.[FN18] In each of those cases, this court held that the traditional fiduciary entire fairness standard could not be applied because it was inconsistent with a contractual provision providing a general partner with sole and complete discretion to effect certain actions subject solely to a contract-specific liability standard. The court's decision was based on two factors. First, the court noted the difference between the sole and complete discretion standard articulated in the agreements, which explicitly stated that the general partner had no duty to consider the interests of the partnership or the limited partner in making its decisions, and the traditional notion that a fiduciary acting in a conflict situation has a duty to prove that it acted in a procedurally and substantively fair manner.[FN19] Second, and even more critically, however, each of the agreements indicated that when the sole and complete discretion standard applied, any other conflicting standards in the agreements, other contracts, or under law (including the DRULPA) were to give way if it would interfere with the general partners' freedom of action under the sole and complete discretion standard.[FN20] That is, in each case, the agreement expressly stated that default principles of fiduciary duty would be supplanted if they conflicted with the operation of the sole and complete discretion standard.[FN21]

FN17. Del. Ch., C.A. No. 15754, mem. op., 2001 WL 846054, Strine, V.C. (July 18, 2001 corr. Aug. 1, 2001); Del. Ch., C.A. No. 15754, mem. op., 2000 WL 1521371 Strine, V.C., (Sept. 27, 2000).

FN18. Del. Ch., C.A. No. 18519, mem. op., Strine, V.C. (Aug. 23, 2001).

FN19. *Gotham,* 2001 WL 846054 at *24; *Gelfman,* mem. op. at 15-16.

FN20. *Gotham,* 2001 WL 846054 at *26;

Not Reported in A.2d

Not Reported in A.2d, 2001 WL 1045643 (Del.Ch.)

(Cite as: Not Reported in A.2d)

Page 8

*Gelfman,* mem. op. at 18.

FN21. *Gotham,* 2001 WL 846054 at *3 (quoting agreement provision stating that each limited partner agreed that "any standard of care or duty ... under the Delaware RULPA or any other applicable law ... shall be modified, waived or limited ... as required to permit the General Partner to act" under the sole and complete discretion standard so long as the General Partner's action "does not constitute willful misconduct and is reasonably believed to be consistent with the overall purposes of the Partnership"); *Gelfman,* mem. op. at 14 (quoting agreement language that is essentially identical to that in *Gotham,* but which also subjects the general partner to liability for gross negligence).

**8** This case presents a twist on *Gotham Partners* and *Gelfman.* Like the provisions in *Gotham Partners* and *Gelfman,* § 6.13(d) sets forth a sole discretion standard that appears to be quite different from the duty of a fiduciary to act with procedural and substantive fairness in a conflict situation. What is different about § 6.13(d), however, is that it does not expressly state that default provisions of law must give way if they hinder the General Partner's ability to act under the sole discretion standard. Rather, § 6.13(d) merely states that other standards in the Agreement or agreements contemplated by the agreement give way to the sole discretion standard. By its own terms, § 6.13(d) says nothing about default principles of law being subordinated when the sole discretion standard applies.

This omission is of legal significance. In prior cases, this court has held that default principles of fiduciary duty will apply unless a partnership agreement plainly provides otherwise.[FN22] As the defendants would have it, when the Partnership Agreement says that the General Partner has sole discretion, it means that the General Partner has unreviewable power to act in any manner whatsoever, however advantageous to the General Partner and however disadvantageous to the Partnership. According to the defendants, the General Partner could choose to invest Partnership

funds in a failing venture solely to ensure that the General Partner's own investment in that venture is not lost, and turn its back on a less risky and more profitable opportunity for the Partnership.

FN22. *See, e.g., Sonet v. Timber Company, L.P.,* Del. Ch., 722 A.2d 319, 322 (1998).

This court has made clear that it will not tempted by the piteous pleas of limited partners who are seeking to escape the consequences of their own decisions to become investors in a partnership whose general partner has clearly exempted itself from traditional fiduciary duties.[FN23] The DRULPA puts investors on notice that fiduciary duties may be altered by partnership agreements, and therefore that investors should be careful to read partnership agreements before buying units.[FN24] In large measure, the DRULPA reflects the doctrine of *caveat emptor,* as is fitting given that investors in limited partnerships have countless other investment opportunities available to them that involve less risk and/or more legal protection. For example, any investor who wishes to retain the protection of traditional fiduciary duties can always invest in corporate stock.

FN23. *Sonet,* 722 A.2d at 327; *see also In re Cencom Cable Income Partners, L.P. Litig.,* Del. Ch., C.A. No. 14634, mem. op. at 12-13, 1997 WL 666970 at *4, Steele, V.C. (Oct. 15, 1997) (In rejecting argument that the entire fairness standard applied to a sale covered by specific contractual provision, the court stated that "[p]laintiffs have failed to show why the written terms of the sale process should be subject to some court-approved, after-the-fact, moralistic 'entirely fair' standard, when the parties defined the desired process in the Partnership Agreement and could have, but did not, require the General Partner to include the specific provisions that Garber testified would be desirable in a purchase agreement negotiated at arms-length.")

FN24. That is, if the investors wish to protect themselves through legal means. Many investors protect themselves by diversifying

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

their portfolios. One suspects that investment funds and other sophisticated investors also protect themselves by refusing to invest their money in entities controlled by persons who have burned them in the past, and that reputational factors might therefore play some role in deterring opportunistic behavior.

But just as investors must use due care, so must the drafter of a partnership agreement who wishes to supplant the operation of traditional fiduciary duties. In view of the great freedom afforded to such drafters and the reality that most publicly traded limited partnerships are governed by agreements drafted exclusively by the original general partner, it is fair to expect that restrictions on fiduciary duties be set forth clearly and unambiguously.[FN25] A topic as important as this should not be addressed coyly.

> FN25. *Sonet,* 722 A.2d at 322 ("[P]rinciples of contract preempt fiduciary principles where the parties to a limited partnership have made their intentions to do so plain.").

**\*9** Here, I conclude that the Partnership Agreement fails to preclude the operation of the fiduciary duty of loyalty with sufficient clarity, even in situations when the General Partner has the contractual power to act in its sole discretion. The reasons I reach this conclusion are several. First, I again note the absence of any express indication that default principles of law must give way when the sole discretion standard applies. This absence is striking given the prevalence of such express provisions, and their use in concert with contractual language markedly similar to § 6.13(d).[FN26] The drafter's decision to preempt conflicting provisions of the Agreement and of other contracts, but not those of default law can thus be viewed as intentional.

> FN26. Aside from *Gotham Partners* and *Gelfman,* I note that the leading treatise on the DRULPA includes a section of forms. That section advocates the use of contractual provisions like § 6.13(c), which state that when a sole discretion standard applies, other standards are to give way. Unlike §

6.13(c), however, the treatise form expressly states that the sole discretion standard applies to the exclusion of "any other or different standards imposed by this Agreement *or any other agreement contemplated herein or by relevant provisions of law or equity or otherwise.*" Martin I. Lubaroff & Paul Altman, *Lubaroff & Altman on Delaware Limited Partnerships,* at F-38 (2000 Supp.) (emphasis added); *see also id* . at F-99 (essentially the same except using the term "applicable law" rather than "relevant provisions of law or equity").

Second, other provisions of the Agreement imply that concepts of fiduciary duty will apply except when the Agreement clearly modifies them. For example, the Agreement contains an exculpatory provision- § 6.14-that exempts the General Partner and its directors and officers from liability except for liability (i) for any breach of such Person's duty of loyalty to the Partnership, as such duty may be set forth in or modified by this Agreement, (ii) for acts or omissions not in good faith or which involve intentional misconduct or knowing violation of law or (iii) for any transaction from which such Person derived an improper benefit.[FN27]

> FN27. Partnership Agreement, § 6.14.

While to some extent my reference to § 6.14 may be seen as begging the question since the application of § 6.14 itself raises the question of whether the Agreement has "modified" the duty of loyalty, the section seems to me to undercut the notion that § 6.13(d) provides the General Partner with the limitless scope of action for which the defendants contend. Given the breadth of actions to which the sole discretion standard applies, § 6.14 would have little scope if the defendants are correct about what § 6.13(d) means. Its presence in the contract and its preservation of liability for situations when the General Partner has breached its duty of loyalty or acted in bad faith is, on balance, more consistent with a reading of § 6.13(d) that leaves room for the application of the fiduciary duty of loyalty, at least as to its substantive aspects.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 10
Not Reported in A.2d, 2001 WL 1045643 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Finally, this interpretation is consistent with the Registration Statement provided to investors when the Partnership was first formed. That Statement contains a section stating:

6.12. Transactions with General Partner or Affiliates. In addition to transactions specifically contemplated by the terms and provisions of this Agreement, the Partnership is expressly permitted to enter into other transactions with the General Partner or any of its Affiliates, including, without limitation, buying and selling properties from or to the General Partner or any of its Affiliates, subject to the Limitations contained in this Agreement, the Delaware Act and in the Registration Statement.[FN28]

FN28. Registration Statement at B-18.

By its own terms, the Partnership Agreement indicates that the Registration Statement is contractually relevant:

*10 The General Partner is accountable to the Partnership and the Unitholders as a fiduciary and, consequently, must exercise good faith and integrity in handling Partnership affairs. This is a rapidly developing and changing area of the law and API Investors who have questions concerning the duties of the General Partner should consult with their counsel. Under appropriate circumstances, a Unitholder may file a class action on behalf of all Unitholders for alleged violations by a General Partner of its fiduciary responsibility or of Federal or state securities laws.

The Partnership Agreement provides that the General Partner and its affiliates and all of their officers, directors, employees and agents will not be liable to the Partnership or to any Unitholder for any losses sustained or liabilities incurred as a result of any action that does not constitute (i) a breach of that person's duty of loyalty to the Partnership, as that duty of loyalty may be specified in or modified by the Partnership Agreement, (ii) an act or omission in bad faith which involves intentional misconduct or a knowing violation of law or (iii) a transaction from which an improper personal benefit is derived.[FN29]

FN29. Registration Statement at 75-76.

These provisions indicate that the drafters of the Part-

nership Agreement did not eliminate fiduciary duties in the sweeping manner contended for by the defendants. Because the Partnership Agreement must be read in accordance with the reasonable expectations of the investors, and because the Agreement does not clearly eliminate the application of the fiduciary duty of loyalty, I conclude that the General Partner owed certain loyalty-based duties to the limited partners.

The question is, exactly what elements of the traditional duty of loyalty apply? The parties have not shed much light on this topic, having confronted the basic question in starker terms. Therefore, I speak tentatively.

At first blush, however, it appears that the Agreement does have some effect on the traditional duty of loyalty. For one thing, the Agreement seems to preclude the application of any "fair process" test to a decision made by the General Partner that is subject to the sole discretion standard, even if such decision is conflicted. Typically, the fairness of a procedure would turn largely on the extent to which the interests of the minority (or in this case, the limited partners) were given due consideration in the decision-making machinery.[FN30] Because the sole discretion standard in the Agreement authorizes the General Partner to make decisions without giving any consideration to particular interests, including those of the limited partners, the application of a procedural fairness test conflicts directly with the contract.[FN31]

FN30. E.g., *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 711 (1983).

FN31. *R.S.M., Inc. v. Alliance Capital Management Holdings L.P.,* Del. Ch., C.A. No. 17449, mem. op. at 39, Strine, V.C. (Apr. 10, 2001).

Less certain is whether the sole discretion standard obviates the duty of the General Partner to act with substantive fairness in a transaction between the General Partner (or an affiliate) and the Partnership. The parties have shed little light on this question, and I hesitate to answer it without additional help. Without prejudice to the defendants' ability to renew their argument at a later time if the need arises, I believe it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

prudent not to foreclose the possibility that something akin to a fairness standard applies in an interested transaction. The fact that § 6.14 does not exculpate the General Partner "for any transaction from which [it] derived an improper personal benefit" buttresses my hesitance to conclude that the General Partner may effect a self-dealing transaction on terms unduly favorable to itself.

**\*11** Likewise, I conclude that the Partnership Agreement preserves that core aspect of the duty of loyalty which prohibits a fiduciary from taking bad faith action to injure the Partnership for his own personal advantage. Again, the specific indication in § 6.14 that the Agreement does not generally exculpate acts of bad faith supports this conclusion. So does a less case-specific, normative proposition. To the extent that an Agreement purports to insulate a General Partner from liability even for acts of bad faith towards the Partnership, it should do so in the most painstakingly clear terms. Whether an Agreement that permits a General Partner-by its unmistakable terms-to exercise its discretion in bad faith is consistent with Delaware public policy is in itself an important question. But no court need reach that question until a Partnership Agreement plainly provides the General Partner with authority to act in bad faith with impunity. The Partnership Agreement at issue in this case does not do so.

### 2. *Does The Complaint State A Claim For Breach Of The Fiduciary Duty Of Loyalty?*

Having concluded that the plaintiffs may state a cognizable claim if they allege facts that support a breach of the more substantive aspects of the traditional fiduciary duty of loyalty, I now turn to the task of analyzing the plaintiffs' claims. This task is complicated by the cursory nature of the complaint, which is redolent with accusations of bad faith schemes but short on the pleading of specific facts that support the inference that these alleged schemes may indeed exist.

In evaluating the plaintiffs' claims, I start with the fact that they do not allege that any of the General Partner's actions were beyond the contractual power of the General Partner, assuming that those actions

were properly motivated and did not confer an improper benefit on the General Partner. Rather, the plaintiffs' ability to plead claims is based entirely on their ability to set forth facts supporting an inference that the General Partner breached its duty of loyalty. Indeed, the complaint alleges a breach of the Partnership Agreement in only two respects. The first is odd, in sense that the complaint alleges that the General Partner breached the Agreement by acting in a manner not exculpated by § 6.14. The second is more general, and consists in the proposition that the implied covenant of good faith and fair dealing precludes all of the actions challenged by the plaintiffs.FN32 Taken together, I have difficulty distinguishing these two "contractual claims" from the plaintiffs' claim that the General Partner and the other defendants breached their fiduciary duty of loyalty. For this reason, the rest of this opinion focuses on the question of whether the complaint pleads facts that support a breach of the substantive aspects of the duty of loyalty.

> FN32. The complaint does not use the implied covenant of good faith and fair dealing in any precise manner. That is, the complaint does not explain why a particular act of the General Partner could be seen, in view of the particular express provisions of the Agreement, as so repugnant to the reasonable expectations of the contracting parties as to be precluded by the implied covenant. Rather, the complaint pleads the implied covenant as a substitute for fiduciary duties, which at the very least precludes the General Partner from exercising its contractual powers in bad faith so as to advantage itself at the expense of the Partnership and the limited partners. As so used by the plaintiffs, the implied covenant becomes indistinguishable from a core aspect of the fiduciary duty of loyalty.

### a. *The General Partner's Termination Of Distributions*

The plaintiffs allege that the General Partner initially halved distributions in 1993 and then terminated them altogether in December 1995. The General Part-

ner's alleged motives for these reductions were: (i) to free up cash to invest in projects in which Icahn was investing through other entities he controlled; and (ii) to put downward pressure on the unit price of the Partnership's units and thus enable High Coast to conduct a tender offer for units at a bargain price.

**\*12** As pernicious as this alleged conduct sounds in the abstract, the complaint does not plead a cognizable claim that the General Partner's decision to reduce and then terminate distributions was a breach of the duty of loyalty. Although the complaint's allegations are undoubtedly inflammatory, they are not backed up with pled facts.

Many businesses decide to eliminate dividends or distributions in order to use free cash for growth. Their shares or units then trade on the premise that the entity is a growth-oriented vehicle. In this case, American Real Estate units are publicly traded on a major stock market.

The complaint contains no facts that suggest that there were not potentially lucrative uses for the Partnership's cash. Under § 6.05 of the Agreement, the General Partner has "the sole and absolute discretion" to retain Partnership cash as "may be required to satisfy the anticipated present and future cash needs of the Partnership, whether for operations, expansion, improvements, acquisitions or otherwise."

What the plaintiffs at best allege is that they have a difference of opinion with the General Partner about the mission of the Partnership. The plaintiffs contend that the Partnership should be managed in a more balanced fashion, in which the Partnership makes regular cash distributions and pursues more modest growth. Instead of doing as the plaintiffs wish, the General Partner has decided to take a long-term approach that focuses on capital growth. Without more, pleading that the General Partner of a limited partnership adopted such a strategy does not suffice to state a claim.

Certainly, however, such a strategy could be deemed a breach of the duty of loyalty, if well-pled facts indicated that the strategy was designed to provide benefits to the General Partner, to the detriment of other

unitholders. Such facts are not pled here, however.

As will be noted later, the plaintiffs have failed to plead facts that indicate that Partnership cash has been invested in projects solely so as to bail out or enrich Icahn, or with any intent to otherwise injure the Partnership. Likewise, even under the pro-plaintiff standards of Rule 12(b)(6), I cannot draw the inference that the General Partner's decision to eliminate distributions *in 1995* was designed to enable High Coast to make a low-ball tender offer *in 1998.*

Nor have the plaintiffs alleged any other more specific form of harm flowing from the termination of distributions. For example, they have not claimed that the General Partner retained the cash and attempted to grow the Partnership because that would result in an increase of management fees to the General Partner, which would more than offset any costs to High Coast from the termination of distributions. Nor have the plaintiffs alleged that the termination of distributions has caused limited partners adverse tax consequences.

b. *The Amendment To The Partnership Agreement*

The plaintiffs claim that the General Partner had a bad faith reason to amend the Partnership Agreement to permit the Partnership to invest in non-real estate projects: the amendment was necessary if Icahn was to be able to use the Partnership as a source of funding for his various efforts to acquire control of entities in diverse business fields. The Partnership itself, plaintiffs insist, had no reason to look beyond real estate for places to invest its cash. Indeed, the plaintiffs allege that Icahn admitted that the General Partner's proposal of the Amendment was a breach of fiduciary duty, because the Information Statement expressly indicated that High Coast's consent to the Amendment was influenced by factors other than "the best interests of the Partnership and maximization of Unitholder value." [FN33] These factors included "whether the General Partner and its affiliates, including Icahn, have independent [non-real estate] assets which may benefit from investments by the Partnership." [FN34] Based on little more than these statements, the plaintiffs allege that the General Partner breached its duty of loyalty by proposing the Amend-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 13
Not Reported in A.2d, 2001 WL 1045643 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

ment in the first place.

>    FN33. Information Statement at 5.

>    FN34. *Id.*.

**\*13** There is no doubt that Icahn admitted that his own reasons for approving the Amendment in his capacity as High Coast's owner were self-interested and not in perfect alignment with the Partnership's other unitholders.[FN35] But the plaintiffs ask me to infer from this the fact that the General Partner *qua* General Partner proposed the Amendment so as to advantage Icahn and disadvantage the Partnership. This I cannot do.

>    FN35. Under Delaware corporation law, to which the plaintiffs look for support in sustaining their claims, a stockholder is entitled to vote its shares in its own self-interest. *See, e.g., Stroud v. Grace,* Del. Ch., 606 A.2d 75, 84 (1992).

The Information Statement that the complaint cites many times identifies a perfectly legitimate rationale for the Amendment: the Partnership could obtain better results if it could also invest its cash in potentially higher-yielding non-real estate investments. The complaint does not plead any facts that support an inference that this was not the motive of the General Partner. Tellingly, the complaint does not allege any facts about the process that was undertaken by the General Partner in deciding to propose the Amendment. This omission is interesting because the Information Statement upon which the plaintiffs place so much reliance does describe the process.

According to the Information Statement, the General Partner's Audit Committee, acting with advice from independent financial advisors, studied the advisability of the Amendment and decided that it was a favorable initiative from the perspective of the Partnership.[FN36] The Audit Committee was comprised of directors of the General Partner who, according to the complaint, had no affiliation with any Icahn-controlled entities other than the General Partner as of the time they made their decision. It is also noteworthy that the Amendment did not diminish any of the protections that the Agreement provided to uni-

tholders against self-dealing by the General Partner. Rather, it simply had the effect of increasing the universe of investments that the Partnership could make.

>    FN36. Information Statement at 14.

Absent well-pled allegations that the purpose of the Amendment was to broaden the purposes of the Partnership so that it could make investments that were not beneficial to it, but were beneficial to Icahn and his affiliates, I believe that the plaintiffs have failed to state a claim. The mere fact that the Amendment permitted the Partnership to invest in a wider array of opportunities, and that those opportunities could include those which with other Icahn affiliates were involved, does not suffice. In this regard, my conclusion is closely linked to my later finding that the plaintiffs have failed to plead facts from which an inference can be drawn that the General Partner invested Partnership funds in Icahn-recommended investments on terms that were unfair to the Partnership and advantageous to Icahn.

Finally, I note another troubling aspect of this part of plaintiffs' claim, which must be addressed if this claim is later resurrected. That possibility exists because my dismissal order will be made without prejudice. The plaintiffs' complaint was filed some two years after the 1996 Amendment was enacted and was not served until four years thereafter. In that time, the Partnership has made investments in reliance on the Amendment. Public investors have bought units in the Partnership based on the expectation that the Partnership's purposes extended beyond real estate.

**\*14** The defendants have not focussed their laches claim specifically on the Amendment. In the future, they may renew that motion (if plaintiffs replead) with this issue in mind. I have difficulty conceiving of how this court can practicably rescind an Amendment that has been in effect for five years. Certainly, any relief that would be available would be prospective in nature only. When unitholders wish to challenge a partnership agreement amendment they should do so promptly and with vigor, not with the torpor that has characterized this litigation.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 14
Not Reported in A.2d, 2001 WL 1045643 (Del.Ch.)
(Cite as: Not Reported in A.2d)

### c. *The 1998 High Coast Tender Offer*

In the most cursory of terms, the plaintiffs challenge the November 1998 tender offer by High Coast as coercive and undervalued. They assert that the unitholders felt that they had no other choice than to tender because the General Partner had cut off distributions and was investing in Icahn-directed investments. The plaintiffs also allege that the offer did not fairly reflect the net asset value ("NAV") of the Partnership, but do not allege that limited partnership units generally trade at a price equaling or even approaching NAV. The plaintiffs also do not identify whether the offer included a premium to the unaffected trading price.[FN37]

> FN37. The defendants insist that the $10.50-per-unit offer represented a significant premium over the previously traded unit price of $7.25. Mem. in Supp. of Defs.' Mot. to Dismiss Am. Class Action Compl. at 6.

I do not believe that these allegations state a claim. For one thing, the tender offer was made by High Coast. The plaintiffs ask me to draw the inference that the General Partner's termination of distributions in 1995 was designed to set the stage for a tender offer by High Coast in 1998. Even under liberal pleading standards, that inference is not a reasonable one. Nor have the plaintiffs identified public disclosures of the Partnership that were coercive in nature; at most, the plaintiffs have pointed to the 1996 Information Statement as involving disclosures that coerced investors in the 1998 tender offer. But the fact that the Partnership had disclosed two years earlier that High Coast's motives for approving the 1996 Amendment were not in total alignment with other unitholders does not rise to the level sufficient to constitute actionable coercion in connection with a 1998 tender offer by High Coast. Put bluntly, the complaint does not allege facts that support the inference that the General Partner took wrongful coercive actions in connection with High Coast's 1998 tender offer.

Even more fundamentally, the plaintiffs before the court do not allege that they tendered into the offer or otherwise suffered any injury on account of it. According to the plaintiffs, High Coast already owned a majority of the Partnership's units before the tender offer. As a result, it is difficult to conceive of how non-tendering unitholders were injured by the tender offer.

### d. *The Partnership's Investments*

As a final matter, I reach the plaintiffs' claim that particular investments made by the General Partner resulted from breaches of fiduciary duty. This is a critical aspect of the plaintiffs' complaint. In large measure, my decision about the Amendment is influenced by the failure of the plaintiffs to plead facts that support an inference that the General Partner's investments were wrongful.

**\*15** The best way to illustrate this is to set forth the most relevant paragraphs of the plaintiffs' complaint verbatim:

73. Since 1997, consistent with its admonition in the Information Statement, Icahn and the General Partner have intentionally and willfully caused the Partnership to make investments which: [1]are high risk; (2) have no financial benefit to the Partnership; and (3) have depressed the value of the Units.

74. As a result, the trading price of the Partnership's Units have [sic] been depressed, and the market for the Units has been highly illiquid.

75. For instance, the Partnership has earned sufficient net cash flow beyond its daily needs to make substantial distributions and/or dividends which would have resulted in a significant increase in the trading value of the Units.

76. According to the Partnership's Form 10-K for the year ended December 31, 1999, (the "1999 10-K"), filed with the U.S. Securities and Exchange Commission on March 30, 2000, in 1999, AREP generated net cash flow after payment of maturing debt obligation and capital expenditures of approximately $35,400,000.

77. According to the 1999 10-K, during 1998, AREP had a net cash flow of $30,000,000. Some of this cash flow was generated by way of sale of the Partnership's properties, and some of the cash flow was generated interest earned from the proceeds of the Rights Offering.

78. Notwithstanding these substantial net cash flows, the General Partner refused to make distributions or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 15
Not Reported in A.2d, 2001 WL 1045643 (Del.Ch.)
(Cite as: Not Reported in A.2d)

declare a divided, or take other steps which would have lead to a rise in the Units' trading price and maximization of value.

79. Rather, as the General Partner, Icahn and the Individual Defendants admit in the 1999 10-K, the net cash flow was added to AREP's operating cash reserve, which was over $100,000,000 by December 31, 1999.

80. These cash reserves have not been used for the financial well being of AREP or its Unitholders, but rather to further Icahn's takeover schemes.

81. For instance, in 1998 and 1999, AREP invested approximately $175,300,000 in the stock of RJR Nabisco in order to aid Icahn in his efforts to take control of that company, financing this purchase at least in part with its cash reserves or cash flow.

82. During the period of 1997 through 1998, Icahn and the General Partner further caused AREP to invest over $100,000,00 of AREP's cash in bonds of certain bankrupt Atlantic City casinos, with the goal of obtaining control of these casinos, including the Sands, the Claridge and Stratosphere.

83. With regard to these Gaming Investments, Icahn has diverted and misappropriated AREP's cash reserves and thus monies which could be distributed to Unitholders to enable himself to cheaply gain control of these entities.

84. Similarly, Icahn cause AREP to make a significant investment in a bankrupt Canadian corporation, Philips Services, Corp. ("Philips") and intends to use AREP to help him gain control of Philips.

*16 85. Icahn has further cause AREP to invest in capital intensive real estate companies, which do not generate current income.

86. For instance, during the first quarter of 2000, Icahn cause AREP to purchase Bayswater Realty & Capital Corp. ("Bayswater") a land development company which he owned, for $84,500,000.

87. Such investment in undeveloped land involve more risk than land upon which developments have been completed, and do not generate operating revenue, while incurring costs to develop the properties.

88. Such investment do not result in the maximization of value for the Unitholders, and do not have not resulted in higher Unit prices or liquidity for Unitholders.

89. At the same time, the General Partner and Icahn

have caused AREP to make these investments, Icahn and the General Partner have failed to take any steps which would increase liquidity for AREP's Unitholders or increase the market price or trading value of the Units.[FN38]

FN38. Am. Comp. ¶¶ 73-89.

What is striking about these paragraphs is how conclusory and nonspecific they are. Given the nature of the plaintiffs' conspiracy theory, one would have expected them to have identified particular Partnership investments of the following kinds:

• An investment in which Partnership money was substituted in for the funds of another Icahn affiliate, so that the Icahn affiliate could gain cash flow while Icahn retained control of the entity in which the investment was made;

• An investment in which the Partnership infused capital in an Icahn-controlled entity that needed capital to avoid a restructuring or a loss of control by Icahn;

• The purchase by the Partnership of an entity that was already owned by another Icahn-controlled entity at an unfair price; or

• A scenario in which a group of Icahn affiliates purchased control of an entity, and in which the Partnership's portion of the investment had the least attractive features. That is, a situation where the Partnership assumed a great deal of risk or a low return, in order to allow other Icahn-controlled entities to receive better terms and for Icahn to obtain control.

Instead, what the complaint gives the court is cursory allegations that the Partnership invested in risky projects along with other Icahn-controlled entities, when it could have been paying out cash distributions (*the bulk of which would have gone to High Coast* ). Even when the complaint alleges that the Partnership purchased an entity from another Icahn affiliate, the Bayswater Realty & Capital Corp., the complaint fails to allege that the purchase price was unfair.

It is unclear to me what is wrong with the Partnership co-investing with other Icahn-controlled entities in situations that are potentially advantageous to all concerned. For example, the complaint alleges that the

Not Reported in A.2d                                                                                      Page 16

Not Reported in A.2d, 2001 WL 1045643 (Del.Ch.)

**(Cite as: Not Reported in A.2d)**

Partnership invested over $175 million in the stock of RJR Nabisco as part of Icahn's effort to obtain control of that entity.[FN39] But the complaint does not allege that the investment turned out poorly for the Partnership.

    FN39. Complaint, § 81.

**\*17** In their briefs, the plaintiffs go a bit further and point in an unclear, but troubling way, to potential facts about one Partnership investment that might suggest that the General Partner used Partnership funds to make an investment that was principally motivated by a desire to aid Icahn, without providing any benefit to the Partnership itself. The words of the brief insinuate that this investment involved the Partnership assuming an equity or creditor position towards a troubled entity that Icahn already controlled, thus preserving Icahn's control and providing him with cash flow at great risk and little upside to the Partnership. But these allegations are not in the complaint and are, to be frank, confusingly stated in the brief.

As of now, the complaint simply alleges that the General Partner is co-investing with other Icahn affiliates in risky projects and that these investments have not yet produced an increase in unit prices. I am not unaware that Icahn had personal reasons which could have motivated him to have caused the General Partner to make investments that were not in the best interests of the Partnership. Investments of the nature I outlined above are illustrative of my understanding of the core concerns raised by the plaintiffs.

That said, it remains the fact that Icahn, through High Coast, has a strong interest in the success of the Partnership, since he owns 90% of its units. The plaintiffs are resourceful enough to have identified and pled facts that support an inference that the General Partner has breached its duty of loyalty by making investments to advantage Icahn at the expense of the Partnership. They could have sought books and records to aid them in this effort.

Given the slow speed of this litigation, it is tempting to dismiss with prejudice. The pace of this case, however, is not solely the fault of the plaintiffs; they

and the defendants were engaged in negotiations for two years which did not break down until last fall. The plaintiffs have also sketched the outlines of a factual scenario that involved the potential for serious abuse of the unitholders by the defendants. Given this factor, there is the prospect that the plaintiffs might be able to plead a cognizable claim using guidance from this opinion. Therefore, I will dismiss this action without prejudice.[FN40]

    FN40. I urge the plaintiffs to give careful thought to who they name as defendants in any new complaint. In the existing complaint, the plaintiffs have pled claims against non-employee directors of the General Partner, and have not alleged any motive for purposeful wrongdoing on their part. Although these directors face a structural conflict, they had no personal interest in advantaging Icahn or High Coast. *Gelfman,* mem. op. at 28, n. 24; *Gotham,* 2001 WL 846054 at \*30. As a result, they are likely protected from liability by § 6 .14 of the Agreement, since any complaint against them would implicate only the duty of care. As to any directors of the General Partner named in the amended complaint, the plaintiffs should also give thought to whether it is necessary to plead a redundant "aiding and abetting claim" against them. One would think that the directors either owed fiduciary duties to the unitholders or that they did not. If only the General Partner was owed such duties directly, its directors would simply be the means through which the General Partner acted. Finally, I dismiss without further discussion the plaintiffs' dissolution claim, which lacks merit. The plaintiffs should give careful thought before reasserting that claim.

### IV. Conclusion

For the foregoing reasons, the defendants' motion to dismiss the complaint is GRANTED. The defendants' motion to dismiss is granted with prejudice as to any actions of the defendants arising on or before three years before the filing of the complaint on November

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1045643 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

18, 1998. The defendants' motion to dismiss is otherwise granted without prejudice to the plaintiffs' right to file an amended complaint. IT IS SO ORDERED.

Del.Ch.,2001.
Miller v. American Real Estate Partners, L.P.
Not Reported in A.2d, 2001 WL 1045643 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 8

Not Reported in A.2d                                                    Page 1
Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**c**

Pomeranz    v.    Museum    Partners,
L.P.Del.Ch.,2005.Only the Westlaw citation is cur-
rently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Jacques POMERANZ, Amalgamated Sludge LLC,
    formerly known as Sludge Management, LLC, a
    Nevada Limited Liability company, Eric Nettere,
Alan W. Steinberg Partners, LP, a New York Limited
    Partnership, David Scott Associates, LP, a Virginia
    Limited Partnership, Robert Goldfein, E.A. Moose
    Co., LP, a Delaware Limited Partnership Robert Gil-
    man, Steven Chaleff, ICMC Paramount Fund, LP, a
    Texas Limited Partnership, Richard and Teresa Lil-
    libridge, Plaintiffs,
v.
MUSEUM PARTNERS, L.P., a Delaware Limited
    Partnership, Asher B. Edelman, Northstar Partner-
    ship, L.P., a Delaware Limited Partnership, Presidio
    Capital Corp., a British Virgin Islands Corporation,
    and Gerald Agranoff, Defendants.
**No. Civ.A. 20211.**

Submitted Oct. 27, 2004.
Decided Jan. 24, 2005.

David J. Margules, and Joanne P. Pinckney,
Bouchard Margules & Friedlander, P.A., Wilming-
ton, Delaware; Joshua L. Dratel, and Mark J. Eberle,
Joshua L. Dratel, P.C., New York, New York, for
Plaintiffs.
Gregory P. Williams, and Peter B. Ladig, Richards,
Layton & Finger, P.A., Wilmington, Delaware; Bar-
bara L. Moore, and John J. Tumilty, Edwards & An-
gell, LLP, Boston, Massachusetts, for Defendants
NorthStar Partnership, L.P. and Presidio Capital
Corp.
Kurt M. Heyman, and Patricia L. Enerio, the Bayard
Firm, Wilmington, Delaware, for Defendants Mu-
seum Partners, L.P. and Asher B. Edelman.

MEMORANDUM OPINION
STRINE, Vice Chancellor.
**\*1** This case centers on the coordinated withdrawal

of two affiliated limited partners, NorthStar Partner-
ship, L.P. and Presidio Capital Corp., NorthStar's
subsidiary, from two related limited partnerships,
Museum Partners, L.P. and Musee Partners L.P. De-
fendant Asher Edelman was the general partner of
both Museum Partners and Musee. Defendant North-
Star held the largest number of units in Museum Part-
ners. The goal of both partnerships was to acquire
shares of Societe du Louvre ("Societe"), a French
conglomerate, and to pressure its management into a
sale of assets or other value-maximizing transaction.

In June 1999, Edelman informed the unitholders of
Museum Partners that the entity's life was being ex-
tended through June 30, 2000 by vote of NorthStar,
which held a majority of the LP units. But, on Febru-
ary 10, 2000, NorthStar exercised its purported right
to withdraw from Museum Partners, arguably trigger-
ing a right to a payment equivalent to its share of the
entity's liquidation value. At the same time, Presidio
purportedly withdrew from Musee.

In this action, the plaintiffs, Jacques Pomeranz and
other remaining limited partners of Museum Partners,
allege that these withdrawals and the contract com-
promising NorthStar and Presidio's demands for pay-
ment (the "Withdrawal Agreement"), breached the
limited partnership agreement ("LP Agreement"),
FN1 were consummated in violation of fiduciary du-
ties owed to Museum Partners and its limited part-
ners, gutted Museum Partners financially, and caused
them cognizable damage. In response, on March 12,
2003, NorthStar and Presidio moved to dismiss the
complaints against them, arguing, among other
things, that the plaintiffs' claims are barred by applic-
able statutes of limitations and the doctrine of laches.
Because the resolution of the timeliness of the
plaintiffs' various claims in their First Amended
Complaint ("Complaint") FN2 disposes of those
claims, I need not reach their argument that the com-
plaint fails to state a claim against them. Instead, this
opinion addresses only NorthStar and Presidio's argu-
ment that the plaintiffs' claims against them were not
timely filed.

FN1. References to the Withdrawal Agree-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 2
Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

ment attached as Exhibit E to the Complaint, will be cited as "Withdrawal Agreement at ___." Similarly, references to the Museum Partners Limited Partnership Agreement, attached as Exhibit A to the Complaint, will be indicated as "LP Agreement at § ___." All of the other exhibits cited were attached to the Complaint and will be cited simply as "Ex. ___."

FN2. The plaintiffs' claims include: 1) breach of contract; 2) tortious interference with contract; 3) breach of fiduciary duty; 4) aiding and abetting of a breach of fiduciary duty; and 5) unjust enrichment.

The analysis is straightforward. The plaintiffs filed their initial complaint in this matter on March 26, 2003 but did not name NorthStar and Presidio as defendants until they filed an amended complaint on January 9, 2004. Because the allegedly wrongful conduct of NorthStar and Presidio occurred in 2000, each of the plaintiffs' claims accrued more than three years before January 9, 2004. The analogous statutes of limitations all have three year filing periods. The plaintiffs were keenly aware that a statute of limitations issue might arise, and therefore attempted to plead facts that would allow for tolling of the relevant statutes of limitations, making their claims timely. Put simply, the plaintiffs must prevail on the tolling question or their claims are barred. The plaintiffs bear the burden of showing that tolling is appropriate.

*2 For reasons that I will explain, the plaintiffs do not plead facts excusing the untimeliness of their filing. The plaintiffs had sufficient notification by October 2000, at the latest, of both the withdrawal of North-Star and the possibly injurious effect of that event on the viability of Museum Partners, to be put on inquiry notice of the claims alleged in the Complaint. As a result, the plaintiffs' claims are time-barred.

No inequity is worked by this conclusion. Had the plaintiffs commenced their investigation in a timely manner, they would have discovered all the relevant details sooner. Even after missing the starting gun triggered by inquiry notice, plaintiffs were in possession of all major pieces of the puzzle by July 2001.

They filed the initial complaint in this matter well after receiving this material and chose not to include NorthStar and Presidio as defendants despite challenging the validity of the Withdrawal Agreement in that original pleading, waiting almost three years from receiving the information to amend their complaint. In light of these facts, I grant NorthStar and Presidio's motion to dismiss.

I. *Analytical Framework*

A. *Procedural Standard*

A statute of limitations defense may be raised and decided on a motion to dismiss.[FN3] As this court has made clear, "[w]hen it is clear from the face of the Complaint (and the documents incorporated by reference in it) that plaintiffs' tolling theories fail even to raise a legitimate doubt about the time the claims accrued, dismissal is appropriate if the claims were filed after the applicable limitations period expired." [FN4]

FN3. *United States Cellular Investment Co. of Allentown v. Bell Atlantic Mobile Systems, Inc.*, 677 A.2d 497, 502 (Del.1996).

FN4. *In re Dean Witter Partnership Litig.*, 1998 WL 442456, at *6 n. 44 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del.1999) (Table); *see also Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del. Ch.1993) (noting that it is "well settled that where the complaint itself alleges facts that show that the complaint is filed too late, the matter may be raised on a motion to dismiss").

Because over three years elapsed between the major events alleged in the Complaint to constitute wrongdoing by NorthStar and Presidio and the filing of that pleading, NorthStar and Presidio have appropriately raised, at this juncture, the question of whether the plaintiffs' claims are time-barred. As will be explained, the most efficient manner to dispose of the dismissal motion is to determine whether the Complaint sufficiently supports their contention that their tardy filing was excused by relevant tolling doctrines, and, in particular, their more specific assertion that they did not receive inquiry notice of their claims un-

Not Reported in A.2d                                                                                    Page 3
Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

til after January 9, 2001.

To obtain the benefit of tolling, the plaintiffs must allege facts that support the applicability of an equitable exception to laches and the relevant statutes of limitations because "the party asserting that tolling applies ... bear[s] the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled." [FN5] In this regard, I accept well-pled facts alleged in the Complaint as true and view them in the light most favorable to the plaintiffs, but I do not accept conclusory allegations without specific factual allegations to support them.[FN6]

> FN5. *Dean Witter,* 1998 WL 442456, at *6 (citing *United States Cellular,* 677 A.2d at 504).

> FN6. *In re Tri-Star Pictures, Inc., Litig.,* 634 A.2d 319, 326 (Del.1993); *Dean Witter,* 1998 WL 442456, at *4.

B. *The Relevant Statutes Of Limitations And The Impact Of Tolling*

All parties generally agree that three years is the relevant limitations period for each of the plaintiffs' substantive claims,[FN7] and that this court typically applies the limitations period at law by analogy to equitable claims in order to apply the doctrine of laches. Therefore, the critical question is when to start counting the three year period for each of the plaintiffs' claims.

> FN7. The plaintiffs make various claims against NorthStar and Presidio. As to the plaintiffs' claim for breach of fiduciary duty, see *Dean Witter,* 1998 WL 442456, at *4; *Fike v. Ruger,* 754 A .2d 254, 260 (Del.Ch.1999), *aff'd* 752 A.2d 112 (Del.2000); as to the plaintiffs' claim for breach of contract, see 10 *Del. C.* § 8106; *Fike,* 754 A.2d at 260; as to the plaintiffs' claim for tortious interference, see *Williams v. Caruso,* 966 F.Supp. 287, 293 (D.Del.1997); as to plaintiffs' claim for unjust enrichment, see *Merck & Co. v. SmithKline Beecham Pharms. Co.,* 1999 WL 669354, at *42 (Del.

Ch. Aug. 5, 1999), *aff'd,* 766 A.2d 442 (Del.2000). *See generally* *Kahn v. Seaboard Corp.,* 625 A.2d 269, 272 (Del. Ch.1993) ("where the statute bars the legal remedy, it shall bar the equitable remedy in analogous cases or in reference to the same subject matter."). As is discussed later, there is an argument that some or all of the plaintiffs' claims are governed by 6 *Del. C.* § 17-607 of the Delaware Revised Uniform Limited Partnership Act ("DRULPA"), which states in pertinent part that "[u]nless otherwise agreed, a limited partner who receives a distribution from a limited partnership shall have no liability under this chapter or other applicable law for the amount of the distribution after the expiration of 3 years from the date of distribution." As I find, however, even if § 17-607 were applicable, the outcome would not change.

**\*3** As a general matter, it is well-settled that "a cause of action 'accrues' [for purposes of a statute of limitations] ... at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action." [FN8] The courts of this state have repeatedly emphasized that this is the prevailing rule.[FN9] Thus, to the extent that the claims against NorthStar and Presidio were based on wrongful acts occurring before January 9, 2001, the claims against them would, absent extraordinary circumstances, be time-barred. As it turns out, and as discussed in greater detail below, the wrongful acts alleged in the Complaint occurred during the year 2000. Therefore, to prevent their claims from being time-barred, the plaintiffs must demonstrate a basis for tolling the various limitations periods.[FN10]

> FN8. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 860 A.2d 312, 319 (Del.2004).

> FN9. *See, e.g., SmithKline Beecham Pharms. Co. v. Merck & Co.,* 766 A.2d 442, 450 (Del.2000) ("This statute [10 *Del. C.* § 8106], ... is not a 'discovery statute' and the limitations period begins to run from the time the cause of action accrues. This is so 'even if the plaintiff is ignorant of the cause of action.' ") (citing *Dean Witter,* 1998 WL

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 4
Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

442456, at *4).

FN10. *Dean Witter,* 1998 WL 442456, at *6.

Various theories exist under which a plaintiff may seek tolling of the statute of limitations.[FN11] But any possible tolling exception to the strict application of the statute of limitations tolls the statute *"only until* the plaintiff discovers (or [by] exercising reasonable diligence should have discovered) his injury."[FN12] When plaintiffs are on inquiry notice, the statute of limitations begins to run.[FN13] Inquiry notice does not require full knowledge of the material facts; rather, plaintiffs are on inquiry notice when they have sufficient knowledge to raise their suspicions to the point where persons of ordinary intelligence and prudence would commence an investigation that, if pursued would lead to the discovery of the injury. FN14

> FN11. The parties debate whether any of the tolling justifications available to plaintiffs-1) that their injuries were inherently unknowable, 2) that the facts of their injuries were fraudulently concealed from them, or 3) that equitable tolling applies because they justifiably relied on Edelman's disclosures because he was a fiduciary-are actually applicable against NorthStar and Presidio. But I need not and do not decide which, if any, of these doctrines applies, recognizing that the defendants contend that none do.
> Inherently unknowable injuries typically involve acts of malpractice or fraud of the kind that are not alleged with respect to NorthStar and Presidio. *See Becker v. Hamada, Inc.,* 455 A.2d 353, 356 (Del.1982) (quoting *Omaha Paper Stock Co. v. Martin K. Eby Constr. Co.,* 230 N.W.2d 87, 89-90 (Neb.1975)); *see also In re ML/EQ Real Estate Partnership Litig.,* 1999 WL 1271885, at *2 n. 12 (Del. Ch. Dec. 21, 1999) (noting that the inherently unknowable doctrine rarely, if ever, should apply in the entity law context). The doctrine of fraudulent concealment arguably does not apply because plaintiffs have not pled any "affirmative act of concealment" by either NorthStar or

Presidio that was "intended to put a plaintiff off the trail of inquiry." *Dean Witter,* 1998 WL 442456, at *5. Of the plaintiffs' theories, equitable tolling is the most logical. Equitable tolling usually applies to claims involving self dealing "where a plaintiff reasonably relies on the competence and good faith of a fiduciary," and the plaintiffs here say they relied on Edelman. *Dean Witter,* 1998 WL 442456, at *6. The plaintiffs also make a very strained, if extensively pressed, argument that NorthStar was a fiduciary simply because it owned a majority of the Partnership's units. I need not address that less-than-convincing contention.

> FN12. *Dean Witter,* 1998 WL 442456, at *6 (emphasis in original); *see In re ML-Lee Acquisition Fund II, L.P. Litig.,* 848 F.Supp. 527, 554 (D.Del.1994) (discussing inherently unknowable injuries); *United States Cellular,* 677 A.2d at 503 (discussing equitable tolling); *Litman v. Prudential-Bache Properties, Inc.,* 1994 WL 30529, at *8 (Del. Ch. Jan. 14, 1994) (discussing fraudulent concealment).

> FN13. *See Dean Witter,* 1998 WL 442456, at *6 n. 43 (collecting cases showing that the statute of limitations runs from the point of inquiry notice under several tolling theories).

> FN14. *Dean Witter,* 1998 WL 442456, at *7.

Because all of the plaintiffs' tolling arguments depend for their vitality on the question of when the plaintiffs were on inquiry notice, I have concentrated my analysis on that question. As I will explain, the plaintiffs' Complaint demonstrates that they were on inquiry notice no later than October 2000-more than three years before the Complaint was filed. That conclusion obviates the need to consider any other elements of the plaintiffs' tolling arguments.

**II.** *Factual Background*[FN15]

> FN15. As alluded to above, on this motion to dismiss, the facts are drawn from the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 5
Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Complaint and attached exhibits, and all reasonable inferences are drawn in favor of the plaintiffs.

A. *Formation And Purpose Of The Museum Partners And Musee Partnerships*

Edelman formed Museum Partners (or the "Partnership") in 1996. Both Museum Partners and Musee were formed as "special single purpose investment vehicles," specifically to purchase shares of Societe, a French conglomerate owning a variety of companies from luxury hotels and perfume and crystal manufacturers to a money-management firm. Societe was and continues to be controlled by the Taittinger family. Edelman's plan was to combine the efforts of Museum Partners, the onshore vehicle, and Musee, the offshore vehicle, with two other Edelman-controlled entities, together obtaining enough voting and non-voting stock of Societe to pressure the Taittingers to break up or restructure the company and realize what Edelman believed to be an exploitable disparity between Societe's stock trading value and its break-up value.

*4 Museum Partners collected approximately $35.5 million in capital contributions. NorthStar contributed $25 million of this amount, fully 70% of the initial capitalization of the Partnership and more than double the contributions of all other limited partners combined. The relative size of NorthStar's contribution was known to the other limited partners; NorthStar was described to the other limited partners as having the "Majority-in-Interest" of the limited partners,[FN16] a term defined in the LP Agreement as meaning that NorthStar had contributed more then 50% of all limited partner capital.[FN17] NorthStar's controlled affiliate, Presidio, also invested in Musee, the offshore vehicle.

FN16. *See, e.g.,* Ex. D.

FN17. *See* LP Agreement at § 14.2.

When formed, according to the terms of the LP Agreement, Museum Partners was to continue through June 30, 1998 with Edelman retaining the right (which he exercised) to extend the Partnership through December 31, 1998. Thereafter, the Partnership could only be extended by agreement of the general partner, Edelman, and the Majority-in-Interest of the limited partners.[FN18]

FN18. There is no specific provision relating to extension of the term of the Partnership in the LP Agreement. Presumably, extension was accomplished via amendment of § 8.1(d) which sets the date of dissolution at June 30, 1998. An amendment of the LP Agreement, pursuant to § 14.2, may be accomplished in a writing signed by the general partner and by the Majority-in-Interest of the Limited Partners, that is "Limited Partners whose Capital Accounts constitute more then 50% of the aggregate value of the Capital Accounts of all Limited Partner[s]." LP Agreement at § 14.2.

B. *The 1999-2000 Renewal Of Museum Partners*

On June 9, 1999, Edelman sent a letter to the limited partners urging them to continue to participate in the Partnership for another year. NorthStar had already agreed with Edelman to extend under the terms of the LP Agreement. Because NorthStar itself was the Majority-in-Interest limited partner, NorthStar's agreement with Edelman was sufficient to effect the extension; therefore the extension was presented to the other limited partners as a fait accompli.[FN19] In the letter, Edelman offered several positive comments on the state of Museum Partners' health and suggested, without promising, that the Partnership might soon realize profits based on the estimated 60% difference between Societe's trading price and its break-up value.

FN19. Ex. D; *see* LP Agreement at § 14.2. The plaintiffs have alleged that NorthStar's agreement to extend the Partnership from 1999 to 2000 was accompanied by a side agreement between NorthStar and Edelman that has never been produced to plaintiffs despite repeated requests for its production. As disturbing as this allegation is, it does not salvage plaintiffs' claims because, as explained below, plaintiffs were aware of sufficient other facts to put them on inquiry no-

Not Reported in A.2d                                                                                    Page 6
Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

tice before January 9, 2001. Similarly, the plaintiffs' recent submission relating to NorthStar's subscription agreement does not affect the timeliness of their claims. *See infra* note 73.

*C. The Withdrawal of NorthStar And Presidio On February 10, 2000 And The Withdrawal Agreement Dated April 19, 2000*

The Complaint alleges that NorthStar effected its withdrawal on February 10, 2000, after it reviewed a financial report, allegedly prepared for its sole benefit and dated the same day, covering the period from January 1, 2000 to February 10, 2000.[FN20] The report showed that the Partnership had suffered substantial losses for the year.[FN21] Although it had agreed to extend the term of the Partnership through July 31, 2000, NorthStar demanded exit from Museum Partners on February 10, 2000. NorthStar premised its request for a withdrawal distribution on § 7.2 of the LP Agreement, which it read as authorizing its request to withdraw and as entitling it to receive the value of its interest in the Partnership, as of February 10, 2000, within 30 days of its request for withdrawal, i.e., by March 9, 2000.[FN22] Presidio made a comparable demand on Musee at the same time.

> FN20. Complaint at ¶ 33; Ex. G (financials, dated February 10, 2000, allegedly prepared for NorthStar's review).

> FN21. *See* Ex. G (showing that the Partnership had lost $7.8 million dollars for the year and, on the attached schedule, attributing all $7.8 million of that loss to the limited partners).

> FN22. *See* Ex. F. (referring to the withdrawal notice that NorthStar provided to Edelman on February 10, 2000 and claiming default). Section 7.2(b) of the LP Agreement provides, in relevant part:
> If the Partnership is continued after the Withdrawal Date, such Limited Partner shall be entitled to receive within 30 days thereafter, in accordance with this Section 7.2,

the value of such Limited Partner's interest in the Partnership as of the applicable Withdrawal Date....

In the Complaint, the plaintiffs contend that NorthStar had no right to demand withdrawal from Museum Partners under the Partnership Agreement and that it breached the LP Agreement by doing so. Nevertheless, Edelman, as general partner, acknowledged that NorthStar had the right to withdraw and that NorthStar had a right to receive the distribution equal to its pro rata share of Museum Partners' liquidation value on March 9, 2001.[FN23]

> FN23. Section 7.2(c) of the LP Agreement provides, in relevant part:
> The value of a withdrawing Limited Partner's interest in the Partnership shall be that amount that the Limited Partner would have received had the Partnership been dissolved as of the Withdrawal Date, its debts and liabilities paid or provided for and its assets distributed in the order of priority set forth in Section 8.3. Such value shall be determined in the manner provided in Section 10.4.

**\*5** But Museum Partners and Musee did not have readily available currency to pay NorthStar and Presidio, presumably because their assets were tied up in pursuing their mutual goal of pressuring the Taittingers through block-holdings in Societe. In other words, if Museum Partners and Musee sold enough Societe shares to satisfy the demand for withdrawal, they would thereby lose much of whatever leverage they had to exercise over Societe. Additionally, the Societe shares could not be transferred directly to NorthStar or Presidio to pay the debt because transfers were prohibited by existing loan agreements between Museum Partners and Musee and Banque de Credit Agricole (Swiss) SA and Great American Insurance Company. To resolve this dilemma, Edelman entered into the Withdrawal Agreement with NorthStar and Presidio on behalf of Museum Partners and Musee on April 19, 2000.[FN24]

> FN24. The Withdrawal Agreement was later revised on October 25, 2000 to extend the Agreement's Outside Date, when all pay-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ments and additional distributions were due, from September 30, 2000 to December 31, 2000.

In the Withdrawal Agreement, Museum Partners and Musee acknowledged that NorthStar and Presidio had the right to withdraw and that they were entitled to withdrawal distributions of $12,057,565 and $11,701,595 respectively. Museum Partners and Musee also agreed that they would pay NorthStar and Presidio an additional $250,000 for each 30 day period during which the distributions had not been paid. This new debt, the "Additional Distribution Amount", would also accrue interest at 8% per annum, compounded monthly, until it was paid. The Withdrawal Agreement also provided an upside for NorthStar and Presidio by entitling them to an increased payment if the value of the Societe shares held by the partnerships increased before they were paid, while guaranteeing that they would not receive less than their original claims for distributions, plus the Additional Distribution Amounts. Thus, under the Withdrawal Agreement, NorthStar and Presidio retained the upside benefits of limited partner status while mitigating much, if not all, of the downside risk.

The Withdrawal Agreement also gave NorthStar and Presidio absolute priority in recovery of their capital, as against other limited partners (i.e., the plaintiffs) who might later withdraw. The provision suggests that before Museum could pay any other Museum Partners limited partner, Museum Partners first had to pay off its entire debt to NorthStar *and* Musee had to pay off its entire debt to Presidio.

### D. *The Limited Partners Receive Unaudited Partnership Financials For The Period Ending March 31, 2000*

At about the same time that Edelman and NorthStar (and Presidio) were negotiating the Withdrawal Agreement in April 2000, the Limited Partners received unaudited financial statements for the Partnership for the period beginning January 1, 2000 and ending March 31, 2000. The March 2000 financials, for the first time, split the schedule listing Partnership interests into two intra-period schedules, a pre-

February 10, 2000 schedule dealing with the period January 1, 2000 through February 10, 2000 (or "March Schedule 1"), and a post-February 10, 2000 schedule dealing with the period February 11, 2000 through March 31, 2000 (or "March Schedule 2").FN25 Importantly, March Schedule 1 appears to show the exactly the same financial information that was depicted in the February 10, 2000 financials that were allegedly provided only to NorthStar.FN26

> FN25. Ex. I.

> FN26. *Compare* Ex. G at 3 (financials allegedly prepared exclusively for NorthStar), *with* Ex. I at 3 (March 31, 2000 financials distributed to the limited partners). It should be noted that March Schedule 1 embodies the same information that the plaintiffs allege was disclosed only to NorthStar in the February 10, 2000 financials, including the negative $7,772,766 attributable as a loss to partner capital in column 6, P & L ALLOC. *Compare* Ex. G at 3 of 3 (financials allegedly prepared exclusively for NorthStar on February 10, 2000), *with* Ex. I at 3 of 4 (March Schedule 1, distributed to the limited partners). The names of the limited partners have been removed in Exhibit I, but the financial information is identical.

**\*6** Taken together, March Schedules 1 and 2 show the reduction of four capital accounts, totaling $25 million of initial contribution, to zero.FN27 The plaintiffs have conceded that a rational investor, upon receiving these schedules,FN28 would have concluded that NorthStar had withdrawn. The reason why that is so obvious is because the $12,057,565 withdrawal shown on March Schedule 2 represented the departure of 66% of Museum Partners' $18,370,157 capital as of February 11, 2000-a diminution that could only have been attributable to the withdrawal of the limited partner holding over a majority of the units, NorthStar.

> FN27. *Id.*

> FN28. Pl. Rep. Br. at 27; *see also* Tr. of Oral Argument at 47-48, 99.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 8
Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

But the plaintiffs note that March Schedule 2 also shows $4.1 million in allocated profit and results in a balance sheet for the entire period that shows $10.4 million remaining in the Partnership's capital accounts.[FN29] The plaintiffs contend that this balance sheet fraudulently inflated the value of the Partnership, and moreover, falsely reported that NorthStar had received its $12.1 million upon withdrawal. For Pomeranz, for example, this allegedly inflated result implied that his initial investment of $250,000, worth $302,692 on January 1, 2000, was worth $338,267 on March 31, 2000. In the big picture, the March Schedules suggest that even though the Partnership had only $18.4 million in capital when NorthStar withdrew its $12.1 million in February, somehow the remaining capital had increased between February 10, 2000 and March 31, 2000, a period of about seven weeks, from $6.3 million ($18.370 million-$12.058 million = $6.312 million) on February 11, 2000 to $10.4 million on March 31, 2000.[FN30]

> FN29. Ex. I.

> FN30. *Id.* One wonders if, upon receiving the March Schedules, the plaintiffs speculated that NorthStar had exited at precisely the *wrong* moment, that is, just before the Partnership's $6.3 million became $10.4 million, a 65% return in seven weeks.

In sum, the plaintiffs essentially concede that they were on notice as of April 2000 of NorthStar's withdrawal. Although they premise a claim explicitly on the contention that the withdrawal was, in itself, a breach of the LP Agreement, the plaintiffs argue that this violation of their contractual rights did not matter to them then because they were told by Edelman that the overall condition of Museum Partners was healthy.

### E. *The 2000-2001 Renewal Of Museum Partners*

On June 9, 2000, Edelman wrote to the limited partners seeking another extension of Museum Partners. In that letter, Edelman failed to disclose: 1) that the $12.1 million represented in the March Schedules as a withdrawal had not in fact been paid; 2) that the Withdrawal Agreement had been reached and the ma-

terial terms of that Agreement; 3) that, in particular, substantial interest penalties under the terms of that Agreement were continuing to accrue; and 4) that the Withdrawal Agreement was executed because Museum Partners could not afford to pay NorthStar. Instead, Edelman stressed (or invented) the positive and told the limited partners that their investments had increased in value and that Edelman had confidence that the Partnership's strategy would triumph within the year.

In one respect, the June 2000 letter differed materially from its 1999 counterpart. In June 1999, Edelman had informed the other limited partners that NorthStar had chosen, with him, to extend the life of Museum Partners for another year. In contrast, the June 2000 letter clearly makes renewal of the Partnership contingent on the agreement of the limited partners and does not mention NorthStar.[FN31] By making the renewal of the Partnership contingent upon plaintiffs' consent, the letter signaled that NorthStar's dominant position had changed from the year before.

> FN31. Ex. K ("In order to move forward, I must once again ask you to extend the partnership from its June 30[th] expiration date for another year.... I am asking you to sign the enclosed document so that we can affect [sic] the extension of the partnership.").

**\*7** Based on the disclosures that the other limited partners had received, several of them, including plaintiffs, voted in June of 2000 to extend the life of Museum Partners for another year. Unbeknownst to those limited partners voting to extend, seven other limited partners chose at that time to withdraw, and were paid the value of their capital accounts as of July 1, 2000.

### F. *Disclosures Following The Vote To Extend Through Year End 2000*

Although not attached to the Complaint, the June 2000 financials apparently reaffirmed the impression of vitality suggested by the March Schedules.[FN32] The September 30, 2000 financials, however, were considerably less upbeat. The $10.4 million in as-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 9

sumed ending capital in March 2000, which reportedly had grown to $15.3 million by the end of June, fell drastically to $8.9 million in September, while allocated profits and losses showed a $6.4 million loss for the period. Overall, the Partnership balance sheet reflected a net loss of $5.1 million. The financials still did not reflect the growing debt owed to NorthStar, nor did they reflect the withdrawal of the seven limited partners at the end of June, 2000. What they did show, however, according to the Complaint, was that "the Partnership's allocated profits [had] been *devalued by $15.4 million since June 30, 2000.*"[FN33]

> FN32. Ex. L (suggesting that Partnership capital at the end of June was in excess of $15 million).

> FN33. Complaint at ¶ 42 (emphasis in the original).

*G. 2001-NorthStar Finally Gets Paid; The Partnership Restates Its June 2000 Financials To Report the Payment To NorthStar; and The Plaintiffs Finally Learn About and Obtain A Copy Of The Withdrawal Agreement*

On or about January 14, 2001, NorthStar was finally paid the $12,057,565 that it was allegedly entitled to receive as of March 9, 2000 under the LP Agreement and that, by virtue of the Withdrawal Agreement, Museum Partners had promised to pay. Together with this sum, NorthStar received $1,296,109 as an Additional Distribution Amount, and $2,615,630.86 as a result of the upside protection provided by the Withdrawal Agreement; together, these additional payments totaled $3,911,739.86.[FN34]

> FN34. Complaint at ¶¶ 27-28, 44.

In March 2001, following an audit for the year 2000 (and the payment of almost $16 million in total to NorthStar), Museum Partners restated its June 30, 2000 financials to show, for the first time, the payment to NorthStar, with penalties, and to reduce allocated profit by $3 million, as of February 11, 2000, as a "realized loss on securities" to "account for the withdrawal and escrow established with the securities used to pay out NorthStar."[FN35]

> FN35. Complaint at ¶ 53.

Upon receiving the restated financials, the plaintiffs begin demanding copies of all agreements surrounding NorthStar's withdrawal from the Partnership, including the Withdrawal Agreement. The plaintiffs obtained a copy of the Withdrawal Agreement on July 11, 2001.

In the meantime, Museum Partners' strategy to pressure Societe disintegrated. All of the Societe shares were sold, leaving Museum Partners as a mere vehicle for litigation between the Partnership and Societe. According to the plaintiffs, they have been left holding the bag for the departing limited partners and have received, on a per unit basis, a mere pittance compared to the value received by NorthStar.

*H. The Plaintiffs File Suit In This Court*

**\*8** Nearly two years after securing a copy of the Withdrawal Agreement, the plaintiffs filed their original complaint in this action on March 26, 2003. In that complaint, the plaintiffs accused Edelman of exceeding his authority in agreeing to a Withdrawal Agreement that directly violated the LP Agreement in several respects. But in that initial complaint, the plaintiffs did not name NorthStar and Presidio as defendants. Moreover, despite being dissatisfied with Museum Partners' response to their informal requests for information, the plaintiffs waited until September 23, 2002 to formally demand to inspect the books and records of the Partnership. Unsatisfied with Edelman's response to that demand, the plaintiffs pursued a books and records action in this court, filed January 21, 2003. The plaintiffs received the fruits of that litigation on February 11, 2003 but waited until January 9, 2004 to amend their complaint and to plead claims for the first time against NorthStar and Presidio.

### III. *LEGAL ANALYSIS*

#### A. *The Accrual of The Plaintiffs' Claims*

To determine when the plaintiffs had inquiry notice of their claims, it is necessary to briefly identify the nature of those claims. The plaintiffs allege that NorthStar breached the LP Agreement by demanding to withdraw when the LP Agreement denied them

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)

**(Cite as: Not Reported in A.2d)**

that right, and also by securing certain contractual benefits through the Withdrawal Agreement that conflict with LP Agreement provisions. By participating in this course of conduct, Presidio is alleged to have tortiously interfered with the LP Agreement. Alternatively, NorthStar and Presidio are alleged to have been unjustly enriched by receiving excessive payments under the Withdrawal Agreement.

Relatedly, the plaintiffs argue that by demanding withdrawal and securing the Withdrawal Agreement, NorthStar either breached the fiduciary duties that it owed to plaintiffs (supposedly because it owned a majority of the limited partner units) or aided and abetted Edelman's breaches of fiduciary duty. Presidio is also alleged to have aided and abetted breaches of fiduciary duty. In these respects, it is alleged that NorthStar and Presidio had access to financial information other limited partners did not and sought an excessive withdrawal payment.

As to all these claims, it is clear that the plaintiffs contend that the execution of the Withdrawal Agreement caused them injury and constituted a breach of contract, tortious interference with contract, a breach of fiduciary duty or aiding and abetting a breach of fiduciary duty, and unjust enrichment. Absent their ability to prove that the Withdrawal Agreement is invalid on some legal or equitable basis, the plaintiffs have no grounds to challenge any later payments made in accordance with that Agreement. In other words, the plaintiffs' claims accrued on April 19, 2000, the date that the allegedly wrongful Withdrawal Agreement was executed, and an argument can be made that some of their claims accrued earlier, on February 10, 2000, at the time of NorthStar's allegedly improper withdrawal.

**\*9** I so conclude even if § 17-607 of DRULPA applies to the plaintiffs' claims. That statute provides in pertinent part that:

[u]nless otherwise agreed, a limited partner who receives a distribution from a limited partnership shall have no liability under this chapter or other applicable law for the amount of the distribution after the expiration of 3 years from the date of distribution.FN36

FN36. 6 *Del. C.* § 17-607(c).

The plaintiffs argue that § 17-607 applies and that the January 9, 2004 Complaint is timely (albeit barely) because NorthStar did not receive the payments provided for in the Withdrawal Agreement until January 14, 2001. These payments, they allege, are distributions for purposes of § 17-607. By contrast, NorthStar contends that, to the extent that § 17-607 applies, it received its "distribution" on April 19, 2000 when the Withdrawal Agreement was executed.

Candidly, the briefing addressing the scope of § 17-607's applicability was sparse and the relevant commentators FN37 provide little insight into how broadly that section's sweep should be in situations like this one. Fortunately, however, the breadth of § 17-607's applicability is not important for this opinion because I conclude that it is inapplicable on the facts presented in this case or, if applicable, does not affect the question of whether the plaintiffs claims are time-barred.

FN37. *E.g.,* Martin I. Lubaroff & Paul M. Altman, *Lubaroff and Altman on Delaware Limited Partnerships,* § 6.7 (2004).

Rather than receiving a distribution in strict accordance with § 17-607 of the LP Agreement, NorthStar accepted in compromise a new set of rights, articulated in the Withdrawal Agreement. That the Withdrawal Agreement required Museum Partners, as part of its total obligations to NorthStar, to make a payment equal to NorthStar's calculation of its distributional entitlement under the LP Agreement and subject to § 17-607, does not alter the fact that NorthStar had accepted a new contractual form of consideration, in lieu of payment under the LP Agreement on the date due. As a result, I conclude that § 17-607 does not apply; instead the plaintiffs are challenging the validity of a payment under a contract with a party that had become a creditor by virtue of that agreement.

Even if § 17-607 applies, I would conclude that the three year period began to run on the date the Withdrawal Agreement was originally signed, at the latest.FN38 The "distribution" would have to be

Not Reported in A.2d                                                                                    Page 11
Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

deemed the Withdrawal Agreement itself, which was the payment that Museum Partners made to NorthStar in response to its demand to withdrawal. In this regard, I perceive nothing in § 17-607 that suggests an intention to permit a plaintiff, who claims that a limited partner's demand for withdrawal was a per se breach of the LP Agreement and that the contract compromising that demand for payment was invalid, to sit on its rights until payments under that supposedly invalid contract are actually made.

> FN38. An argument can also be made that it ran from March 9, 2000, when NorthStar was arguably due its withdrawal payment under § 7.2(c) of the LP Agreement.

For all these reasons, I conclude that the determinative question on this motion, as to all claims, is whether the plaintiffs were on inquiry notice before January 9, 2001.[FN39] I answer that question next.

> FN39. The defendants have not argued that the statute of limitations established under 6 Del. C. § 17-607(c) cannot be subject to equitable tolling and nothing in this opinion should be read as a holding on that question. Based on the lack of arguments to this effect, I therefore assume, without deciding, that § 17-607(c) of DRULPA may be tolled when appropriate under the Delaware jurisprudence developed under other statutes of limitations.

### B. When Were The Plaintiffs On Inquiry Notice?

*10 The plaintiffs assert that the information required to bring the Complaint was withheld from them and invoke principles of equitable tolling in support of the timeliness of their action.[FN40] In particular, they contend that they relied on Edelman as a fiduciary to provide them with the material facts about the status of Museum Partners and that his non-disclosures of key facts, such as the execution and terms of the Withdrawal Agreement, tolled the running of the limitation periods for their claims. By contrast, NorthStar and Presidio contend that the plaintiffs were on inquiry notice as to their claims as early as April 2000 and no later than October 2000.[FN41] For the

following reasons, I conclude that the defendants have the better of the argument.

> FN40. Pl. Br. at 24-27; see Eberle Affidavit at ¶ 7 (alleging that plaintiffs did not know of Presidio until production of the Withdrawal Agreement on July 11, 2001).

> FN41. Def. Br. at 16-17; see Merck & Co. v. SmithKline Beecham Pharms. Co., 1999 WL 669354 (Del. Ch. Aug. 5, 1999).

### 1. Plaintiffs Were On Inquiry Notice Of NorthStar's Purported Withdrawal In April 2000

In support of their contention that the plaintiffs received inquiry notice in April 2000, NorthStar and Presidio point to the March Schedules sent to the plaintiffs that month. As noted, in those statements, there is a breakdown of the partners' capital into two intra-period schedules, one covering January 1, 2000 through February 10, 2000 (i.e., March Schedule 1) and a second covering February 11, 2000 through March 31, 2000 (i.e., March Schedule 2). This breakdown, the defendants quite rationally contend, indicates that an important event occurred on that date. March Schedule 2 shows that four unitholders, representing investors who had made $25 million in initial contributions, were removing the $12.1 million remaining in their capital accounts, and reducing the value of their capital accounts to zero.[FN42]

> FN42. Ex. I at 4.

No matter how the plaintiffs slice this information, it reveals that a withdrawal had occurred that was extremely large relative to the size of Museum Partners. First, March Schedule 2 clearly reports that the total capital of the Partnership dropped 66% on February 11, when the capital of $18,370,157 was reduced by a $12,057,565 withdrawal to a mere $6,312,592.[FN43] And, of course, the plaintiffs have alleged in their Complaint that such a withdrawal was a per se breach of the LP Agreement.[FN44] The plaintiffs attempt to slight the significant of the withdrawal's size by contending that they were lulled by the healthy profits recorded on March Schedule 2. But even taking into account the allegedly misleading allocation of $4.1 million in profits shown on March Schedule 2, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                       Page 12
Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
(Cite as: Not Reported in A.2d)

plaintiffs cannot avoid the conclusion that the March Schedules still should have raised their eyebrows regarding what was happening to the financial strength of the Partnership. Taken together, the March Schedules depicted the Partnership reporting an aggregate allocated loss of $3,663,876 for the period January 1, 2000 through March 31, 2000.[FN45] During this same period, the Partnership's assumed capital fell for the total period from $26,342,923 to $10,421,482. That represented a diminution of 60% in the Partnership's capital.[FN46]

FN43. *Id.*

FN44. Complaint at ¶¶ 26, 91. These portions of the Complaint were added when the original complaint was amended to name NorthStar and Presidio as defendants. The original complaint alleges a similar theory: that NorthStar and Presidio demanded withdrawal without having any right to do so, that Edelman exceeded his authority in agreeing to the Withdrawal Agreement, and that the Withdrawal Agreement directly violated the LP Agreement for various reasons, including that NorthStar: 1) demanded more than its liquidation value in its calculation of its withdrawal distribution; 2) secured an entitlement to receive excessive payments on top of that allegedly excessive withdrawal distribution; and 3) secured unfair priority for itself and Presidio over other limited partners.

FN45. This loss for the entire period is derived by adding the $4,108,890 of reported allocated profit on March Schedule 2 to the initial allocated loss for the period of $7,772,766 reported on March Schedule 1.

FN46. Ex. I.

**11** A rational limited partner investor in a single purpose entity, where the goal is to bring pressure on another company to force its management to negotiate with your entity, should have suspected that the loss of 60% of the Partnership's available capital very well might endanger that business strategy. Why?

The reason is obvious: the strategy was premised on having a large block of Societe shares to exert pressure on the Taittinger family. Less capital leads to owning fewer shares which, in turn, leads to less pressure which thus calls the whole strategy into question. The plaintiffs, as rational investors, should have begun asking questions.

Critically, at oral argument, their counsel candidly admitted that the plaintiffs were on inquiry notice as of April 2000 of the fact that NorthStar was the limited partner that had withdrawn:

THE COURT: But when your clients got this thing [the March 31, 2000 financials], they might have known that somebody large withdrew.

[PLAINTIFFS' COUNSEL]: That's correct, Your Honor. They did know. I mean, I can't argue that looking at this, you don't know it's NorthStar.

THE COURT: But what you are saying is you get-you are assuming that NorthStar has been paid.

[PLAINTIFFS' COUNSEL]: Correct.[FN47]

FN47. Tr. of Oral Argument at 47-48; *see also* Pl. Br. at 27 ("Plaintiffs might have deduced during 2000 that the withdrawing limited partner was NorthStar....").

So the plaintiffs knew, sometime in 2000 and as early as April of 2000 not only that someone had withdrawn, but that NorthStar had withdrawn, allegedly in breach of the LP Agreement.

Thus, at least with respect to this particular breach of contract claim, plaintiffs were on inquiry notice, upon receiving the March 31, 2000 Schedules in April 2000, that NorthStar had breached the LP agreement and should have suspected that the breach, because of the sheer size of the withdrawal, would jeopardize the Partnership's ability to pressure the Taittinger family and realize the break-up value of Societe, the stated purpose of the Partnership. For rational investors, this in and of itself is probably enough "that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued,* would lead to discovery of the injury."[FN48] But this is not the only indication that plaintiff had of NorthStar's withdrawal in breach of the LP Agreement or

the harm that arose as a result.

> FN48. *Dean Witter,* 1998 WL 442456, at *7
> (emphasis in original).

### 2. *The Renewal Letter In June 2000 Also Implied That NorthStar Had Withdrawn*

In contrast to the 1999 extension letter informing the limited partners that NorthStar and Edelman had decided to extend the Partnership, the 2000 extension letter made extension contingent upon the limited partners' agreement to extend and never mentioned NorthStar.[FN49] If NorthStar had retained its Majority-in-Interest position, the Partnership could only be extended by and with its consent-the other limited partners' agreement was irrelevant. The absence of any mention of NorthStar sharply contrasted with the prior year's notice and constituted further inquiry notice of NorthStar's withdrawal.[FN50]

> FN49. *Compare* Ex. D, *with* Ex. K.

> FN50. Recall that seven partners chose not to extend their interest in the Partnership in June 2000, and received the value of their interest as of that time.

### 3. *The Bleaker Picture Of The Partnership's Financial Condition Reported In October 2000, Should Have Prompted Inquiry By The Plaintiffs*

*12 Having conceded that inquiry notice of NorthStar's withdrawal existed as early as April 2000, the plaintiffs have attempted to change the focus of their argument to emphasize that although they had inquiry notice of their claims that NorthStar's demand to withdraw, and Edelman's acceptance of that demand, were improper under the LP Agreement and under fiduciary principles, they were lulled into believing that Museum Partners was thriving irrespective of the departure of its largest unitholder and that the pressure strategy would succeed despite a drastic reduction in the Partnership's capital. As a result, the plaintiffs were supposedly excused from acting upon their claim that NorthStar's withdrawal was a per se breach of the LP Agreement, on the basis of a novel "no harm, no foul" exception to the statute of limitations.

The problems with their argument are several. First of all, their argument rests on the dubious proposition that a plaintiff can know of causes of action that she thereafter asserts but argue that the statute was tolled until she understood the economic impact that the wrongful acts had caused her. That is, as to the plaintiffs' claim that NorthStar's demand for withdrawal, and Edelman's acknowledgement of the validity of that demand, breached the LP Agreement, the plaintiff is arguing that inquiry notice does not run until it had notice of the full economic impact of the wrong. That is not the law-"having all the facts necessary to articulate the wrong is not required." [FN51]

> FN51. *In re Dean Witter Partnership Litigation,* 1998 WL 442456, at *7 n. 49 (the " 'statutory period does not await plaintiffs' leisurely discovery of the full details of the alleged scheme.' ... It may have taken an expert to unravel the entire scheme alleged by plaintiffs. But having all of the facts necessary to articulate the wrong is *not* required.") (*citing McCoy v. Goldberg,* 748 F.Supp. 146, 158 (S.D.N.Y.1990) (emphasis in original).

The plaintiffs, even if they relied on a fiduciary, only receive the benefit of tolling until they "had reason to know that a wrong has been committed."[FN52] Here plaintiffs believed that NorthStar had breached the LP agreement by withdrawing. As our Supreme Court expressly held in an analogous case, the "doctrine of equitable tolling does not apply [when plaintiffs] had reason to know of the breach of the Agreement."[FN53]

> FN52. *Id.* at *5.

> FN53. *United States Cellular,* 677 A.2d at 503.

Contrary to the plaintiffs' assertion here, they may not simply wait until the details of the harm are provided to them before the statute begins to run.[FN54] Knowing of a wrong is sufficient to require action to preserve one's rights.[FN55] Delaware law expects some initiative from plaintiffs, even those who rely on fidu-

ciaries.FN56

> FN54. *Dean Witter,* 1998 WL 442456, at \*7 ("Inquiry notice does *not* require *actual* discovery of the reason for the injury.") (emphasis in original).

> FN55. *In re USACafes, L.P. Litig.,* 1993 WL 18769, at \*6 (Del. Ch. Jan. 21, 1993) ("when facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights.").

> FN56. *See Adams v. Jankouskas,* 452 A.2d 148, 157 (Del.1982) ( "Equity aids the vigilant, not those who slumber on their rights.").

Second, and as important, the Complaint itself indicates that the plaintiffs were on inquiry notice as to the economic impact of NorthStar's demand for withdrawal no later than October 2000 when they received the September 30, 2000 financials which provided a striking contrast to the comparatively sunnier, earlier disclosures. According to the plaintiffs, the September financials depicted that "the Partnership's allocated profits [had] been *devalued by $15,397,107 since June 30, 2000."* FN57

> FN57. Complaint at ¶ 42 (emphasis in the original). I must confess that I cannot follow the plaintiffs' math on this particular point. As I read the financials, the assumed ending capital of the limited partners was reportedly $10.4 million at the end of March (Ex. I), $15.3 million at the end of June, and $8.9 million at the end of September (Ex. L). This implies a $6.4 million loss for the period of June 30-September 30, 2000. *Id.* Such a loss, approximately 42% in three months, is certainly material, but, as far as I can tell, not on the order of magnitude of a $15.4 million devaluation. In any event, the message that the September financials gave, and that plaintiffs received at the time, was exceptionally negative, and that alone is sufficient to support the conclusion that they were on inquiry notice.

Now, it is of course true that the plaintiffs argue that the September financials did not constitute adequate notice of the impact of NorthStar's withdrawal because those financials attributed the devaluation to events post-dating the withdrawal indicated in the March financials. According to the plaintiffs, they did not receive inquiry notice until at least March 2001 because the causal link had not been provided to them. In March 2001, the Partnership: 1) restated its results for the quarter ending on June 30, 2000; 2) showed, for the first time, the nearly $16 million that NorthStar actually received in January 2001, pursuant to the Withdrawal Agreement; and 3) revealed the fact that NorthStar had not, in fact, been paid roughly $12.1 million in February of 2000 as the earlier financials had implied. It was only then that the plaintiffs supposedly realized that the downward shift in the Partnership's fortunes had anything to do with NorthStar's withdrawal. Moreover, it was only at that time that they were aware of the need to track down the Withdrawal Agreement itself, the document that gave them notice of Presidio's role.

**\*13** The difficulty for the plaintiffs is that their argument depends on the premise that inquiry notice only exists once they were aware of all material facts relevant to their claims. That is not the case. Equitable exceptions to statutes of limitations are narrow and designed to prevent injustice.FN58 Once a plaintiff is on notice of facts that ought to make her suspect wrongdoing, she is obliged to diligently investigate and to file within the limitations period as measured from that time.FN59

> FN58. *Ambase Corp. v. City Investing Co.,* 2001 WL 167698, at \*6 (Del. Ch. Feb. 7, 2001) ("Equitable tolling doctrines are an exception to the normal rule, and should not be lightly invoked."); *see also United States v. All Funds Distributed To Weiss,* 345 F.3d 49, 54-55 (2d Cir.2003) (equitable tolling is a narrow exception reserved for extraordinary situations in order to prevent injustice); *Olson v. Mobil Oil Co.,* 904 F.2d 198, 201 (4th Cir.1990) ("Equitable tolling is a narrow limitations exception, however. Courts cannot countenance ad hoc litigation for every missed deadline. The repose that stat-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 15
Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

utes of limitations provide will be lost if their applicability is up for grabs in every case.") (quotations omitted).

FN59. *E.g., Dean Witter,* 1998 WL 442456, at *8 (" '[W]hen facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights.' ... It is not too much to ask investors ... to read past the rosy forecasts and actually look at the cold, hard figures provided to them.... [The contradiction between the two] should prompt[ ] an inquiry by plaintiff into the health of their investments") (citing *In re USACafes,* 1993 WL 18769, at *6); *see also Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 96 (1990) ( "Federal courts have typically extended equitable relief only sparingly. We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies.... We have generally been much less forgiving ... where the claimant failed to exercise due diligence in preserving his legal rights."); *Johnson v. Nyack Hospital,* 86 F .3d 8, 12 (2d Cir.1996) (affirming that plaintiffs' claims were time barred when plaintiffs' delay was "excessive and occasioned by plaintiffs' lack of diligence").

Although the plaintiffs have, as a pleading matter, demonstrated that Edelman did not disclose all the material facts that he should have in 2000, their own complaint demonstrates that, no later than the beginning of October 2000, they were on inquiry notice that NorthStar had purportedly withdrawn, that the withdrawal substantially reduced the capital of the Partnership, and that the Partnership's value had plummeted for no apparent reason as of September 2000. Given that Societe shares were publicly traded and the complaint does not allege that their per share value had decreased, a rational investor should have been suspicious that the reported withdrawal of 66% of the Partnership's capital in mid-February 2000-or over $12 million-had injured the Partnership.

Indeed, the Complaint itself makes this very assertion:

Instead, at the time of extension [June 2000], Plaintiffs believed, based on explicit representations by defendant Edelman, that their investments in the Partnership had appreciated. It was not until the end of September 2000, however, that Plaintiffs were first alerted to the fact that even as of Spring 2000, when they decided to extend the Partnership, their interests were worth significantly less than what was reported to them contemporaneously (at the time they made the decision to extend the Partnership), and that they had borne the draconian financial burden of the Withdrawal Agreement.

Recognizing that by its plain terms, the Complaint admits knowledge of the Withdrawal Agreement as of the end of September 2000,[FN60] one of the plaintiffs' lawyers filed an affidavit taking back this statement and indicating that although plaintiffs knew of the financial straits of the Partnership in early October, they did not know of the link between this financial collapse and NorthStar's withdrawal until it was revealed to them in March 2001. Unfortunately for plaintiffs the fact that they did not know, in these circumstances, only highlights the fact that they did not ask, either about the allegedly improper withdrawal or the inexplicable reversal of the Partnership's fortunes-and, as rational investors, they should have.

FN60. I assume that the reference to the "end of September 2000" refers a receipt of the information contained in the September 30, 2000 financials, therefore while the plaintiffs may have been alerted by the Partnership at the end of September, they would not have been on notice of this information until they received it, sometime in October of 2000.

Although I am willing to decide this motion on the basis that the plaintiffs did not become aware of the Withdrawal Agreement until March 2001, the Complaint was not inaccurate about the plaintiffs' understanding, as of early October 2000, of the Partnership's decidedly bleaker financial status. Rather, paragraph 37 of the Complaint is properly read as an acknowledgement of the importance of the September financials and their obvious provision of inquiry no-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 16
Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

tice. The dramatic devaluation and losses reported in the September financials provided reason to suspect that the huge withdrawal reported in the March 2000 financials had harmed the Partnership. At the very least, the September financials ought to have raised plaintiffs' suspicions, and this is all that is required for inquiry notice. "Once a plaintiff is in possession of facts that make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice."[FN61]

> FN61. *See Dean Witter,* 1998 WL 442456, at *7 n. 49 (quoting *Harner v. Prudential Sec. Inc.,* 785 F.Supp. 626, 633 (E.D.Mich.1992), *aff'd,* 35 F.3d 565 (6th Cir.1994)).

*14 Nor does the fact that Edelman was a fiduciary excuse the plaintiffs' torpor. Although reliance on fiduciaries may toll the statute of limitations in appropriate circumstances, "the trusting plaintiff must still be reasonably attentive to his interest."[FN62] Plaintiffs must remain alert to red-flags that should prompt "an inquiry by plaintiffs into the health of their investments" even when those red-flags are "accompanied by optimistic projections."[FN63] Here, the plaintiffs were on inquiry notice of the per se breach of the LP Agreement represented by the withdrawal, the massive size of the withdrawal in relation to the value of the Partnership as a whole, the difficulty of achieving the Partnership's goals if the size of its Societe holdings had to be downsized by at least 60% as implied by the March Schedules, and of the possible relation between that withdrawal and the drastic and unexplained reduction of the Partnership's value as reported by Edelman in the September financials. However distorting Edelman's prior words might have been, by October 2000, it was unreasonable for the plaintiffs to ignore the obvious warnings because, by that time, Edelman's previous optimism, standing in stark contradiction to the bleak financial reality, should have, if anything, deepened and not dampened, their suspicions.

> FN62. *Dean Witter,* 1998 WL 442456, at *8.

> FN63. *Id.* at *8-9; *see also Fike,* 754 A.2d at 262 ("[Plaintiff], however trusting he may

have been that his partners would act in good faith, had some obligation to be 'reasonably attentive' to his investment interests.") (citations omitted).

In so ruling, I necessarily reject the plaintiffs' untenable suggestion that they were not "actually" on inquiry notice until they acquired the Withdrawal Agreement itself.[FN64] Only at that time, say the plaintiffs, were they aware of the precise terms of that Agreement, including the formula for determining the payout to NorthStar, and the provisions giving NorthStar a priority position over other limited partners, not only for itself, but also for its affiliate Presidio, which was not even a limited partner in Museum Partners.[FN65] But to credit plaintiffs' argument would subvert the concept of inquiry notice, by providing a ready excuse for untimely filing whenever a plaintiff was not aware of all material facts relating to its claims, not only as to their possible existence, but as to the extent of the harm they caused.

> FN64. Pl. Br. 26 n. 12.

> FN65. Pl. Br. 27.

Our law, as was well described by Chancellor Chandler in *In re Dean Witter Partnership Litig.,* sharply contrasts with the views advocated by the plaintiffs:

[T]he limitations period is tolled until such time that persons of average intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued,* would lead to discovery of the injury. Inquiry notice does *not* require *actual* discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all aspects of the alleged wrongful conduct. Rather the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme.[FN66]

> FN66. *Dean Witter,* 1998 WL 442456, at *7 (emphasis in original) (citations omitted).

Likewise, our Supreme Court has aptly stated that "whatever is notice calling for inquiry is notice of everything to which such inquiry might have led,"[FN67] including, in this case, the causal link between NorthStar's withdrawal and the consequent damage to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 17
Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

the Partnership.

> FN67. *United States Cellular,* 677 A.2d at
> 504 n. 7 (citing with approval *Kahn v. Sea-*
> *board Corp.,* 625 A.2d 269, 277 (Del.
> Ch.1993), and its adoption of the federal
> standard from *Tobacco and Allied Stocks,*
> *Inc. v. Transamerica Corp.,* 143 F.Supp.
> 323, 328-29 (D.Del.1956)).

**\*15** In deciding this case, the relatively generous approach our state has taken to tolling doctrines must be borne in mind. In general, Delaware law does not begin the running of the statute of limitations at all when a tolling doctrine applies-even one not involving any fraudulent concealment-until the plaintiff is on inquiry notice, giving the plaintiff the full limitations period to file after receiving that notice.[FN68] Arguably, it would be more faithful to the statutory intent behind statutes of limitations for Delaware common law to permit plaintiffs to rely upon tolling exceptions only when inquiry notice of their claims was either received at a time too close to the expiration of the limitations period to reasonably expect a timely filing or after the limitations period had already. expired. Even in those circumstances, the statute should arguably be tolled only for a period reasonably necessary to enable the filing of a complaint.[FN69]

> FN68. *E.g., Dean Witter,* 1998 WL 442456,
> at *5-7.

> FN69. In the case of equitable tolling, Judge
> Posner of the Seventh Circuit has expressed
> support for an approach of that kind, stating:
> We do not think equitable tolling should
> bring about an automatic extension of the
> statute of limitations by the length of the
> tolling period or any other definite term. It
> is, after all, an equitable doctrine. It gives
> the plaintiff extra time, if he needs it. If he
> doesn't need it, there is no reason for de-
> priving the defendants of the protection of
> the statute of limitations. Statutes of limita-
> tion are not arbitrary obstacles to the vindic-
> ation of just claims, and therefore they
> should not be given a grudging application.

They protect important social interests in
certainty, accuracy and repose.... When as
here the necessary information is gathered
after the claim arose but before the statute of
limitations has run, the presumption should
be that the plaintiff could bring the suit with-
in the statutory period and should have done
so. The presumption will be more easily re-
buttable the nearer the date of obtaining the
information is to the date at which the stat-
utory period runs out.
*Cada v. Baxter Healthcare Corp.,* 920 F.2d
446, 452-53 (7th Cir.1990), *cert. den'd,* 501
U.S. 1261 (1991).

Given the generosity of our approach to equitable tolling-which gives the plaintiff the full measure of the limitations period running from the date when inquiry notice was first received[FN70]-our courts should be careful to apply the concept of inquiry notice as Chancellor Chandler did in *Dean Witter*[FN71] and expect plaintiffs to act with reasonable alacrity once they have reason to suspect that their rights were injured. By any reasonable measure, the plaintiffs' antenna should have been raised no later than October 2000.[FN72] They had a full three years after that to file suit against NorthStar and Presidio and failed to do so. By acting too slowly, the plaintiffs, by tactical choice, forfeited their right to seek relief from NorthStar and Presidio and must look for relief only against Edelman and the other defendants they sued with the required promptness.

> FN70. *E.g., Dean Witter,* 1998 WL 442456,
> at *5-7.

> FN71. *See generally Dean Witter,* 1998 WL
> 442456, *passim.*

> FN72. The plaintiffs concede that they re-
> ceived a copy of the Withdrawal Agreement
> in July 2001 but waited over two years after
> that to sue NorthStar and Presidio. By con-
> trast, in the *Cada* case cited in note 69,
> Judge Posner found that the plaintiff had the
> necessary information to bring suit eight
> months before the end of the statutory peri-
> od and affirmed a finding that his claims

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
(Cite as: Not Reported in A.2d)

were time-barred.

### IV. *Conclusion*

For all the foregoing reasons, I find that all of the plaintiffs' claims against NorthStar and Presidio are time-barred and therefore grant the motion to dismiss the claims against them.[FN73]

> FN73. A week or so ago, the plaintiffs wrote a letter alerting the court to the existence of a subscription agreement between Museum Partners and NorthStar that purportedly gave NorthStar the right to withdraw at any time. The plaintiffs, however, had expressly agreed not to use ongoing discovery in connection with this motion, the briefing for which was completed. Thus, I conclude that the plaintiffs should not have submitted this document and do not consider it. As important, by their own arguments, the plaintiffs adhere to the view that, irrespective of the document, NorthStar had no right to withdraw. Therefore, the emergence of this document does nothing to undermine the conclusion that, as to their claim that the withdrawal was a per se breach of the LP Agreement and as to their related claims concerning the circumstances of NorthStar's withdrawal, plaintiffs were on inquiry notice no later than October 2000.

IT IS SO ORDERED.

Del.Ch.,2005.
Pomeranz v. Museum Partners, L.P.
Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 9

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

**H**

In re Turbodyne Technologies, Inc. Securities Litiga-
tionC.D.Cal.,2000.Only the Westlaw citation is cur-
rently available.

United States District Court,C.D. California.
In re TURBODYNE TECHNOLOGIES, INC. SE-
CURITIES LITIGATION,
**No. CV9900697MMMBQRX.**

Filed Jan. 22, 1999.
March 15, 2000.

Jeffrey H Squire, Ira M Press, Daniel Hume, FTS,
Kirby McInerney & Squire, New York, NY, Lionel Z
Glancy, Tracy L Thrower, Peter Arthur Binkow, Mi-
chael M Goldberg, Glancy & Binkow, Los Angeles,
CA, Jeffrey R Krinsk, Finkelstein & Krinsk, San
Diego, CA, Mark A Strauss, Kirby McInerney &
Squire, New York, NY, for David Takeda, individu-
ally and on behalf of all others similarly situated,
plaintiff.

Howard M Privette, Julie Michelle McEvilly, Elise J
Cohen, Brobeck Phleger & Harrison, Los Angeles,
CA, Robert P Varian, Brobeck Phleger & Harrison,
Spear St Twr, San Francisco, CA, Daniel J Tyukody,
Jr, Clifford Chance Rogers & Wells, Los Angeles,
CA, for Turbodyne Technologies, Inc, defendant.

Howard M Privette, Julie Michelle McEvilly, Elise J
Cohen, Robert P Varian, Daniel J Tyukody, Jr, (See
above), for Edward Halimi, defendant.

Dianne Marie Costales, Dale Braden & Hinchcliffe,
Los Angeles, CA, for Reliance Insurance Company,
defendant.

ORDER GRANTING DEFENDANTS' MOTION
TO DISMISS

MORROW, J.

**\*1** This is a securities fraud class action brought
against Turbodyne Technologies, Inc. and three of its
officers and directors on behalf of all public investors
who purchased Turbodyne securities between March
1, 1997 and January 22, 1999 (the "class period").
Turbodyne designs, develops, manufactures and mar-
kets products to enhance automotive engine perform-
ance.

Plaintiffs allege that defendants violated §§ 10(b)(5)
and 20(a) of the Securities Exchange Act of 1934 (the
"1934 Act"), and Rule 10b-5 of the Securities and
Exchange Commission ("SEC") regulations promul-
gated thereunder by making false and misleading
statements concerning a variety of issues related to
the company's development and expected release of a
product known as the Turbopac. The Turbopac is an
allegedly advanced form of turbocharger for internal
combustion engines that uses microchip technology
to boost airflow into the engine at critical times. The
product also allegedly increases the engine's fuel effi-
ciency and reduces emissions.

Defendants have moved to dismiss the consolidated
class action complaint on the basis that plaintiffs
have failed to plead their claims with particularity as
required by the Private Securities Litigation Reform
Act ("PSLRA") and Rule 9(b) of the Federal Rules of
Civil Procedure. Defendants argue that plaintiffs' al-
legations of reliance and scienter fail to satisfy the
pleading standard established in the PSLRA. They
also assert that the complaint fails to allege defend-
ants' statements during the class period were know-
ingly false or misleading at the time they were made.

Plaintiffs counter that they have alleged facts demon-
strating that Turbodyne trades in an efficient market,
and thus that there is a presumption of reliance under
a fraud-on-the-market theory. Additionally, they as-
sert that they have satisfied the PSLRA's require-
ments regarding the pleading of scienter by alleging
facts strongly supporting an inference that defendants
consciously disregarded the truth in making the pur-
portedly false statements. In this regard, they cite al-
legations in the complaint that incorporate pleadings
filed in three state court actions involving
Turbodyne.FN1 These pleadings reference testimony
and documents that, according to plaintiffs, indicate
defendants knew their statements were misleading
when they were made.

> FN1. The three cases are: (1) *Singleton v.
> Turbodyne Technologies, Inc.,* Los Angeles
> Superior Court Case No. LC047346, which
> was filed by a former corporate officer of

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Turbodyne on December 29, 1998, and alleges, *inter alia,* a claim for constructive discharge; (2) *Grand Tech, Inc. v. Turbodyne Technologies, Inc.,* Los Angeles Superior Court Case No. BS056312, which was filed by former Turbodyne distributor Grand Tech on March 24, 1999 to confirm an arbitration award in Grand's favor on a claim for negligent misrepresentation; and (3) *Turbodyne Technologies v. Manual P. Asensio,* Los Angeles Superior Court Case No. BC202422, which was filed on March 1, 1999, by Turbodyne against securities analyst Asensio. (See Complaint at 2.)

Although the Ninth Circuit has not itself defined the concept of an "efficient market," it has approved evaluation of the issue using the five factors suggested in *Cammer v. Bloom,* 711 F.Supp. 1264 (D.N.J.1989). These include the stock's trading volume, whether securities analysts follow the stock, whether the stock has market makers and arbitrageurs, whether the company files a Form S-3 registration statement, and whether the empirical facts show a causal connection between corporate announcements and movement in stock price. Plaintiffs have adequately alleged two of the five factors - i.e., that Turbodyne's stock is followed by analysts and that there is movement in the stock's price following corporate announcements. While no court has apparently required that all five factors be pled in a securities fraud complaint before plaintiffs may rely on a fraud-on-the-market theory, the court believes that the pleading of only two of the factors is not sufficient to satisfy plaintiffs' burden of pleading reliance with particularity.

**\*2** This failure to plead reliance requires that defendants' motion to dismiss be granted. Because it is likely that plaintiffs will be able to cure this deficiency in their pleading, however, the court has also examined the sufficiency of their scienter allegations. As interpreted by the Ninth Circuit, the PSLRA requires that plaintiffs plead in "great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics, Inc. Securities Litigation,* 183 F.3d 970, 974 (9th Cir.1999). This standard mandates that

plaintiffs "show intent, as opposed to mere motive and opportunity." *Id.* Additionally, plaintiffs must plead "adequate corroborating details ." *Id.* at 985.

Here, plaintiffs have alleged that defendants made six different types of misrepresentations. As explained in detail below, plaintiffs have adequately alleged that certain defendants made certain of the alleged misrepresentations with scienter. As respects other defendants and other representations, however, the facts alleged do not give rise to a strong inference of conscious misconduct or deliberate recklessness as required by *Silicon Graphics.* In amending the complaint, therefore, plaintiffs should address those areas in which the court finds their pleading of scienter deficient, or limit the alleged misrepresentations upon which they base their complaint to those concerning which scienter had been adequately alleged.[FN2]

FN2. Because the court finds that plaintiffs have not pled reliance with particularity, and have failed adequately to allege scienter as respects certain of the defendants' purported misrepresentations, the court does not address defendants' additional arguments that plaintiffs have failed adequately to allege defendants' knowledge that the statements were false when made, or that the statements fall within the PSLRA's safe harbor for forward-looking statements or the parameters of the bespeaks caution doctrine. In filing an amended complaint, the court recommends that plaintiffs group their allegations so that the pleading of each alleged misrepresentation is followed by allegations regarding falsity and scienter. If this is done, the merits of these additional arguments, and the adequacy of plaintiffs' pleading, can more easily be assessed.

## I. FACTUAL BACKGROUND

In deciding a motion to dismiss under Rule 12(b)(6), the court's review is limited to the contents of the complaint. *Campanelli v. Bockrath,* 100 F.3d 1476, 1479 (9th Cir.1996). All allegations of material fact must be taken as true and construed in the light most favorable to the non-moving party. *Smith v. Jackson,*

Case 4:06-cv-05255-SBA    Document 46-10    Filed 10/24/2006    Page 4 of 27

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

<u>84 F.3d 1213, 1217 (9th Cir.1996)</u>. Accordingly, this statement of facts recites and accepts as true the allegations contained in the consolidated class action complaint.

The 93-page complaint alleges six categories of purported misrepresentations during the class period:

A. The Turbopac's Performance Capabilities

Plaintiffs allege that throughout the class period, defendants made a series of statements misrepresenting the performance capabilities and technical characteristics of the Turbopac. These include that:
• Turbodyne's Form 20-F registration statement, filed with the SEC in September 1996, and signed by defendant Halimi, represented: (1) that the Turbopac employed a motor that "runs continuously"; (2) that the Turbopac was easy to install and could be installed by "unskilled mechanics"; [FN3] and (3) that development of the Turbopac was "substantially complete." [FN4]

> FN3. Complaint, ¶ 41.

> FN4. Id., ¶ 43.

• Turbodyne's Form 20-F, filed December 10, 1996, again represented that the Turbopac motor "r[a]n continuously" and that it could easily be installed by "unskilled mechanics." [FN5] The report also stated that the Turbopac's "specification and design [were] essentially complete." [FN6]

> FN5. Id., ¶ 44.

> FN6. Id.

*3 • Turbodyne issued a press release on May 21, 1997 that claimed the Turbopac "excel[led] at EPA air quality tests" and possessed the "unique capability of" reducing diesel engine emissions.
• Turbodyne's 1996 Form 20-F, filed July 29, 1997, claimed that it had "completed development and commenced production of the 1500 Turbopac model." [FN7] It also stated that while Turbodyne had delivered a total of 210 Turbopacs to its distributor, Grand Tech, Inc., Grand had not made any other significant purchases, and would likely be unable to complete its purchase obligations under the parties' distributorship agreement. [FN8]

> FN7. Id., ¶ 49.

> FN8. Id., ¶ 50. Representations regarding "completed development" and Grand's inability to satisfy its obligations under the purchase agreement were made again in Turbodyne's 6-K filings in August and September of 1997. Id., ¶¶ 53, 54.

• On more than one occasion, Turbodyne referred to the Turbopac as "already-proven" and as "breakthrough technology." [FN9]

> FN9. Id., ¶¶ 57, 59.

• In August and September 1997, Heavy Trucking Magazine reported claims by the Turbodyne that the Turbopac "produced a 4 psi to 5 psi boost almost instantaneously." [FN10] A Turbodyne brochure "recommended" use of the Turbopac with "engines [having] up to 8 liters of displacement," and claimed it was "capable of supplying 12 lbs./min, of air at 4 psi of boost at sea level." [FN11]

> FN10. Id., ¶ 60.

> FN11. Id., ¶ 69.

• Turbodyne's 1997 Annual Report, published in November 1998, claimed that the company's products were "available now, today. Our products are tried, tested and true." [FN12]

> FN12. Id., ¶ 65.

• In an October 26, 1998 Wall Street Transcript interview, defendant Ware said that the Turbopac was "easy to install" and required no "additional equipment" to operate. [FN13]

> FN13. Id., ¶ 68.

Plaintiffs allege that these statements were materially false or misleading because defendants knew, or consciously and recklessly disregarded, that the Turbopac was "beset with design and operational prob-

Case 4:06-cv-05255-SBA    Document 46-10    Filed 10/24/2006    Page 5 of 27

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

lems that [made it] unable to perform the basic functions represented, unmarketable, and potentially dangerous." [FN14] Plaintiffs further allege that Grand was not "unable" to fulfill its purchase obligations, but rather refused to accept delivery of additional Turbopacs because of the problems with them it had encountered. [FN15] Finally, plaintiffs allege that the Turbopac was incapable of generating the represented level of boost, and that it could function only on vehicles with up to 2.0 liters of displacement.[FN16]

> FN14. *Id.,* ¶ 48. Plaintiffs also allege that Grand had "report[ed] to Turbodyne" that the Turbopacs were unmarketable and dangerous. *Id.,* ¶ 55.

> FN15. *Id.,* ¶ 52.

> FN16. *Id.,* ¶ 70.

Plaintiffs assert that the true facts are "revealed in ... pleadings and other documents publicly filed in connection with the Grand arbitration proceeding." [FN17] As alleged in plaintiffs' complaint, these pleadings contain the following factual statements:

> FN17. *Id.,* ¶ 71.

• Grand's trial brief asserts that in March 1997, "Grand reported to Turbodyne" that the Turbopac failed to operate "continuously." It states that defendant Halimi disclosed he had put a "5 second governor on all of the units" because that was all "that was needed for passing and acceleration." [FN18] Grand's closing brief claims that during the arbitration, Halimi and a Turbodyne engineer testified that the Turbopac was "designed" not to run continuously.[FN19] The arbitrator's award states that the Turbopac never ran for more than 8 seconds, and that the "Turbopac 1500 as produced did not perform as represented." [FN20]

> FN18. *Id.,* ¶ 74.

> FN19. *Id.,* ¶ 75.

> FN20. *Id.,* ¶ 77.

**\*4** • Grand's closing brief asserts that Halimi testified he knew the Turbopac had to be "installed by an ex-

pert" and required "specialized microchips." [FN21]

> FN21. *Id.,* ¶ 80.

• Grand's trial brief contends that by March 1997, it had become aware that the Turbopac was not generating the promised amount of boost, and conveyed this information to Turbodyne.[FN22] Further, the brief asserts that "independent evidence" proffered by Grand during the arbitration indicated that the Turbopac performed at 1.6, not 4, psi. Thus, Grand argued that the Turbopac "deviated so far from the represented specification as to be unmarketable." [FN23]

> FN22. *Id.,* ¶ 82.

> FN23. *Id.,* ¶ 82.

• Grand's trial brief asserts that in 1997, it began to receive complaints from individuals who had received promotional Turbopacs that the units were shorting out and burning up. Grand asserts it "reported th[e]se complaints to the defendants," [FN24] and that in September 1997, Turbodyne reported that a "design flaw in the control panel was causing the units to burn." [FN25] Grand maintains that despite knowledge of the problem, Turbodyne did not take steps to correct it, and continued to manufacture the units.[FN26]

> FN24. *Id.,* ¶ 86.

> FN25. *Id.,* ¶ 87.

> FN26. *Id.*

**B. John Singleton's Involvement In Turbodyne's Operations**

In February 1998, Turbodyne issued a press release naming John Singleton as its Chief Financial Officer.[FN27] The release noted Singleton's superior qualifications and stated that he would serve as chairman of the company's Finance Committee and a member of its board of directors.[FN28]

> FN27. *Id.,* ¶ 140.

> FN28. *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

In March and April 1998, Turbodyne issued a news release and filed documents with the SEC announcing Singleton's appointment as its Chief Operating Officer.[FN29] The release stated that Singleton would, among other things, oversee the company's "finance and treasury,"[FN30] and again heralded Singleton's stature in the financial community.

FN29. *Id.,* ¶ 141.

FN30. *Id.*

On May 14, 1998, Turbodyne issued a news release, and shortly thereafter filed documents with the SEC, reporting the company's 1997 financial results. The documents contained extensive quotations by Singleton concerning the company's revenue and growth.[FN31] On May 22, 1998, defendants issued another release regarding financial performance that identified Singleton as the source of the information.[FN32]

FN31. *Id.,* ¶ 142.

FN32. *Id.,* ¶ 144.

Singleton's 1998 action against Turbodyne for constructive wrongful termination alleges that "news releases regarding the company's financial results were prepared and published without [his] authorization and involvement."[FN33] The complaint asserts that although the company held Singleton out as its CFO and COO, he was "denied the responsibilities and access to rudimentary information and resources [that are] customary [in] those positions."[FN34] Singleton contends that he was thus unable to perform the functions of CFO/COO,[FN35] and that Turbodyne hired him only so that it could "us[e his] name and reputation for honesty and integrity to boost ... industry, ... financial community and ... public [confidence] ... in [the company]."[FN36]

FN33. *Id.,* ¶ 143.

FN34. *Id.,* ¶ 150.

FN35. *Id.*

FN36. *Id.,* ¶ 151.

**C. Turbodyne's Alleged United Nations Endorsement**

**\*5** On April 11, 1997, defendants issued a news release stating that Turbodyne "had been recognized by the United Nations' Development Program (UNDP)."[FN37] The release indicated that the Chief of the UNDP's "Global Technology Group," Joseph B. DenBak, had issued a letter of "designation" to Turbodyne.[FN38] Turbodyne noted that such a designation was "significant," because it could "open[ ] up opportunities for Turbodyne to market products in countries that might not otherwise [be able to] afford [to buy its products]."[FN39] The release stated:

FN37. *Id.,* ¶ 123.

FN38. *Id.*

FN39. *Id.*

"Turbodyne has received interest from 57 developing countries for implementation of air quality improvement programs. These programs can now be accelerated with the assistance of the United Nations Global Technology Group and other international organizations including funding from the World Bank, which is currently under consideration."[FN40]

FN40. *Id.*

Plaintiffs contend that defendants cited the company's "flag technology" status throughout the class period, including in a May 21, 1997 news release and a Form 6-K filed on July 22, 1997.[FN41] In an October 21, 1997 news release, defendants discussed use of the Turbopac in "pilot programs" underway on three different continents, and noted that Turbodyne was participating in such programs in "cooperation [with] the United Nations Technology Group ."[FN42] In Turbodyne's 1997 Annual Report, the company claimed that its "United Nations Flag status [would] allow ... countries [interested in purchasing the Turbopac) to seek World Bank assistance in funding programs to improve air quality."[FN43]

FN41. *Id.,* ¶¶ 124-126.

FN42. *Id.,* ¶ 127.

FN43. *Id.,* ¶ 129.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 6

Plaintiffs contend these statements were materially false, citing an August 19, 1998 letter from the UN-DP to Asensio & Co. in which the UNDP denied having bestowed flag status on Turbodyne or having endorsed its products in any way.[FN44] Asensio subsequently issued a report captioned "Turbodyne's UN endorsements are blatantly false,"[FN45] in which it asserted that Ben-Dak had ended his term at the UN ten days before Turbodyne announced receipt of his endorsement.[FN46] Asensio also reported that the UNDP Global Technology Group was no longer in existence, that Turbodyne's press releases regarding its flag status were not authorized by the UNDP, and that they did not accurately reflect the UNDP's position with respect to Turbodyne's products.[FN47]

FN44. *Id.,* ¶ 132.

FN45. *Id.,* ¶¶ 133, 134.

FN46. *Id.*

FN47. *Id.*

On August 21, 1998, defendants issued a news release suggesting Asensio was a "short seller" that had an "ulterior motive" for publishing "blatant misinformation" about Turbodyne.[FN48] The company defended its use of the UNDP designation, stating that Turbodyne had been granted flag status on March 14, 1997, before Ben-Dak left the UN, and after a "rigorous examination."[FN49]

FN48. *Id.,* ¶ 135.

FN49. *Id.* Turbodyne has since initiated legal action against Asensio. See note 1, *supra.*

D. Turbodyne's Manufacturing Capabilities

According to Grand's Trial Brief, on December 31, 1996, Halimi sent a letter to Turbodyne shareholders and Grand stating that the company's manufacturing facility was "now fully operational and had the capacity to produce 8,000 Turbopacs per month."[FN50] In various SEC filings during September and December 1996, Turbodyne asserted that development "of its products [was] substantially" and/or "essentially" complete.[FN51]

FN50. *Id.,* ¶ 96.

FN51. *Id.,* ¶¶ 98, 99.

**\*6** In 1997 SEC filings, Turbodyne reported that "production" of the Turbopac, "which [had] beg[u]n late [in 1996], *continue[d]*"[FN52] and that development was complete.[FN53] A Form 6-K filed in September 1997 referenced delays in "full scale production" of the Turbopac, but allegedly "downplayed" their significance, reporting that they involved problems with warranties and manuals, not problems with the product itself.[FN54]

FN52. *Id.,* ¶ 100.

FN53. *Id.,* ¶ 101.

FN54. *Id.*

On March 30, 1998, Turbodyne issued a news release announcing that it had signed a three-year agreement with a Brazilian company, Asoria International, S.A., pursuant to which Asoria was to purchase at least 1,000 Turbopacs the first year, 5,000 the second and 25,000 the third.[FN55] In April, Turbodyne announced that it had obtained a purchase order from an Italian company for forty Turbopacs.[FN56] In May, a news release reported that "a major European ... engine manufacturer" had designated Turbopac models 1500 and 2200 as standard equipment on three classes of engines "being manufactured for the 1999 model year."[FN57]

FN55. *Id.,* ¶ 103.

FN56. *Id.,* ¶ 106.

FN57. *Id.,* ¶ 107.

In June 1998, Turbodyne issued a news release regarding its first quarter 1998 financial results. It reported that its outlook was strong as it "roll[ed]-out ... new breakthrough technology on a global scale."[FN58] Turbodyne's S-1 registration statement, filed September 23, 1998, claimed that the company had commenced commercial production of the Turbopac 1500 and 2500 models.[FN59]

FN58. *Id.,* ¶ 112.

Case 4:06-cv-05255-SBA    Document 46-10    Filed 10/24/2006    Page 8 of 27

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

FN59. *Id.,* ¶ 113.

Relying on evidence introduced during the Grand arbitration, the arbitrator's findings, and allegations set forth in Singleton's complaint, plaintiffs assert that these statements were misleading when made. Specifically, they contend that Turbodyne did not have a large-scale manufacturing capability at any time prior to June 1998, that it had no Turbopac assembly line until Spring 1997, and that it was capable only of producing grossly defective and potentially dangerous units.FN60 Plaintiffs allege that during the Grand arbitration, Turbodyne employees testified that there was no assembly line operational until Spring 1997 and that thereafter, it produced only defective products.FN61 The arbitrator's findings confirm these facts.FN62

FN60. *Id.,* ¶ 97.

FN61. *Id.,* ¶ 115.

FN62. *Id.,* ¶ 117.

Further confirmation is found in Singleton's complaint, which asserts that he objected to defendants' representations regarding Turbodyne's "manufacturing capabilities" on several occasions prior to his resignation.FN63 Despite these objections, Singleton contends, defendants persisted in making the representations.FN64

FN63. *Id.,* ¶ 118.

FN64. *Id.,* ¶ 119.

E. The Multi-Million Dollar Russian Transaction

On June 22, 1998, Turbodyne issued a news release announcing that it had received a letter of intent from Trans Business Group ("TBG") in Moscow regarding the purchase of 10,500 Turbopacs beginning in the third quarter of 1998.FN65 While cautioning that the purchase transaction was contingent on the "successful completion of financing arrangements with the U.S. Export-Import Bank,"FN66 the June 22 release stated that TBG would receive matching grants and consumer credit from sources such as the World Bank that would assist it in consummating the

agreement.FN67

FN65. *Id.,* ¶ 110.

FN66. *Id.,* ¶ 163.

FN67. *Id.,* ¶ 161.

*7 In a July 1998 release, Turbodyne announced that it had "formally accepted" TBG's order, and that the first shipment of Turbopacs would occur on October 1, 1998.FN68 In August, it stated that the TBG purchase order represented "more than $1 billion in potential sales to the company."FN69 Plaintiffs allege that these statements were misleading because defendants knew they did not have the manufacturing capability to fulfill such an order.FN70

FN68. *Id.*

FN69. *Id.,* ¶ 166.

FN70. *Id.,* ¶ 111.

The August 1998 release also announced that Turbodyne had established Turbodyne Credit Corporation for the purpose of "provid[ing] product financing guaranteed by world organizations for expanded sales to the Russian Federation." FN71 On October 2, 1998, defendants issued a release announcing that Turbodyne had received authorization to ship the first installation of Turbopacs to TBG.FN72 The release stated that "payment for the shipment [would] be through Direct Bank to Bank Financing and [an] appropriate Export Credit Guaranty." FN73

FN71. *Id.,* ¶ 167.

FN72. *Id.,* ¶ 170.

FN73. *Id.*

Plaintiffs allege these statements were false because defendants knew, or were consciously reckless in disregarding, that "no financing was in place for Turbodyne sales to [TBG]" and that, as a consequence, no sales could be expected.FN74

FN74. *Id.,* ¶ 171.

On March 3, 1999, EASDAQ issued a news release

Case 4:06-cv-05255-SBA    Document 46-10    Filed 10/24/2006    Page 9 of 27

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

in which it stated that, following an investigation, it had ordered Turbodyne to "release complete and accurate information [regarding] certain contracts and agreements." [FN75] Simultaneously, Turbodyne issued a release indicating that the TBG agreement was "subject to the completion of financing arrangements," and that it could not "provide any assurance ... the financing arrangements [would] be completed in the near future." [FN76]

> FN75. *Id.,* ¶ 173.

> FN76. *Id.,* ¶ 174.

### F. The Value Of Turbodyne's Technology

Plaintiffs allege that defendants disseminated a series of statements during the class period that misrepresented the value of the Turbopac technology. Specifically, they assert that, on January 20, 1998, Turbodyne issued a press release concerning its testing of the Turbopac, which touted the product's "already-proven ... engine performance capabilities" and "breakthrough technology." [FN77] Turbodyne used this same language to describe the Turbopac on other occasions as well. [FN78] At various times during the class period, defendants issued news releases and an Annual Report that described the Turbopac as "breakthrough," "innovative," and "advanced technology." [FN79] They further asserted that the Turbopac "establishe[d] a new paradigm." [FN80]

> FN77. *Id.,* ¶ 57.

> FN78. See, e.g., *id.,* ¶¶ 59, 65.

> FN79. *Id.,* ¶¶ 60, 65, 90.

> FN80. *Id.,* ¶ 90.

Plaintiffs allege these representations were materially false, as evidenced by the published research reports of securities analyst Asensio & Co. [FN81] One of these Asensio reports asserted that the Turbopac was "merely a supercharger ... driven by an electric motor instead of a belt" and that it was "easy to duplicate." [FN82] Another, issued on August 4, 1998, recommended selling Turbodyne's stock because the company's managers had cultivated a "false perception" of signi-

ficant earnings "in order to defraud investors ." [FN83] The report stated:

> FN81. *Id.,* ¶ 91.

> FN82. *Id.*

> FN83. *Id.,* ¶ 92.

**\*8** "In the last five years, Turbodyne has claimed deals with 12 different companies in over 14 different countries. No manufacturer has ever incorporated a single Turbodyne product in a new engine or vehicle." [FN84]

> FN84. *Id.*

Approximately two weeks later, Asensio published another report stating that "Turbodyne possesses no valuable technology.... Its alleged revolutionary product is easy to duplicate." [FN85]

> FN85. *Id.,* ¶ 93.

Plaintiffs allege these reports demonstrate the material falsity of defendants' statements regarding the value of the Turbopac technology. [FN86] Additionally, they assert that defendants made the statements knowing of their falsity or in "conscious reckless disregard" thereof, because defendants continued to disseminate the information even after the Asensio reports were published. Indeed, plaintiffs note, Turbodyne argued that the analyst's reports were incorrect. [FN87]

> FN86. *Id.,* ¶ 91.

> FN87. *Id.*

## II. DISCUSSION

### A. Legal Standard Governing Motions To Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. Rule 12(b)(6) must be read in conjunction with Rule 8(a) which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles A. Wright & Arthur R. Miller, Federal Practice and

Case 4:06-cv-05255-SBA    Document 46-10    Filed 10/24/2006    Page 10 of 27

Not Reported in F.Supp.2d                                                      Page 9
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Procedure, § 1356 (1990).

A court may not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." _Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Johnson v. Knowles, 113 F.3d 1114, 1117 (9th Cir.1997); Moore v. City of Costa Mesa, 886 F.2d 260, 262 (9th Cir.1989)_ (quoting _Conley_ ), cert. denied, _496 U.S. 906 (1990)._ In other words, a Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." _Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir.1988)._

As noted above, in deciding a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the court's review is limited to the contents of the complaint. _Campanelli, supra, 100 F.3d at 1479; Allarcom Pay Television, Ltd. v. General Instrument Corp., 69 F.3d 381, 385 (9th Cir.1995)._ The court must accept all factual allegations pleaded in the complaint as true, and must construe them and draw all reasonable inferences from them in favor of the nonmoving party. _Cahill v. Liberty Mutual Ins. Co., 80 F.3d 336, 337-38 (9th Cir.1996); Mier v. Owens, 57 F.3d 747, 750 (9th Cir.1995)._ It need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. _Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir.1981),_ cert. denied, _454 U.S. 1031 (1981)._

Because Rule 12(b)(6) review is confined to the complaint, the court may not consider material outside the pleading (e.g., facts presented in briefs, affidavits, or discovery materials). _In re American Continental Corp./ Lincoln Savings & Loan Securities Litigation, 102 F.3d 1524, 1537 (9th Cir.1996)._ It may, however, properly consider exhibits submitted with the complaint, documents whose contents are alleged in the complaint when their authenticity is not questioned, and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. _Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n. 19 (9th Cir.1989); Branch v. Tunnell, 14 F.3d 449,_

_454 (9th Cir.1994),_ cert. denied, _114 S.Ct. 2704 (1994)._[FN88] The court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." _Steckman v. Hart Brewing Inc., 143 F.3d 1293, 1295 (9th Cir.1998)._

> FN88. Taking judicial notice of matters of public record does not convert a motion to dismiss into a motion for summary judgment. _MGIC Indemnity Corp. v. Weisman, 803 F.2d 500, 504 (9th Cir.1986)._

B. The Parties' Requests For Judicial Notice

**\*9** Both parties have asked that the court take judicial notice of various documents, and both have objected to their opponent's request. The court will address each party's objections in turn:

1. Plaintiffs' Objections

Plaintiffs object to defendants' request that the court take judicial notice of the report of securities analyst Yorktown Retail Group concerning Turbodyne. FN89 Because plaintiffs assert that the allegations in their complaint are based in part on a "thorough review" of "securities analyst reports," defendants urge that plaintiffs have incorporated all such reports by reference, and thus that the Yorktown Report is a proper subject of judicial notice. See, e.g., _Plevy v. Heggarty, 38 F.Supp.2d 816, 821 (C.D.Cal.1998)_ (taking judicial notice of analysts' reports cited or quoted in the complaint because their contents were "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"). Plaintiffs counter that the Yorktown Report is "outside" the complaint, and that defendants cannot rely on it as support for a motion to dismiss. See e.g., _Branch, supra, 14 F.3d at 453_ (a "document is not 'outside' the complaint if the complaint _specifically_ refers to the document and if its authenticity is not questioned" (emphasis added)).

> FN89. See Declaration of Julie M. McEvilly In Support of Defendant's Motion to Dismiss Consolidated Class Action Complaint ("McEvilly Decl."), Ex. C.

Case 4:06-cv-05255-SBA    Document 46-10    Filed 10/24/2006    Page 11 of 27

Not Reported in F.Supp.2d                                                                    Page 10
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

While plaintiffs' complaint pleads generally that it is based, *inter alia,* on a thorough review of "analysts' reports," plaintiffs identify only three specific analysts whose reports they reviewed - B. Riley & Co., CSK Securities and Fulcrum Securities.[FN90] The complaint does not quote, cite or reference the Yorktown report. See *Plevy, supra,* 38 F.Supp.2d at 821 ("all of these exhibits are cited, quoted from and/or referenced in the [complaint]"). For this reason, the court considers the Yorktown Report "outside" the complaint, and declines to take judicial notice of it.[FN91]

FN90. Complaint, ¶¶ 184, 195.

FN91. To hold otherwise would undermine the integrity of the *Branch* rule. In addition to their allegations respecting analysts' reports, plaintiffs assert that the complaint is based on a review of relevant "news articles." Very few such articles are identified in the complaint. (See, e.g., Complaint, ¶ 60.) Surely *Branch'* s requirement of specificity means that only those news articles that are quoted or cited, and not every news article that ever mentioned the company, may be considered. Yet one would logically have to reach a contrary conclusion if one accepted defendants' argument respecting the Yorktown report.

### 2. Defendants' Objections

Defendants object to plaintiffs' request for judicial notice of Exhibits I-P and Exhibit Q.[FN92] Exhibits I-P are docket sheets and various pleadings from three state court actions filed against Turbodyne. Plaintiffs' complaint relies heavily - at times, exclusively - on the allegations and evidence developed in these cases. Exhibit Q contains information regarding the trading volume in Turbodyne shares, as well as the stock's price, during the class period.

FN92. See Declaration of Tracy L. Thrower In Support of Plaintiff's Opposition To Defendant's Motion to Dismiss Consolidated Class Action Complaint ("Thrower Decl."), Exs. I-J and Q.

### a. Exhibits I-P

As respects the state court pleadings, defendants assert that the court may take judicial notice of the fact that they were filed, but not of the truth of the matter asserted therein. See, e.g., *General Electric Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1082, n. 6 (7th Cir.1994) ("We agree that courts generally cannot take notice of findings of fact from other proceedings for the truth [of the matter] asserted therein because these findings are disputable and usually are disputed"); *Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.,* 969 F.2d 1384, 1388 (2d Cir.1992) ("A court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings' "). See also *Goetz v. Capital Factors, Inc.,* 120 F.3d 268, 1997 WL 415340, * 1-2 (9th Cir.1997) (Unpub.Disp.) ("although a court may take judicial notice of its own records, it cannot take judicial notice of the truth of the contents of all documents found therein"). Consequently, defendants contend, taking judicial notice of Exhibits I-P would be inappropriate, since plaintiffs proffer the documents to prove the truth of the allegations contained therein.

*10 Because defendants' objections were filed with their reply, plaintiffs did not have an opportunity to respond to them. Presumably, however, plaintiffs would argue that the court must consider the state court pleadings under the incorporation by reference doctrine because the documents are expressly incorporated into the allegations of the complaint.[FN93] The incorporation by reference doctrine permits a court to consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading." *Branch, supra,* 14 F.3d at 454. See also *Silicon Graphics, supra,* 183 F.3d at 986 (holding that it was proper for the district court to consider SEC filings under the incorporation by reference doctrine because their contents were alleged in the complaint). Here, plaintiffs allege the contents of, and quote extensively from, briefs filed in the Grand arbitration and the complaint filed by Singleton. While defendants challenge the truth of the allegations set forth in these documents, they do

Case 4:06-cv-05255-SBA    Document 46-10    Filed 10/24/2006    Page 12 of 27

Not Reported in F.Supp.2d                                                                                           Page 11
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

not appear to challenge their authenticity. By incorporating the documents, plaintiffs have made the allegations their own, and they must thus be considered true for purposes of this motion to dismiss. See *Cahill, supra.* Accordingly, the court need not take judicial notice of the documents. Rather, it will consider the pleadings under the *Branch* incorporation by reference doctrine.

> FN93. Complaint, ¶ 35.

#### b. Exhibit Q

Defendants contend the court should decline to take judicial notice of Exhibit Q, which contains information concerning the trading volume of Turbodyne's stock during the class period, because "plaintiffs are attempting to save their defective Complaint by asking this court to judicially notice matters which they failed to plead in their Complaint."[FN94] Plaintiffs' complaint alleges much of the information contained in Exhibit Q, including Turbodyne's stock price on certain days and the dates the stock's upward and downward price swings began.[FN95] The complaint lacks any allegations regarding Turbodyne's daily trading volume, however, and plaintiffs clearly seek to have the court take judicial notice of Exhibit Q to cure this omission.[FN96] In deciding a motion to dismiss, courts may not "take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a)." *Schneider v. California Dept. of Corrections,* 151 F.3d 1194, 1197, n. 1 (9th Cir.1998) (quoting 2 J. Moore et al., Moore's Federal Practice, § 12.34[2] (3d ed.1997)). The effect of plaintiffs' request that the court take judicial notice of Exhibit Q is the same, and the court declines to do so for that reason.

> FN94. Defendants' Objection To Plaintiffs' Request For Judicial Notice In Support of Their Opposition To Defendants' Motion To Dismiss at 1:9-10.

> FN95. Complaint, ¶¶ 179-182.

> FN96. Pls.' Opp. at 25:4-5 ("the stock was heavily traded throughout most of the Class Period, with daily trading volume often ex-

ceeding 500,000 shares").

#### C. Legal Standards Governing Rule 10b-5 And Section 20(a)

##### 1. Rule 10b-5

Rule 10b-5, promulgated by the SEC pursuant to § 10(b) of the 1934 Act, makes it unlawful for any person to use "manipulative or deceptive device[s]" in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). Specifically, one may not "(a) ... employ any device, scheme, or artifice to defraud; (b) ... make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) ... engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

*11 The elements of a Rule 10b-5 violation are (1) the misrepresentation or omission of a material fact, (2) reliance, (3) scienter, and (4) damages. See *Paracor Finance, Inc. v. General Electric Capital Corp.,* 96 F.3d 1151, 1157 (9th Cir.1996) (en banc); *McCormick v. Fund American Companies, Inc.,* 26 F.3d 869, 875 (9th Cir.1994). "Scienter" refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, n. 12 (1976). While recklessness has long been held to constitute scienter (see *Nelson v. Serwold,* 576 F.2d 1332, 1337 (9th Cir.1978)), the Ninth Circuit has recently clarified that recklessness "satisfies scienter under § 10(b)" only to the extent it "reflects some degree of intentional or conscious misconduct." *Silicon Graphics, supra,* 183 F.3d at 977.[FN97]

> FN97. For a more complete discussion of the pleading of scienter following *Silicon Graphics,* see Section II.E.2.a., *infra.*

##### 2. Section 20(a)

Section 20(a) of the 1934 Act provides:
"Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be

Case 4:06-cv-05255-SBA    Document 46-10    Filed 10/24/2006    Page 13 of 27

Not Reported in F.Supp.2d                                                    Page 12
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

A prima facie case of control person liability requires evidence (a) that a primary violation of the securities laws occurred and (b) that defendant directly or indirectly controlled the person or entity committing the primary violation. See, e.g., _Paracor Finance, supra, 96 F.3d at 1161_. Plaintiffs need not prove the individual defendant's scienter or "culpable participation" in the alleged wrongdoing. _Id._ (quoting _Arthur Children's Trust v. Keim_, 994 F.2d 1390, 1396 (9th Cir.1993)).[FN98]

> FN98. Defendants do not argue that the PSLRA heightened pleading requirements under § 20.

While the determination of control person status is an "intensely factual" question (_Paracor, supra_, 96 F.3d at 1161(internal quotations omitted)), it is clear that a defendant's status as a director of the corporate defendant is alone not enough to create a presumption of control. See _Arthur Children's Trust, supra_, 994 F.2d at 1396-97; _Lilley v. Charren_, 1996 WL 328243, * 6 (N.D.Cal.1996). Where plaintiffs limit their allegations to a narrowly defined group of corporate officers who are "charged with the day-to-day operations of a public corporation," however, it may be "reasonable to presume that these officers had the power to control or influence the particular transactions giving rise to the securities violation," and to find that status alone is sufficient. _Wool v. Tandem Computers, Inc._, 818 F.2d 1433, 1441 (9th Cir.1987). See also _Arthur Children's Trust, supra_, 994 F.2d at 1397.

### D. Pleading Standards

#### 1. Rule 9(b) Of The Federal Rules Of Civil Procedure

Rule 9(b) of the Federal Rules of Civil Procedure provides that "circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.Proc. 9(b). A securities fraud claim cannot survive a motion to dismiss under this rule merely by identifying the allegedly fraudulent statements. _In Re Glenfed, Inc. Securities Litigation_, 42 F.3d 1541, 1548 (9th Cir.1994) (en banc). Rather, the complaint must allege "why the disputed statement was untrue or misleading _when made._" _Id._ at 1549 (emphasis added). This requires that the plaintiff allege inconsistent contemporaneous statements or information known to the defendants at the time the statement was made that demonstrates its falsity. _Id._ at 1548 ("our cases have consistently required that circumstances indicating falseness be set forth").

#### 2. The Private Securities Litigation Reform Act

*12 In 1995, Congress passed the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, which amended the Securities Exchange Act of 1934. The PSLRA modifies Rule 9(b)'s particularity requirement, "providing that a securities fraud complaint shall identify: (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed." _Silicon Graphics, supra_, 183 F.3d at 996; 15 U.S.C. § 78u-4(b)(1). The statute mandates that in alleging scienter, a plaintiff "state with particularity," as respects each allegedly misleading statement or omission, "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). If the complaint does not contain such allegations, it must be dismissed. 15 U.S.C. § 78u4(b)(3)(A).[FN99]

> FN99. The PSLRA creates a "safe harbor" for "forward-looking" statements that are immaterial, are limited by "meaningful cautionary statements," or are made without _actual_ knowledge of their falsity. 15 U.S.C. §§ 77z-2(c), 78u-5(c). Such statements include, but are not limited to, statements of future economic performance and management plans and objectives. 15 U.S.C. §§ 77z-2(i), 78u-5(i). This "safe harbor" has much the same effect as the "bespeaks caution" doctrine, which provides that forward-looking representations that contain adequate cautionary language or risk disclosure protect a defendant from securities liability. See, e.g.,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

*Plevy, supra,* 38 F.Supp.2d at 830.

The parties dispute the effect of the PSLRA on the traditional standards used to judge motions to dismiss under Rules 12(b)(6) and (9)(b) of the Federal Rules of Civil Procedure. Plaintiffs urge that the PSLRA "did not alter the standard by which courts evaluate Rule 12(b)(6) motions." [FN100] Defendants, by contrast, argue that the heightened pleading requirements established by the PSLRA make it harder for securities class action complaints to survive a motion to dismiss. [FN101]

FN100. Pls.' Opp. at 10:7-8.

FN101. Defs.' Reply at 3-7.

The Ninth Circuit has already resolved this dispute in its recent decision in *Silicon Graphics.* As the court there indicated, in enacting the PSLRA, "Congress intended to elevate the pleading requirement[s]" that previously applied to securities fraud complaints. *Silicon Graphics, supra,* 183 F.3d at 974. Following the PSLRA, it is no longer sufficient to plead "facts showing simple recklessness or a motive to commit fraud and opportunity to do so." *Id.* Rather, "a private securities plaintiff proceeding under the PSLRA must plead in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Id.* While the standard used in judging motions under Rule 12(b)(6) has not changed, therefore, it is clear that plaintiffs must meet the more stringent pleading requirements established by the statute to avoid dismissal.

E. Sufficiency Of The Complaint

With respect to plaintiffs' claim under Rule 10b-5, defendants argue that the complaint fails (1) to plead reliance adequately; (2) to plead scienter adequately; (3) to allege facts showing that each representation was knowingly false when made; and (4) to allege facts demonstrating each individual defendant's connection to the alleged misstatements. [FN102] Additionally, defendants contend that plaintiffs have not adequately alleged controller liability for purposes of their § 20(a) claim. [FN103]

FN102. Because the court finds that

plaintiffs' allegations of reliance and scienter are deficient in certain respects, it need not address defendants' arguments regarding the falsity of the representations or each defendant's connection to the alleged misstatements. The court notes, however, plaintiffs' contention that they have sufficiently alleged the individual defendants' liability for the misstatements under the doctrine of "group pleading." The "group pleading" doctrine creates a presumption that statements contained in "group-published information," such as annual reports, news releases, prospectuses and registration statements, are the collective work of the individuals who control the day-to-day operations of the corporation. *See, e.g., In re GlenFed Inc. Securities Litigation,* 60 F.3d 591, 593 (9th Cir.1993) ("In cases of corporate fraud where the false and misleading information is conveyed in ... 'group-published information,' it is reasonable to presume that these are the collective actions of the officers"); *In Re Stratosphere Corporation Securities Litigation,* 1 F.Supp.2d 1096, 1108 (D.Nev.1998). The Ninth Circuit has not addressed whether the PSLRA's requirement that a plaintiff allege facts demonstrating each individual defendant's scienter with particularity can be satisfied by invocation of the group pleading doctrine, nor whether, following enactment of the PSLRA, the doctrine can be used to link individual defendants to the making of particular statements. District courts that have addressed the latter issue have reached opposite conclusions. Some courts have held that "it is nonsensical to require that a plaintiff specifically allege facts regarding scienter as to each defendant, [and then] allow him to rely on group pleading in asserting that the defendant made the statement or omission." *Coates v. Heartland Wireless Communications, Inc.,* 26 F.Supp.2d 910, 916 (N.D.Tex.1998). See also *Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1350 (S.D.Cal.1998) ("To permit a judicial pre-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 4:06-cv-05255-SBA     Document 46-10     Filed 10/24/2006     Page 15 of 27

Not Reported in F.Supp.2d                                                    Page 14
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

sumption as to particularity simply cannot be reconciled with the statutory mandate that plaintiffs must plead specific facts as to each act or omission by the defendant"). The majority view, however, appears to be that, absent direction from a higher court, the group pleading doctrine survives the PSLRA. See, e.g., *In re Oxford Health Plans, Inc., 187 F.R.D. 133, 142 (S.D.N.Y.1999)* ("This Court agrees that the PSLRA has not altered the group pleading doctrine...."); *Schlagel v. Learning Tree Int'l,* 1998 WL 1144581, * 5-6 (C.D.Cal.1998) ( "Until the Ninth Circuit speaks otherwise, the Court finds the rationale behind the group-pleading doctrine sound and will not disturb it"); *In re Miller Industries, Inc., Securities Litigation,* 12 F.Supp.2d 1323, 1329 (N.D.Ga.1998) (applying the "group pleading doctrine" post PSLRA); *Stratosphere Corp., supra,* 1 F.Supp.2d at 1108 (refusing to hold "that group pleading has been sub silentio abolished by the PSLRA"). For purposes of the present motion, the court need not resolve whether the group pleading doctrine remains a viable method of linking individual defendants to the making of particular alleged misrepresentations. It does conclude, however, that the doctrine cannot be used to establish that an individual defendant made an alleged misrepresentation with scienter. See, e.g., *In re Sunbeam Securities Litigation,* 1999 WL 1223604, * 12 (S.D.Fla.1999) ( "while the group pleading doctrine may satisfy ... Rule 9(b)'s requirement of particularity, group pleading does not apply to the Reform Act[']s scienter requirements").

FN103. Given plaintiffs' failure to allege reliance and scienter adequately, the court need not address their pleading of controller liability. Since plaintiffs will undoubtedly file an amended complaint, however, the court makes the following observations regarding liability under § 20(a). To state a controller liability claim, plaintiffs must

plead a primary violation of the securities laws, and defendants' direct or indirect control of the person or entity committing the violation. See *Paracor Finance, supra,* 96 F.3d at 1161. Because they have not adequately alleged reliance and scienter, plaintiffs have not pled a "primary violation." Defendants contend plaintiffs have also failed to plead the second element of a § 20(a) claim, because they allege nothing more than that the individual defendants were Turbodyne officers and directors. See, e.g., *Hemming v. Alfin Fragrances,* 690 F.Supp. 239, 245 (S .D.N.Y.1988) ("A person's status as an officer, director or shareholder, absent more, is not enough to trigger liability under § 20"). As noted above, the Ninth Circuit has held that where "corporate officers are a narrowly defined group charged with the day-to-day operations of a public corporation, it is reasonable to presume that these officers had the power to control or influence the particular transactions giving rise to the securities violation." *Wool, supra,* 818 F.2d at 1441. See also *Lilley, supra,* 1996 WL 328243 at * 6 ("status alone may be sufficient when plaintiffs limit their fraud allegations to a narrowly-defined group of corporate officers"). Here, plaintiffs have named only Halimi, Nowek and Ware, whom they identify respectively as Turbodyne's President and Chief Executive Officer, the Vice Chairman of its Board and Chief Financial Officer, and its Chief Operating Officer. The complaint clearly alleges that each of these defendants had the power and ability to, and did in fact, control the contents of the company's annual and quarterly reports, its filings with the SEC, and its press releases. Assuming plaintiffs can plead a primary violation, therefore, they may well have adequately alleged that the individual defendants controlled the corporation.

1. Allegations Of Reliance

Reliance is an essential element of a Rule 10b-5 viol-

Not Reported in F.Supp.2d                                                    Page 15
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

ation. See *Paracor Finance, supra,* 96 F.3d at 1157. Rule 9(b) requires that reliance be pled with particularity. See *In Re NationsMart Corp. Securities Litigation,* 130 F.3d 309, 321-22 (8th Cir.1997). Here, it is clear that plaintiffs do not allege direct, personal reliance. Rather, they seek to plead reliance under the fraud-on-the-market doctrine.[FN104] See, e.g., *Basic Inc. v. Levinson,* 485 U.S. 224, 241-42 (1988) (the fraud-on-the-market doctrine presumes that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements"). This "presumption of reliance" is available only when plaintiffs allege that defendants made material misrepresentations or omissions regarding a security actively traded in an "efficient market." *Id.* at 247; *Binder v. Gillespie,* 184 F.3d 1059, 1064 (9th Cir.1999). An "efficient market" is one "where the stock prices reflect public information." *Binder, supra,* 184 F.3d at 1065.

FN104. Pls.' Opp. at 24-25.

**\*13** In its most recent pronouncement regarding the fraud-on-the-market doctrine, the Ninth Circuit noted that earlier circuit cases had not squarely addressed what constitutes an "efficient market," and that the district court had thus used the five-factor test articulated in *Cammer v. Bloom,* 711 F.Supp. 1264, 1286-87 (D.N.J.1989) to evaluate the issue. See *Binder, supra,* 184 F.3d at 1064. While the Ninth Circuit did not explicitly endorse the *Cammer* test, it implicitly approved it by affirming the district court's decision. See *id.* at 1064-65.

*Cammer'* s five-factor test considers: (1) whether the stock trades at a high weekly volume; (2) whether securities analysts follow and report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file an SEC registration Form S-3, as opposed to Form S-1 or S-2; and (5) whether there are "empirical facts" showing causation between corporate events or releases and an immediate response in the stock price. *Id.* at 1065 (citing *Cammer, supra,* 711 F.Supp. at 1286-87).

Defendants contend that plaintiffs have alleged facts addressing only two of the five *Cammer* factors, and that, "legally and factually," this is insufficient. Plaintiffs counter that they have adequately alleged most, if not all, of the factors discussed in *Cammer* and *Binder.* They note that *Binder* was a summary judgment case, and that neither *Binder* nor *Cammer* purported to establish any minimum requirement for the pleading of an efficient market. See *Binder, supra,* 184 F.3d at 1065 (offering evidence as to only one factor - the presence of market makers and arbitrageurs - was not sufficient to survive summary judgment).

While it is true that *Binder* did not set minimum requirements for pleading an efficient market, Rule 9(b) requires that reliance be pleaded with particularity. See, *e.g., NationsMart, supra,* 130 F.3d at 321. Applying Rule 9(b) standards to the pleading of reliance under a fraud-on-the-market theory, therefore, the complaint must state with particularity the facts upon which plaintiffs base their assertion that Turbodyne's stock traded in an efficient market. *Id.* at 322.

Plaintiffs assert that they have specifically alleged four of the *Cammer* "factors" - that Turbodyne stock was actively traded on NASDAQ during the class period; that Turbodyne was actively followed by numerous analysts; that Turbodyne filed periodic reports with the SEC; and that the market promptly responded to both negative and positive news regarding the company.[FN105] As defendants note, however, only two of these allegations actually satisfy one of the *Cammer* factors. Neither the market on which a stock trades, nor the fact that a company "file[s] periodic reports with the SEC" is sufficient to show the existence of an efficient market. See *Harman v. LyphoMed, Inc.,* 122 F.R.D. 522, 525 (N.D.Ill.1988) ("the inquiry in an individual case remains the development of the market for that stock, and not the location where the stock trades," cited in *Binder, supra,* 184 F.3d at 1065); *Cammer, supra,* 711 F.Supp. at 1287 (discussing the fact that "it would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of

Case 4:06-cv-05255-SBA    Document 46-10    Filed 10/24/2006    Page 17 of 27

Not Reported in F.Supp.2d                                                    Page 16
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met").

> FN105. *Id.* In their opposition, plaintiffs contend that Turbodyne's daily trading volume was high. Because this fact was not alleged in the complaint, however, the court cannot consider it in deciding defendants' motion to dismiss. See Section II.B.2.b., *supra.*

**\*14** As respects the remaining two factors - that analysts followed Turbodyne's stock and that the market responded to positive and negative news regarding the stock - defendants challenge the sufficiency of plaintiffs' allegations. Plaintiffs allege that during the class period at least three analysts followed the stock and issued reports thereon.[FN106] While defendants urge that plaintiffs must also allege when the reports were issued, what subjects they addressed, and the identity and number of the analyst's customers, the relevant case law does not impose such a requirement. Indeed, *Cammer* merely states that it is "persuasive to allege [that] a significant number of securities analysts followed and reported on a company's stock during the class period." *Cammer, supra,* 711 F.Supp. at 1286. This plaintiffs have done. They have also properly alleged facts showing a cause and effect relationship between corporate announcements or events and the rise and fall of the stock's price.[FN107] Accordingly, the court concludes that plaintiffs have adequately alleged these two *Cammer* factors.

> FN106. See, e.g., Complaint, ¶ 184 ("[a]t all relevant times, Turbodyne was followed by securities analysts employed by brokerage houses including B. Riley & Co., CSK Securities and Fulcrum Securities, which issue reports and make recommendations concerning Turbodyne's common stock to their clients").

> FN107. See Complaint, ¶¶ 177-182 (tracking the price of Turbodyne stock in relation to the various company announcements and third party reports).

While it is clear that satisfaction of only one *Cammer* factor is not sufficient as a matter of law to prove the existence of an efficient market (see *Binder, supra,* 184 F.3d at 1065), it appears no case has addressed how many *Cammer* factors must be alleged to plead reliance under a fraud-on-the-market theory. Reviewing plaintiffs' allegations in this case, the court concludes that pleading two of the five factors is not sufficient to satisfy the particularity requirement of Rule 9(b). Plaintiffs have not only failed to plead a majority of the factors, but it is clear that "an important factor weighing in favor of [a] finding" of efficient market is expressly alleged not to exist. The complaint clearly states that Turbodyne files a Form S-1, not a Form S-3, registration statement.[FN108] See *Cammer, supra,* 711 F.Supp. at 1285.

> FN108. See Complaint, ¶ 113. Assuming plaintiffs can plead additional *Cammer* factors, it is not clear that the fact Turbodyne files a Form S-1 *precludes* a finding that its stock trades in an efficient market.

For these reasons, the court finds that plaintiffs have not alleged reliance under a fraud-on-the-market theory with sufficient particularity, and defendants' motion to dismiss on this basis must be granted.[FN109]

> FN109. It is possible that this pleading defect can be overcome, since it appears plaintiffs can plead that Turbodyne's stock traded at a high weekly volume.

2. Allegations Of Scienter [FN110]

> FN110. Plaintiffs' deficient pleading of reliance necessitates granting defendants' motion to dismiss. Because it appears this deficiency can be corrected, however, and because it is likely defendants will move to dismiss any amended complaint that is filed, the court addresses defendants' arguments respecting the scienter allegations of the complaint in the interests of judicial efficiency.

a. Generally

Defendants contend that plaintiffs have also failed

Case 4:06-cv-05255-SBA    Document 46-10    Filed 10/24/2006    Page 18 of 27

Not Reported in F.Supp.2d                                                    Page 17
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

adequately to plead intent to defraud. In this regard, they cite *Silicon Graphics, supra,* which requires that plaintiffs plead "particular facts giving rise to a strong inference of deliberate recklessness." *Silicon Graphics, supra,* 183 F.3d at 974. This is done by alleging "in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Id.* While "facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent," they are not alone sufficient to satisfy a plaintiff's pleading burden under the PSLRA. *Id.* Rather, a complaint must allege "facts that come closer to demonstrating intent, as opposed to mere motive and opportunity." *Id.* Plaintiffs contend that, consistent with *Silicon Graphics,* they have set forth particular facts demonstrating "at the very least ... a strong inference of deliberate recklessness."[FN111]

FN111. Pls.' Opp. at 22:14-16.

*15 *Silicon Graphics* involved a securities fraud class action in which plaintiff alleged that a corporation and its officers had made a series of misleading statements to inflate the value of the company's stock while they engaged in insider trading. *Id.* at 984. The complaint alleged that, despite their receipt of internal reports reflecting serious production and sales problems, defendants made positive public statements regarding the company's performance that kept its stock at artificially high prices. *Id.* While plaintiff asserted that defendants held meetings at which they entered into this "conspiracy of silence," she provided no details to corroborate her allegation. *Id.* at 985. The complaint contained no allegations regarding the contents of the reports, nor any facts that "indicate[d] their reliability." *Id.* at 985. Additionally, it failed to allege "the sources of [plaintiff's] information with respect to the [internal] reports, how she learned of the reports, who drafted them, [and] which officers received them ." *Id.* at 985. See also *Heliotrope General, Inc. v. Ford Motor Company,* 189 F.3d 971, 979 (9th Cir.1999) (applying the *Silicon Graphics* standard).

In the absence of such information, the court stated, it could not "ascertain whether there [was] any basis for the allegations that the officers had actual or constructive knowledge of [the company's] problems [and] that ... their optimistic representations to the contrary [were] consciously misleading." *Id.* The court also found plaintiff's allegations regarding insider trading deficient since they did not demonstrate that the stock sales were "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Id.* at 986.

Here, plaintiffs allege the source of their information regarding the alleged misrepresentations by identifying and incorporating various public documents (i.e., pleadings) that purportedly show defendants knew their statements were misleading when made.[FN112] See, e.g., *Weiss v. Mentor Graphics Corp.,* 1999 WL 985141, *6-7 (D.Or.1999) (finding that a complaint met PSLRA pleading standards because plaintiff alleged he knew defendants' representations were false based on a conversation with one of its directors). Further analysis of the adequacy of plaintiff's scienter allegations is complicated, however, by the fact that plaintiffs allege multiple misrepresentations in six different categories, purportedly made by each defendant. In order to determine whether plaintiffs have pled "adequate corroborating details" and "facts demonstrating, at a minimum, a degree of recklessness that strongly suggests the required degree of intent" (*Silicon Graphics, supra,* 183 F.3d at 985), the court must analyze the question of scienter separately for each of the purported misrepresentations and each of the defendants. See, e.g., *Sunbeam, supra,* 1999 WL 1223604 at * 12 (the Reform Act requires pleading "that each separate defendant acted with scienter"); *In re Fine Host Corp. Securities Litigation,* 25 F.Supp.2d 61, 69-71 (D.Conn.1998) (analyzing scienter separately as to each defendant); 15 U.S.C. § 78u-4(b)(2) (plaintiffs must "state with particularity facts giving rise to a strong inference that *the defendant* acted with the required state of mind" (emphasis added)). Cf. *Silicon Graphics, supra,* 183 F.3d at 983, 985 (plaintiff's pleading was deficient, in part, because it did not allege which defendants received internal reports reflecting serious production and sales problems).

FN112. Plaintiffs rely, for example, on the Grand pleadings, which contain allegations

Case 4:06-cv-05255-SBA    Document 46-10    Filed 10/24/2006    Page 19 of 27

Not Reported in F.Supp.2d                                                Page 18
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

that Grand *told* Turbodyne its products were ineffective, dangerous and not performing properly.

b. Categories Of Misrepresentations

i. The Turbopac's Performance Capabilities

**\*16** Plaintiffs allege that defendants knowingly misrepresented the Turbopac's performance capabilities. They assert that the Turbopac (1) could not operate continuously as promised; (2) required expert installation, and was thus not "easy to install" as represented; (3) delivered substantially less boost than represented; (4) could only operate in engines up to 2.0 liters of displacement, not 8.0 as represented; (5) contained a design flaw that caused units to short out and burn; and (6) contained a design flaw that caused units to drain engine batteries.[FN113]

FN113. Complaint, ¶¶ 74-89.

As evidence that defendants made these misrepresentations with scienter, plaintiffs allege that Grand's trial and closing briefs, as well as the arbitrator's award, confirm that Turbodyne knew of these design flaws and characteristics, but nonetheless continued to misrepresent the Turbopac's capabilities. In order properly to assess whether these allegations are sufficient, it is necessary to review the Grand pleadings on which plaintiffs rely.

• Grand's trial brief recounts defendant Halimi's testimony that the Turbopac was never designed to operate continuously and that it was equipped with a 5-second "governor" that precluded continuous operation.[FN114] These admissions by Halimi give rise to a strong inference that he knew statements to the contrary were false or that he acted with deliberate recklessness in making such statements. Halimi's knowledge or recklessness in this regard is imputed to Turbodyne.[FN115] It is not imputed to defendants Nowek and Ware, however, and the Grand brief, incorporated into plaintiffs' complaint, does not support a similar inference that they acted knowingly or with deliberate recklessness in making the allegedly false statements.

FN114. *Id.,* ¶ 75.

FN115. See, e.g., *Wyle v. R.J. Reynolds Industries, Inc.,* 709 F.2d 585, 590 and n. 3 (9th Cir.1983) (the knowledge of senior officers that statements are false is imputable to the corporation); *W.R. Grace & Co., Inc. v. Western U.S. Industries, Inc.,* 608 F.2d 1214, 1218 (9th Cir.1979) ( " 'It is a well settled principle that knowledge of officers and key employees of a corporation, obtained while acting in the course of their employment and within the scope of their authority, is imputed to the corporation itself" ' (quoting *Acme Precision Products, Inc. v. American Alloys Corp.,* 422 F.2d 1395, 1398 (8th Cir.1970)); *Sunbeam, supra,* 1999 WL 1223604 at \* 12 ("knowledge of individuals who exercise substantial control over a corporation's affairs is properly imputable to the corporation"). Cf. *Nordstrom, Inc. v. Chubb & Son, Inc.,* 54 F.3d 1424, 1435 (9th Cir.1995) (the "cumulative knowledge" of officers and directors "will be imputed to the corporation" (internal quotations omitted)).

• According to the Grand arbitration filings, Halimi testified that, as early as 1996, Turbodyne understood the Turbopac required expert installation and specialized microchips to operate properly.[FN116] As with his testimony regarding continuous operation, this admission by Halimi is sufficient to support a strong inference that he and Turbodyne acted with the requisite scienter in stating that the Turbopac was "easy to install." Halimi's purported statement, however, does not give rise to a similar inference respecting Nowek and Ware, and plaintiffs have not satisfied their burden of pleading that these defendants made statements regarding the ease of installation with the requisite scienter.

FN116. *Id.,* ¶¶ 78-80.

• The Grand filings detail the fact that Grand told Turbodyne the Turbopac did not deliver the advertised amount of boost, and that a Turbodyne engineer testified the company had never been able to achieve this level in its product testing.[FN117] Grand's closing brief states that Halimi admitted that Turbodyne "had frozen the design specifications at only 3 psi."[FN118]

Not Reported in F.Supp.2d                                                                                    Page 19
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Halimi's admission is sufficient to give rise to a strong inference that he knew statements that the Turbopac would deliver 4 to 5 pounds per square inch of boost were false or that he made such statements with deliberate recklessness. While Halimi's knowledge may be imputed to Turbodyne, it may not be similarly imputed to defendants Nowek and Ware, and plaintiffs' allegations are insufficient to support an inference that they knew the statements regarding the amount of boost the Turbopac could deliver were false or that they made such statements with deliberate recklessness.

> FN117. *Id.,* ¶¶ 81-83.

> FN118. *Id.,* ¶ 83.

**\*17** • Grand's closing brief asserts that Halimi and another Turbodyne employee testified that as early as the beginning of the class period, Turbodyne knew the Turbopac would not operate on engines with 8.0 liters of displacement.FN119 Halimi allegedly testified that, prior to June 1996, Turbodyne knew "the product was suitable only for small 4 cylinder engines." FN120 Halimi's testimony adequately supports a strong inference that he knew statements concerning the Turbopac's ability to work on engines with up to 8.0 liters of displacement were false or that he made such statements with deliberate recklessness. While his knowledge and/or recklessness are imputed to Turbodyne, they are not similarly imputed to defendants Nowek and Ware. As to these defendants, plaintiffs have not adequately pled scienter.

> FN119. *Id.,* ¶¶ 84-85.

> FN120. *Id.,* ¶ 85.

• Finally, filings in the Grand proceeding indicate that Turbodyne knew of major design defects in the Turbopac as early as Spring 1997, but failed to inform the public of the problems, and continued to represent that it was prepared to begin large-scale product production. Specifically, Grand's trial brief reports that Turbodyne engineers told Grand a design flaw in the control panel was causing units to burn. The brief also states that of the twenty-nine Turbopacs delivered by Grand in the Summer of 1997, eight burned out by September. Of these, one caused a fire

in an automobile owned by a Taiwanese magazine publisher. Halimi testified that he knew of this fire, and that it resulted from problems with the electronic control panel.FN121 Coupled with the remainder of the evidence detailed in Grand's brief, this admission supports a strong inference that defendants Turbodyne and Halimi knew by Summer 1997 that a large number of Turbopacs were shorting out and burning up. No such inference can be drawn with respect to Nowek and Ware, however, and plaintiffs' pleading of these defendants' scienter is not sufficient as a result.

> FN121. *Id.,* ¶¶ 86-87. Plaintiffs also allege that the Grand filings demonstrate that defendants' knowledge of another design defect -that the Turbopac drained engine batteries. Unlike other allegations regarding the Turbopac's shortcomings, Grand's brief does not disclose that Halimi or other Turbodyne employees admitted knowledge of this problem.

Halimi's admissions, as detailed above, indicate that he possessed information contrary to his public statements respecting various aspects of the Turbopac's performance. These admissions are sufficient to give rise to a strong inference of deliberate recklessness or conscious misconduct on the part of Halimi and Turbodyne. See, e.g., *Weiss, supra,* 1999 WL 985141 at \* 6-7. They do not, however, give rise to a similar inference as respects defendants Nowek and Ware, and the court finds that plaintiffs' pleading of these defendants' scienter does not satisfy the standard set forth in *Silicon Graphics, supra,* as respects alleged misrepresentations concerning the Turbopac's performance.

> ii. John Singleton's Involvement In Turbodyne's Operations

Plaintiffs also allege that defendants misrepresented John Singleton's involvement in Turbodyne's operations as CFO and COO during the early half of 1998. Plaintiffs' allegation that these representations were either consciously false or deliberately reckless rests on a complaint filed by Singleton against Turbodyne, Halimi, and Nowek asserting claims, *inter alia,* for

Not Reported in F.Supp.2d                                                                           Page 20
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

breach of contract and tortious constructive discharge.[FN122] Singleton alleges that Turbodyne, Halimi and Nowek denied him access to financial information and "deprived [him] of the ability to perform the functions of Chief Operating Officer and Chief Financial Officer ."[FN123] He further asserts that the "financial affairs of the corporation ... were ... conducted by Halimi, and others designated by him, in a manner which was intentionally designed to circumvent and exclude [Singleton]."[FN124] Finally, he pleads that Halimi and Nowek "directed" preparation of Turbodyne's quarterly financial statement "without [his] knowledge, involvement or review."[FN125] Singleton contends that, "[o]n several occasions," he "communicated to Halimi and Nowek that such continued ... use of [his] name ... was misleading, dishonest, and constituted violations of the securities laws."[FN126]

> FN122. Thrower Decl., Ex. P.
>
> FN123. *Id.* at ¶ 10; Complaint, ¶ 150.
>
> FN124. Thrower Decl., Ex. P, ¶ 10; Complaint, ¶ 150.
>
> FN125. Thrower Decl., Ex. P, ¶ 13; Complaint, ¶ 153.
>
> FN126. Thrower Decl., Ex. P, ¶ 15; Complaint, ¶ 154.

**\*18** Plaintiffs assert that, as incorporated into their complaint, these allegations adequately plead scienter with respect to five purported misrepresentations. The first two - a news release issued February 26, 1998, and Form 6-K issued on or about March 16, 1998 - merely announced Singleton's appointment as Turbodyne's Chief Financial Officer.[FN127] None of the allegations in Singleton's complaint supports a strong inference that defendants made these statements with knowledge of their falsity or with deliberate recklessness. At most, Singleton's allegations support a claim that, following his appointment, he was excluded from the financial affairs of the company.[FN128] Thus, as to the February 26 and March 16, 1998 statements, plaintiffs have not adequately alleged scienter.

> FN127. Complaint, ¶¶ 140-141.
>
> FN128. Indeed, Singleton's complaint asserts that he grew concerned about his lack of access to financial information "during the first three months of his employment." See Thrower Decl., Ex. P, ¶ 10.

The same is not true of the other statements pleaded in the complaint. Plaintiffs allege (1) that Turbodyne filed a Form 6-K with the SEC on May 14, 1998 that quoted Singleton extensively; (2) that on May 22, 1998, the company issued a news release regarding its financial performance that identified Singleton as the source; and (3) that on June 24, 1998, Turbodyne released its financial results for the quarter ending March 31, 1998.[FN129] Singleton's complaint asserts that during the period these representations were made (i.e., March through May 1998), Halimi intentionally circumvented and excluded him from important aspects of Turbodyne's financial affairs.[FN130] He further asserts that Halimi and Nowek "directed" preparation of the March 31, 1998 quarterly financial statements and disseminated them to the public "without [his] knowledge, involvement or review."[FN131]

> FN129. Complaint, ¶¶ 142-146.
>
> FN130. Thrower Decl., ¶ 10.
>
> FN131. *Id.,* ¶ 13; Complaint, ¶ 153.

These allegations give rise to a strong inference that Halimi and Nowek, and through them, Turbodyne, knew that statements suggesting Singleton was actively involved in the company's financial affairs were false, or that they were deliberately reckless in making such statements. Accordingly, as to these defendants, scienter is adequately pled. None of Singleton's allegations, however, supports a strong inference that defendant Ware knew statements regarding Singleton were false or that he acted with deliberate recklessness in disseminating them. Consequently, as to this defendant, scienter has not been adequately alleged.

iii. Turbodyne's Alleged United Nations Endorsement

Plaintiffs next allege that Turbodyne misrepresented

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 21
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

the fact that it had been awarded "UN Flag Technology Status." They contend that, on multiple occasions between April 1997 and August 1998, Turbodyne publicized its recognition by the United Nations Development Program and its receipt of "assistance" from the United Nations in connection with the negotiation of potential international contracts and financing.[FN132]

FN132. *Id.,* ¶¶ 123-131.

To support their allegation that defendants knew these representations were false or that they made them with deliberate recklessness, plaintiffs cite an August 20, 1998 report by Asensio & Co. The report asserted that the UNDP had not authorized Turbodyne's announcement that it had been accorded "UN Flag Technology" status, and that the company's news release in no way represented the UN's position regarding Turbodyne's technology or financing. The report also noted that Joseph Ben-Dak, the UN official who had allegedly awarded Turbodyne Flag Technology status, had terminated his service with the organization ten days before Turbodyne's announcement.[FN133]

FN133. *Id.,* ¶ 133.

**\*19** Plaintiffs also cite an August 19, 1998 letter sent to Asensio by Francois Lorio, the Chief of UNDP's Legal Section. Lorio stated that Ben-Dak had left the UNDP on April 1, 1997, that the project portfolio and funding resources he had managed had been terminated, and that Turbodyne's technology "carrie[d] no endorsement on behalf of [the] UNDP."[FN134]

FN134. *Id.,* ¶ 135.

On August 26, 1998, Asensio published a second report stating that the UNDP denied any endorsement of Turbodyne.[FN135] The report juxtaposed the fact that Ben-Dak left the UN on April 1, 1997 with Halimi's statement on August 17, 1998 that the two men had traveled to London and Moscow for negotiations regarding the Turbopac. It further noted that Turbodyne's website continued to run an interview with Halimi in which he claimed the UN was "assisting" Turbodyne.[FN136]

FN135. *Id.,* ¶ 136.

FN136. *Id.*

On August 21, 1998, Turbodyne released a statement asserting that it had been awarded Flag Technology status on March 14, 1997, before Ben-Dak left the UN.[FN137] On December 16, 1998, it sued Asensio for defamation and disparagement in a complaint that did not allege that Asensio's statements regarding UN Flag Technology status were false.[FN138]

FN137. *Id.,* ¶ 135.

FN138. *Id.,* ¶ 138.

Plaintiffs' allegations regarding the Asensio reports and Turbodyne's reaction to them support an inference that Turbodyne knew its statements concerning Flag Technology status were false. See *Sunbeam, supra,* 1999 WL 1223604 at \* 9 (officers' denial of published reports that a company had engaged in improper accounting and financial reporting, together with their charge that the reports were "propaganda stirred up by 'shorts'' " adequately pled scienter since the denial supported an inference that defendants were "either sufficiently familiar with the facts, or severely reckless in not being familiar, [that they were] in a position to issue a denial"); *Fugman v. Aprogenex, Inc.,* 961 F.Supp. 1190, 1195-96 (N.D.Ill.1997) (finding that defendants' "statements mitigating the seriousness of their failure to complete the cell enrichment component of the GenSite system create a strong inference of scienter"); *Rehm v. Eagle Financial Corp.,* 954 F.Supp. 1246, 1256 (N.D.Ill.1997) ( "defendant's attempts to mollify public doubt about [the corporation's] financial health by putting an optimistic and reassuring 'spin' on otherwise damaging [reports] show[ ] the defendants acted with knowledge"). Turbodyne's immediate denial of Asensio's allegations, coupled with its later decision not to allege that the analyst's reports regarding the UN relationship were libelous, constitutes circumstantial evidence sufficient to give rise to a strong inference that Turbodyne knew the statements were false or that it was deliberately reckless in making them.

Further evidence of Turbodyne's alleged recklessness

Not Reported in F.Supp.2d　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 22
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

can be found in plaintiffs' allegations that Turbodyne failed to remove information regarding the UN arrangement from its website after Asensio published its reports in August 1998, and that its 1997 Annual Report, issued in November 1998, contained statements touting the company's Flag Technology status.FN139 At a minimum, the Asensio reports put Turbodyne on notice that it needed to investigate the true facts concerning the UN relationship, and the company's continued reference to its Flag Technology status months after those reports surfaced is sufficient to satisfy the "strong inference of deliberate recklessness" standard. See *Sunbeam, supra,* 1999 WL 1223604 at * 15 (the fact that a corporate officer "consciously ignored or recklessly disregarded ... the public allegation of accounting impropriety in the Barron's articles" constituted sufficient circumstantial evidence of scienter); *id.* at 17 (the fact that an outside accounting firm did not "follow up" on allegations in Barron's of manipulation of a company's interim financial statements was sufficient to support an inference of "severe[ ] reckless [ness]"). Consequently, the court concludes that plaintiffs have adequately alleged scienter as respects statements regarding the UN relationship.

FN139. *Id.,* ¶¶ 129-30.

**\*20** The allegations are sufficient only as to Turbodyne and Halimi, however. Turbodyne's August 17, 1998 release reported that Halimi traveled to London and Moscow with Ben-Dak, and identified Ben-Dak as an UN official. Similarly, after the Asensio reports were published, Turbodyne's website allegedly carried an audio interview with Halimi stating that the UN was assisting Turbodyne.FN140 These purported facts give rise to a strong inference that Halimi knew the representations regarding Turbodyne's relationship with the UN were false, or that he was deliberately reckless in permitting them to be made. Nothing in the complaint, however, supports an inference, much less a strong one, that defendants Nowek and Ware made statements regarding the UN endorsement with deliberate recklessness or knowledge of their falsity. Consequently, while the court concludes that plaintiffs have adequately alleged that defendants Turbodyne and Halimi made misrepresentations regarding Turbodyne's UN affiliation with scienter,

they have not pled facts giving rise to a strong inference that defendants Nowek and Ware acted with scienter in making such representations.

FN140. *Id.,* ¶¶ 131, 136.

iv. Turbodyne's Manufacturing Capabilities

Plaintiffs allege that on December 31, 1996, Halimi sent a letter to Turbodyne shareholders and Grand claiming that Turbodyne's manufacturing facility was "now fully operational and had the capacity to produce 8,000 Turbopacs per month." FN141 Additionally, plaintiffs allege that various announcements made during 1997 and 1998 misrepresented that Turbodyne had the capability to produce Turbopacs on a large scale.FN142

FN141. *Id.,* ¶ 96.

FN142. *Id.,* ¶¶ 98-113.

In support of their claim that defendants knew these statements were false, plaintiffs cite the arbitration testimony of Turbodyne employees that the Turbopac assembly line did not go into operation until Spring or early Summer 1997.FN143 This testimony was believed by the arbitrator, who specifically found that a production line "was not put in operation until the spring of 1997." FN144 The arbitrator also found that, even then, the only Turbopacs that operated properly were handmade prototypes "made before the production line was put in operation." FN145 Plaintiffs also cite statements in the Grand trial brief that throughout the fall of 1996, Halimi assured Grand that Turbodyne was on the verge of beginning production, that he blamed production delays on Turbodyne's parts suppliers, and that product delivery dates were unilaterally extended several times.FN146 As further support for their claim that statements regarding production capability were made with scienter, plaintiffs cite Singleton's allegations that he demanded defendants stop misrepresenting Turbodyne's manufacturing capacity before he resigned in June 1998.FN147

FN143. *Id.,* ¶ 115. Plaintiffs allege that even after the assembly line became operational, it produced grossly and dangerously defect-

Case 4:06-cv-05255-SBA    Document 46-10    Filed 10/24/2006    Page 24 of 27

Not Reported in F.Supp.2d                                                           Page 23
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

ive products. *Id.*

FN144. *Id.,* ¶ 117.

FN145. *Id.*

FN146. *Id.,* ¶ 116.

FN147. *Id.,* ¶ 118.

Assuming the truth of these allegations, they demonstrate that Turbodyne did not have substantial manufacturing capacity at any point between 1996 and mid-1998. Given the significance of the Turbopac to the company's operations,[FN148] a strong inference can be drawn that the president and chief executive officer, the chief operating officer, and the chief financial officer knew the true facts respecting the company's manufacturing capacity. See, e.g., *Danis v. USN Communications, 73 F.Supp.2d 923, 938-39 (N.D.Ill.1999)* ( " '[F]acts critical to a business's core operations ... generally are so apparent that their knowledge may be attributed to the company and its key officers," ' quoting *Epstein v. Itron, Inc., 993 F.Supp. 1314, 1326 (E.D.Wash.1998)*); *Chalverus v. Pegasystems, Inc., 59 F.Supp.2d 226, 232 (D.Mass.1999)* ("As a matter of law, ... courts have held that certain information, particularly 'facts critical to ... an important transaction [,] generally are so apparent that their knowledge may be attributed to the company and its key officers' "); *In re Aetna Inc. Securities Litigation, 34 F.Supp.2d 935, 953 (E.D.Pa.1999)* (finding strong circumstantial evidence of individual defendants' scienter where the alleged fraud related to the corporation's "core business" during the time period in which the defendants ran the corporation); *Schlagel, supra, 1998 WL 1144581 at * 18* ("facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers" (internal quotations omitted)); *In re Ancor Communications, Inc., 22 F.Supp.2d 999, 1005 (D.Minn.1998)* (knowledge of facts related to company's $30 million contract could be imputed to its officers and gave rise to a strong inference of scienter). Specifically, it can be inferred that individuals in such key management positions as those allegedly held by the individual defendants

must have known so basic a fact as whether the company's production line was up and running. The officers' knowledge on this score may be imputed to Turbodyne. See *Wyle, supra, 709 F.2d at 590.* Thus, to the extent that misrepresentations regarding production capability - or predictions of future production capability - can serve as a basis for liability, plaintiffs have adequately alleged both Turbodyne's and the individual defendants' scienter.[FN149]

FN148. See *id.,* ¶¶ 34, 36 (the Turbopac was Turbodyne's "core engine technology product").

FN149. While plaintiffs have adequately alleged scienter, they may wish to consider whether they can establish the actual falsity of several of the alleged statements regarding manufacturing capability. It is not immediately apparent, for example, how the evidence adduced during the Grand arbitration establishes the falsity of Turbodyne's May 1998 announcement that it had shipped Turbopac "bus kits" to the Detroit Diesel Company.

v. The Multi-Million Dollar Russian Transaction

**\*21** Plaintiffs allege that defendants misrepresented two distinct aspects of the Russian transaction. First, they cite Turbodyne's news release announcing that it had "formally accepted" an order from TBG for the purchase of 10,500 Turbopacs and that the first delivery would be shipped on October 1, 1998.[FN150] Plaintiffs allege these statements were misleading because defendants knew they did not have the manufacturing capability to fulfill the order.[FN151] As discussed above, plaintiffs have adequately alleged defendants' scienter with respect to statements regarding Turbodyne's manufacturing capacity. Thus, to the extent that Turbodyne's statements regarding the TBG sale can be seen as misrepresenting the company's production capabilities, plaintiffs have properly alleged scienter.

FN150. Complaint, ¶ 110.

FN151. *Id.,* ¶ 111.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 24
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Additionally, plaintiffs assert that defendants more generally misrepresented the likelihood of financing for - and thus the completion of - the TBG sale. They contend defendants made six misrepresentations regarding the financing of the transaction:

• Turbodyne's 1997 Annual Report, issued in November 1998, stated that its Flag Technology status would allow countries interested in purchasing the Turbopac as a means of improving air quality to seek World Bank financing assistance.[FN152]

FN152. *Id.,* ¶¶ 65, 129-30.

• On June 22, 1998, defendants issued a press release indicating that Turbodyne had "received the official Export-Import Bank of the United States 'Letter of Interest No. L10783628XX-Russia,' dated June 18, 1998, for funding of an expected purchase order of $30,675,000.00 from Trans Business Group of Moscow, Russia." The release noted that TBG had issued a Letter of Intent for the purchase of 10,500 Turbopacs, with delivery to commence in the third quarter of 1998,[FN153] and quoted Halimi as stating that TBG would "benefit from matching grants and consumer credit, which [were] available from several sources, including the World Bank for Environmental Programs."[FN154] The release cautioned that the sale was contingent on the "successful completion of financing agreements with the U.S. Export-Import Bank."[FN155]

FN153. *Id.,* ¶ 161.

FN154. *Id.*

FN155. *Id.*

• On July 2, 1998, Turbodyne issued a second news release stating that TBG had submitted a purchase order for Turbopacs, which had been "formally accepted and confirmed" by Turbodyne.[FN156] The release noted the statement in the "purchase order ... that all financing arrangements [were] expected to be finalized 30 days prior to the first shipment date,"[FN157] and quoted Halimi's comment that "users of Turbodyne technology [were] candidates for several grants and funding assistance from various organizations, including the World Bank."[FN158]

FN156. *Id.,* ¶ 164.

FN157. *Id.*

FN158. *Id.*

• On August 17, 1998, Turbodyne issued a press release announcing that it had created a credit financing subsidiary to facilitate the TBG transaction. Halimi stated that "Turbodyne Credit Corporation" would "provide product financing guaranteed by world organizations for expanded sales to the Russian Federation, as well as to other export markets."[FN159] Approximately two months later, Turbodyne announced that "Turbodyne Credit Corporation" had "commenced operations."[FN160]

FN159. *Id.,* ¶ 167.

FN160. *Id.,* ¶ 169.

*22 • On October 2, 1998, Turbodyne announced that it had received its first "shipment order" for Turbopacs from TBG, and that "[p]ayment for the shipment will be through Direct Bank to Bank Financing and appropriate Export Credit Guaranty."[FN161]

FN161. *Id.,* ¶ 170.

• Finally, Turbodyne's Form 10-Q for the period September to November 1998 stated that "the first shipment to [TBG] currently is anticipated to begin in the fourth fiscal quarter of 1998."[FN162]

FN162. *Id.,* ¶ 171.

Plaintiffs allege these statements were false because defendants knew or were consciously reckless in disregarding that "no financing was in place for Turbodyne sales to [TBG]" and thus that no sales could be expected.[FN163] Plaintiffs base their allegation of scienter on a March 3, 1999 EASDAQ release which stated that, following an investigation, the exchange had ordered Turbodyne to "release complete and accurate information on certain contracts and agreements."[FN164] Simultaneously, Turbodyne issued a release stating that the TBG deal was "subject to the completion of financing arrangements," and that the company could not "provide any assurance that the financing arrangements [would] be completed in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 4:06-cv-05255-SBA    Document 46-10    Filed 10/24/2006    Page 26 of 27

Not Reported in F.Supp.2d                                                    Page 25
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

near term." <u>FN165</u> Similarly, Turbodyne's 1998 Form 10-K, filed April 16, 1999, stated that the volatility of Russia's economy "decrease[d] the likelihood that [TBG] w[ould] obtain the necessary financing in order for the Company to commence shipments of the Turbopacs$^{TM}$ pursuant to its agreement with [TBG]." <u>FN166</u>

> <u>FN163.</u> *Id.*

> <u>FN164.</u> *Id.,* ¶ 173

> <u>FN165.</u> *Id.,* ¶ 174.

> <u>FN166.</u> *Id.,* ¶ 175.

Initially, the court notes that plaintiffs have failed to allege facts showing that defendants deliberately or recklessly misrepresented the creation of the Turbodyne Credit Corporation. Nothing in Turbodyne's "corrective" press release or in the company's Form 10-K appears to contradict its statements regarding the creation or the purpose of the credit subsidiary.

Additionally, none of the plaintiffs' allegations indicates that defendants knew their statements regarding the TBG sale or its financing were consciously false or deliberately reckless when made. <u>FN167</u> The complaint contains no allegations respecting the individual defendants' knowledge that the statements were false. While Turbodyne was directed to issue a "corrective" release, none of the allegations in the complaint gives rise to a strong inference that defendants knew the earlier releases were misleading or that they were deliberately reckless in issuing them. In fact, plaintiffs themselves recognize that Turbodyne's June 1998 release cautioned that the TBG sale was contingent on the successful completion of financing. The fact that the EASDAQ later determined the press releases were inaccurate does not alone support a strong inference of conscious misconduct or deliberate recklessness. See *Silicon Graphics, supra,* 183 F.3d at 974. And, even if the releases might be classified as "reckless," mere recklessness, as opposed to a strong inference of deliberate recklessness, does not satisfy the heightened pleading requirements of the PSLRA. *Id.* Consequently, with the exceptions noted above, plaintiffs have failed to allege adequately that defendants made false statements regarding the TBG

transaction with knowledge or deliberate recklessness.

> <u>FN167.</u> Plaintiffs' allegations regarding World Bank financing of the TBG sale are the only exception to this. To the extent defendants tied the availability of such credit to Turbodyne's UN affiliation, plaintiffs have adequately pled that the statements were consciously false or deliberately reckless for the reasons set forth in Section II.E.2.b.iii above.

> vi. The Value Of Turbodyne's Technology

**\*23** Plaintiffs allege that defendants knowingly misrepresented the value of Turbopac's technology on numerous occasions during the class period by publicly claiming that the Turbopac was "breakthrough" and "innovative," utilized "advanced technology," and "establishe[d] a new paradigm." <u>FN168</u> Plaintiffs allege defendants knew these claims were false, because on August 4, 1998, securities analyst Asensio & Co. published a research report stating that the Turbopac was "merely a supercharger that is driven by an electric motor instead of a belt." <u>FN169</u> On August 20, 1998, Asensio reported that "Turbodyne possesses no valuable technology.... Its alleged revolutionary product is merely an easy to duplicate and manufacture electric motor driven supercharger...." <u>FN170</u> Plaintiffs assert that defendants' representations to the contrary were made with scienter because "defendants continued to disseminate [such] representations ... after publication of the Asensio reports and claimed publicly that those reports were incorrect." <u>FN171</u>

> <u>FN168.</u> *Id.,* ¶ 90. These statements can be found in press releases (*id.,* ¶¶ 57, 60), and Turbodyne's 1997 Annual Report (*id.,* ¶¶ 65-66).

> <u>FN169.</u> *Id.,* ¶ 92.

> <u>FN170.</u> *Id.,* ¶ 93.

> <u>FN171.</u> *Id.,* ¶ 91.

Initially, it is unclear that defendants' alleged

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 26
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

"misrepresentations" regarding the value of the Turbopac technology provide an independent basis for imposing liability under Rule 10b-5. Unlike statements regarding the Turbopac's performance characteristics (i.e., "the Turbopac is easy to install"), it is difficult to determine the falsity of a representation that a product is "innovative." Usually, "[u]nless such statements are used to emphasize and induce reliance upon a material misrepresentation, they alone are not actionable as no reasonable investor would rely on them." _Plevy, supra,_ 38 F.Supp.2d at 827 .[FN172] Rather, liability for such statements lies in combining them with other, more concrete misrepresentations (i.e., overstating Turbodyne's manufacturing capabilities).

> FN172. Plaintiffs assert that these statements were made in conjunction with potentially material misrepresentations on several occasions. As part of its claim that ease of installation made the Turbopac a practical way to reduce vehicle emissions, for example, Turbodyne allegedly asserted that the technology was "breakthrough" and established a "new paradigm" for reducing fuel emissions. (_Id,_ ¶¶ 65, 66.)

Additionally, the fact that Asensio found the Turbopac "easy to duplicate" and "merely a supercharger" does not provide strong circumstantial evidence that defendants' statements to the contrary were consciously false or deliberately reckless. While presumably defendants were aware of Asensio's reports, this knowledge does not indicate that they were deliberately reckless in labeling the Turbopac "advanced." First, Asensio's reports were published _after_ defendants made many of the statements at issue, a fact that militates against inferring scienter solely on the basis of the analyst's publications. Second, no facts are pled that support an inference defendants had information available to them suggesting the Turbopac was merely a "supercharger" that was "easy to duplicate." Thus, while Asensio's reports may support an inference that defendants' statements were false, they do not support a strong inference that defendants knew of the falsity or made the statements with deliberate recklessness.

Additionally, plaintiffs' allegations do not differentiate among the individual defendants or provide any basis upon which to infer that any of them made false statements regarding the "value" of the technology knowingly or with deliberate recklessness. While plaintiffs have adequately pled that Halimi knew the Turbopac did not perform properly, their allegations do not support a similar inference that he knew the Turbopac was not "innovative" or "breakthrough." Certainly, none of plaintiffs' allegations supports an inference that defendants Nowek and Ware knew the Turbopac was not innovative. Accordingly, plaintiffs have failed to allege facts giving rise to a strong inference of deliberate recklessness or conscious misconduct on the part of any of the defendants as respects statements that the Turbopac utilized innovative, advanced technology.

### III. CONCLUSION

**\*24** For the foregoing reasons, defendants' motion to dismiss is granted. Plaintiffs may file an amended complaint within forty-five (45) days of the date of this order.

C.D.Cal.,2000.
In re Turbodyne Technologies, Inc. Securities Litigation
Not Reported in F.Supp.2d, 2000 WL 33961193 (C.D.Cal.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 10

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1432419 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 1

c
Briefs and Other Related Documents
Union Fire Ins. Co. of Pittsburgh, P.A. v. Pan Amer-
ican Energy LLCDel.Ch.,2003.Only the Westlaw
citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
        Court of Chancery of Delaware.
    THE INSURANCE COMPANY OF THE STATE
    OF PENNSYLVANIA, National Union Fire Insur-
    ance Company of Pittsburgh, P.A., Plaintiffs,
                        v.
    PAN AMERICAN ENERGY LLC, Pan American
    Energy LLC, Argentine Branch, Defendants.
              No. Civ.A. 19629-NC.

              Submitted Jan. 13, 2003.
              Decided March 19, 2003.

Richard D. Heins, Philip Trainer, Jr., and Carolyn S.
Hake, of Ashby & Geddes, Wilmington, Delaware,
for Plaintiffs.
Thomas R. Hunt, Jr., and David J. Teklits, of Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware, for
Defendants.

              MEMORANDUM OPINION
NOBLE, Vice Chancellor.
**\*1** Plaintiffs, The Insurance Company of the State of
Pennsylvania ("ICOSP") and National Union Fire In-
surance Company of Pittsburgh, Pa. ("NUFIC"), filed
this action to compel Defendants, Pan American En-
ergy LLC ("Pan Am LLC") and Pan American En-
ergy LLC, Argentine Branch ("Pan Am Argentina")
(collectively, "Pan Am"), to post $41,046,301.37 in
collateral in favor of ICOSP and NUFIC. Under the
Advance Payment Surety Bond, dated June 16, 1999
(the "Surety Bond"), ICOSP and NUFIC act as
sureties for the performance of Pan Am Argentina in
supplying crude oil to Chase Manhattan International
Limited ("Chase Manhattan") pursuant to the Crude
Oil Forward Sales Contract, dated June 16, 1999 (the
"Forward Sales Contract"). The claims asserted by
ICOSP and NUFIC, however, arise from obligations
Pan Am assumed in the Continuing Agreement of In-
demnity (Miscellaneous Surety Bonds), dated June

15, 1999 (the "Indemnity Agreement"), by which Pan
Am agreed to indemnify ICOSP and NUFIC for any
losses suffered in connection with the Surety Bonds.
At issue in this post-trial memorandum opinion is
whether the Indemnity Agreement requires Pan Am
to post collateral.

I. FACTUAL BACKGROUND

A. *The Parties*

The parties are highly sophisticated participants in
the international oil and gas markets, engaged in the
production of those energy resources or providing in-
surance and surety products for those markets. ICO-
SP and NUFIC, both Pennsylvania corporations with
their principal places of business in New York, are
direct subsidiaries of American International Group,
Inc. ("AIG") and are part of the American Interna-
tional Companies.[FN1] Pan Am LLC, a Delaware
limited liability company, is the second largest pro-
ducer of oil and gas in Argentina.[FN2] Pan Am Ar-
gentina is the Argentine branch of Pan Am LLC.[FN3]

        FN1. ICOSP and NUFIC are collectively re-
        ferred to as "AIG."

        FN2. I acknowledge that, while the parties
        have treated Pan Am Argentina and Pan Am
        LLC as the same entity in their arguments,
        this characterization, at times, precludes a
        completely accurate analysis. However, I
        follow their convention and treat the two en-
        tities as equivalents for purposes of this
        memorandum opinion under the name "Pan
        Am."

        FN3. BP p.l.c. indirectly holds an approxim-
        ate 60% interest in Pan Am, LLC.

B. *The Agreements*

Three interrelated agreements, the Forward Sales
Contract, the Surety Bond, and the Indemnity Agree-
ment, establish the relationships between the parties
and their obligations which are the focus of this ac-
tion. In June 1999, Pan Am entered into the Forward

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                  Page 2
Not Reported in A.2d, 2003 WL 1432419 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Sales Contract with Chase Manhattan. Pursuant to the terms of the Forward Sales Contract, Pan Am Argentina agreed to supply Chase Manhattan with crude oil for the period of March 2000 to April 2004; in return, Chase Manhattan paid Pan Am up front the sum of $250 million. Two ancillary agreements were necessary in order to structure a surety arrangement: the Surety Bond and the Indemnity Agreement.

To mitigate the risk of default by Pan Am, Chase Manhattan required Pan Am to procure a surety bond in favor of Chase Manhattan. Thus, Pan Am contracted for AIG and three other insurance companies to serve as sureties.[FN4] AIG's participation under the Surety Bond, and thus its maximum exposure in the event of nonperformance, was $75 million.[FN5] To procure AIG's services as surety under the Surety Bond, Pan Am paid to AIG a premium of $2.3 million, a premium which would be earned over the duration of the Forward Sales Contract.

> FN4. The three other sureties are St. Paul Fire and Marine Insurance Company, SAFECO Insurance Company of America, and Lumbermens Mutual Casualty Company. Pls.' Ex ("PX") 3 at 2.

> FN5. The obligations of those five companies serving as sureties under the Surety Bond are several, and not joint. However, the obligations of ICOSP and NUFIC are joint and several as between themselves.

*2 Yet, the risk associated with nonperformance of the Forward Sales Contract would be further reallocated. The parties entered into the Indemnity Agreement, the agreement primarily at issue in this action .[FN6] The Indemnity Agreement required that Pan Am indemnify AIG for any losses AIG incurred in connection with the Surety Bond. Additionally, the Indemnity Agreement required Pan Am to post collateral upon the occurrence of certain triggering events.[FN7] Because this action arises from the language of the Indemnity Agreement, a more detailed review of its terms is in order.

> FN6. Elizabeth Bottemiller ("Bottemiller") negotiated the Indemnity Agreement on behalf of AIG, and Rodolfo Eduardo Berisso ("Berisso") was Pan Am's principal representative. Bottemiller was one of AIG's two commercial surety group divisional vice-presidents. She left AIG in April 2000 after her position was eliminated and was neither deposed nor called to testify at trial. Berisso is the Vice President of Finance and Planning for Pan Am. He did testify at trial.

> FN7. Thus, the basic structure of a surety relationship can be distinguished from that of a true insurance arrangement. Unlike an insurance arrangement, which is between the two parties of the insurer and the insured, a surety relationship is among three parties: the principal (Pan Am), the obligee (Chase Manhattan), and the surety (including AIG). Furthermore, unlike the insurer in an insurance arrangement, the surety is not expected to bear any losses. The only risks undertaken by AIG as surety are the risk of the underlying obligation, the risk of Pan Am's nonperformance, and the risk of Pan Am's insolvency. Accordingly, the surety arrangement can be described as "a pure credit transaction." Tr. at 9.

AIG's demand for collateral in this action is based solely upon Paragraph 21 of the Indemnity Agreement ("Paragraph 21"), which provides:
If [Pan Am's] senior debt rating falls below BBBby Standard & Poor's rating bureau, or if [Pan Am's] tangible net worth drops below one billion dollars ($1,000,000,000) American International Companies can demand at any time that [Pan Am] post acceptable collateral to American International Companies to the full extent of any liability under the advance payment surety bond(s).[FN8]

> FN8. PX 36 at 4. I pause to note that on a draft of the Indemnity Agreement, next to Paragraph 21, Bottemiller jotted: "[Pan Am] will be paying this off so no debt rating." Defs.' Ex. ("DX") 1 at 4. Though the parties contest its significance, I consider it of limited value in resolving the merits of this con-

Not Reported in A.2d                                                    Page 3
Not Reported in A.2d, 2003 WL 1432419 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

troversy, and I do not rely upon it in doing so.

Thus, to mitigate those risks borne as a surety, AIG could demand, upon the occurrence of any of those events, the posting of cash (or other functionally equivalent) collateral to cover its remaining exposure under the Surety Bond.[FN9] The litigants disagree about whether Pan Am's senior debt rating has fallen below the threshold rating, thereby triggering Pan Am's obligation to post collateral. Thus, the principal issue of this case involves the interpretation of Paragraph 21.[FN10]

> FN9. This provision, through its multiple triggers, is designed to be sensitive to the financial vitality of Pan Am. Such a design is expected given the type of risk, that of insolvency of the principal, assumed by AIG as the surety in this surety arrangement. *See supra* note 7.

> FN10. AIG's claim for attorneys' fees also necessitates a review of the text of the Indemnity Agreement because Paragraph 2 of the Indemnity Agreement requires Pan Am to reimburse certain legal expenses incurred by AIG in connection with the Indemnity Agreement.

C. *Subsequent Events and Their Effects Upon the Parties*

To date, Pan Am has performed all of its obligations under the Forward Sales Contract. Indeed, Pan Am may now be a stronger company, in terms of finances and reserves, than it was in June 1999. As Pan Am has continued to perform its obligations to deliver crude oil under the Forward Sales Contract, the maximum exposure facing AIG pursuant to its obligations under the Surety Bond has declined; by October 1, 2002, ICOSP's remaining maximum exposure was $23,280,117.37 and NUFIC's remaining maximum exposure was $11,640,058.68.[FN11] However, for reasons beyond Pan Am's control, by December 2001, AIG would assert that it was entitled to collateral under Paragraph 21.

> FN11. Thus, AIG's aggregate remaining

maximum exposure was $34,920,176.05.

Events occurring after execution of the Indemnity Agreement in 1999 would affect the foreign currency rating of Argentina, the issuer rating of Pan Am, and the issue ratings of Pan Am obligations. During 2001, Argentina became embroiled in an economic crisis (the "Argentine Crisis"), during which "economic stagnation, persistent high interest rates, and the government's continued struggle to restore domestic confidence diminish[ed] financial flexibility and heighten[ed] refinancing risks."[FN12] Thus, Standard & Poor's in March 2001, as updated in May 2001, placed Argentina on CreditWatch with negative implications. Currently, Standard & Poor's assigns a foreign currency rating for Argentina of "SD" (selective default).

> FN12. Standard & Poor's, Commentary, Argentine Oil and Gas Industry Review (June 12, 2001), PX 40 at 1. Standard & Poor's, the rating agency designated in Paragraph 21 of the Indemnity Agreement, further noted that the "depressed economic activity hinder[ed] production and revenue growth and contribute[d] to higher demand volatility." *Id.*

*3 The issuer rating of Pan Am derivatively suffered from the Argentine Crisis. On March 26, 2001, Standard & Poor's downgraded the issuer rating of Pan Am to BB+. Since then, Pan Am's issuer rating has continued to decline.[FN13] Clearly, the Argentine Crisis adversely impacted the issuer rating of Pan Am, as evidenced by Standard & Poor's repeated downgrades of Pan Am's issuer rating. What is much less certain is how the Argentine Crisis affected the ratings of Pan Am's outstanding senior debt issues.

> FN13. By July 13, 2001, Standard & Poor's had downgraded Pan Am's issuer rating to BB-. By November 1, 2001, Standard & Poor's had downgraded Pan Am's issuer rating to B. In December 2001, Standard & Poor's again downgraded Pan Am's issuer rating to CCC+. PX 26 at 1.

At the time of execution of the Indemnity Agreement,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 4
Not Reported in A.2d, 2003 WL 1432419 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Pan Am had one outstanding "senior debt" issue, which Standard & Poor's had rated raAAA on the Standard & Poor's Argentine scale but had not rated on the global scale.[FN14] The parties have focused upon two sets of issues which currently constitute Pan Am's outstanding "senior debt."[FN15] The first set of outstanding senior debt issues is comprised of the first and second series of negotiable obligations, both of which are guaranteed by BP Amoco Corporation ("BP") (collectively, the "Guaranteed Debt"). Standard & Poor's rated the Guaranteed Debt raAAA with a stable outlook.[FN16] The remaining set of senior debt issues is neither guaranteed by any third party nor secured by any assets (the "Unguaranteed Debt"). Standard & Poor's rated the Unguaranteed Debt raAA with a negative outlook.[FN17] Importantly, however, Standard & Poor's rating bureau has never rated either the Guaranteed Debt or the Unguaranteed Debt on the global scale.

> FN14. A digression may be helpful to explain the difference between country-specific scale and global scale ratings. Those country-specific ratings for Argentine issuers are designated with an "ra" before the rating. The 'ra' prefix to a rating of Pan Am's senior debt issues signifies that the rating compares Pan Am's senior debt only to the obligations of other issuers domiciled in Argentina. In contrast, a rating without any prefix denotes a rating on the global scale; the issue being rated is compared against the entire global set of companies.
>
> However, this is not to say that the country of origin does not have an impact upon the issuer's global rating. Nations are assigned a specific, national foreign currency rating. "Standard & Poor's global scale ratings are based on the obligor's individual credit characteristics and on indirect sovereign-related risks, such as economic and political factors and direct sovereign risks, including transfer and convertibility, that might interfere with an obligor's ability to access foreign currency and thereby prevent it from servicing obligations on a timely basis." PX 40 at 9. Thus, an obligor's foreign currency rating

typically is no higher than that of the sovereign where it is located.

The specific situation here presents a twist on this analysis. In the case of Argentina, the direct sovereign risks are mitigated because of the "dollarization" of the Argentine economy. Because "dollarization" in Argentina encompasses both external and internal obligations, "Standard & Poor's considers that the likelihood of the sovereigns interfering with foreign currency obligations is reduced, because of the impact such a restriction would be likely to have on the local economy. In accordance with this assessment, Standard & Poor's criteria allow obligations of Argentine entities to be rated as much as three notches higher than the foreign currency rating of the sovereign. In these circumstances, company ratings will remain tied to the sovereign rating and, consequently, will be lowered in the event of the downgrading of the sovereign, in order to maintain up to a three-notch differential." *Id.*

In this opinion, global scale ratings have no prefix, while Argentine scale ratings bear the prefix of "ra."

> FN15. In the Amended Answer, Pan Am retracted its previous answer and admitted to only these issues as comprising the senior debt of Pan Am. Amended Answer ¶ 12. I note that, while the evidence has suggested other issues could also be considered, for purposes of Paragraph 21, to constitute outstanding senior debt of Pan Am, these other issues, which have never been rated by Standard & Poor's rating bureau on the global scale, do not affect my decision.

> FN16. Standard & Poor's, Rating Report, Pan American Energy LLC, Sucursal Argentina (July 8, 2002), PX 14 at 1.

> FN17. *Id.*

While Pan Am weathered the Argentine Crisis, AIG confronted a different economic malaise. Between

Not Reported in A.2d                                                          Page 5
Not Reported in A.2d, 2003 WL 1432419 (Del.Ch.)
(Cite as: Not Reported in A.2d)

1997 and 2000, AIG served as surety for seven similarly structured forward sales contracts, including a surety arrangement with Enron Corporation ("Enron"). Ultimately, with the collapse of Enron, AIG was forced to pay a claim of $125.8 million, of which possibly only $16 million is covered by reinsurance.[FN18] Soon after the Enron debacle, AIG began to reevaluate all surety bonds it had written in support of forward sales contracts, scrutinizing surety arrangements that earlier had seemed to be almost risk-free. At a meeting of its senior managers in November 2001, AIG determined that errors had been made in calculating its exposure as surety under such forward sales contracts and that it should attempt to "get off" of all such surety arrangements.[FN19] Influenced by this policy, AIG demanded in December 2001 that collateral be posted by Pan Am pursuant to the Indemnity Agreement.

> FN18. Five reinsurers to AIG have contested whether forward sales contracts, like those forward sales contracts AIG entered into with Enron and Pam Am, are covered by the 1999 domestic reinsurance treaty.

> FN19. Tr. at 74-75.

## II. CONTENTIONS

In support of its demand that Pan Am post collateral, AIG advances two arguments that Pan Am's senior debt rating has fallen below BBB-, thereby triggering the obligation to post sufficient collateral under Paragraph 21. Initially, AIG presumes that any rating of Pan Am's senior debt is to be measured against the threshold "BBB-" rating based upon the global scale. AIG then contends that any rating that would be assigned to the Unguaranteed Debt cannot exceed the issuer rating of Pan Am; therefore, the Unguaranteed Debt could not possibly be rated any higher than Pan Am's issuer rating of CCC+. Additionally, AIG hypothesizes that the Argentine scale ratings, raAAA and raAA, assigned to the Guaranteed Debt and the Unguaranteed Debt, respectively, must correspond to a global scale rating below BBB-, because any rating of an Argentine issuer's obligations, in accordance with Standard & Poor's guidelines, could only be rated, at most, three notches above that assigned to the sovereign where the issuer is located. Since Standard & Poor's has assigned to Argentina a foreign currency rating of SD, Pan Am's obligations, at most, would be rated CCC+, which is below BBB-. AIG also seeks an award of attorneys' fees under Paragraph 2 of the Indemnity Agreement.

**\*4** Pan Am argues that it has no obligation to post collateral pursuant to Paragraph 21. First, Pan Am disputes AIG's conjecture that Pan Am's senior debt rating has fallen below the threshold in Paragraph 21. It notes that Paragraph 21 does not draw a distinction between the global scale and the Argentine scale. Because all of Pan Am's outstanding, rated senior debt issues are rated above the triggering threshold of BB-B on the Argentine scale, Pan Am's obligation to post collateral has not been triggered. Furthermore, even if the BBB-threshold is to be measured on the global scale, "the result is simply that Pan [Am] currently has no 'senior debt rating.' " ' [FN20] Second, Pan Am also contends that if an issue is guaranteed or secured, the rating may very well be greater than three notches above that of the obligor's issuer rating. Thus, it distinguishes the Guaranteed Debt from the situation envisioned by the Standard & Poor's practice of "allow[ing] obligations of Argentine entities to be rated as much as three notches higher than the foreign currency rating of the sovereign." [FN21] Complementing this line of reasoning, Pan Am asserts that all rated senior debt issues must be rated below BBB-in order to trigger its obligation to past collateral. Thus, in combination, these arguments prove that Paragraph 21 has yet to be triggered.

> FN20. Defs.' Post-Trial Answering Br. at 18.

> FN21. PX 40 at 9. Neither AIG nor Pan Am presented a Standard & Poor's representative to explain its rating procedures and protocols.

Moreover, Pan Am contends that even if its senior debt issues have been rated below the threshold contained in Paragraph 21, it is still not obligated to post collateral. Pan Am notes that AIG has suffered no "liability" in connection with the Surety Bond and is not entitled to any collateral. It additionally argues that AIG's demand for collateral, which would extin-

guish its exposure to any remaining risk under the Surety Bond, violates the implied covenant of good faith and fair dealing. Finally, Pan Am characterizes AIG's demand for collateral as blindly adhering to its new corporate policy of "getting off" this type of surety arrangement, ignoring the millions of dollars in premiums paid to it, and ultimately amounting to bad faith. Pan Am also requests reimbursement by AIG, pursuant to the bad faith exception to the American Rule, of its reasonable attorneys' fees.

### III. ANALYSIS

A. *The Obligations of Defendants to Post Collateral Under Paragraph 21 of the Indemnity Agreement*

I am guided by principles of New York law in determining whether Pan Am is obligated to post collateral pursuant to Paragraph 21.[FN22] Courts are to give effect to the intention of the contracting parties and are not to rewrite the parties' contract.[FN23] "The Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby 'make a new contract for the parties under the guise of interpreting the writing .' "[FN24] "It is well settled that '[a] contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed.' "[FN25] In doing so, the Court is to " 'giv[e] a practical interpretation to the language employed so that the parties' reasonable expectations are realized.' "[FN26] Moreover, the Court, in its interpretation, should endeavor to give force and effect to all provisions of the contract.[FN27] With these principles in mind,[FN28] I turn to the language of Paragraph 21.

FN22. The parties agree that the Indemnity Agreement is governed by New York law.

FN23. *Walton v. Eastern Analytical Labs, Inc.,* 667 N.Y.S.2d 407, 409 (N.Y.App.Div.1998).

FN24. *Morlee Sales Corp. v. Manufacturers Trust Co.,* 172 N.E.2d 280, 282 (N.Y.1961) (quoting *Heller v. Pope,* 164 N.E. 881, 882 (N.Y.1928)).

FN25. *JJFN Holdings, Inc. v. Monarch Inv.*

*Properties, Inc.,* 736 N.Y.S.2d 66, 69 (N.Y.App.Div.2001) (alteration in original) (quoting *Kailasanathan v. Mysorekar,* 651 N.Y.S.2d 124, 125 (N.Y.App.Div.1996)).

FN26. *Jellinick v. Joseph J. Naples & Assocs., Inc.,* 744 N.Y.S.2d 610, 613 (N.Y.App.Div.2002) (quoting *Sunrise Mall Assoc. v. Import Alley of Sunrise Mall, Inc.,* 621 N.Y.S.2d 662, 663 (N.Y.App.Div.1995)).

FN27. *Id.*

FN28. Pan Am has urged this Court to apply another general principle of contract interpretation, that of *contra proferentum.* Contra proferentum is inappropriate when, "although [a party] prepared the first draft of the ... agreement, [the other party] negotiated significant changes to it and had counsel available to review the agreement for them." *American Property Consultants, Ltd. v. Zamias Servs., Inc.,* 741 N.Y.S.2d 852, 853 (N.Y.App.Div.2002), *leave to appeal denied,* 2003 WL 124701 (N.Y. Jan. 9, 2003) (Table). Here, Paragraph 21 was the product of negotiation between two highly sophisticated parties, of comparable bargaining power, who presumably had access to counsel. As such, the principle of contra proferentum is inapplicable.

1. *The Scale of the Threshold Rating*

*5 The parties initially differ upon which scale, the Argentine or the global scale, is the threshold rating of a "BBB-" rating to be measured. A term of a contract is ambiguous when "the agreement on its face is reasonably susceptible of more than one interpretation."[FN29] " 'An omission or mistake in a contract does not constitute an ambiguity [and] ... the question of whether an ambiguity exists must be ascertained from the face of an agreement without regard to extrinsic evidence.' "[FN30] Nothing on the face of the Indemnity Agreement clarifies which scale the parties intended.[FN31] Thus the term "BBB-" is ambiguous, and, therefore, I may review extrinsic evid-

ence in order to determine on which of the competing scales lies the threshold, BBBrating.[FN32]

> FN29. *Chimart Assocs. v. Paul*, 489 N.E.2d 231, 233 (N.Y.1986); *see also Kass v. Kass*, 696 N.E.2d 174, 180-81 (N.Y.1998).

> FN30. *Reiss v. Financial Performance Corp.*, 764 N.E.2d 958, 961 (N.Y.2001) (alterations in original) (quoting *Schmidt v. Magnetic Head Corp.*, 468 N.Y.S.2d 649, 653 (N.Y.App.Div.1983)). Furthermore, "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *W.W.W. Assocs. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y.1990).

> FN31. It is reasonable to infer from the evidence that the parties' representatives who negotiated Paragraph 21 did not fully understand the relationships between global and local currency ratings.

> FN32. *JJFN Holdings, Inc.*, 736 N.Y.S.2d at 69 ("[A] court may permit the introduction of extrinsic evidence if the contract is ambiguous.").

The extrinsic evidence supports the interpretation that the threshold "BBB-" rating is to be measured on the global scale. Argentine scale ratings are designated with a prefix "ra." Global scale ratings, however, have no prefix. The term "BBB-" used in Paragraph 21 has no prefix and, thus, can only be reasonably interpreted as referring to the global rating scale. Therefore, I conclude that any evaluation of whether Pan Am's obligation to post collateral under Paragraph 21 has been triggered is a question of whether Pan Am's senior debt has been rated below BBBon the global scale.

### 2. The Number of Debt Issues Necessary to Trigger Defendants' Obligation to Post Collateral

Pan Am next argues that all of Pan Am's senior debt issues must be rated below BBBin order to trigger its obligation to post collateral. Ultimately, Pan Am

claims that if the Guaranteed Debt is above the threshold rating (because of the credit enhancement afforded by the guarantee of BP), it has no obligation to post collateral under Paragraph 21. However, I conclude that Paragraph 21 does not permit such an interpretation.

Paragraph 21 states in pertinent part:
If [Pan Am's] senior debt rating falls below BBBby Standard & Poor's rating bureau ... American International Companies can demand at any time that [Pan Am] post acceptable collateral."

Significantly, Paragraph 21 refers not to multiple ratings, but to a single "rating," which, when it "falls below BBB-," triggers Pan Am's obligation to post collateral. Therefore, this language must refer to (i) a rating of any single issue, (ii) a single rating of a group issues, or (iii) the rating of an issuer. The three plausible interpretations attached to this language pose an ambiguity that can only be resolved by reference to extrinsic evidence. That evidence eliminates the possibility of a single rating for a group of issues: no such rating exists. Indeed, the closest approximation of a single rating for multiple issues would be the issuer rating. While this may have been what AIG intended,[FN33] I must interpret the language as drafted-language ("senior debt") that both parties now agree does not implicate Pan Am's issuer rating. [FN34] By process of elimination, the only remaining interpretation is that of the rating of any single senior debt issue. Therefore, were the rating of any senior debt issue to fall below BBBon the global ratings scale, Pan Am's obligation to post collateral would be triggered.

> FN33. In fact, AIG subsequently has revised the wording of similar collateral-posting provisions from "senior debt rating" to "any credit downgrade to [the indemnitor] which results in a rating." DX 11 at 2. Forte also testified that the issuer rating is the preferred trigger because "the issuer rating takes into account the entire financial picture of the company as opposed to just a specific debt issuance." Tr. at 65.

> FN34. *See* Defs.' Post-Trial Answering Br.

at 16 ("No reasonable person could interpret 'senior debt rating' to mean anything other than the current Standard & Poor's rating on Pan American's outstanding senior debt issuances."); Pls.' Post-Trial Reply Br. at 4 ("Plaintiffs, of course, do not contend that the phrase 'senior debt rating' refers to Pan Am's issuer credit rating.").

### 3. The Ratings of Defendants' Senior Debt Issues

**\*6** The next question is: what, in fact, are the ratings of the pertinent senior debt issues of Pan Am? I will consider first the Unguaranteed Debt.

The Unguaranteed Debt is not guaranteed by BP or any other third party and is not secured by any assets.[FN35] The risks of repayment are functionally equivalent to those risks associated with the issuer. As such, one would expect that the Unguaranteed Debt, with no additional features, would be rated no higher than Pan Am's issuer rating.[FN36] The Standard & Poor's guidelines, which are properly applied in the context of the Unguaranteed Debt,[FN37] indicate that the rating of debt without any credit-enhancement device does not exceed the issuer rating of its obligor. In this case, Pan Am's issuer rating is below BBB-. Thus, applying the Standard & Poor's guidelines to the Unguaranteed Debt, I find by a preponderance of the evidence (or, perhaps more accurately, predict) that the Unguaranteed Debt would be rated by Standard & Poor's rating bureau below BBB-.[FN38]

FN35. I recognize that, in regard to the Unguaranteed Debt, "there have been two tranches of that issue, the second of which carries a credit enhancement consisting of a dedicated collection account for export proceeds." Letter from Thomas R. Hunt, Jr., Esq., dated January 27, 2003, at 1. However, this partial collection mechanism does not render the Unguaranteed Debt guaranteed or secured. Moreover, it affords no enhancement to the first tranch.

FN36. Indeed, Berisso admitted that the issuer rating of an entity typically is equival-

ent to the rating given that entity's senior unsecured debt issues. Dep. of Rodolfo Berisso at 49-50.

FN37. Pan Am takes issue merely with the applicability of this rule in the context of debt with some form of credit enhancement.

FN38. AIG has pressed several arguments by which I should determine that a senior debt issue of Pan Am would be rated below BBB-. I do not reach the question of what rating Standard & Poor's would assign to the Guaranteed Debt. Furthermore, I do not address the predicted outcome of any analysis based upon a possible three notch constraint concerning the relationship between the ratings of Pan Am's senior debt and that of the sovereign, Argentina.

This may appear to be the end of my inquiry. However, I must answer one more question: whether this Court's prediction of what rating Standard & Poor's rating bureau would assign to the Unguaranteed Debt is sufficient to trigger Pan Am's obligation to post collateral under Paragraph 21.

### 4. Whether Defendants' Obligation to Post Collateral Under Paragraph 21 of the Indemnity Agreement Has Been Triggered

It may seem that determining whether the obligation to post collateral under Paragraph 21 has been triggered would be a purely ministerial task after I have predicted what rating Standard & Poor's rating bureau would assign to the Unguaranteed Debt. However, such a view ignores the express words chosen by the drafters of Paragraph 21 and, further, assumes much about the nature of debt ratings. Despite my finding that the expected rating of the Unguaranteed Debt would be less than BBB-, I conclude that the obligation to post collateral pursuant to Paragraph 21 has not been triggered.

Again, the natural and proper starting point is the text of Paragraph 21. In pertinent part, that paragraph states:

If [Pan Am's] senior debt rating falls below BBB*by Standard & Poor's rating bureau ...* American Inter-

Not Reported in A.2d                                                                                          Page 9
Not Reported in A.2d, 2003 WL 1432419 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

national Companies can demand at any time that [Pan Am] post acceptable collateral.[FN39]

> FN39. Emphasis added.

Critically, the words "by" and "Standard & Poor's rating bureau" require that a specific entity, Standard & Poor's rating bureau, determine the rating for the senior debt of Pan Am. This is quite different from deriving a rating by merely applying Standard & Poor's guidelines and principles; one identifies a specific decision-maker, while the other describes a decision-making process.[FN40] Paragraph 21 unambiguously designates Standard & Poor's rating bureau, and not another rating agency or this Court, to determine the rating. Standard & Poor's rating bureau has not "rated" any of Pan Am's senior debt issues to be less than the BBBthreshold. Because Standard & Poor's rating bureau has not yet rated a Pan Am senior debt issue below BBB-, AIG has not demonstrated that Pan Am's obligation to post collateral under Paragraph 21 has been triggered.[FN41] Therefore, judgment will be entered in favor of Pan Am.[FN42]

> FN40. An analogy to the game of baseball illustrates the importance of this distinction. A pitch may be belt-high, over the middle of the plate, thus, satisfying all objective criteria for classification as a strike. *See* Rule 2.00, *Official Rules of Major League Baseball* ("The strike zone is that area over home plate the upper limit of which is a horizontal line at the midpoint between the top of the shoulders and the top of the uniform pants, and the lower level is a line at the hallow beneath the knee cap."). That pitch, however, for purposes of the game, is not a strike unless and until the home plate umpire makes the call. *See id.* ("A strike is a legal pitch when so called by the umpire, which ... (b) [i]s not struck at, if any part of the ball passes through any part of the strike zone.").

> FN41. Additionally, I reject AIG's criticism that, because any rating by Standard & Poor's rating bureau is performed only at an issuer's request, this interpretation defines a

triggering event that can be postponed indefinitely by Pan Am. I note that AIG could have contractually required that Pan Am's senior debt be subject to periodic global ratings by Standard & Poor's or that a different standard be employed.

> FN42. I note that, had Paragraph 21 been triggered and Pan Am been obligated to post collateral, AIG's initiation of this action would not have violated the implied covenant of good faith and fair dealing. "Courts generally have been reluctant to find a breach of an implied covenant of good faith when doing so reads so much into the contract as to create a new term or when the alleged misconduct is expressly allowed by the contract. Therefore, when a contract expressly grants a party the right to take actions that otherwise might be considered in breach of the implied covenant of good faith, the express terms of the contract override the implied covenant, and 'grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing.' " *Keene Corp. v. Bogan,* 1990 WL 1864, at *14 (S.D.N.Y. Jan. 11, 1990) (quoting *VTR, Inc. v. Goodyear Tire & Rubber Co.,* 303 F.Supp. 773, 777 (S.D.N.Y.1969)).

### B. *Attorneys' Fees*

**\*7** Both sides seek to have their attorneys' fees reimbursed by the other. AIG seeks a reimbursement of its attorneys' fees pursuant to the express language of Paragraph 2 of the Indemnity Agreement, which states that Pan Am agrees:

[t]o indemnify, and keep indemnified, and hold harmless [AIG] against all demands, claims, loss, costs, damages, expenses and attorneys' fees whatever, and any and all liability therefore, sustained or incurred by [AIG] by reason of ... recovering or attempting to recover any salvage in connection therewith or enforcing by litigation or otherwise any of the agreements herein contained.

Meanwhile, Pan Am contends that AIG acted in bad

Not Reported in A.2d                                                                                Page 10
Not Reported in A.2d, 2003 WL 1432419 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

faith in pursuing this litigation and, therefore, it is entitled to reasonable attorneys' fees.

Under the American Rule, each party bears its own legal fees in the absence of a recognized basis for fee shifting.[FN43] "Attorneys' fees may be awarded, nevertheless, in situations where litigation is brought in bad faith or a party's bad faith conduct increased the costs of litigation."[FN44] Any determination of whether a party's conduct constitutes bad faith is based upon the particular facts and circumstances of a given case.[FN45] Upon reviewing the specific facts and circumstances of this litigation, I am unable to say that this is the "unusual" case where it has been shown the "filing of the action was fraudulent, utterly frivolous or the like."[FN46] The arguments advanced by AIG concerned intricate issues regarding the interpretation of a poorly drafted agreement and were not without merit. Therefore, I decline to award attorneys' fees to Pan Am under the bad faith exception to the American Rule.

>     FN43. *Cartanza v. Lynn,* 2002 WL
>     31007802, at *4 (Del. Ch. Aug. 8, 2002)

>     FN44. *Jacobson v. Dryson Acceptance
>     Corp.,* 2002 WL 31521109, at *16 (Del. Ch.
>     Nov. 1, 2002).

>     FN45. *Id.*

>     FN46. *Hutchinson v. Fish Engineering
>     Corp.,* 204 A.2d 752, 753 (Del. Ch.1964),
>     *aff'd,* 213 A.2d 447 (Del.1965).

AIG argues for an award of attorneys' fees, premised upon Pan Am's contractual commitment as set forth in Paragraph 2 of the Indemnity Agreement, which entitles AIG to fees incurred while "enforcing by litigation" its rights under Paragraph 21 of the Indemnity Agreement.[FN47] I do not understand AIG to argue that Pan Am is to reimburse AIG's attorneys' fees sustained in an unsuccessful attempt to "enforc[e] by litigation" its rights under the Indemnity Agreement. Therefore, I deny AIG's request for attorneys' fees.

>     FN47. A contractual provision allocating the
>     burdens of legal fees is also one of the exceptions to the American Rule. *See, e.g.,*

*Cura Fin. Servs. N.V. v. Electronic Payment
Exch., Inc.,* 2001 WL 1334188, at *24 (Del.
Ch. Oct. 22, 2001).

### IV. CONCLUSION

For the foregoing reasons, judgment is entered in favor of Defendants and against Plaintiffs. Each party shall bear its own legal fees and expenses. Otherwise, costs are awarded to Defendants.

IT IS SO ORDERED.

Del.Ch.,2003.
Union Fire Ins. Co. of Pittsburgh, P.A. v. Pan American Energy LLC
Not Reported in A.2d, 2003 WL 1432419 (Del.Ch.)

Briefs and Other Related Documents (Back to top)

• 2002 WL 32994140 (Trial Pleading) Answer (Jun. 10, 2002) Original Image of this Document (PDF)
• 2002 WL 32994139 (Trial Pleading) Complaint (May 17, 2002) Original Image of this Document (PDF)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.