United States District Court

For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMISIL HOLDINGS LTD.,                          No. C-06-5255 MJJ (EMC)

       Plaintiff,

       v.                                  **REPORT AND RECOMMENDATION**
**RE DEFENDANTS' MOTION TO**
**COMPEL ARBITRATION**

CLARIUM CAPITAL MANAGEMENT
LLC, *et al.*,                                 **(Docket No. 12)**

       Defendants.
_____/

On August 28, 2006, Plaintiff Amisil Holdings, Ltd. filed suit against Clarium Capital

Management, LLC, Peter Andreas Thiel, Jason Portnoy, and Mark Woolway. Amisil alleged

violations of federal securities law as well as various state laws. Currently pending is a motion to

compel arbitration filed by all Defendants (*i.e.*, both the company and the individual defendants) and

to stay proceedings pending arbitration. Having considered the parties' briefs and accompanying

submissions, the Court hereby recommends that Defendants' motion to compel arbitration and stay

proceedings be granted.[1]

_____

[1] Some courts have held that a motion to compel arbitration is a dispositive motion. *See, e.g.*,
*Leal v. Chapman Chevrolet, L.L.C.*, No. CV 06-1152-PHX-LOA, 2006 U.S. Dist. LEXIS 38586, at *3
(D. Ariz. June 9, 2006) (stating that "a motion to compel arbitration, even a stipulation to such, may be
deemed a dispositive motion, as a motion to remand is"); *Flannery v. Tri-State Div.*, 402 F. Supp. 2d
819, 821 (E.D. Mich. 2005) (concluding that an order compelling arbitration is a dispositive motion
because it -- like an order remanding case to state court -- "has the practical effect of allowing the case
to proceed in a different forum"); *Alticor, Inc. v. Nat'l Union Fire Ins. Co.*, No. 1:03-CV-350, 2003 U.S.
Dist. LEXIS 27109, at *2 (W.D. Mich. Dec. 10, 2003) ("Claims for injunctive relief (including motions
to compel arbitration) are dispositive motions which the district courts must review *de novo*."). If it
were, a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(C) is appropriate.

Other courts, however, have held that a motion to compel arbitration is not a dispositive motion.

**United States District Court**
For the Northern District of California

# I.  FACTUAL & PROCEDURAL BACKGROUND

In its complaint, Amisil alleges as follows:  Clarium (formerly known as Thiel Capital Management, LLC) is a global macro hedge fund manager.  *See* Compl. ¶ 13.  Mr. Thiel is the majority member as well as managing member of Clarium.  *See id.* ¶ 9.  Mr. Portnoy is the CFO of Clarium and Mr. Woolway the managing director.  *See id.* ¶¶ 10-11.

On or about December 19, 1997, Mr. Thiel solicited Amisil to invest in Clarium and Thiel Capital International, LLC (the "Fund"), a fund managed and owned in part by Clarium.  *See id.* ¶ 18, 20, 27.  Amisil agreed and entered into a Subscription Agreement with Clarium and the Fund.  *See id.* ¶ 19.  Thus, as of 1998, Amisil became a minority member of Clarium.  *See id.* ¶ 14.

In December 1998, the Fund invested in a new company that was ultimately named PayPal.  *See id.* ¶ 23.  In February 2002, PayPal conducted an IPO of its shares in the public markets.  Subsequently, Clarium's stake in PayPal (as a manager of and investor in the Fund) was worth approximately $4.9 million.  *See id.* ¶ 28.  Just a few months later, on May 2, 2002, at the behest of Mr. Thiel, Clarium tried to buy out Amisil's membership interest in Clarium for only $372.  *See id.* ¶ 29.

On July 8, 2002, PayPal announced that it would be sold to eBay, Inc. for more than $1.5 billion.  *See id.* ¶ 30.  The sale was consummated in October 2002.  *See id.* ¶ 32.

On February 19, 2003, Mr. Thiel, on behalf of Clarium, wrote to Amisil regarding proposed changes to Clarium's Operating Agreement.  One of the proposed changes was a provision that

---

*See, e.g., Gonzalez v. GE Group Adm'rs, Inc.*, 321 F. Supp. 2d 165, 166-67 (D. Mass. 2004) (noting that orders to stay proceedings pending arbitration and to compel arbitration are non-dispositive orders); *Third Millennium Techs., Inc. v. Bentley Sys.*, No. 03-1145-JTM, 2003 U.S. Dist. LEXIS 14662, at *3 (D. Kan. Aug. 21, 2003) ("The district courts that have considered the nature of an order to stay proceedings pending arbitration and to compel arbitration have concluded that these are non-dispositive orders."); *Herko v. Metropolitan Life Ins. Co.*, 978 F. Supp. 141, 142 n.1 (W.D.N.Y. Jan. 29, 1997) (concluding that a motion to compel arbitration is not a dispositive motion because "the FAA provides that there is no final exercise of Article III power until after arbitration is complete and the arbitrator's decision is either affirmed, modified, or vacated by the district court judge where the actions remain lodged").  In that instance, the Magistrate Judge's order is pursuant to 28 U.S.C. § 636(b)(1)(A).

In an abundance of caution, this Court issues a report and recommendation herein to the District Judge.

1  authorized the managing member of Clarium (*i.e.*, Mr. Thiel) to remove a member without the

2  member's consent. *See id.* ¶ 34. Amisil objected to this proposed change, as well as others. *See id.*

3       Clarium failed to make any distributions to Amisil, issue any tax returns, or disclose any of

4  its operations to Amisil from 2002 through 2005. *See id.* ¶ 35. For 2005, Mr. Thiel received a $31

5  million distribution. *See id.* ¶ 48.

6       On March 1, 2006, Amisil learned for the first time that Clarium was managing a hedge fund

7  with more than $1.5 billion in assets. *See id.* ¶ 37.

8       On March 14, 2006, Mr. Portnoy and Mr. Woolway met with Amisil to discuss Amisil's

9  interest in Clarium. At this meeting, Amisil was told that Clarium now had only two members,

10  namely, Mr. Thiel and Amisil (with Mr. Thiel holding 98.66%) because all other members had been

11  bought out in 2002. *See id.* ¶ 38.

12       Subsequently, on March 20, 2006, Amisil made a written request to inspect certain books

13  and records of Clarium as provided by Clarium's Operating Agreement. *See id.* ¶ 39. Mr. Portnoy

14  told Amisil that the requested documents would be forthcoming but they were not provided. *See id.*

15  ¶ 40. Instead, on May 2, 2006, Mr. Thiel proposed to buy out Amisil's membership interest. *See id.*

16  ¶ 41.

17       On July 17, 2006, Amisil made another request to inspect Clarium's books and records. *See*

18  *id.* ¶ 44. Three days later, Mr. Thiel, in his capacity as managing member of Clarium, purported to

19  expel Amisil as a member of Clarium and acquire its interest, effective July 26, 2006. *See id.* ¶ 45.

20       The thrust of Amisil's complaint is that

21          [Mr.] Thiel and the other individual codefendants, acting individually
        and on behalf of Clarium, have oppressed and continue to oppress
22          Amisil's rights as a holder of a minority membership interest in
        Clarium. Defendants have also repeatedly breached the company's
23          Subscription Agreement and Operating Agreement to Amisil's
        continuing damage. Through a pattern and practice of unlawful
24          activity, Defendants have deprived Amisil of the true value of its
        investment.

25

26  *Id.* ¶ 2.

27       The claims asserted in the complaint are as follows:

28  (1)     Violation of § 10(b) of the Securities Exchange Act of 1984 and Rule 10b-5 (all Defendants);

1    (2)    Violation of the Investment Advisers Act of 1940 (all Defendants);

2    (3)    Fraud (all Defendants);

3    (4)    Conversion (all Defendants);

4    (5)    Breach of fiduciary duty (Mr. Thiel, Mr. Portnoy, and Mr. Woolway only);

5    (6)    Conspiracy to defraud and to breach fiduciary duties (Mr. Thiel, Mr. Portnoy, and Mr.

6           Woolway only);

7    (7)    Breach of contract (Clarium only);

8    (8)    Breach of implied covenant of good faith and fair dealing (Clarium only);

9    (9)    Unfair business practices (all Defendants);

10   (10)   Accounting and constructive trust (all Defendants); and

11   (11)   Preliminary and permanent injunction (all Defendants).

12          Attached to Amisil's complaint is a copy of Clarium's Operating Agreement and the Fund's

13   Operating Agreement, both dated September 9, 1996. *See id.*, Ex. A (Fund's Operating Agreement);

14   *id.* Ex. B (Clarium's Operating Agreement).  Also attached is a copy of a Subscription and

15   Investment Representation Agreement, dated February 27, 1998, entered into by Amisil, Clarium,

16   and the Fund. *See id.*, Ex. C (Subscription Agreement).  According to the terms of the Subscription

17   Agreement, Amisil agreed to be bound by Clarium's Operating Agreement as well as the Fund's.

18   *See* Subscription Agreement ¶ 2(c).  Paragraph 10.17(a) of Clarium's Operating Agreement

19   provides:

20               Except as otherwise specifically provided in this Agreement, the
                 Members shall make a reasonable attempt to resolve any controversy
21               or claim arising out of or relating to this Agreement through non-
                 binding mediation.  Any such controversy or claim not resolved after
22               such reasonable attempt shall be resolved through arbitration
                 conducted in accordance with the rules of the American Arbitration
23               Association, and judgment upon an award arising in connection
                 therewith may be entered in any court of competent jurisdiction.

24

25   Operating Agreement ¶ 10.17(a).  While Defendants do not concede that the Clarium Operating

26   Agreement attached to the complaint is the version currently governing the parties' rights and

27   obligations, they note that the language of the arbitration clause was not changed in other versions of

28   the Operating Agreement.  *See* Mot. at 2 n.1.

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.    DISCUSSION

In the instant case, all Defendants -- *i.e.*, both Clarium and the individual defendants -- seek to compel arbitration.  Defendants argue that arbitration must be compelled based on the arbitration provision in the Operating Agreement quoted above.

A.    Clarium

Amisil argues that arbitration should not be compelled with respect to its claims against Clarium because arbitration under the AAA rules would substantially prejudice Amisil.  Amisil points out that the AAA rules provide for discovery at the discretion of the arbitrator and as is consistent with the expedited nature of arbitration.[2]  According to Amisil, this is not adequate because, in order to determine the true value of its interest in Clarium, Amisil needs "a thorough forensic examination of Clarium's books and records."  Opp'n at 7.  Amisil adds that Clarium has repeatedly failed to produce records requested by Amisil, to which Amisil was entitled under Clarium's Operating Agreement.

The only authority cited by Amisil in support of its argument above is *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991).  However, in *Gilmer*, the Supreme Court indicated that a challenge to arbitration on the basis that it provides for only limited discovery is not likely to succeed.  The plaintiff in *Gilmer* claimed that he had been discriminated against on the basis of his age.  According to the plaintiff, it would be more difficult for him to prove discrimination in arbitrator because the discovery allowed there was more limited than in federal courts.  The Supreme Court thought it "unlikely . . . that age discrimination claims [would] require more extensive discovery than other claims that we have found to be arbitrable, such as RICO and

---

[2] Rule 21(a) of the AAA's Commercial Arbitration Rules and Mediation Procedures provides:

(a)    At the request of any party or at the discretion of the arbitrator, consistent with the expedited nature of arbitration, the arbitrator may direct

    i)    the production of documents and other information, and

    ii)    the identification of any witnesses to be called.

United States District Court

For the Northern District of California

1    antitrust claims." *Id.* at 31.  The Court further stated that there had been no showing that "the NYSE

2    discovery provisions, which allow for document production, information requests, depositions, and

3    subpoenas will prove insufficient to allow ADEA claimants such as [the plaintiff] a fair opportunity

4    to present their claims." *Id.*

5    In the instant case, Amisil has not adequately demonstrated why arbitration under the AAA

6    rules would deny it a fair opportunity to present its claims.  The AAA rules allow for discovery,

7    including the production of documents.  That the discovery is at the discretion of the arbitrator does

8    not mean that Amisil will necessarily be denied the ability to obtain relevant books and records.  *See*

9    *Morrison v. Circuit City Stores*, 317 F.3d 646, 678 n.16 (6th Cir. 2003) ("[A]lthough Morrison has

10   asserted that the discovery allowed under the Circuit City arbitration rules is more limited than that

11   generally allowed in federal district court, she has failed even to attempt to show that such

12   restrictions prevent either her or any other claimants from presenting their claims.").  At this point, it

13   would be entirely speculative to assume otherwise.  Nor does Amisil point to anything in the AAA

14   that gives Clarium an *a priori* unfair advantage.

15   Accordingly, the Court recommends that the motion to compel arbitration with respect to

16   Clarium be granted.

17   B.    Individual Defendants (Mr. Thiel, Mr. Portnoy, and Mr. Woolway)

18   Amisil argues next that, even if its claims against Clarium should be arbitrated, its claims

19   against the individual defendants should not be.  Amisil emphasizes that "arbitration is a matter of

20   contract and a party cannot be required to submit to arbitration any dispute which he has not agreed

21   so to submit." *AT&T Techs., Inc. v. Communications Workers*, 475 U.S. 643, 648 (1986).  In the

22   instant case, Amisil entered into a Subscription Agreement with Clarium and the Fund, and, as part

23   of the Subscription Agreement, Amisil agreed to be bound by the terms of the Operating Agreement,

24   which included a provision on arbitration.  The signatories to the agreement to arbitrate were Amisil,

25   Clarium, and the Fund.  The individual defendants were not signatories.[3]

26

27   _____

28        [3] Mr. Thiel signed the Subscription Agreement but only on behalf of Clarium.

The courts have made clear, however, that an obligation to arbitrate does not attach *only* to those who have actually signed the agreement to arbitrate. In certain circumstances, a signatory can compel a nonsignatory to arbitrate. For example, a nonsignatory may be bound by an agreement to arbitrate under ordinary contract and agency principles, such as "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Comer v. Micor, Inc.*, 436 F.3d 1099, 1101 (9th Cir. 2006).

Conversely, in certain circumstances, a nonsignatory can compel a signatory to arbitrate. For instance, a nonsignatory can enforce an arbitration agreements as a third-party beneficiary. *See id.* Also, a signatory can be compelled to arbitrate at the nonsignatory's insistence under "an alternative estoppel theory" -- *i.e.*, "because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations." *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 778 (2d Cir. 1995) (internal quotation marks omitted); *see also Comer*, 436 F.3d at 1101 (noting the same).

In the instant case, the Court is confronted with the situation of a nonsignatory seeking to compel a signatory to arbitrate -- *i.e.*, the latter situation. Although Amisil argues that there should be no difference between the two situations, *see* Opp'n at 4 n.2, courts have generally found there is a difference: arbitration is more likely to be attained when the party resisting arbitration is a signatory. *See, e.g.*, *Thomson-CSF*, 64 F.3d at 779 (rejecting argument that "this is a non-distinction" -- "the nature of arbitration makes it important"); *Merrill Lynch Investment Managers v. Optibase, Ltd.*, 337 F.3d 125, 131 (2d Cir. 2003) ("[I]t matters whether the party resisting arbitration is a signatory or not."); *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 799 (8th Cir. 2005) ("The test for determining whether a nonsignatory can force a signatory into arbitration is different from the test for determining whether a signatory can force a nonsignatory into arbitration."). The individual defendants argue that Amisil should be compelled to arbitrate under two theories: (1) agency and (2) estoppel.

7

United States District Court

For the Northern District of California

1.    Agency

The Ninth Circuit has indicated that, in certain circumstances, a nonsignatory can compel a signatory to arbitrate based on agency principles.  The two main cases are *Letizia v. Prudential Bache Secs., Inc.*, 802 F.2d 1185 (9th Cir. 1986), and *Britton v. Co-op Banking Group*, 4 F.3d 742 (9th Cir. 1993).

In *Letizia*, the plaintiff opened a securities account with Prudential Bache Securities.  *See Letizia*, 802 F.2d at 1186.  At that time, he signed the company's standard Customer Agreement, which provided for arbitration of any dispute arising out of or relating to the plaintiff's securities account.  *See id.*  Subsequently, the plaintiff filed suit against the company and two employees who managed his account for fraud and violation of the securities laws.  According to the plaintiff, the employees "churned his account and traded securities on his behalf without regard to his investment objectives."[4]  *Id.*  Both the company and the employees demanded arbitration pursuant to the Customer Agreement.  *See id.*

On appeal, the plaintiff argued, *inter alia*, that, even if the company could compel arbitration, the employees -- who were not signatories to the Customer Agreement -- could not.  *See id.* at 1187.  The Ninth Circuit disagreed.  It noted first that "nonsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles."  *Id.*  It then went on to note that virtually every court who had "addressed the problem of nonsignatories in cases factually similar to this one . . . held the brokerage firm employees bound by the arbitration agreement."  *Id.* at 1188.  The court concluded that this majority view was persuasive: "All of the individual defendants' allegedly wrongful acts *related* to their handling of [the plaintiff's] securities account.  [The company] has clearly indicated its intention to protect its employees through its Customer Agreement."[5]  *Id.* (emphasis added); *see also Pritzker v. Merrill, Lynch, Pierce, Fenner & Smith,*

---

[4] "Churning 'occurs when a securities broker enters into transactions and manages a client's account for the purpose of generating commissions and in disregard of his client's interests.'"  *In re Roche*, 53 S.E.C. 16, 22 (1997).

[5] One of the cases cited by Amisil, *CBS, Inc. v. Snyder*, 798 F. Supp. 1019 (S.D.N.Y. 1992), characterizes *Letizia* as a third-party beneficiary case instead of a case about agency.  *See id.* at 1026 ("[In *Letizia*], the employees, as third-party beneficiaries to the contract, were entitled to invoke the customer agreement to require the arbitration of the customer's claims against them.").  However, most

United States District Court

For the Northern District of California

1  *Inc.*, 7 F.3d 1110, 1122 (3d Cir. 1993) ("The *Letizia* court noted that brokers and employees were

2  integral to, if not directly responsible for, the alleged statutory violations of the principal

3  corporation.").

4      In *Britton*, the plaintiffs signed a contract for allegedly fraudulent securities with a company

5  called GDL.  *See Britton*, 4 F.3d at 743.  The contract contained an arbitration provision which

6  stated that "[a]ny controversy or claim arising out of or relating to this Agreement or the breach

7  thereof, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the

8  American Arbitration Association."  *Id.* at 745.  Subsequently, the plaintiffs filed suit alleging that

9  various defendants had perpetuated a securities fraud scheme by selling a fraudulent tax shelter

10  investment.  *See id.* at 743.  The plaintiffs also sued one of GDL's agents, Jeff Liebling, asserting

11  that he had engaged in fraudulent activity after the initial sales.  *See id.*  Mr. Liebling was not a

12  signatory to the contract but tried to invoke the contract's arbitration clause "for one or more of

13  three reasons: (1) he is a third party beneficiary of the contract; (2) he is a successor in interest to the

14  contract; or (3) he is an agent, officer, and employee of GDL."  *Id.* at 744.

15      Regarding the third category, the court accepted the assertion that Mr. Liebling was an agent

16  of GDL.  The only question for the court was whether "any of Liebling's alleged wrongdoing as

17  agent, officer or employee of GDL during this alleged period of time relate to or arise out of the

18  contract containing the arbitration clause?"  *Id.* at 747.  The court concluded it did not.  "The sum

19  and substance of [the plaintiffs'] allegations are that [Liebling] in some way attempted to defraud the

20  investors by not pursuing their law suits against the persons who originally sold the securities under

21  the contract.  These acts are subsequent, independent acts of fraud, unrelated to any provision or

22  interpretation of the contract [which concerned the sale of the securities]."  *Id.* at 748.

23      Taken together, *Letizia* and *Britton* establish that agents of a signatory can compel the other

24  signatory to arbitrate so long as (1) the wrongful acts of the agents for which they are sued relate to

25  their behavior as agents or in their capacities as agents (*Letizia*) and (2) the claims against the agents

26

27  ───────────────

28  courts have interpreted *Letizia* as a case about agency.  Moreover, the cases cited by *Letizia* indicate
    that its rationale was based on agency.

**United States District Court**

For the Northern District of California

1  arise out of or relate to the contract containing the arbitration clause (*Britton*) (consistent with the

2  language of the arbitration clause).

3       Other circuits are in agreement with the Ninth Circuit.  For example, in *Lee v. Chica*, 983

4  F.2d 883 (8th Cir. 1993), the Eight Circuit concluded that an agent of the signatory was covered by

5  the arbitration agreement even though he did not sign the agreement because

6          [t]he arbitration clause provides that "any controversy arising out of
        [the customer] agreement" will be settled by arbitration.  It is not

7          disputed that Chica was employed by Engler-Budd, that Lee knew of
        the employment relationship between Chica and Engler-Budd, and that

8          Chica was responsible for the transactions in Lee's account.  *All
        of Lee's allegations against Chica arise out of his actions as Engler-*

9          *Budd's employee in connection with the management of her account.*

10  *Id.* at 887 (emphasis added). Similarly, in *Arnold v. Arnold Corp.*, 920 F.2d 1269 (6th Cir. 1990), the

11  Sixth Circuit concluded that the nonsignatory agents could enforce the arbitration agreement

12  because,

13          [j]ust as in *Letizia*, where all of the individual defendants' allegedly
        wrongful acts related to their handling of plaintiff's securities account

14          as agents of the brokerage house, in the present case the nonsignatory
        defendants are alleged to have committed acts related to their running

15          of the corporation. . . . *All of these alleged wrongful acts relate to the*
        *nonsignatory defendants' behavior as officers and directors or in their*

16          *capacities as agents of the Arnold Corporation.*  In *Letizia*, the
        employees were not deprived of arbitration simply because they were

17          alleged to have sought personal enrichment through unauthorized
        "churning" of accounts.

18

19  *Id.* at 1282 (emphasis added).

20       Although the Ninth Circuit has not expressly articulated why nonsignatory agents should be

21  able to enforce an arbitration agreement, other courts have.  There are two reasons why courts have

22  held that nonsignatory agents are covered by the arbitration agreement: (1) because "[a]n entity . . .

23  can only act through its employees, and an arbitration agreement would be of little value if it did not

24  extend to [them]," *Pritzker*, 7 F.3d at 1122 (internal quotation marks omitted); and (2) because, if a

25  party could "avoid the practical consequences of an agreement to arbitrate by naming nonsignatory

26  parties as [defendants] in his complaint, . . . the effect of the rule requiring arbitration would, in

27  effect, be nullified."  *Arnold*, 920 F.2d at 1281 (internal quotation marks omitted); *see also CD*

28  *Partners*, 424 F.3d at 798 ("A nonsignatory can enforce an arbitration clause against a signatory to

United States District Court

For the Northern District of California

the agreement . . . when 'the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided.'"); *Roby v. Corporation of Lloyd's*, 996 F.2d 1353, 1360 (2d Cir. 1993) ("[W]e believe that the parties fully intended to protect the individual Chairs to the extent they are charged with misconduct within the scope of the agreements.  If it were otherwise, it would be too easy to circumvent the agreements by naming individuals as defendants instead of the entity Agents themselves.").

While, as noted above, most courts seem to agree that nonsignatory agents can enforce an agreement to arbitrate so long as the wrongful acts of the agents for which they are sued relate to their behavior as agents or in their capacities as agents, the First Circuit seems to be in disagreement. In *McCarthy v. Azure*, 22 F.3d 351 (1st Cir. 1994), the First Circuit indicated that a nonsignatory agent could not compel arbitration so long as the agent was sued in his or her personal capacity as opposed to corporate capacity.  According to the court, how an agent was sued -- *i.e.*, personal versus corporate -- was "no mere semantic quibble."  *Id.* at 359.

> In the corporate context, personal capacity actions can take several forms, including by way of illustration claims alleging ultra vires conduct; tort suits in which a corporate officer or agent, though operating within the scope of corporate authorization, "through his or her own fault injures another to whom he or she owes a personal duty"; and . . . suits alleging that a person affiliated with a corporation created or manipulated it as part of a larger (fraudulent) scheme.

*Id.*

Notably, the First Circuit rejected the argument that, if a court were to honor the distinction between a personal capacity suit and a corporate capacity suit, "wily plaintiffs [could] circumvent arbitration" through "artful pleading."  *Id.* at 360.  According to the court, to address this problem, a company could simply write a contract that specified that employees were covered by the arbitration clause.  The court also suggested that artful pleading could not overcome facts: "whether a claim properly lies against a party in his personal capacity or in his official capacity is ultimately a function of the facts, not of pleading techniques alone."  *Id.*  Finally, the court stated that not honoring the distinction between a personal capacity suit and a corporate capacity suit "would introduce a troubling asymmetry into the law."  *Id.* at 361.  The law clearly provided that an agent

1    could not be forced to arbitrate claims against him personally just because he signed an arbitration

2    agreement as agent for a principal.  *See* at 361.  Thus, if the court did not honor the

3    individual/representative capacity distinction, then the agent "could not be compelled to arbitrate,

4    [but] nonetheless could compel the claimant to submit to arbitration."  *Id.*

5        *McCarthy*, however, cannot be reconciliated with the result in *Letizia*.  Moreover,

6    *McCarthy's* avowed rejection of "asymmetry" is inconsistent with the distinction drawn by other

7    courts (discussed *supra*) between motions to arbitration brought against signatories versus those

8    brought against nonsignatories.  Nor does *McCarthy* deal adequately with the policy considerations

9    addressed by *Pritzker* and the other cases cited above.

10       In any event, *McCarthy* is distinguishable.  First, the arbitration clause in *McCarthy* only

11   provided that disputes "arising under" the agreement (as opposed to, *e.g.*, "arising out of or relating

12   to") would be subject to arbitration.  *See id.* at 358.  The First Circuit concluded that, because of this

13   specific language, the scope of the arbitration clause should be read more narrowly.  *See id.*  "[I]t is

14   difficult to see how a lawsuit between the seller and a nonsignatory who is not a successor in interest

15   to the buyer's rights can be said to 'arise under' the Purchase Agreement."  *Id.* at 359.  In contrast,

16   the scope of the arbitration clause in *Letizia*, as in the instant case, was broader; it reached "any

17   controversy" which arises under or "relates to" the Agreement.  By its plain terms, a suit against

18   individual defendants for activities which were undertaken in their capacities as employees or

19   officers or which related to their roles in the defendant entity is "related to" the Agreement.

20       Second, the First Circuit found that, as a matter of contract interpretation, the parties could

21   not have intended the arbitration provision to cover employees.  The court noted that, in those cases

22   in which a court did find that the arbitration provision covered nonsignatory employees (including

23   *Letizia*), the contract containing the arbitration clause was a *service* contract between an individual

24   and a financial institution.  *See id.* at 357.

25           The claims diverted to arbitration in those cases . . . were, without
            exception, in the nature of professional malpractice.  Thus, each
26          related directly to the essence of the service contract that the
            consumer-plaintiff had signed.  The Purchase Agreement [in
27          *McCarthy*] is at a considerable remove; it is primarily concerned with
            a transfer of assets.  The distinction is an important one.  *A person who*
28          *enters into a service contract with a firm contemplates an ongoing*

1 | *relationship in which the firm's promises only can be fulfilled by future (unspecified) acts of its employees or agents stretching well into an uncertain future. A person who contracts to transfer assets to a company faces a much different prospect: a one-short transaction in which the purchaser's obligations are specified and are, essentially, performed in full at the closing, or soon thereafter.* So it is here. And because the Purchase Agreement cannot easily be construed to refer to the operations of, or services rendered by, Theta II, that company's employees cannot plausibly be included by implication within the ambit of either the agreement or its arbitration clause.

7 *Id.* at 357-58 (emphasis added). In the instant case, the Agreement contemplates a sustained legal

8 and business relationship between Amisil and the individual defendants.

9 Because *McCarthy* is distinguishable and more fundamentally, is in conflict with Ninth

10 Circuit law, the Court must adhere to the general principles established in *Letizia* and *Britton* -- *i.e.*,

11 that agents of a signatory can compel the other signatory to arbitrate so long as (1) the wrongful acts

12 of the agents for which they are sued relate to their behavior as agents or in their capacities as agents

13 (*Letizia*) and (2) the claims against the agents arise out of or relate to the contract containing the

14 arbitration clause (*Britton*). Those criteria are met here.

15 Amisil's complaint demonstrates that the individual defendants are being sued precisely

16 because of their duties to Amisil as officers and managers of Clarium. *See, e.g.*, Compl. ¶ 71 (in

17 fraud claim, asserting that "Defendants Thiel, Portnoy and Woolway, as officers of Clarium, owed a

18 duty to provide its minority member a full and fair disclosure of all facts affecting Amisil's rights");

19 *id.* ¶ 84 (in breach of fiduciary duty claim, asserting that "Defendants Thiel, Portnoy and Woolway,

20 in their capacity as officers and directors of and/or majority members of Clarium, were and are

21 fiduciaries to all members in Clarium [including Amisil]").

22 Furthermore, the claims asserted against the individual defendants all arise out of or relate to

23 the Agreement. They are:

24 (1)    Violation of § 10(b) of the Securities Exchange Act of 1984 and Rule 10b-5 (all Defendants);

25 (2)    Violation of the Investment Advisers Act of 1940 (all Defendants);

26 (3)    Fraud (all Defendants);

27 (4)    Conversion (all Defendants);

28 (5)    Breach of fiduciary duty (Mr. Thiel, Mr. Portnoy, and Mr. Woolway);

**United States District Court**
For the Northern District of California

(6)    Conspiracy to defraud and to breach fiduciary duties (Mr. Thiel, Mr. Portnoy, and Mr. Woolway);

(7)    Unfair business practices (all Defendants).

All of the claims above, except for the claims for breach of fiduciary duty and conspiracy to defraud and to breach fiduciary duties, are asserted against not only the individual defendants but also Clarium.  The fact that Amisil never argued that any of the claims asserted against Clarium does not "arise out of" or is not "related to" the Operating Agreement suggests that all of the claims asserted jointly against Clarium and the individual defendants do in fact arise out of or are related to the Agreement.

In any event, all of these claims, including the claims asserted against the individual defendants only, are in fact related to specific terms of the Operating Agreement.  The Agreement covers, *inter alia*, how the company is capitalized and managed, when and how distributions are to be made to members, what rights a member has to Clarium's books and records, and under what circumstances a member may be removed from the company.  *See, e.g.*, Operating Agreement ¶ 3.1 ("Each Member, upon and as a condition to admission as a Member of the Company, shall make the Capital Contribution set forth in such Member's Subscription Agreement . . . ."); *id.* ¶ 5.1 ("[A]ll distributions shall be made in proportion to the Members' closing Capital Account balances determined as of the close of the allocation period for which such distribution occurs."); *id.* ¶ 6.1 ("[T]he Non-Managing Members shall take no part in the management or control of the Company or its business . . . ."); *id.* ¶ 6.2(a) ("[T]he Managing Member shall have the exclusive power and authority to perform acts associated with the management and control of the Company and its business . . . ."); *id.* ¶ 6.9(a) ("The Company shall maintain true and proper books, records, reports, and accounts in which shall be entered all transactions of the Company.  Such books, records, reports and accounts . . . shall be available to any Member for inspection and copying during reasonable business hours."); *id.* ¶ 7.3 ("A Member may not be removed as a Member without its consent.").

In particular:

14

(1)    For the first claim, Amisil's complaint alleges, *inter alia*, that "Amisil's minority interest in Clarium was acquired pursuant to an investment contract."  Compl. ¶ 52.

(2)    For the second claim, Amisil's complaint alleges, *inter alia*, that "Defendants knowingly concealed material information from Amisil in many ways, including but not limited to failing to provide information about Clarium's business plans, failing to provide any meaningful financial information regarding Clarium in the course of Amisil's eight-year investment and re-investing Amisil's interest in distributions back into the Fund and elsewhere without Amisil's knowledge or consent."  *Id.* ¶ 62.

(3)    For the third claim, Amisil's complaint alleges, *inter alia*, that, "[f]rom 2000 to the present, Defendants have failed to furnish the required yearly financial statements to Amisil such that Amisil was deprived of information which would have allowed it to determine the value of any profits made by Clarium or evaluate its entitlement to any distributions owed by Clarium, to determine whether to continue to invest in Clarium; and to determine whether to exercise any of its rights as a member of Clarium."  *Id.* ¶ 69(a).

(4)    For the fourth claim, Amisil's complaint alleges, *inter alia*, that "Amisil owned the money and/or shares of stock that should have been distributed to it as income pursuant to its membership interest in Clarium for the past eight years."  *Id.* ¶ 79.

(5)    For the fifth claim, Amisil's complaint alleges, *inter alia*, that "Defendants Thiel, Portnoy and Woolway, in their capacity as officers and directors of and/or majority members in Clarium, were and are fiduciaries to all members in Clarium.  As fiduciaries, they owe Amisil a duty of loyalty, honesty and candor regarding the conduct of the affairs of Clarium and their handling of Amisil's interest in Clarium's securities."  *Id.* ¶ 84.

(6)    For the sixth claim, Amisil's complaint alleges, *inter alia*, that "Defendants [Thiel, Portnoy and Woolway] took steps in furtherance of the conspiracy [to injure Amisil] by not allowing Amisil to be informed about the conduct of Clarium's business, failing to make any income distributions to Amisil despite its eight-year investment in Clarium, and ultimately attempting to expel Amisil from Clarium and force a sale of Amisil's interest in Clarium for a fraction of its true value."  *Id.* ¶ 88.

United States District Court

For the Northern District of California

1   (7)    For the seventh claim, Amisil's complaint alleges, *inter alia*, that "Defendants, in breach of

2   their respective duties to Amisil, have engaged in a pattern and practice of disguising the true

3   value of Amisil's membership interest while purporting to offer Amisil the real value of its

4   interest.  In addition, Defendants have refused to allow Amisil access to financial statements

5   and other related documentation from Clarium except on limited terms contrary to the

6   applicable agreements between the parties.  Finally, Defendants unilaterally and unlawfully

7   issued a notice purporting to expel Amisil as a member of Clarium and pay it a mere fraction

8   of the value of its interest."  *Id.* ¶ 104.

9   The Operating Agreement is, in essence, about the running of Clarium as a company and

10   addresses, among other things, the relationship between members.  For instance, Paragraph 7.3 of

11   the Operating Agreement provides: "A Member may not be removed as a Member without its

12   consent."  Operating Agreement ¶ 7.3.  Accordingly, conduct such as an attempted buy-out of one

13   member by another is related to the Operating Agreement.[6]

14   Notwithstanding the fact that all of the claims within the scope of the broadly worded

15   arbitration clause, Amisil argues that the Operating Agreement's indemnification clause does not

16   protect the individual defendants under the claims alleged and thus Clarium cannot establish an

17   intention to protect its employees and have claims against them arbitrated.  *See* Opp'n at 4.  Amisil

18   cites *Snyder* in support, in which the court stated that "[t]here is no reason to believe that in agreeing

19   to indemnify certain of its employees, CBS was also manifesting an intent to benefit and protect

20   those employees through the arbitration provision."  *Snyder*, 798 F. Supp. at 1027.  However, the

21   scope of an indemnification clause is irrelevant to the question of arbitrability.  Coverage under the

22

23

24

---

25   [6] In their reply brief, Defendants reference an amendment to the Operating Agreement which

26   allows the Managing Member to remove a member without the member's consent.  *See* Reply at 6 (arguing that "the Operating Agreement must be interpreted to evaluate the buy out" because "the buy

27   out was effected pursuant to the terms of the [amended] Operating Agreement").  Amisil objects to this evidence and argues that the amendment is invalid because it did not consent to the amendment.  *See*

28   Pl.'s Sur-Reply at 3.  However, Amisil's objection is moot.  The Court concludes that the claims against the individual defendants are arbitrable without looking at the amendment.

16

United States District Court

For the Northern District of California

1    arbitration provision is a matter of interpretation of the arbitration provision and not the

2    indemnification provision.[7]

3        *Letizia* is not to the contrary.  In *Letizia*, the Ninth Circuit concluded that the company "has

4    clearly indicated its intention to protect its employees through its Customer Agreement."  *Letizia*,

5    802 F.2d at 1188.  Although the court did not expressly state what in the Customer Agreement

6    demonstrated this clear intent, arriving at this conclusion, it is evident that court was referring to the

7    broad scope of the arbitration clause, the only contractual provision cited and relied upon in the

8    court's analysis.  Moreover, the court cited several cases, including *Brown v. Dean Witter Reynolds,

9    Inc.*, 601 F. Supp. 641 (S.D. Fla. 1985) which support the conclusion that the employer's intent to

10   protect its employees is evidenced by the arbitration clause.  In *Brown*, the court explained that the

11   failure of the employee to sign the agreement to arbitrate was not important because "the clauses are

12   broad enough to include disputes arising out of business between plaintiff and other Dean Witter

13   employees who are not signatories to the contract."  *Id.* at 644.  The clauses at issue employed the

14   language "arising out of or relating to."  *See id.* at 643 n.2.

15       Second, Amisil asserts that the individual defendants as nonsignatories to the Operating

16   Agreement have no right to compel arbitration because Amisil's claims against them arise from the

17   individual defendants' independent, noncontractual acts of fraud.  *See* Opp'n at 6.  Amisil explains:

18   "Thiel's attempts to buy out Amisil's interest in 2002 and May-June 2006 for a fraction of its true

19   value constitute independent acts of fraud because the Operating Agreement neither obligates nor

20   encourages the Managing Member, officer or majority shareholder to buy out minority interests."

21   Opp'n at 6.

22       Although Amisil is correct that the Operating Agreement does not expressly obligate the

23   Managing Member, officer, or majority shareholder to buy out any minority interest, that fact does

24   not preclude arbitration because the arbitration clause at issue is not limited, *e.g.*, to a breach of the

25   Operating Agreement.  Rather, as noted above, the arbitration clause is broader and requires

26   ────────────────────

27       [7] Accordingly, Amisil's argument that the indemnification provision does not cover material
     misconduct (*i.e.*, gross negligence, willful breach of the Operating Agreement, fraud, breach of a
28   fiduciary duty arising out of the Operating Agreement, or commission of a felony), *see* Opp'n at 4-5,
     is moot.

1   arbitration with respect to "any controversy or claim arising out of *or relating to* [the Operating]

2   Agreement."  Operating Agreement ¶ 10.17(a) (emphasis added).  As found above, all of the claims

3   against the individuals fall within the broad scope of the arbitration clause herein.

4        The situation in the case at bar is different from that in *Britton* where the alleged fraud was

5   truly independent of the contract containing the arbitration clause because the fraud had nothing to

6   do with the contract.  *See Britton*, 4 F.3d at 748 ("The sum and substance of [the plaintiffs']

7   allegations are that [Liebling] in some way attempted to defraud the investors by not pursuing their

8   law suits against the persons who originally sold the securities under the contract.  These acts are

9   subsequent, independent acts of fraud, unrelated to any provision or interpretation of the contract

10  [which concerned the sale of the securities]."); *see also Hawkins v. KPMG LLP*, 423 F. Supp. 2d

11  1038, 1049 (N.D. Cal. 2006) ("Although the Warrant [to purchase a majority stake in a company]

12  governs a single intermediate step of the allegedly fraudulent tax shelter transaction, plaintiff's

13  claims of fraud are based solely on the communications between plaintiff and defendants, contained

14  in the KPMG engagement and opinion letters.  Plaintiff does not allege any breach of the terms of

15  the Warrant.  In sum, plaintiff's fraud claims are wholly independent of any wrongdoing associated

16  with the Warrant.").

17       Finally, Amisil contends that the individual defendants should not be allowed to have the

18  claims against them arbitrated because Amisil alleged that they engaged in ultra vires wrongful

19  conduct -- *i.e.*, "in perpetrating the fraudulent and wrongful course of conduct against Amisil, Thiel,

20  Portnoy and Woolway violated their respective duties not to injure Amisil, *separate and apart from*

21  *their concurrent duties as officers and managers of Clarium*."  Opp'n at 6 (emphasis added).  There

22  are several problems with this argument.

23       First, as noted above, the complaint states that the individual defendants are being sued

24  because of their duties to Amisil as officers and managers of Clarium.

25       Second, Amisil's argument is predicated on *McCarthy*, which again is inconsistent with

26  *Letizia* and not controlling here.  Morever, Amisil's argument does not address the fact that the

27  individual defendants were in the position to commit the alleged fraud *because* of their positions in

28  Clarium and the wrongful acts were *related* to their behavior as agents.

18

**United States District Court**
For the Northern District of California

Third, to the extent that *McCarthy* suggests that arbitration should not apply to nonsignatory agents who act outside the scope of their authority (*i.e.*, ultra vires), case law is to the contrary.  In *Pritzker*, for instance, the Third Circuit rejected the plaintiffs' argument that they could not be compelled to arbitrate because the defendants acted outside the scope of their authority under the agreement.  The court stated that this "flatly contradicts the inclusive language contained in the [arbitration] clauses in question," which "does not distinguish between disputes based on conduct within or outside the scope of authority granted" -- "indeed, one is left to ponder what purpose an arbitration clause would serve if it did not encompass claims that the terms of the parties' agreement had been breached."  *Pritzker*, 7 F.3d at 1115.  More importantly, in *Letizia*, the employees were charged with unauthorized churning of accounts -- in essence, ultra vires conduct -- but this fact did not prevent the Ninth Circuit from finding the claims against the employees arbitrable.  As the Sixth Circuit pointed out in *Arnold*, "[i]n *Letizia*, the employees were not deprived of arbitration simply because they were alleged to have sought personal enrichment through unauthorized 'churning' of accounts."  *Arnold*, 920 F.2d at 1282.

At the hearing on Defendants' motion to compel, Amisil argued for the first time that its claims against the individual defendants do not arise out of and are not related to the Operating Agreement because Amisil is suing the individual defendants for their conduct which prevented Clarium from carrying out its obligations that it owed to Amisil.  Amisil characterized its claims against the individual defendants as claims for tortious interference with contract.

Even if this argument were not deemed waived, there are two problems with this argument.  First, had Amisil pled a claim for tortious interference, a party cannot "avoid an otherwise valid arbitration provision merely by casting its complaint in tort.  The touchstone of arbitrability in such situations is the relationship of the tort alleged to the subject matter of the arbitration clause." *CD Partners*, 424 F.3d at 801 (internal quotation marks omitted).  Second, a broad arbitration clause "does not limit arbitration to the literal interpretation or performance of the contract" but rather "embraces every dispute between parties having a significant relationship to the contract regardless of the label attached to the dispute." *JJ Ryan & Sons v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988) (stating that a broad arbitration clause "does not limit arbitration to the literal

**United States District Court**
For the Northern District of California

1  interpretation or performance of the contract" but rather "embraces every dispute between parties

2  having a significant relationship to the contract regardless of the label attached to the dispute"); *see*

3  *also Kifer Specialty Flooring, Inc. v. Tercet, Inc.*, 174 F.3d 907, 910 (7th Cir. 1999) (noting the

4  same); *P & P Indus., Inc. v. Setter Corp.*, 179 F.3d 861, 871 (10th Cir. 1999) (noting the same).  In

5  the instant case, Imbecile's dispute with the individual defendants does have a significant

6  relationship to the contract, *i.e.*, the Operating Agreement.  Imbecile's dispute with the individual

7  defendants concerns the manner in which they managed Clarium, matters governed by the Operating

8  Agreement.

9       Thus, under agency principles, the claims against the individual defendants should be

10  arbitrated.

11      2.    Estoppel

12      The individual defendants are also entitled to arbitration on an estoppel theory.  Courts --

13  including those in this district -- have identified two kinds of equitable estoppel to support a

14  nonsignatory's right to compel arbitration.  First,

15           equitable estoppel applies when the signatory to a written agreement
             containing an arbitration clause must rely on the terms of the written
16           agreement in asserting its claims against the nonsignatory.  When each
             of a signatory's claims against a nonsignatory makes reference to or
17           presumes the existence of the written agreement, the signatory's
             claims arise out of and relate directly to the written agreement, and
18           arbitration is appropriate.

19  *Hawkins*, 423 F. Supp. 2d at 1050 (internal quotation marks omitted).  *See, e.g.*, *Swankiest Soft*

20  *Drinks, Inc. v. Swankiest Growers, Inc.*, 10 F.3d 753, 758 (11th Cir. 1993) ("Although Swankiest

21  does not rely exclusively on the license agreement to support its claims, each claim presumes the

22  existence of such an agreement.  We find that each counterclaim maintained by Swankiest arises out

23  of and relates directly to the license agreement.").  The policy behind this kind of equitable estoppel

24  is that "[a] signatory to an agreement cannot . . . have it both ways: it cannot on the one hand, seek

25  to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an

26  arbitration provision, but on the other hand, deny the arbitration provision's applicability because

27  the defendant is a non-signatory."  *Hawkins*, 423 F. Supp. 2d at 1050 (internal quotation marks

28  omitted); *see also Larson v. Sweetens*, No. C 05-3176 SBA, 2006 U.S. Dist. LEXIS 66459, at *14

United States District Court

For the Northern District of California

1    (N.D. Cal. Sept. 5, 2006) (in discussing equitable estoppel, noting that "[a] party should not be

2    allowed to claim the benefit of the contract and simultaneously avoid its burdens").

3        Second,

> where the conduct of a nonsignatory is substantially interdependent with the conduct of a signatory, unless the non-signatory is compelled to arbitrate, arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted. In other words, where a lawsuit against non-signatories is inherently bound up with claims against a signatory, the court should compel arbitration in order to avoid denying the signatory the benefit of the arbitration clause, and in order to avoid duplicative litigation which undermines the efficiency of arbitration.

9    *Id.* (internal quotation marks omitted); *see also Westmoreland v. Sadoux*, 299 F.3d 462, 467 (5th Cir.

10    2002) (providing that a nonsignatory can compel arbitration when the signatory raises allegations of

11    substantially interdependent and concerted misconduct by the nonsignatory and the other signatory);

12    *Thomson-CSF*, 64 F.3d at 778 (noting that a signatory can be bound to arbitrate with a nonsignatory

13    "because of the close relationship between the entities involved, as well as the relationship of the

14    alleged wrongs to the nonsignatory's obligations and duties in the contract . . . and [the fact that] the

15    claims were intimately founded in and intertwined with the underlying contract obligations");

16    *Comer*, 436 F.3d at 1101 (noting the same).[8]  *See, e.g.*, *CD Partners*, 424 F.3d at 799-800 (noting

17    that a nonsignatory can force a signatory into arbitration "when the relationship of the persons,

18    wrongs and issues involved is a close one" and, here "the core of the dispute is the conduct of the

19    three nonsignatories in fulfilling signatory CDWI's promises").

20        In the instant case, the individual defendants focus on the first kind of equitable estoppel.

21    That is, according to the individual defendants, "Amisil's claims against [them] all 'make reference

22    to or presume the existence of' the Operating Agreement" so that it is only fair that they submit to

23    the arbitration clause of the Operating Agreement.  Reply at 4; *see also Hawkins*, 423 F. Supp. 2d at

24    1050 (internal quotation marks omitted) ("When each of a signatory's claims against a nonsignatory

25

26

27        [8] In *Comer*, the Ninth Circuit acknowledged this theory of estoppel although it did not apply the

28    theory because, there, a signatory was invoking estoppel against a nonsignatory -- *i.e.*, the converse of the situation here.

21

1  makes reference to or presumes the existence of the written agreement, the signatory's claims arise

2  out of and relate directly to the written agreement, and arbitration is appropriate.").

3      As the Court has discussed above, each of the claims are related to the Agreement in a way

4  that either refers to or presumes the existence of the Agreement.  Absent the Operating Agreement,

5  none of these claims would lie.  Amisil cannot use the Agreement as a sword and at the same time

6  choose to ignore it as a shield.  Arbitration of the claims is warranted on estoppel principles.

7      The Court acknowledges that estoppel is equitable in nature and therefore it "has

8  considerable discretion to select a remedy that is appropriate under the circumstances." *Fujian*

9  *Pacific Elec. Co. Ltd. v. Bechtel Power Corp.*, No. C 04-3126 MHP, 2004 U.S. Dist. LEXIS 23472,

10  at *23 (N.D. Cal. Nov. 19, 2004).  In *Fujian*, the court stayed the individual claims and did not

11  require the individual defendants to arbitrate.  The proper remedy here, however, is to compel

12  arbitration.  This case is not like *Fujian* in which there was "little doubt" that the nonsignatory

13  defendant and signatory plaintiff did not contemplate that disputes between the two would be

14  arbitrated.  *Id.*  In any event, as noted above, the Court finds arbitration appropriate under the agency

15  theory as well.

16      3.    Stay

17      Finally, both Clarium and the individual defendants ask for a stay of this suit during the

18  pendency of arbitration.  Title 9 U.S.C. § 3 provides:

19          If any suit or proceeding be brought in any of the courts of the United
            States upon any issue referable to arbitration under an agreement in
20          writing for such arbitration, the court in which such suit is pending,
            upon being satisfied that the issue involved in such suit or proceeding
21          is referable to arbitration under such an agreement, *shall* on
            application of one of the parties stay the trial of the action until such
22          arbitration has been had in accordance with the terms of the
            agreement, providing the applicant for the stay is not in default in
23          proceeding with such arbitration.

24  9 U.S.C. § 3 (emphasis added).  According to Defendants, a stay is required because both the claims

25  against Clarium and the claims against the individual defendants are arbitrable.  However,

26  Defendants argue that, even if the claims against the individual defendants are not arbitrable, the

27  Court should at the very least stay the case against them pending completion of the Imbecile-

28  Clarium arbitration.  *See* Reply at 7 n.2.

22

United States District Court

For the Northern District of California

1    For the reasons stated above, the entire litigation in this Court should be stayed because both

2  the claims against Clarium and the claims against the individual defendants are arbitrable.  However,

3  if the District Judge herein concludes that only the claims against Clarium are arbitrable, the Court

4  recommends that the litigation against the individual defendants be stayed pending the Clarium

5  arbitration.  *See Moses H. Cone Hosp. v. Mercury Contr. Corp.*, 460 U.S. 1, 20 n.23 (1983) ("[I]t

6  may be advisable to stay litigation among the nonarbitrating parties pending the outcome of the

7  arbitration.  That decision is one left to the district court (or to the state trial court under applicable

8  state procedural rules) as a matter of its discretion to control its docket."); *see also Fujian*, 2004 U.S.

9  Dist. LEXIS 23472, at *6 ("[A] district court retains the inherent power to stay litigation 'to control

10 the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and

11 for the litigants.'  In exercising this power, the court must balance the hardship and equity of

12 allowing the action to proceed with 'the ossification of rights which attends inordinate delay.'").

13   In *Fujian*, Judge Patel chose to stay the action against the nonsignatory defendant while the

14 arbitration with the signatory defendant proceeded because failure to stay would result in prejudice

15 to the signatory defendant.  As the Fifth Circuit noted, "if a suit against a nonsignatory is based upon

16 the same operative facts and is inherently inseparable from the claims against a signatory, the trial

17 court has discretion to grant a stay if the suit would undermine the arbitration proceedings and

18 thwart the federal policy in favor of arbitration."  *Hill v. GE Power Systems, Inc.*, 282 F.3d 343, 347

19 (5th Cir. 2002).  In the instant case, the claims against Clarium and those against the individual

20 defendants are based upon the same facts -- indeed, all but two of the claims against Clarium and the

21 individual defendants are identical.  Given these circumstances, a stay would be appropriate.  Not

22 only would a failure to stay prejudice Clarium's right to arbitration but also "[c]onsiderations of

23 economy and efficiency" counsel in favor of a stay.  *Newton v. Neumann Caribbean Internat'l, Ltd.*,

24 750 F.2d 1422, 1427 (9th Cir. 1985).

25 ///

26 ///

27 ///

28 ///

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court recommends that Defendants' motion to compel arbitration for all defendants and stay the litigation pending arbitration be granted.

Any party may file objections to this report and recommendation with the district judge within ten days after being served with a copy. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Civil L.R. 72-3.


IT IS SO ORDERED.


Dated:  December 21, 2006

_____
EDWARD M. CHEN
United States Magistrate Judge

**United States District Court**
For the Northern District of California